FILED
2013 Aug-30  PM 02:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Civil Action No. |
| | : | |
| ex rel **UNDER SEAL**, | : | |
| | : | CV-13-J-1626-NE |
| | : | |
| BRINGING THIS ACTION ON | : | |
| BEHALF OF THE | : | |
| UNITED STATES | : | **Complaint** Filed |
| OF AMERICA | : | **IN CAMERA** |
| | : | <u>**SEALED**</u>, Pursuant to 31 U.S.C. |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| **vs.** | : | **DO NOT PLACE IN PRESS BOX** |
| | : | |
| **UNDER SEAL**, | : | **NO NOT ENTER ON PACER** |
| | : | |
| Defendants. | : | |

<u>**COMPLAINT**</u>

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION
*ASTERN*

| | | |
|---|---|---|
| UNITED STATES ex rel | : | Civil Action No. |
| | : | |
| LEAMON M. FITE, III, | : | |
| | : | |
| | : | Date Received: _____ |
| BRINGING THIS ACTION ON BEHALF | : | |
| OF THE UNITED STATES | : | Complaint **Filed** |
| OF AMERICA | : | **IN CAMERA** |
| | : | **SEALED**, Pursuant to 31 U.S.C. |
| C/O JOYCE WHITE VANCE | : | § 3730(b) |
| U.S. Attorney | : | |
| Northern District of Alabama | : | |
| 1801 Fourth Avenue North | : | |
| Birmingham, AL 35203 | : | |
| | : | |
| and | : | _____ |
| | : | United States District Court |
| C/O Eric Holder | : | Judge |
| Attorney General of the United States | : | |
| Department of Justice | : | |
| 10th & Constitution Aves. N.E. | : | |
| Washington, D.C. 20530 | : | |
| | : | |
| Plaintiffs and Relators, | : | **COMPLAINT** |
| | : | **AND JURY DEMAND** |
| vs. | : | |
| | : | |
| APERIAN LABORATORY SOLUTIONS, | : | |
| LLC; EAST ALABAMA HEALTH | : | |
| CARE AUTHORITY d/b/a EAST | : | |
| ALABAMA MEDICAL CENTER; | : | |
| SUMMIT DIAGNOSTICS, LLC; | : | |
| COMPASS LABORATORY SERVICES, | : | |
| LLC; TOTAL DIAGNOSTIC | : | |
| SOLUTIONS, LLC;  JANNIE LYNN | : | |
| WORK CHAPMAN; AND | : | |
| SHELINDER AGGARWAL, | : | |
| | : | |
| Defendants. | : | |

**COMPLAINT**

This is an action by *qui tam* Relator Leamon M. Fite, III in the name of the United States Government to recover damages and civil penalties arising from the false claims for payment submitted, and caused to be submitted, to the United States by the Defendants for laboratory services.

## I. PARTIES

### A. Relator

1.      Relator Leamon M. Fite, III is a citizen of Alabama and the United States of America. Relator brings this civil action for violations of 31 U.S.C. § 3729 *et seq*. for himself and for the United States Government under the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3730(b)(1). Relator is a former employee of East Alabama Medical Center in the State of Alabama who was also involved in the operations of wholly-owned subsidiary Aperian Laboratory Solutions, LLC. Relator has direct and independent knowledge of the false claims submitted by Defendants to the Federal Government and is an original source of the information contained in these allegations.

### B. Defendants

2.      Defendant Aperian Laboratory Solutions, LLC ("Aperian") is a corporation with its principal office in Opelika, Alabama at 121 N. 20th Street, Suite 17 Opelika, AL 36801. It is a wholly-owned subsidiary of The East Alabama Health Care Authority d/b/a East Alabama Medical Center. Aperian provides both forensic lab services (through drug screens for industrial employees) and clinical laboratory services (through testing for pain management and family practice clinics to determine the presence of pain management drugs in their patients'

2

bodies). Aperian has its own provider numbers and submitted, and continues to submit, claims for laboratory services to Federal payors, Medicare, Medicaid, Tri-Care and CHAMPUS.

3.     Defendant East Alabama Health Care Authority, d/b/a East Alabama Medical Center is located at 2000 Pepperell Parkway, Opelika, AL, 36801.  Defendant EACHA is owned by Lee County and holds itself out as a not for profit institution.  It is the parent company of wholly-owned subsidiary Aperian. The officers for Aperian and EAHCA are the same people.

4.     Defendant Summit Diagnostics, LLC ("Summit Diagnostics") is a Delaware corporation with its principal place of business in New Hampshire. The address for Summit Diagnostics is P.O. Box 743, Londonberry, NH 03053. Its physical address 88 Stiles Road, Suite 103, Salem, NH 03079. Summit Diagnostics provided marketing for Aperian's laboratory services and referred business to Aperian in exchange for a percentage of the billing of all samples. The percentage increased with the number of samples referred by Summit Diagnostics.

5.     Defendant Compass Laboratory Services, LLC ("Compass") is a Tennessee corporation with a primary place of business at 1910 Nonconnah Boulevard, Memphis, TN 38132. Compass is a full service toxicology lab. Compass also provided marketing for Aperian and referred patient samples to Aperian in exchange for remuneration. That remuneration was first a percentage of the referral billing value, then a flat fee of $35,000 a month with increases if volume increased, and then it returned to a percentage of the referral billing

value. Jannie Chapman is the V.P. of Compass and the President of Total Diagnostic Solutions, LLC.

6.    Defendant Total Diagnostic Solutions, LLC ("TDS") is a Tennessee corporation located at 7506 Enterprise Way, Germantown, TN 38138. Its mailing address is P.O. Box 11895, Memphis, Tennessee 38111. TDS is solely a marketing company. TDS also provided marketing for Aperian and referred patient samples to Aperian in exchange for remuneration. That remuneration was first a percentage of the referral billing value, then a flat fee of $35,000 a month with increases for increased volume, and then it returned to a percentage of the referral billing value.

7.    Defendant Jannie Lynn Work Chapman is the President of Defendant TDS and President/V.P. of Defendant Compass. She is the primary salesperson and driving force for both Compass and TDS. Her home address is 333 Ripple Lane, Owens Crossroads, AL 35763. She negotiated the marketing agreements with Defendant Aperian.

8.    Defendant Shelinder "Shaun" Aggarwal, M.D. is a resident of Madison County, Alabama. He is an investor in Compass Laboratory Solutions. He was also one of the largest volume physicians that referred samples to Aperian. Of course, Compass (the company he invested in) benefitted financially by way of commissions from his referrals to Aperian. Dr. Aggarwal surrendered his medical license on July 16, 2013 for over-prescribing narcotics.

**II. JURISDICTION AND VENUE**

9.      This action arises under 31 U.S.C. § 3729 *et seq.*, commonly known as the False Claims Act.

10.      Jurisdiction over this action is conferred on this Court by 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331, because this civil action arises under the laws of the United States and at least one of the Defendants resides and can be found in Alabama and transacts business in Alabama.

11.      Venue is proper in the Northern District of Alabama under 28 U.S.C. § 1391(b) and (c) and 31 U.S.C. § 3732(a) because at least one Defendant that operated in concert with other Defendants resides, can be found in, and operates and transacts business in the Northern District of Alabama.

12.      Relator has complied with the requirements of 31 U.S.C. § 3730(b)(2).

## III. THE LAW

### A. The False Claims Act

13.      The False Claims Act ("FCA") provides, in pertinent part that:

(a) Liability for certain acts.

(1) In general. Subject to paragraph (2), any person who--

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

(D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;

(E) is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(F) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $ 5,000 and not more than $ 10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (*28 U.S.C. 2461* note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729.

## B.    The Anti-Kickback Statute

14.    The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), arose out of Congressional concern that payoffs to those who can influence healthcare decisions would result in goods and services being provided that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population. To protect the integrity of the program from these difficult to detect harms, Congress enacted a per se prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback gave rise to overutilization or poor quality of care. First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. *See* Social Security Amendments of 1972, Pub. L. No.

92-603, §§ 242(b), (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

15.    The Anti-Kickback Statute prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for federally-funded medical services, including services provided under the Medicare, Medicaid and (as of January 1, 1997) TRICARE programs. In pertinent part, the statute states:

(b) Illegal remuneration

(1) whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind --

(A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

(2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person --

(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b). Violation of the statute can also subject the perpetrator to exclusion from participation in federal health care programs and, effective August 6, 1997, civil monetary penalties of $50,000 per violation and three times the amount of remuneration paid. 42 U.S.C. § 1320a-7(b)(7); 42 U.S.C. § 1320a-7a(a)(7).

