FILED

2016 Mar-15  PM 05:17
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES ex rel** | : | |
| | : | |
| **LEAMON M. FITE III**, | : | |
| | : | |
| | : | |
| | : | |
| *Relator-Plaintiff*, | : | |
| | : | **CIVIL ACTION NO.** |
| **v.** | : | **5:13-cv-1626-LSC** |
| | : | |
| **APERIAN LABORATORY SOLUTIONS** | : | |
| **LLC; EAST ALABAMA HEALTH** | : | |
| **CARE AUTHORITY d/b/a EAST** | : | |
| **ALABAMA MEDICAL CENTER;** | : | |
| **SUMMIT DIAGNOSTICS, LLC;** | : | |
| **COMPASS LABORATORY SERVICES**, | : | |
| **LLC; TOTAL DIAGNOSTIC** | : | |
| **SOLUTIONS, LLC; JANNIE LYNN** | : | |
| **WORK CHAPMAN; AND** | : | |
| **SHELINDER AGGARWAL,** | : | |
| | : | |
| *Defendants*. | : | |

## SECOND AMENDED COMPLAINT

This Second Amended Complaint is filed by Relator Leamon M. Fite III

against Defendants Aperian Laboratory Solutions, LLC; East Alabama Health Care

Authority d/b/a East Alabama Medical Center; Summit Diagnostics, LLC; Compass

Laboratory Services, LLC; Total Diagnostic Solutions, LLC; Jannie Lynn Work

Chapman; and Shelinder Aggarwal.

## I.    Summary of the Case

Relator Leamon M. Fite III has sued in the name of the United States Government to recover damages and civil penalties arising from false claims for laboratory services submitted, and caused to be submitted, to the United States for payment. This case was originally filed on August 30, 2013, and this Court ordered the Complaint unsealed on August 11, 2015.

In this case, the Defendants participated in four unlawful schemes. The first was a series of improper contractual relationships that violate the Anti-Kickback Statute and the False Claims Act. The second was a series of transactions where physicians were provided things of value—in this case, Noble Split-Specimen Cups—to physicians who would make referrals through referral companies to Aperian, which would perform "confirmatory" testing of the submitted samples. The third scheme concerns the Defendants paying for collector personnel in physician offices as an inducement to refer laboratory tests. The fourth scheme that violates Federal law is that Defendant EAMC supplied physicians with collectors who provided a direct benefit to their practice by performing collections for tests conducted in-house at the physician practice to physician offices with a high volume of clinical lab testing referrals. Each of these schemes, the facts underlying the schemes, and the manner in which these schemes violate Federal law are described reliably below. A table of contents follows for ease of reference.

## II.    Table of Contents

**I.    Summary of the Case**................................................................2

**II.   Table of Contents**.................................................................3

**III.  Parties**.............................................................................5

*A.    Relator*...............................................................................5

*B.    Defendants*........................................................................10

**IV.   Jurisdiction and Venue**.....................................................13

**V.    Governing Law**.................................................................13

*A.    The False Claims Act*.......................................................13

*B.    The Anti-Kickback Statute*...............................................15

*C.    The Stark Law*.................................................................17

**VI.   The Federal Healthcare Programs**......................................19

*A.    The Medicare Program*.....................................................19

*B.    The Medicaid Program*......................................................20

*C.    Tricare/CHAMPUS*..........................................................20

**VII.  Factual Allegations**..........................................................21

*A.    The Commission-Based Marketing Schemes*.......................21

1.    Summit Diagnostics Markets for Aperian.........................24

2.    Compass and TDS Market for Aperian.............................33

3.    Magnolia Analytical Markets for Aperian.........................44

4.    Additional Facts Regarding the Commission-Based
Marketing Schemes.........................................................47

*B.*    *The Point-of-Care Testing Cup Scheme* ........................................................47

*C.*    *The Collector Personnel Scheme* ....................................................................70

1.    Collectors Provided to Aperian Base Clients. ................................................71

2.    Collectors Provided to Summit Diagnostics-Referred Clients. ......................77

3.    Collectors Provided to Compass/TDS-Referred Clients. ..............................79

*D.*    *EAMC Lab Outreach Program Provides Collectors to Physicians' Offices.*........................................................................................82

1.    Collectors Employed Directly by EAMC. ....................................................82

2.    Employee Lease Agreements ........................................................................83

*E.*    *Additional Facts Regarding Relator's Employment.*......................................86

**VIII.** **Causes of Action** ..............................................................................................89

**IX.**    **Prayer for Relief and Jury Demand** ................................................................132

**[Remainder of page left blank intentionally.]**

### III.   Parties

1.     The Relator and each of the seven Defendants are described reliably in turn below.

#### A. Relator

2.     Relator Leamon M. Fite III is a citizen of Alabama and the United States of America. Relator brings this civil action for violations of 31 U.S.C. § 3729 *et seq*. for himself and for the United States Government under the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3730(b)(1).

3.     Relator is a former employee of East Alabama Medical Center (EAMC) in the State of Alabama. Relator also was involved in the operations of Aperian Laboratory Solutions, LLC, which is a wholly-owned subsidiary of EAMC. Relator was employed by Defendants EAMC and Aperian from May 2005 to May 2013.

4.     Relator has direct and independent knowledge of the false claims submitted by Defendants to the Federal government and is an original source of the information contained in these allegations.

5.     Relator's direct and independent knowledge was obtained inside EAMC and Aperian where he performed many job functions that directly relate to the conduct alleged here.

6.     In May 2005, Relator began working with EAMC as a laboratory assistant. When he was certified by the American Society for Clinical Pathology in

May 2006, he was promoted to medical laboratory technologist. In May 2007, he was promoted to process management analyst.

7.     In May 2008 relator was promoted again—this time to director of operations of Lab Outreach. Relator served in that position for approximately five years.

8.     In his positions with EAMC, Relator gained first-hand knowledge of the clinical operation of all departments within the EAMC Clinical Laboratory, the clinical operation and business operation of Laboratory Outreach, and the clinical operation and business operation of Aperian Laboratory Solutions.

9.     Relator attended Tuesday administrative meetings on a weekly basis for more than two years. Other attendees included the CEO, Vice Presidents, and Assistant Vice Presidents of EAMC. From these meetings, Relator gained a substantial base of knowledge in the general clinical and administrative operations of the hospital, including financial performance metrics, clinical performance metrics, departmental staffing processes and issues, and ongoing medico-legal issues.

10.     As a process management analyst, Relator gained knowledge of clinical and operational processes within many hospital departments, including medical records, billing, registration, perioperative services, cancer center, and radiology.

11.     In addition to his job duties with EAMC, Relator was asked to oversee the business side of Aperian. In his role as Director of Operations for Aperian, Relator oversaw a team of approximately five people in the administrative section of the lab. The functions of the employees he oversaw included a client services manager, two billing/registration representatives, one IT/systems coordinator, and one front desk clerk/collector.

12.     Relator communicated with Aperian's outside billing company regarding various issues, including registration information, payor credentialing, claim issues, collections, cash flow of reimbursements from payers, and other billing issues.

13.     Relator made monthly reports regarding the performance of the billing company, client performance and volume, reimbursement issues, various financial metrics (related to revenue, expenses, and net income), and current issues (such as staffing demands, ROI for equipment purchase, compliance issues, and client issues) to what was termed the "Aperian Board."

14.     The Aperian Board was not a formal board of directors, but the group consisted of the administrative decision-makers of EAMC. Members of the Aperian Board included Terry Andrus (CEO), Laura Grill (Administrator), Sam Price (CFO), Ken Lott (VP of Relator's division), Sara Gray (AVP of information technology), Roben Nutter (AVP of compliance and legal affairs), Laura Bell (AVP of quality

management), Carey Owen (VP of plant and equipment), and LeAnne Moran (Director of Revenue Cycle/Billing). Also regularly present at these meetings were Allen Valaer (Aperian Clinical Director), Jerry McHan (Aperian Medical Director), and Michele Hunter (Aperian Client Relations Manager).

15.    In coordination with the clinical director (Valaer), medical director (McHan), VP (Lott), and AVP for compliance and legal affairs (Nutter), Relator worked with various vendors in contract negotiations, capital purchases, and provision of services. One example of this coordination involved the purchase and implementation of a new laboratory information system called Horizon ChemWare.

16.    Relator was responsible for negotiating and supervising contracts with various "marketing companies" on behalf of Aperian.

17.    Throughout his five years as Director of Operations at Aperian, Relator was the primary liaison between Aperian and its outside billing company, Peachtree Medical Billing. Peachtree began handling billing for Aperian in 2009.

18.    Relator worked closely with Louri Roberts (CFO of Peachtree) to complete all private insurance payer credentialing contracts in many states.

19.    Relator, Valaer, and Michele Hunter also worked with Peachtree Billing to establish a billing policy and to correct any claim issues that arose during the normal process of registration to billing to reimbursement.

20.    Approximately one year before Relator was separated from his employment with Aperian and EAMC, an effort was made to move Aperian billing back in-house to EAMC's billing department. During that year, Relator worked very closely with Peachtree Billing, LeAnne Moran (revenue cycle director), Michelle Pitts (business office director), and Tracy Liveoak (outside IT consultant) to establish appropriate processes for registration and billing in-house.

21.    During his time as director of operations, Relator had access to Aperian's registration system, which is a custom portal where patient information, coding information, and billing information was entered and then sent to Peachtree billing for submission of claims.

22.    Relator received and reviewed custom reports from Peachtree Billing on behalf of Aperian. These reports detailed billed claims and reimbursed claims broken down by client and individual physicians, general reimbursement information broken down by referral source and Marshall reports which consolidated billing and reimbursement information by private and governmental insurance payers over time. They were reliably and regularly used by EAMC financial services and Aperian.

23.    As shown in this Complaint, Relator neither planned nor initiated any of the schemes alleged here. He was, however, responsible for the ongoing business of Aperian and as such may provide reliable allegations regarding the schemes

alleged here because, in summary, Relator had access to all financial and billing information (including specific insurance claim information, EAMC EPSi financial reporting system, Peachtree reporting system), client service information, vendor contracting information, credentialing information, various other ancillary databases and systems, and operational and strategic planning information for both Aperian and EAMC Lab Outreach for the entire time he served as director of operations.

### B. Defendants

24.    Defendant Aperian Laboratory Solutions, LLC (Aperian) is a corporation with its principal office in Opelika, Alabama at 121 N. 20th Street, Suite 17 Opelika, AL 36801. It is a wholly-owned subsidiary of The East Alabama Health Care Authority d/b/a East Alabama Medical Center. Aperian provides both forensic lab services (through drug screens for industrial employees) and clinical laboratory services (through testing for pain management and family practice clinics to determine the presence of pain management drugs in their patients' bodies). Aperian has its own provider numbers and submitted, and continues to submit, claims for laboratory services to Federal payors, Medicare, Medicaid, Tricare and CHAMPUS.

25.    Defendant East Alabama Health Care Authority d/b/a East Alabama Medical Center (EAMC) is located at 2000 Pepperell Parkway, Opelika, AL, 36801. Defendant EACHA is owned by Lee County and holds itself out as a not for profit

institution. It is the parent company of wholly-owned subsidiary Aperian. The officers for Aperian and EAMC are the same people.

26.     Defendant Summit Diagnostics, LLC (Summit Diagnostics) is a Delaware corporation with its principal place of business in New Hampshire. The address for Summit Diagnostics is P.O. Box 743, Londonberry, NH 03053. Its physical address 88 Stiles Road, Suite 103, Salem, NH 03079. Summit Diagnostics provided marketing for Aperian's laboratory services and also referred and arranged the referral of business to Aperian in exchange for a percentage of the billing of all samples. The percentage increased with the number of samples referred by Summit Diagnostics.

27.     Defendant Compass Laboratory Services, LLC (Compass) is a Tennessee corporation with a primary place of business at 1910 Nonconnah Boulevard, Memphis, TN 38132. Compass is a full service toxicology lab. Compass provided marketing for Aperian and referred and arranged the referral of patient samples to Aperian in exchange for remuneration. That remuneration was first a percentage of the referral billing value, then a flat fee of $35,000 a month with increases if volume increased, and then it returned to a percentage of the referral billing value. Jannie Chapman is the V.P. of Compass and the President of Total Diagnostic Solutions, LLC.

28.     Defendant Total Diagnostic Solutions, LLC (TDS) is a Tennessee corporation located at 7506 Enterprise Way, Germantown, TN 38138. Its mailing address is P.O. Box 11895, Memphis, Tennessee 38111. TDS provided marketing for Aperian and referred and arranged the referral of patient samples to Aperian in exchange for remuneration. That remuneration was first a percentage of the referral billing value, then a flat fee of $35,000 a month with increases for increased volume, and then it returned to a percentage of the referral billing value.

29.     Defendant Jannie Lynn Work Chapman is the President of Defendant TDS and President/V.P. of Defendant Compass. She is the primary salesperson and driving force for both Compass and TDS. Her home address is 333 Ripple Lane, Owens Crossroads, AL 35763. She negotiated the marketing agreements with Defendant Aperian.

30.     Defendant Shelinder "Shaun" Aggarwal, M.D. is a resident of Madison County, Alabama. He is an investor in Compass Laboratory Solutions. He was also one of the largest volume physicians that referred samples to Aperian. Of course, Compass (the company he invested in) benefitted financially by way of commissions from his referrals to Aperian. Dr. Aggarwal surrendered his medical license on July 16, 2013 for over-prescribing narcotics. On information and belief, Aggarwal has fled the country.

**IV.    Jurisdiction and Venue**

31.    This action arises under 31 U.S.C. § 3729 *et seq*., commonly known as the False Claims Act.

32.    This Court has jurisdiction over this action under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331, because this civil action arises under the laws of the United States and at least one of the Defendants resides and can be found in Alabama and transacts business in Alabama.

33.    Venue is proper in the Northern District of Alabama under 28 U.S.C. § 1391(b) and (c) and 31 U.S.C. § 3732(a) because at least one Defendant that operated in concert with other Defendants resides, can be found in, and operates and transacts business in the Northern District of Alabama.

34.    Relator has complied with the requirements of 31 U.S.C. § 3730(b)(2).

**V.    Governing Law**

35.    Three Federal statutes govern the claims pleaded in this Second Amended Complaint. They are addressed in turn below.

**A. The False Claims Act**

36.    The False Claims Act ("FCA") provides in part that certain acts are prohibited by law, and any person or corporate entity that violates the False Claims Act is liable for damages, penalties, and other relief, including exclusion from participation in Federal healthcare programs:

(a) Liability for certain acts.

(1) In general. Subject to paragraph (2), any person who—

    (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

    (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

    (C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

    (D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;

    (E) is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

    (F) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or

    (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729.

**Second Amended Complaint | 14**

### B. The Anti-Kickback Statute

37.    The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), arose out of Congressional concern that payoffs to those who can influence healthcare decisions would result in goods and services being provided that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population. To protect the integrity of the program from these difficult-to-detect harms, Congress enacted a *per se* prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback gave rise to overutilization or poor quality of care. First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b), (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

38.    The Anti-Kickback Statute prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for federally-funded medical services, including services provided under the Medicare, Medicaid and (as of January 1, 1997) TRICARE programs:

(b) Illegal remuneration

(1) whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—

> (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

> (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

(2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person --

> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

> (B) to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b). Violation of the statute can also subject the perpetrator to exclusion from participation in federal health care programs and civil monetary penalties of $50,000 per violation and three times the amount of remuneration paid. 42 U.S.C. § 1320a-7(b)(7); 42 U.S.C. § 1320a-7a(a)(7).

39.     Compliance with the Anti-Kickback Statute is, and was at all relevant times, a prerequisite to payment under the Medicare, Medicaid and CHAMPUS/ TRICARE.

40.     Defendants are required to certify compliance with the Anti-Kickback Statute as condition of payment when they submit their claims for payment to the aforementioned Federal payors on form CMS Form 1500.

### C. The Stark Law

41.     Section 1877 of the Social Security Act, codified at 42 U.S.C. § 1395nn and commonly referred to as the "Stark Law," prohibits a physician from referring Medicare patients for certain "designated health services" to an entity with which he has a "financial relationship" unless an exception applies. When originally enacted in 1989, the prohibitions applied only to physicians' referrals for clinical laboratories. Omnibus Budget Reconciliation Act of 1989, P.L. 103-66, § 13562, Social Security Act Amend. of 1994, P.L. 103-432, § 152. Clinical laboratory services provided by Defendant Aperian and related physicians are at issue in this *qui tam* lawsuit.

42.     In addition to prohibiting certain physician referrals, the Stark Law prohibits health care entities from presenting or causing to be presented any Medicare claim for DHS provided as a result of a prohibited referral. 42 U.S.C. § 1395(a)(1)(B). Any entity that collects a Medicare payment for DHS rendered under

a prohibited referral must refund all collected amounts. 42 U.S.C. § 1395nn(g)(2); 42 C.F.R. § 411.353(g).

43.    Any person or entity who bills Medicare for DHS that the person or entity knew, or should have known, resulted from a prohibited referral is also subject to a civil monetary penalty of not more than $15,000 for each service and an assessment by OIG of three times the amount claimed for DHS. 42 U.S.C. § 1395nn(g); 42 CFR § 1003.100 (b)(viii).

44.    Under the Stark Law, the United States will not pay for certain items or services prescribed or ordered by physicians who have improper financial relationships with the entities that furnish those items or services. Stated conversely, compliance with the Stark Law is a condition of payment imposed by the Federal Healthcare Programs. One of the major purposes of the statute was to reduce losses suffered by the Medicare program due to overutilization of services.

45.    The Stark Law broadly defines "financial relationship" to include ownership and investment interest and compensation agreements that involve any direct or indirect remuneration between a physician and an entity providing DHS. A variety of regulatory and statutory exceptions identify specific types of investments and compensation agreements that will not violate its referral and billing prohibitions. Financial relationships between a physician and an entity providing DHS that do not meet a regulatory or statutory exception violate the statute.

46.     As specified below, some of the transactions and activities into which the Defendants entered and participated violate these prohibitions on financial relationships. They also do not meet the exceptions or safe harbors provided by law.

47.     Where, as here, the government through its governmental reimbursement programs, has conditioned payment of a claim upon a claimant's certification of compliance with a statute or regulation, a claimant submits a false or fraudulent claim when the claimant falsely certifies compliance with the statute or regulation. Defendants submitted their claims, or caused claims to be submitted, on CMS Forms 1500 with the required certification for reimbursement but falsely stated that they were in compliance with statutes and regulations, including but not limited to the False Claims Act, Anti-Kickback Statutes, and Stark Laws.

## VI.   The Federal Healthcare Programs

48.     There are three Federal healthcare programs at issue in this case. They are described in turn below.

### A. *The Medicare Program*

49.     In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare Program, to pay for the costs of certain healthcare services. Entitlement to Medicare is based on age, disability or affliction with end-stage renal disease. *See* 42 U.S.C. §§ 426, 426A. Part B of the Medicare Program authorizes payment for clinical diagnostic laboratory services ordered by a doctor or

practitioner including certain blood tests, urinalysis, tests on tissue specimens and some screening tests.

### B. The Medicaid Program

50.    Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled. The federal government provides matching funds and ensures that states comply with minimum standards in the administration of the program.

51.    The Federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding, which is called federal financial participation ("FFP"). 42 U.S.C. §§ 1396, et seq.

