IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* LEAMON M. FITE, III, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CIVIL ACTION NUMBER 5:13-cv-01626-LSC |
| APERIAN LABORATORY SOLUTIONS, LLC, et al., | ) ) ) | |
| Defendants. | ) ) ) | |

## Memorandum of Opinion and Order

Relator Leamon M. Fite, III ("Fite") filed this action against Aperian Laboratory Solutions, LLC ("Aperian"), East Alabama Health Care Authority ("East Alabama"), Summit Diagnostics, LLC ("Summit"), Compass Laboratory Services, LLC ("Compass"), Total Diagnostic Solutions, LLC ("Total Diagnostic"), Jannie Lynn Work Chapman ("Chapman"), and Shelinder Aggarwal ("Aggarwal") (collectively "Defendants") alleging violations of the False Claims Act, 31 U.S.C. § 3729 *et seq.*, ("FCA") the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) ("AKS"), and Section 1877 of the Social Security Act, 42 U.S.C. § 1395nn ("the Stark Law"). Before the Court are two Fed. R. Civ. P. 12(b)(6)

motions to dismiss: one submitted by Summit (Doc. 65) and one submitted by Compass, Chapman, and Total Diagnostic ("Compass Defendants"). (Doc. 68.) For the reasons stated below, both motions to dismiss (Doc. 65, 68) are denied.

## I. BACKGROUND[1]

Fite commenced this *qui tam* proceeding on behalf of the United States by filing his complaint under seal on August 30, 2013. The United States ultimately elected not to intervene in this action on August 10, 2015 and the complaint was unsealed on August 11, 2015. Fite is a former employee of East Alabama and was involved in the operations of its wholly-owned subsidiary, Aperian. He held the role as Director of Operations for Aperian and in that capacity handled issues regarding proper billing of claims, and received and reviewed reports detailing "billed claims and reimbursed claims broken down by client and individual physicians [and] general reimbursement information broken down by referral source." (Doc. 63 at Page 9.) In his 134-page complaint, Fite alleges that Defendants engaged in certain "schemes of fraudulent conduct" that violated the AKS and the FCA.

The first scheme involves commission-based marketing agreements, including agreements between (1) Aperian and Summit and (2) Aperian and the Compass Defendants. Under the Aperian-Summit contract, Summit agreed to

---

[1] In ruling on Defendants' motions to dismiss under Rule 12(b)(6), this Court must accept all facts in Fite's complaint as true and construe them in his favor. *Chepstow Ltd. v. Hunt*, 381 F.3d 1077, 1080 (11th Cir. 2004).

provide lab work referrals to Aperian in exchange for a percentage of the referral value. The percentage Aperian paid Summit was based on the monthly volume of referrals Aperian received, with the percentage increasing as the number of referrals rose. Fite lists the specific number of specimens needed per month to increase the commission percentage.[2] The complaint also includes a chart showing monthly invoice dates and amounts Aperian paid Summit for the referrals. Fite provides a second chart showing both the monthly claim amounts Aperian submitted to the government for work referred by Summit and the amounts the government paid Aperian for those claims. Fite further details two specific examples of claims submitted by Aperian for work referred by Summit, including patient initials, physician name, date of service, procedure code, and the date Aperian submitted the claim for payment.

Under the contractual agreement between Aperian and the Compass Defendants, Aperian paid the Compass Defendants for referring specimen lab work to Aperian. Fite's allegations here are similar to his allegations regarding the Aperian-Summit contract in their specificity and content, including a chart documenting invoice dates and amounts Aperian paid for referrals and a chart

---

[2] For example, Aperian paid Summit a 20% commission if Summit referred 800–1000 specimens within a month, a 22% commission if Summit referred 1001–1200 specimens within a month, and 28% commission if Summit referred more than 1200 specimens within a month. (Doc. 63 at Page 25.)

showing both the monthly claim amounts Aperian submitted to the government for work referred by the Compass Defendants and the amounts the government paid for those claims. Fite provides four detailed examples of claims Aperian submitted for work referred by the Compass Defendants, including recounting for each claim the patient's initials, the referring physician, the date of service, the procedure code, and the date Aperian submitted the claim to the government for payment. Further, Fite alleges that Chapman, as the president or vice president for Compass and Total Diagnostic, negotiated and signed this agreement with Aperian and personally dismissed concerns that were raised regarding compliance with the AKS and FCA. (Doc. 63 at Page 35–41.)