16.    Compliance with the Anti-Kickback Statute is, and was at all relevant times, a prerequisite to payment under the Medicare and Medicaid programs and, after August 1996, to payment under CHAMPUS/TRICARE. Defendants are required to certify compliance with the Anti-Kickback Statute as condition of payment when they submit their claims for payment to the aforementioned Federal payors on form CMS 1500.

C.    The Stark Statute

17.    Section 1877 of the Social Security Act, codified at 42 U.S.C. § 1395nn and commonly referred to as the "Stark Statute," prohibits a physician from referring Medicare patients for certain "designated health services" ("DHS") to an entity with which he has a "financial relationship" unless an exception applies. When originally enacted in 1989 ("Stark I"), the prohibitions applied only to physicians' referrals for clinical laboratories. Omnibus Budget Reconciliation Act of 1989, P.L. 103-66, § 13562, Social Security Act Amend. of 1994, P.L. 103-

8

432, § 152. Clinical laboratory services provided by Defendant Aperian and related physicians are at issue in this *qui tam* lawsuit.

18.     In addition to prohibiting certain physician referrals, the Stark Statute prohibits health care entities from presenting or causing to be presented any Medicare claim for DHS provided as a result of a prohibited referral. 42 U.S.C. § 1395(a)(1)(B). Any entity that collects a Medicare payment for DHS rendered under a prohibited referral must refund all collected amounts. 42 U.S.C. § 1395nn(g)(2); 42 C.F.R. § 411.353(g). Any person or entity who bills Medicare for DHS that the person or entity knew, or should have known, resulted from a prohibited referral is also subject to a civil monetary penalty of not more than $15,000 for each service and an assessment by OIG of three times the amount claimed for DHS. 42 U.S.C. § 1395nn(g)93); 42 CFR § 1003.100 (b)(viii).

19.     Under the Stark Statute, the United States will not pay for certain items or services prescribed or ordered by physicians who have improper financial relationships with the entities that furnish those items or services. Stated conversely, compliance with the Stark Statute is a condition of payment imposed by the Federal Healthcare Programs. One of the major purposes of the statute was to reduce losses suffered by the Medicare program due to overutilization of services.

20.     The Stark Statute broadly defines "financial relationship" to include ownership and investment interest and compensation agreements that involve any direct or indirect remuneration between a physician and an entity providing DHS. A variety of regulatory and statutory exceptions identify specific types of

investments and compensation agreements that will not violate its referral and billing prohibitions. Financial relationships between a physician and an entity providing DHS that do not meet a regulatory or statutory exception violate the statute.

21.    As specified below, some of the transactions and activities into which the Defendants entered and participated violate these prohibitions on financial relationships. They also do not meet the exceptions or safe harbors provided by law.

22.    Where, as here, the government through its governmental reimbursement programs, has conditioned payment of a claim upon a claimant's certification of compliance with a statute or regulation, a claimant submits a false or fraudulent claim when the claimant falsely certifies compliance with the statute or regulation. Defendants submitted their claims, or caused claims to be submitted, on CMS Form 1500s with the required certification for reimbursement but falsely stated that they were in compliance with statutes and regulations, including but not limited to the False Claims Act, Medicare Anti-Kickback Statutes, and Stark Laws.

## IV. THE FEDERAL HEALTHCARE PROGRAMS

### A.    The Medicare Program

23.    In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare Program, to pay for the costs of certain healthcare services.  Entitlement to Medicare is based on age, disability or affliction with end-stage renal disease. *See* 42 U.S.C. §§ 426, 426A. Part B of the Medicare

Program authorizes payment for clinical diagnostic laboratory services ordered by a doctor or practitioner including certain blood tests, urinalysis, tests on tissue specimens and some screening tests.

**B. The Medicaid Program**

24.     Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled. The federal government provides matching funds and ensures that states comply with minimum standards in the administration of the program.

25.     The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding, which is called federal financial participation ("FFP"). 42 U.S.C. §§ 1396, et seq.

26.     The Medicaid program of each state must cover laboratory services. 42 U.S.C. § 1396a(10)(A), 42 U.S.C. § 1396d(a).

**C. Tricare/CHAMPUS**

27.     Tricare, formerly known as the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS") is a health care program of the United States Department of Defense Military health System. Tricare provides civilian health benefits for military personnel, military retirees and their dependents, including some members of the Reserve Component. These benefits include the laboratory services at issue in this case.

28.     The Tricare program is managed by the Tricare Management Activity ("TMA") under the authority of the Assistant Secretary of Defense (Health Affairs).

11

## V. FACTUAL ALLEGATIONS

29.     There are four schemes of fraudulent conduct that led to the submission of false claims to the Federal payors by Defendant Aperian or by which Aperian and other Defendants caused the submission of false claims to Federal payors. Those four schemes are described in turn below.

### A. Commission-Based Marketing Schemes

30.     Defendant Aperian obtained referrals from various "marketing" firms and labs by paying commissions to these companies for laboratory referrals. These arrangements violate the Anti-Kickback Act and run afoul of the OIG Advisory opinion on sales agents posted on August 31, 1998 (Advisory Request No. 98-10). Each of the three commission-based marketing schemes is described in detail below.

i.      Summit Diagnostics marketing for Aperian.

31.     This relationship between Defendant Summit Diagnostics and Defendant Aperian began when George Powell, the CEO of Summit Diagnostics, contacted Aperian Medical Director Jerry McHan about providing marketing services for Aperian. This contact evolved into a contractual relationship wherein Summit Diagnostics agreed to provide referrals of laboratory testing customers to Aperian in exchange for a percentage of the referral value.

32.     The contract on its face violates the Stark Act and Anti-Kickback law, despite acknowledging those laws and paying lip service to the parties conducting themselves in accordance with those laws in paragraph 7.9 of the

contract signed by Ken Lott for Aperian and George Powell for Summit Diagnostics.

33.     In other words, Defendants have specifically stated their knowledge of the Stark Law and Anti-Kickback Act. Therefore, their conduct certainly is "knowing" within the meaning of the False Claims Act.

34.     The Sales Services Contractor Agreement provides that Aperian will pay Summit Diagnostics "a base amount of 15% for all specimens received from Summit Diagnostics Accounts up to the following volumes at which time Aperian Laboratory Solutions will pay a higher rate starting from specimen #1. The contract further states that all commissions will be paid on the 20th of each month and will be based on received amounts only" (received amounts means, amounts paid by providers).

- 800-1000 specimens/month 20% commission will be paid for all specimens per month.

- 1001-1200 specimens/month 22% commission will be paid for all specimens per month.

- 1201+ specimens/month 28% commission will be paid for all specimens per month.

35.     The contract length was for one year with automatic renewal.

36.     This contract began in August of 2008 and continues to the present.

37.     Payments for laboratory referrals were made, and continue to be made, to Summit Diagnostics by Aperian on a monthly basis. The documentation of payments from Aperian to Summit Diagnostics can be found in the Accounts Payable Year-to-Date reports from Aperian. These reports come from the EPSI

system at EAHCA and are the AP Detail YTD (accounts payable year-to-date). The commission paid from Aperian to Summit Diagnostics averaged around $20,000 per month. A few examples to provide an indicia of reliability regarding the commission payments are as follows:

| Summit Diagnostics Invoice Date | Aperian Payment Amount |
|---|---|
| 11/23/2009 | $8,687.01 |
| 8/6/2010 | $25,660.11 |
| 10/20/2010 | $30,403.28 |
| 12/22/2010 | $39,207.95 |
| 8/24/2011 | $43,029.29 |
| 10/3/2011 | $49,847.95 |
| **Total through February 2013** | **$812,385.75** |

38.    The contract is an inducement to provide referrals and takes into consideration the volume and value of the referrals, as can be clearly seen by the fluctuating monthly amounts above. This referral relationship, and the referrals and payments made under that relationship, violate the Anti-Kickback Act.

39.    During the time period of the improper contractual referral relationship between Summit Diagnostics and Aperian (which is an ongoing relationship), Aperian submitted millions of dollars of claims to Medicare, Medicaid, Tri-Care, and CHAMPUS for laboratory tests referred to Aperian by Summit Diagnostics. These amounts are documented in the Peachtree Billing Accounts Receivable Marshall Reports. There is a separate Marshall report for

each individual referral relationship (including Summit Diagnostics) and then there is a roll-up report for all payments.

40.     To provide an indicia of reliability, Relator states that the following amounts represent the claims submitted and actually paid by Federal payors during the following time periods for referrals received by Aperian from Summit Diagnostics under the prohibited referral compensation arrangement.