52.    The Medicaid program of each state must cover laboratory services. 42 U.S.C. §§ 1396a(10)(A), 1396d(a).

### C. Tricare/CHAMPUS

53.    Tricare, formerly known as the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS") is a health care program of the United States Department of Defense Military health System. Tricare provides civilian health benefits for military personnel, military retirees, and their dependents, including some members of the Reserve Component. These benefits include the laboratory services at issue in this case.

54.     The Tricare program is managed by the Tricare Management Activity under the authority of the Assistant Secretary of Defense (Health Affairs).

## VII.   Factual Allegations

55.     There are four schemes of fraudulent conduct that led to the submission of false claims to the Federal payors by Defendant Aperian or by which Aperian and other Defendants caused the submission of false claims to Federal payors.

56.     Aperian entered into these four schemes despite its governing compliance policies, which state that "[p]ayments or other items of value . . . intended to induce or reward favorable decisions or actions are not to be offered, made, solicited, received, or tolerated in connection with" the business of EAMC.

57.     Those four schemes, which are described reliably in turn below, were directly in knowing conflict with EAMC policies that prohibit "[r]eceiving or making payments for any patient referrals" and "[o]ffering or giving gifts, money, services, or other items to influence purchasing decisions to any third party."

### A. The Commission-Based Marketing Schemes

58.     Defendant Aperian obtained referrals from and through various "marketing" firms and labs by paying commissions to these companies for laboratory testing referrals. These arrangements violate the Anti-Kickback Statute and violate the OIG Advisory opinion on sales agents posted on August 31, 1998 (Advisory Request No. 98-10).

59.    HHS has long been concerned with situations where health care items or services that are reimbursable by a Federal health care program, whether through direct or indirect reimbursement, are marketed through agents irrespective of the methodology used to compensate the agent.

60.    The HHS OIG has identified several characteristics of marketing arrangements that may lead to an increased potential for false claims, overutilization, and excessive costs to the government payors. The chief "suspect characteristic" on that list is "compensation based on percentage of sales." Another suspect characteristic is "direct contact between the sales agent and physicians in a position to order items or services that are then paid for by a Federal health care program." A third suspect characteristic is "use of sales agents who are health care professionals" because those agents may "exert undue influence on purchasers."

61.    Most importantly, the costs of performing testing were reimbursable by Federal payors, which incentivizes all of the participants to increase the volume of testing. The marketing companies would receive a greater referral fee; the providers would receive additional reimbursement by Federal payors; and Aperian would receive an additional volume of business from the providers that could be reimbursed by Federal payors.

62.    Each of those suspect characteristics is pleaded in the facts described reliably below, though there are others that Relator could offer if required to do so

because he was responsible for helping Aperian enter into contracts with marketing companies, including Summit Diagnostics and Compass/TDS.

63.    Jerry McHan, the medical director of Aperian, took the lead on communication and began a dialogue with these two companies initially before handing off negotiations to Relator. After McHan and the respective leaders at these companies (George Powell for Summit Diagnostics and Chapman for Compass/TDS) established an initial understanding, then representatives of the respective companies (and/or their counsel) and EAMC and Aperian executives received a draft contract to review.

64.    These contract negotiations would go back and forth between the parties, usually by email. With each revision, Relator would consult with a compliance officer/Assistant Vice President of EAMC for input regarding contract terms and to ensure compliance issues were addressed.

65.    Ken Lott typically would be copied on emails regarding contract revisions and discussions. Once contract negotiations were finished and both parties agreed on the terms, either Lott or Sam Price typically would execute the contract for EAMC.

66.    Valaer typically would be responsible for instituting the clinical testing processes, and Michele Hunter would reach out to the various clients to begin a client service relationship.

67.     Fite raised concerns regarding these commission-based marketing arrangements to his superiors, including to Lott, but those concerns were not met with a willingness to change the conduct to comply with Federal law.

68.     In fact, in a February 11, 2013 email from Lott to Relator and others, Lott stated that the business model of EAMC and Aperian was "to combine our business with a Marketing Company that can drive volume to us."

69.     EAMC and Aperian participated in three commission-based marketing schemes, and each is described in reliable detail below.

### 1.  Summit Diagnostics Markets for Aperian.

70.     This relationship between Defendant Summit Diagnostics and Defendant Aperian began when George Powell, the CEO of Summit Diagnostics, contacted Aperian Medical Director Jerry McHan about providing marketing services for Aperian. This contact evolved into a contractual relationship wherein Summit Diagnostics agreed to provide referrals of laboratory testing customers to Aperian in exchange for a percentage of the referral value.

71.     The contract on its face violates the Anti-Kickback Statute, despite acknowledging, in paragraph 7.9, laws and paying lip service to the parties conducting themselves in accordance with the laws; this contract was signed by Ken Lott for Aperian and George Powell for Summit Diagnostics.

72.     In other words, Defendants have specifically stated their knowledge of the Anti-Kickback Statute. Therefore, their conduct is "knowing" within the meaning of the False Claims Act.

73.     The Sales Services Contractor Agreement provides that Aperian will pay Summit Diagnostics "a base amount of 15% for all specimens received from Summit Diagnostics Accounts up to the following volumes at which time Aperian Laboratory Solutions will pay a higher rate starting from specimen #1."

74.     The contract further states that all commissions "will be paid on the 20th of each month and will be based on received amounts only" (amounts paid by providers are the received amounts under that contract).

75.     The contract established the following value-for-volume provisions:

- 800-1000 specimens/month 20% commission will be paid for all specimens per month.

- 1001-1200 specimens/month 22% commission will be paid for all specimens per month.

- 1201+ specimens/month 28% commission will be paid for all specimens per month.

76.     The contract length was for one year with automatic renewal.

77.     This contract began in August 2009 and continued through the date on which Relator was separated from his employment at Aperian/EAMC.

78.     After the Summit Diagnostics relationship began in 2009, Relator participated in weekly status calls. Other participants in those weekly calls included

Valaer, Jerry McHan, Michele Hunter, and George Powell. Business associates of Powell's at Summit Diagnostics, including Alice Erret (sales manager) and other sales reps, occasionally participated in these weekly calls, as well.

79.    These calls would normally involve discussions about new client possibilities, new service offerings, laboratory performance such as testing turn-around time, supply needs and issues, new markets, the need for additional collector personnel in physician practices, and other operational and marketing issues.

80.    Payments for laboratory referrals were made, and continued to be made through the time of Relator's employment, to Summit Diagnostics by Aperian on a monthly basis.

81.    The documentation of payments from Aperian to Summit Diagnostics can be found in the Accounts Payable Year-to-Date reports from Aperian. These reports come from the EPSI system at EAMC and are the AP Detail YTD (accounts payable year-to-date).

82.    The commission paid from Aperian to Summit Diagnostics averaged around $20,000 per month. A few examples to provide indicia of reliability regarding the commission payments are as follows:

| Summit Diagnostics Invoice Date | Aperian Payment Amount |
|---|---|
| 11/23/2009 | $8,687.01 |
| 8/6/2010 | $25,660.11 |
| 10/20/2010 | $30,403.28 |
| 12/22/2010 | $39,207.95 |
| 8/24/2011 | $43,029.29 |
| 10/3/2011 | $49,847.95 |
| **Total through February 2013** | **$812,385.75** |

83.     The contract is an inducement to provide referrals and takes into consideration the volume and value of the referrals, as shown by the fluctuating monthly amounts above. This referral relationship, and the referrals and payments made under that relationship, violate the Anti-Kickback Statute.

84.     During the time period of the improper contractual referral relationship between Summit Diagnostics and Aperian (which was an ongoing relationship at the time Relator was separated from his employment at Aperian), Aperian submitted millions of dollars of claims to Medicare, Medicaid, Tricare, and CHAMPUS for laboratory tests referred to Aperian by Summit Diagnostics.

85.     These amounts are documented in the Peachtree Billing Accounts Receivable Marshall Reports. There is a separate Marshall report for each individual referral relationship (including Summit Diagnostics) and then there is a roll-up report for all payments.

86.    To provide indicia of reliability, Relator states that the following amounts represent the claims submitted and actually paid by Federal payors during the following time periods for referrals received by Aperian from Summit Diagnostics under the prohibited referral compensation arrangement.

**Medicare**

| Month | Billed | Paid |
|---|---|---|
| April 2009 | $2,425.52 | $1,212,76 |
| May 2009 | $15,226.14 | $7,613.07 |
| June 2009 | $29,165.84 | $14,342.81 |
| July 2009 | $23,100.76 | $10,770.15 |
| August 2009 | $38,553.42 | $17,981.26 |
| September 2009 | $48,642.02 | $24,136.31 |
| October 2009 | $13,895.52 | $6,873.81 |
| November 2009 | $13,361.62 | $5,743.55 |
| December 2009 | $21,225.88 | $8,754.09 |
| January 2010 | $40,047.90 | $16,963.66 |
| February 2010 | $43,369.28 | $22,156.44 |
| March 2010 | $169,512.52 | $75,904.07 |
| April 2010 | $144,308.36 | $66,380.16 |
| May 2010 | $144.285.34 | $64,305.35 |
| June 2010 | $121,405.87 | $55,040.88 |
| July 2010 | $162,452.04 | $67, 757.30 |
| August 2010 | $126,493.54 | $61,178.32 |
| September 2010 | $146,124.16 | $59,946.31 |
| October 2010 | $91,348.10 | $39,298.39 |
| November 2010 | $132,569.34 | $59,728.02 |
| December 2010 | $122,329.42 | $52,796.37 |
| January 2011 | $85,385.66 | $13,171.59 |
| February 2011 | -$11,290.77 | $27,000.14 |
| March 2011 | $80,901.05 | $44,776.51 |
| April 2011 | $67,470.20 | $39,650.57 |
| May 2011 | $89,248.16 | $49,837.29 |
| June 2011 | $69,066.94 | $41,821.97 |
| July 2011 | $62,961.98 | $35,157.46 |

| August 2011 | $71,443.08 | $41,190.76 |
| September 2011 | $54,781.86 | 29,954.66 |
| October 2011 | $35,955.03 | $19,440.59 |
| November 2011 | $24,501.80 | $13,648.16 |
| December 2011 | $13,128.53 | $6,550.46 |
| January 2012 | $16,812.82 | $9,156.48 |
| February 2012 | $17,179.97 | $10,477.79 |
| March 2012 | $6,010.06 | $6,235 |
| April 2012 | $8,746.04 | $5,062.72 |
| May 2012 | $12,026.23 | $6,960.37 |
| June 2012 | $5,374.32 | $3,877.17 |
| July 2012 | $2,292.23 | $5,407.45 |
| August 2012 | $6,833.65 | $4,323.94 |
| September 2012 | $7,347.43 | $5,657.02 |
| October 2012 | $5,353.49 | $2,871.75 |
| November 2012 | $2,225.67 | $1,553.75 |
| December 2012 | $2,670.71 | $1,793.05 |
| January 2013 | $2,445.15 | $858.55 |
| February 2013 | $419.75 | $292.82 |
| **Total for Above Time Period** | **$2,289,133.63 billed to Medicare** | **$1,168,487.26 paid by Medicare** |

**Medicaid**

| Month | Billed | Paid |
| --- | --- | --- |
| April 2009 | $0 | $0 |
| May 2009 | $4,317.97 | $132.64 |
| June 2009 | $23,803.18 | $816.78 |
| July 2009 | $21,518.10 | $155.19 |
| August 2009 | $29,934.60 | $629.05 |
| September 2009 | $26,751.04 | $477.16 |
| October 2009 | $25,879.58 | $811.27 |
| November 2009 | $33,454.08 | $2,739.03 |
| December 2009 | $92,997.14 | $7,569.35 |
| January 2010 | $93,062.64 | $7,053.70 |
| February 2010 | $95,633.76 | $8,346.02 |
| March 2010 | $181,049.42 | $16,901.43 |
| April 2010 | $166,462.92 | $12,604.08 |
| May 2010 | $214,379.24 | $18,346.56 |

| | | |
|---|---|---|
| June 2010 | $196,525.38 | $13,548.09 |
| July 2010 | $187,182.79 | $12,247.05 |
| August 2010 | $198,839.02 | $17,975.21 |
| September 2010 | $148, 055.68 | $18,206.10 |
| October 2010 | $80,281.06 | $12,892.96 |
| November 2010 | $116,708.46 | $17,462.88 |
| December 2010 | $139,693.08 | $21,882.78 |
| January 2011 | $95,709.60 | $12,944.46 |
| February 2011 | $104,700.21 | $12,530.41 |
| March 2011 | $161,288.76 | $20,085.74 |
| April 2011 | $133,487.44 | $18,026.69 |
| May 2011 | $197,356.23 | $30,051.13 |
| June 2011 | $161,105.63 | $17,981.52 |
| July 2011 | $124,067.50 | $14,891.19 |
| August 2011 | $120,967.44 | $12,774.11 |
| September 2011 | $107,795.37 | $10,321.72 |
| October 2011 | $82,509.57 | $5,103.23 |
| November 2011 | $49,568.67 | $3,148.70 |
| December 2011 | $28,782.03 | $2,185.66 |
| January 2012 | $62,289.13 | $2,360.36 |
| February 2012 | $59,256.77 | $4,343.13 |
| March 2012 | $19,270.24 | $2,102.60 |
| April 2012 | $27,339.49 | $4,682.23 |
| May 2012 | $20,951.44 | $3,263.53 |
| June 2012 | $10,253.28 | $1666.73 |
| July 2012 | $10,260.08 | $835.81 |
| August 2012 | $7,677.92 | $1,642.98 |
| September 2012 | $6,433.30 | $817.28 |
| October 2012 | $4,745.26 | $221.06 |
| November 2012 | $3,936.88 | $36.71 |
| December 2012 | $3,076.62 | $0 |
| January 2013 | $1,115.54 | $1,128.01 |
| February 2013 | $945.08 | $0 |
| **Total for Above Time Period** | **$3,681,418.59 billed to Medicaid** | **$373,679.93 paid by Medicaid** |

87.    The claims for payment were submitted by Aperian on CMS Forms 1500 and contained an Aperian signed certification that the provider, Aperian Laboratory Solutions, LLC, was in compliance with the Anti-Kickback Statute.

88.    This certification was knowingly false because of the prohibited financial relationship with Defendant Summit Diagnostics. Thus, each CMS Form 1500 claim for payment of laboratory services by Aperian originating from a Summit Diagnostics referral is a false claim for payment. Defendant Aperian submitted the false claims for payment on CMS Forms 1500 and Defendant Summit Diagnostics caused the submission of the false claims for payment by entering into the referral relationship that violated the Anti-Kickback Statute making the claims ineligible for payment. Both defendants conspired in their conduct to violate the law and submit false claims for payment.

89.    Relator provides the following specific examples of claims submitted by Aperian for Summit Diagnostics referrals in violation of the Anti-Kickback Statute:

a.    Encounter #A12-08197, patient initials C.M., referral source Summit Diagnostics, Dr. Joel Floyd Schock IV, M.D., date of service February 9, 2012, procedure code 82145, submitted on CMS Form 1500 to Medicare for payment on May 29, 2012. This claim contained the signature

and certification of Aperian Laboratory Solutions, LLC and a certification of compliance with the Anti-Kickback Statute.

b.     Encounter #A12-07524, patient initials K.A., referral source Summit Diagnostics, Dr. Ashley M. Classen, D.O., date of service February 9, 2012, procedure codes G0431, 80154, 82205, and 82646, submitted on CMS form to Medicare for payment on May 29, 2012. This claim contained the signature and certification of Aperian Laboratory Solutions, LLC and a certification of compliance with the Anti-Kickback Statute.

90.     The conduct at issue here is knowing and warrants treble damages and penalties. Relator pointed out the problems with these contracts to his superiors in written correspondence.

91.     The first correspondence pre-dates the first contract between Aperian and Summit Diagnostics. Relator, therefore, raised red flags and blew the whistle to his employers regarding these improper relationships from the time they began to the time he left. Further, the web site of Summit Diagnostics offers a compliance service to review relationship contracts for compliance with Stark and Anti-Kickback Statute. *See* www.Summit Diagnosticsdiagnostics.com (listed under "Services").

92.     Given that Summit Diagnostics offered advice on compliance with the Anti-Kickback Statute and was involved in the laboratory services industry, Summit

Diagnostics either was aware, or should have been aware, that the type of marketing referral arrangement it entered into with Aperian had been found to be a criminal violation of the Anti-Kickback Statute by a Federal district court as early as 1994. *See Modern Medical Labs., Inc. v. Smith-Kline Beecham Clinical Labs., Inc.*, 1994 WL 449281, *3 (N.D. Ill. 1994) (Section 1320a-7b(2) proscribes activity whereby one entity receives remuneration for essentially taking the physician's "orders" for laboratory tests and arranging for another entity to perform the work.).

93.    Moreover, outside compliance auditor Kevin Hunter of Colaborate identified the referral contracts as non-compliant when he conducted his audit, but Defendants made no changes to the contracts. This audit report was presented to management of EAMC and Aperian on or about June 13, 2012.

### 2.  Compass and TDS Market for Aperian

94.    The second commission-based marketing scheme involves Compass and TDS, which are related entities. Compass is a toxicology laboratory that is also engaged in the marketing of toxicology laboratory services. TDS is a medical testing device sales company that is also involved in the marketing of toxicology laboratory services. A common denominator and the driving force behind both entities is Defendant Chapman, who is the President and/or Vice President of Compass (she signed one contract as President and a later contract as Vice President) and President of TDS.

95.     Defendant Chapman has an ownership interest in both companies. Defendant Aggarwal has a financial interest in Compass and is believed to have a financial interest in TDS.

96.     Regardless of whether the contractual relationship with Aperian was with Compass or TDS, the payments were made from Aperian to TDS.

97.     After Compass/TDS began its marketing relationship with Aperian, Relator's communication with Chapman mostly took place through email. Other individuals within Aperian/EAMC often would be copied on those emails. Among those copied were Lott, Nutter, Valaer, and McHan.

98.     During 2009 and 2010, selected groups of Aperian claims were audited by Medical Management Plus, whose primary responsible person was Karen Northcutt. Those audits revealed several concerns with the coding of claims; specifically, the general ICD-9 code V58.69 was used on almost every claim for payment.

99.     Those audits also revealed concerns regarding the quantity of CPT codes that were billed for claims; specifically, a screening test combined with multiple confirmations of individual drugs caused MMP to suspect the medical necessity of the quantity of tests performed and billed.

100.   Nutter commissioned MMP's audits on behalf of EAMC.

101.   MMP presented its audit findings directly to Nutter, and Karen Northcutt presented a summary of the audit findings at the Aperian Board meetings immediately following the audits.

102.   Lott, Valaer, and McHan quickly dismissed those audit findings as too stringent based on the fact Aperian and toxicology testing was a "new area" of business. They also dismissed those findings because they believed MMP's knowledge of this type of testing was not up-to-date enough to change the coding and testing methods based on MMP's recommendations.

103.   This was typical of the response Lott made to any compliance concern that arose—his reaction was usually to "push forward" and maximize reimbursement, even against the advice and warnings of Relator and others.

104.   Aperian contracted to pay Compass a flat 25% referral fee for referral of specimens to Aperian from September 1, 2009 through March 1, 2012; another contract governed referrals after that date.