The second scheme of fraudulent conduct concerned a contract between Aperian and Summit under which Aperian agreed to provide free Noble Specimen Cups ("Noble cups") to physicians.[3] Fite alleges that this agreement obligated Aperian to provide the Noble cups for free "in exchange for the physicians' agreement to send the samples to Aperian for confirmation testing of the results." (Doc. 63 at Page 51.) Fite then lists the names of more than 125 physicians who

---

[3] Summit filed as an exhibit to its motion to dismiss the referral agreement it has with Aperian, which states that Aperian "[m]ust make Noble cups or other client requested collection cups available." (Doc. 66-1 at Page 7.) Summit contends that this provision does not explicitly state that Aperian was obligated to provide the cups free of charge. While that may be so, at this motion to dismiss stage, the Court will not find this provision to contradict and override Fite's allegation that Summit required Aperian to provide the cups free of charge.

both used Summit as a referral source for confirmation testing and also received free Noble cups. The complaint details an October 12, 2011 email from a Summit employee to an Aperian employee requesting that Aperian stop sending one physician cups because "'[i]t appears they are just using the cups but not sending any specimens' to Aperian through Summit." (Doc. 63 at Page 61 (alteration in original) (quoting email).) The complaint details eight claims Aperian submitted for payment for referrals induced by the provision of the free Noble cups, noting the date the physician received free Noble cups, the dates Aperian conducted confirmation testing on those specimen samples, the amount Aperian billed to the government for that testing, and the amount Aperian received from the government for that testing.

The third scheme of fraudulent conduct addresses the provision of urine sample collectors, who were based in physician offices, to perform specimen collection duties along with other work such as testing, filing, and recording medical records. Fite alleges that Aperian provided these collectors to doctors after Summit instructed it to do so to increase referrals from those physicians, believing that the provision of these collectors was essential to the Summit-Aperian referral agreement. The complaint further names the specific agencies recommended by Summit and utilized by Aperian to hire collectors to work in physician offices.

Further, Fite alleges that these collectors engaged in non-collection work for the physicians.

Fite also alleges that the Compass Defendants paid for sample collectors located in physician offices pursuant to an agreement with Aperian—an arrangement that was discussed during conference calls in which Fite participated. (Doc. 63 at Page 80.) Fite notes that Chapman, on Compass and Total Diagnostic's behalf, oversaw the provision of these collectors to physician offices. The complaint details the types of non-collection work, including other testing, medical record recording, and filing, that these collectors performed for the doctors. Fite alleges that the Compass Defendants provided the collectors to induce physicians to refer samples to Aperian, which in turn would increase the amount Aperian paid the Compass Defendants under the commission-based marketing agreement. The complaint then details the subsequent substantial increase in referrals from physicians with whom the Compass Defendants had provided collectors.

## II. STANDARD OF REVIEW

The facts alleged in the complaint must be specific enough that the claim raised is "plausible." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is *plausible on its face*.") (emphasis added). A

claim for relief is plausible on its face when the complaint's "factual content . . . allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1325 (11th Cir. 2012) (quoting *Iqbal*, 556 U.S. at 678). Conclusory statements of law may "provide the framework of a complaint," but the plaintiff is required to support them with "factual allegations." *Iqbal*, 556 U.S. at 679.

The process for evaluating the sufficiency of a complaint has two steps. This Court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* Conclusory statements and recitations of a claim's elements are thus disregarded for purposes of determining whether a plaintiff is entitled to survive a motion to dismiss. *See Randall v. Scott*, 610 F.3d 701, 709 (11th Cir. 2010) (citing *Iqbal*, 556 U.S. at 687). Next, this Court "assume[s] [the] veracity" of "well-pleaded factual allegations" and "determine[s] whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. A complaint's factual matter need not be detailed, but it "must . . . raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