**Medicare**

| Month | Billed | Paid |
|---|---|---|
| April 2009 | $2,425.52 | $1,212,76 |
| May 2009 | $15,226.14 | $7,613.07 |
| June 2009 | $29,165.84 | $14,342.81 |
| July 2009 | $23,100.76 | $10,770.15 |
| August 2009 | $38,553.42 | $17,981.26 |
| September 2009 | $48,642.02 | $24,136.31 |
| October 2009 | $13,895.52 | $6,873.81 |
| November 2009 | $13,361.62 | $5,743.55 |
| December 2009 | $21,225.88 | $8,754.09 |
| January 2010 | $40,047.90 | $16,963.66 |
| February 2010 | $43,369.28 | $22,156.44 |
| March 2010 | $169,512.52 | $75,904.07 |
| April 2010 | $144,308.36 | $66,380.16 |
| May 2010 | $144.285.34 | $64,305.35 |
| June 2010 | $121,405.87 | $55,040.88 |

| | | |
|---|---|---|
| July 2010 | $162,452.04 | $67, 757.30 |
| August 2010 | $126,493.54 | $61,178.32 |
| September 2010 | $146,124.16 | $59,946.31 |
| October 2010 | $91,348.10 | $39,298.39 |
| November 2010 | $132,569.34 | $59,728.02 |
| December 2010 | $122,329.42 | $52,796.37 |
| January 2011 | $85,385.66 | $13,171.59 |
| February 2011 | -$11,290.77 | $27,000.14 |
| March 2011 | $80,901.05 | $44,776.51 |
| April 2011 | $67,470.20 | $39,650.57 |
| May 2011 | $89,248.16 | $49,837.29 |
| June 2011 | $69,066.94 | $41,821.97 |
| July 2011 | $62,961.98 | $35,157.46 |
| August 2011 | $71,443.08 | $41,190.76 |
| September 2011 | $54,781.86 | 29,954.66 |
| October 2011 | $35,955.03 | $19,440.59 |
| November 2011 | $24,501.80 | $13,648.16 |
| December 2011 | $13,128.53 | $6,550.46 |
| January 2012 | $16,812.82 | $9,156.48 |
| February 2012 | $17,179.97 | $10,477.79 |
| March 2012 | $6,010.06 | $6,235 |
| April 2012 | $8,746.04 | $5,062.72 |
| May 2012 | $12,026.23 | $6,960.37 |

| June 2012 | $5,374.32 | $3,877.17 |
| July 2012 | $2,292.23 | $5,407.45 |
| August 2012 | $6,833.65 | $4,323.94 |
| September 2012 | $7,347.43 | $5,657.02 |
| October 2012 | $5,353.49 | $2,871.75 |
| November 2012 | $2,225.67 | $1,553.75 |
| December 2012 | $2,670.71 | $1,793.05 |
| January 2013 | $2,445.15 | $858.55 |
| February 2013 | $419.75 | $292.82 |
| **Total for Above Time period** | **$2,289,133.63 billed to Medicare** | **$1,168,487.26 paid by Medicare** |

**Medicaid**

| Month | Billed | Paid |
|---|---|---|
| April 2009 | $0 | $0 |
| May 2009 | $4,317.97 | $132.64 |
| June 2009 | $23,803.18 | $816.78 |
| July 2009 | $21,518.10 | $155.19 |
| August 2009 | $29,934.60 | $629.05 |
| September 2009 | $26,751.04 | $477.16 |
| October 2009 | $25,879.58 | $811.27 |
| November 2009 | $33,454.08 | $2,739.03 |
| December 2009 | $92,997.14 | $7,569.35 |

| | | |
|---|---|---|
| January 2010 | $93,062.64 | $7,053.70 |
| February 2010 | $95,633.76 | $8,346.02 |
| March 2010 | $181,049.42 | $16,901.43 |
| April 2010 | $166,462.92 | $12,604.08 |
| May 2010 | $214,379.24 | $18,346.56 |
| June 2010 | $196,525.38 | $13,548.09 |
| July 2010 | $187,182.79 | $12,247.05 |
| August 2010 | $198,839.02 | $17,975.21 |
| September 2010 | $148, 055.68 | $18,206.10 |
| October 2010 | $80,281.06 | $12,892.96 |
| November 2010 | $116,708.46 | $17,462.88 |
| December 2010 | $139,693.08 | $21,882.78 |
| January 2011 | $95,709.60 | $12,944.46 |
| February 2011 | $104,700.21 | $12,530.41 |
| March 2011 | $161,288.76 | $20,085.74 |
| April 2011 | $133,487.44 | $18,026.69 |
| May 2011 | $197,356.23 | $30,051.13 |
| June 2011 | $161,105.63 | $17,981.52 |
| July 2011 | $124,067.50 | $14,891.19 |
| August 2011 | $120,967.44 | $12,774.11 |
| September 2011 | $107,795.37 | $10,321.72 |
| October 2011 | $82,509.57 | $5,103.23 |
| November 2011 | $49,568.67 | $3,148.70 |

| December 2011 | $28,782.03 | $2,185.66 |
| January 2012 | $62,289.13 | $2,360.36 |
| February 2012 | $59,256.77 | $4,343.13 |
| March 2012 | $19,270.24 | $2,102.60 |
| April 2012 | $27,339.49 | $4,682.23 |
| May 2012 | $20,951.44 | $3,263.53 |
| June 2012 | $10,253.28 | $1666.73 |
| July 2012 | $10,260.08 | $835.81 |
| August 2012 | $7,677.92 | $1,642.98 |
| September 2012 | $6,433.30 | $817.28 |
| October 2012 | $4,745.26 | $221.06 |
| November 2012 | $3,936.88 | $36.71 |
| December 2012 | $3,076.62 | $0 |
| January 2013 | $1,115.54 | $1,128.01 |
| February 2013 | $945.08 | $0 |
| **Total for Above Time** | **$3,681,418.59 billed to Medicaid** | **$373,679.93 paid by Medicaid** |

41.   The claims for payment were submitted by Aperian on CMS Form 1500s and contained an Aperian signed certification that the provider, Aperian Laboratory Solutions, LLC, was in compliance with the Stark and Anti-Kickback laws.

42.   This certification was knowingly false because of the prohibited financial relationship with Defendant Summit Diagnostics.   Thus, each CMS

Form 1500 claim for payment of laboratory services by Aperian originating from a Summit Diagnostics referral is a false claim for payment. Defendant Aperian submitted the false claims for payment on CMS Form 1500s and Defendant Summit Diagnostics caused the submission of the false claims for payment. Both defendants conspired in their conduct to violate the law and submit false claims for payment.

43. Relator provides the following specific examples of claims submitted by Aperian for Summit Diagnostics referrals in violation of the Anti-Kickback and Stark laws:

   a. Encounter # A12-08197, patient initials C.M., referral source Summit Diagnostics, Dr. Joel Floyd Schock IV, M.D., date of service February 9, 2012, procedure code 82145, submitted on CMS Form 1500 to Alabama Medicare for payment on May 29, 2012. This claim contained the signature and certification of Aperian Laboratory Solutions, LLC and a certification of compliance with the Anti-Kickback and Stark laws.

   b. Encounter # A12-07524, patient initials K.A., referral source Summit Diagnostics, Dr. Ashley M. Classen, D.O., date of service February 9, 2012, procedure codes G0431, 80154, 82205, and 82646, submitted on CMS form to Alabama Medicare for payment on May 29, 2012. This claim contained the signature and certification of Aperian Laboratory Solutions, LLC and a certification of compliance with the Anti-Kickback and Stark laws.

44.    The conduct at issue here is knowing and warrants treble damages and penalties. Relator pointed out the problems with these contracts to his superiors in written correspondence. The first correspondence pre-dates the first contract between Aperian and Summit Diagnostics. Relator, therefore, raised red flags and blew the whistle to his employers regarding these improper relationships from the time they began to the time he left. Further, the web site of Summit Diagnostics offers a compliance service to review relationship contracts for compliance with Stark and Anti-Kickback laws. *See* www.summitdiagnostics.com (listed under "Services").

45.    Moreover, outside compliance auditor Kevin Hunter of Collaborate identified the referral contracts as non-compliant when he conducted his audit and Defendants made no changes to the contracts. This audit report was presented to management on or about June 13, 2012.

### ii. Compass/Total Diagnostic Solutions ("TDS") Marketing for Aperian.

46.    The second commission-based marketing scheme involves Compass/TDS, which are related entities. Compass is a toxicology laboratory that is also engaged in the marketing of toxicology laboratory services. TDS is simply a marketing company for laboratory services. The common denominator and driving force behind both entities is Defendant Jannie Chapman, who is the President and/or Vice President of Compass (she signed one contract as President and a later contract as Vice President) and President of TDS.

47.     Defendant Jannie Chapman has an ownership interest in both companies. Defendant Shelinder Aggarwal has a financial interest in Compass and is believed to have a financial interest in TDS.