105.   The contract is signed by Price as CFO for Aperian and Chapman as President of Compass.

106.   Payments were actually made by Aperian to TDS—an entity related to Compass—instead of directly to Compass.

107.   The payments from Aperian to TDS are documented in the report titled EPSI AP Detail YTD. The following is a list of some of the monthly referral fees paid by Aperian to TDS for referrals by Compass and TDS to Aperian:

| Compass/TDS Invoice Date | Payment from Aperian to TDS |
|---|---|
| 11/22/2011 | $16,503.45 |
| 12/30/2011 | $23,827.08 |
| 1/25/2012 | $118,600.98 |
| 2/17/2012 | $17,154.59 |

108.   From March 1, 2012 to December 1, 2012, the parties changed their contract from a percentage based contract to a flat fee of $35,000 a month. The parties had an agreement that, if $35,000 a month was not enough to equate with the former percentage arrangement, the monthly amount would be increased.

109.   The change to a flat fee was made because Aperian was concerned about the implications of the percentage contract violating the Stark Law and Anti-Kickback Statute. The flat fee contract was made between TDS and Aperian. The contract was signed by Chapman as president of TDS and Ken Lott as VP of Aperian.

110.   Relator also communicated via phone and email frequently during 2011 and 2012 with Chapman, Chapman's attorney, and Nutter regarding the contract revisions with Compass/TDS. Outside counsel for Aperian/EAMC occasionally participated in these calls, as well.

111.    Despite Relator's concerns that these contracts violated the Anti-Kickback Statute, Lott insisted that Aperian continue to receive referrals from Chapman and her entities, Compass and TDS.

112.    All of the relevant executives and administrators at Aperian/EAMC and Compass/TDS were aware of the OIG advisory opinion outlining the inherent risks of drafting a contract which attempts to skirt the Anti-Kickback Statute and Stark Law by specifically excluding Federal payors. This opinion was circulated among Lott, Chapman, and others by email in 2012. Nevertheless, even with the knowledge of that guidance against exclusionary contracts, the final product was a flat-fee contract that ostensibly excluded Federal payors.

113.    Other red flags existed, as well. All relevant executives and administrators at EAMC were aware of another document produced by OIG that described several characteristics of an arrangement which may implicate the Anti-Kickback Statute and indicate an improper inducement. This document was circulated by email in 2012 and discussed with Lott, Chapman, and others. All but one of the characteristics the document mentioned described the contract between Compass and Aperian. With this knowledge, Lott, Sam Price, and EAMC administration continued the contractual relationship with Compass/TDS.

114.    The following is a list of payments made under the March 1, 2012 contract between Aperian and TDS:

| Compass/TDS Invoice Date | Payment from Aperian to TDS |
|---|---|
| 3/5/2012 | $40,000 |
| 4/19/2012 | $70,000 |
| 4/20/2012 | $35,000 |
| 5/20/2012 | $35,000 |
| 6/20/2012 | $35,000 |
| 7/20/2012 | $35,000 |
| 8/20/2012 | $35,000 |
| 9/27/2012 | $35,000 |
| 11/2/2012 | $40,000 |
| 11/27/2012 | $40,000 |

115.   The $35,000 flat fee was not satisfactory to Chapman and TDS/Compass because they did not believe this was adequate compensation for the volume of samples they referred to Aperian.

116.   Once Chapman made that position known on behalf of Compass/TDS, negotiations between those entities and Aperian/EAMC began again in the end of summer/fall of 2012. There were proposals for various versions of the contract. However, the parties eventually signed a new 25% commission agreement that governed the relationship from December 1, 2012 to the date on which Relator was separated from his employment at Aperian.

117.   This percentage-based commission arrangement was motivated by the desire of Aperian and EAMC executives to obtain a higher volume of referral business from Compass/TDS and to deepen their business relationship with Chapman.

118.   That contract is signed by Chapman as VP of Compass Laboratory Services, LLC and Price as CFO of Aperian.

119.   The following is a list of payments made under the December 1, 2012 contract between Aperian and Compass:

| Compass/TDS Invoice Date | Payment by Aperian to TDS |
| --- | --- |
| 1/15/2013 | $58,860.68 |
| 2/18/2013 | $28,972.62 |

120.   Aperian submitted millions of dollars in claims to Federal payors during the time of the improper Compass/TDS referral relationships. The amounts of these claims submitted to Medicare are documented in the Peachtree Billing Accounts Receivable Marshall Report as follows:

| Month | Billed to Medicare | Paid by Medicare |
| --- | --- | --- |
| August 2011 | $3,945.59 | $1,954.45 |
| September 2011 | $31,454.61 | $14,774.20 |
| October 2011 | $71,200.66 | $33,402.65 |
| November 2011 | $84,836.86 | $35,301.63 |
| December 2011 | $87,364.02 | $46,276.33 |
| January 2012 | $165,866.70 | $76,968.22 |
| February 2012 | $149,779.08 | $72,372.40 |
| March 2012 | $184,527.09 | $86,884.96 |
| April 2012 | $165,975.36 | $74,666.51 |
| May 2012 | $166,859.96 | $78,752.44 |
| June 2012 | $142,883.29 | $72,604.62 |
| July 2012 | $151,997.91 | $72,842.18 |
| August 2012 | $106,897.89 | $61,607.40 |
| September 2012 | $189,923.03 | $98,379.58 |
| October 2012 | $193,521.02 | $98,066.57 |

| | | |
|---|---|---|
| November 2012 | $259,083.32 | $111,456.94 |
| December 2012 | $151,358.26 | $60,218.31 |
| January 2013 | $218,262.55 | $71,220.26 |
| February 2013 | $54,006.01 | $18,138.50 |
| **TOTAL** | **$2,579,743.21** | **$1,185,888.15** |

121.   The amounts of these claims submitted to Medicaid are documented in

the Peachtree Billing Accounts Receivable Marshall Report as follows:

| Month | Billed to Medicaid | Paid by Medicaid |
|---|---|---|
| August 2011 | $270.52 | $75.00 |
| September 2011 | $37,302.18 | $7,706.46 |
| October 2011 | $46,076.88 | $10,114.77 |
| November 2011 | $47,751.92 | $10,359.64 |
| December 2011 | $32,407.52 | $6,684.38 |
| January 2012 | $96,953.32 | $20,205.10 |
| February 2012 | $63,236.65 | $15,476.94 |
| March 2012 | $77,429.46 | $19,253.85 |
| April 2012 | $94,290.34 | $25,110.85 |
| May 2012 | $88,548.35 | $22,605.73 |
| June 2012 | $83,692.81 | $20,108.54 |
| July 2012 | $70,940.38 | $15,712.40 |
| August 2012 | $67,548.82 | $16,089.85 |
| September 2012 | $245,061.31 | $24,544.38 |
| October 2012 | -$54,707.56 | $29,451.70 |
| November 2012 | $170,663.78 | $50,153.00 |
| December 2012 | $119,527.42 | $34,050.90 |
| January 2013 | $164,503.30 | $35,950.20 |
| February 2013 | $52,579.92 | $3,706.80 |
| **TOTAL** | **$1,504,077.32** | **$367,360.49** |

122.   The improper referral relationship between Aperian and Compass/TDS

was an ongoing relationship for several years. Referrals and claims for payment

submitted in violation of the Anti-Kickback Statute and False Claims Act continued

at least until the date on which Relator was separated from his employment at Aperian.

123.   As shown above, even during the period of time when the parties operated under a flat-fee arrangement that ostensibly excluded Federal payor-reimbursed claims, in practice Aperian and the referral sources did not exclude those claims.

124.   Furthermore, in 2012, Lott, Price, and Chapman began discussions about a potential merger/buyout between Compass and Aperian. This was a brokered discussion, utilizing the Cain Brothers investment firm. During this discussion, Relator was the primary managerial contact from Aperian (with email copies of every material discussion to Lott and Price) and Stewart Carr was the primary contact from Cain Brothers.

125.   Relator mentioned his compliance concerns regarding the contractual referral arrangement between Compass/TDS and Aperian to Stewart Carr in 2012, who then brought up his concern on a call with Lott, Chapman, and Relator. The compliance concern was quickly dismissed by the other participants on the call, and the conversation then moved on to a discussion about how a merger could reduce compliance risk and allow more flexibility by forming an entity outside the corporate umbrella of EAMC.

126.   Those transactional discussions were ongoing when Relator was separated from his employment at EAMC.

127.   The claims for payment were submitted by Aperian on CMS Forms 1500 and contained certifications signed by Aperian that the provider, Aperian Laboratory Solutions, LLC, was in compliance with the Anti-Kickback Statute. These certifications were knowingly false, because of the prohibited financial relationship with Defendants Compass, TDS, Chapman, and Aggarwal.

128.   Thus, each CMS Form 1500 claim for payment of laboratory services by Aperian originating from a Compass/TDS referral is a legally false claim for payment. Defendant Aperian submitted the false claims for payment on CMS Forms 1500 and Defendants Compass, TDS, Chapman, and Aggarwal caused the submission of the false claims for payment by entering into the referral relationship that violated the Anti-Kickback Statute making the claims ineligible for payment. All of the aforementioned defendants conspired in their conduct to violate the law and submit false claims for payment.

129.   Relator provides the following specific examples of claims submitted by Aperian for Compass/TDS referrals in violation of the Anti-Kickback Statute:

   a.   Encounter #A12-08101, patient initials A.G, referral source TDS/Compass, Dr. Jeffrey Wayne Long, D.O., date of service February 10, 2012, procedure codes 80154, 82542, 82646, 83925, submitted on CMS form

1500 to Medicare for payment on May 29, 2012. This claim contained the signature and certification of Aperian Laboratory Solutions, LLC and a certification of compliance with the Anti-Kickback Statute.

b.      Encounter #A12-07508, patient initials K.K., referral source TDS/Compass, Dr. Shelinder Aggarwal, M.D., date of service February 6, 2012, procedure codes 82542 and 83925, submitted on CMS Form 1500 to Medicare for payment on May 24, 2012. This claim contained the signature and certification of Aperian Laboratory Solutions, LLC and a certification of compliance with the Anti-Kickback Statute.

c.      Encounter #A12-07782, patient initials L.S., referral source TDS/Compass, Dr. Shelinder Aggarwal, M.D., date of service February 8, 2012, procedure codes 82542 and 83925, submitted on CMS Form 1500 to Medicare for payment on May 25, 2012. This claim contained the signature and certification of Aperian Laboratory Solutions, LLC and a certification of compliance with the Anti-Kickback Statute.

d.      Encounter #A12-07120, patient initials H.P., referral source TDS/Compass, Dr. Farouk Anwarul Raquib, M.D., date of service February 6, 2012, procedure codes 82646, submitted on CMS Form 1500 to Alabama Medicaid for payment on May 24, 2012. This claim contained the signature

and certification of Aperian Laboratory Solutions, LLC and a certification of compliance with the Anti-Kickback Statute.

130.   Defendant Aperian submitted the false claim for payment and Defendants Compass, TDS, Chapman, and Aggarwal caused the submission of the false claim for payment and each of the defendants conspired in their conduct to violate the law and submit false claims for payment.

131.   The documents that support Defendants' knowing violation of the Anti-Kickback and False Claims Act laws are the same as those that support Defendants' knowledge that the Summit Diagnostics contracts were improper inducements as set forth above in paragraphs 56 through 61.

### 3.  Magnolia Analytical Markets for Aperian

132.   The third commission-based marketing scheme involves Magnolia Analytical of Hattiesburg, Mississippi. Magnolia Analytical was owned by Dr. David C. Lee and it was dissolved in 2013. Chapman also had an ownership interest in Magnolia Analytical, which is how this company was first brought to the attention of Aperian/EAMC.

133.   Dr. David Lee also owns and practices at Southern Neurologic and Spinal Institute, P.A. Dr. Lee also owns a host of other medical businesses in the Hattiesburg area.

134.   According to phone call from Chapman to Relator on or about July 10, 2012, Chapman described Ashly Hudson as Dr. Lee's "girlfriend." The information regarding that relationship was conveyed by email to Nutter and Lott on that day. The Hudson/Lee relationship was confirmed by their mutual Facebook relationship at the time Relator was separated from his employment with Aperian.

135.   Ashly Hudson marketed for Magnolia Analytical, who in turn referred patients to Aperian in exchange for an approximately 10% referral fee. The payment of the referral fee from Aperian to Magnolia for referral of patients for laboratory services violates the Anti-Kickback and Stark Laws.

136.   Between May and September 2012, Aperian billed Medicaid approximately $110,000 and Medicare approximately $105,000 on samples referred by Magnolia Analytical. Of these amounts, approximately $60,000 of the billed claims came from Dr. Lee's practice at Southern Neurologic. The referrals from Southern Neurologic were credited to the Magnolia Analytical referral arrangement as evidenced by the Peachtree Billing "Aperian_Aging" Report tab "referring cumulative total."

137.   The amounts of these claims submitted to Medicare are documented in the Peachtree Billing Accounts Receivable Marshall Report as follows:

| Month | Amount Billed to Medicare for Magnolia Referrals | Amount Paid by Medicare |
|---|---|---|
| May 2012 | $7,398.54 | $5,431.82 |
| June 2012 | $57,306.97 | $26,917.30 |

| | | |
|---|---|---|
| July 2012 | $29,874.89 | $14,698.34 |
| August 2012 | $9,709.12 | $4,063.93 |
| September 2012 | $692.77 | $494.10 |
| October 2012 | $0.00 | $0.00 |
| **TOTAL** | **$104,982.29** | **$51,605.49** |

138.   The amounts of these claims submitted to Medicaid are documented in

the Peachtree Billing Accounts Receivable Marshall Report as follows:

| Month | Amount Billed to Medicaid for Magnolia Referrals | Amount Paid by Medicaid |
|---|---|---|
| May 2012 | $798.46 | $0.00 |
| June 2012 | $65,080.14 | $8,634.51 |
| July 2012 | $29,314.08 | $2,727.75 |
| August 2012 | $14,971.88 | $1,906.11 |
| September 2012 | $0.00 | $0.00 |
| **TOTAL** | **$110,164.56** | **$13,268.37** |

139.   The claims for payment were submitted by Aperian on CMS Forms

1500 and contained a certification that the provider Aperian was in compliance with

the Stark Law and Anti-Kickback Statute. This certification was knowingly false

because of the prohibited financial relationship with Magnolia Analytical and Dr.

Lee. Thus, each CMS Form 1500 claim for payment of laboratory services by

Aperian originating from a Magnolia Analytical or Dr. Lee referral is a false claim

for payment. Defendant Aperian submitted the false claims for payment.

### 4. Additional Facts Regarding the Commission-Based Marketing Schemes

140.   In addition to the facts described above, Relator contacted and hired an outside auditor, Colaborate, to conduct an audit regarding the business of Aperian. Kevin Hunter was the primary contact at Colaborate and completed the audit personally. This audit was completed on or about June 13, 2012.

141.   The Colaborate audit report stated the commission-based referral contracts were not in compliance with the fraud and abuse laws:

> Colaborate reviewed the contracted sales agreement with both Summit Diagnostics and Total Diagnostic Solutions, the Summit Diagnostics and Compass contracts should be revised; a good rule of thumb is not to enter into any relationships that pay commission-based on Medicare revenue. . . . Lastly when reviewing this agreement Aperian should ask for some stronger performance requirements and require that all sales people sign a compliance agreement form that clearly outlines legal and regulatory agreement.

142.   Relator presented that report to his superiors but all of the commission-based relationships continued.

### B. The Point-of-Care Testing Cup Scheme

143.   The second scheme under which Aperian violated the Stark Laws, Anti-Kickback Statute, and False Claims Act was by providing free Noble Split Specimen Cups® to physicians to use for drug tests.

144.   These "Noble cups," as they are commonly known, both collect samples and serve as rapid drug screen cups. This function is important because the

cup itself may be used for collection purposes, but when combined with the unique strip technology of a Noble cup—which is in the broad category known as "point-of-care testing cups"—a physician may obtain a rapid result for testing because of the strip technology of the Noble cup.

145.    This practice has been addressed by a Special Fraud Alert, "Arrangements for the Provision of Clinical Lab Services," 59 Fed. Reg. 65372, 65377 (Dec. 19, 1994) and the court proceeding *In re: Petition for Declaratory Statement of Dominion Diagnostics, LLC* (2008). The Florida Healthcare Agency stated in *Dominion Diagnostics* that HHS "has explained that when a laboratory gives an item or service for free to a referral source, an inference may arise that the item is offered to induce the referral business." That opinion cited guidance from 1994.

146.    In 2008, the Florida Agency for Health Care Administration issued an order addressing whether the petitioner could provide physicians cups like the ones at issue here: free urine specimen cups that can also provide on-site test results to the physician. *In Re: Petition for Declaratory Statement of Dominion Diagnostics, LLC.,* FRAES No. 200800828 (Fla. Agency for Health Care Admin., July 8, 2008) The agency noted, however, that HHS "has explained that when a laboratory gives an item or service for free to a referral source, an inference may arise that the item is offered to induce the referral of business."

147.   This professional guidance is also supported by caselaw from within the Eleventh Circuit. The United States District Court for Southern District of Florida has held that laboratory operators providing free point-of-care testing cups to doctors may constitute violations of the Anti-Kickback Statute and Stark Law, even though the lab argued that the cups were used solely to collect, transport and store the specimens. *Ameritox,* 20 F. Supp. 3d at 1354-56, *vacated and remanded on other grounds*, 803 F.3d 518 (11th Cir. 2015).

148.   Six weeks after *Ameritox* was decided in the Southern District of Florida, HHS-OIG issued another Special Fraud Alert reiterating that violations of the Anti-Kickback Statute and False Claims Act occur when remuneration is paid from laboratories to referring physicians. HHS-OIG specifically addressed the provision of free point of care testing cups, like the Noble cup at issue here, and how providing free cups violates the Anti-Kickback Statute: "The same principles described in this Special Fraud Alert apply to arrangements that are similar or analogous to Specimen Processing Arrangements, including arrangements under which clinical laboratories . . . provide free or below-market point of care testing cups to health care providers who use the cups to perform billable in-office testing."

149.   Under this illegal scheme, Aperian would provide free Noble cups to physicians. They provided these Noble cups to physicians and practice groups to induce them to refer more laboratory testing business to Aperian.

150.   After they received those things of value, the physicians who received cups from Aperian submitted requests to Aperian for further testing representing approximately 8,202 unique claims to Federal payors between April 13, 2010 and September 30, 2014.

151.   The providers who received the Noble cups as an inducement submitted further testing requests to Aperian which billed Federal payors a total of $3,348,635.02 for those claims, and they were paid at least $1,138,218.40 from the United States based on these illegal false claims.

152.   The physicians submitted these requests for further testing to Aperian, in part, because the physicians could perform rapid screen drug tests in their office by using the technology of the Noble cup.

153.   Sometimes the physicians bill the tests in a category known as "waived tests" under the Clinical Laboratory Improvement Amendments of 1988 (CLIA). Those CLIA-waived tests "must be simple and have a low risk for erroneous results" and include the category of tests that may be performed at home. Such billing is proper for providers who are not laboratories.

154.   At other times, the physicians who received Noble cups would take a rapid screen test performed by the cup and would bill Federal and private payors as up to 19 separate complex toxicology tests. This is improper. A rapid screen drug test is not a complex toxicology test and the cup itself performs the test.