In reviewing the complaint, this Court "draw[s] on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Nonetheless, "[a] well-pleaded

complaint may proceed even if it strikes a savvy judge that actual proof of [the facts alleged] is improbable." *Twombly*, 550 U.S. at 556. Generally, this Court considers only "the face of the complaint and attachments thereto" in order to determine whether Plaintiff states a claim for relief. *Starship Enters. of Atlanta, Inc. v. Coweta Cnty.*, 708 F.3d 1243, 1252 n.13 (11th Cir. 2013). Generally, the complaint should include "enough information regarding the material elements of a cause of action to support recovery under some 'viable legal theory.'" *Am. Fed'n of Labor & Cong. of Indus. Orgs v. City of Miami, Fla.*, 637 F.3d 1178, 1186 (11th Cir. 2011) (quoting *Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678, 683-84 (11th Cir. 2001)).

Additionally, Fite has pleaded fraud claims that are subject to the heightened pleading standard of Fed. R. Civ. P. 9(b), which states:

> In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.

Fed. R. Civ. P. 9(b). This rule applies to actions under the FCA, "because the Act subjects entities that knowingly submit 'false or fraudulent' claims to the Government for payment or approval—or knowingly make, use, or cause to be made or used a false record or statement to get such claims paid or approved—to civil liability." *U.S. ex rel. Clausen v. Laboratory Corp. of America, Inc.*, 290 F.3d 1301, 1309 (11th Cir. 2002).

To state a claim under the FCA, "a plaintiff must plead 'facts as to time, place, and substance of the defendant's alleged fraud,' specifically 'the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them.'" *Clausen*, 209 F.3d at 1310 (quoting *Cooper v. Blue Cross & Blue Shield of Florida, Inc.*, 19 F.3d 562, 567–68 (11th Cir. 1994)). In other words, indicia of reliability must appear in the complaint, supporting the "stated reason for [the] belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government." *Clausen*, 290 F.3d at 1311. For example, a complaint lacks the required indicia of reliability when, "[d]espite her assertion that she had direct knowledge of the defendants' billing and patient records [the plaintiff] fail[s] to provide any specific details regarding either the dates on or the frequency with which the defendants submitted false claims, the amounts of those claims, or the patients whose treatment served as the basis for the claims. . . . or similar details." *U.S. ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1302 (11th Cir. 2010).

## III. Discussion

### A. General Legal Framework

Fite alleges that claims Defendants submitted were false under the FCA because they sought payment for services that were not legally reimbursable due to

Defendants' violations of the AKS. Knowingly submitting claims to the government for payment while in violation of the AKS makes the claim false under the FCA. *See, e.g.*, *McNutt ex rel. U.S. v. Haleyville Medical Supplies, Inc.*, 423 F.3d 1256, 1259–1260 (11th Cir. 2005) ("The government has alleged a valid [FCA claim]. The government has alleged that the [defendants] violated the Anti-Kickback Statute; compliance with the Statute is necessary for reimbursement under the Medicare program; and the [defendants] submitted claims for reimbursement knowing that they were ineligible for the payments demanded in those claims."). The AKS states, in relevant part,

> (1) whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—
>
> (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>
> (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
>
> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

(2) whoever knowingly or willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

> (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b). When alleging FCA violations based on non-compliance with the AKS, "[u]nderlying improper practices alone are insufficient to state a claim . . . absent allegations that a specific fraudulent claim was in fact submitted to the government. In short [a complaint must] provide[] the 'who,' 'what,' 'where,' 'when,' and 'how' of improper practices, [and] allege the 'who,' 'what,' 'where,' 'when,' and 'how' of fraudulent submissions to the government." *Corselo v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005).

## B.    Summit's Motion to Dismiss

Fite asserts four claims against Summit: (1) Violations of the FCA through the commission-based marketing scheme by causing false claims to be presented and causing Aperian to make false statements material to those false claims

(certifying compliance with the AKS); (2) Violations of the FCA through the agreement regarding the Noble cups by causing false claims to be presented and causing Aperian to make false statements material to those claims (certifying compliance with the AKS); (3) Violations of the FCA through the agreement regarding collector personnel by causing false claims to be presented and causing Aperian to make false statements material to those claims (certifying compliance with the AKS); and (4) Violations of the AKS. The claims brought under the FCA are based on allegations that the commission-based marketing scheme, the agreement regarding the Noble cups, and the agreement regarding the provision of collector personnel violated the AKS and thus claims submitted for payment were false under the FCA.