48.     Regardless of whether the contractual relationship with Aperian was with Compass or TDS, the payments were made from Aperian to TDS.

49.     Aperian contracted to pay Compass a flat 25% referral fee for referral of specimens to Aperian from September 1, 2009 through March 1, 2012. The contract is signed by CFO Samuel A. Price, Jr. for Aperian and Jannie Chapman as President of Compass.  Payments were actually made by Aperian to TDS—an entity related to Compass—instead of directly to Compass.  The payments from Aperian to TDS are documented in the report titled EPSI AP Detail YTD.  The following is a list of some of the monthly referral fees paid by Aperian to TDS for referrals by Compass and TDS to Aperian:

| Compass/TDS Invoice Date | Payment from Aperian to TDS |
|---|---|
| 11/22/2011 | $16,503.45 |
| 12/30/2011 | $23,827.08 |
| 1/25/2012 | $118,600.98 |
| 2/17/2012 | $17,154.59 |

50.     From March 1, 2012 to December 1, 2012, the parties changed their contract from a percentage based contract to a flat fee of $35,000 a month. The parties had an agreement that, if $35,000 a month was not enough to equate with the former percentage arrangement, the monthly amount would be increased. The change to a flat fee was made because Aperian was concerned

about Stark/AKA implications of the percentage contract. The flat fee contract was made between TDS and Aperian Laboratory Solutions, LLC.  The contract was signed by Jannie Chapman as President of TDS and Ken Lott as V.P. of Aperian Laboratory Solutions, LLC.

51.    The following is a list of payments made under the March 1, 2012 contract between Aperian and TDS:

| Compass/TDS Invoice Date | Payment from Aperian to TDS |
| --- | --- |
| 3/5/2012 | $40,000 |
| 4/19/2012 | $70,000 |
| 4/20/2012 | $35,000 |
| 5/20/2012 | $35,000 |
| 6/20/2012 | $35,000 |
| 7/20/2012 | $35,000 |
| 8/20/2012 | $35,000 |
| 9/27/2012 | $35,000 |
| 11/2/2012 | $40,000 |
| 11/27/2012 | $40,000 |

52.    The $35,000 flat fee was not satisfactory to Jannie Chapman and TDS/Compass so negotiations between Aperian/EAHCA and Compass/TDS began again in the end of summer/fall of 2012. There were proposals for various versions of the contract. However, the parties eventually signed a new 25% commission agreement that governed the relationship from December 1, 2012 to the present. That contract is signed by Jannie Chapman as V.P. of Compass

Laboratory Services, LLC and Samuel A. Price, Jr. as CFO of Aperian Laboratory Solutions, LLC.

53.    The following is a list of payments made under the December 1, 2012 contract between Aperian and Compass:

| Compass/TDS Invoice Date | Payment by Aperian to TDS |
|---|---|
| 1/15/2013 | $58,860.68 |
| 2/18/2013 | $28,972.62 |

54.    Aperian submitted millions of dollars in claims to Federal payors during the time of the improper Compass/TDS referral relationships. The amounts of these claims submitted to Medicare are documented in the Peachtree Billing Accounts Receivable Marshall Report as follows:

| Month | Billed to Medicare | Paid by Medicare |
|---|---|---|
| August 2011 | $3,945.59 | $1,954.45 |
| September 2011 | $31,454.61 | $14,774.20 |
| October 2011 | $71,200.66 | $33,402.65 |
| November 2011 | $84,836.86 | $35,301.63 |
| December 2011 | $87,364.02 | $46,276.33 |
| January 2012 | $165,866.70 | $76,968.22 |
| February 2012 | $149,779.08 | $72,372.40 |
| March 2012 | $184,527.09 | $86,884.96 |
| April 2012 | $165,975.36 | $74,666.51 |
| May 2012 | $166,859.96 | $78,752.44 |
| June 2012 | $142,883.29 | $72,604.62 |
| July 2012 | $151,997.91 | $72,842.18 |
| August 2012 | $106,897.89 | $61,607.40 |
| September 2012 | $189,923.03 | $98,379.58 |
| October 2012 | $193,521.02 | $98,066.57 |
| November 2012 | $259,083.32 | $111,456.94 |
| December 2012 | $151,358.26 | $60,218.31 |
| January 2013 | $218,262.55 | $71,220.26 |
| February 2013 | $54,006.01 | $18,138.50 |

| TOTAL | $2,579,743.21 | $1,185,888.15 |

55.    The amounts of these claims submitted to Medicaid are documented in the Peachtree Billing Accounts Receivable Marshall Report as follows:

| Month | Billed to Medicaid | Paid by Medicaid |
|---|---|---|
| August 2011 | $270.52 | $75.00 |
| September 2011 | $37,302.18 | $7,706.46 |
| October 2011 | $46,076.88 | $10,114.77 |
| November 2011 | $47,751.92 | $10,359.64 |
| December 2011 | $32,407.52 | $6,684.38 |
| January 2012 | $96,953.32 | $20,205.10 |
| February 2012 | $63,236.65 | $15,476.94 |
| March 2012 | $77,429.46 | $19,253.85 |
| April 2012 | $94,290.34 | $25,110.85 |
| May 2012 | $88,548.35 | $22,605.73 |
| June 2012 | $83,692.81 | $20,108.54 |
| July 2012 | $70,940.38 | $15,712.40 |
| August 2012 | $67,548.82 | $16,089.85 |
| September 2012 | $245,061.31 | $24,544.38 |
| October 2012 | -$54,707.56 | $29,451.70 |
| November 2012 | $170,663.78 | $50,153.00 |
| December 2012 | $119,527.42 | $34,050.90 |
| January 2013 | $164,503.30 | $35,950.20 |
| February 2013 | $52,579.92 | $3,706.80 |
| TOTAL | $1,504,077.32 | $367,360.49 |

56.    The improper referral relationship between Aperian and Compass/TDS is an ongoing relationship. Referrals and claims for payment submitted in violation of the Anti-Kickback, Stark and False Claims Act laws continue to this day.

57.    The claims for payment were submitted by Aperian on CMS Form 1500s and contained certification signed by Aperian that the provider, Aperian Laboratory Solutions, LLC, was in compliance with the Stark and Anti-Kickback

laws. This certification was knowingly false, because of the prohibited financial relationship with Defendants Compass, TDS, Chapman, and Aggarwal.

58.     Thus, each CMS Form 1500 claim for payment of laboratory services by Aperian originating from a Compass/TDS referral is a false claim for payment. Defendant Aperian submitted the false claims for payment on CMS Form 1500s and Defendants Compass, TDS, Chapman, and Aggarwal caused the submission of the false claims for payment. All of the aforementioned defendants conspired in their conduct to violate the law and submit false claims for payment.

59.     Relator provides the following specific examples of claims submitted by Aperian for Compass/TDS referrals in violation of the Anti-Kickback and Stark laws:

   a. Encounter # A12-08101, patient initials A.G, referral source TDS/Compass, Dr. Jeffrey Wayne Long, D.O., date of service February 10, 2012, procedure codes 80154, 82542, 82646, 83925, submitted on CMS form 1500 to Alabama Medicare for payment on May 29, 2012. This claim contained the signature and certification of Aperian Laboratory Solutions, LLC and a certification of compliance with the Anti-Kickback and Stark laws.

   b. Encounter # A12-07508, patient initials K.K., referral source TDS/Compass, Dr. Shelinder Aggarwal, M.D., date of service February 6, 2012, procedure codes 82542 and 83925, submitted on CMS Form 1500 to Alabama Medicare for payment on May 24,

26

2012. This claim contained the signature and certification of Aperian Laboratory Solutions, LLC and a certification of compliance with the Anti-Kickback and Stark laws.

c. Encounter # A12-07782, patient initials L.S., referral source TDS/Compass, Dr. Shelinder Aggarwal, M.D., date of service February 8, 2012, procedure codes 82542 and 83925, submitted on CMS Form 1500 to Alabama Medicare for payment on May 25, 2012. This claim contained the signature and certification of Aperian Laboratory Solutions, LLC and a certification of compliance with the Anti-Kickback and Stark laws.

d. Encounter # A12-07120, patient initials H.P., referral source TDS/Compass, Dr. Farouk Anwarul Raquib, M.D., date of service February 6, 2012, procedure codes 82646, submitted on CMS Form 1500 to Alabama Medicaid for payment on May 24, 2012. This claim contained the signature and certification of Aperian Laboratory Solutions, LLC and a certification of compliance with the Anti-Kickback and Stark laws.

60.     Defendant Aperian submitted the false claim for payment and Defendants Compass, TDS, Chapman, and Aggarwal caused the submission of the false claim for payment and each of the defendants conspired in their conduct to violate the law and submit false claims for payment.