155.   Aperian provides the free Noble cups in exchange for the physicians' agreement to send the samples to Aperian for confirmation testing of the results obtained by the physician. The benefits and inducements to the physician are the free cup, the free instant test result, and the ability to bill for tests that the cup performs automatically. The benefit to Aperian is the ability to bill for the referred confirmation testing.

156.   The Summit Diagnostics contract with Aperian specifically required that Aperian provide Noble cups—specifically Exhibit A to the contract, ¶ i.

157.   Based on Relator's knowledge of the business relationships among Aperian, EAMC, and Summit Diagnostics, one reason why Summit Diagnostics required Aperian to provide Noble cups was that Powell—the CEO of Summit Diagnostics—had a financial incentive to market those cups on behalf of Noble Medical, Inc.

158.   Some of the doctors using Summit Diagnostics as a referral source for Aperian confirmation tests are as follows:

- STEVEN SHIELD (100CA-SS)
- RIAZ SYED (101GA-RS)
- GERMAINE HAWKINS (104TX-GH)
- CAROL KRAUSE (105ND-CK)
- JEANNE HABERER (107MI-JH)
- SCOTT SONDES (10S-SS)
- CHERYL WILLIAMS (110MO-CW)
- JENNIFER MILLER (112GA-JM)
- PAUL GUTTUSO (113TX-PG)

- ABIGAIL NEIGHMOND (114MO-AN)
- MOIN KAZI (115GA-MK)
- JIMENEZ JOSEPH (116NJ-JJ)
- DAVID WEISS (116PA-DW)
- ROBERT RICHTER (118TN-RR)
- SUSAN AULL (119FL-SA)
- BRADLEY KATZ (120AL-BK)
- DAVID HERRICK (120AL-DH)
- KATHRIN WELLER (121OR-AW)
- CHRISTINE MAGILL (123CM-HI)
- LESTER HANDS (123LH-OR)
- CHRISTOPHER PRATT (125CP-TX)
- DAVID COSTNER (126DC-TN)
- RICHARD GELLENDER (127RG-KS)
- ULYSSES WILLIAMS (128UW-NJ)
- ALLAN ROSANSKY (13MA-AR)
- MARGARET CHAPLIN (14S-MC)
- ERIC ROBINSON (15AL-ER)
- ANDREA STONE (17MA-AS)
- EMAD ESKANDER (17MA-EE)
- TERRY OSBORNE (17MA-TO)
- ALBERT STONE (17S-AS)
- KRISTIN TAYLOR (19MI-KT)
- RICHARD MANSFIELD (19MI-RM)
- HUNTINGTON HAPWORTH (1AL-HH)
- STEVEN PRAKKEN (20NC-SP)
- LEE ACKLEY (21TX-LA)
- LAWRENCE STUTTE (21TX-LS)
- PETER COTEY (22MI-PC)
- CESAR LLANERA (23FL-CL)
- DIANE BLUHM (24MI-DB)
- HOWARD MAHABEER (24MI-HM)
- KAREN LEITER (24MI-KL)
- LYNI NOWAK (24MI-LN)
- RICK BEACH (25FL-RB)
- CHRISTOPHER MARSH (26AZ-CM)
- JULIE MCCARTAN (26AZ-JM)

- SHERIF ALGENDY (27MA-SA)
- KENNETH WILLIS (28AL-KW)
- STEPHANIE SMITH (2AL-SS)
- GURUDATT SETTY (2GA-GS)
- JORGE ALVEAR (2GA-JA)
- JENNIFER SIDDLE (2GA-JS)
- RICHARD REISMAN (2GA-RR)
- STEPHANIE SMITH (2GA-SS)
- ABIGAIL MARLEY (30AZ-AM)
- LANA KEESLER (30AZ-LK)
- MICHAEL GOODMAN (30AZ-MG)
- RAGA OSMAN (30AZ-RO)
- TOBIAS FREEBOURN (30AZ-TF)
- SHISHUKA MALHOTRA (31OH-SM)
- SARBJOT SINGH AJIT (32OH-SA)
- CARROLL MCLEOD (33MS-CM)
- ANTERPREET SINGH DUA (34SC-AD)
- UNKNOWN (35CA-SS)
- JULIE CEASAR (35LA-JC)
- KENNETH SUMNER (35LA-KS)
- SIDNEY SMITH (35LA-SS)
- DIETER ECKART (37AZ-DE)
- ALISAHAH COLE (39SC-AC)
- ERICA JETER (39SC-ES)
- SARAH DERRICK (39SC-SD)
- MARION SOVIC (3AL-MS)
- ROBERT LANSDEN (3AL-RL)
- THOMAS KRAUS (3AL-TK)
- JOSEPH LEANO (40AZ-JL)
- LANA KEESLER (40AZ-LK)
- SONIA GRABER (40AZ-SG)
- BRADLEY BLISS (40MI-BB)
- REBECCA GANZOW (40MI-RG)
- RAYMOND TRACY (40MI-RT)
- DANIEL CHEN (40TX-DC)
- LISA MALHER (41OK-LM)
- MELVIN ROBINSON (41OK-MR)

- BRADLEY BLISS (42MI-BB)
- RICHARD BRITTINGHAM (43OK-RB)
- LAURA MILLER (44AZ-LM)
- WENDY BARTANEM (45OK-WB)
- AMJAD FAHEEM (46KY-AF)
- SOCORRO BELLA-OROPILLA (46KY-SB)
- SYED QUADRI (46KY-SQ)
- AYAZ AHMED (47KY-AA)
- AMJAD MOHAMMED FAHEEM (47KY-AF)
- KELLY RICHARDSON (47KY-KR)
- SOCORRO BELLA OROPILLA (47KY-SB)
- AMAR GOYAL (48OH-AG)
- BRIAN WASSON (49TX-BW)
- ICHABOD BALKCOM (49TX-IB)
- DAVID COSGROVE (4AL-DC)
- FAZAL RAHIM (50AL-FR)
- DEBRA ROSSELL (50DR-TX)
- JOHN BAIRD (50KY-JB)
- CAMILLE PITRE (50LA-CP)
- MICHAEL MILLER (50TN-MM)
- ASHLEY CLASSEN (50TX-AC)
- BENNIE EMBRY (50TX-BE)
- ERIK TIJERINA (50TX-ET)
- JILL PRIDGEN (50TX-JP)
- CHRISTINE MCDANIEL (51LA-CM)
- CAMILLE PITRE (51LA-CP)
- DEANNA HODSON (51LA-DH)
- JOHN JACKSON (51LA-JJ)
- MEDGAR MOYA (52AZ-MM)
- DANIEL CHEN (53TX-DC)
- JOHN BAIRD (54KY-JB)
- MICHAEL MILLER (55TN-MM)
- FAZAL RAHIM (56AL-FR)
- ASHLEY CLASSEN (58TX-AC)
- PETER CLEMENS (59UT-PC)
- JAMES JETER (5AL-JJ)
- MICHAEL GOSNEY (5AL-MG)

- WILLIAM BLACKBURN (5AL-WB)
- JOSE DUARTE (61TX-JD)
- KENNETH DORITY (61TX-KD)
- SALVATORE CAMPO (61TX-SC)
- MARK WILLIAMS (62TN-MW)
- KATHARINE VACHON (64TN-KV)
- ROSE WIDENER (64TN-RW)
- KRISHNAMURTHY ASHOK (66OH-KA)
- ABIGAIL MARLEY (67AZ-AM)
- ALBERT WILLISON (67AZ-AW)
- KERI HOBERT (67AZ-KH)
- LANA KEESLER (67AZ-LK)
- ROBERT JOHNSON (67AZ-RJ)
- RAGA OSMAN (67AZ-RO)
- VICKI CLOUS (68AZ-VC)
- MOHAMMAD TARIQ (69TX-MT)
- MUHAMMAD ZULQUARNIAN (69TX-MZ)
- ANNE XAVIER (6AL-AX)
- DAVID EVANS (6AL-DE)
- JOHN MARSELLA (6AL-JM)
- MICHAEL FLANAGAN (6AL-MF)
- MARK WILLIS (6AL-MW)
- WILLIAM MCRAE (6AL-WM)
- DAVID BEST (71MI-DB)
- RYAN MCCONNELL (71MI-RM)
- TODD KREYKES (71MI-TK)
- ANNA YOUNG (72MI-AY)
- LEONHARD MAENDEL (72MI-LM)
- MITCHELL CAREY (72MI-MC)
- SAMUEL DYSTE (72MI-SD)
- SCOTT ISPIRESAN (73CA-SI)
- MICHAEL RHODES (74TN-MR)
- DEBORAH HANKS (76AZ-DH)
- VIVIAN CASTILLO BARONIA (76AZ-VC)
- VALLI SUBRAMANIAN (77FL-VS)
- CHI LAI (78NC-CL)
- MOIZ TAJKHANJI (79TX-MT)

- JASON MCKEOWN (7AL-JM)
- JOHN ROBERTS (7AL-JR)
- RONALD COLLINS (7AL-RC)
- RODDIE GANTT (7AL-RG)
- THOMAS VETTER (7AL-TV)
- KEVIN DREW (80MI-KD)
- ROY BLACKBURN (82OR-RB)
- ANDREW CHIU (83OR-AC)
- JASON MAUER (83OR-JM)
- MARK KALLGREN (83OR-MK)
- MARK NORLING (83OR-MN)
- STUART ROSENBLUM (83OR-SR)
- ROBERT BROWN (83SB-OR)
- KATHARINE VACHON (84TN-KV)
- PAULA SANDLER (85MS-PS)
- PAULA SANDLER (85TN-PS)
- EDDIE SMITH (86LA-ES)
- ALETHIA BALDWIN (8AL-AB)
- KELLER AMBER (8AL-AK)
- AIMEE WALSH (8AL-AW)
- ANNE XAIER (8AL-AX)
- HASSAN MONFARED (8AL-HM)
- JOSEPHINE HACKETT (8AL-JH)
- JASON MCKEOWN (8AL-JM)
- JAMES BAILEY (8AL-MB)
- MICHAEL SHETH (8AL-MS)
- PETER NAGI (8AL-PN)
- ROLAND SHORT (8AL-RS)
- TIMOTHY NESS (8AL-TN)
- THOMAS VETTER (8AL-TV)
- JOHN WOODYEAR (90NC-JW)
- ERIK VAN GINKEL (91FL-EV)
- JACK HEIDENREICH (92LA-JH)
- CRAIG CRITCHLEY (93OH-CC)
- CARLA GARBER (93OH-CG)
- JAMES BURKHARDT (93OH-JB)
- JAMES MCNERNEV (93OH-JM)

- MUHAMMAD ZULQARNAIN (94TX-MZ)
- ELSA REMER (96ND-ER)
- KURT GOLD (98NE-KG)
- MIKE HAYDEL (99LA-MH)
- ERIK VAN GINKEL (FL-EV)

159.   These doctors used Noble cups provided for free by Aperian because the contract between Summit Diagnostics and Aperian required Aperian to provide the cups.

160.   Providing a free point-of-care testing cup is an improper inducement for referrals under Federal law.

161.   Further, the billing to Federal payors by the above list of doctors for multiple complex or CLIA-waived toxicology tests for a single sample resulting from the use of the free Noble cup provided by Aperian are also false claims for payment caused by Aperian's conduct of providing the free cup.

162.   The reason for this is partly because of CMS coding requirements. CMS implemented the codes G0431 and G0434 in 2010 to replace the codes 80101 and 80100.

163.   G0431 is defined as "drug screen, qualitative: multiple drug classes by high complexity test method, per patient encounter" (reimbursed at around $103). There were approximately 7,163 of these tests submitted to Federal payors by Aperian from the physician providers who received the Noble cups after the cups were received, and Aperian was paid more than $771,000 for performing those tests.

164.   G0434 is defined as "drug screen, other than chromatographic; any number of drug classes; by CLIA waived test or moderate complexity test, per patient encounter" (reimbursed at around $20).

165.   The Noble cup meets the definition of the G0434 code, but it does not meet the definition of G0431 because it is not high complexity.

166.   Even if it was medically proper to bill the cup-based test under the G0434 code, the physicians are still being provided the inducement of a free Noble cup for which they can perform tests and bill Medicare $20.

167.   The cups, therefore, are remuneration and things of value under Federal law. They are a benefit to the physician's practice, because they have relieved the practice from the burden of purchasing those supplies and because they provide a free instant diagnostic test result and the opportunity to bill for the test.

168.   These cups constitute remuneration even under the Stark Law, which is more lenient than the Anti-Kickback Statute because of its safe harbor. CMS has determined that a lab may not even provide sterile gloves to a physician practice because they are remunerative and "are not items, devices, or supplies used *solely* to collect, transport, process, or store specimens." *Physicians' Referrals to Health Care Entities With Which They Have Financial Relationships*, 66 Fed. Reg. 856, 948 (Jan. 4, 2001) (emphasis added).

169.   That Noble cups are inducements and things of value is confirmed by the June 2012 Colaborate compliance review: the Summit Diagnostics agreement "needs to be rewritten to remove the requirement of providing Noble cups as this could be viewed as an inducement by the OIG. . . . [T]his should be addressed as soon as possible" and Summit Diagnostics "should be instructed to return any undistributed cups as soon as possible." As of the date on which Relator was separated from his employment, Aperian had not done so.

170.   Between the month after the Colaborate report and the present, nearly 6,600 unique claims for laboratory testing were submitted by Aperian to government payors from doctors who received Noble cups from Aperian or its marketers, which resulted in more than $206,000.00 in payments to Aperian from government payors. This confirms the continuing, knowing nature of the violations alleged here.

171.   During approximately June 2012, Relator learned through Carol Gittens and Louri Roberts, Aperian's representatives at Peachtree Billing that Aperian and at least one provider who received the inducement of the Noble cups—Defendant Aggarwal—were billing for the same complex drug screening test on each patient. The test performed by the doctor using a Noble cup is not a complex drug screening test and is a false claim for payment.

172.   The claims for payment submitted by Aperian for referrals of confirmation tests resulting from the provision of free Noble cups to doctors are false

claims for payment because they are tainted by the improper inducement to refer that violates the Stark Law and Anti-Kickback Statute.

173.   Aperian submitted the claims for confirmation testing to Federal payors on CMS Forms 1500 that contained a certification that the provider was in compliance with the Stark Law and Anti-Kickback Statute.

174.   This certification was knowingly false because of the prohibited financial inducement provided to the doctors referred by Summit Diagnostics. Thus, each CMS Form 1500 claim for payment of laboratory confirmation testing services by Aperian originating from a Summit Diagnostics referral is a false claim for payment.

175.   Defendant Aperian submitted the false claims for payment and Summit Diagnostics caused the submission of the false claim for payment by requiring the provision of the free Noble cups in the contract that violated the Anti-Kickback Statute making the claims ineligible for payment. Both Summit Diagnostics and Aperian conspired in their conduct to violate the law and submit false claims for payment.

176.   As further evidence of the conspirators' intent to use of the cups as an inducement to refer an increased volume of testing, on October 12, 2011, a Summit Diagnostics customer service representative emailed Michele Hunter of Aperian and stated that the Summit Diagnostics sales representative for the account of Dr.

Bernard Savariego wanted the supply of cups cut off to that doctor because "[i]t appears they are just using the cups but not sending any specimens" to Aperian through Summit Diagnostics.

177.   This type of exchange was not uncommon, because on August 9, 2011, Michele Hunter emailed a Summit Diagnostics customer service representative and said that an order for Williams Medical Associates should not be filled because Aperian did not receive enough of a financial benefit from that practice:

> I will send the order in to Noble, but I am very concerned with this acct. I have called to verify two different supply order requests for them b/c I have [sent] them 150 cups in the last two months and we have only rec'd 24 specimens. I think they are ordering through you now since I called to question the last faxed order.
>
> Please have the rep check to see what is going on. ***We can't continue to ship cups at this rate of return.***

178.   Similarly, on March 9, 2012, Christine (a Summit Diagnostics customer service representative) emailed Michele Hunter and said that the marketing rep for the Lady of the Sea accounts, Alex Breaulx, informed her that Aperian was "no longer willing to supply cups because the accounts are not sending in enough specimens." She continued, "We do understand that if accounts are sending in a small percentage of the cups the lab is providing, that Aperian would not want to continue supplying cups."

179.   Even as late as February 2014, Powell and Valaer communicated regarding the overhead costs Aperian incurred to ship Noble cups to physicians and practice groups:

> We had a request for 4 cases of Noble cups to be overnighted to Jacksonville I.M. (formerly Stringfellow Pain Clinic) which we are obliged to do as a service of this client even though they dropped the ball with monitoring inventory. We need, however, a system to either defer the cost or share the cost of this expenditure which as you can see is tremendous and hits out bottom line directly. The cost of four cases is $650 which is part of doing business but to overnight these to the clinic (by drop shipping them) we incurred an additional charge of $220.97. Please look into this and let's decide on a way to either split the O.N. cost or otherwise defer.

That email further evidences the cost-benefit analysis Aperian made in its business decision to induce referral business from physicians.

180.   While employed at Aperian, Relator had access to Aperian's supply logs—including a Microsoft Sharepoint database which Relator and Michele Hunter created to track supply requests from clients. Relator regularly accessed and used Aperian's client service log, which was a Microsoft Sharepoint database used to track client calls, service issues, and follow-up.

181.   Information from that database will confirm the allegations Relator has reliably pleaded regarding this scheme, because that database and shipping documents will show the volume of Noble cups shipped, the dates of the shipment, the physician or practice group to whom the cups were shipped, and other relevant

information. That information also may be determined from the client initiation forms that Aperian filled out for each physician or practice group.