Summit contends that all four counts asserted against it are due to be dismissed because they rest on allegations that do not state a claim for the underlying AKS violations making the claims false and lack the requisite indicia of reliability. Further, Summit contends that the FCA counts against it are alternatively due to be dismissed because Fite failed to allege with particularity how Summit caused a false claim to be submitted or caused the creation of a false statement material to a false claim. Because the claims against Summit rely on the existence and impropriety of three different arrangements between Aperian and

Summit, the Court addresses Summit's contentions as to each arrangement separately.

### i. Commission-Based Marketing Arrangement

The first AKS violation to which Fite points is the Aperian-Summit commission-based referral agreement. Among other details provided, Fite lists the numbers of specimens per month needed to increase the commission percentage paid. Fite provides a chart showing the monthly amounts of claims referred by Summit that Aperian submitted to the government as well as the amounts the government paid on those claims that month. Further, Fite offers two examples of specific claims submitted by Aperian for Summit referrals, including patient initials, physician name, date of service, procedure code, the date the claim was submitted for payment, and the form used to certify compliance with the AKS. This information, along with Fite's insider status, offers the indicia of reliability required to support his allegations that Summit, through this agreement, caused Aperian to submit false claims and falsely certify compliance with the AKS.

Further, Fite's complaint sufficiently alleges a violation of the AKS. The AKS prohibits the offering and receipt of kickbacks or other payments in exchange for referring patients for services payable under a federal health care program. The Aperian-Summit referral agreement requires Aperian to pay Summit a commission

based on the number of referrals Summit sends it. This agreement falls within the AKS's prohibitions—receiving a cash remuneration in return for referring testing payable under a federal health care program—and Defendants offer no law interpreting the AKS as excluding these types of arrangements. Fite has sufficiently alleged a violation of the AKS.

### ii.     Aperian's Provision of Free Noble Specimen Cups

The second AKS violation that Fite alleges involves Aperian providing free Noble cups to physicians "in exchange for the physicians' agreement to send the samples to Aperian for confirmation testing of the results." (Doc. 63 at Page 51.) Fite alleges that the referral agreement between Aperian and Summit specifically requires that Aperian provide Noble cups to physicians. Fite then lists the names of more than 125 physicians who used Summit as a referral source and who also received free Noble cups. The complaint details multiple different claims Aperian submitted to the government for reimbursement for confirmation testing referred from physicians receiving free Noble cups. As to each claim, the complaint recites the date the cups were received by the physician, the dates Aperian conducted confirmation testing on those specimen samples, the amount Aperian billed to the government for that testing, the form used to certify compliance with the AKS, and the amount Aperian received from the government for that testing. Further, the

complaint details an October 12, 2011 email from a Summit employee to an Aperian employee requesting that Aperian stop sending one physician cups because that physician was not sending specimens through Summit to Aperian. These allegations offer the indicia of reliability to support Fite's contention that Summit caused Aperian to submit false claims and caused Aperian to falsely certify compliance with the AKS.

Fite's allegations regarding the Noble cup scheme also sufficiently plead a violation of the AKS. The AKS prohibits the offering or receipt of any remuneration in return for providing a referral for the furnishing of a service for which payment may be made under a federal health care program. 42 U.S.C. § 1320a-7b(b). Section 1320a-7a, which allows for civil penalties for AKS violations, provides a definition of "remuneration" as including "transfers of items or services for free or for other than fair market value." 42 U.S.C. § 1320a-7a(i)(6). In other words, the AKS imposes civil penalties for the offer, payment, or receipt of free services or items to induce someone to provide a referral or purchase a service. Fite has alleged that Summit and Aperian contracted to provide free Noble cups to physicians in exchange for the physicians' agreeing to send any confirmation testing to Aperian, falling within the AKS's prohibitions. On these allegations, Fite has stated a claim for violations of the AKS.