61.     The documents that support Defendants' knowing violation of the Stark, AKA, and FCA laws are the same as those that support Defendants'

knowledge that the Summit Diagnostics contracts were improper inducements as set forth above in paragraphs 44 and 45.

### iii. Magnolia Analytical Marketing for Aperian

62.    The third commission-based marketing scheme involves Magnolia Analytical of Hattiesburg, Mississippi. Magnolia Analytical was owned by Dr. David C. Lee and it was dissolved in 2013.

63.    Dr. David Lee also owns and practices at Southern Neurologic and Spinal Institute, P.A. Dr. Lee also owns a host of other medical businesses in the Hattiesburg area.

64.    Dr. Lee's girlfriend is Ashly M. Hudson.   A relationship between them is confirmed by their mutual Facebook relationship.   Ashly Hudson marketed for Magnolia Analytical who in turn referred patients to Aperian in exchange for approximately 10% referral fee.   The payment of the referral fee from Aperian to Magnolia for referral of patients for laboratory services violates the Anti-Kickback and Stark laws.

65.    Between May and September 2012, Aperian billed Medicaid approximately $110,000 and Medicare approximately $105,000 on samples referred by Magnolia Analytical.  Of these amounts, approximately $60,000 of the billed claims came from Dr. Lee's practice at Southern Neurologic.  The referrals from Southern Neurologic were credited to the Magnolia Analytical referral arrangement as evidenced by the Peachtree Billing "Aperian_Aging" Report tab "referring cumulative total."

66.    The   amounts   of   these   claims   submitted   to   Medicare   are documented in the Peachtree Billing Accounts Receivable Marshall Report as follows:

| Month | Amount Billed to Medicare for Magnolia Referrals | Amount Paid by Medicare |
|---|---|---|
| May 2012 | $7,398.54 | $5,431.82 |
| June 2012 | $57,306.97 | $26,917.30 |
| July 2012 | $29,874.89 | $14,698.34 |
| August 2012 | $9,709.12 | $4,063.93 |
| September 2012 | $692.77 | $494.10 |
| October 2012 | $0.00 | $0.00 |
| TOTAL | $104,982.29 | $51,605.49 |

67.    The   amounts   of   these   claims   submitted   to   Medicaid   are documented in the Peachtree Billing Accounts Receivable Marshall Report as follows:

| Month | Amount Billed to Medicaid for Magnolia Referrals | Amount Paid by Medicaid |
|---|---|---|
| May 2012 | $798.46 | $0.00 |
| June 2012 | $65,080.14 | $8,634.51 |
| July 2012 | $29,314.08 | $2,727.75 |
| August 2012 | $14,971.88 | $1,906.11 |
| September 2012 | $0.00 | $0.00 |
| TOTAL | $110,164.56 | $13,268.37 |

68.    The claims for payment were submitted by Aperian on CMS Form 1500s and contained a certification that the provider Aperian was in compliance with the Stark and Anti-Kickback laws. This certification was knowingly false because of the prohibited financial relationship with Magnolia Analytical and Dr. Lee.  Thus, each CMS Form 1500 claim for payment of laboratory services by

Aperian originating from a Magnolia Analytical or Dr. Lee referral is a false claim for payment. Defendant Aperian submitted the false claims for payment.

### B. Providing Free Noble Specimen Cups to Physicians

69.     The second scheme under which Aperian violated the Stark laws, Anti-Kickback laws, and False Claims Act was by providing free Noble Split Specimen Cups® to physicians to use for drug tests. These "Noble cups," as they are commonly known, both collect samples and serve as rapid drug screen cups.     This practice has been addressed by a Special Fraud Alert, "Arrangements for the Provision of Clinical Lab Services," 59 Fed. Reg. 65372, 65377 (Dec. 19, 1994) and the court proceeding *In re: Petition for Declaratory Statement of Dominion Diagnostics, LLC* (2008).

70.     Under this arrangement, Aperian provides the free Noble cups to physicians.  The physicians then perform the rapid screen drug tests in their office and bill payors for the tests performed in their office. Sometimes the physicians bill the tests as CLIA waived tests and sometimes they bill a rapid screen test as up to 19 separate complex toxicology tests, which a rapid screen drug test is not because the cup itself performs the test.

71.     Aperian provides the free Noble cups in exchange for the physicians' agreement to send the samples to Aperian for confirmation testing of the results obtained by the physician.  The benefit provided to the physician is the free cup and the ability to bill for tests that the cup performs automatically. The benefit to Aperian is the ability to bill for the referred confirmation testing.

72. The Summit Diagnostics contract with Aperian specifically requires that Aperian provide Noble cups—specifically Exhibit A to the contract, ¶ i.

73. The names of all doctors using Summit Diagnostics as a referral source for Aperian confirmation tests are as follows:

- STEVEN SHIELD (100CA-SS)
- RIAZ SYED (101GA-RS)
- GERMAINE HAWKINS (104TX-GH)
- CAROL KRAUSE (105ND-CK)
- JEANNE HABERER (107MI-JH)
- SCOTT SONDES (10S-SS)
- CHERYL WILLIAMS (110MO-CW)
- JENNIFER MILLER (112GA-JM)
- PAUL GUTTUSO (113TX-PG)
- ABIGAIL NEIGHMOND (114MO-AN)
- MOIN KAZI (115GA-MK)
- JIMENEZ JOSEPH (116NJ-JJ)
- DAVID WEISS (116PA-DW)
- ROBERT RICHTER (118TN-RR)
- SUSAN AULL (119FL-SA)
- BRADLEY KATZ (120AL-BK)
- DAVID HERRICK (120AL-DH)
- KATHRIN WELLER (121OR-AW)
- CHRISTINE MAGILL (123CM-HI)
- LESTER HANDS (123LH-OR)
- CHRISTOPHER PRATT (125CP-TX)
- DAVID COSTNER (126DC-TN)
- RICHARD GELLENDER (127RG-KS)
- ULYSSES WILLIAMS (128UW-NJ)
- ALLAN ROSANSKY (13MA-AR)
- MARGARET CHAPLIN (14S-MC)
- ERIC ROBINSON (15AL-ER)
- ANDREA STONE (17MA-AS)
- EMAD ESKANDER (17MA-EE)
- TERRY OSBORNE (17MA-TO)
- ALBERT STONE (17S-AS)
- KRISTIN TAYLOR (19MI-KT)
- RICHARD MANSFIELD (19MI-RM)
- HUNTINGTON HAPWORTH (1AL-HH)
- STEVEN PRAKKEN (20NC-SP)
- LEE ACKLEY (21TX-LA)

- LAWRENCE STUTTE (21TX-LS)
- PETER COTEY (22MI-PC)
- CESAR LLANERA (23FL-CL)
- DIANE BLUHM (24MI-DB)
- HOWARD MAHABEER (24MI-HM)
- KAREN LEITER (24MI-KL)
- LYNI NOWAK (24MI-LN)
- RICK BEACH (25FL-RB)
- CHRISTOPHER MARSH (26AZ-CM)
- JULIE MCCARTAN (26AZ-JM)
- SHERIF ALGENDY (27MA-SA)
- KENNETH WILLIS (28AL-KW)
- STEPHANIE SMITH (2AL-SS)
- GURUDATT SETTY (2GA-GS)
- JORGE ALVEAR (2GA-JA)
- JENNIFER SIDDLE (2GA-JS)
- RICHARD REISMAN (2GA-RR)
- STEPHANIE SMITH (2GA-SS)
- ABIGAIL MARLEY (30AZ-AM)
- LANA KEESLER (30AZ-LK)
- MICHAEL GOODMAN (30AZ-MG)
- RAGA OSMAN (30AZ-RO)
- TOBIAS FREEBOURN (30AZ-TF)
- SHISHUKA MALHOTRA (31OH-SM)
- SARBJOT SINGH AJIT (32OH-SA)
- CARROLL MCLEOD (33MS-CM)
- ANTERPREET SINGH DUA (34SC-AD)
- UNKNOWN (35CA-SS)
- JULIE CEASAR (35LA-JC)
- KENNETH SUMNER (35LA-KS)
- SIDNEY SMITH (35LA-SS)
- DIETER ECKART (37AZ-DE)
- ALISAHAH COLE (39SC-AC)
- ERICA JETER (39SC-ES)
- SARAH DERRICK (39SC-SD)
- MARION SOVIC (3AL-MS)
- ROBERT LANSDEN (3AL-RL)
- THOMAS KRAUS (3AL-TK)
- JOSEPH LEANO (40AZ-JL)
- LANA KEESLER (40AZ-LK)
- SONIA GRABER (40AZ-SG)
- BRADLEY BLISS (40MI-BB)
- REBECCA GANZOW (40MI-RG)
- RAYMOND TRACY (40MI-RT)