182.   As stated above, there were literally thousands of illegal false claims made under this scheme. By way of example, and to provide even greater indicia of reliability, Relator identifies the following false claims induced by shipment of point-of-care testing cups to providers:

a.   Claim #1: Noble cups were shipped by Aperian to Mona Bakshi, MD. The cups were received on July 15, 2014. Dr. Mona Bakshi used the cups for testing and submitted requests to Aperian for further testing that Aperian performed on the following dates: August 9, 2014; September 13, 2014; September 22, 2014; September 25, 2014; and March 11, 2015. Aperian billed Medicare $2585.80 and was reimbursed $388.88 for these Code G0431 screens.

b.   Claim #2: Noble cups were shipped by Aperian to Pain Care Center, TX. The cups were received on October 5, 2012. Pain Care Center used the cups for testing and submitted requests to Aperian for further testing that Aperian performed on the following dates: April 4, 2013; April 15, 2013; May 6, 2013; May 9, 2013; May 25, 2013; May 28, 2013; June 7, 2013; June 15, 2013; June 27, 2013; July 3, 2013; July 27, 2013; August 30, 2013; September 20, 2013; September 21, 2013; and September 28, 2013. Aperian

billed Medicare $6,087.70 and was reimbursed $2,279.68 for these and later Code G0431 screens.

c.      Claim #3: Noble cups were shipped by Aperian to Jefferson Psychiatric Associates. The cups were received on December 11, 2012. Jefferson Psychiatric Associates used the cups for testing and submitted requests to Aperian for further testing that Aperian performed on August 26, 2013 and March 27, 2014. Aperian billed Medicare $5,464.36 and was reimbursed $486.83 for these and later Code G0431 screens.

d.      Claim #4: Noble cups were shipped by Aperian to Lakeside Family and Sports Medicine. The cups were received on October 11, 2012. Lakeside Family and Sports Medicine used the cups for testing and submitted requests to Aperian for further testing that Aperian performed on the following dates: December 19, 2012; January 2, 1013; March 20, 2013; March 22, 2013; April 11, 2013; April 15, 2013; June 7, 2013; July 3, 2013; August 26, 2013; September 25, 2013; and October 9, 2013. Aperian billed Medicare $7,508.18 and was reimbursed $2,371.94 for these and later Code G0431 screens.

e.      Claim #5: Noble cups were shipped by Aperian to Park Clinic. The cups were received on February 21, 2013. Park Clinic used the cups for testing and submitted requests to Aperian for further testing that Aperian

performed on April 10, 2013 and July 8, 2013. Aperian billed Medicare $204.66 and was reimbursed $197.90 for these Code G0431 screens.

f.  Claim #6: Noble cups were shipped by Aperian to Primary Care Associates of Gun Barrel City. The cups were received on October 30, 2012. Primary Care Associates of Gun Barrel City used the cups for testing and submitted requests to Aperian for further testing that Aperian performed on the following dates: February 16, 2013; March 1, 2013; March 4, 2013; May 3, 2013; June 15, 2013; July 13, 2013; August 26, 2013; September 5, 2013; September 14, 2013; September 16, 2013; September 18, 2013; September 19, 2013; September 23, 2013; September 28, 2013; October 9, 2013; and October 24, 2013. Aperian billed Medicare $6,067.94 and was reimbursed $1,869.43 for these and later Code G0431 screens.

g.  Claim #7: Noble cups were shipped by Aperian to Trinity Pain Medicine. The cups were received on July 30, 2012. Trinity Pain Medicine used the cups for testing and submitted requests to Aperian for further testing that Aperian performed on the following dates: August 16, 2012; August 17, 2012; August 20, 2012; August 22, 2012; August 24, 2012; August 27, 2012; August 29, 2012; September 8, 2012; September 12, 2012; September 17, 2012; September 19, 2012; September 20, 2012; September 26, 2012; October 3, 2012; October 5, 2012; October 6, 2012; October 11, 2012; October 12,

2012; October 13, 2012; October 15, 2012; October 17, 2012; November 2, 2012; November 7, 2012; December 17, 2012; January 25, 2013; and February 28, 2013. Aperian billed Medicare $4,707.18 and was reimbursed $4,093.20 for these Code G0431 screens.

h.      Claim #8: Noble cups were shipped by Aperian to UAB Pain Treatment Clinic. The cups were received on October 3, 2012. UAB Pain Treatment Center used the cup for testing that Aperian performed on the following dates: November 16, 2012; November 28, 2012; January 18, 2013; January 26, 2013; January 28, 2013; January 31, 2013; February 1, 2013; February 4, 2013; February 6, 2013; February 7, 2013; February 11, 2013; February 14, 2013; February 15, 2013; February 16, 2013; February 23, 2013; February 25, 2013; March 2, 2013; March 7, 2013; March 15, 2013; March 18, 2013; March 20, 2013; March 21, 2013; March 22, 2013; March 23, 2013; March 29, 2013; April 1, 2013; April 3, 2013; April 11, 2013; April 13, 2013; April 17, 2013; April 19, 2013; April 20, 2013; April 22, 2013; April 24, 2013; April 25, 2013; April 27, 2013; April 29, 2013; May 3, 2013; May 4, 2013; May 9, 2013; May 10, 2013; May 17, 2013; May 25, 2013; May 28, 2013; May 30, 2013; June 3, 2013; June 8, 2013; June 13, 2013; June 15, 2013; June 17, 2013; June 24, 2013; July 3, 2013; July 4, 2013; July 8, 2013; July 10, 2013; July 13, 2013; July 17, 2013; July 20, 2013; July 31, 2013; August 1,

2013; August 3, 2013; August 26, 2013; August 30, 2013; September 12, 2013; September 13, 2013; September 14, 2013; September 16, 2013; September 18, 2013; September 19, 2013; September 23, 2013; September 25, 2013; September 27, 2013; September 30, 2013; and October 2, 2013. Aperian billed Medicare $305,109.92 and was reimbursed $58,966.28 for these and later Code G0431 screens.

183.   By way of example, and to provide even greater indicia of reliability regarding the manner in which these point-of-care testing cups were used by providers who received them, Relator identifies the following false claims:

a.      Claim #1: Noble cups were shipped by Aperian to Park Clinic. Park Clinic used the cups for testing and submitted requests to Aperian for further testing. Aperian performed confirmation testing on April 13, 2010, and billed Medicare $369.40 for those tests. On August 4, 2010, Medicare paid Aperian $181.20 for this service.

b.      Claim #2: Noble cups were shipped by Aperian to Nashville Pain Center. Nashville Pain used the cups for testing and submitted requests to Aperian for further testing. Aperian performed confirmation testing on June 24, 2010, and billed Medicare $221.61 for those tests. On August 4, 2010, Medicare paid Aperian $108.72 for this service.

c.      Claim #3: Noble cups were shipped by Aperian to Trinity Pain Medicine. Trinity Pain used the cups for testing and submitted requests to Aperian for further testing. Aperian performed confirmation testing on June 24, 2010, and billed Medicare $369.40 for those tests. On August 7, 2010, Medicare paid Aperian $181.20 for this service.

d.      Claim #4: Noble cups were shipped by Aperian to CHA Center for Family Medicine. CHA used the cups for testing and submitted requests to Aperian for further testing. Aperian performed confirmation testing on billed March 29, 2010, and Medicare $664.92 for these tests. On August 19, 2010, Medicare paid Aperian $326.16 for this service.

e.      Claim #5: Noble cups were shipped by Aperian to Pain Medicine Center. Pain Medicine used the cups for testing. Aperian performed confirmation testing on March 30, 2010, and billed Medicare $664.92 for these tests. On August 7, 2010, Medicare paid Aperian $326.16 for this service.

f.      Claim #6: Noble cups were shipped by Aperian to East Jordan Family Heath Center. East Jordan used the cups for testing and submitted requests to Aperian for further testing. Aperian performed confirmation testing on July 8, 2010, and billed Medicare $221.61 for those tests. On August 4, 2010, Medicare paid Aperian $108.72 for this service.

g.      Claim #7: Noble cups were shipped by Aperian to Davis Family Medicine. Davis Family Medicine used the cups for testing. Aperian performed confirmation testing on January 3, 2013, and billed Medicare $102.33 for those tests. On January 25, 2013, Medicare paid Aperian $99.95 for this service.

h.      Claim #8: Noble cups were shipped by Aperian to Troy Family Medicine. Troy Family Medicine used the cups for testing and submitted requests to Aperian for further testing. Aperian performed confirmation testing on January 15, 2014, and billed Medicare $517.16 for those tests. On January 24, 2014, Medicare paid Aperian $97.22 for this service.

i.      Claim #9: Noble cups were shipped by Aperian to Pain Care Center, TX. Pain Care Center used the cups for testing and submitted requests to Aperian for further testing. Aperian performed confirmation testing on December 6, 2012, and billed Medicare $102.33 for these tests. On January 3, 2013, Medicare paid Aperian $102.33 for this service.

j.      Claim #10: Noble cups were shipped by Aperian to NP Clinics of Tennessee. NP Clinics used the cups for testing and submitted requests to Aperian for further testing. Aperian performed confirmation testing on August 3, 2011, and billed Medicare $102.33 for these tests. On July 12, 2012, Medicare paid Aperian $102.33 for this service.

### C. The Collector Personnel Scheme

184.   The third scheme by which the Defendants violated the False Claims Act is paying for collector personnel to work in doctors' offices.

185.   Aperian routinely paid for urine sample collectors to be based in physician offices. These people would perform urine sample collection duties, but would also perform other work for the physicians (including other testing, filing, or medical record recording).

186.   For more than twenty years, the position of the OIG has been that "the mere existence of a contract between the laboratory and the health care provider that prohibits the phlebotomist from performing services unrelated to specimen collection does not eliminate the OIG's concern, where the phlebotomist is not closely monitored by his [or her] employer or where the contractual prohibition is not rigorously enforced." HHS-OIG Special Fraud Alert, "Arrangements for the Provision of Clinical Lab Services" 59 Fed. Reg. 65372, 65377 (Dec. 19, 1994) available at http://oig.hhs.gov/fraud/docs/alertsandbulletins/121994.html.

187.   That guidance was echoed by Colaborate in its June 13, 2012 audit findings to Aperian:

> Colaborate recommends implementing a compliance form that is updated and signed annually for all the collectors and by the third-party marketing company along with the individual sales representatives. This compliance document will ensure that all representatives of Aperian no matter how far [removed] understand the importance as well as the legalities of representing Aperian.

188.   Based on Relator's knowledge, none of the agreements with the collectors themselves were in writing and they do not satisfy any safe harbor provisions under Federal law.

189.   There are three categories of clients for whom Aperian provided collector personnel: original Aperian base clients (physicians originally recruited by Aperian to send samples to Aperian for testing), Summit Diagnostics clients, and TDS/Compass clients.

### 1.  Collectors Provided to Aperian Base Clients.

190.   Beginning in approximately 2008 and continuing at least until Relator was separated from his employment at Aperian, Aperian provided collectors under an employee lease agreement. Aperian paid the physician office a monthly fee to lease back one their employees to provide collection services for Aperian samples. Many of these contracts were written and entered into by EAMC.

191.   This practice has also been addressed by a Special Fraud Alert, "Arrangements for the Provision of Clinical Lab Services," 59 Fed. Reg. 65372, 65377 (Dec. 19, 1994); *see also In re: Petition for Declaratory Statement of Dominion Diagnostics, LLC* (2008).

192.   Further, a May 9, 2008 e-mail from Dr. Jerry McHan, the medical director of Aperian, discusses visiting a Georgia medical practice and providing them improper incentives to refer lab tests. McHan stated that "[s]ince I had such a

receptive audience and since I knew they were testing only a portion of their patients, I decided to go for the gold." He first offered to provide the practice with a free color printer if they provide 50 samples a month. The practice agreed. So he promised them a grant of $20,000 if they could provide 100 samples a month for 12 months. The practice agreed. Dr. McHan then promised that if the practice would contract with Aperian to provide a minimum of 150 samples a month, Aperian would pay the cost of a new employee/collector. Dr. McHan concludes his e-mail by saying the practice was already strategizing on how to get 150 samples a month by the time he left the meeting.

193.   This 2008 email was a triggering event that caused Relator to believe that Defendants EAMC and Aperian were violating Federal law. He raised concerns regarding this conduct to his superiors. Among the superiors copied on this email were Lott, Valaer, and Michele Hunter.

194.   Aperian did in fact provided a collector to Gwinnett Anesthesia Services, P.C. under an employee lease agreement. The agreement provided that Aperian would pay Gwinnett to lease a full time employee at the rate of $18 per hour for 2080 hours per year to provide collection services.

195.   By way of example, and to provide even greater indicia of reliability, Relator identifies the following false claim induced by providing collector personnel to Gwinnett: On September 29, 2009, Aperian submitted claims under CPT Codes

80154, 83925, and 80101 to Georgia Medicaid in the amount of $812.68. This claim was referred by provider Richard Reisman, and the patient's initials are M.R.

196.   The contract acknowledges the Stark Law and Anti-Kickback Statute, but does not comply with those laws because the employee lease agreement was entered into by Aperian as an inducement for laboratory testing referrals from Gwinnett as detailed by McHan's e-mail. The relationship further violates the Anti-Kickback Statute because the leased employee also performed other work for the physicians (including other testing, filing, or medical record recording).

197.   One contract in the line of employee lease contracts between Gwinnett and Aperian is dated April 1, 2011 and signed by Ken Lott for Aperian. All claims submitted to Federal payors for referrals of laboratory testing from Gwinnett to Aperian are false claims for payment because they are submitted in violation of the certification of Stark and Anti-Kickback compliance on CMS Form 1500.

198.   On March 21, 2011, Relator and Lott exchanged emails regarding the ability of the collector employed at Gwinnett Pain to provide adequate value for the expenditure. Lott stated in an email to Relator that "I just hate to give free labor away when there is no allegiance to us."

199.   Aperian had another such an employee lease agreement with FLH, Inc., a pain management services provider in Northport, Alabama. The agreement

provided that Aperian would pay FLH, Inc. to lease a full time employee at the rate of $16 per hour for 2080 hours per year to provide collection services.

200.   By way of example, and to provide even greater indicia of reliability, Relator identifies the following false claim induced by providing collector personnel to FLH, Inc.: On May 25, 2012, Aperian submitted claims under CPT Codes G0431 and 80154 to Medicare of Alabama in the amount of $156.33, and for which Aperian was paid $128.53. This claim was referred by provider Frederick Graham, and the patient's initials are C.W.

201.   The contract acknowledges the Stark Law and Anti-Kickback Statute, but it does not comply with those laws because Aperian entered into the employee lease agreement to induce FLH, Inc. to refer laboratory testing to Aperian.  The relationship further violates the Anti-Kickback Statute because the leased employee also performed other work for the physicians (including other testing, filing, or medical record recording).

202.   The contract is dated May 19, 2011 and signed by Ken Lott and Sam Price for Aperian. All claims submitted to Federal payors for referrals of laboratory testing from FLH, Inc. to Aperian are false claims for payment because they are submitted in violation of the certification of Stark and Anti-Kickback compliance on the CMS Form 1500.

203.   Aperian had another such an employee lease agreement with Southeast Pain Management Center in Dothan, Alabama. Aperian paid Southeast Pain Management Center $864 every two weeks for a collector from October 9, 2009 through at least the date on which Relator was separated from his employment with Aperian.

204.   By way of example, and to provide even greater indicia of reliability, Relator identifies the following false claims induced by providing collector personnel to Southeast Pain Clinic:

     a.     On April 3, 2013, Aperian submitted claims under CPT Codes G0431, 81003, 82542, 82646, and 82570 to Medicare of Alabama for a total of $237.05. This claim was referred by provider John Marsella, and the patient's initials are E.W.

     b.     On April 3, 2013, Aperian submitted claims under CPT Codes G0431, 81003, 82542, and 82570 to Medicare of Alabama for a total of $176.75, and for which Aperian was paid $134.97. This claim was referred by provider Michael Flanagan, and the patient's initials are S.G.

205.   The contract acknowledges the Stark Law and Anti-Kickback Statute, but it does not comply with those laws because Aperian entered into the employee lease agreement to induce Southeast Pain Management Center to refer laboratory testing to Aperian. The relationship further violates the Anti-Kickback Statute

because the leased employee also performed other work for the physicians (including other testing, filing, or medical record recording). All claims submitted to Federal payors for referrals of laboratory testing from Southeastern Pain Management Center to Aperian are false claims for payment because they are submitted in violation of the certification of Stark and Anti-Kickback compliance on the CMS Form 1500.

206. On June 1, 2008, McHan emailed another potential client and stated "I did want to mention to you that we would like to give your practice an incentive to increase the volume of testing." This email, which was sent to Dr. Thomas Yearwood who currently practices at Comprehensive Pain and Rehabilitation in Pascagoula, Mississippi, plainly describes the motivation for this scheme:

> We are currently getting an average of just over 50 samples/month including both sites. Tami felt that that could be increased to 100/month. If that becomes the case over a 12 month period, we will contribute back to you $20k to [subsidize] the collection process. If you average >150/month we will contribute $30k to support a collector. We will be providing to your Pascagoula office a color printer in order to fully utilize the improved report. I will be glad to do the same for Daphne if the volume from there increases.

207. By way of example, and to provide even greater indicia of reliability, Relator identifies the following false claim induced by providing collector personnel to Comprehensive Pain and Rehabilitation: On September 22, 2009, Aperian submitted claims under CPT Codes 80101, 83840, 82542, and 83925 to Medicare.

This claim was referred by provider Thomas Yearwood, and the patient's initials are L.J.

### 2.  Collectors Provided to Summit Diagnostics-Referred Clients.

208.   For physicians or practice group clients that Summit Diagnostics would refer to Aperian for laboratory tests, Aperian provided collectors to the physician practice by contracting with several temp agencies to provide the collectors to the physicians' office. This scheme began in the year 2009 and continued at least through the time when Relator was separated from his employment at Aperian.

209.   During weekly status calls, which occurred primarily between 2009 and 2011, Summit Diagnostics representatives, including George Powell, said to Aperian personnel, including Relator and other individuals identified at paragraphs 78-79, that Aperian would need to place collectors inside physician offices to gain referral business from a physician.

210.   Summit Diagnostics believed this was a competitive move that was essential to the furtherance of the contract. During those calls, Relator was typically physically sitting in Alan Valaer's office at Aperian.

211.   Powell and Alice Erret recommended certain temp agencies Aperian should contact to place collectors in those physician offices. They included Augmentation Incorporated; Delta Personnel, Inc.; All Medical Personnel, Inc.; and,

Favorite Healthcare Staffing. This information likely would be confirmed in emails between Alice Erret and Michele Hunter.

212.   In addition, George Powell made at least two in-person presentations to the Aperian Board in 2009 and 2010 regarding new services, client possibilities, marketing performance, and reimbursement performance of various Summit Diagnostics clients in various states with differing payor mixes. People who attended those presentations included EAMC administration and Aperian management.

213.   Based on Powell's advice, Aperian paid the temp agency and the employees worked in the doctors' offices, collecting urine samples and doing other work for the physicians. The temp agencies utilized for this purpose are: Augmentation Incorporated; Delta Personnel, Inc.; All Medical personnel, Inc.; and, Favorite Healthcare Staffing.

214.   In a September 6, 2011 email exchange between Powell and McHan—and on which Relator and other Aperian, EAMC, and Summit Diagnostics personnel were copied—McHan told Powell not to continue to expend resources that were not leading to increased business for Aperian:

> Our administration has requested that we take action against accounts that are consuming resources without significant payback. The attachments reflect the total percent reimbursement by state and show the breakdown by individual account. We would like to drop those states that are below the 20% level. This would include CA, CT (already done), MI, NJ, KS, AZ, and OH.

While not on the overall 20% list, we would like to include the Tennessee accounts, as well. Here we are expending some $6k/month for collectors. This is particularly notable with Integrity Behavioral Medicine where we are paying out almost $3k/month, which further reduces our part of the 11% reimbursement. My own calculations indicate we are actually subsidizing this account.

I would like to talk to you further, rather than just providing you a list of states to move. We would like to have these states transferred to another lab as soon as possible but certainly no later than October 1, which begins our new fiscal year. . . .

Powell responded that Summit Diagnostics would comply, and would limit future referrals of this nature to states in which Aperian already had established its presence.

215.   All claims submitted to Federal payors for referrals of laboratory testing from Summit Diagnostics physician or practice group clients to Aperian, where Aperian provided a collector, are false claims for payment because they are submitted in violation of the certification of Stark and Anti-Kickback compliance on the CMS Form 1500.

### 3.  Collectors Provided to Compass/TDS-Referred Clients.

216.   Beginning in the year 2011 and continuing at least through the time when Relator was separated from his employment with Aperian, Compass and TDS paid for collectors in the physician offices where samples were collected and referred to Aperian. The provision of collectors by Compass/TDS was an inducement to the

physicians to conduct testing and provide referrals to Compass and Aperian (the Compass/TDS client).