### iii.    Paying for "Collector Personnel" in Doctors' Offices

The third scheme of allegedly fraudulent conduct is Aperian's routine payment for urine sample collectors, who were based in physician offices, to perform urine sample collection duties as well as other testing, filing, and medical record recording. Both Fite and Summit agree that, under the AKS, a lab is not prohibited from providing collectors to a doctors' office to collect specimens for testing at its outside laboratory. (Doc. 66 at Page 22–23; Doc. 74 at Page 32.) However, Fite contends, and Summit does not appear to dispute, that placing collectors in physician offices who do more than collect specimens for testing at its laboratory is improper under the AKS.

Fite alleges that Summit's representative instructed Aperian to place collectors inside physician offices to increase referrals from those physicians, believing that the provision of these collectors was essential to the Summit-Aperian contract. The complaint further names the specific agencies recommended by Summit and utilized by Aperian to hire collectors to work in physician offices. Further, Fite alleges that these collectors engaged in non-collection work for the physicians.

These allegations, Fite's insider status, personal presence at meetings and conferences where the provision of collector personnel was discussed, and detailed

facts regarding increased referrals from those physician offices offer the indicia of reliability that claims for testing referred by physicians given collectors were submitted for payment with the false certification of compliance with the AKS.

Fite's allegations regarding the provision of collector personnel also sufficiently plead a violation of the AKS. The AKS prohibits the offering or receipt of any remuneration in return for providing a referral for the furnishing of a service for which payment may be made under a federal health care program. 42 U.S.C. § 1320a-7b(b). Section 1320a-7a, which allows for civil penalties for AKS violations, provides a definition of "remuneration" as including "transfers of items or services for free or for other than fair market value." 42 U.S.C. § 1320a-7a(i)(6). In other words, the AKS imposes civil penalties for the offer, payment, or receipt of free services, like providing and paying for a collector to do work for the physician, to induce someone to provide a referral or purchase a service. Fite has alleged that Summit and Aperian agreed to provide collector personnel to physicians to do both collection and non-collection work in exchange for referrals. On these allegations, Fite has stated a claim for violations of the AKS.

### C.  Compass Defendants' Motion to Dismiss

Fite asserts three claims against the Compass Defendants: (1) Violations of the FCA through the commission-based marketing agreement by causing false

claims to be presented, causing Aperian to make false statements material to those false claims, and conspiring to submit false claims; (2) Violations of the FCA through the provision of collector personnel by causing false claims to be presented, causing Aperian to make false statements material to those claims, and conspiring to submit false claims; and (3) Violations of the AKS and Stark Law. The claims brought under the FCA are based on allegations that the commission-based marketing scheme and the provision of collector personnel violated the AKS and thus claims submitted for payment were false under the FCA.

The Compass Defendants contend that all three counts asserted against them are due to be dismissed because they rest on allegations that do not state a claim for AKS violations, lack the requisite indicia of reliability supporting the allegations that they caused Aperian to submit false claims, and lack the facts needed to support a knowing violation of the FCA.[4] Because the claims against the Compass Defendants rely on the existence and impropriety of two different

---

[4] Chapman further contends that the complaint "uniquely fails" to state a claim against her as an individual. However, as noted below, the complaint alleges that Chapman, as Compass and Total Diagnostic's president or vice president, negotiated and signed the commission-based agreement and oversaw the provision of collectors to doctors' offices and personally dismissed concerns raised regarding compliance with the AKS and FCA. Along with Fite's other allegations regarding the commission-based agreement and collector personnel scheme, these allegations are sufficient to state a claim against Chapman individually. *See, e.g.*, *U.S. v. Aerodex, Inc.*, 469 F.2d 1003, 10008 (5th Cir. 1972) (affirming a finding of liability as to an entity's vice president who was personally involved in carrying out the entity's FCA violations); *Bonner v. City of Prichard*, 661 F.2d 1206, 1207–08 (11th Cir. 1981) (adopting as binding Eleventh Circuit precedent all Fifth Circuit decisions handed down prior to October 1, 1981).

arrangements they had with Aperian, the Court addresses the Compass Defendants' contentions as to each arrangement separately.