- DANIEL CHEN (40TX-DC)
- LISA MALHER (41OK-LM)
- MELVIN ROBINSON (41OK-MR)
- BRADLEY BLISS (42MI-BB)
- RICHARD BRITTINGHAM (43OK-RB)
- LAURA MILLER (44AZ-LM)
- WENDY BARTANEM (45OK-WB)
- AMJAD FAHEEM (46KY-AF)
- SOCORRO BELLA-OROPILLA (46KY-SB)
- SYED QUADRI (46KY-SQ)
- AYAZ AHMED (47KY-AA)
- AMJAD MOHAMMED FAHEEM (47KY-AF)
- KELLY RICHARDSON (47KY-KR)
- SOCORRO BELLA OROPILLA (47KY-SB)
- AMAR GOYAL (48OH-AG)
- BRIAN WASSON (49TX-BW)
- ICHABOD BALKCOM (49TX-IB)
- DAVID COSGROVE (4AL-DC)
- FAZAL RAHIM (50AL-FR)
- DEBRA ROSSELL (50DR-TX)
- JOHN BAIRD (50KY-JB)
- CAMILLE PITRE (50LA-CP)
- MICHAEL MILLER (50TN-MM)
- ASHLEY CLASSEN (50TX-AC)
- BENNIE EMBRY (50TX-BE)
- ERIK TIJERINA (50TX-ET)
- JILL PRIDGEN (50TX-JP)
- CHRISTINE MCDANIEL (51LA-CM)
- CAMILLE PITRE (51LA-CP)
- DEANNA HODSON (51LA-DH)
- JOHN JACKSON (51LA-JJ)
- MEDGAR MOYA (52AZ-MM)
- DANIEL CHEN (53TX-DC)
- JOHN BAIRD (54KY-JB)
- MICHAEL MILLER (55TN-MM)
- FAZAL RAHIM (56AL-FR)
- ASHLEY CLASSEN (58TX-AC)
- PETER CLEMENS (59UT-PC)
- JAMES JETER (5AL-JJ)
- MICHAEL GOSNEY (5AL-MG)
- WILLIAM BLACKBURN (5AL-WB)
- JOSE DUARTE (61TX-JD)
- KENNETH DORITY (61TX-KD)
- SALVATORE CAMPO (61TX-SC)

- MARK WILLIAMS (62TN-MW)
- KATHARINE VACHON (64TN-KV)
- ROSE WIDENER (64TN-RW)
- KRISHNAMURTHY ASHOK (66OH-KA)
- ABIGAIL MARLEY (67AZ-AM)
- ALBERT WILLISON (67AZ-AW)
- KERI HOBERT (67AZ-KH)
- LANA KEESLER (67AZ-LK)
- ROBERT JOHNSON (67AZ-RJ)
- RAGA OSMAN (67AZ-RO)
- VICKI CLOUS (68AZ-VC)
- MOHAMMAD TARIQ (69TX-MT)
- MUHAMMAD ZULQUARNIAN (69TX-MZ)
- ANNE XAVIER (6AL-AX)
- DAVID EVANS (6AL-DE)
- JOHN MARSELLA (6AL-JM)
- MICHAEL FLANAGAN (6AL-MF)
- MARK WILLIS (6AL-MW)
- WILLIAM MCRAE (6AL-WM)
- DAVID BEST (71MI-DB)
- RYAN MCCONNELL (71MI-RM)
- TODD KREYKES (71MI-TK)
- ANNA YOUNG (72MI-AY)
- LEONHARD MAENDEL (72MI-LM)
- MITCHELL CAREY (72MI-MC)
- SAMUEL DYSTE (72MI-SD)
- SCOTT ISPIRESAN (73CA-SI)
- MICHAEL RHODES (74TN-MR)
- DEBORAH HANKS (76AZ-DH)
- VIVIAN CASTILLO BARONIA (76AZ-VC)
- VALLI SUBRAMANIAN (77FL-VS)
- CHI LAI (78NC-CL)
- MOIZ TAJKHANJI (79TX-MT)
- JASON MCKEOWN (7AL-JM)
- JOHN ROBERTS (7AL-JR)
- RONALD COLLINS (7AL-RC)
- RODDIE GANTT (7AL-RG)
- THOMAS VETTER (7AL-TV)
- KEVIN DREW (80MI-KD)
- ROY BLACKBURN (82OR-RB)
- ANDREW CHIU (83OR-AC)
- JASON MAUER (83OR-JM)
- MARK KALLGREN (83OR-MK)
- MARK NORLING (83OR-MN)

- STUART ROSENBLUM (83OR-SR)
- ROBERT BROWN (83SB-OR)
- KATHARINE VACHON (84TN-KV)
- PAULA SANDLER (85MS-PS)
- PAULA SANDLER (85TN-PS)
- EDDIE SMITH (86LA-ES)
- ALETHIA BALDWIN (8AL-AB)
- KELLER AMBER (8AL-AK)
- AIMEE WALSH (8AL-AW)
- ANNE XAIER (8AL-AX)
- HASSAN MONFARED (8AL-HM)
- JOSEPHINE HACKETT (8AL-JH)
- JASON MCKEOWN (8AL-JM)
- JAMES BAILEY (8AL-MB)
- MICHAEL SHETH (8AL-MS)
- PETER NAGI (8AL-PN)
- ROLAND SHORT (8AL-RS)
- TIMOTHY NESS (8AL-TN)
- THOMAS VETTER (8AL-TV)
- JOHN WOODYEAR (90NC-JW)
- ERIK VAN GINKEL (91FL-EV)
- JACK HEIDENREICH (92LA-JH)
- CRAIG CRITCHLEY (93OH-CC)
- CARLA GARBER (93OH-CG)
- JAMES BURKHARDT (93OH-JB)
- JAMES MCNERNEV (93OH-JM)
- MUHAMMAD ZULQARNAIN (94TX-MZ)
- ELSA REMER (96ND-ER)
- KURT GOLD (98NE-KG)
- MIKE HAYDEL (99LA-MH)
- ERIK VAN GINKEL (FL-EV)

74.     These doctors used Noble cups provided for free by Aperian, because the Summit Diagnostics-Aperian contract required Aperian to provide the cups.  The free cup is an improper inducement to the doctors for the reasons set forth above.

75.     Further, the billing to Federal payors by the above list of doctors for multiple complex or CLIA waived toxicology tests for a single sample resulting

from the use of the free Noble cup provided by Aperian are also false claims for payment caused by Aperian's conduct of providing the free cup.

76.     CMS implemented the codes G0431 and G0434 in 2010 to replace the codes 80101 and 80100.

77.     G0431 is defined as "drug screen, qualitative: multiple drug classes by high complexity test method, per patient encounter" (reimbursed at around $103).

78.     G0434 is defined as "drug screen, other than chromatographic; any number of drug classes; by CLIA waived test or moderate complexity test, per patient encounter" (reimbursed at around $20).

79.     The Noble rapid screen cup **does not meet** the definition of G0431 because it is not high complexity. The Noble cup **does meet** the definition of G0434. However, the physicians are still being provided the inducement of a free Noble cup for which they can and do bill Medicare $20.

80.     Relator learned that there was a problem with doctors billing for multiple complex or CLIA waived toxicology tests by word of mouth when there were issues of double billing for the same CPT code raised by payors.  In other words, both the doctor and Aperian were billing for the same complex or CLIA waived test.  The test performed by the doctor using a Noble rapid screen cup is not a complex or CLIA waived test and is a false claim for payment.

81.     The claims for payment submitted by Aperian for referrals of confirmation tests resulting from the provision of free Noble cups to doctors are false claims for payment because they are tainted by the improper inducement to

refer that violates the Stark and Anti-Kickback laws. Aperian submitted the claims for confirmation testing to Federal payors on CMS Form 1500s that contained a certification that the provider was in compliance with the Stark and Anti-Kickback laws.

82.    This certification was knowingly false because of the prohibited financial inducement provided to the doctors referred by Summit Diagnostics. Thus, each CMS Form 1500 claim for payment of laboratory confirmation services by Aperian originating from a Summit Diagnostics doctor referral is a false claim for payment.

83.    Defendant Aperian submitted the false claims for payment and Summit Diagnostics caused the submission of the false claim for payment by requiring the provision of the free Noble cups in the contract. Both Summit Diagnostics and Aperian conspired in their conduct to violate the law and submit false claims for payment.

## C. Paying for "Collector Personnel" in Doctors' Offices

84.    The third scheme by which the Defendants violated the False Claims Act is paying for collector personnel to work in doctors' offices.

85.    Aperian routinely paid for urine sample collectors to be based in physician offices. These people would perform urine sample collection duties, but would also perform other work for the physicians (including other testing, filing, or medical record recording).