217.   Aperian/EAMC executives had routine status calls concerning this scheme—including Valaer, McHan, Michele Hunter, Lott, Chapman, and Relator.

218.   During those calls, which occurred between 2011 and the time at which Relator's employment with Aperian/EAMC ended, Chapman told Aperian that Compass/TDS would provide collectors to physician offices.

219.   Those collectors were paid for by Compass/TDS for the benefit of the physicians and to induce them to refer testing business to Aperian. This relationship benefitted Aperian by increasing the volume of tests it received.  The relationship further violates the Anti-Kickback Statute because the leased employee also performed other work for the physicians (including other testing, filing, or medical record recording). It also benefitted Compass/TDS because of the referral contract relationships Aperian had with Compass/TDS, in which Aperian paid Compass/TDS more money based on the volume and value of the samples it received from their referrals.

220.   During status calls regarding this scheme early in its life, Chapman asked Aperian to free-up more lab capacity so she could send more sample referrals.

221.   As lab capacity became saturated, the status calls revolved mostly around increasing turn-around time. As capacity became limited due to the large

volume of samples coming in from Chapman's referrals, samples from large-volume referrer Dr. Shelinder Aggarwal (also a business partner/investor of Chapman's in Compass/TDS) were stored on racks in the lab hallway for weeks at a time before testing could be completed.

222.   As the samples aged (from three weeks to several months), they would occasionally burst due to bacterial growth in the urine. On at least one occasion a lab technician was spattered with urine from an exploding container.

223.   Chapman insisted, and Ken Lott agreed, that Aperian continue to hold the samples until testing could be completed so the testing would be reimbursed and Chapman and her businesses would be paid commission on those samples.

224.   Chapman also communicated in several phone calls that Aggarwal was not concerned about turn-around time as long as the samples were eventually tested. When capacity had become so saturated that Aggarwal's sample volume filled the entire hallway at Aperian and turn-around time had reached nearly one month on all testing, Chapman announced she and Aggarwal were opening their own toxicology lab under the name "Compass Laboratory Services."

225.   All claims submitted to Federal payors for referrals of laboratory testing from TDS/Compass physician or practice group clients, where Compass/TDS provided a collector to the physician or practice group, to Aperian, are false claims

for payment because they are submitted in violation of the certification of Stark and Anti-Kickback compliance on the CMS Form 1500.

### D. EAMC Lab Outreach Program Provides Collectors to Physicians' Offices.

226.   The fourth scheme that violates Federal law is that Defendant EAMC provided collectors to physician offices with a high volume of clinical lab testing referrals.

227.   This scheme began before Relator's employment with Lab Outreach and continued through the time at which Relator was separated from his employment with Aperian.

228.   These collectors performed collections for both referrals to EAMC lab outreach and for the doctors in-house testing. In other words, EAMC covered the full cost of the employee, but the employee provided a direct benefit to the physician practice by performing collections for tests conducted in-house at the physician practice.

### 1.  Collectors Employed Directly by EAMC.

229.   Tabitha Spratlin and Latressa Whitfield worked at Lee Obstetrics and Gynecology, PA. These women were paid by Defendant EAMC. Their paychecks came from Defendant EAMC, but they worked full time at Lee Obstetrics and Gynecology.

230.   They performed collections for both Defendant EAMC and Lee OBGYN. They performed Hemoglobin A1c, glucose testing, and dipstick urinalysis for Lee OBGYN and these tests were billed by Lee OBGYN.

231.   Thus, a financial inducement and benefit was provided by Defendant EAMC to Lee OBGYN for the referral of all other laboratory testing to Defendant EAMC.

232.   All claims submitted to Federal payors on the CMS Form 1500 for laboratory testing referred from Lee OBGYN to Defendant EAMC are false claims for payment because they are falsely submitted as complying with the Stark Law and Anti-Kickback Statute when they did not comply.

233.   That relationship was ongoing at the time Relator was separated from his employment at Aperian and existed for more than one year before that date.

## 2.  Employee Lease Agreements.

234.   In certain situations, Defendant EAMC paid physician practices for the lease of an employee to collect samples. At the time Relator was separated from his employment at Aperian, these arrangements were in place with Family Medicine Associates and Hiren K. Patel, M.D., P.C. Before the direct employment of two collectors at Lee OBGYN, Defendant EAMC had an employee lease agreement with Lee OBGYN for the lease of one employee.

235.   In the employee lease agreement between EAMC Hiren K. Patel, MD, PC of Opelika, Alabama, the agreement provides that EAMC will pay Hiren K. Patel, MD, PC to lease a full time employee at the rate of $12 per hour for 2080 hours per year to provide collection services.

236.   The contract acknowledges the Stark Law and Anti-Kickback Statute, but that acknowledgement is undermined by the fact that the employee lease agreement was entered into by EAMC to induce Hiren K. Patel, M.D., PC to refer laboratory testing referrals to Aperian. The relationship further violates the Anti-Kickback Statute because the leased employee also performed other work for the physicians (including other testing, filing, or medical record recording.

237.   The first contract is dated February 1, 2012 and signed by Ken Lott for Defendant EAMC and Hiren K. Patel for a term of one year. The second contract is dated February 1, 2013 and signed by Lott for Defendant EAMC and Hiren K. Patel for a term of one year.

238.   All claims submitted to Federal payors on the CMS Form 1500 for laboratory testing referred from Hiren K. Patel to Defendant EAMC are false claims for payment because they are falsely submitted as complying with the Stark Law and Anti-Kickback Statute when they did not comply.

239.   Defendant EAMC had an employee lease agreement with Family Medicine Associates of Opelika, Alabama. The agreement provides that EAMC will

pay Family Medicine Associates to lease a full time employee at the rate of $15 per hour for 2080 hours per year to provide collection services.

240.   The contract acknowledges the Stark Law and Anti-Kickback Statute, but that acknowledgement is undermined by the fact that the employee lease agreement was entered into by EAMC to induce Family Medicine Associates to refer laboratory testing business to Aperian. The relationship further violates the Anti-Kickback Statute because the leased employee also performed other work for the physicians (including other testing, filing, or medical record recording. The first contract is dated May 1, 2010 and signed by Ken Lott for Defendant EAMC. The same parties entered into a subsequent contract with the same material terms dated May 1, 2012.

241.   By way of example, and to provide even greater indicia of reliability, Relator identifies the following example of a collector provided by EAMC performing functions other than sample collection: On October 18, 2013, a collector named Rosie Upshaw, who was an employee leased to the practice by EAMC, performed a blood draw and in-house CBC lab test on a patient whose initials are T.F. Family Medicine Associates billed the patient's insurance provider for a venipuncture (collection) fee and CBC test performed by Upshaw—a total of $28.00—and received a benefit from the EAMC-funded collector in two ways. First, Family Medicine Associates did not have to pay an employee to perform those

functions. Second, Family Medicine Associates was paid $16.15 from the insurance provider for the claim submitted based on the work done by Upshaw.

242.   All claims submitted to Federal payors on the CMS Form 1500 for referrals of laboratory testing from Family Medicine Associates to Defendant EAMC are false claims for payment because they were falsely submitted as certifying compliance with the Stark Law and Anti-Kickback Statute when they did not comply.

### E. Additional Facts Regarding Relator's Employment.

243.   In addition to the conduct described above, Relator also made specific compliance reports, which were protected activity, that led to his separation from employment.

244.   On March 26, 2013, Relator emailed Lott, Valaer, Price, and McHan to inform them that Defendant Aggarwal's medical practice had been shut down by the authorities. Relator also said "Aggarwal is one of Jannie's main investors from what we've seen from her in the past. Until this gets resolved and we see what happens with Jannie, I'd suggest pulling out of the Cain Brothers project and distancing ourselves as much as possible."

245.   Lott forwarded that information to Cain Brothers, and Stewart Carr spoke with representatives of Chapman, Compass, and TDS. Cain Brothers

conveyed several options to EAMC leadership including "Dr. Aggarwal being separated from Compass for the purposes of potential relationship with Aperian."

246.   Lott and other leadership at EAMC continued to press forward with joint venture negotiations despite these facts and Relator's report that they presented serious compliance concerns for Aperian.

247.   On April 23, 2013, Relator sent an email outlining compliance concerns to his superiors at Aperian/EAMC. This was the proper step under EAMC compliance policies, which require "[a]ll personnel" to "report known or suspected violations of these policies to their supervisors, the appropriate [EAMC] executive, or the Compliance Officer."

248.   EAMC compliance policies also state that such reports will be kept confidential to the extent possible, ostensibly to protect any reporting individual from retaliation.

249.   Relator's email to Ken Lott stated, in pertinent part, as follows: "I realized how acutely focused this business is on increasing profits, completely masking risks which are and have been apparent." Relator specifically identified management's disregard of the findings of the Colaborate audit and when he and Nutter "attempted to amend the TDS contract to remove the risk of Medicare 'per-click' remuneration" and were told "to back off before Jannie took her business away."

250.   Less than one month later, Fite was told he would be subject to demotion at Aperian.

251.   He then was called into a meeting with Nutter, the chief compliance officer, and Laura Grill where he was asked about his compliance concerns. Fite was told that he was being considered for termination.

252.   EAMC and Aperian executives made Relator's conditions of employment unbearable and initiated internal investigations into conduct of Relator's that was a pretext to discharge him from his employment.

253.   In a meeting with Lott and Susan Johnston (AVP of human resources), Relator was told he would be terminated if he did not resign. He was offered a separation agreement on or about May 21, 2013 that provided Relator would resign.

254.   EAMC and Aperian offered Relator three months' severance in exchange for his resignation. This offer, however, was conditioned on Relator's "release of any and all claims arising out of or related to his employment relationship with" EAMC and Aperian.

255.   In addition to that general release, which one would expect to see in any such agreement, the offer presented to Relator went further. It would have required Relator to release, *inter alia*, any claims under the False Claims Act, Anti-Kickback Statute, and Stark Law. This confirms that Defendants EAMC and Aperian believed Relators conduct was protected.

## VIII.  Causes of Action

### Count I: Violations of 31 U.S.C. § 3729(a)(1) Concerning
### the Commission-Based Marketing Scheme
### *Against Defendants Aperian, EAMC, and Summit Diagnostics*

256.   Relator incorporates and realleges the allegations of paragraphs 2-26, 36-40, 48-54, 55-93, 140-142, and 243-255 as if set forth fully herein.

257.   Defendants Aperian and EAMC by and through their agents, officers, and employees, presented or caused to be presented false or fraudulent claims for payment or approval to the United States or its fiscal intermediaries in violation of 31 U.S.C. § 3729(a)(1)(A) for laboratory tests arranged and referred by Defendant Summit Diagnostics.

258.   These claims for laboratory testing were legally false because Defendants Aperian and EAMC by and through their agents, officers, and employees, certified eligibility to participate and compliance with governing Federal laws that were conditions of participation and payment. These certifications were submitted to the United States or its fiscal intermediaries on CMS Form 1500 for each and every false claim.

259.   These false claims were presented or caused to be presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

260.    Defendants Aperian and EAMC submitted false claims for payment for laboratory tests to the United States or its fiscal intermediaries. The claims were false because they violated the Anti-Kickback Statute and because they were tainted by the illegal commission-based marketing agreements with Defendant Summit Diagnostics.

261.    Defendant Summit Diagnostics by and through its agents, officers, and employees, knowingly caused to be presented false or fraudulent claims for payment or approval to the United States or its fiscal intermediaries in violation of 31 U.S.C. § 3729(a)(1)(A) for laboratory tests arranged and referred to EAMC and Aperian. Defendant Summit Diagnostics caused the submission of these false claims by entering into a series of commission-based marketing agreements that violated the Anti-Kickback Statute as set forth above.

262.    These claims were legally false because Defendants Aperian and EAMC by and through their agents, officers, and employees, certified eligibility to participate and compliance with governing Federal laws, including the Anti-Kickback Statute, that were conditions of participation and payment. These certifications were submitted on CMS Form 1500 for each and every false claim.

263.    These false claims were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

264.   Defendants Aperian and EAMC by and through their agents, officers, and employees, made, used, and caused to be made or used, false records or statements—i.e., false statements regarding compliance with the Anti-Kickback Statute and coverage for its services on CMS Forms 1500—to get false or fraudulent claims paid and approved by the United States in violation of 31 U.S.C. § 3729(a)(1)(B).

265.   The false certifications and representations of Defendants Aperian and EAMC were made on each CMS Form 1500 submitted to the United States or its fiscal intermediaries for claims resulting from the commission-based marketing agreements with Summit Diagnostics that violated the Anti-Kickback Statute. The CMS Form 1500 and its electronic equivalent are records used to get claims paid by the United States or its fiscal intermediaries. Each such Form 1500 contained a false certification by EAMC or Aperian that these Defendants and the claim were in compliance with certain federal regulations, including the Anti-Kickback Statute.

266.   The false certifications and representations made and caused to be made by Defendants Aperian and EAMC were material to the payment of the false claims as the United States conditions payment on compliance with the Anti-Kickback Statute and failing to comply with the Anti-Kickback Statute makes a provider statutorily ineligible to receive payment.

267.   These false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

268.   Defendant Summit Diagnostics by and through its agents, officers, and employees, knowingly caused to be made false records or statements material to false claims in violation of 31 U.S.C. § 3729(a)(1)(B) for laboratory tests arranged and referred by Summit Diagnostics to EAMC and Aperian. Defendant Summit Diagnostics caused the false CMS Form 1500 with the false certification of compliance with the Anti-Kickback Statue to be made by entering into a series of commission-based marketing agreements that violated the Anti-Kickback Statute as set forth above, and by arranging and referring the laboratory tests to Aperian and EAMC pursuant to those illegal commission-based marketing agreements. The illegal referrals and referral relationship caused the certification of compliance with the Anti-Kickback Statute by Aperian and EAMC on each CMS Form 1500 to be false thereby make the document false.

269.   Defendant Summit Diagnostics conspired with Aperian and EAMC to knowingly present and cause to be presented false or fraudulent claims for payment to the United States or its fiscal intermediaries and conspired to knowingly make use or cause to be made or used a false record or statement material to a false or

fraudulent claim in violation of 31 U.S.C. § 3729(a)(1)(C). The object of this conspiracy was to be paid money by Federal payors.

270.   Defendants entered into illegal commission-based marketing contracts for the referral of laboratory tests. Summit Diagnostics performed acts to effect the object of the conspiracy by arranging and referring laboratory tests to EAMC and Aperian in exchange for per test commissions. Aperian and EAMC performed acts to effect the object of this conspiracy by certifying eligibility to participate and compliance with governing Federal laws that were conditions of participation and payment. These certifications were submitted by Aperian and EAMC on CMS Form 1500 for each and every false claim.

271.   Defendants Aperian and EAMC also effected the conspiracy by paying commission-based marketing payments to Defendants Summit Diagnostics for the referral of laboratory tests under their agreement.

272.   The United States has been damaged as a result of Defendants' violations of the False Claims Act in an amount to be proven at trial. The United States is entitled to this sum as reimbursement for monies obtained by the Defendants for false claims submitted to the United States.

273.   The United States is entitled to three times the total damages sustained as a result of the Defendants' violations.

274.   The United States is entitled to a civil penalty of not less than $5,500.00 and not more than $11,000.00, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 Note; Public Law 104-410) for each of Defendants' false claims.

275.   Relator is entitled to reasonable attorney's fees and costs under 31 U.S.C. § 3730(d)(1).

### Count II: Violations of 31 U.S.C. § 3729(a)(1) Concerning the Point-of-Care Testing Cup Scheme
#### *Against Defendants Aperian, EAMC, and Summit Diagnostics*

276.   Relator incorporates and realleges the allegations of paragraphs 2-26, 36-57, 143-183, and 243-255 as if set forth fully herein.

277.   Defendants Aperian and EAMC submitted false claims for payment for laboratory tests to the United States or its fiscal intermediaries in violation of 31 U.S.C. § 3729 (a)(1)(A). The claims were false because they violated the Stark Law and the Anti-Kickback Statute and because they were tainted by Aperian's agreement to provide free Noble cups to physicians marketed by Defendant Summit Diagnostics. This scheme provided a financial benefit to non-party George Powell of Defendant Summit Diagnostics.

278.   These claims for laboratory testing were legally false because Defendants Aperian and EAMC by and through their agents, officers, and employees, certified eligibility to participate and compliance with governing Federal

laws that were conditions of participation and payment. These certifications were submitted to the United States or its fiscal intermediaries on CMS Form 1500 for each and every false claim.

279.   These false claims were presented or caused to be presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

280.   Summit Diagnostics violated 31 U.S.C. § 3729 (a)(1)(A) and caused the submission of the false claims for laboratory tests to the United States by entering into agreements with Aperian that required Aperian to provide free Noble Cups to Summit Diagnostics physician clients. The provision of free Noble cups is an inducement for referrals that violated the Anti-Kickback Statute and Stark Law, making the claims submitted by EAMC and Aperian to the United States for tainted referrals ineligible for payment.

281.   Defendants Aperian and EAMC by and through their agents, officers, and employees, made, used, and caused to be made or used, false records or statements—i.e., false statements regarding compliance with the Anti-Kickback and Stark Laws, and coverage for its services, on CMS Forms 1500—to get false or fraudulent claims paid and approved by the United States in violation of 31 U.S.C. § 3729(a)(1)(B).

282.   The false certifications and representations of Defendants Aperian and EAMC were made on each CMS Form 1500 submitted to the United States or its fiscal intermediaries for claims resulting from Physicians to whom Defendant Summit Diagnostics marketed the services of Defendants Aperian and EAMC who were provided with free Noble cups as an inducement to refer laboratory testing to Aperian and EAMC in violation of Stark Law and Anti-Kickback Statute. The CMS Form 1500 and its electronic equivalent are records used to get claims paid by the United States or its fiscal intermediaries. Each such Form 1500 contained a false certification by EAMC or Aperian that these Defendants and the claims were in compliance with certain federal regulations, including the Stark Law and Anti-Kickback Statute.

283.   The false certifications and representations made and caused to be made by Defendants Aperian and EAMC were material to the payment of the false claims as the United States conditions payment on compliance with the Stark Law and Anti-Kickback Statute and failing to comply with the Anti-Kickback Statute makes a provider statutorily ineligible to receive payment.

284.   These false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

285.   Defendant Summit Diagnostics by and through its agents, officers, and employees, including CEO George Powell, knowingly caused to be made false records or statements material to a false claim in violation of 31 U.S.C. § 3729(a)(1)(B) for laboratory test claims resulting from Physicians to whom Defendant Summit Diagnostics marketed the services of Defendants Aperian and EAMC who were provided with free Noble cups as an inducement to refer laboratory testing to Aperian and EAMC in violation of Stark Law and Anti-Kickback Statute. Defendant Summit Diagnostics also caused false CMS Form 1500 with the false certifications of compliance with the Stark Law and Anti-Kickback Statute to be made by entering into a series of agreements with EAMC and Aperian that required the provision of free Noble Cups to Physicians to whom Defendant Summit Diagnostics marketed the services of Defendants Aperian and EAMC to induce referrals in violation of the Anti-Kickback Statute and Stark Law as set forth above. The illegal inducement of free Noble cups caused the certification of compliance with the Anti-Kickback Statute and Stark Law by Aperian and EAMC on each CMS Form 1500 to be false thereby make the document false.