###### i.  Commission-Based Marketing Agreement

The commission-based marketing agreement between Aperian and the Compass Defendants obligated Aperian to pay the Compass Defendants for referrals. Fite's allegations regarding this agreement are similar in their specificity and in their content to his allegations regarding the Aperian-Summit referral agreement. Further, the complaint offers four examples of claims the Compass Defendants referred to Aperian that Aperian submitted to the government for payment. Fite has alleged sufficient facts to provide a basis for his assertion that claims referred by the Compass Defendants were submitted to the government.

Further, Fite's allegations state a claim for AKS violations. This referral agreement required Aperian to pay the Compass Defendants a commission based on the number of referrals they send. Like the Aperian-Summit commission-based referral agreement, this agreement falls within the language of the AKS, and the Compass Defendants offer no law showing how these arrangements are permissible under the AKS. Thus, Fite has sufficiently alleged a violation of the AKS.

Fite's complaint also sufficiently alleges that the Compass Defendants knowingly violated the FCA. Fite alleges facts showing that he raised compliance

concerns regarding the agreements but that Chapman quickly dismissed them. Under these allegations, Chapman, on behalf of Compass and Total Diagnostic, at least recklessly disregarded compliance concerns raised by Fite, thus alleging a knowing violation. *See* 31 U.S.C. § 3729(b)(1)(A)(iii) (defining the terms "knowing" and "knowingly" to include "a person, with respect to information . . . acts in reckless disregard of the truth or falsity of the information.").

### ii.    Provision of Collector Personnel

Fite alleges that Chapman told Aperian that the Compass Defendants would provide and pay for collector personnel stationed in physician offices. The complaint further details the non-collection work, including other testing, medical record recording, and filing, that these collectors performed for the doctors. Fite alleges that the Compass Defendants provided the collectors to induce physicians to refer samples to Aperian, which in turn would increase what Aperian paid them under the referral agreement. The complaint then details the subsequent substantial increase in referrals from physicians with whom the Compass Defendants had provided collectors. These allegations, along with Fite's insider status and attendance on conference calls where the provision of collectors was discussed, offer the indicia of reliability that claims for referrals under this agreement were submitted to the government for payment.

Fite's allegations regarding the provision of collector personnel also sufficiently plead a violation of the AKS for the same reasons stated above regarding the Aperian-Summit agreement regarding collector personnel. Fite has alleged that the Compass Defendants agreed to provide collector personnel to physicians to perform both collection and non-collection work in exchange for referrals. Fite has stated a claim for violations of the AKS.

### iii.    Conspiracy Claims

The Compass Defendants further contend that Fite's FCA conspiracy claims are not pled with particularity and thus must be dismissed. To state a claim under the conspiracy provision of the FCA, "the plaintiff must show '(1) that the defendant conspired with one or more persons to get a false or fraudulent claim paid by the United States; (2) that one or more of the conspirators performed any act to effect the object of the conspiracy; and (3) that the United States suffered damages as a result of the false or fraudulent claim.'" *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005) (quoting *United States ex rel. Stinson v. Provident Life & Accident Ins. Co.*, 721 F. Supp. 1247, 1259 (S.D. Fla. 1989)).

As explained above, Fite's complaint alleges facts showing that the Compass Defendants, as well as Aperian, were aware that (1) their arrangements with Aperian violated the AKS, and (2) some of the referrals received as a result of those

arrangements would be submitted to the government for payment. Despite that awareness, the Compass Defendants forged ahead to carry out these arrangements in a manner that in fact caused Aperian to submit false claims. Further, Fite alleges in detail the amounts paid by the government on those false claims, thus showing the final element that the United States suffered damages. Fite's conspiracy claims against the Compass Defendants are sufficiently pled and dismissal is thus not warranted. *Cf. Corsello*, 428 F.3d at 1014 ("In his second amended complaint, [the plaintiff] alleged that '[the defendants] conspired to defraud the Government,' but this bare legal conclusion was unsupported by specific allegations of any agreement or overt act. The district court correctly dismissed [the plaintiff]'s [FCA conspiracy claim] for failure to comply with Rule 9(b).").

## IV. CONCLUSION

For the reasons stated above, Summit's motion to dismiss (Doc. 65) and Compass, Total Diagnostic, and Chapman's motion to dismiss (Doc. 68) are DENIED.

**DONE** AND **ORDERED** ON APRIL 26, 2016.

_____
L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE

182184