86.    There are three categories of clients for whom Aperian provided collector personnel: original Aperian base clients (physicians originally recruited

by Aperian to send samples to Aperian for testing); Summit Diagnostics clients;
and TDS/Compass clients.

### i. Aperian base clients

87.    Aperian provided collectors under an employee lease agreement.
Aperian paid the physician office a monthly fee to lease back one their
employees to provide collection services for Aperian samples. Many of these
contracts were written and entered into by East Alabama Medical Center which is
a d/b/a name of Defendant EAHCA.

88.    This practice has also been addressed by a Special Fraud Alert,
"Arrangements for the Provision of Clinical Lab Services," 59 Fed. Reg. 65372,
65377 (Dec. 19, 1994). Ex. 19. *See also In re: Petition for Declaratory Statement
of Dominion Diagnostics, LLC* (2008).

89.    Further, a May 9, 2008 e-mail from Dr. Jerry McHan (Aperian
Medical Director and sales person) discusses visiting a Gwinnett medical
practice and providing them improper incentives to refer lab tests.  He started by
promising to provide the practice with a free color printer if they provide 50
samples a month.   The practice agreed.   So he promised them a grant of
$20,000 if they could provide 100 samples a month for 12 months.  The practice
agreed.   Dr. McHan then promised that if the practice would contract with
Aperian to provide a minimum of 150 samples a month, Aperian would pay the
cost of a new employee/collector.  Dr. McHan concludes his e-mail by saying the
practice was already strategizing on how to get 150 samples a month by the time
he left the meeting.

90.     Aperian did in fact provided a collector to Gwinett Anesthesia Services, P.C. ("Gwinett") under an employee lease agreement.  The agreement provided that Aperian would pay Gwinett to lease a full time employee at the rate of $18 per hour for 2080 hours per year to provide collection services.   The contract acknowledges the Stark and Anti-Kickback laws. Yet, the employee lease agreement was entered into by Aperian as an inducement for laboratory drug testing referrals from Gwinett as detailed by McHan's e-mail.  One contract in the line of employee lease contracts between Gwinett and Aperian is dated April 1, 2011 and signed by Ken Lott for Aperian. All claims submitted to Federal payors for referrals of drug testing from Gwinett to Aperian are false claims for payment because they are submitted in violation of the certification of Stark and Anti-Kickback compliance on the CMS Form 1500.

91.     Aperian had another such an employee lease agreement with FLH, Inc., a pain management services provider in Northport, Alabama. The agreement provided that Aperian would pay FLH, Inc. to lease a full time employee at the rate of $16 per hour for 2080 hours per year to provide collection services.  The contract acknowledges the Stark and Anti-Kickback laws.  Yet, the employee lease agreement was entered into by Aperian as an inducement for laboratory drug testing referrals from FLH, Inc.  The contract is dated May 19, 2011 and signed by Ken Lott and Sam Price for Aperian.  All claims submitted to Federal payors for referrals of drug testing from FLH, Inc. to Aperian are false claims for payment because they are submitted in violation of the certification of Stark and Anti-Kickback compliance on the CMS Form 1500.

92.     Aperian had another such an employee lease agreement with Southeast Pain Management Center in Dothan, Alabama. Aperian paid Southeast Pain Management Center $864 every two weeks for a collector from October 9, 2009 to the present.  The contract acknowledges the Stark and Anti-Kickback laws.  Yet, the employee lease agreement was entered into by Aperian as an inducement for laboratory drug testing referrals from Southeast Pain Management Center.  All claims submitted to Federal payors for referrals of drug testing from Southeastern Pain Management Center to Aperian are false claims for payment because they are submitted in violation of the certification of Stark and Anti-Kickback compliance on the CMS Form 1500.

ii. Summit Diagnostics Clients

93.     For  physicians or practice group clients that Summit Diagnostics would refer to Aperian for laboratory tests, Aperian provided collectors to the physician practice by contracting with several temp agencies to provide the collectors to the physicians' office.

94.     Aperian paid the temp agency and the employees worked in the doctors' offices, collecting urine samples and doing other work for the physicians. The temp agencies utilized for this purpose are: Augmentation Incorporated; Delta Personnel, Inc.; All Medical personnel, Inc.; and, Favorite Healthcare Staffing.

95.     All claims submitted to Federal payors for referrals of drug testing from Summit Diagnostics physician or practice group clients to Aperian, where Aperian provided a collector, are false claims for payment because they are

submitted in violation of the certification of Stark and Anti-Kickback compliance on the CMS Form 1500.

### iii. Compass/TDS Clients

96.     Compass and TDS paid for collectors in the physician offices where samples were collected and referred to Aperian. The provision of collectors by Compass/TDS was an inducement to the physicians to conduct testing and provide referrals to Compass and Aperian (the Compass/TDS client).

97.     All claims submitted to Federal payors for referrals of drug testing from TDS/Compass physician or practice group clients, where Compass/TDS provided a collector to the physician or practice group, to Aperian, are false claims for payment because they are submitted in violation of the certification of Stark and Anti-Kickback compliance on the CMS Form 1500.

## D. East Alabama Medical Center Hospital Lab Outreach Program Provides Collectors to Physician Offices.

98.     The fourth scheme that violates Federal law is that Defendant EAHCA d/b/a EAMC provided collectors to physician offices with a high volume of clinical lab testing referrals.  These collectors performed collections for both referrals to EAMC lab outreach and for the doctors in-house testing.  In other words, EAMC covered the full cost of the employee, but the employee provided a direct benefit to the physician practice by performing collections for tests conducted in-house at the physician practice.

### i. Collectors employed directly by EAMC

99.     Tabitha Spratlin and Latressa Whitfield worked at Lee Obstetrics and Gynecology, PA. These women were paid by Defendant EAMC.  Their

paychecks came from Defendant EAMC, but they worked full time at Lee Obstetrics and Gynecology.   They performed collections for both Defendant EAMC and Lee OBGYN.  They performed Hemoglobin A1c, glucose testing and dipstick urinalysis for Lee OBGYN and these tests were billed by Lee OBGYN. Thus, a financial inducement and benefit was provided by Defendant EAMC to Lee OBGYN for the referral of all other laboratory testing to Defendant EAMC. That relationship is ongoing and has existed for approximately a year and a half.

ii. Employee Lease Agreements

100.   Defendant EAMC pays the physician practice for the lease of the employee to collect samples.   These arrangements are currently in place with Family Medicine Associates in Lee County, Alabama and Hiren K. Patel, M.D., P.C. in Lee County, Alabama.  Before the direct employment of two collectors at Lee OBGYN, Defendant EAMC had an employee lease agreement with Lee OBGYN for the lease of two employees.

101.   Defendant EAMC has such an employee lease agreement with Hiren K. Patel, MD, PC of Opelika, Alabama.   The agreement provides that Defendant EAMC will pay Hiren K. Patel, MD, PC to lease a full time employee at the rate of $12 per hour for 2080 hours per year to provide collection services. The contract acknowledges the Stark and Anti-Kickback laws.  Yet, the employee lease agreement was entered into by Defendant EAMC as an inducement for laboratory drug testing referrals from Hiren K. Patel, M.D., PC.

102.   The first contract is dated February 1, 2012 and signed by Ken Lott for Defendant EAMC and Hiren K. Patel for a term of one year.   The second

contract is dated February 1, 2013 and signed by Ken Lott for Defendant EAMC and Hiren K. Patel for a term of one year. All claims submitted to Federal payors for referrals of drug testing from Hiren K. Patel to Defendant EAMC are false claims for payment because they are submitted in violation of the certification of Stark and Anti-Kickback compliance on the CMS Form 1500.

103.   Defendant EAMC had such an employee lease agreement with Family Medicine Associates of Opelika, Alabama. The agreement provides that Defendant EAMC will pay Family Medicine Associates to lease a full time employee at the rate of $15 per hour for 2080 hours per year to provide collection services. The contract acknowledges the Stark and Anti-Kickback laws. Yet, the employee lease agreement was entered into by Defendant EAMC as an inducement for laboratory drug testing referrals from Family Medicine Associates. The first contract is dated May 1, 2010 and signed by Ken Lott for Defendant EAMC.   The same parties entered into a subsequent contract with the same terms dated May 1, 2012.

104.   All claims submitted to Federal payors for referrals of drug testing from Family Medicine Associates to Defendant EAMC are false claims for payment because they are submitted in violation of the certification of Stark and Anti-Kickback compliance on the CMS Form 1500.