286.   Defendant Summit Diagnostics conspired with Aperian and EAMC to knowingly present, cause to be presented a false or fraudulent claim for payment to the United States or its fiscal intermediaries and conspired to knowingly make use or cause to be made or used a false record or statement material to a false or

fraudulent claim in violation of 31 U.S.C. § 3729(a)(1)(C). The object of this conspiracy was to be paid money by Federal payors for claims submitted pursuant to illegally induced referrals of laboratory tests.

287.   Defendants entered into illegal agreements to provide free Noble Cups to Physicians to whom Defendant Summit Diagnostics marketed the services of Defendants Aperian and EAMC in order to induce referrals of laboratory tests by those physicians. Summit Diagnostics performed acts to effect the object of the conspiracy by telling EAMC and Aperian which of physicians should be provided with free Noble cups and by marketing to the physicians with the promise of free Noble cups if they referred their confirmation tests to Aperian and EAMC. Aperian and EAMC performed acts to effect the object of this conspiracy because they certified eligibility to participate and compliance with governing Federal laws that were conditions of participation and payment by the United States. These certifications were submitted by Aperian and EAMC on CMS Form 1500 for each and every false claim.

288.   Defendants Aperian and EAMC also performed acts to effect the conspiracy by providing the free Noble cups to Physicians to whom Defendant Summit Diagnostics marketed the services of Defendants Aperian and EAMC to induce referrals and paying Summit Diagnostics commissions on the illegal referrals.

289.   The United States has been damaged as a result of Defendants' violations of the False Claims Act in an amount to be proven at trial. The United States is entitled to this sum as reimbursement for monies obtained by the Defendants for false claims submitted to the United States.

290.   The United States is entitled to three times the total damages sustained as a result of the Defendants' violations.

291.   The United States is entitled to a civil penalty of not less than $5,500.00 and not more than $11,000.00, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 Note; Public Law 104-410) for each of Defendants' false claims.

292.   Relator is entitled to reasonable attorney's fees and costs under 31 U.S.C. § 3730(d)(1).

### Count III: Violations of 31 U.S.C. § 3729(a)(1)(A)
### Concerning the Collector Personnel Scheme
### *Against Defendants Aperian, EAMC, and Summit Diagnostics*

293.   Relator incorporates and realleges the allegations of paragraphs 2-26, 36-57, 184-189, 208-215, and 243-255 as if set forth fully herein.

294.   Defendants Aperian and EAMC submitted false claims for payment for laboratory tests to the United States or its fiscal intermediaries in violation of 31 U.S.C. § 3729 (a)(1)(A). The claims were false because they violated the Stark Law and the Anti-Kickback Statute and because they were tainted by Aperian's

agreement to provide collectors to physicians' offices marketed by Defendant Summit Diagnostics.

295.   These claims for laboratory testing were legally false because Defendants Aperian and EAMC by and through their agents, officers, and employees, certified eligibility to participate and compliance with governing Federal laws that were conditions of participation and payment. These certifications were submitted to the United States or its fiscal intermediaries on CMS Form 1500 for each and every false claim.

296.   These false claims were presented or caused to be presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

297.   Summit Diagnostics violated 31 U.S.C. § 3729 (a)(1)(A) and caused the submission of the false claims for laboratory tests to the United States by Summit Diagnostics requesting and arranging for Aperian and EAMC to provide collectors to Summit Diagnostics physician client offices. The provision of collectors who do additional work for the physicians is an inducement for referrals that violated the Anti-Kickback Statute and Stark Law, making the claims submitted by EAMC and Aperian to the United States ineligible for payment.

298.   Defendants Aperian and EAMC by and through their agents, officers, and employees, made, used, and caused to be made or used, false records or

statements—i.e., false statements regarding compliance and coverage for its services and false statements on CMS Forms 1500—to get false or fraudulent claims paid and approved by the United States in violation of 31 U.S.C. § 3729(a)(1)(B).

299.   The false certifications and representations of Defendants Aperian and EAMC were made on each CMS Form 1500 submitted to the United States or its fiscal intermediaries for claims resulting from Physicians to whom Defendant Summit Diagnostics marketed the services of Defendants Aperian and EAMC who were provided with collectors as an inducement to refer laboratory testing to Aperian and EAMC in violation of Stark Law and Anti-Kickback Statute. The CMS Form 1500 and its electronic equivalent are records used to get claims paid by the United States or its fiscal intermediaries. Each such Form 1500 contained a false certification by EAMC or Aperian that these Defendants and the claims were in compliance with certain federal regulations, including the Stark Law and Anti-Kickback Statute.

300.   The false certifications and representations made and caused to be made by Defendants Aperian and EAMC were material to the payment of the false claims as the United States conditions payment on compliance with the Stark Law and Anti-Kickback Statute and failing to comply with the Anti-Kickback Statute makes a provider statutorily ineligible to receive payment.

301.   These false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

302.   Defendant Summit Diagnostics by and through its agents, officers, and employees, including CEO George Powell, knowingly caused to be made false records or statements material to a false claim in violation of 31 U.S.C. § 3729(a)(1)(B) for laboratory test claims resulting from Physicians to whom Defendant Summit Diagnostics marketed the services of Defendants Aperian and EAMC who were provided with collectors as an inducement to refer laboratory testing to Aperian and EAMC in violation of Stark Law and Anti-Kickback Statute. Defendant Summit Diagnostics also caused false CMS Forms 1500 with false certifications of compliance with the Stark Law and Anti-Kickback Statute to be made by marketing the provision of collectors, and requesting that EAMC and Aperian provide collectors, to physicians to whom Defendant Summit Diagnostics marketed the services of Defendants Aperian and EAMC to induce referrals in violation of the Anti-Kickback Statute and Stark Law as set forth above. The illegal inducement of collectors caused the certification of compliance with the Anti-Kickback Statute and Stark Law by Aperian and EAMC on each CMS Form 1500 to be false thereby making the document false.

303.   Defendant Summit Diagnostics conspired with Aperian and EAMC to knowingly present, cause to be presented false or fraudulent claims for payment to the United States or its fiscal intermediaries and conspired to knowingly make use or cause to be made or used a false records or statements material to a false or fraudulent claim in violation of 31 U.S.C. § 3729(a)(1)(C). The object of this conspiracy was to be paid money by Federal payors for claims submitted pursuant to illegally induced referrals of laboratory tests.

304.   Defendants coordinated their efforts and actions to provide collectors to Physicians to whom Defendant Summit Diagnostics marketed the services of Defendants Aperian and EAMC in order to induce referrals of laboratory tests. Summit Diagnostics performed acts to effect the object of the conspiracy by telling EAMC and Aperian which of physicians should be provided with collectors, by suggesting agencies to provide the collectors and by marketing to the physicians with the promise of collectors if they referred enough laboratory tests to Aperian and EAMC. Aperian and EAMC performed acts to effect the object of this conspiracy because they certified eligibility to participate and compliance with governing Federal laws that were conditions of participation and payment by the United States. These certifications were submitted by Aperian and EAMC on CMS Form 1500 for each and every false claim.

305.   Defendants Aperian and EAMC also performed acts to effect the conspiracy by paying for and providing the collectors to Physicians to whom Defendant Summit Diagnostics marketed the services of Defendants Aperian and EAMC to induce referrals and paying Summit Diagnostics commissions on the illegal referrals.

306.   The United States has been damaged as a result of Defendants' violations of the False Claims Act in an amount to be proven at trial. The United States is entitled to this sum as reimbursement for monies obtained by the Defendants for false claims submitted to the United States.

307.   The United States is entitled to three times the total damages sustained as a result of the Defendants' violations.

308.   The United States is entitled to a civil penalty of not less than $5,500.00 and not more than $11,000.00, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 Note; Public Law 104-410) for each of Defendants' false claims.

309.   Relator is entitled to reasonable attorney's fees and costs under 31 U.S.C. § 3730(d)(1).

**Count IV: Violations of 31 U.S.C. § 3729(a)(1) Concerning the
Commission-Based Marketing Agreement Scheme**
*Against Defendants Aperian, EAMC, Compass, TDS, Chapman, and Aggarwal*

310.   Relator incorporates and realleges the allegations of paragraphs 2-25, 27-30, 36-40, 48-69, 94-131, 140-142, and 243-255 as if set forth fully herein.

311.   Defendants Aperian and EAMC by and through their agents, officers, and employees, presented or caused to be presented false or fraudulent claims for payment or approval to the United States in violation of 31 U.S.C. § 3729(a)(1)(A) for laboratory tests arranged and referred by Defendants Compass, TDS, Chapman and Aggarwal.

312.   These claims for laboratory testing were legally false because Defendants Aperian and EAMC by and through their agents, officers, and employees, certified eligibility to participate and compliance with governing Federal laws that were conditions of participation and payment. These certifications were submitted to the United States or its fiscal intermediaries on CMS Form 1500 for each and every false claim.

313.   These false claims were presented or caused to be presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

314.   Defendants Aperian and EAMC submitted false claims for payment for laboratory tests to the United States or its fiscal intermediaries. The claims were false

because they violated the Anti-Kickback Statute and because they were tainted by the illegal commission-based marketing agreements and payments to Defendants Compass, TDS, Chapman and Aggarwal.

315.   Defendants Compass and TDS by and through its agents, officers, and employees, including Defendants Chapman and Aggarwal, knowingly caused to be presented false or fraudulent claims for payment or approval to the United States or its fiscal intermediaries in violation of 31 U.S.C. § 3729(a)(1)(A) for laboratory tests arranged and referred to EAMC and Aperian pursuant to the commission-based marketing agreements. Defendants Compass, TDS, Chapman and Aggarwal caused the submission of these false claims by entering into a series of commission-based marketing agreements that violated the Anti-Kickback Statute as set forth above.

316.   These claims were legally false because Defendants Aperian and EAMC by and through their agents, officers, and employees, certified eligibility to participate and compliance with governing Federal laws, including the Anti-Kickback Statute, that were conditions of participation and payment. These certifications were submitted on CMS Form 1500 for each and every false claim related to a laboratory test arranged or referred by Compass or TDS.

317.   These false claims were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

318.   Defendants Aperian and EAMC by and through their agents, officers, and employees, made, used, and caused to be made or used, false records or statements—i.e., false statements regarding compliance and coverage for its services and false statements on CMS Forms 1500—to get false or fraudulent claims paid and approved by the United States in violation of 31 U.S.C. § 3729(a)(1)(B).

319.   The false certifications and representations of Defendants Aperian and EAMC were made on each CMS Form 1500 submitted to the United States or its fiscal intermediaries for claims resulting from the commission-based marketing agreements with Compass and TDS that violated the Anti-Kickback Statute. The CMS Form 1500 and its electronic equivalent are records used to get claims paid by the United States or its fiscal intermediaries. Each such Form 1500 contained a false certification by EAMC or Aperian that these Defendants and the claims were in compliance with certain federal regulations, including the Anti-Kickback Statute.

320.   The false certifications and representations made and caused to be made by Defendants Aperian and EAMC were material to the payment of the false claims as the United States conditions payment on compliance with the Anti-Kickback Statute and failing to comply with the Anti-Kickback Statute makes a provider statutorily ineligible to receive payment.

321.  These false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

322.  Defendants Compass and TDS by and through its agents, officers, and employees, including Chapman and Aggarwal, knowingly caused to be made false records or statements material to a false claim in violation of 31 U.S.C. § 3729(a)(1)(B) for laboratory tests arranged and referred by Compass and TDS to EAMC and Aperian pursuant to the commission-based marketing agreements. Defendants Compass and TDS also caused the false CMS Form 1500 with the false certifications of compliance with the Anti-Kickback Statute to be made by entering into a series of commission-based marketing agreements that violated the Anti-Kickback Statute as set forth above and by arranging and referring laboratory tests to Aperian and EAMC pursuant to those illegal commission-based marketing agreements. The illegal referrals and referral relationship caused the certification of compliance with the Anti-Kickback Statute by Aperian and EAMC on each CMS Form 1500 to be false thereby make the document false.

323.  Defendants Compass, TDS, Chapman and Aggarwal conspired with Aperian and EAMC to knowingly present and cause to be presented a false or fraudulent claim for payment to the United States or its fiscal intermediaries and conspired to knowingly make use or cause to be made or used false records or

statements material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(C). The object of this conspiracy was to be paid money by Federal payors.

324.   Defendants entered into illegal commission-based marketing contracts for the referral of laboratory tests. Compass, TDS, Chapman and Aggarwal performed acts to effect the object of the conspiracy by arranging and referring laboratory tests to EAMC and Aperian in exchange for per test commissions. Aperian and EAMC performed acts to effect the object of this conspiracy by certifying eligibility to participate and compliance with governing Federal laws that were conditions of participation and payment by the United States. These certifications were submitted by Aperian and EAMC on CMS Form 1500 for each and every false claim.

325.   Defendants Aperian and EAMC also performed acts to effect the conspiracy by paying commission-based marketing payments to Defendants Compass and TDS (owned by Chapman and Aggarwal) for the arranging and referral of laboratory tests under their agreement.

326.   The United States has been damaged as a result of Defendants' violations of the False Claims Act in an amount to be proven at trial. The United States is entitled to this sum as reimbursement for monies obtained by the Defendants for false claims submitted to the United States.

327.   The United States is entitled to three times the total damages sustained as a result of the Defendants' violations.

328.   The United States is entitled to a civil penalty of not less than $5,500.00 and not more than $11,000.00, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 Note; Public Law 104-410) for each of Defendants' false claims.

329.   Relator is entitled to reasonable attorney's fees and costs under 31 U.S.C. § 3730(d)(1).

**Count V: Violations of 31 U.S.C. § 3729(a)(1)**
**Concerning the Collector Personnel Scheme**
*Against Defendants Aperian, EAMC, Compass, TDS and Chapman*

330.   Relator incorporates and realleges the allegations of paragraphs 2-25, 27-30, 36-57, 184-189, 216-225, and 243-255 as if set forth fully herein.

331.   Defendants Aperian and EAMC submitted false claims for payment for laboratory tests to the United States or its fiscal intermediaries in violation of 31 U.S.C. § 3729 (a)(1)(A). The claims were false because they violated the Stark Law and the Anti-Kickback Statute and because they were tainted by Compass, TDS and Chapman's provision of collectors to physicians' offices marketed by Defendants Compass, TDS and Chapman. The collectors were provided in order to induce more referrals to EAMC and Aperian and thereby Compass and TDS would earn more commissions.

332.   These claims for laboratory testing were legally false because Defendants Aperian and EAMC by and through their agents, officers, and employees, certified eligibility to participate and compliance with governing Federal laws that were conditions of participation and payment. These certifications were submitted to the United States or its fiscal intermediaries on CMS Form 1500 for each and every false claim.

333.   These false claims were presented, or caused to be presented, with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

334.   Compass, TDS and Chapman violated 31 U.S.C. § 3729 (a)(1)(A) and caused the submission of the false claims for laboratory tests to the United States by providing collectors to Compass and TDS marketed physician client offices as an inducement for referral of laboratory tests to EAMC and Aperian. The provision of collectors who do additional work for the physicians is an inducement for referrals that violated the Anti-Kickback Statute and Stark Law, making the claims submitted to the United States by EAMC and Aperian, related to those referrals, ineligible for payment.

335.   Defendants Aperian and EAMC by and through their agents, officers, and employees, made, used, and caused to be made or used, false records or statements—i.e., false statements regarding compliance with the Stark and Anti-

Kickback laws, and coverage for its services, as well as false statements on CMS Forms 1500—to get false or fraudulent claims paid and approved by the United States in violation of 31 U.S.C. § 3729(a)(1)(B).

336.   The false certifications and representations of Defendants Aperian and EAMC were made on each CMS Form 1500 submitted to the United States or its fiscal intermediaries for claims resulting from Compass, TDS and Chapman marketed physicians who were provided with collectors as an inducement to refer laboratory testing to Aperian and EAMC in violation of Stark Law and Anti-Kickback Statute. The CMS Form 1500 and its electronic equivalent are records used to get claims paid by the United States or its fiscal intermediaries. Each such Form 1500 contained a false certification by EAMC or Aperian that these Defendants and the claims were in compliance with certain federal regulations, including the Stark Law and Anti-Kickback Statute.

337.   The false certifications and representations made and caused to be made by Defendants Aperian and EAMC were material to the payment of the false claims as the United States conditions payment on compliance with the Stark Law and Anti-Kickback Statute and failing to comply with the Anti-Kickback Statute makes a provider statutorily ineligible to receive payment.

338.   These false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

339.   Defendants Compass and TDS by and through their agents, officers, and employees, including Chapman, knowingly caused to be made false records or statements material to a false claim in violation of 31 U.S.C. § 3729(a)(1)(B) for laboratory test claims resulting from Compass, TDS and Chapman marketed physicians who were provided with collectors as an inducement to refer laboratory testing to Aperian and EAMC in violation of Stark Law and Anti-Kickback Statute. Defendants Compass, TDS and Chapman also caused false CMS Form 1500 with the false certifications of compliance with the Stark Law and Anti-Kickback Statute to be made by providing collectors to Compass, TDS and Chapman marketed physicians to induce referrals in violation of the Anti-Kickback Statute and Stark Law as set forth above. The illegal inducement of collectors caused the certification of compliance with the Anti-Kickback Statute and Stark Law by Aperian and EAMC on each CMS Form 1500 to be false thereby make the document false.

340.   Defendants Compass, TDS and Chapman conspired with Aperian and EAMC to knowingly present, cause to be presented false or fraudulent claims for payment to the United States or its fiscal intermediaries and conspired to knowingly make use or cause to be made or used a false records or statements material to false

or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(C). The object of this conspiracy was to be paid money by Federal payors for claims submitted pursuant to illegally induced referrals of laboratory tests.

341.   Defendants coordinated their efforts and actions to provide collectors to Compass, TDS and Chapman marketed physicians in order to induce referrals of laboratory tests. Compass, TDS and Chapman performed acts to effect the object of the conspiracy by providing and paying for collectors to Compass, TDS and Chapman marketed physicians if they referred enough laboratory tests to Aperian and EAMC. Aperian and EAMC performed acts to effect the object of this conspiracy because they certified eligibility to participate and compliance with governing Federal laws that were conditions of participation and payment by the United States. These certifications were submitted by Aperian and EAMC on CMS Form 1500 for each and every false claim.

342.   The United States has been damaged as a result of Defendants' violations of the False Claims Act in an amount to be proven at trial. The United States is entitled to this sum as reimbursement for monies obtained by the Defendants for false claims submitted to the United States.

343.   The United States is entitled to three times the total damages sustained as a result of the Defendants' violations.

344.   The United States is entitled to a civil penalty of not less than $5,500.00 and not more than $11,000.00, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 Note; Public Law 104-410) for each of Defendants' false claims.

345.   Relator is entitled to reasonable attorney's fees and costs under 31 U.S.C. § 3730(d)(1).

### Count VI: Violation of 31 U.S.C. § 3729(a)(1)
### Concerning the Collector Personnel Scheme
### *Against Defendants Aperian and EAMC*

346.   Relator incorporates and realleges the allegations of paragraphs 2-25, 35-57, 184-207, and 226-255 as if set forth fully herein.