## CAUSES OF ACTION

### COUNT I: VIOLATION OF 31 U.S.C. § 3729(a)(1)(A)

105.   Relator hereby incorporates and re-alleges all the preceding paragraphs as if set forth fully herein.

106. Defendants by and through their agents, officers, and employees, knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

107. The United States has been damaged as a result of Defendants' violations of the False Claims Act in an amount to be proven at trial. The United States is entitled to this sum as reimbursement for monies obtained by the Defendants for false claims submitted to the United States.

108. The United States is entitled to three times the total damages sustained as a result of the Defendants' violations.

109. The United States is entitled to a civil penalty of not less than $5,000.00 and not more than $10,000.00, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 Note; Public Law 104-410) for each of Defendants' false claims.

110. Relator is entitled to reasonable attorney's fees and costs under 31 U.S.C. §3730(d)(1).

## COUNT II: VIOLATION OF 31 U.S.C. § 3729(a)(1)(B)

111. Relator hereby incorporates and hereby re-alleges all of the preceding paragraphs as if fully set forth herein.

112. Defendants by and through their agents, officers, and employees, knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim in violation of 31 U.S.C. § 3729(a)(1)(B).

113.   The United States has been damaged as a result of Defendants' violations of the False Claims Act in an amount to be proven at trial.  The United States is entitled to this sum as reimbursement for monies obtained by the Defendants for false claims submitted to the United States.

114.   The United States is entitled to three times the total of damages sustained as a result of the Defendants' violations of 31 U.S.C. § 3729(a)(1)(B).

115.   The United States is entitled to a civil penalty of not less than $5,000.00 and not more than $10,000.00, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 Note; Public Law 104-410) for each of Defendants' false claims.

116.   The Relator is entitled to reasonable attorney's fees and costs under 31 U.S.C. §3730(d)(1).

## COUNT III: VIOLATION OF 31 U.S.C. § 3729(a)(1)(C)

117.   Relator hereby incorporates and hereby re-alleges all of the preceding paragraphs as if fully set forth herein.

118.   Each of the above named Defendants conspired with other named Defendants to knowingly present, cause to be presented, a false or fraudulent claim for payment; and conspired to knowingly make use or cause to be made a false record or statement material to a false or fraudulent claim; and knowingly conspired to conceal or avoid an obligation to pay or transmit money to the government in violation of 31 U.S.C. § 3729(a)(1)(C).

119.   The United States has been damaged as a result of Defendants' violations of the False Claims Act in an amount to be proven at trial.  The United

States is entitled to this sum as reimbursement for monies obtained by the Defendants for false claims submitted to the United States.

120.   The United States is entitled to three times the total of damages sustained as a result of the Defendants' violations of 31 U.S.C. § 3729(a)(1)(C).

121.   The United States is entitled to a civil penalty of not less than $5,000.00 and not more than $10,000.00, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 Note; Public Law 104-410) for each of Defendants' false claims.

122.   The Relator is entitled to reasonable attorney's fees and costs under 31 U.S.C. § 3730(d)(1).

### COUNT IV: VIOLATIONS OF 31 U.S.C. § 3729(a)(1)(G)

123.   Relator hereby incorporates and re-alleges all the preceding paragraphs as if set forth fully herein.

124.   Defendants, by and through it agents, officers, and employees, knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government in violation of 31 U.S.C. § 3729(a)(1)(G).

125.   The United States has been damaged as a result of Defendants' violations of the False Claims Act in an amount to be proven at trial.  The United States is entitled to this sum as reimbursement for monies obtained by the Defendants for money improperly withheld from the United States.

126.   The United States is entitled to three times the total damages sustained as a result of Defendants' violations of 31 U.S.C. § 3729(a)(1)(G).

127.   The United States is entitled to a civil penalty of not less than $5,000.00 and not more than $10,000.00, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 Note; Public Law 104-410) for each of Defendant's false claims.

128.   The Relator is entitled to reasonable attorney's fees and costs under 31 U.S.C. § 3730(d)(1).

### COUNT V: FALSE BILLINGS INCIDENT TO ANTI-KICKBACK AND STARK ACT VIOLATIONS

129.   Relator hereby incorporates and re-alleges all preceding paragraphs as if set forth fully herein.

130.   From 2008 to the present, Defendants violated the Anti-Kickback/Self-Referral Laws, 42 U.S.C. § 1395nn (a)(1), (h)(6) and 42 U.S.C. §1320a-7b(b), by entering into prohibited financial relationships with physicians, marketing companies and laboratories in order to obtain referrals of their patients.

131.   Defendants' violations of these laws rendered it statutory ineligible to receive payment for services rendered to patients referred under these prohibited relationships, under both the express terms of 42 U.S.C. §1395nn and by operation of the Medicaid/Medicare laws and regulations, including 42 C.F.R. §424.5 (a).

132.    The United States conditions payment on Defendants' compliance with the Anti-Kickback/Self Referral laws, 42 U.S.C. §§ 1395nn (a)(1), (h)(6) and 1320a-7b (b).

133.    Defendants submitted and continue to submit claims for payment for laboratory services rendered to Medicare and Medicaid patients while knowingly violating the Anti-Kickback/Self Referral laws and thereby statutorily ineligible to receive payment in violation of the False Claims Act, 31 U.S.C. § 3729.

134.    Defendants' actions also caused the submission of claims for payment for services rendered for Medicare, Medicaid, Tricare, and CHAMPUS patients while Defendants were knowingly violating the Anti-Kickback/Self Referral laws and statutorily ineligible to receive payment violating the False Claims Act 31 U.S.C. §3729.

135.    Accordingly, Defendants, by and through its agents, officers, and employees, knowingly presented or caused to be presented false or fraudulent claims for payment or approval and knowingly made, used, caused to be made or used, false records or statements material to a false or fraudulent claim and/or knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government in violation of 31 U.S.C. § 3729.

136.   The United States has been damaged as a result of Defendants' violations of the False Claims Act in an amount to be proven at trial.  The United States is entitled to this sum as reimbursement for monies obtained by the Defendants for false claims submitted to the United States.

137.   The United States is entitled to three times the total damages sustained as a result of Defendant's violations of the 31 U.S.C. § 3729.

138.   The United States is entitled to a civil penalty of not less than $5,000.00 and not more than $10,000.00, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 Note; Public Law 104-410) for each of Defendants' false claims.

139.   The Relator is entitled to reasonable attorney's fees and costs under 31 U.S.C. §3730(d)(1).

### COUNT VI: VIOLATION OF THE WHISTLEBLOWER PROTEC0(h)

140.   Relator hereby incorporates and re-alleges all preceding paragraphs as if set forth fully herein.

141.   Defendants Aperian and EAHCA demoted, constructively discharged and otherwise discriminated against Relator Fite in the terms and conditions of his employment, because of the lawful acts done by Relator Fite in furtherance of his efforts to stop one or more violations of the False Claims Act by Defendants.

142.   Under the False Claims Act, Relator is entitled to reinstatement with the same seniority status that he would have had but for the discrimination, two times the amount of back pay, interest on back pay, and compensation for any

special damages sustained as a result of the discrimination, including litigation costs and reasonable attorney's fees.

## PRAYER FOR RELIEF

WHEREFORE, Relator prays that this Court enter an order granting the following judgment and relief:

(a)    Ordering the Defendants to pay the United States Government three times its actual damages resulting from the Defendant's violations of the False Claims Act;

(b)    Ordering Defendants to pay the United States Government a civil penalty for each false claim as set forth in the False Claims Act;

(c)    Ordering Defendants to pay Relator monetary damages for its violation of 31 U.S.C. §3730 (h), the Whistleblower Protection Provision of the False Claims Act;

(d)    Awarding Relator an amount the Court decides is reasonable for collecting the civil penalty and monetary damages by pursuing this matter, which award, by statute shall not be less than 15% nor more than 25% of the proceeds of this action or the settlement of any such claim, if the Government intervenes in the action and not less than 25% nor more than 30% if the Government declines to intervene in the action.

(e)    Ordering the Defendants to pay Relator's attorney's fees and cost;

(f)    Granting such other relief as the Court may deem just and proper.

**RELATOR DEMANDS TRIAL STRUCK JURY.**

Respectfully submitted,

SCOTT A. POWELL (ASB-7523-L60S)
DON McKENNA  (ASB-6494-C66D)

**Attorneys for Relator Leamon M. Fite III**

**HARE, WYNN, NEWELL & NEWTON, LLP**
The Massey Bldg., Suite 800
2025 Third Avenue North
Birmingham, AL 35203
Tel: (205) 328-5330
Fax: (205) 324-2165

ADAM P. PLANT (ASB-6324-A64P)

**Attorney for Relator Leamon M. Fite III**

**BATTLE & WINN, LLP**
2901 Second Avenue South, Suite 220
Birmingham, Alabama 35233
Tel: (205) 397-8160
Fax: (205) 397-8179

51