347.   Defendants Aperian and EAMC submitted false claims for payment for laboratory tests to the United States or its fiscal intermediaries in violation of 31 U.S.C. § 3729 (a)(1)(A). The claims were false because they violated the Stark Law and the Anti-Kickback Statute and because they were tainted by paying for collector personnel working in physicians' offices that referred laboratory tests to EAMC and Aperian. The collectors were provided in order to induce more referrals of laboratory tests to EAMC and Aperian that they could bill to the United States and its fiscal intermediaries.

348.   These claims for laboratory testing were legally false because Defendants Aperian and EAMC by and through their agents, officers, and

employees, certified eligibility to participate and compliance with governing Federal laws that were conditions of participation and payment. These certifications were submitted to the United States or its fiscal intermediaries on CMS Form 1500 for each and every false claim.

349.   These false claims were presented, or caused to be presented, with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

350.   EAMC and Aperian violated 31 U.S.C. § 3729 (a)(1)(A) and caused the submission of the false claims for laboratory tests to the United States by providing collectors to EAMC and Aperian physician client offices as an inducement for referral of laboratory tests to EAMC and Aperian. EAMC and Aperian provided the collectors through direct payment by these defendants or through employee lease agreements as more fully described above in paragraphs 171-188 and 209-223. The provision of collectors who did additional work for the physicians is an inducement for referrals that violated the Anti-Kickback Statute and Stark Law, making the claims submitted to the United States by EAMC and Aperian, related to those referrals, ineligible for payment.

351.   Defendants Aperian and EAMC by and through their agents, officers, and employees, made, used, and caused to be made or used, false records or statements—i.e., false statements regarding compliance with federal law and

coverage for its services, and false statements on CMS Forms 1500—to get false or fraudulent claims paid and approved by the United States in violation of 31 U.S.C. § 3729(a)(1)(B).

352.   The false certifications and representations of Defendants Aperian and EAMC were made on each CMS Form 1500 submitted to the United States or its fiscal intermediaries for claims resulting from laboratory test referrals from physicians who were provided collectors as an inducement to refer laboratory testing to Aperian and EAMC in violation of Stark Law and Anti-Kickback Statute. The CMS Form 1500 and its electronic equivalent are records used to get claims paid by the United States or its fiscal intermediaries. Each such Form 1500 contained a false certification by EAMC or Aperian that these Defendants and the claims were in compliance with certain federal regulations, including the Stark Law and Anti-Kickback Statute.

353.   The false certifications and representations made and caused to be made by Defendants Aperian and EAMC were material to the payment of the false claims as the United States conditions payment on compliance with the Stark Law and Anti-Kickback Statute and failing to comply with said laws makes a provider statutorily ineligible to receive payment.

354.   These false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

355.   The United States has been damaged as a result of Defendants' violations of the False Claims Act in an amount to be proven at trial. The United States is entitled to this sum as reimbursement for monies obtained by the Defendants for false claims submitted to the United States.

356.   The United States is entitled to three times the total of damages sustained as a result of the Defendants' violations of 31 U.S.C. § 3729(a)(1)(B).

357.   The United States is entitled to a civil penalty of not less than $5,500.00 and not more than $11,000.00, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 Note; Public Law 104-410) for each of Defendants' false claims.

358.   Relator is entitled to reasonable attorney's fees and costs under 31 U.S.C. § 3730(d)(1).

### Count VII: Violations of 31 U.S.C. § 3729(a)(1) Concerning the Commission-Based Marketing Agreement Scheme
### *Against Defendants Aperian and EAMC*

359.   Relator incorporates and realleges the allegations of paragraphs 2-25, 36-40, 48-93, 140-142, and 243-255 as if set forth fully herein.

360.   Defendants Aperian and EAMC by and through their agents, officers, and employees, presented or caused to be presented false or fraudulent claims for payment or approval to the United States in violation of 31 U.S.C. § 3729(a)(1)(A) for laboratory tests arranged and referred by Defendant Summit Diagnostics.

361.   These claims for laboratory testing were legally false because Defendants Aperian and EAMC by and through their agents, officers, and employees, certified eligibility to participate and compliance with governing Federal laws that were conditions of participation and payment. These certifications were submitted to the United States or its fiscal intermediaries on CMS Form 1500 for each and every false claim.

362.   These false claims were presented or caused to be presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

363.   Defendants Aperian and EAMC submitted false claims for payment for laboratory tests to the United States or its fiscal intermediaries. The claims were false because they violated the Anti-Kickback Statute and because they were tainted by the illegal commission-based marketing agreements with Magnolia Analytical.

364.   These claims were legally false because Defendants Aperian and EAMC by and through their agents, officers, and employees, certified eligibility to participate and compliance with governing Federal laws, including the Anti-

Kickback Statute, that were conditions of participation and payment. These certifications were submitted on CMS Form 1500 for each and every false claim.

365.   These false claims were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

366.   Defendants Aperian and EAMC by and through their agents, officers, and employees, made, used, and caused to be made or used, false records or statements—i.e., false statements regarding compliance and coverage for its services and false statements on CMS Forms 1500—to get false or fraudulent claims paid and approved by the United States in violation of 31 U.S.C. § 3729(a)(1)(B).

367.   The false certifications and representations of Defendants Aperian and EAMC were made on each CMS Form 1500 submitted to the United States or its fiscal intermediaries for claims resulting from the commission-based marketing agreements that violated the Anti-Kickback Statute. The CMS Form 1500 and its electronic equivalent are records used to get claims paid by the United States or its fiscal intermediaries. Each such Form 1500 contained a false certification by EAMC or Aperian that these Defendants and the claim were in compliance with certain federal regulations, including the Anti-Kickback Statute.

368.   The false certifications and representations made and caused to be made by Defendants Aperian and EAMC were material to the payment of the false claims

as the United States conditions payment on compliance with the Anti-Kickback Statute and failing to comply with the Anti-Kickback Statute makes a provider statutorily ineligible to receive payment.

369.   These false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

370.   The United States has been damaged as a result of Defendants' violations of the False Claims Act in an amount to be proven at trial. The United States is entitled to this sum as reimbursement for monies obtained by the Defendants for false claims submitted to the United States.

371.   The United States is entitled to three times the total of damages sustained as a result of the Defendants' violations of 31 U.S.C. § 3729(a)(1)(B).

372.   The United States is entitled to a civil penalty of not less than $5,5000.00 and not more than $11,000.00, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 Note; Public Law 104-410) for each of Defendants' false claims.

373.   Relator is entitled to reasonable attorney's fees and costs under 31 U.S.C. § 3730(d)(1).

## Count VIII: False Billings Incident to Anti-Kickback Statute
## and Stark Law Violations
### *Against Defendants EAMC and Aperian*

374. Relator incorporates and realleges the allegations of paragraphs 2-30, 35-255, and 256-373 as if set forth fully herein.

375. From 2008 through at least the date on which Relator was separated from his employment with Aperian—and likely longer—Defendants EAMC and Aperian violated the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), and the Stark Law regarding self-referral, 42 U.S.C. § 1395nn(a)(1) and (h)(6), and by entering into prohibited financial relationships with physicians, marketing companies, and laboratories to obtain referrals of their patients. These prohibited relationships, which are described in great detail above, include: commission-based marketing agreements that pay for arranging and referring laboratory tests; provision of free Noble cups as an inducement for referrals of laboratory tests; and, provision of collector personnel to physicians as an inducement for referrals of laboratory tests.

376. Defendants' violations of these laws rendered them statutory ineligible to receive payment for services rendered to patients referred under these prohibited relationships, under both the express terms of 42 U.S.C. §1395nn and by operation of the Medicaid/Medicare laws and regulations, including 42 C.F.R. §424.5 (a).

377. The United States conditions payment on Defendants' compliance with these laws.

378.    Defendants submitted, and may continue to submit, claims for payment for laboratory services rendered to patients who are beneficiaries of Federal healthcare programs while knowingly violating the Anti-Kickback Statute and Stark Law. Those violations render Defendants statutorily ineligible to receive payment in violation of the False Claims Act, 31 U.S.C. § 3729.

379.    Defendants' actions also caused the submission of claims for payment for services rendered to patients who are beneficiaries of Federal healthcare programs while Defendants committed knowing violations of the Anti-Kickback Statute and Stark Law, and those violations rendered Defendants statutorily ineligible to receive payments violating the False Claims Act 31 U.S.C. §3729.

380.    Accordingly, Defendants, by and through its agents, officers, and employees, knowingly presented or caused to be presented false or fraudulent claims for payment or approval and knowingly made, used, caused to be made or used, false records or statements material to a false or fraudulent claim and/or knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government in violation of 31 U.S.C. § 3729.

381.    The United States has been damaged as a result of Defendants' violations of the False Claims Act in an amount to be proven at trial. The United

States is entitled to this sum as reimbursement for monies obtained by the Defendants for false claims submitted to the United States.

382.   The United States is entitled to three times the total damages sustained as a result of Defendant's violations of the 31 U.S.C. § 3729.

383.   The United States is entitled to a civil penalty of not less than $5,5000.00 and not more than $11,000.00, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 Note; Public Law 104-410) for each of Defendants' false claims.

384.   Relator is entitled to reasonable attorney's fees and costs under 31 U.S.C. § 3730(d)(1).

**Count IX: False Billings Incident to Anti-Kickback
Statute and Stark Law Violations**
*Against Defendant Aggarwal*

385.   Relator incorporates and realleges the allegations of paragraphs 2-30, 36-54, 58-69, 94-131, 140-142, 184-189, 216-225, and 310-329 as if set forth fully herein.

386.   Defendant Aggarwal violated the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), and the Stark Law regarding self-referral, 42 U.S.C. § 1395nn(a)(1) and (h)(6), and by entering into prohibited financial relationships with Defendants Aperian, EAMC, Compass, and TDS. These prohibited financial relationships described above included commission-based marketing schemes whereby Aggarwal

profited by referring his own patients' laboratory tests to EAMC and Aperian, because the companies he had an ownership interest in (Compass and TDS) earned commissions on his referrals.

387.   Defendant's violations of these laws rendered him statutory ineligible to receive payment for services rendered to patients referred under these prohibited relationships, under both the express terms of 42 U.S.C. §1395nn and by operation of the Medicaid/Medicare laws and regulations, including 42 C.F.R. §424.5 (a).

388.   The United States conditions payment on compliance with these laws.

389.   Defendant submitted claims for payment for services rendered to patients who are beneficiaries of Federal healthcare programs while knowingly violating the Anti-Kickback Statute and Stark Law. Those violations render Defendant statutorily ineligible to receive payment in violation of the False Claims Act, 31 U.S.C. § 3729.

390.   Defendant's actions also caused the submission of claims for payment for services rendered to patients who are beneficiaries of Federal healthcare programs while Defendant committed knowing violations of the Anti-Kickback Statute and Stark Law, and those violations rendered Defendant statutorily ineligible to receive payments violating the False Claims Act 31 U.S.C. §3729.

391.   Accordingly, Defendant, by and through his agents, officers, and employees, knowingly presented or caused to be presented false or fraudulent claims

for payment or approval and knowingly made, used, caused to be made or used, false records or statements material to a false or fraudulent claim and/or knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government in violation of 31 U.S.C. § 3729.

392.   The United States has been damaged as a result of Defendant's violations of the False Claims Act in an amount to be proven at trial. The United States is entitled to this sum as reimbursement for monies obtained by the Defendant for false claims submitted to the United States.

393.   The United States is entitled to three times the total damages sustained as a result of Defendant's violations of the 31 U.S.C. § 3729.

394.   The United States is entitled to a civil penalty of not less than $5,5000.00 and not more than $11,000.00, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 Note; Public Law 104-410) for each of Defendant's false claims.

395.   Relator is entitled to reasonable attorney's fees and costs under 31 U.S.C. § 3730(d)(1).

### Count X: False Billings Incident to Anti-Kickback
### Statute and Stark Law Violations
### *Against Defendants Compass, TDS, and Chapman*

396.   Relator incorporates and realleges the allegations of paragraphs 2-30, 36-69, 94-131, 140-142, 184-189, 216-225, 243-255,310-329, and 330-345 as if set forth fully herein.

397.   Defendants Compass, TDS, and Chapman violated the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), and Stark Law regarding self-referral, 42 U.S.C. § 1395nn(a)(1) and (h)(6), by entering into prohibited financial relationships with Defendants Aperian and EAMC. These prohibited relationships, which are described in great detail above, include: commission-based marketing agreements with Aperian and EAMC that pay Defendants for arranging and referring laboratory tests and providing things of value, including collector personnel, to physicians as an inducement for referrals of laboratory tests.

398.   Defendants' violations of these laws rendered them statutory ineligible to receive payment for services rendered to patients referred under these prohibited relationships, under both the express terms of 42 U.S.C. §1395nn and by operation of the Medicaid/Medicare laws and regulations, including 42 C.F.R. §424.5 (a).

399.   The United States conditions payment on compliance with these laws.

400.   Defendants caused to be submitted claims for payment for services rendered to patients who are beneficiaries of Federal healthcare programs while

knowingly violating the Anti-Kickback Statute. Those violations render Defendants statutorily ineligible to receive payment in violation of the False Claims Act, 31 U.S.C. § 3729.

401.   Accordingly, Defendants by and through their agents, officers, and employees, knowingly caused to be presented false or fraudulent claims for payment or approval and/or knowingly caused to be made or used false records or statements material to a false or fraudulent claim in violation of 31 U.S.C. § 3729.

402.   The United States has been damaged as a result of Defendants' violations of the False Claims Act in an amount to be proven at trial. The United States is entitled to this sum as reimbursement for monies obtained by the Defendant for false claims submitted to the United States.

403.   The United States is entitled to three times the total damages sustained as a result of Defendants' violations of the 31 U.S.C. § 3729.

404.   The United States is entitled to a civil penalty of not less than $5,5000.00 and not more than $11,000.00, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 Note; Public Law 104-410) for each of Defendants' false claims.

405.   Relator is entitled to reasonable attorney's fees and costs under 31 U.S.C. § 3730(d)(1).

## Count XI: False Billings Incident to Anti-Kickback Statute Violations
### *Against Defendant Summit Diagnostics*

406.   Relator incorporates and realleges the allegations of paragraphs 2-26, 36-93, 140-189, 208-215, and 256-309 as if set forth fully herein.

407.   Defendant Summit Diagnostics violated the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) by entering into prohibited financial relationships with Defendants Aperian and EAMC. These prohibited relationships, which are described in great detail above, include: commission-based marketing agreements that pay for arranging and referring laboratory tests; requiring the provision of free Noble cups as an inducement for referrals of laboratory tests; and, requesting and requiring provision of collector personnel to physicians as an inducement for referrals of laboratory tests.

408.   Defendant's violations of these laws rendered it statutory ineligible to receive payment for services rendered to patients referred under these prohibited relationships by operation of the Medicaid/Medicare laws and regulations, including 42 C.F.R. §424.5 (a).

409.   The United States conditions payment on compliance with these laws.

410.   Defendant caused to be submitted claims for payment for services rendered to patients who are beneficiaries of Federal healthcare programs while knowingly violating the Anti-Kickback Statute. Those violations render Defendant

statutorily ineligible to receive payment in violation of the False Claims Act, 31 U.S.C. § 3729.

411.   Accordingly, Defendant by and through its agents, officers, and employees, knowingly caused to be presented false or fraudulent claims for payment or approval and/or knowingly caused to be made or used false records or statements material to a false or fraudulent claim in violation of 31 U.S.C. § 3729.

412.   The United States has been damaged as a result of Defendant's violations of the False Claims Act in an amount to be proven at trial. The United States is entitled to this sum as reimbursement for monies obtained by the Defendant for false claims submitted to the United States.

413.   The United States is entitled to three times the total damages sustained as a result of Defendant's violations of the 31 U.S.C. § 3729.

414.   The United States is entitled to a civil penalty of not less than $5,5000.00 and not more than $11,000.00, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 Note; Public Law 104-410) for each of Defendant's false claims.

415.   Relator is entitled to reasonable attorney's fees and costs under 31 U.S.C. § 3730(d)(1).

**Count XII: Violation of the False Claims Act**
**Whistleblower Protection Provisions at 31 U.S.C. § 3730(h)**
*Against Defendants EAMC and Aperian*

416.   Relator incorporates and realleges the allegations of paragraphs 2-25 and 55-255 as if set forth fully herein.

417.   Defendants Aperian and EAMC demoted, temporarily constructively discharged, discharged, and discriminated against Relator in the terms and conditions of his employment because of the lawful acts done by Relator in furtherance of his efforts to stop violations of the False Claims Act by Defendants.

418.   As set forth in much greater detail above, Relator made repeated efforts to report issues to his superiors that he felt were out of compliance and would lead to the submission of False Claims. As a result of those complaints, he was demoted, temporarily constructive discharged, discharged and discriminated against in the terms and conditions of his employment.

419.   Under the False Claims Act, Relator is entitled to any and all relief that would make him whole, including but not limited to reinstatement with the same seniority status that he would have had but for the discrimination, two times the amount of back pay, interest on back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorney's fees.

## IX.    Prayer for Relief and Jury Demand

Relator prays that this Court enter an order granting the following judgment and relief:

(a)    Ordering the Defendants to pay the United States Government three times its actual damages resulting from the Defendant's violations of the False Claims Act;

(b)    Ordering Defendants to pay the United States Government a civil penalty for each false claim as set forth in the False Claims Act;

(c)    Ordering Defendants to pay Relator monetary damages for its violation of 31 U.S.C. §3730 (h), the Whistleblower Protection Provision of the False Claims Act;

(d)    Awarding Relator an amount the Court decides is reasonable for collecting the civil penalty and monetary damages by pursuing this matter, which award, by statute shall not be less than 15% nor more than 25% of the proceeds of this action or the settlement of any such claim, if the Government intervenes in the action and not less than 25% nor more than 30% if the Government declines to intervene in the action;

(e)    Ordering the Defendants to pay Relator's attorney's fees and costs; and

(f)    Granting such other relief as the Court may deem just and proper.

**Relator demands a trial by a struck jury.**

Respectfully submitted,

*/s/ Adam P. Plant*
Robert E. Battle (ASB-7807-T67R)
Adam P. Plant (ASB-6324-A64P)
**BATTLE & WINN, LLP**
2901 Second Avenue South, Suite 220
Birmingham, Alabama 35233
Tel: (205) 397-8160
Fax: (205) 397-8179

*/s/Don McKenna*
Scott A. Powell (ASB-7523-L60S)
Don McKenna (ASB-6494-C66D)
**HARE, WYNN, NEWELL & NEWTON, LLP**
The Massey Bldg., Suite 800
2025 Third Avenue North
Birmingham, AL 35203
Tel: (205) 328-5330
Fax: (205) 324-2165

***Attorneys for Relator Leamon M. Fite III***

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 15, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Joyce White Vance, US Attorney usaaln.ecfusa@usdoj.gov
Erin Massey Everitt erin.everitt@usdoj.gov
Lane H. Woodke lane.woodke@usdoj.gov
Don Long Don.Long2@usdoj.gov
James A. Hoover jhoover@burr.com
S. Greg Burge gburge@burr.com
Kelli C. Flemming kflemming@burr.com
Benjamin B. Coulter bcoulter@burr.com
Daniel J. Martin danielmartin@joneswalker.com
Timothy P. Burkhard tburkhard@thehlp.com
Adrienne D. Dresevic adresevic@thehlp.com
Sara M. Turner smturner@bakerdonelson.com

/s/Adam P. Plant
*Attorney for Relator*