FILED
2018 Mar-20  PM 03:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT 2 DEPOSITION OF ROBEN NUTTER

Page 1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE NORTHERN DISTRICT OF ALABAMA

3         NORTHEASTERN DIVISION

4

5

6

7    CIVIL ACTION NO.:  5:13-cv-1626-LSC

8

9    UNITED STATES OF AMERICA, ex rel. LEAMON

10   M. FITE, III,

11        Plaintiffs,

12   v.

13

14   APERIAN LABORATORY SOLUTIONS, LLC; EAST

15   ALABAMA HEALTH CARE AUTHORITY, d/b/a EAST

16   ALABAMA MEDICAL CENTER; SUMMIT

17   DIAGNOSTICS, LLC; et al.,

18        Defendants.

19

20

21   VIDEOTAPED DEPOSITION TESTIMONY OF:

22        ROBEN NUTTER, ESQ.

23        February 12, 2018

Page 2

1         S T I P U L A T I O N S

2         IT IS STIPULATED AND AGREED

3    by and between the parties through their

4    respective counsel that the deposition of

5    ROBEN NUTTER may be taken before Lane C.

6    Butler, a Court Reporter and Notary

7    Public for the State at Large, at the law

8    offices of Burr & Forman, 420 North 20th

9    Street, Suite 3400, Birmingham, Alabama,

10   on the 12th day of February, 2018,

11   commencing at approximately 9:05 a.m.

12        IT IS FURTHER STIPULATED

13   AND AGREED that it shall not be necessary

14   for any objections to be made by counsel

15   to any questions except as to form or

16   leading questions and that counsel for

17   the parties may make objections and

18   assign grounds at the time of trial or at

19   the time said deposition is offered in

20   evidence, or prior thereto.

21        In accordance with the Federal

22   Rules of Civil Procedure, I, Lane C.

23   Butler, am hereby delivering to Donald P.

Page 3

1    McKenna, Jr., Esq., the original

2    transcript of the oral testimony taken

3    the 12th day of February, 2018.

4         Please be advised that this is

5    the same and not retained by the Court

6    Reporter, nor filed with the Court.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

Page 4

1         A P P E A R A N C E S

2

3    FOR THE PLAINTIFF:

4

5    Donald P. McKenna, Jr., Esq.

6    Randi L. McCoy, Esq.

7    HARE, WYNN, NEWELL & NEWTON

8    2024 Third Avenue North

9    Suite 800

10   Birmingham, Alabama  35203

11   don@hwnn.com

12   randi@hwnn.com

13

14   Robert Battle, Esq.

15   BATTLE & WINN

16   2901 Second Avenue South

17   Suite 220

18   Birmingham, Alabama  35233

19   bbattle@battlewinn.com

20

21

22

23

**Roben Nutter**                                                    **2 (5 - 8)**

|  | Page 5 |
|---|---|
| 1 | FOR THE DEFENDANTS: |
| 2 | |
| 3 | James A. Hoover, Esq. |
| 4 | Benjamin B. Coulter, Esq. |
| 5 | BURR & FORMAN |
| 6 | 420 North 20th Street |
| 7 | Suite 3400 |
| 8 | Birmingham, Alabama 35203 |
| 9 | jhoover@burr.com |
| 10 | bcoulter@burr.com |
| 11 | |
| 12 | Kary B. Wolfe, Esq. |
| 13 | JONES WALKER |
| 14 | 1819 Fifth Avenue North |
| 15 | Suite 1100 |
| 16 | Birmingham, Alabama 35203 |
| 17 | kwolfe@joneswalker.com |
| 18 | |
| 19 | |
| 20 | ALSO PRESENT: |
| 21 | |
| 22 | Brandon Brown, videographer |
| 23 | |

|  | Page 6 |
|---|---|
| 1 | I N D E X |
| 2 | |
| 3 | EXAMINATION BY:          PAGE NO. |
| 4 | Mr. McKenna          14 |
| 5 | Ms. Wolfe          399 |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | E X H I B I T S |
| 11 | |
| 12 | FOR THE PLAINTIFF: |
| 13 | 1 Memorandum, October 2, 2007, RE:  27 |
| 14 |   Organizational Chart |
| 15 | 2 A Healthy Variety online          31 |
| 16 |   interview with Roben Nutter |
| 17 | 3 Health Insurance Claim Form,          91 |
| 18 |   Form 1500 |
| 19 | 4 Services Agreement, December 1,  141 |
| 20 |   2012 |
| 21 | 5 E-mails, 7/11/2012, Subject: RE: 220 |
| 22 |   Contract language for Total and |
| 23 |   Magnolia |

|  | Page 7 |
|---|---|
| 1 | 6 Marketing Services Agreement,    226 |
| 2 |   Burr & Forman Draft of August 2, |
| 3 |   2012 |
| 4 | 7 E-mails, 8/15/2012, Subject:    231 |
| 5 |   Subject: Jannie contract payment |
| 6 |   amounts |
| 7 | 8 E-mails, 8/23/2012, Subject: Re: 235 |
| 8 |   New fiscal year contract |
| 9 | 9 E-mails, 8/28/2012, Subject: RE: 240 |
| 10 |   Contract language for Total and |
| 11 |   Magnolia |
| 12 | 10 E-mails, 8/28/2012, Subject: RE: 242 |
| 13 |   Contract language for Total and |
| 14 |   Magnolia |
| 15 | 11 E-mail, August 29, 2012,          246 |
| 16 |   Subject: RE: Contract language |
| 17 |   for Total and Magnolia |
| 18 | 12 E-mail, 8/30/2012, Subject:    248 |
| 19 |   Anti-kickback article |
| 20 | 13 AHLA Connections, August 2012,   252 |
| 21 |   "Does Intent Matter? Applying |
| 22 |   the Federal Anti-Kickback Law to |
| 23 |   Marketing Arrangements" |

|  | Page 8 |
|---|---|
| 1 | 14 E-mails, 8/30/2011, Subject: RE: 255 |
| 2 |   Compass/Aperian |
| 3 |   Contract-Revisions |
| 4 | 15 Subcontract Agreement with          261 |
| 5 |   margin comments |
| 6 | 16 Subcontract Agreement with          264 |
| 7 |   strike-throughs and underlines |
| 8 | 17 Subcontract Agreement, undated  266 |
| 9 | 18 E-mail, 9/24/2012, Subject:    267 |
| 10 |   DOCS-#2021471-v3-Services_ |
| 11 |   Agreement_-_Aperian.DOC |
| 12 | 19 Services Agreement, Burr &          267 |
| 13 |   Forman Draft of September 17, |
| 14 |   2012 |
| 15 | 20 East Alabama Medical Center:   274 |
| 16 |   Compliance Update, September 25, |
| 17 |   2012 |
| 18 | 21 E-mail, 9/25/2012, Subject:    281 |
| 19 |   Compliance Update Presentation |
| 20 | 22 E-mails, 9/27/2012, Subject: RE: 283 |
| 21 |   DOCS-#2021471-v3-Services_ |
| 22 |   Agreement_-_Aperian.DOC |
| 23 | 23 E-mails, 9/28/2012, Subject: RE: 295 |

Page 9

1   DOCS-#2021471-v3-Services_
2   Agreement_-_Aperian.DOC
3   24 HHS Re: OIG Advisory Opinion No. 298
4   11-17
5   25 E-mails, 9/28/2012, Subject: FW: 300
6   DOCS-#2021471-v3-Services_
7   Agreement_-_Aperian.DOC
8   26 E-mails 10/15/2012, Subject: RE: 306
9   DOCS-#2021471-v3-Services_
10  Agreement_-_Aperian.DOC
11  27 Services Agreement, Evans Petree 306
12  PC Revisions Draft of October 2,
13  2012
14  28 Services Agreement, Evans Petree 310
15  PC Revisions Draft of October 2,
16  2012
17  29 E-mails, 10/25/2012, Subject:    312
18  RE: Compass Laboratory-Aperian
19  Laboratory Services Agreement
20  30 Services Agreement, Evans Petree 312
21  PC Draft of October 25, 2012
22  31 Services Agreement, Evans Petree 312
23  PC Draft of October 25, 2012

Page 10

1   32 E-mails, November 29, 2012,      316
2   Subject: Subcontract
3   33 Correspondence, October 9, 2013, 317
4   RE: Cease and Desist
5   34 HHS Re: OIG Advisory Opinion No. 321
6   13-03
7   35 Corporate Compliance Report Log 325
8   36 EAMC Corporate Compliance and    334
9   Standards of Conduct
10  37 E-mails, 9/16/2013, Subject: FW: 357
11  Aperian Growth Talking Points -
12  KL(2)(2).docx
13  38 E-mails, 12/16/2013, Subject:     361
14  RE: email to Connie
15  39 E-mails, 10/13/2009, Subject:     366
16  RE:
17  40 E-mails, 11/20/2008, Subject:     370
18  RE:[starklaw]?
19  41 E-mail, 11/20/2008, Subject:      372
20  RE:[starklaw]?
21  42 E-mails, 11/20/2008, Subject:     373
22  RE:[starklaw]?
23  43 E-mails, 4/24/2013, Subject:      377

Page 11

1   Fwd: Request
2   44 Separation Agreement, May 21,    391
3   2013
4   45 E-mails, 5/23/2013, Subject: Re: 391
5   Separation Agreement
6   46 E-mails, 4/30/2013, Subject: RE: 396
7   Colaborate's final report for
8   your review
10
11
12  PREVIOUSLY MARKED EXHIBITS ATTACHED:
13
14  Price Exhibit 15
15  Price Exhibit 16
16  Powell Exhibit 2
17  Powell Exhibit 40
18  McHan Exhibit 13
19  McHan Exhibit 14
20
21
22
23

Page 12

1        I, Lane C. Butler, a Court
2   Reporter and Notary Public, State of
3   Alabama at Large, acting as Notary,
4   certify that on this date, pursuant to
5   the Federal Rules of Civil Procedure and
6   the foregoing stipulation of counsel,
7   there came before me at the law offices
8   of Burr & Forman, 420 North 20th Street,
9   Suite 3400, Birmingham, Alabama,
10  commencing at approximately 9:05 a.m., on
11  the 12th day of February, 2018, ROBEN
12  NUTTER, ESQ., witness in the above cause,
13  for oral examination, whereupon the
14  following proceedings were had:
15
16       THE VIDEOGRAPHER: This        09:04
17  begins Disc No. 1 in the deposition      09:04
18  of Roben Nutter in the matter of         09:04
19  United States, ex rel. Leamon M.         09:04
20  Fite, III, v. Aperian Laboratory         09:04
21  Solutions, LLC, et al., Case No.         09:04
22  5:13-CV-1626-LSC.  We are on the         09:04
23  record at 9:06 a.m. on Monday,           09:04

**Roben Nutter**                                          **4 (13 - 16)**

Page 13

1   February the 12th, 2018. This        09:04
2   deposition is taking place in         09:04
3   Birmingham, Alabama. My name is       09:04
4   Brandon Brown, representing Freedom   09:04
5   Court Reporting.                      09:04
6         Would counsel identify          09:04
7   yourself and state whom you           09:05
8   represent.                            09:05
9         MR. McKENNA: Don McKenna for    09:05
10  relator Fite and the United States.   09:05
11        MS. McCOY: Randi McCoy for the  09:05
12  relator and the United States.        09:05
13        MR. BATTLE: Bob Battle for the  09:05
14  relator and the United States.        09:05
15        MS. WOLFE: Kary Wolfe for       09:05
16  Summit Diagnostics.                   09:05
17        MR. COULTER: Ben Coulter for    09:05
18  East Alabama Health Care Authority and 09:05
19  Aperian.                              09:05
20        MR. HOOVER: Jim Hoover for East 09:05
21  Alabama Health Care Authority and Aperian 09:05
22  Laboratory Solutions.                 09:05
23        THE VIDEOGRAPHER: Would the     09:05

Page 14

1   reporter please swear in the witness. 09:05
2                                         09:05
3         ROBEN NUTTER, ESQ.,
4         having been duly sworn,
5   was examined and testified as follows:
6
7         THE COURT REPORTER: Usual
8   stipulations?
9         MR. HOOVER: She'll read and     09:05
10  sign.                                 09:05
11                                        09:05
12  EXAMINATION BY MR. McKENNA:           09:05
13    Q. Ms. Nutter, will you state your  09:05
14  full name for the record, please.     09:05
15    A. Roben Hunt Nutter.               09:05
16    Q. And what is your home address?   09:05
17    A. 1308 Gatewood Drive, Auburn,     09:05
18  Alabama.                              09:05
19    Q. And your date of birth?          09:05
20    A. 8/24/73.                         09:05
21    Q. You're a lawyer; correct?        09:05
22    A. I am.                            09:05
23    Q. And you've sat through a number  09:05

Page 15

1   of these depositions and understand how 09:05
2   they work. I don't have to explain the 09:06
3   rules to you?                         09:06
4     A. You don't.                       09:06
5     Q. Okay. Have you ever given        09:06
6   testimony before?                     09:06
7     A. No.                              09:06
8     Q. You obviously know not to tell   09:06
9   me about conversations with counsel, but 09:06
10  other than that, what have you done to 09:06
11  prepare for your deposition?          09:06
12    A. I've reviewed documents.         09:06
13    Q. Any of those documents refresh   09:06
14  your recollection regarding events in the 09:06
15  past?                                 09:06
16    A. Not necessarily. Some, maybe.    09:06
17    Q. Have you read the complaint and  09:06
18  the amended complaints?               09:06
19    A. I have.                          09:06
20    Q. Okay. You have sat in and        09:06
21  listened to which depositions in this 09:06
22  case?                                 09:06
23    A. Sam Price, Jerry McHan, Lorri    09:06

Page 16

1   Lloyd, Lee Ann Green, Laura Grill. There 09:06
2   may have been others I can't remember.  09:07
3     Q. Did you sit in on Allen          09:07
4   Valaer's?                             09:07
5     A. I did.                           09:07
6     Q. Trae Fite?                       09:07
7     A. Yes.                             09:07
8     Q. You were not present for George  09:07
9   Powell's deposition. Did you read his 09:07
10  deposition or a summary of it?        09:07
11    A. I did not.                       09:07
12    Q. You were not present for Michele 09:07
13  Hunter's deposition. Have you read her 09:07
14  deposition or a summary?              09:07
15    A. A summary.                       09:07
16    Q. Okay. Are there any documents    09:07
17  you recall looking at in preparation for 09:07
18  your deposition that we haven't seen so 09:07
19  far in the depositions today?         09:07
20    A. I've reviewed so many thousands  09:07
21  of documents, I -- I don't know.      09:07
22    Q. Okay. Were you interviewed by    09:07
23  the Department of Justice in this case? 09:07

**Roben Nutter**                                          **5 (17 - 20)**

Page 17

1    A.  No.                    09:07
2    Q.  Have you talked to Ken Lott    09:07
3  about the facts in this case?    09:07
4    A.  We've had discussions.    09:07
5    Q.  Are you married?              09:08
6    A.  I'm not.                09:08
7    Q.  Okay.  Do you have any relatives  09:08
8  over the age of nineteen that live in any  09:08
9  of these counties:  Bibb, Fayette,    09:08
10  Greene, Lamar, Marion, Pickens, Sumter,  09:08
11  Tuscaloosa, Walker, or Winston?      09:08
12    A.  No.                    09:08
13    Q.  Have you ever been convicted or  09:08
14  pled guilty to a crime?        09:08
15    A.  No.                    09:08
16    Q.  And it's kind of obvious that my  09:08
17  voice is struggling.  If you can't hear  09:08
18  me at some point, just let me know, and  09:08
19  I'll do the best I can.        09:08
20      Can you give us the benefit of  09:08
21  your educational history, please.    09:08
22    A.  I attended Auburn University.  09:08
23  My undergraduate degree was in health  09:08

Page 18

1  administration.  Went on to get an M.B.A.  09:08
2  from Troy University, and then law school  09:08
3  at Faulkner in Montgomery.        09:08
4    Q.  All right.  What year did you    09:08
5  get your degree from Auburn?      09:09
6    A.  I believe 1997.          09:09
7    Q.  Okay.  And then the M.B.A.?    09:09
8    A.  I think that was in 2000.      09:09
9    Q.  All right.  And then your law --  09:09
10    A.  Or 2001.                09:09
11    Q.  Sorry.                  09:09
12    A.  Somewhere in there.  Sorry.    09:09
13    Q.  That's okay.  And your law      09:09
14  degree?                    09:09
15    A.  2007.                  09:09
16    Q.  All right.  Were you going to    09:09
17  law school while working at EAMC?    09:09
18    A.  I was.                  09:09
19    Q.  Okay.  So, was it night school?  09:09
20    A.  It was.                09:09
21    Q.  Was Faulkner accredited when you  09:09
22  graduated?                  09:09
23    A.  It became accredited during the  09:09

Page 19

1  time that I was there.          09:09
2    Q.  All right.  Did you have classes  09:09
3  on healthcare law while at Faulkner?    09:09
4    A.  I did.                09:09
5    Q.  Did the classes -- well, do you  09:09
6  recall what the names of those courses    09:09
7  were?                      09:09
8    A.  I don't.                09:09
9    Q.  Okay.  And since you were        09:09
10  working at a hospital, taking classes on  09:09
11  healthcare law was important to you;      09:09
12  correct?                    09:10
13    A.  It was.                09:10
14    Q.  Okay.  Did the classes cover the  09:10
15  Medicare fraud and abuse laws?        09:10
16    A.  I believe so.            09:10
17    Q.  The anti-kickback statute, False  09:10
18  Claims Act, and Stark law?        09:10
19    A.  I believe at a broad level, yes.  09:10
20    Q.  Okay.  Did you write any papers  09:10
21  on those subjects?            09:10
22    A.  Not that I recall.        09:10
23    Q.  Did you attend any seminars      09:10

Page 20

1  during school on the healthcare fraud and  09:10
2  abuse laws?  For example, I've gone in    09:10
3  and guest-lectured on those at Alabama    09:10
4  before.  Do you recall any seminars like  09:10
5  that at Faulkner?              09:10
6    A.  I don't.                09:10
7    Q.  Did you pass the bar?        09:10
8    A.  I did.                09:10
9    Q.  When?                  09:10
10    A.  2007.                  09:10
11    Q.  First time?              09:10
12    A.  Yes.                    09:10
13    Q.  And who is your current        09:10
14  employer?                    09:10
15    A.  East Alabama Medical Center.      09:10
16    Q.  And what is your employment      09:10
17  history prior to -- from when you        09:10
18  graduated Auburn to prior to EAMC?      09:10
19    A.  I actually began working at EAMC  09:10
20  when I was in school at Auburn.        09:10
21    Q.  Okay.                  09:11
22    A.  In 1994.                09:11
23    Q.  And did you stay with EAMC from  09:11

**Roben Nutter**                                                **6 (21 - 24)**

Page 21

1  that time until now?              09:11
2     A. I did.                      09:11
3     Q. Okay. Who hired you back in    09:11
4  '94?                             09:11
5     A. I believe it was Jane Robertson. 09:11
6  That wasn't her name at the time.   09:11
7     Q. Okay. What was your first job   09:11
8  with EAMC?                       09:11
9     A. I was what's called a unit     09:11
10 clerk, part-time, on a part-time basis. 09:11
11    Q. Unit clerk?                 09:11
12    A. Uh-huh.                     09:11
13    Q. What did you do as a unit clerk? 09:11
14    A. I worked on a specific nursing  09:11
15 floor, and I put in orders, sort of a  09:11
16 secretarial duties --            09:11
17    Q. Okay.                       09:11
18    A. -- role.                    09:11
19    Q. And how long did you do that?   09:11
20    A. I think until I graduated.   09:11
21    Q. From Auburn?                 09:11
22    A. Right.                      09:11
23    Q. Okay. What was the next job you  09:11

Page 22

1  had with EAMC?                   09:11
2     A. I think the title of it was    09:11
3  outcomes coordinator. It was within the 09:12
4  case management department. And backing 09:12
5  up, I actually interned probably my last 09:12
6  semester. I don't remember specifically. 09:12
7  That was a paid internship. And I     09:12
8  believe that's when I started working in 09:12
9  the case management department.    09:12
10    Q. Okay. What -- when was the    09:12
11 internship?                      09:12
12    A. I don't remember specifically. 09:12
13 Probably my last semester --      09:12
14    Q. Okay.                       09:12
15    A. -- of school at Auburn.      09:12
16    Q. What did you do as the outcomes  09:12
17 coordinator?                     09:12
18    A. It was a data collection role,  09:12
19 looking at the gathering of data on a lot 09:12
20 of quality-type indicators for the   09:12
21 service lines that case management    09:12
22 oversaw.                         09:12
23    Q. Okay. And when did you -- what  09:12

Page 23

1  was the time period of being outcomes  09:13
2  coordinator?                     09:13
3     A. I really don't remember.     09:13
4     Q. Okay. What's the next job you   09:13
5  remember having?                 09:13
6     A. I was brought in as a, I think  09:13
7  a -- a manager of our marketing    09:13
8  department, specifically around some  09:13
9  initiatives with senior services   09:13
10 marketing in a physician call center  09:13
11 concept, which we never really launched, 09:13
12 but.                             09:13
13    Q. Okay. With regard to the senior 09:13
14 services marketing, did that actually go 09:13
15 forward?                         09:13
16    A. It did. It was a program called 09:13
17 55 Plus.                         09:13
18    Q. Okay. And being a manager of a  09:13
19 marketing department, did you receive  09:13
20 training on the fraud and abuse laws as  09:13
21 they relate to marketing?        09:13
22    A. I'm sure I did.             09:13
23    Q. And just the best to your    09:13

Page 24

1  recollection, time frame that you were  09:14
2  the manager of a marketing department?  09:14
3     A. Not long.                   09:14
4     Q. Okay.                       09:14
5     A. I -- I don't remember        09:14
6  specifically, but it wasn't long.   09:14
7     Q. Are we still the '90s?       09:14
8     A. Yes.                        09:14
9     Q. Okay. Before you get your    09:14
10 M.B.A. Which was --             09:14
11    A. Yes.                        09:14
12    Q. -- 2001?                    09:14
13    A. Yeah.                       09:14
14    Q. Okay. What did you do next?   09:14
15    A. I went to work in the quality  09:14
16 department over risk management and   09:14
17 performance improvement services and   09:14
18 medical staff services.          09:14
19    Q. What was your position within   09:14
20 the quality department?          09:14
21    A. I was a manager.            09:14
22    Q. And in risk management did you   09:14
23 also have training on the Medicare fraud 09:14

**Roben Nutter**                                        **7 (25 - 28)**

Page 25

1  and abuse laws?                        09:14
2    A.  I would have had the annual     09:14
3  training that every employee has and   09:14
4  probably some additional, but I don't   09:15
5  recall specifically what it was.        09:15
6    Q.  Okay.  And that annual training,  09:15
7  to your understanding, covers the      09:15
8  Medicare fraud and abuse laws?         09:15
9    A.  Yes.                            09:15
10    Q.  All right.  What was the next   09:15
11  position you had?                     09:15
12    A.  I stayed within that department.  09:15
13  Eventually, I became a director.  I don't 09:15
14  remember when that was.  But I continued 09:15
15  with responsibility over risk management 09:15
16  and medical staff services.  The      09:15
17  performance improvement services dropped 09:15
18  off at some point because the department 09:15
19  was split.                           09:15
20    Q.  So you moved from manager to   09:15
21  director in the same department?       09:15
22    A.  Correct.                        09:15
23    Q.  Okay.  Were you getting your    09:15

Page 26

1  M.B.A. during this time?              09:15
2    A.  I don't remember how that       09:15
3  related to the time frame, but, you know, 09:15
4  at some point I did --                09:15
5    Q.  Okay.                           09:15
6    A.  -- work towards my M.B.A.       09:15
7    Q.  What was the next job you had   09:16
8  with EAMC?                           09:16
9    A.  I believe my next job would have 09:16
10  been in my role as general counsel.   09:16
11    Q.  So, is it your testimony that   09:16
12  you remained a director in quality     09:16
13  control risk management medical services 09:16
14  until such time as you became general  09:16
15  counsel?                             09:16
16    A.  It was primarily risk management 09:16
17  medical staff services.  The -- the    09:16
18  performance improvement aspect dropped 09:16
19  off.  But -- but, yes, I believe.  I   09:16
20  don't -- I don't remember there being  09:16
21  anything between that.                09:16
22    Q.  Okay.  And did you become a    09:16
23  compliance officer before you became   09:16

Page 27

1  general counsel?                      09:16
2    A.  I did not.                      09:16
3    Q.  Okay.  I'll give you what we're  09:16
4  marking as Nutter Exhibit 1.  Do you   09:17
5  recognize this document dated October   09:17
6  2nd, 2007, from T -- Terry Andrus to the 09:17
7  EAMC management team?                 09:17
8  (Plaintiff's Exhibit 1 was marked for  09:17
9  identification and is attached.)        09:17
10    A.  I see it.                       09:17
11    Q.  Okay.  Do you see the third     09:17
12  bullet point there he's -- where he's   09:17
13  announcing changes to the organizational 09:17
14  chart?  He says, "Roben Nutter - Roben is 09:17
15  now a licensed attorney and will assume  09:17
16  the role as General" -- "of General     09:17
17  Counsel"?                            09:18
18    A.  Yes.                           09:18
19    Q.  Okay.  Typically, bar results   09:18
20  come out in September.  So, would you   09:18
21  have gotten your 2007 bar exam results in 09:18
22  September and then assumed the role as  09:18
23  general counsel?                      09:18

Page 28

1    A.  Correct.                        09:18
2    Q.  And so you moved into the       09:18
3  general counsel position at EAMC       09:18
4  immediately upon passing the bar?      09:18
5    A.  Yes.                           09:18
6    Q.  Was anyone general counsel      09:18
7  immediately before you?               09:18
8    A.  No.  We didn't have an in-house  09:18
9  counsel at all.                       09:18
10    Q.  Okay.  So general counsel was a  09:18
11  new role for EAMC when you took on that  09:18
12  position?                            09:18
13    A.  It was.  We'd had an in-house    09:18
14  counsel at some point for a short time   09:18
15  before that, but I don't remember the   09:18
16  time frame.  Sometime while I was in law 09:18
17  school.  But we didn't at this time.    09:18
18    Q.  Okay.  Do you remember who the   09:18
19  in-house counsel was for that short     09:18
20  period of time?                      09:18
21    A.  Paige Jackson.                  09:18
22    Q.  Do you know where Paige is now?  09:18
23    A.  No.                           09:18

**Roben Nutter**                                    **8 (29 - 32)**

Page 29

1  Q.  Okay.                09:18
2  A.  I don't.             09:18
3  Q.  Do you know how long she served  09:18
4  as general counsel?           09:19
5  A.  My best recollection is maybe    09:19
6  around six months.            09:19
7  Q.  Okay.                09:19
8  A.  It could have been longer than  09:19
9  that, but it wasn't a long period of   09:19
10  time.                  09:19
11  Q.  Do you know why she left?      09:19
12  A.  I don't.              09:19
13  Q.  Did she get fired?          09:19
14  A.  No.                 09:19
15  Q.  Okay.  Are you currently both   09:19
16  general counsel and compliance officer  09:19
17  for East Alabama Health Care Authority?  09:19
18  A.  Currently?             09:19
19  Q.  Yes.                09:19
20  A.  Yes.                09:19
21  Q.  And were you during the 2008 to  09:19
22  2013 time frame in those roles?      09:19
23  A.  Not during the entire time.    09:19

Page 30

1  Q.  Okay.  What period of time did  09:19
2  you have both roles?           09:19
3  A.  I believe that I became        09:19
4  compliance officer in October of 2010.  09:19
5  Q.  Okay.  Who was compliance      09:19
6  officer, if anyone, before you?     09:19
7  A.  Janice Baker.            09:19
8  Q.  Okay.  And is Janice with --    09:19
9  still with EAMC?             09:20
10  A.  She's not.             09:20
11  Q.  Did she leave EAMC in October    09:20
12  2010?                 09:20
13  A.  She did.              09:20
14  Q.  Okay.  What happened to her?    09:20
15  A.  She retired.            09:20
16  Q.  Was Janice a lawyer?         09:20
17  A.  No.                 09:20
18  Q.  Did she have any legal training,  09:20
19  to your understanding?          09:20
20  A.  I don't know.           09:20
21  Q.  Okay.  So in October 2007 you    09:20
22  became general counsel, and then in   09:20
23  October 2010 you assumed the additional  09:20

Page 31

1  duties of compliance officer?      09:20
2  A.  Correct.              09:20
3  Q.  I'll give you what we're marking  09:20
4  Exhibit 2.  Take a second to look through  09:20
5  that.  I'm going to ask you to identify  09:20
6  it first.                09:21
7  (Plaintiff's Exhibit 2 was marked for   09:21
8  identification and is attached.)     09:21
9  (Witness reviews document.)     09:21
10  Q.  Can you tell me what this is,    09:21
11  please?                09:21
12  A.  This is an article that I was    09:21
13  interviewed for, for American Healthcare  09:21
14  Leader.                09:21
15  Q.  Okay.  Based on the upload date,  09:21
16  2016/03, is this -- did this happen   09:21
17  around March of 2016?          09:21
18  A.  That sounds about right.      09:21
19  Q.  Okay.  The first bold question   09:21
20  asked to you is, "As EAMC's sole in-house  09:21
21  attorney, what are the day-to-day issues  09:21
22  most pressing for you?"  Do you see that?  09:21
23  A.  I do.                09:21

Page 32

1  Q.  Is that correct, am I         09:21
2  understanding correctly that you are the  09:21
3  sole house -- in-house attorney?     09:21
4  A.  That's not correct right now.   09:21
5  Q.  Okay.  Who is an additional     09:21
6  in-house attorney right now?       09:21
7  A.  Cindy Rayfield.           09:21
8  Q.  What was -- what's her last     09:21
9  name?                 09:21
10  A.  Rayfield, R-A-Y-F-I-E-L-D.      09:21
11  Q.  Okay.  When did Cindy join?     09:22
12  A.  I believe around October of     09:22
13  2016.                 09:22
14  Q.  Okay.  Prior to that, were you   09:22
15  the sole in-house attorney for East   09:22
16  Alabama Medical Center?          09:22
17  A.  I was.                09:22
18  Q.  And was that -- is that true for  09:22
19  the entire time period that you became   09:22
20  general counsel until Cindy Rayfield   09:22
21  joined?                09:22
22  A.  Correct.              09:22
23  Q.  Okay.  Your answer to that      09:22

Page 33

1  question, the first sentence says   09:22
2  compliance and regulatory issues take up  09:22
3  most of your time.  Is that true?   09:22
4  A.  Regulatory issues for sure.   09:22
5  Q.  Okay.  What about compliance,   09:22
6  which is the first part of your answer?  09:22
7  A.  Yes.  I mean, I deal with   09:22
8  compliance issues which, you know, are  09:22
9  often legal and regulatory issues.   09:22
10  Q.  Okay.  The last sentence in that  09:22
11  answer says, "I serve as compliance   09:22
12  officer for the whole organization."  Is  09:22
13  that a true statement?   09:23
14  A.  Correct.   09:23
15  Q.  Okay.  And was that true from  09:23
16  2010, October 2010 through the end of   09:23
17  2014?   09:23
18  A.  Yes.   09:23
19  Q.  And is that true today?   09:23
20  A.  Yes.   09:23
21  Q.  In the next paragraph in your  09:23
22  answer, you say, "I'm spending time  09:23
23  providing guidance, researching, and  09:23

Page 34

1  working with outside counsel, as well as  09:23
2  on contract reviews and transactional   09:23
3  issues."   09:23
4  Did I read that correctly?   09:23
5  A.  You did.   09:23
6  Q.  And your job duty as general   09:23
7  counsel and compliance officer includes  09:23
8  contractual reviews?   09:23
9  A.  It does.   09:23
10  Q.  I asked you if you were the only  09:23
11  general counsel for East Alabama Health  09:24
12  Care Authority up until Cindy came on.  09:24
13  Let me expand it a little further.  Is  09:24
14  that true for East Alabama Health Care  09:24
15  Authority and its affiliated business  09:24
16  units?   09:24
17  A.  That I'm the general counsel  09:24
18  for --   09:24
19  Q.  Yes.   09:24
20  A.  -- those entities?  Yes.   09:24
21  Q.  Okay.  How many business units  09:24
22  are you -- are you over as general  09:24
23  counsel?   09:24

Page 35

1  A.  I don't know the -- the number.  09:24
2  Q.  Is it more than five?   09:24
3  A.  Clarify what you mean by   09:24
4  "business units."   09:24
5  Q.  Well, like Aperian was a   09:24
6  business unit, and I've seen documents  09:24
7  with Ken Lott's name on it, he's over  09:24
8  some fitness thing, and then there's a  09:24
9  senior living thing.  Are those separate  09:24
10  business units?  I don't know the   09:24
11  structure of EAMC as well as you do.   09:24
12  A.  Yeah.  I mean, some are -- some  09:24
13  are departments within EAMC.  Some are  09:24
14  separate, you know, affiliated entities.  09:24
15  Q.  Okay.  Can you give me some of  09:24
16  the names of the affiliated entities?  09:24
17  A.  Well, you just named a few.  09:24
18  Q.  Okay.   09:25
19  A.  In addition to those, our DME  09:25
20  company.  At one point we had assisted  09:25
21  living facilities.  I'm drawing a blank,  09:25
22  but there -- there's a number of them.  09:25
23  Q.  Okay.  When Aperian was a   09:25

Page 36

1  separate LLC, was it an affiliated   09:25
2  business unit?   09:25
3  A.  It was.   09:25
4  Q.  And you were general counsel for  09:25
5  both East Alabama Health Care Authority  09:25
6  and all of those affiliated business  09:25
7  units?   09:25
8  A.  Correct.   09:25
9  Q.  Okay.  How many employees are  09:25
10  under your umbrella as general counsel?  09:25
11  A.  Just over 3,000.   09:25
12  Q.  And I think I understand this,  09:25
13  but you were the only compliance officer  09:25
14  for East Alabama Health Care Authority  09:25
15  and its affiliated business units at  09:25
16  least from 2010 through the end of 2014?  09:26
17  A.  I was the compliance officer  09:26
18  during that time.   09:26
19  Q.  Were you the only one?   09:26
20  A.  Yes.   09:26
21  Q.  Okay.  And I take it from what  09:26
22  you've told me, from 2008 to 2014 Aperian  09:26
23  did not have its own general counsel?  09:26

**Roben Nutter**                                                    **10 (37 - 40)**

Page 37

1   A.  They did not.                    09:26
2   Q.  And from 2008 to 2014, did       09:26
3  Aperian have its own compliance officer? 09:26
4   A.  They did not.                    09:26
5   Q.  Did you attend the board         09:26
6  meetings of Aperian at any time from 2008 09:26
7  through 2013?                         09:26
8   A.  Not that I recall.  I certainly  09:26
9  can't say that I didn't ever attend one, 09:26
10 but I don't recall ever attending one.  09:26
11  Q.  Okay.  How do the roles, as you  09:26
12 see them, of general counsel and      09:26
13 compliance officer differ?            09:26
14  A.  I think they're very             09:26
15 intertwined.  There, you know, may be 09:27
16 certain issues that the compliance    09:27
17 department handles on their own as far as 09:27
18 basic auditing, routine auditing that's 09:27
19 done through the organization, compliance 09:27
20 education that's done through the      09:27
21 organization.  I think that when there 09:27
22 becomes issues or questions, those often 09:27
23 turn into legal questions and issues.  So 09:27

Page 38

1  I think they're very, very intertwined.  09:27
2   Q.  Which role do you feel like you  09:27
3  spend more of your time on, compliance 09:27
4  officer or general counsel?           09:27
5   A.  Well, it's hard to say since     09:27
6  they're intertwined, but -- but my    09:27
7  primary role when I'm involved in     09:27
8  compliance issues is from a legal     09:27
9  perspective.                          09:27
10  Q.  What do you understand your      09:27
11 duties and responsibilities as general 09:27
12 counsel for East Alabama Health Care  09:28
13 Authority and its affiliated business 09:28
14 entities?                             09:28
15  A.  Well, at a broad level, I'm      09:28
16 overseeing a compliance program that is 09:28
17 committed to ethical and compliant    09:28
18 business operations.                  09:28
19  Q.  Okay.  Getting down to a more    09:28
20 granular level, what is -- what are   09:28
21 the -- the duties that you do on a    09:28
22 regular basis in that role as compliance 09:28
23 officer?                              09:28

Page 39

1   A.  Well, the compliance department  09:28
2  handles --                            09:28
3   Q.  I'm sorry.  General counsel.  I  09:28
4  was asking general counsel to begin with. 09:28
5   A.  Okay.  Repeat your question?     09:28
6   Q.  Let me ask Lane.                  09:28
7      MR. McKENNA:  Did I ask about     09:28
8  general counsel or compliance officer to 09:28
9  begin with?                           09:28
10     (Requested material read.)        09:28
11  Q.  Okay.  So, we were talking about 09:28
12 compliance officer.  What are your    09:28
13 duties, like day-to-day type duties?  09:28
14  A.  So the compliance department     09:28
15 handles the day-to-day functions of the 09:28
16 compliance program.  So day-to-day, my 09:28
17 primary role and responsibility is to 09:29
18 handle legal issues and provide legal 09:29
19 analysis.  And sometimes those come   09:29
20 through compliance issues and sometimes 09:29
21 they come from other areas.           09:29
22  Q.  All right.  What do you see your 09:29
23 duties and responsibilities as general 09:29

Page 40

1  counsel to be?                        09:29
2   A.  At a broad level, overseeing all 09:29
3  legal matters of the organization.    09:29
4   Q.  Is one of the duties, your       09:29
5  duties as general counsel and compliance 09:30
6  officer to be familiar with the laws and 09:30
7  regulations governing the hospital and 09:30
8  its affiliated business units?        09:30
9   A.  Yes.                             09:30
10  Q.  And do you do that, familiarize  09:30
11 yourself?                             09:30
12  A.  I sure try.                       09:30
13  Q.  Okay.  What do you do to         09:30
14 familiarize yourself with those laws and 09:30
15 regulations that impact the hospital and 09:30
16 its business units?                   09:30
17  A.  I think there's numerous ways.   09:30
18 You know, I attend legal sessions and 09:30
19 seminars.  I -- I attend CLE activities 09:30
20 that are primarily focused on healthcare 09:30
21 issues.  I am in close contact with   09:30
22 outside counsel.  I receive updates on 09:30
23 issues and matters.  I try to stay    09:30

**Roben Nutter**                                          **11 (41 - 44)**

Page 41

1  abreast of various hot issues. I          09:31
2  think -- I think part of what I do every  09:31
3  day is learning.                          09:31
4    Q.  Okay.  Do you read the HHS OIG       09:31
5  special fraud alerts applicable to the    09:31
6  hospital and its business units?          09:31
7    A.  Not all of them, but some.          09:31
8    Q.  The ones that would be              09:31
9  applicable to the business?               09:31
10   A.  I can't say that I read every        09:31
11 single one, but the ones that are         09:31
12 applicable, I would.                      09:31
13   Q.  What's your understanding of the     09:31
14 purpose of HHS OIG special fraud alerts?  09:31
15   A.  They're guidance, and they're        09:31
16 usually very fact-dependent, and they are 09:31
17 specific to the requesters who are asking 09:31
18 for the opinions.                         09:31
19   Q.  Now, is that your understanding     09:31
20 of a special fraud alert or an advisory   09:31
21 opinion?                                  09:32
22   A.  Well, probably more an advisory     09:32
23 opinion, but I think the fraud alerts do  09:32

Page 42

1  the same thing often.                     09:32
2    Q.  The fraud alerts are more           09:32
3  general, generalized and not necessarily  09:32
4  fact-dependent.  They're not based on a   09:32
5  factual scenario sent in by a healthcare  09:32
6  entity; correct?                          09:32
7      MR. HOOVER:  Object to the form.      09:32
8    A.  I think it depends.  You'd have     09:32
9  to ask me about a specific one.           09:32
10   Q.  Okay.  Are the special fraud        09:32
11 alerts available online at the HHS OIG    09:32
12 website?                                  09:32
13   A.  Yes.                                09:32
14   Q.  Do you read the HHS OIG advisory    09:32
15 opinions applicable to the hospital and   09:32
16 its business units?                       09:32
17   A.  I think that would be the same      09:32
18 answer.  I can't say that I've read every 09:32
19 single one of them.                       09:32
20   Q.  Okay.  But you generally try to     09:32
21 read the ones that are applicable?        09:32
22   A.  I -- if -- if -- if I am aware      09:32
23 of ones that are applicable, I would read 09:32

Page 43

1  them, yes.                                09:32
2    Q.  All right.  And I think we          09:32
3  discussed it, but what's your             09:32
4  understanding of the purpose of the HHS   09:32
5  OIG advisory opinions?                    09:32
6    A.  Again, I would say that those       09:32
7  are guidance and they are, again,         09:32
8  fact- -- fact-specific and -- and relate  09:33
9  specifically to the requesters who ask    09:33
10 for the opinions.                         09:33
11   Q.  What's your understanding of why    09:33
12 HHS publishes the advisory opinions and   09:33
13 makes them available online?              09:33
14     MR. HOOVER:  Object to the form.      09:33
15   A.  Well, I don't know exactly why      09:33
16 they do that.  My impression would be to  09:33
17 provide guidance on some issues.          09:33
18   Q.  Okay.  To provide guidance to       09:33
19 other entities in the healthcare          09:33
20 industry?                                 09:33
21   A.  Yes.                                09:33
22   Q.  Does HHS OIG circulate new          09:33
23 advisory opinions on its Listserv?        09:33

Page 44

1      MR. HOOVER:  Object to the form.      09:33
2    A.  I believe so.  I -- I'm not sure    09:33
3  exactly what Listserv you're talking      09:33
4  about.                                    09:33
5    Q.  Well, there's -- there -- are       09:33
6  you aware that there is an HHS OIG        09:33
7  Listserv?                                 09:33
8    A.  I am.                               09:33
9    Q.  And have you been on that           09:33
10 Listserv before?                          09:34
11   A.  I -- I have been on a Listserv.     09:34
12 I don't know what Listserv you're talking 09:34
13 about.                                    09:34
14   Q.  Okay.                               09:34
15   A.  But yes.                            09:34
16   Q.  Have you received HHS OIG           09:34
17 advisory opinions via a Listserv?         09:34
18   A.  Yes.                                09:34
19   Q.  Do you read case law applicable     09:34
20 to the hospital and its affiliated        09:34
21 business units?                           09:34
22   A.  I read some case law.               09:34
23   Q.  How do you decide which ones to     09:34

**Roben Nutter**                                    **12 (45 - 48)**

Page 45

1  read and which ones not to read?      09:34
2      MR. HOOVER: Object.            09:34
3   Q.  Is there a way that information  09:34
4  comes to you?                      09:34
5      MR. HOOVER: Object to the form.  09:34
6   A.  Not routinely pertaining to case  09:34
7  law.                               09:34
8   Q.  Okay.  Do you have any sort of   09:34
9  alert set up for -- in software search  09:34
10  engines, legal search engines, that if a  09:34
11  case comes out on this topic, it will be  09:34
12  sent to you?                      09:34
13   A.  No, I don't.                  09:34
14   Q.  Okay.  Do you have access to    09:34
15  case law through either Westlaw,     09:35
16  LexisNexis, or some other case search  09:35
17  program?                          09:35
18   A.  I do.                         09:35
19   Q.  Which one?                    09:35
20   A.  Lexis.                        09:35
21   Q.  Which Listservs do you subscribe  09:35
22  to now?                           09:35
23   A.  Pertaining to what?           09:35

Page 46

1   Q.  I don't want to know about your  09:35
2  running Listserv.  Pertaining to the   09:35
3  hospital and -- and its business.      09:35
4   A.  I am on a Listserv for the       09:35
5  American Health Lawyers Association.   09:35
6  HHS, that we just talked about.  I -- I  09:35
7  don't -- I can't recall other specific   09:35
8  Listservs.                         09:35
9   Q.  Okay.                         09:35
10   A.  I get a lot of e-mails every day  09:35
11  on various topics.                  09:35
12   Q.  We all do.  Did you subscribe to  09:35
13  these Listservs during the 2008 to 2014  09:35
14  time frame?                       09:36
15   A.  I don't recall when I subscribed  09:36
16  to the Listservs.                   09:36
17   Q.  Do you recall ever being on a    09:36
18  Stark law Listserv?                 09:36
19   A.  Not specifically related to     09:36
20  Stark, no.                         09:36
21   Q.  What type of information is      09:36
22  circulated on the American Health Lawyers  09:36
23  Listserv?                          09:36

Page 47

1   A.  Various health law topics.  Just  09:36
2  about any health law topic you need to   09:36
3  know something about.               09:36
4   Q.  And would Medicare fraud abuse   09:36
5  laws be covered in some of those topics?  09:36
6   A.  It would.                      09:36
7   Q.  And what is circulated on the    09:36
8  HHS OIG Listserv?                   09:36
9   A.  Well, I think we just talked     09:36
10  about a couple of things related to the  09:36
11  fraud alerts and advisory opinions.  I   09:36
12  believe also the actions, DOJ          09:36
13  compliance-related actions for providers.  09:37
14   Q.  When you say "action," what do   09:37
15  you mean by that?                  09:37
16   A.  I think it's primarily related   09:37
17  to corporate integrity agreements.     09:37
18   Q.  After there's been a           09:37
19  prosecution?                       09:37
20   A.  Correct.                      09:37
21   Q.  Okay.  Or --                   09:37
22   A.  Prosecutions as well, I think,   09:37
23  are listed there.                  09:37

Page 48

1   Q.  So the types of conduct that DOJ  09:37
2  is prosecuting is circulated on the HHS  09:37
3  OIG Listserv?                      09:37
4   A.  It is.                         09:37
5   Q.  What publications do you receive  09:37
6  on healthcare?                     09:37
7   A.  American Health Lawyers         09:37
8  Association publications, the         09:37
9  compliance -- I don't know what the name  09:37
10  of that organization is, the compliance  09:38
11  association.  National Compliance     09:38
12  Association.  I receive the general    09:38
13  Alabama Bar publication every month.    09:38
14  Those are the ones I can recall        09:38
15  specifically.                      09:38
16   Q.  Are the -- is the American       09:38
17  Health Lawyers publication, that's a   09:38
18  physical copy?                     09:38
19   A.  There is.  Uh-huh.             09:38
20   Q.  Okay.  Same thing with the       09:38
21  National Compliance Association?       09:38
22   A.  Yes.                          09:38
23   Q.  How long have you gotten the     09:38

1 American Health Lawyers publication? 09:38
2 A. I don't recall specifically. 09:38
3 Q. How about the National 09:38
4 Compliance Association? 09:38
5 A. I don't recall. 09:38
6 Q. For as long as you can remember, 09:38
7 that you've been a lawyer? 09:38
8 A. For -- I don't know if I've 09:38
9 received the compliance publication since 09:38
10 I've been a lawyer. I began receiving it 09:38
11 at some point after I became a lawyer. 09:39
12 Q. Okay. Did you begin receiving 09:39
13 it after you became the compliance 09:39
14 officer in addition to general counsel? 09:39
15 A. I don't remember specifically. 09:39
16 Q. All right. And I think you said 09:39
17 you attend conferences related to 09:39
18 healthcare law? 09:39
19 A. I do. 09:39
20 Q. How often? 09:39
21 A. More than a few a year. I -- I 09:39
22 generally attend the American Health 09:39
23 Lawyers Association meeting annually. 09:39

1 And I attend various annual updates 09:39
2 outside of that. 09:39
3 Q. Such as? 09:39
4 A. Such as the -- the -- the 09:39
5 session that's put on by Cumberland every 09:39
6 year specific to healthcare, legal 09:39
7 updates. And I attend any other 09:39
8 conferences that are pertinent to 09:40
9 something that I might have going on at 09:40
10 the time. 09:40
11 Q. Is there a particular professor 09:40
12 at Cumberland that puts on that annual 09:40
13 health care update? 09:40
14 A. I don't know. 09:40
15 Q. Okay. Do these conferences and 09:40
16 updates typically cover the Medicare 09:40
17 fraud and abuse laws? 09:40
18 A. There are generally topics 09:40
19 related to that. 09:40
20 Q. Have you attended conferences 09:40
21 that cover the topic of the False Claims 09:40
22 Act? 09:40
23 A. I have attended conferences that 09:40

1 include that topic, yes. 09:40
2 Q. Have you attended any that were 09:40
3 specifically -- there are False Claims 09:40
4 Act conferences out there. I -- I've 09:40
5 been to the ABA Health Law Conference, 09:40
6 and they'll talk about the False Claims 09:40
7 Act within it. That's one way. And then 09:40
8 there's like specific False Claims Act 09:40
9 conferences. Have you ever been to 09:40
10 the -- the latter? 09:40
11 A. I don't recall being -- going to 09:40
12 a specific conference related to just 09:41
13 that topic. 09:41
14 Q. Okay. I think Laura Grill 09:41
15 testified that she gets training on the 09:41
16 fraud and abuse laws, including the 09:41
17 anti-kickback statute and Stark law, at 09:41
18 the annual meetings of the hospital 09:41
19 association. Do you recall that 09:41
20 testimony? 09:41
21 A. Yes. 09:41
22 Q. Okay. Do you attend that same 09:41
23 conference? 09:41

1 A. I have attended it. I don't 09:41
2 attend it every year. 09:41
3 Q. You attended part of Steve 09:41
4 Brannon's deposition; correct? 09:41
5 A. Correct. 09:41
6 Q. On snow day? 09:41
7 A. Yes. 09:41
8 Q. Do you understand that he's the 09:41
9 former compliance officer for UAB? 09:41
10 A. I do. 09:41
11 Q. He brought with him to his 09:41
12 deposition a treatise on healthcare fraud 09:41
13 and abuse laws that he kept in his office 09:41
14 when he was a compliance officer. Do you 09:41
15 recall that? 09:41
16 A. I recall him saying that. 09:41
17 Q. Do you have such a book on the 09:41
18 healthcare fraud and abuse laws in your 09:41
19 office? 09:42
20 MR. HOOVER: Object to the form. 09:42
21 A. I don't know. I may. Most of 09:42
22 what I reference is online. 09:42
23 Q. What do you -- what online 09:42

Page 53

1  sources do you use to access information  09:42
2  about the Medicare fraud and abuse laws?  09:42
3     A.  Numerous.              09:42
4     Q.  Tell me which ones you remember.  09:42
5     A.  Well, be more specific.       09:42
6     Q.  Sure.  You said most of what you  09:42
7  reference is online.  So if you were     09:42
8  looking for information about the     09:42
9  anti-kickback statute or the Stark law,  09:42
10  want -- you know, you wanted to do some  09:42
11  research on it, do you have websites that  09:42
12  you would go to to look at that?     09:42
13     A.  There are resources through the  09:42
14  American Health Lawyers website.     09:42
15  Obviously, I would pull the actual law in  09:42
16  a lot of cases or the regulations, the  09:43
17  pertinent regulations.  I use Lexis for  09:43
18  some of that.  I use the compliance     09:43
19  association website for some of that.  09:43
20     Q.  That's the National Compliance  09:43
21  Association?              09:43
22     A.  (Witness nods head.)     09:43
23     Q.  Do you have those --     09:43

Page 54

1     A.  Yes.              09:43
2     Q.  -- websites bookmarked on your  09:43
3  computer?              09:43
4     A.  I try to bookmark some things,  09:43
5  but it seems that those bookmarks     09:43
6  disappear all the time, so I don't know  09:43
7  if any are bookmarked right now or not.  09:43
8     Q.  Okay.  Do you have -- we talked  09:43
9  about you may or may not have a book.  09:43
10  Sometimes when I go to a conference, I'll  09:43
11  keep my binder of materials, although a  09:43
12  lot of times they give it to us on a     09:43
13  thumb drive now.  But do you have     09:43
14  materials in your office on the     09:43
15  healthcare fraud and abuse laws, physical  09:44
16  materials?              09:44
17     A.  I don't -- I don't recall.     09:44
18     Q.  Do you have conference material  09:44
19  in your office that covered the     09:44
20  healthcare fraud and abuse laws?     09:44
21     A.  I don't -- I don't know.     09:44
22     Q.  What is your understanding of  09:44
23  what is prohibited by the anti-kickback  09:44

Page 55

1  statute?              09:44
2     MR. HOOVER:  I'm going to object  09:44
3  to the form.  It asks for mental     09:44
4  impressions of general counsel for the  09:44
5  hospital.              09:44
6     Q.  You can answer.        09:44
7     MR. McKENNA:  Unless you're     09:44
8  instructing her not to answer.     09:44
9     MR. HOOVER:  No.  She can answer  09:44
10  it generally, but not as it relates to  09:44
11  any allegations in this lawsuit.     09:44
12     MR. McKENNA:  I -- I know.  I     09:44
13  asked it generally.        09:44
14     MR. HOOVER:  Well, I want to     09:44
15  make sure it's clear on the record.     09:44
16     A.  So, ask your question again.  09:44
17     Q.  (By Mr. McKenna)  Yeah.     09:44
18  Generally, what is your understanding of  09:44
19  what is prohibited by the anti-kickback  09:44
20  statute?              09:44
21     A.  Generally, the -- the        09:44
22  anti-kickback statute prohibits     09:44
23  inducement of referrals around federal  09:44

Page 56

1  healthcare program business.     09:44
2     Q.  All right.  And generally, what  09:44
3  is your understanding of what is     09:45
4  prohibited by the Stark laws?     09:45
5     A.  Generally, the Stark laws     09:45
6  prohibit referrals by physicians     09:45
7  businesses that they may have some     09:45
8  financial ownership in.        09:45
9     Q.  And what is your general     09:45
10  understanding of what is prohibited by  09:45
11  the False Claims Act?        09:45
12     A.  Generally, the False Claims  09:45
13  Ac- -- Act prohibits the filing of false  09:45
14  claims, you know, mostly around     09:45
15  designated health services that would be  09:45
16  prohibited under the anti-kickback     09:45
17  statute.              09:45
18     Q.  Okay.  Do you understand -- what  09:45
19  is your general understanding of what  09:45
20  safe harbors are with regard to the     09:45
21  anti-kickback statute?        09:45
22     A.  Sort of what the name implies.  09:45
23  They are a specific set of parameters  09:45

Page 57

1  under which there is an assumption that  09:45
2  there is no violation.
3       Q.  Is it sort of a carveout from     09:46
4  the anti-kickback statute that if you    09:46
5  looked at the conduct on its face, it may 09:46
6  be violative, but HHS has determined that 09:46
7  this specific set of circumstances is    09:46
8  permissible if you meet the requirements 09:46
9  of the safe harbor?                      09:46
10      MR. HOOVER:  Object to the form.     09:46
11      Q.  Is that an accurate general      09:46
12 statement?                               09:46
13      A.  It -- it -- it pro- -- it        09:46
14 provides an avenue under which, if you   09:46
15 meet certain parameters that are -- that 09:46
16 are -- that are enumerated under the --  09:46
17 the safe harbors, that prosecution would 09:46
18 not be likely.                           09:46
19      Q.  Okay.  And certainly, the       09:46
20 hospital, such as East Alabama Health    09:46
21 Care Authority, and its business units   09:46
22 would have numerous agreements that      09:46
23 operate within safe harbors.  Is that    09:46

Page 58

1  fair?                                    09:46
2       MR. HOOVER:  Object to the form.    09:46
3  Asked -- I don't know that you can ask -- 09:47
4  I don't think she can testify to that as 09:47
5  general counsel.                         09:47
6       MR. McKENNA:  Are you               09:47
7  instructing her not to answer?           09:47
8       MR. HOOVER:  Uh-huh.                09:47
9       MR. McKENNA:  Okay.                 09:47
10      MR. BATTLE:  You've got to say       09:47
11 "yes."                                   09:47
12      MR. HOOVER:  Yes.  I'm sorry.        09:47
13 Yes.                                     09:47
14      Q.  (By Mr. McKenna) All right.  Do  09:47
15 you -- do you understand that for a safe 09:47
16 harbor to provide protection, that all   09:47
17 the requirements of a safe harbor have to 09:47
18 be met, generally?                       09:47
19      A.  Generally.                      09:47
20      MR. HOOVER:  And -- and let me       09:47
21 just -- I mean -- I mean, I don't -- I   09:47
22 won't object every time.  I just want to 09:47
23 make sure it's clear on the record, too,  09:47

Page 59

1  that, you know, when you say "generally," 09:47
2  you're -- you're not asking her to make a 09:47
3  legal conclusion and/or that that is an  09:47
4  affirmative recitation of the law.       09:47
5       MR. McKENNA:  I'm asking for her    09:47
6  understanding, yeah, of how the safe     09:47
7  harbors operate on a general level.      09:47
8       MR. HOOVER:  You can answer         09:47
9  that.                                    09:48
10      A.  I'm sorry.  Repeat your         09:48
11 question.                                09:48
12      Q.  Sure.  Do you understand that   09:48
13 for a safe harbor to be applicable and   09:48
14 provide protection, that all the         09:48
15 requirements of the safe harbor have to  09:48
16 be met?  You talked about the enumerated 09:48
17 requirements.                            09:48
18      A.  I think if all the requirements 09:48
19 are met, there is a much less --         09:48
20 there's -- there's much less likeliness  09:48
21 of there being any prosecution.  I think 09:48
22 there are ways in which meeting some of  09:48
23 the areas of a safe harbor could provide 09:48

Page 60

1  protection as well.                      09:48
2       Q.  Okay.  Have you read 11th       09:48
3  Circuit case law that holds that all the 09:48
4  requirements of a safe harbor must be met 09:48
5  to provide protection?                   09:48
6       A.  I don't recall sitting here     09:48
7  today what case law I've read.           09:48
8       Q.  Have you been taught that in    09:48
9  healthcare conferences discussing        09:48
10 compliance with the anti-kickback statute 09:48
11 and Stark law safe harbors, that all the 09:48
12 requirements have to be met?             09:49
13      A.  I think what I just said is how 09:49
14 I would answer it again.  There -- if you 09:49
15 meet all of the requirements in the safe 09:49
16 harbor, you're -- you're going to have   09:49
17 more protection than you would if you met 09:49
18 only a certain number of the provisions  09:49
19 or none.                                 09:49
20      Q.  Okay.  All right.  You talked   09:49
21 about -- get the right term -- the       09:49
22 compliance department.  Is there a       09:49
23 compliance department or just a          09:49

**Roben Nutter**                                                    **16 (61 - 64)**

Page 61

1  compliance committee at East Alabama    09:49
2  Health Care Authority?                  09:49
3      A.  There is a compliance           09:49
4  department.  It's called the regulatory 09:49
5  affairs department.                     09:49
6      Q.  And -- and how long has that     09:49
7  department been in existence?           09:49
8      A.  I couldn't answer that.         09:49
9      Q.  The whole time you've been       09:49
10 there?                                   09:49
11     A.  Yes.                             09:49
12     Q.  Okay.  And is there also a       09:49
13 compliance committee?                   09:49
14     A.  There is.                        09:50
15     Q.  Okay.  What does the            09:50
16 regulatory -- regulatory affairs        09:50
17 department do?                           09:50
18     A.  They are responsible for the    09:50
19 offering of educational opportunities   09:50
20 around compliance.  They conduct audits, 09:50
21 internal audits according to a work plan 09:50
22 that's developed every year.  They work  09:50
23 with outside consultants on outside     09:50

Page 62

1  auditing that is done.  They field      09:50
2  general compliance questions day in and 09:50
3  day out.  They oversee policies and     09:50
4  procedures in the organization.         09:50
5  Generally.  But that's what they do.    09:51
6      Q.  And how many people work in the  09:51
7  regulatory affairs department?          09:51
8      A.  Currently five, I believe.      09:51
9      Q.  Okay.  In the time frame that    09:51
10 we've been talking about with this      09:51
11 lawsuit, 2008 to 2014, how many people  09:51
12 worked in there?                         09:51
13     A.  It fluctuated some, so I can't   09:51
14 answer that definitively, but, you know, 09:51
15 five to seven at any given time,         09:51
16 probably.                                09:51
17     Q.  Are there any -- is there        09:51
18 anybody in that department that has a law 09:51
19 degree?                                  09:51
20     A.  No.                             09:51
21     Q.  Does the regulatory affairs     09:51
22 department review the contracts of East 09:52
23 Alabama Health Care Authority and its   09:52

Page 63

1  affiliated business units for compliance 09:52
2  with the Medicare fraud and abuse laws? 09:52
3      A.  I don't know what contracts     09:52
4  specifically they look at.              09:52
5      Q.  Okay.  All right.  In your role  09:52
6  as compliance officer and general       09:52
7  counsel, are you over the regulatory    09:52
8  affairs department?                      09:52
9      A.  I am.                            09:52
10     Q.  Okay.  But your testimony is you 09:52
11 don't know what contracts they look at?  09:52
12     A.  Their primary role and          09:52
13 responsibility is not contract review.  09:52
14 Those get bumped to the legal department. 09:52
15 Whether or not they look and review some 09:52
16 contracts, I'm not sure.                 09:52
17     Q.  All right.  You know, you said   09:52
18 contract review gets bumped to the legal 09:53
19 department.  Is there a department that's 09:53
20 the legal department?                    09:53
21     A.  Yes.                             09:53
22     Q.  Okay.  How many people are in    09:53
23 the legal department?                    09:53

Page 64

1      A.  Well, the legal department is    09:53
2  embedded within administration, so      09:53
3  there's two attorneys.  And we also have 09:53
4  two administrative secretaries that     09:53
5  assist us.                               09:53
6      Q.  Is one of the two attorneys you? 09:53
7      A.  Yes.                             09:53
8      Q.  And the other is Cindy?          09:53
9      A.  Yes.                             09:53
10     Q.  Okay.  2008 to 2014 time frame,  09:53
11 which is applicable to this case, how    09:53
12 many people were in the legal department, 09:53
13 or was there -- let me just ask the first 09:53
14 question, and then I'll ask the second.  09:53
15         How many people were in the     09:53
16 legal department?                        09:53
17     A.  Well, again, it's embedded       09:53
18 within admin- -- the administrative      09:54
19 department, and I was the only attorney. 09:54
20     Q.  Did you have any support staff   09:54
21 back then?                               09:54
22     A.  The same.                        09:54
23     Q.  Two?                             09:54

Page 65

1  A. Two administrative secretaries.  09:54
2  Q. And so contract review would  09:54
3  have been bumped up to you at that time?  09:54
4  A. Yes. And I may employ outside  09:54
5  resources to help me with that.  09:54
6  Q. Okay. Do you review -- did you  09:54
7  review during that time frame all  09:54
8  contracts, or were there just certain  09:54
9  ones that would be sent to you for  09:54
10  review?  09:54
11  A. I did not review every single  09:54
12  contract that came through the  09:54
13  organization.  09:54
14  Q. Were there criteria for which  09:54
15  contracts should be sent to you for  09:54
16  review?  09:54
17  A. There was some criteria,  09:54
18  especially around our materials  09:54
19  contracts. So there was a specific  09:55
20  dollar amount in which I would become  09:55
21  involved in those, and I don't recall  09:55
22  what that dollar amount is. But  09:55
23  generally, most of the contracts in the  09:55

Page 66

1  organization should come through the  09:55
2  legal department. And I had processes in  09:55
3  place where some of those were farmed to  09:55
4  outside resources to help.  09:55
5  Q. Okay. So the types of contracts  09:55
6  we had in this case, would you expect the  09:55
7  employee lease agreements to come through  09:55
8  the legal department?  09:55
9  A. Yes.  09:55
10  Q. And the contracts with temporary  09:55
11  agencies to employ collectors, would you  09:55
12  expect those to come to the legal  09:55
13  department?  09:56
14  A. Not -- I know that not all of  09:56
15  those did or have. And just like many of  09:56
16  the things I'll talk about, I'm talking  09:56
17  generally. A lot of times temporary  09:56
18  staffing contracts would go through our  09:56
19  HR department.  09:56
20  Q. The contracts with the -- the  09:56
21  marketing companies, Summit, Compass,  09:56
22  Total, and Magnolia, would you expect  09:56
23  those to come through the legal  09:56

Page 67

1  department?  09:56
2  A. Depends on what time period  09:56
3  you're talking about.  09:56
4  Q. Okay. Well, what time period  09:56
5  would you have expected them to come  09:56
6  through?  09:56
7  A. Well, I think our processes have  09:56
8  been shored up some over time, so I think  09:56
9  the expectation would be that those  09:57
10  contracts would have been reviewed by  09:57
11  someone. But there -- say in 2008, there  09:57
12  wasn't a -- as defined a process as for  09:57
13  how that happens as there is today.  09:57
14  Q. Okay. You said the processes  09:57
15  have been shored up. How -- how have  09:57
16  they been shored up?  09:57
17  A. I think over time it -- it --  09:57
18  it's a -- it's a process of just trying  09:57
19  to make sure that I'm seeing the things  09:57
20  that I need to see. There was also a  09:57
21  time in which some roles were combined as  09:57
22  far as Janice Baker in the compliance  09:58
23  role and me in the legal role.  09:58

Page 68

1  Q. Was there any written guidance  09:58
2  set out that -- that you've sent out  09:58
3  saying, "I want all contracts to come to  09:58
4  the legal department that meet these  09:58
5  criteria," to shore up the process?  09:58
6  A. There have been e-mails that  09:58
7  have gone out that have outlined the  09:58
8  process for contract review.  09:58
9  Q. Would these have been after  09:58
10  2008, 2009?  09:59
11  A. Yes.  09:59
12  Q. All right. Laura Grill  09:59
13  testified that the compliance committee  09:59
14  reports to the board of directors of the  09:59
15  Health Care Authority and meets at a  09:59
16  dedicated time. Do you recall that?  09:59
17  A. I'm sorry. Repeat that?  09:59
18  Q. Yeah. Laura Grill's testimony  09:59
19  was that there is a compliance committee  09:59
20  that reports to the board of directors of  09:59
21  the Health Care Authority and that  09:59
22  committee meets at a dedicated time. Is  09:59
23  that accurate?  09:59

**Roben Nutter**

Page 69

1  A.  I don't know that she said they    09:59
2  meet at a dedicated time.  There is a    09:59
3  compliance committee of the board --    09:59
4  Q.  Okay.    09:59
5  A.  -- that meets.    09:59
6  Q.  And is that made up of different    09:59
7  members of the board?    09:59
8  A.  It is.    09:59
9  Q.  And it rotates periodically?    09:59
10  A.  The membership?    09:59
11  Q.  Yes.    09:59
12  A.  Yes.    09:59
13  Q.  Okay.  Are any of those people    09:59
14  lawyers?    10:00
15  A.  Currently, I don't think so.    10:00
16  I -- I'm not sure if there ever has been    10:00
17  a lawyer on that committee or not.    10:00
18  Q.  Okay.  Is there somebody on the    10:00
19  committee that is assigned responsibility    10:00
20  for particular business units?    10:00
21  A.  No.  Not that I'm aware of.    10:00
22  Q.  And the people that are on the    10:00
23  compliance committee, the compliance    10:00

Page 70

1  committee is not their full-time job.    10:00
2  They -- they have a regular job.  They're    10:00
3  just also a member of the compliance    10:00
4  committee.  Is that right?    10:00
5  A.  I'm not really sure what they do    10:00
6  outside the compliance committee.    10:00
7  Q.  For example, if Laura Grill is    10:00
8  on the compliance committee, she is also    10:00
9  functioning as chief operating officer;    10:00
10  correct?    10:00
11  A.  Laura Grill would not be a    10:00
12  member of the compliance committee.  The    10:00
13  compliance committee is made up of board    10:01
14  members.    10:01
15  Q.  Okay.    10:01
16  A.  She would be an attendee at    10:01
17  those meetings.    10:01
18  Q.  All right.  Is Terry Andrus a    10:01
19  board member?    10:01
20  A.  No.    10:01
21  Q.  All right.  It's Dr. Pittard    10:01
22  who's a board member; correct?    10:01
23  A.  Yes.    10:01

Page 71

1  Q.  Okay.  Does he also have a job    10:01
2  other than the EAMC compliance committee?    10:01
3  A.  I don't know --    10:01
4  Q.  Okay.    10:01
5  A.  -- what Dr. Pittard does at this    10:01
6  point.    10:01
7  Q.  He may be retired from being a    10:01
8  physician, but at some point he was a    10:01
9  physician at the same time he was on the    10:01
10  compliance committee?    10:01
11  A.  At some point he was a    10:01
12  physician, yes.  As I sit here, I'm not    10:01
13  sure that Dr. Pittard was a member of the    10:01
14  compliance committee or not.    10:01
15  Q.  Okay.    10:01
16  A.  I'd have to go back and look at    10:01
17  the membership.    10:01
18  Q.  Can you tell me your    10:01
19  understanding of why the toxicology lab    10:01
20  split off from EAMC as Aperian, making it    10:02
21  a separate LLC?    10:02
22  A.  I don't know.    10:02
23  Q.  Was there a -- so when it was    10:02

Page 72

1  put off and formed its own LLC, it was a    10:02
2  separate corporation; correct?    10:02
3      MR. HOOVER:  Object to the form.    10:02
4  A.  A separate LLC was formed.    10:02
5  Q.  Okay.  Was there a separate    10:02
6  compliance department for the Aperian lab    10:02
7  when it separated out as its own LLC?    10:02
8  A.  No.    10:02
9  Q.  Was there a separate chief    10:02
10  compliance officer for Aperian Lab?    10:02
11  A.  No.    10:02
12  Q.  Were there any compliance    10:02
13  officers that worked for Aperian from    10:02
14  2008 to 2014?    10:02
15  A.  Other than the -- the general    10:02
16  compliance duties and responsibilities    10:02
17  that the -- that the leaders in that    10:02
18  department would have, no.    10:02
19  Q.  Nobody was designated as the    10:02
20  compliance person?    10:03
21  A.  Not as a compliance officer.  I    10:03
22  think any management team member of ours    10:03
23  is designated to be someone that should    10:03

Page 73

1  be aware of and cognizant of compliance  10:03
2  issues.  10:03
3  Q. Okay. Was there a separate  10:03
4  compliance committee for Aperian Lab?  10:03
5  A. No.  10:03
6  Q. Did Aperian have its own written  10:03
7  policies and procedures and standards of  10:03
8  conduct with regard to compliance  10:03
9  separate and apart from the Health Care  10:03
10  Authority?  10:03
11  A. I don't know if they had  10:03
12  anything separate. They would have  10:03
13  fallen under the general policies and  10:03
14  procedures of the organization.  10:03
15  Q. Did Aperian have its own  10:03
16  standards of conduct that addressed  10:03
17  specific areas of potential fraud, such  10:03
18  as marketing schemes, coding issues, and  10:03
19  improper claim submission separate and  10:03
20  apart from the Health Care Authority?  10:03
21  A. The Aperian employees would be  10:03
22  governed by the -- the organizational  10:04
23  standards of conduct.  10:04

Page 74

1  Q. So that's a no, they didn't have  10:04
2  a separate -- they didn't have their own  10:04
3  --  10:04
4  A. I don't know if they developed  10:04
5  their own set of standards of conduct,  10:04
6  but they would -- the -- the standards of  10:04
7  conduct that I'm aware of that they would  10:04
8  be governed by would be the  10:04
9  organizational standards of conduct.  10:04
10  Q. Did Aperian have its own  10:04
11  compliance manual separate from the  10:04
12  Health Care Authority from 2008 to 2014?  10:04
13  A. I don't know what they  10:04
14  maintained on their own, but they would  10:04
15  be governed by the organizational  10:04
16  compliance policies.  10:04
17  Q. Well, as compliance officer for  10:04
18  the Health Care Authority also over  10:04
19  Aperian, don't you think you would be  10:04
20  aware if they had a separate compliance  10:04
21  manual?  10:04
22  A. I may or may not. But my  10:04
23  position would be that they would be  10:04

Page 75

1  governed by the organizational policies  10:04
2  and procedures.  10:04
3  Q. Have you heard any testimony  10:04
4  during all the depositions that you sat  10:04
5  through that Aperian had its own  10:04
6  compliance manual?  10:04
7  A. No.  10:04
8  Q. Did Aperian have its own  10:04
9  training and education for employees of  10:04
10  Aperian focused on compliance issues  10:05
11  applicable to the lab separate and apart  10:05
12  from the Health Care Authority?  10:05
13  A. I'm sorry. Repeat that?  10:05
14  Q. Yes. I'm sorry. My voice is  10:05
15  trailing --  10:05
16  A. That's all right.  10:05
17  Q. -- with this cold.  10:05
18  Did Aperian have its own  10:05
19  training and education for employees of  10:05
20  Aperian focused on compliance issues  10:05
21  applicable to the lab separate from the  10:05
22  Health Care Authority?  10:05
23  A. They certainly may have had  10:05

Page 76

1  their own educational opportunities and  10:05
2  sessions that they attended. I'm not  10:05
3  aware of what those are right now. I  10:05
4  would expect employees in individual  10:05
5  departments to get education as required.  10:05
6  Q. Outside of the education  10:05
7  provided by the Health Care Authority?  10:05
8  A. The Health Care Authority would  10:05
9  provide any education that would be  10:05
10  pertinent to those areas. What I think  10:05
11  I'm saying is that it might not be  10:05
12  derived specifically from the compliance  10:06
13  department, but there are numerous  10:06
14  educational opportunities that employees  10:06
15  take advantage of daily.  10:06
16  Q. Which educational opportunities  10:06
17  with regard to the toxicology lab are you  10:06
18  aware of --  10:06
19  A. I  10:06
20  Q. -- that focus on lab specific  10:06
21  issues?  10:06
22  A. I'm not aware specifically of  10:06
23  what those would be.  10:06

Page 77

1    Q.  Did Aperian have its own         10:06
2    disciplinary guidelines for enforcing its 10:06
3    compliance standards separate from --   10:06
4    A.  Outside of the organizational?   10:06
5    Q.  Yes.                    10:06
6    A.  Not that I'm aware of.       10:06
7    Q.  Did Aperian have its own      10:06
8    processes, such as its own hotline, to  10:06
9    receive complaints and protect the     10:06
10   anonymity of complainants?        10:06
11   A.  No.  They had the organizational 10:06
12   hotline available to them.         10:06
13   Q.  Did Aperian have its own system 10:06
14   to respond to allegations of improper   10:07
15   or -- or illegal activities?        10:07
16   A.  Not apart from the          10:07
17   organizational process.          10:07
18   Q.  Did Aperian have a system to   10:07
19   require that all fraud alerts issued by  10:07
20   OIG are carefully considered by the    10:07
21   compliance officer of Aperian, legal    10:07
22   staff, and other appropriate personnel?  10:07
23        MR. HOOVER:  Object to the form. 10:07

Page 78

1    I don't understand your question.      10:07
2    A.  I don't understand your       10:07
3    question.                  10:07
4    Q.  Yeah.  Did -- did Aperian have 10:07
5    its own system for receiving and      10:07
6    reviewing fraud alerts issued by OIG?   10:07
7    A.  I'm not aware.             10:07
8    Q.  Did Aperian have its own system 10:07
9    of compliance auditing and monitoring   10:07
10   that included periodic internal and     10:07
11   external audits separate from the      10:07
12   organization?                10:07
13   A.  I think primarily the auditing,  10:07
14   internal and external, is governed     10:08
15   through the compliance department.     10:08
16   Generally, that's how that occurred.    10:08
17   Q.  And that's through the        10:08
18   organization, not through Aperian's own 10:08
19   efforts?                   10:08
20   A.  Well, there could be times in   10:08
21   which they made their own efforts towards 10:08
22   that, but generally the way the auditing, 10:08
23   both external and internal, occurs is   10:08

Page 79

1    through the compliance department.     10:08
2    Q.  Okay.  Are you aware of Aperian 10:08
3    having its own system to have internal   10:08
4    and external audits?            10:08
5    A.  I'm not aware of a separate     10:08
6    system, if I even understand what that  10:08
7    means.                    10:08
8    Q.  Well, like a schedule by which  10:08
9    we're going to have internal audits on   10:08
10   these topics during this period of time  10:08
11   and every so often we're going to have an 10:08
12   external audit where they come in and    10:08
13   look at things?               10:08
14   A.  I don't know of a separate plan 10:08
15   they had for that.             10:09
16   Q.  Do you know if Aperian had a   10:09
17   plan for audits that were designed to   10:09
18   address the clinical lab's compliance    10:09
19   with laws governing kickback        10:09
20   arrangements, physician self-referral   10:09
21   prohibition, coding and billing, claim   10:09
22   development and submission,        10:09
23   reimbursement, marketing, reporting and  10:09

Page 80

1    recordkeeping, separate from the      10:09
2    organization?                10:09
3        MR. HOOVER:  Object to the form. 10:09
4    A.  That's a pretty broad question,  10:09
5    but I don't know.  I'm not aware of    10:09
6    anything else out of the organizational  10:09
7    compliance department.           10:09
8    Q.  Did Aperian have its own system 10:09
9    of policies and procedures for taking   10:09
10   corrective action on items that were    10:09
11   found not to be in compliance with     10:09
12   policies, procedures, or governing laws? 10:09
13        MR. HOOVER:  Object to the form. 10:09
14   A.  I don't know what Aperian's    10:09
15   specific system was.  However, the     10:10
16   department would be expected to follow up 10:10
17   on issues identified through audits and  10:10
18   have a process for how they respond to   10:10
19   that.                     10:10
20   Q.  Do you know if they did have   10:10
21   such a process in place?          10:10
22   A.  As far as I'm aware, they did.   10:10
23   Q.  As compliance officer, do you go 10:10

**Roben Nutter**                                    **21 (81 - 84)**

Page 81

1  to the different business units and ask    10:10
2  to review their compliance policies and    10:10
3  procedures and whether they have any    10:10
4  separate and apart from the hospital?    10:10
5    A.   Me personally?              10:10
6    Q.   Yes.                    10:10
7    A.   No.              10:10
8    Q.   Do you have somebody do that?    10:10
9    A.   I don't -- I don't know that I    10:10
10  can speak specifically to an action like    10:10
11  that that the compliance department would    10:10
12  take. They're responsible for compliance    10:10
13  generally for the organization. They    10:11
14  have day-to-day activities that they    10:11
15  perform that I wouldn't necessarily be    10:11
16  involved in.              10:11
17    Q.   Do you know if there's any    10:11
18  annual or biannual review of the    10:11
19  compliance policies of the different    10:11
20  business units?              10:11
21    A.   The compliance policies for the    10:11
22  organization generally are reviewed, yes.    10:11
23    Q.   Okay. But I'm talking about --    10:11

Page 82

1  you've got the Health Care Authority, and    10:11
2  then you have these business units, one    10:11
3  of which is Aperian. Does the compliance    10:11
4  department at the Health Care Authority    10:11
5  have any schedule to review compliance    10:11
6  policies that are separate and apart for    10:11
7  the business units such as Aperian?    10:11
8    A.   There is a process in place    10:11
9  generally to review policies and    10:11
10  procedures of the organization which    10:11
11  includes department-specific policies.    10:11
12    Q.   Okay. Is Aperian considered --    10:11
13  when it was a separate LLC, was it    10:11
14  considered a department?    10:11
15    A.   I'm using that term loosely.    10:11
16  But -- but they are considered an entity    10:12
17  that policies and procedures would be    10:12
18  housed and reviewed for.    10:12
19    Q.   Did EAMC provide any training on    10:12
20  the healthcare fraud and abuse laws,    10:12
21  including anti-kickback statute, Stark,    10:12
22  and False Claims Act, for employees of    10:12
23  Aperian from 2008 through 2014?    10:12

Page 83

1    A.   Yes.              10:12
2    Q.   All right. How often?    10:12
3    A.   At least annually.    10:12
4    Q.   So if somebody worked there from    10:12
5  2008 through 2014, you would have    10:12
6  expected them to get training that    10:12
7  included those topics every year?    10:12
8    A.   Yes.              10:12
9    Q.   And that would include all the    10:12
10  employees of the Aperian lab?    10:13
11    A.   Every employee of the    10:13
12  organization has annual training that    10:13
13  they're required to perform.    10:13
14    Q.   And that includes the topics    10:13
15  I've mentioned, the anti-kickback    10:13
16  statute, Stark, and False Claims Act?    10:13
17    A.   Yes.              10:13
18    Q.   What -- what information is    10:13
19  provided to them? In other words, do    10:13
20  they provide it in written documentation?    10:13
21  Is it computer-based? How -- how is that    10:13
22  training conducted?              10:13
23    A.   I think I've already talked    10:13

Page 84

1  about this a little bit. But the    10:13
2  training that I'm referring to is the    10:13
3  annual online training that has a    10:13
4  compliance module.              10:13
5    Q.   Is that Otis?          10:13
6    A.   Currently, it's Otis.    10:13
7    Q.   What was it before that?    10:13
8    A.   I believe it was HealthStream    10:13
9  before that.              10:13
10    Q.   Do you know when the transition    10:13
11  was?              10:14
12    A.   I don't.              10:14
13    Q.   Did it happen -- transition    10:14
14  happen during the 2008 to 2014 time    10:14
15  frame?              10:14
16    A.   I believe so, but I don't -- I'm    10:14
17  not sure exactly when that took place.    10:14
18    Q.   Okay. Is Otis -- what does it    10:14
19  stand for?              10:14
20    A.   I don't know. I could guess,    10:14
21  but I don't know.              10:14
22    Q.   Is it training provided by a    10:14
23  third-party vendor, or was it something    10:14

**Roben Nutter**                                          **22 (85 - 88)**

Page 85

1  developed in house?            10:14
2     A.  I don't know exactly how that    10:14
3  happens.  I know that the compliance    10:14
4  department contributes their information, 10:14
5  but I'm not sure exactly how that    10:14
6  happens.                    10:14
7     Q.  Is it Web-based training?    10:14
8     A.  It is Web-based.        10:14
9     Q.  Is it intraweb, or is it    10:14
10 external Web-based?            10:14
11    A.  I believe it would be intra --   10:14
12    Q.  Okay.                10:15
13    A.  -- but I'm not sure.  I'm not    10:15
14 sure of the different ways that it can be 10:15
15 accessed, actually.            10:15
16    Q.  Would the training on Otis cover 10:15
17 the -- any HHS advisory opinions or    10:15
18 special fraud alerts that have come out? 10:15
19    A.  Not specifically in that module, 10:15
20 but employees are directed to the    10:15
21 compliance section on EAMC's internal  10:15
22 website.  And on that website there's a   10:15
23 link to the HHS web page.        10:15

Page 86

1     Q.  So internally, any employee of   10:15
2  EAMC can go to the HHS OIG website and   10:15
3  pull up the advisory opinions?        10:15
4     A.  Sure.                10:15
5     Q.  The -- the written modules that   10:15
6  are Web-based, are these like PowerPoint 10:15
7  presentations?                10:16
8     A.  They are.            10:16
9     Q.  Do -- do the employees have to    10:16
10 answer questions, or do they just look at 10:16
11 the material and read it?        10:16
12    A.  They look through the material    10:16
13 and have to answer questions at the end. 10:16
14    Q.  Okay.  And I assume they have to 10:16
15 pass a certain number of those questions? 10:16
16    A.  Correct.            10:16
17    Q.  All right.  Have the written    10:16
18 modules on compliance been produced that 10:16
19 show the actual materials employees were 10:16
20 trained on?                10:16
21    A.  I don't know what's actually    10:16
22 been produced.                10:16
23    Q.  What do they look like?  I --   10:16

Page 87

1  I've seen a lot of spreadsheets of people 10:16
2  that have completed Otis training where  10:16
3  this department has 97 percent, but we   10:16
4  haven't actually seen the materials.    10:16
5  We've looked for them.  We've searched   10:16
6  for them.  What -- what do they look    10:16
7  like?                    10:16
8     A.  They look like PowerPoint     10:16
9  slides.                    10:16
10    Q.  Okay.  Do you know if they say    10:16
11 "Otis" or anything on the top of them?   10:17
12    A.  I don't think they would say    10:17
13 "Otis" on them.  I think they would be    10:17
14 titled "Compliance," you know, something 10:17
15 related to compliance.            10:17
16    MR. McKENNA:  All right.  That's    10:17
17 a good breaking point.            10:17
18    MR. HOOVER:  Thank you.  I was    10:17
19 just getting ready to ask you that.     10:17
20    THE VIDEOGRAPHER:  We are going   10:17
21 off the record at 10:18.        10:17
22    (Break taken.)            10:17
23    THE VIDEOGRAPHER:  This begins    10:30

Page 88

1  Disc No. 2.  We're back on the record at 10:30
2  10:32.                    10:30
3     Q.  (By Mr. McKenna) Just one     10:30
4  follow-up on something you testified    10:30
5  about earlier.  I think you said     10:30
6  procedures had been shored up now and    10:30
7  it's the expectation that most contracts 10:30
8  would come through the legal department 10:30
9  for review; correct?            10:30
10    A.  Uh-huh.  Yes.         10:31
11    Q.  Are those contracts reviewed for 10:31
12 compliance with the applicable --      10:31
13 applicable laws governing healthcare    10:31
14 entities?                  10:31
15    A.  Yes.                10:31
16    Q.  Do you know what a provider    10:31
17 application is with Medicare?        10:31
18    A.  I do.                10:31
19    Q.  Okay.                10:31
20    A.  Generally.            10:31
21    Q.  You understand generally that    10:31
22 when enrolling as a Medicare        10:31
23 participating provider, the provider    10:31

**Roben Nutter**                                                23 (89 - 92)

Page 89

1  certifies it will comply with all        10:31
2  applicable laws, including the           10:31
3  anti-kickback and Stark laws?            10:31
4      A.  I do.                            10:31
5      Q.  Okay.  Did Aperian have its own  10:31
6  provider number separate and apart from  10:31
7  the hospital while it was an LLC?        10:31
8      A.  Yes.                            10:31
9      Q.  Okay.  So Aperian would have     10:31
10 submitted its own provider application   10:31
11 with the certification we discussed?     10:31
12     A.  Yes.                            10:31
13     Q.  What is your understanding of    10:31
14 the claim submission process from a      10:31
15 provider like Aperian to federal payors? 10:31
16     MR. HOOVER:  Object to the form.     10:31
17     A.  You're going to have to be more  10:31
18 specific.                               10:32
19     Q.  How are the claims submitted, in 10:32
20 what format?                            10:32
21     A.  I'm not involved in the actual   10:32
22 claims submission, so I don't know that I 10:32
23 can answer that.                        10:32

Page 90

1      Q.  Okay.  Do you understand that    10:32
2  with each claim that's submitted to      10:32
3  federal payors, whether it's electronic  10:32
4  or on paper, there's an attestation that 10:32
5  goes with it?                           10:32
6      A.  I don't know if there's a        10:32
7  separate attestation with each individual 10:32
8  claim at this point or not.  And it      10:32
9  depends on what type of claims you're    10:32
10 talking about as well.                  10:32
11     Q.  Okay.  The types of claims       10:32
12 submitted by Aperian for toxicology lab  10:32
13 testing, they -- they are the types of   10:32
14 claims that would be submitted on a CMS  10:32
15 Form 1500; correct?                     10:32
16     A.  1500.                           10:32
17     Q.  Okay.                           10:32
18     A.  Well, I mean, at different time  10:32
19 periods that could be different.         10:32
20     Q.  Okay.                           10:32
21     A.  But if you're talking about the  10:32
22 1500, that -- that helps.               10:32
23     Q.  Okay.  I'll give you what I'm    10:32

Page 91

1  marking as Exhibit 3.                   10:33
2      (Plaintiff's Exhibit 3 was marked for 10:33
3  identification and is attached.)         10:33
4      MR. HOOVER:  Don't -- don't          10:33
5  touch that exhibit label.               10:33
6      MR. McKENNA:  I know.  Sorry.        10:33
7      Q.  Do you recognize Exhibit 3 as a  10:33
8  sample copy of the CMS Form 1500?       10:33
9      A.  Yes.                            10:33
10     Q.  If you'll look on the second     10:33
11 page --                                 10:33
12     MR. HOOVER:  Well, can I just        10:33
13 say something just for the record, too?  10:33
14 And I'm not sure that it makes a big     10:33
15 difference, but it looks like on the     10:33
16 bottom there's in parens 02 two thousand 10:33
17 -- I don't know if that's a date range or 10:33
18 if it changed over -- over time.         10:33
19     MR. McKENNA:  Okay.                  10:33
20     A.  Generally, I recognize this as a 10:33
21 1500.                                   10:33
22     Q.  Okay.  And on the second page,   10:33
23 which is actually the back page of the   10:33

Page 92

1  1500, you see, it's the third paragraph  10:34
2  down, signature of physician or supplier, 10:34
3  Medicare, Tricare, FECA, and black lung? 10:34
4      A.  I see that, yes.                 10:34
5      Q.  Okay.  And it reads, "In         10:34
6  submitting this claim for payment for    10:34
7  federal funds, I certify that:  1) the   10:34
8  information on this form is true,        10:34
9  accurate and complete; 2) I have        10:34
10 familiarized myself of all applicable    10:34
11 laws, regulations, and program          10:34
12 instructions, which are available from   10:34
13 the Medicare contractor; 3) I have       10:34
14 provided or will provide sufficient      10:34
15 information required to allow the        10:34
16 government to make an informed           10:34
17 eligibility and payment decision; 4) this 10:34
18 claim, whether submitted by me or on my  10:34
19 behalf by my designated billing company, 10:34
20 complies with all applicable Medicare    10:34
21 and/or Medicaid laws, regulations, and   10:34
22 program instructions for payment         10:34
23 including but not limited to the Federal  10:35

Page 93

1  anti-kickback statute and Physician    10:35
2  Self-Referral law (commonly known as the 10:35
3  Stark law)."                         10:35
4      Did I read that correctly?       10:35
5  A.  You did.                         10:35
6  Q.  Do you understand that           10:35
7  certification is on all CMS 1500 forms 10:35
8  submitted by Aperian to Medicare,    10:35
9  Medicaid, and Tricare?               10:35
10     MR. HOOVER:  Object to the form. 10:35
11 A.  On this 1500, it appears that    10:35
12 that would be the case.              10:35
13 Q.  Okay.  And when you say -- by    10:35
14 "this 1500," you mean this version of it? 10:35
15 A.  Correct.                         10:35
16 Q.  Do you understand that           10:35
17 compliance with the federal anti-kickback 10:35
18 and Physician Self-Referral laws is a 10:35
19 condition of payment by federal payors? 10:35
20     MR. HOOVER:  I'm going to object 10:35
21 to the form to the extent you're asking 10:35
22 general counsel to form a legal opinion 10:35
23 or give her legal testimony, draw a legal 10:35

Page 94

1  conclusion.  I would instruct her not to 10:35
2  answer.                              10:36
3      MR. McKENNA:  You're instructing 10:36
4  her not to answer?                   10:36
5      MR. HOOVER:  Uh-huh.             10:36
6      MR. McKENNA:  This is about the  10:36
7  knowledge of the general counsel and 10:36
8  compliance officer of East Alabama   10:36
9  Medical Center.                      10:36
10     MR. HOOVER:  But -- but you're   10:36
11 asking her to form an opinion and give 10:36
12 her mental impressions in the case, Don. 10:36
13     MR. McKENNA:  I'm asking her,    10:36
14 based on her training that she's received 10:36
15 from all the various forms that we've 10:36
16 talked about, what her understanding is 10:36
17 of the implication of the anti-kickback 10:36
18 statute and self-referral laws and   10:36
19 whether the compliance with them is a 10:36
20 condition of payment and whether she's 10:36
21 been trained on that and all these   10:36
22 things.                              10:36
23     MR. HOOVER:  But the problem     10:36

Page 95

1  with your question is, is condition of 10:36
2  payment, is there -- there is not a  10:36
3  condition of payment necessarily anymore. 10:36
4  That's been done away with by Escobar. 10:36
5  So I don't know what you mean by a   10:36
6  condition of payment.                10:36
7  Q.  Let me ask the question.         10:36
8      MR. McKENNA:  Escobar was        10:36
9  decided in 2016.                     10:36
10     MR. HOOVER:  Correct.  But a     10:36
11 condition of payment, to me, is, I mean, 10:36
12 that's a legal -- that's a legal     10:36
13 definition that I don't think she can 10:36
14 answer.                              10:37
15 Q.  All right.  Do you have an       10:37
16 understanding from your training that a 10:37
17 claim to Medicare is not payable if it's 10:37
18 been obtained as a result of the     10:37
19 anti-kickback -- violation of the    10:37
20 anti-kickback statute or Stark law?  10:37
21     MR. HOOVER:  I'm going to object 10:37
22 -- I'm going to object on a little bit 10:37
23 different in the fact that, I mean,  10:37

Page 96

1  you're still calling for a general legal 10:37
2  conclusion.  She can answer generally, 10:37
3  but not as it relates specifically to 10:37
4  this case.                           10:37
5  A.  Can you repeat it?               10:37
6  Q.  Sure.                            10:37
7  A.  Or read it back?                 10:37
8  Q.  Do you understand that a claim   10:37
9  to a federal payor like Medicare is not 10:37
10 payable if it has been obtained as a 10:37
11 result of an illegal kickback or     10:37
12 violation of the Stark law?          10:37
13     MR. HOOVER:  That's -- that's    10:37
14 not an accurate statement of law.    10:37
15 A.  My answer was going to be,       10:37
16 generally, it could be paid.  You're 10:37
17 saying it's not payable.             10:37
18 Q.  Right.  Well, let me ask it this 10:37
19 way.  If Medicare knows, has knowledge 10:38
20 that the claim has been obtained as a 10:38
21 result of illegal kickback or violation 10:38
22 of the Stark laws, is it your        10:38
23 understanding that Medicare will not pay 10:38

Page 97

1  that claim if they have that knowledge?  10:38
2      MR. HOOVER:  Object to the form.  10:38
3  That's not the legal standard.  10:38
4      A.  Not necessarily.  10:38
5      Q.  I didn't hear your answer.  10:38
6      A.  Not necessarily.  10:38
7      Q.  Okay.  Why?  You're saying, if  10:38
8  Medicare has knowledge that the claim is  10:38
9  obtained in violation of the kickback  10:38
10 statute, they would pay the claim anyway?  10:38
11     A.  I can't tell you what Medicare  10:38
12 would do.  10:38
13     Q.  Who signed the CMS 1500 forms  10:38
14 for Aperian from 2008 to 2014?  10:38
15     A.  I don't know.  10:38
16     Q.  Who signs them -- who signed  10:38
17 them for East Alabama Health Care  10:38
18 Authority from 2008 to 2014?  10:38
19     A.  Each individual claim?  Or --  10:38
20 you're going to have to clarify your  10:39
21 question.  10:39
22     Q.  When claims are submitted -- a  10:39
23 lot of times it's just a electronic  10:39

Page 98

1  signature if they're going  10:39
2  electronically.  Whose signature is on  10:39
3  there with that certification?  10:39
4      A.  I don't know if there's a  10:39
5  requirement through that time period that  10:39
6  there be a signature.  And if there is, I  10:39
7  don't know whose signature is on there.  10:39
8      Q.  Let's see if you look at Exhibit  10:39
9  3 down in the bottom left, Block 31,  10:39
10 "Signature of Physician Or Supplier"?  10:39
11     A.  Well I, guess that would depend  10:39
12 on the services being rendered.  10:39
13     Q.  Okay.  So you don't know who  10:39
14 signed these 1500 forms for Aperian at  10:39
15 any time?  10:39
16     A.  Not that I can recall sitting  10:39
17 here.  10:39
18     Q.  Okay.  Do you know who signed  10:39
19 the provider agreement for Aperian when  10:39
20 they enrolled with Medicare?  10:39
21     A.  Can you be more specific in the  10:40
22 "provider agreement"?  10:40
23     Q.  Yeah.  Medicare enrollment  10:40

Page 99

1  application.  10:40
2      A.  Are you asking about the A55?  10:40
3      Q.  Yes.  10:40
4      A.  I believe that would be Sam  10:40
5  Price.  But I'd have to go back and look  10:40
6  at the individual A55's to make sure.  10:40
7      Q.  Do you know somebody by the name  10:40
8  of Richard Carson?  10:40
9      A.  I do not know him.  10:40
10     Q.  Okay.  So you don't know what  10:40
11 type of work he did for Aperian or East  10:40
12 Alabama Health Care Authority?  10:40
13     A.  No.  10:40
14     Q.  Do you recognize Richard Carson  10:40
15 as a lobbyist for the Health Care  10:40
16 Authority?  10:41
17     A.  No.  10:41
18     Q.  Both you and Mr. Fite had been  10:41
19 at the Health Care Authority for a long  10:41
20 time early in their careers.  When do you  10:41
21 first recall meeting Mr. Fite?  10:41
22     A.  I have no idea.  I don't -- I  10:41
23 don't really have a recollection of that.  10:41

Page 100

1      Q.  Do you think you met him at some  10:41
2  point before he worked with Aperian?  10:41
3      A.  I would imagine we met.  I just  10:41
4  don't recall.  10:41
5      Q.  Okay.  When he was working for  10:41
6  Aperian and Lab Outreach, what was your  10:41
7  understanding of what he did on a daily  10:41
8  basis?  10:41
9      A.  I wouldn't have knowledge of his  10:41
10 day-to-day activities.  10:41
11     Q.  What type of interactions did  10:41
12 you have with Trae?  10:41
13     MR. HOOVER:  I'm going to --  10:42
14 just for the record, too, I mean, to the  10:42
15 extent that she can testify, and she's  10:42
16 not going to testify as to any legal  10:42
17 conversations she had or any advice that  10:42
18 she gave.  10:42
19     MR. McKENNA:  Sure.  I'm not  10:42
20 asking the specifics --  10:42
21     MR. HOOVER:  Okay.  10:42
22     MR. McKENNA:  -- at this point.  10:42
23     Q.  But just types of interactions  10:42

Page 101

1  that you had with him.                10:42
2      A.  During what time period?         10:42
3      Q.  During the time he was working   10:42
4  at Aperian and Lab Outreach.          10:42
5      A.  Fairly minimal.  But in my role  10:42
6  as legal counsel.                     10:42
7      Q.  I don't want to know any         10:42
8  specifics.  Would Trae come to you if he  10:42
9  had compliance concerns?              10:42
10     A.  Would he?                       10:42
11     Q.  Yes.  Did he?                   10:42
12     A.  Did he?                         10:42
13     Q.  No details other than just did  10:42
14 he.                                    10:42
15     A.  I would characterize issues that  10:42
16 we worked with each other on as legal  10:42
17 issues.                                10:43
18     Q.  Okay.  And is that pretty much  10:43
19 the extent of it, your interaction with  10:43
20 Trae around legal issues?             10:43
21     A.  Primarily, my role dealing with  10:43
22 him would be from a legal perspective  10:43
23 related to Aperian and Lab Outreach.   10:43

Page 102

1      Q.  Do you recall, again, not       10:43
2  specifics, but the number of legal issues  10:43
3  you worked on with Trae relating to    10:43
4  Aperian and Lab Outreach?             10:43
5      A.  I don't.                        10:43
6      Q.  Was it more than one?           10:43
7      A.  I think that would be fair.     10:43
8      Q.  Again, no specifics, but did you  10:43
9  have interaction with Trae about       10:44
10 contracts with third parties?         10:44
11     A.  Yes.                            10:44
12     Q.  Did you have interaction with   10:44
13 Trae about the Summit contract?       10:44
14     A.  Not that I recall.              10:44
15     Q.  How about the Compass contract?  10:44
16     A.  Depends on which one you're     10:44
17 talking about.                         10:44
18     Q.  Okay.  I don't want to know any  10:44
19 details, just which contract.  And there  10:44
20 was three, is my understanding.       10:44
21     A.  I don't recall specifically.    10:44
22     Q.  Do you think it began with the  10:44
23 first contract, or is it in your mind a  10:44

Page 103

1  later contract?                       10:44
2      A.  I don't think it began with the  10:44
3  first.                                 10:44
4      Q.  Okay.  Did you have interaction  10:45
5  with Trae regarding -- no specifics --  10:45
6  just employee lease agreements?       10:45
7      A.  Yes.                            10:45
8      Q.  Did you have interactions with  10:45
9  him about temporary employee collectors,  10:45
10 employed through temporary agencies?    10:45
11     A.  I don't recall about that issue.  10:45
12     Q.  How about interactions with him  10:45
13 regarding the provision of free Noble   10:45
14 rapid screen cups?                     10:45
15         MR. HOOVER:  Object to the form.  10:45
16     A.  Say that again?                 10:45
17     Q.  Sure.  Interaction with -- did  10:45
18 you have interaction with Trae about the  10:45
19 provision of free Noble rapid screen    10:45
20 cups?                                  10:46
21     A.  At some point, yes.             10:46
22     Q.  Did you have interaction with   10:46
23 Trae about his separation with East    10:46

Page 104

1  Alabama Medical Center?               10:46
2      A.  Yes.                            10:46
3      Q.  Did you have interaction with   10:46
4  Trae about the Magnolia Analytical     10:46
5  contract?                              10:46
6      A.  I'm not sure if it was the      10:46
7  contract specifically.                 10:46
8      Q.  Maybe some interaction about    10:46
9  Magnolia Analytical Medical?          10:46
10     A.  Possibly, yes.                  10:46
11     Q.  Okay.  Do you know the company  10:47
12 Summit Diagnostics, LLC?              10:47
13     A.  Do I know them?                 10:47
14     Q.  Yes.  Do you know of them?      10:47
15     A.  I've certainly heard the name.  10:47
16     Q.  Okay.  When did you first learn  10:47
17 of their existence?                    10:47
18     A.  I don't know.                   10:47
19     Q.  Was it after Aperian had already  10:47
20 contracted with them?                  10:47
21     A.  I believe so.                   10:47
22     Q.  Do you know what the context was  10:47
23 in which you learned of the existence of  10:47

**Roben Nutter**                                    **27 (105 - 108)**

Page 105

1  Summit?                    10:47
2   A.  No.                   10:47
3   Q.  Did you ever meet George Powell  10:47
4  or anybody from Summit?             10:47
5   A.  No.                   10:47
6   Q.  Did you ever have any     10:47
7  telephone --               10:47
8   A.  As far as I know.          10:47
9   Q.  Okay.                 10:47
10   A.  No.                   10:47
11   Q.  Did you ever have any telephone  10:47
12  conferences with anyone from Summit?  10:47
13   A.  Not that I recall.          10:47
14   Q.  Did you participate in any of  10:47
15  the weekly conference calls with Summit?  10:47
16   A.  No.                   10:48
17   Q.  Did you review the contract   10:48
18  between Summit and Aperian before the  10:48
19  parties entered into it?         10:48
20     MR. HOOVER:  Asked and answered,  10:48
21  I believe.  Object.         10:48
22     But you can answer.         10:48
23   A.  Not that I'm aware of.       10:48

Page 106

1   Q.  Do you know if anybody in     10:48
2  compliance reviewed the contract between  10:48
3  Summit and Aperian before it was entered  10:48
4  into?                      10:48
5   A.  I don't know.            10:48
6   Q.  Did you engage any outside    10:48
7  counsel to review the Summit and Aperian  10:48
8  contract before the parties entered into  10:48
9  it?                       10:48
10     MR. HOOVER:  I'm going to object  10:48
11  to that as it's attorney-client privilege  10:48
12  as to what she did about having it    10:48
13  reviewed.                  10:48
14     MR. McKENNA:  I mean, I can ask  10:48
15  if she engaged outside counsel.  Again, I  10:48
16  didn't ask about what advice outside   10:48
17  counsel gave or.            10:49
18     MR. HOOVER:  You can answer.  If  10:49
19  you recall.                10:49
20   A.  I don't recall.          10:49
21   Q.  Do you understand from being in  10:49
22  multiple depositions that under the terms  10:49
23  of the Summit contract, that Aperian paid  10:49

Page 107

1  Summit a percentage commission on all  10:49
2  collected revenue for all laboratory    10:49
3  samples referred to Aperian by physician  10:49
4  clients of Summit?              10:49
5     MR. HOOVER:  Object to the form.  10:49
6   A.  Generally, without looking at  10:49
7  the contract in front of me, yes.      10:49
8   Q.  Did you ever review the Aperian  10:49
9  contract with Summit after it was entered  10:50
10  into?                      10:50
11     MR. HOOVER:  Object to the form.  10:50
12   A.  I think you need to be more    10:50
13  specific in your question.         10:50
14   Q.  Sure.  That contract was signed  10:50
15  in 2009.  Did you ever get the contract,  10:50
16  take a look at it, and review it at any  10:50
17  time after 2009 not related to this   10:50
18  litigation?                 10:50
19   A.  Okay.  No.             10:50
20   Q.  By that I mean just, you know,  10:50
21  became unsealed --              10:50
22   A.  Right.                 10:50
23   Q.  -- sometime in 2015.         10:50

Page 108

1   A.  I don't recall.          10:50
2   Q.  You don't recall ever doing    10:50
3  that?                      10:50
4   A.  I don't.                10:50
5   Q.  Prior to this litigation, do you  10:50
6  recall if anybody came to you with     10:51
7  compliance concerns about the Summit   10:51
8  contract?                  10:51
9   A.  I don't recall.          10:51
10   Q.  Prior to this litigation, were  10:51
11  you aware that Aperian was providing free  10:51
12  Noble rapid screen cups to its physician  10:51
13  clients who were marketed to by Summit?  10:51
14   A.  I don't recall.          10:51
15   Q.  Prior to this litigation, were  10:51
16  you aware that the free rapid screen cups  10:51
17  provided a rapid test result to the    10:51
18  physician in the office?          10:52
19     MR. HOOVER:  Let me get an      10:52
20  objection on the record for that too.  I  10:52
21  mean, to the extent that you're asking  10:52
22  her any type of investigation she may   10:52
23  have done in her role as legal counsel  10:52

Page 109

1  for the hospital, I don't think she can   10:52
2  answer, and I'm going to tell her not to   10:52
3  answer. But if it's a business-type   10:52
4  analysis, she can answer from the   10:52
5  business perspective, but not in a   10:52
6  legal -- not in a legal perspective.   10:52
7    A. Can you ask your question again?   10:52
8    Q. Sure. Prior to this litigation,   10:52
9  were you aware that the free rapid screen   10:52
10  cups provided a rapid test result to the   10:52
11  physician in the office?   10:52
12    A. I think my only role with the   10:52
13  cups would have been from a legal   10:52
14  perspective.   10:52
15    Q. When was the first time you were   10:52
16  engaged about the cups from a legal   10:52
17  perspective?   10:52
18    A. I don't remember.   10:52
19    Q. Prior to this litigation, did   10:53
20  you do any research into the legality of   10:53
21  providing free Noble rapid screen cups to   10:53
22  physicians who were referring specimens   10:53
23  to the lab for testing?   10:53

Page 110

1    A. I don't recall specifically.   10:53
2    Q. You don't recall specifically   10:53
3  doing any research?   10:53
4    A. I don't. Or what that research   10:53
5  would have been.   10:53
6    MR. HOOVER: Guys, remind me   10:54
7  during the break to tell whoever the IT   10:54
8  guy is to turn that dang thing off in the   10:54
9  other conference room.   10:54
10    MR. McKENNA: Yeah.   10:54
11    MR. HOOVER: It's the PA system   10:54
12  or something like that. That needs to be   10:54
13  turned off.   10:54
14    Q. Let me give you what's been   10:54
15  previously marked as Defendant's Exhibit   10:54
16  2 to George Powell's deposition.   10:54
17    MR. HOOVER: Are you going to   10:54
18  mark this as another exhibit?   10:54
19    MR. McKENNA: No.   10:54
20    MR. HOOVER: Okay.   10:54
21    Q. For the record, it's Bates   10:54
22  number PL 00021528 through 21534. Do you   10:54
23  recognize that as the Aperian contract   10:55

Page 111

1  with Summit?   10:55
2    A. I do.   10:55
3    Q. Okay. And who signed it on   10:55
4  behalf of East Alabama Medical Center?   10:55
5    A. Ken Lott.   10:55
6    Q. All right. Is the compensation   10:55
7  paid from Aperian to Summit listed on the   10:56
8  last page, 7 of 7?   10:56
9    A. Section 2 refers to it in   10:56
10  Exhibit A. Which looks to be page 6.   10:56
11    Q. Okay.   10:56
12    A. Actually, that's duties. And   10:56
13  then the compensation is on page 7.   10:56
14    Q. Okay. And you understand the   10:56
15  base amount for the compensation is 15   10:56
16  percent of all specimens received from   10:56
17  Summit accounts up to the following   10:56
18  volumes and they're listed below?   10:56
19    MR. HOOVER: Object to the form.   10:56
20    A. That's what it says.   10:56
21    Q. Okay. But if the number of   10:56
22  specimens received by Aperian from Summit   10:56
23  customers goes over 800 and up to 1,000,   10:56

Page 112

1  the commission will go to 20 percent for   10:56
2  all specimens per month? Correct?   10:56
3    A. That's what it says.   10:56
4    Q. And if it's 1,001 to 1,200 the,   10:56
5  commission goes up to 22 percent for all   10:56
6  specimens per month? Correct?   10:57
7    A. That's what it says.   10:57
8    Q. And then if it gets over 1,201,   10:57
9  the commission goes up to 28 percent for   10:57
10  all specimens; correct?   10:57
11    A. That's what it says.   10:57
12    Q. So, would you agree that Summit   10:57
13  was clearly incentivized by the   10:57
14  commission structure to get its customers   10:57
15  to send more specimens to Aperian so its   10:57
16  commissions would be higher and its   10:57
17  commission percentage would be higher?   10:57
18    MR. HOOVER: Object to the form,   10:57
19  and I'm not going to -- instruct her not   10:57
20  to answer that question. Again, you're   10:57
21  -- you're asking for a mental -- legal   10:57
22  conclusion from the general counsel of   10:57
23  the hospital.   10:57

**Roben Nutter**                                          **29 (113 - 116)**

Page 113

1    MR. McKENNA:  She's also the    10:57
2  compliance officer.          10:57
3    MR. HOOVER:  There's no      10:57
4  compliance exception to the      10:57
5  attorney-client privilege.  It's a    10:57
6  business exception, if anything, but    10:57
7  you're not asking her a business    10:57
8  question.          10:57
9    MR. McKENNA:  From a business    10:57
10  perspective --        10:57
11    MR. HOOVER:  And she's not --   10:57
12  she's not going to testify to that, Don.  10:57
13    MR. McKENNA:  I want my question  10:57
14  on the record --        10:57
15    MR. HOOVER:  That's fine.  Go    10:57
16  ahead.          10:57
17    MR. McKENNA:  -- so I can go to    10:57
18  Judge Coogler.        10:57
19    MR. HOOVER:  That's fine.      10:57
20    Q.  (By Mr. McKenna) From a business  10:57
21  perspective, is Summit incentivized to    10:57
22  provide more samples to Aperian so that  10:57
23  its commissions will be greater each    10:58

Page 114

1  month?          10:58
2    MR. HOOVER:  Same objection.    10:58
3  She's instructed not to answer.  You're  10:58
4  not asking for a business, you're --    10:58
5  that's going to be a legal conclusion,    10:58
6  and you know it.        10:58
7    MR. McKENNA:  No, I don't know    10:58
8  it.  We've asked lots of business people  10:58
9  about that same question.      10:58
10    MR. HOOVER:  That's right.  And   10:58
11  they're business people.  You're asking  10:58
12  the general counsel of the hospital.    10:58
13  Totally different.        10:58
14    MR. McKENNA:  All right.  We'll   10:58
15  mark that question for Court.      10:58
16    Q.  (By Mr. McKenna) Ms. Nutter, are  10:58
17  you aware of guidance that suggests the  10:58
18  roles of general counsel and compliance  10:58
19  officer not be combined in the same    10:58
20  person?          10:58
21    MR. HOOVER:  Object to the form.  10:58
22    A.  I'm aware that there's some    10:58
23  guidance that says that.      10:58

Page 115

1    Q.  And is that from HHS OIG?      10:58
2    A.  Yes.          10:58
3    Q.  Okay.  And when did that      10:58
4  guidance come out?        10:58
5    A.  I don't know.        10:58
6    Q.  Have you looked into separating  10:58
7  the roles of general counsel and      10:58
8  compliance officer?        10:58
9    A.  We have.          10:58
10    Q.  Okay.  And, but that hasn't been  10:58
11  done to date?        10:58
12    A.  It has not.        10:58
13    Q.  Does the guidance from HHS OIG    10:58
14  identify potential conflicts of interest  10:59
15  between the general counsel and the    10:59
16  compliance officer?        10:59
17    MR. HOOVER:  Object to the form.  10:59
18    A.  It does identify the possibility  10:59
19  of conflicts of interest existing.    10:59
20    Q.  Have you talked with Ken Lott    10:59
21  about this contract?        10:59
22    A.  Not that I recall.      10:59
23    Q.  Are you aware of who at Aperian  10:59

Page 116

1  negotiated the contract with Summit?    10:59
2    A.  I'm not aware.        10:59
3    Q.  Do you know who was involved in  10:59
4  negotiating the original contract with    11:00
5  Jannie Chapman's companies, between    11:00
6  Aperian and Jannie Chapman's companies  11:00
7  Compass and Total?        11:00
8    A.  I'm not aware.        11:00
9    Q.  Were you involved in negotiating  11:00
10  that original contract?      11:00
11    A.  I'm not aware if I was.      11:00
12    Q.  Do you have any recollection of  11:00
13  whether you reviewed the first contract  11:00
14  before it was entered into?      11:00
15    A.  I don't recall.        11:00
16    Q.  That was September of 2011.    11:00
17  Does that help you at all?      11:00
18    A.  No.          11:00
19    Q.  Okay.          11:00
20    Did you have outside counsel    11:00
21  review the first contract before it was    11:00
22  entered into?        11:00
23    A.  I am not aware.  I don't recall.  11:00

Page 117

1    Q.  Was Aperian's relationship with  11:00
2  Jannie Chapman's companies different than  11:00
3  the relationship with Summit?          11:00
4        MR. HOOVER:  Object to the form.  11:00
5    A.  I don't know.                11:00
6    Q.  Was Aperian's first contractual  11:00
7  arrangement with Jannie Chapman's company  11:01
8  different than the Aperian contractual  11:01
9  arrangement with Summit?          11:01
10        MR. HOOVER:  Object to the form.  11:01
11    A.  I don't know.              11:01
12    Q.  Can you tell us why there were  11:01
13  three different contracts with Jannie  11:01
14  Chapman's companies over a 16-month  11:01
15  period?                    11:01
16        MR. HOOVER:  Again, to the  11:01
17  extent that you're asking her to give her  11:01
18  legal impressions or her legal advice, I  11:01
19  am going to instruct her not to answer on  11:01
20  the legal.                  11:01
21    Q.  With that instruction, can you  11:01
22  answer?                    11:01
23    A.  Outside of my legal involvement  11:01

Page 118

1  in those contracts, I don't know.      11:01
2    Q.  Let me give you what's been    11:01
3  marked as Exhibit 15 to Sam Price's    11:02
4  deposition.  For the record, this is    11:02
5  Aperian Bates 000 -- five 0's, 13 through  11:02
6  25.                      11:02
7        (Witness reviews document.)    11:02
8    Q.  Okay.  The --              11:03
9        MR. HOOVER:  Let me just for the  11:03
10  record just to make sure the record's    11:03
11  clear, too, the first, I think through    11:03
12  Aperian 0000019 is the actual contract,  11:03
13  and I think the business associate    11:03
14  agreement goes from 20 to 25.        11:03
15        MR. McKENNA:  That's correct.    11:03
16        MR. HOOVER:  Yeah.          11:03
17        MR. McKENNA:  Thank you.      11:03
18        MR. HOOVER:  That's right.      11:03
19    Q.  (By Mr. McKenna) Do you      11:03
20  recognize Exhibit 15 as the September    11:03
21  2011 contract and business agreement    11:03
22  between Compass Laboratory Services, LLC  11:03
23  and Aperian Laboratory Solutions, LLC?  11:03

Page 119

1    A.  That's what it appears to be.  I  11:03
2  would mention that it looks like page 2  11:03
3  of the business associate agreement is  11:03
4  missing.                  11:03
5    Q.  Fair enough.  It also looks like  11:03
6  that Bates number is missing, too.      11:03
7    A.  Right.                11:03
8    Q.  All right.  We're going to be  11:03
9  focusing on the contract, anyway.  All  11:04
10  pages of the contract there?        11:04
11    A.  As far as I can see, yes.      11:04
12    Q.  And who signed this for Compass  11:04
13  Laboratory Services?            11:04
14    A.  Sam Price -- oh, for Compass?  11:04
15  Jannie Chapman.              11:04
16    Q.  Okay.  Who signed it for      11:04
17  Aperian?                  11:04
18    A.  Sam Price.              11:04
19    Q.  All right.  We looked at the    11:04
20  Summit contract earlier, and Ken Lott    11:04
21  signed that one, and Sam Price signed    11:04
22  this contract with Compass.  Do you -- is  11:04
23  there any reason you would know why Ken  11:04

Page 120

1  would sign one contract and Sam would    11:04
2  sign another?                11:04
3    A.  I don't know.              11:04
4    Q.  Okay.  Have you ever met Jannie  11:04
5  Chapman?                  11:04
6    A.  Outside of this litigation?    11:04
7    Q.  Yes.                  11:04
8    A.  No.  I believe -- no.        11:04
9    Q.  Okay.                  11:04
10    A.  Not that I can recall.        11:04
11    Q.  Did you ever speak to her on the  11:04
12  phone?                    11:04
13    A.  I believe I did.          11:04
14    Q.  Okay.  About contract        11:05
15  negotiations?                11:05
16    A.  Best I can recall, I may have  11:05
17  been on a call or two with her.      11:05
18    Q.  Okay.  What was your impression  11:05
19  of Jannie prior to this litigation?    11:05
20    A.  I didn't have an impression.    11:05
21    Q.  Did you have an impression of  11:05
22  her as a business person?          11:05
23    A.  No.                  11:05

Page 121

1   Q.  Did you have an impression about   11:05
2   the way she did business?   11:05
3   A.  No.   11:05
4   Q.  Did you keep a copy of this   11:05
5   Compass contract in your office?   11:05
6   A.  No.   11:05
7   Q.  Would you have had a copy of the   11:05
8   Summit contract in your office?   11:05
9   A.  No.   11:05
10   Q.  In terms of contracts that you   11:05
11   would review as general counsel and   11:05
12   compliance officer, would you keep copies   11:05
13   of those contracts?   11:05
14   A.  We'd keep contracts in their   11:06
15   final form.   11:06
16   Q.  Okay.  Do you keep them in hard   11:06
17   copy?   11:06
18   A.  Yes.   11:06
19   Q.  And is that within the legal   11:06
20   department or the compliance department?   11:06
21   A.  Legal.   11:06
22   Q.  Okay.  But back when the Summit   11:06
23   contract was entered into, you did not   11:06

Page 122

1   keep that contract in your office?   11:06
2   A.  No.   11:06
3   Q.  Okay.  And did not keep the   11:06
4   Compass contract in your office back in   11:06
5   2011?   11:06
6   A.  No.   11:06
7   Q.  Is there a reason you wouldn't   11:06
8   have kept those?   11:06
9   A.  I don't keep any contracts in my   11:06
10   office.   11:06
11   Q.  Okay.  Then, I'm asking a   11:06
12   question inartfully.  Did you keep the   11:06
13   Summit contract within the legal   11:06
14   department?   11:06
15   A.  I don't recall.   11:06
16   Q.  Okay.   11:06
17   A.  Actually.   11:06
18   Q.  Did you keep this Compass   11:06
19   contract, Exhibit 15 to Price, in the   11:06
20   legal department?   11:07
21   A.  I don't -- I don't recall.   11:07
22   Q.  Okay.   11:07
23   A.  I would have to go back and   11:07

Page 123

1   look.   11:07
2   Q.  Would there be a reason you   11:07
3   would not have kept the Summit contract   11:07
4   in the legal department?   11:07
5   A.  Not as long as it was provided   11:07
6   to me.   11:07
7   Q.  Okay.  Was the Summit contract   11:07
8   ever provided to you prior to this   11:07
9   litigation?   11:07
10   A.  I don't recall.   11:07
11   Q.  You don't have a recollection of   11:07
12   ever receiving it prior to the   11:07
13   litigation?   11:07
14   A.  One way or the other, I don't.   11:07
15   Q.  Okay.  All right.  Under --   11:07
16   under the first Summit contract, you   11:07
17   understand that Compass has relationships   11:07
18   with physicians and is offering to refer   11:07
19   those physicians to Aperian for certain   11:07
20   laboratory services?   11:08
21       MR. HOOVER:  Object to the form.   11:08
22       MS. WOLFE:  Object to the form.   11:08
23   A.  I believe you said Summit.   11:08

Page 124

1   Q.  Did I say Summit?  Sorry.  The   11:08
2   DayQuil is probably taking effect.   11:08
3       Did you understand in this   11:08
4   contract that Compass has relationships   11:08
5   with physicians and is going to refer   11:08
6   those physicians to Aperian for   11:08
7   laboratory services?   11:08
8       MR. HOOVER:  Object to the form.   11:08
9   A.  No, I don't think that's my   11:08
10   understanding.   11:08
11   Q.  Okay.  What is your   11:08
12   understanding of the relationship?   11:08
13   A.  My understanding was that   11:08
14   Compass was a -- provided marketing-type   11:08
15   services.   11:08
16   Q.  Okay.  And what type of   11:08
17   marketing services did they provide?   11:08
18   A.  Well, I think we can read the   11:08
19   contract related to the duties to find   11:08
20   that.   11:08
21   Q.  And are you referring to Section   11:08
22   2?   11:09
23   A.  I am.   11:09

1    Q.  Okay.  And does it list duties    11:09
2  and responsibilities of contractor?    11:09
3    A.  That section is, is their    11:09
4  duties, yes.    11:09
5    Q.  Yeah.  You see anything there    11:09
6  about marketing?    11:09
7    (Witness reviews document.)    11:09
8    A.  Not specifically the word    11:09
9  "marketing."    11:09
10   Q.  Okay.  Do you see anything that    11:09
11 you interpret as marketing in Section 2,    11:09
12 duties and responsibilities of    11:09
13 contractor?    11:09
14   A.  I think, broadly, their customer    11:09
15 service duties could be construed that    11:09
16 way.    11:09
17   Q.  But the word "marketing" is not    11:09
18 mentioned anywhere in this contract, is    11:10
19 it?    11:10
20   A.  It's not.  Well, I don't know    11:10
21 about anywhere in the contract, but it's    11:10
22 not in that section.    11:10
23   Q.  And that's defining the duties    11:10

1  of Compass; right?    11:10
2    A.  That's what it says.    11:10
3    Q.  All right.  And under "Fees,"    11:10
4  Aperian is going to be compensated by    11:10
5  being able to keep 75 percent of the    11:10
6  reimbursable costs for the services;    11:10
7  correct?    11:10
8    A.  That's what it says.    11:10
9    Q.  And then Compass gets the other    11:10
10 25 percent of the reimbursable costs;    11:10
11 correct?    11:10
12     MR. HOOVER:  Object to the form.    11:10
13     (Witness reviews document.)    11:10
14   A.  Actually, that says the    11:10
15 subcontractor is compensated for the    11:10
16 services provided by receiving 75 percent    11:11
17 of the reimbursable cost.  I think you    11:11
18 said that in reverse.  I might be wrong    11:11
19 about that.    11:11
20   Q.  I could have.  The subcontractor    11:11
21 is Aperian?    11:11
22   A.  Correct.  In this contract, yes.    11:11
23   Q.  Right.  And then they get to    11:11

1  deduct out 75 percent and remit the    11:11
2  balance, which is 25 percent, to Compass;    11:11
3  correct?    11:11
4    A.  It says that they have a right    11:11
5  to deduct the fee.    11:11
6    Q.  Okay.    11:11
7    A.  From the monies it receives.    11:11
8    Q.  And that was the fee on money    11:11
9  collection, all patient insurance,    11:11
10 including Medicare and Medicaid; correct?    11:11
11 There's no exclusion in this contract?    11:11
12   A.  It says from applicable patient    11:11
13 insurance company, Medicare, and    11:11
14 Medicaid.    11:11
15   Q.  Okay.  Section 9 of this    11:11
16 contract is an indemnification provision.    11:12
17 To your knowledge, has that provision    11:12
18 come into play in this litigation?    11:12
19     MR. HOOVER:  Object to the form.    11:12
20 I think that is asking for a legal    11:12
21 conclusions and legal advice in this    11:12
22 case.  I would instruct her not to    11:12
23 answer.    11:12

1    Q.  Has Aperian or Compass made a    11:12
2  claim of indemnification from one another    11:12
3  in this case?    11:12
4      MR. HOOVER:  Okay.    11:12
5    A.  Not that I'm aware of.    11:12
6    Q.  Are you aware of any current    11:12
7  lawsuits between Aperian and Compass?    11:12
8    A.  Between the two?    11:12
9    Q.  Yes.    11:12
10   A.  No.    11:12
11   Q.  Okay.  Are you aware of any    11:12
12 current lawsuits other than this one that    11:12
13 involve both Aperian and Compass?    11:12
14   A.  No.    11:13
15   Q.  Okay.  Are you aware of any    11:13
16 current lawsuits other than this one that    11:13
17 involved Aperian and Total Diagnostic    11:13
18 Services?    11:13
19   A.  No.    11:13
20   Q.  Are you aware of any current    11:13
21 lawsuits that involve East Alabama Health    11:13
22 Care Authority and either Compass or    11:13
23 Total?    11:13

Page 129

1    A.  No.                        11:13
2    Q.  Are you aware of any lawsuits    11:13
3  that involve Jannie Chapman and either  11:13
4  East Alabama Health Care Authority or   11:13
5  Aperian?                         11:13
6    A.  No.                        11:13
7    Q.  Are you aware of any lawsuits    11:13
8  between any of the parties named in this  11:13
9  litigation other than this lawsuit?    11:13
10   A.  No.                        11:13
11      MR. HOOVER:  And any other    11:13
12  parties in the whole wide world.       11:13
13   Q.  All right.  Now, do you know who  11:13
14  drafted Exhibit 15 to the Price        11:13
15  deposition?                      11:13
16   A.  I do not.                   11:13
17   Q.  Did you review this contract    11:13
18  after it was entered into?            11:14
19   A.  I don't recall.              11:14
20   Q.  Did you have concern about the   11:14
21  legality of the contract when you       11:14
22  eventually did review it?            11:14
23      MR. HOOVER:  Well, object to    11:14

Page 130

1  that, and that is attorney-client      11:14
2  privilege, and instruct her not to answer 11:14
3  that question.                    11:14
4    Q.  Did anyone express any concerns   11:14
5  about the legality of this contract to   11:14
6  you?                           11:14
7      MR. HOOVER:  Again, to the      11:14
8  extent that she is performing her role as 11:14
9  general counsel for the hospital and is  11:14
10  providing legal advice, I would instruct  11:14
11  her not to answer that question.  It's   11:14
12  attorney-client privilege.             11:14
13   A.  My only role in reviewing this   11:14
14  contract would have been my role as     11:14
15  general counsel.                  11:14
16   Q.  Would it have been --          11:14
17   A.  If I did review it.            11:14
18   Q.  -- in providing legal advice?   11:14
19   A.  I'm sorry?                  11:14
20   Q.  Would it have been, in your role  11:14
21  as general counsel, would you have been  11:14
22  providing legal advice?             11:14
23   A.  I do provide legal advice in my  11:14

Page 131

1  role as general counsel.             11:15
2    Q.  Regarding the contract we're     11:15
3  looking at, Exhibit 15 to Price?       11:15
4    A.  Well, I think I already         11:15
5  testified that I don't recall if I     11:15
6  reviewed this contract or not.  If I had, 11:15
7  it would have been possibly legal advice, 11:15
8  yes.                           11:15
9    Q.  Okay.  Let me go back to my     11:15
10  question, then.  Did anybody come to you  11:15
11  with concerns about the legality of this  11:15
12  contract in your role as general counsel? 11:15
13      MR. HOOVER:  Again, I think     11:15
14  that's -- I think that's protected by    11:15
15  attorney-client privilege, and I would   11:15
16  instruct her not to answer that.        11:15
17   Q.  I'm going to give you Exhibit 16 11:15
18  to Sam Price's deposition.            11:15
19      (Witness reviews document.)       11:16
20   Q.  For the record, Exhibit 16 to    11:16
21  Price is Aperian Bates numbers 39 through 11:16
22  47, and it includes both the contract and 11:16
23  the business associate agreement.       11:16

Page 132

1      MR. HOOVER:  Two pages of it.  I 11:17
2  don't know what -- where the other --   11:17
3  other pages are.                  11:17
4      MR. McKENNA:  Okay.            11:17
5    Q.  Have you seen this subcontract   11:17
6  agreement between Aperian and Total      11:17
7  Diagnostic Solutions dated the 1st day of 11:17
8  March 2012 before?                 11:17
9    A.  I've seen it.                11:17
10   Q.  Okay.  Do you recognize this as  11:17
11  the second contract between Aperian and  11:17
12  one of Jannie Chapman's entities?       11:17
13   A.  That's my understanding.         11:17
14   Q.  Okay.  What's your understanding  11:17
15  of why the contract changed from Compass  11:17
16  laboratory solutions to Total Diagnostic  11:17
17  Solutions?                       11:17
18   A.  I think any understanding I have  11:17
19  about that would be in my role as general 11:17
20  counsel and from a legal perspective.    11:17
21   Q.  Okay.  Do you recall in -- with  11:17
22  regard to this contract, having         11:17
23  discussions with Jannie Chapman and her  11:17

**Roben Nutter**                                                    **34 (133 - 136)**

Page 133

1  attorney, Blake Bourland?          11:18
2      A.  I do remember having discussions  11:18
3  and exchanges with Jannie and her      11:18
4  attorney, Blake Bourland.          11:18
5      Q.  Okay.  And so communications      11:18
6  with them as third parties would not be  11:18
7  privileged.  Do you have an understanding 11:18
8  through any communications with Jannie or 11:18
9  Blake Bourland why the contract was      11:18
10 changed from Compass Laboratory Solutions 11:18
11 to Total Diagnostics Solutions?        11:18
12     A.  I think if you have specific      11:18
13 questions regarding that communication, I 11:18
14 could try to answer that.          11:18
15     Q.  Let me ask it this way.        11:18
16     A.  But I think does -- but I think  11:18
17 that gets into my thoughts and.        11:18
18     Q.  Did Jannie Chapman or Blake      11:18
19 Bourland explain to you why the entity    11:18
20 name was changed from Compass Laboratory  11:18
21 Solutions to Total Diagnostics Solutions? 11:19
22     A.  I don't recall that they did.    11:19
23     Q.  Did Jannie or Blake request the  11:19

Page 134

1  name change?              11:19
2      A.  I don't know.            11:19
3      Q.  What's your understanding of why 11:19
4  a new agreement with a different Chapman  11:19
5  company was entered into by Aperian only  11:19
6  seven months after the original agreement 11:19
7  with Compass?              11:19
8          MR. HOOVER:  To the extent that 11:19
9  you're asking her for her legal mental    11:19
10 impressions or her legal responses, I      11:19
11 would instruct her not to answer on -- on 11:19
12 that basis, for the legal -- for the      11:19
13 legal conclusions she may have made or    11:19
14 legal impressions she may have had.        11:19
15     Q.  Well, did you obtain an          11:20
16 understanding from Jannie Chapman or      11:20
17 Blake Bourland about why a new agreement  11:20
18 was entered into only seven months after  11:20
19 the original agreement with Compass?      11:20
20     A.  I don't recall having an        11:20
21 understanding about that outside of my    11:20
22 legal involvement and processes.          11:20
23     Q.  Well, there's a difference      11:20

Page 135

1  between legal involvement and legal      11:20
2  communication with your people on your    11:20
3  side and your -- maybe outside counsel    11:20
4  and communication with the other side of 11:20
5  the contract.  Do you have an          11:20
6  understanding from communication with the 11:20
7  other side of the contract, Jannie and    11:20
8  her team, as to why there was a change?  11:20
9      A.  I think I could go back and      11:20
10 review those specific e-mail exchanges to 11:20
11 see if there's an answer to that          11:21
12 question.  But at this moment, I don't.    11:21
13 I don't recall.              11:21
14     Q.  Okay.  Who were the people      11:21
15 involved in discussing the new terms and  11:21
16 new company as a contractor?          11:21
17         MR. HOOVER:  Well, not          11:21
18 internally.  Because I think internally    11:21
19 would be -- would be protected.  I mean,  11:21
20 if she has had external communications, I 11:21
21 think that's fine.            11:21
22         MR. McKENNA:  You're going to    11:21
23 instruct her not to answer just which      11:21

Page 136

1  people were involved?          11:21
2          MR. HOOVER:  I don't understand  11:21
3  the scope of your question.          11:21
4          MR. McKENNA:  It's the identity  11:21
5  of potential witnesses.          11:21
6          MR. HOOVER:  From -- are you      11:21
7  talking about both internally and        11:21
8  externally?                11:21
9          MR. McKENNA:  Yeah.          11:21
10         MR. HOOVER:  To the extent she  11:21
11 can answer that, if she knows.          11:21
12     A.  Ask your question again --      11:21
13     Q.  Sure.                11:21
14     A.  -- please?              11:21
15     Q.  Who was involved in discussing  11:21
16 the new terms and the new company as the  11:21
17 contractor.                11:22
18     A.  To the extent that I recall, it  11:22
19 would be Trae Fite, Jannie Chapman, Blake 11:22
20 Bourland, myself, outside counsel.        11:22
21 That's -- that's what I can recall at the 11:22
22 moment.                  11:22
23     Q.  Would you recall if Ken Lott --  11:22

**Roben Nutter**                                          **35 (137 - 140)**

Page 137

1  Ken Lott was involved at all?        11:22
2     A.  Involved in the contract      11:22
3  negotiation?                         11:22
4     Q.  Yes.                          11:22
5     A.  I don't recall that he was or 11:22
6  wasn't.  I just don't recall.        11:22
7     Q.  All right:  Is it fair to say 11:22
8  you reviewed this contract, Exhibit 16, 11:22
9  before it was entered into?          11:22
10    A.  I think it's fair to say I was 11:22
11 involved in the review of it.        11:22
12    Q.  Did this agreement terminate the 11:22
13 September 2011 agreement with Compass, or 11:23
14 did they run parallel?               11:23
15    (Witness reviews document.)       11:23
16    A.  I'm not sure.                  11:23
17    Q.  All right.  The term of this   11:23
18 agreement is set forth in paragraph 4. 11:23
19 It says it's effective on the date set 11:23
20 forth in the initial paragraph and shall 11:23
21 terminate on September 30th, 2012, unless 11:23
22 terminated earlier pursuant to the   11:23
23 provisions hereof.  From any of your 11:23

Page 138

1  communications with people outside of 11:23
2  your outside counsel and outside of  11:23
3  people involved in the discussion within 11:23
4  EAMC, in other words, Jannie or people on 11:24
5  her team, what's your understanding of 11:24
6  why it was only a 6-month term?      11:24
7     A.  I don't recall.               11:24
8     Q.  Paragraph 5, the fees are     11:24
9  different than the Compass contract here. 11:24
10 Here, Aperian keeps 100 percent of the 11:24
11 money it receives from the private   11:24
12 insurance and federal payors but pays 11:24
13 Total Diagnostics a $35,000 fee per  11:24
14 month.  Is that correct?             11:24
15    A.  It -- it does say that there's a 11:24
16 flat fee of $35,000, yes.            11:24
17    Q.  Okay.  Again, from third      11:24
18 parties, people on the other side of the 11:24
19 negotiations, what's your understanding 11:24
20 of who suggested the change in payment 11:24
21 terms?                               11:24
22    A.  I don't recall.               11:24
23    Q.  Again, from third parties, what 11:25

Page 139

1  was the reason given for the change in 11:25
2  payment structure?                   11:25
3     A.  I don't recall.               11:25
4     Q.  Were you part of the discussions 11:25
5  regarding that change in payment     11:25
6  structure?                           11:25
7     A.  I participated in discussions 11:25
8  around that, yes.                    11:25
9     Q.  If the contract calls for a   11:25
10 $35,000-a-month flat fee, can you explain 11:25
11 why Aperian paid Total Diagnostics a fee 11:25
12 of more than $35,000 a month in some of 11:25
13 the months after this contract was   11:25
14 entered into?                        11:25
15    A.  Can I explain that?           11:25
16    Q.  Yeah.                         11:25
17    A.  No, I can't.                  11:25
18    Q.  Can you explain why Aperian paid 11:25
19 Total Diagnostics $40,000 in some months 11:25
20 after this contract was entered into? 11:26
21    A.  No.                           11:26
22    Q.  From your discussions with     11:26
23 people on the other side of the contract 11:26

Page 140

1  negotiations, was there a separate oral 11:26
2  understanding that if 25 -- a 25 percent 11:26
3  commission on the revenues generated from 11:26
4  referrals exceeded the $35,000 flat fee, 11:26
5  that additional money would be paid from 11:26
6  Aperian to Total Diagnostics?        11:26
7     A.  Was I aware that that was the  11:26
8  understanding?                       11:26
9     Q.  Were you aware of an oral      11:26
10 understanding?                       11:26
11    A.  No.  Not that I recall.        11:26
12    Q.  Are any payors, insurance or   11:26
13 federal, excluded under this contract? 11:26
14    (Witness reviews document.)       11:27
15    A.  I don't believe so.           11:27
16    MR. McKENNA:  Why don't we take   11:27
17 a break?                             11:27
18    MR. HOOVER:  Okay.                11:27
19    THE VIDEOGRAPHER:  We are going  11:27
20 off the record at 11:28.             11:27
21    (Break taken.)                    11:44
22    THE VIDEOGRAPHER:  This begins    11:44
23 Disc No. 3.  We're back on the record at 11:44

1  11:46.                          11:44
2    Q.  (By Mr. McKenna) All right.      11:44
3  Give me what I'm marking Exhibit 4 to    11:44
4  your deposition.                 11:44
5  (Plaintiff's Exhibit 4 was marked for    11:45
6  identification and is attached.)      11:45
7    (Witness reviews document.)        11:45
8    Q.  All right.  Can you identify    11:45
9  this document, please?            11:45
10    A.  It appears to be a contract    11:45
11  between Compass Laboratory Services and   11:45
12  Aperian Laboratory Solutions.      11:45
13    Q.  Okay.  Is this the third      11:45
14  contract between one of Jannie's entities 11:45
15  and Aperian?                  11:45
16    A.  That is my understanding.      11:45
17    Q.  Okay.  It is dated December 1st,  11:45
18  2012?                         11:45
19    A.  Yes.                   11:45
20    Q.  And again, I'll say it so the    11:45
21  record is clear, but from your       11:45
22  interactions with the third parties,    11:46
23  Jannie, Blake, people on that side, do   11:46

1  you have an understanding of why there    11:46
2  was a switch back to Compass from Total   11:46
3  Diagnostics in the second contract?      11:46
4    A.  I don't recall.            11:46
5    Q.  Under "Compensation," parties    11:46
6  went back to a percentage commission    11:46
7  again; correct?                  11:46
8    A.  I'm sorry.  Repeat that.       11:46
9    Q.  Is it your understanding the    11:46
10  parties went back to a percentage     11:46
11  commission under this agreement?      11:46
12    (Witness reviews document.)        11:46
13    A.  That is the way it appears, yes. 11:46
14    Q.  Again, based on your          11:46
15  conversations and exchanges with Blake   11:46
16  Bourland and Jannie, why did the parties 11:46
17  go back to a percentage commission     11:47
18  arrangement after having originally had a 11:47
19  percentage commission and then switching 11:47
20  to a flat fee?                  11:47
21    A.  I don't recall that as it      11:47
22  relates to those two.            11:47
23    Q.  Did Jannie Chapman express a    11:47

1  desire to go back to a percentage      11:47
2  commission arrangement?            11:47
3    A.  I don't recall that being      11:47
4  expressed to me.                 11:47
5    Q.  Did -- was it expressed through  11:47
6  Blake Bourland that his client wanted to 11:47
7  go back to a percentage commission     11:47
8  arrangement?                  11:47
9    A.  I just don't recall those      11:47
10  interactions specifically.         11:47
11    Q.  Did this agreement terminate the 11:47
12  what we've called the second contract   11:47
13  that was entered into in March of 2012?  11:47
14    (Witness reviews document.)        11:47
15    A.  I don't recall.            11:48
16    Q.  Okay.                   11:48
17    A.  I've just scanned this, so if it 11:48
18  says it in here, I'm not seeing it.    11:48
19    Q.  All right.  There's a new      11:48
20  heading in this contract, number 3, it   11:48
21  says "No Federal Government          11:48
22  Reimbursement."  Did you see that?     11:48
23    A.  Which -- yes.  Number 3, yes.    11:48

1    Q.  All right.  Again, not from your  11:48
2  team or outside counsel, but what is your 11:48
3  understanding of why that provision was   11:48
4  added to this contract, "No Federal     11:48
5  Government Reimbursement"?          11:48
6    A.  I don't think I can answer that  11:48
7  outside of my team.               11:48
8    Q.  Do you have any understanding    11:48
9  from interactions with Blake or Jannie   11:48
10  about why that was added?          11:48
11    A.  No.                    11:48
12    Q.  All right.  And a federal      11:48
13  government reimbursement was included in  11:49
14  the fee calculation in the prior two    11:49
15  contracts; correct?               11:49
16    A.  That's my understanding.       11:49
17    Q.  Okay.  Section 3 says under (a), 11:49
18  3(a) says contractor, meaning Compass,   11:49
19  won't even send specimens of any client  11:49
20  which are to be reimbursed by a federal  11:49
21  government program.  Correct?        11:49
22    A.  It says that the "Contractor    11:49
23  shall not provide to the Subcontractor  11:49

Page 145

1  any specimens" from federal government    11:49
2  programs.                                11:49
3    Q.  Okay.  And it says "Contractor,"   11:49
4  meaning Compass, "shall be solely        11:49
5  responsible for providing to the Clients 11:49
6  any laboratory services which are covered 11:49
7  and reimbursable by a Federal" program.  11:50
8  Correct?                                 11:50
9    A.  That's what it says.               11:50
10   Q.  So, is it your understanding        11:50
11 that Compass was supposed to handle any  11:50
12 federal program specimens by itself and  11:50
13 not send those to Aperian?               11:50
14   A.  My understanding is that those     11:50
15 weren't supposed to be sent to Aperian.  11:50
16   Q.  Okay.  Did either Blake or         11:50
17 Jannie Chapman suggest this term, or     11:50
18 anybody on their side of the negotiation? 11:50
19   A.  I don't recall.                    11:50
20   Q.  Next section, (b) says, to the     11:50
21 extent that a client specimen            11:51
22 reimbursable by a federal program happens 11:51
23 to get referred for testing, that test   11:51

Page 146

1  will be excluded from reimbursable costs 11:51
2  otherwise known as commissions.  Correct? 11:51
3    A.  Yeah.  And, well, let me --        11:51
4  repeat that question just a second, but I 11:51
5  wanted to go back, as I've read          11:51
6  subsection (b).                          11:51
7    Q.  Okay.                              11:51
8    A.  I testified a minute ago that it   11:51
9  was the contractor's sole responsibility, 11:51
10 but there's a provision there that that's 11:51
11 the intent.  But if that happens, then   11:51
12 the payments will be excluded.           11:51
13   Q.  So it's the intent that they not   11:51
14 be sent, but if it does happen, then the 11:51
15 payments are supposed to be excluded from 11:51
16 commissions; correct?                    11:51
17   A.  That's what subsection (b)         11:51
18 reads.                                   11:51
19   Q.  Okay.                              11:51
20   A.  And I'm sorry, repeat your last    11:51
21 question.  I was reading that section.   11:51
22   Q.  I think we just covered it --      11:51
23   A.  Oh, okay.                          11:51

Page 147

1    Q.  -- because it was section (b)      11:52
2  would exclude those referrals from       11:52
3  commission; right?                       11:52
4    A.  Got you.                           11:52
5    Q.  Okay.  Do you know if anybody on   11:52
6  Jannie and Blake's side of the           11:52
7  negotiations suggested term (b)?         11:52
8    A.  I don't recall.                    11:52
9    Q.  Okay.  And then under              11:52
10 "Compensation," Section 5, we're again   11:52
11 back to 75 percent to Aperian and 25     11:52
12 percent to Compass with the exclusion of 11:52
13 federal payors under section (c)?        11:52
14   A.  That's what it appears to be.      11:52
15   Q.  Okay.  Were you involved in the    11:52
16 discussions with Jannie's team about this 11:52
17 changed compensation structure?          11:52
18   A.  I was involved in some            11:52
19 discussion or correspondence.  I would   11:52
20 have to go back and look at those        11:52
21 specific e-mails.  Most of that was with 11:52
22 my team.                                 11:53
23   Q.  From your interactions with        11:53

Page 148

1  Jannie's team, what is your understanding 11:53
2  of why the 2012 contract between Compass 11:53
3  and Aperian wanted to exclude client     11:53
4  specimens reimbursed by federal program  11:53
5  payors?                                  11:53
6    A.  I don't recall.                    11:53
7    Q.  Was there a concern expressed by  11:53
8  anybody on Jannie's side of the          11:53
9  negotiations about the prior contracts   11:53
10 and relationships violating the          11:53
11 anti-kickback statute?                   11:53
12   A.  As it related to her and her      11:53
13 team, I don't recall.                    11:53
14   Q.  If the new contract -- or, I'm     11:53
15 sorry, if the contract we're looking at, 11:54
16 Exhibit 4 to your deposition, excludes   11:54
17 specimens from clients reimbursable by   11:54
18 federal government program payors, can   11:54
19 you explain why there are claims in 2013 11:54
20 to Medicare from Aperian in the hundreds 11:54
21 of thousands of dollars for specimens    11:54
22 referred by Compass to Aperian?          11:54
23     MR. HOOVER:  I'm going to object    11:54

**Roben Nutter**                                                    **38 (149 - 152)**

Page 149

1  to the question just because I don't    11:54
2  understand the question.    11:54
3     MR. McKENNA:  Sure.    11:54
4  Q.  So we just -- we went through    11:54
5  the contract terms that Compass is    11:54
6  essentially not supposed to send federal    11:54
7  payor specimens to Aperian under this    11:54
8  Exhibit 4 contract.  Correct?    11:54
9  A.  That's the intent.    11:54
10  Q.  Okay.  That's the intent.  If    11:54
11  that is the intent, can you explain why    11:54
12  in 2013 after this contract is entered    11:54
13  into, that there are hundreds of    11:54
14  thousands of dollars in payments from    11:54
15  Medicare and other federal payors to    11:55
16  Aperian as a result of the specimens    11:55
17  referred by Compass to Aperian?    11:55
18  A.  To the extent that that's a true    11:55
19  statement, I don't know.    11:55
20  Q.  Okay.  As the only compliance    11:55
21  officer and general counsel over EAMC and    11:55
22  Aperian, what did you do to ensure that    11:55
23  the federal payor specimens were not    11:55

Page 150

1  referred by Compass and commissions were    11:55
2  not paid on them?    11:55
3     MR. HOOVER:  I'm going to object    11:55
4  to that.  In her role as general counsel,    11:55
5  opening an investigation would be    11:55
6  protected by the attorney-client    11:55
7  privilege and attorney work product.    11:55
8  Q.  Did you set up any review    11:55
9  procedures to make sure paragraph 5 of    11:55
10  Exhibit 4 was complied with by Aperian?    11:55
11  A.  I did not, no.    11:56
12  Q.  Okay.  Did anybody in compliance    11:56
13  for EAMC or Aperian set up any review or    11:56
14  audit schedule to make sure paragraph 5    11:56
15  of Exhibit 4 was complied with?    11:56
16     MR. HOOVER:  Object to the form.    11:56
17  A.  I'm not aware of a specific    11:56
18  audit that was done related to that    11:56
19  specific term of the contract.    11:56
20  Q.  Really, within EAMC and Aperian,    11:56
21  are you aware of any mechanism that was    11:56
22  put in place for people to review the    11:56
23  claims that were actually coming from    11:56

Page 151

1  Compass and the commissions paid by    11:56
2  Aperian to Compass to make sure paragraph    11:56
3  5 of Exhibit 4 was complied with?    11:56
4     MR. HOOVER:  Object to the form.    11:57
5  A.  I'm hesitating in answering this    11:57
6  because I don't want to waive any    11:57
7  potential protections.  I think general    11:57
8  I'd say that there was an understanding    11:57
9  of this contractual term and compliance    11:57
10  was expected.  And that would have been    11:57
11  most closely monitored by the management    11:57
12  in -- in that area.    11:57
13  Q.  Meaning it would be expected    11:57
14  that management within Aperian would    11:57
15  monitor that?    11:57
16  A.  Yes.    11:57
17  Q.  Okay.  And I think you heard    11:57
18  testimony from both Trae's deposition and    11:58
19  Lorri Lloyd's deposition that referral of    11:58
20  federal payments -- payor specimens and    11:58
21  payment of commissions on those specimens    11:58
22  from Compass to Aperian continued after    11:58
23  this contract took effect; correct?    11:58

Page 152

1  A.  I don't think I recall that    11:58
2  testimony specifically.    11:58
3  Q.  Okay.  You don't recall Lorri    11:58
4  Lloyd's deposition last week, that she    11:58
5  reviewed the -- after Allen took over,    11:58
6  she reviewed the compensation paid to    11:58
7  Compass and did not exclude federal payor    11:58
8  patients from it?    11:58
9  A.  Again, I don't recall that    11:59
10  testimony specifically.  But my    11:59
11  understanding from her testimony is that    11:59
12  she would not be the person that would be    11:59
13  responsible for doing that.    11:59
14  Q.  Okay.  Do you understand that    11:59
15  both referrals of federal payor specimens    11:59
16  and commissions paid on those specimens    11:59
17  continued after this contract was entered    11:59
18  into?    11:59
19  A.  I'm sorry.  Repeat that?    11:59
20     MR. HOOVER:  Well, and I'm going    11:59
21  to object to -- as her role of general    11:59
22  counsel.  I mean, to the extent there's    11:59
23  testimony, testimony can do that, but I    11:59

Page 153

1  don't think you can ask her or she can  11:59
2  testify as to what her mental impressions 11:59
3  is or what her investigation or made in  11:59
4  anticipation revealed. I mean, if you're 11:59
5  asking her what the other testimony is  11:59
6  out there, then she can just repeat what  11:59
7  that other testimony is. But she can't  11:59
8  answer specifically what her  11:59
9  investigation revealed and what she  11:59
10  looked at as general counsel.  11:59
11     MR. McKENNA: You're not going  12:00
12  to let her testify to the facts of what  12:00
13  really happened?  12:00
14     MR. HOOVER: Well, to the extent  12:00
15  she did an investigation and found out  12:00
16  what those facts are, she's not going to  12:00
17  testify to that, exactly right. She can  12:00
18  testify to what people have testified or  12:00
19  what she recalls they've testified to,  12:00
20  but she's not going to testify as to what 12:00
21  her -- what her role as general counsel  12:00
22  is in reviewing the discovery and doing  12:00
23  investigations and made -- all the  12:00

Page 154

1  information made in anticipation of  12:00
2  litigation, no, she's not going to  12:00
3  testify to that.  12:00
4     If you're asking her that other  12:00
5  people testified to that at deposition,  12:00
6  that's a different question.  12:00
7     Q. All right. Let me ask it this  12:00
8  way. Before EAMC and Aperian ever  12:00
9  received a CID from the federal  12:00
10  government, did you ever make a  12:00
11  determination of whether referrals from  12:00
12  Compass of federal payor patients and  12:00
13  commissions from Aperian to Compass on  12:00
14  federal payor patients continued after  12:00
15  December 1st, 2012?  12:01
16     A. Not that I'm aware of.  12:01
17     Q. Okay. Did anybody in  12:01
18  compliance, to your understanding, before 12:01
19  a CID was issued and received,  12:01
20  investigate to determine whether federal  12:01
21  payor specimens were sent from Compass to 12:01
22  Aperian and commissions paid on those  12:01
23  specimens from Aperian to Compass after  12:01

Page 155

1  December 1st, 2012?  12:01
2     MR. HOOVER: Object to the form. 12:01
3     A. Not that I'm aware of.  12:01
4     Q. And the testimony is what it --  12:01
5  what it is, but. If the referral of  12:01
6  specimens and payment of commissions on  12:01
7  federal specimens continued after the  12:01
8  contract both before and after Trae left, 12:01
9  do you have any explanation as to why  12:01
10  that continued?  12:02
11     A. I don't.  12:02
12     Q. It should not have; correct?  12:02
13     MR. HOOVER: Object to the form. 12:02
14     A. What should not have?  12:02
15     Q. The referral of specimens and  12:02
16  the payment of commissions on federal  12:02
17  specimens should not have continued after 12:02
18  December 1st, 2012.  12:02
19     A. According to the terms of this  12:02
20  contract, that was the intent.  12:02
21     Q. All right. Do you know what a  12:02
22  collector is in the business of Aperian  12:02
23  and EAMC Lab Outreach?  12:02

Page 156

1     A. Do I know what a collector is?  12:02
2     Q. Yes.  12:02
3     A. Yes.  12:02
4     Q. Okay. Describe what you  12:02
5  understand a collector to be.  12:02
6     A. A person who collects specimens. 12:02
7     Q. And that could be urine, blood,  12:02
8  oral fluid?  12:02
9     A. Correct.  12:02
10     Q. I think somebody even testified  12:02
11  stool?  12:03
12     A. Correct.  12:03
13     Q. That's lovely. Okay.  12:03
14     A. I'm not aware of the details  12:03
15  around everything they collect, but yes.  12:03
16     Q. And from both the testimony and  12:03
17  your working knowledge of being in the  12:03
18  hospital, do you understand that both  12:03
19  EAMC Lab Outreach and Aperian provided  12:03
20  collectors to some physicians' offices?  12:03
21  Correct?  12:03
22     A. There were arrangements in which 12:03
23  collectors were provided.  12:03

**Roben Nutter**                                    **40 (157 - 160)**

Page 157

1  Q. Is that no longer the case?    12:03
2  A. I don't -- I don't think that's  12:03
3  accurate.                12:03
4  Q. Okay. I just asked because of  12:03
5  the way you said "There were      12:03
6  arrangements," but.           12:03
7  A. Oh. I'm sorry.       12:03
8  Q. Let's ask it this way. During  12:03
9  the 2008 to 2014 time frame, were    12:03
10 collectors provided by Aperian and EAMC 12:03
11 Lab Outreach to certain physician offices 12:03
12 at the expense of Aperian and Lab   12:03
13 Outreach?           12:04
14  A. You changed that question a   12:04
15 little bit. During that time period,  12:04
16 there were arrangements in which    12:04
17 collectors were provided. Specifically,  12:04
18 I'm thinking about employee lease   12:04
19 agreements and employee collectors    12:04
20 employed by the Authority.      12:04
21  Q. Okay. So that's one way they   12:04
22 were provided, through the employee lease 12:04
23 agreement and employed by the Health Care 12:04

Page 158

1  Authority; correct?        12:04
2  A. Correct. Well, that's two    12:04
3  different ways.          12:04
4  Q. Okay. You described two    12:04
5  different ways. One is the lease   12:04
6  agreement, one is direct employment by  12:04
7  the Health Care Authority?      12:04
8  A. Correct.          12:04
9  Q. And are you aware that the third 12:04
10 way was through temporary agencies to  12:04
11 physicians and practice groups marketed  12:05
12 to by Summit and Compass in different  12:05
13 areas of the country?        12:05
14  A. I'm aware that there were some   12:05
15 arrangements through temporary staffing  12:05
16 companies.            12:05
17  Q. Okay. To provide collectors to  12:05
18 physicians' offices; correct?     12:05
19  A. Correct.          12:05
20  Q. And those collectors were paid  12:05
21 by Aperian paying the staffing agency and 12:05
22 the staffing agency paying the collector; 12:05
23 correct?            12:05

Page 159

1  A. I believe that's correct.    12:05
2  Q. Okay. And the collectors that  12:05
3  were provided under either of the three  12:05
4  arrangements we've discussed, they were  12:05
5  provided at no cost to the physician;   12:05
6  correct?            12:05
7  A. I probably can't speak to all   12:06
8  the arrangements, but I think that's   12:06
9  generally how the arrangements were set  12:06
10 up.              12:06
11  Q. Okay.          12:06
12  A. Since they were collecting on   12:06
13 behalf of Aperian specimens -- for   12:06
14 Aperian specimens.         12:06
15  Q. Okay. And in the physician   12:06
16 office, somebody's got to perform the   12:06
17 collection work; correct?      12:06
18  A. I assume so.         12:06
19  Q. Okay. And so it's the --    12:06
20 specimens that are going to be collected 12:06
21 are going to be sent to Aperian or the  12:06
22 Health Care Authority, depending on which 12:06
23 situation it is. Aperian or the Health  12:06

Page 160

1  Care Authority pays for the collector.  12:06
2  Is that generally how it works?    12:06
3  A. In -- in certain arrangements.  12:06
4  Q. Okay. Was that the arrangement  12:06
5  when they were using the temporary   12:06
6  agencies?            12:06
7  A. That the employees were     12:06
8  contracted through the temporary agencies 12:07
9  to collect specimens?        12:07
10  Q. Yes.           12:07
11  A. I want to make sure I understand 12:07
12 your question.          12:07
13  Q. Yes. To collect specimens that  12:07
14 would then be referred to Aperian.    12:07
15  A. They were collecting specimens  12:07
16 to be sent to Aperian for testing.   12:07
17  Q. Okay. And the job function of a 12:07
18 collector, that is something of value;  12:07
19 correct?            12:07
20    MR. HOOVER: Object to the form  12:07
21 to the extent you're asking for a legal  12:07
22 conclusion from general counsel.    12:07
23 Instruct her not to answer that.    12:07

Page 161

1    MR. McKENNA: I'm asking --    12:07
2    MR. HOOVER: You are.    12:07
3    Q. -- for your understanding as    12:07
4 both compliance officer and from a    12:07
5 business perspective. Does providing a    12:07
6 employee to a physician, is that    12:07
7 something of value to them?    12:07
8    MR. HOOVER: I renew my    12:07
9 objection. It's not a business question,    12:07
10 it's a legal question. You're asking for    12:07
11 a legal conclusion from general counsel.    12:07
12    Q. Let me ask it this way. If    12:07
13 Aperian didn't pay the collector, would    12:07
14 the physician have to pay the collector    12:07
15 in order to collect the samples?    12:07
16    MR. HOOVER: Object to the form.    12:08
17 Calls for speculation.    12:08
18    A. I'm not sure how the physician    12:08
19 would handle that.    12:08
20    Q. And weren't there -- weren't    12:08
21 there specifically situations where the    12:08
22 physician was already paying a collector    12:08
23 and had them in house and Aperian took    12:08

Page 162

1 over the payment?    12:08
2    A. You would have to give me    12:08
3 specific examples. I think generally    12:08
4 that happened.    12:08
5    Q. Okay.    12:08
6    A. Some. And those were through    12:08
7 the employee lease arrangements.    12:08
8    Q. Are you aware of any instances    12:08
9 where a physician already had a collector    12:08
10 on site and then Aperian continued to pay    12:08
11 for -- Aperian took over the payment for    12:08
12 that collector through a temporary    12:08
13 agency?    12:08
14    MR. HOOVER: Again, to the    12:09
15 extent that you're asking her to opine or    12:09
16 provide any investigative facts that she    12:09
17 uncovered in her role as general counsel,    12:09
18 I would instruct her not to answer that    12:09
19 question.    12:09
20    Q. You can answer.    12:09
21    MR. HOOVER: No, she can't.    12:09
22    A. He just instructed me not to    12:09
23 answer.    12:09

Page 163

1    MR. McKENNA: Oh, you instructed    12:09
2 her not to answer?    12:09
3    MR. HOOVER: I mean, again, if    12:09
4 you're asking her to testify to what's --    12:09
5 what -- what's already been testified to,    12:09
6 I think that's a different question than    12:09
7 what she has found out and what she    12:09
8 uncovered during any investigation she    12:09
9 may have done.    12:09
10    MR. McKENNA: Okay.    12:09
11    Q. Well, you've sat through most of    12:09
12 the depositions. Have you seen examples    12:09
13 where through using temporary agencies,    12:09
14 Aperian took over the payment of a    12:09
15 collector for a physician who had already    12:09
16 employed the collector?    12:09
17    A. I don't recall those specific --    12:09
18 that specific fact scenario.    12:09
19    Q. Are you testifying that the    12:10
20 provision by Aperian to a physician of a    12:10
21 free collector to collect specimens has    12:10
22 no value to that physician?    12:10
23    MR. HOOVER: She's -- I'm going    12:10

Page 164

1 to object to that question as well.    12:10
2 You've asked that before. I instruct her    12:10
3 not to answer because you're asking for a    12:10
4 legal conclusion from general counsel for    12:10
5 the hospital.    12:10
6    Q. Okay. Are the collectors paid    12:10
7 an hourly rate?    12:10
8    A. In most cases, I believe so.    12:10
9    Q. Okay. And is that hourly rate    12:10
10 paid in dollars?    12:10
11    A. Versus?    12:10
12    Q. Pesos.    12:10
13    A. As far as I know, dollars.    12:10
14    Q. Can we agree that dollars in    12:10
15 America have value?    12:10
16    A. There is a value associated with    12:10
17 a dollar, yes.    12:10
18    Q. Okay. Through the CLEs,    12:10
19 American Health Care Lawyer magazines    12:11
20 you've read, seminars you've gone to,    12:11
21 what is your understanding of why    12:11
22 providing a collector to a physician and    12:11
23 paying for that collector when the    12:11

**Roben Nutter**                                    **42 (165 - 168)**

Page 165

1  physician is expected to refer the        12:11
2  samples the collector takes to the lab is 12:11
3  not violating the anti-kickback statute?  12:11
4      MR. HOOVER: I'm going to object     12:11
5  to that for the same previous, that       12:11
6  you're asking for a legal conclusion and  12:11
7  a legal opinion from the lawyer, the      12:11
8  general counsel of the hospital. And      12:11
9  that's specific to this case, Don.        12:11
10 That's more than just a general -- a      12:11
11 general question.                         12:11
12     Q.  Was that topic covered in the    12:11
13 seminars that you've attended on the      12:11
14 healthcare fraud and abuse laws?          12:11
15     A.  Was what topic covered?          12:11
16     Q.  Providing collectors to          12:12
17 physicians' offices.                      12:12
18     A.  I don't recall. I don't recall   12:12
19 specific topics covered in CLE sessions I 12:12
20 attended related to that one way or the   12:12
21 other.                                    12:12
22     Q.  Do you have an understanding of  12:12
23 whether there is a safe harbor that is    12:12

Page 166

1  interpreted to apply to the collector     12:12
2  situation if the requirements are met?    12:12
3      A.  If you're talking about the      12:12
4  services agreements related to that?      12:12
5      Q.  Personnel services agreements.   12:12
6      A.  There is a safe harbor that      12:12
7  covers personal service arrangements.     12:12
8      Q.  Is that a safe harbor that       12:12
9  collectors attempt to be placed into?     12:12
10     A.  If it's applicable to the        12:12
11 arrangement.                             12:13
12     Q.  Yeah. Any other safe harbor      12:13
13 you're aware of that might apply to the   12:13
14 collector situation?                      12:13
15     MR. HOOVER: Again, I'm going to      12:13
16 object to the extent you're asking for a  12:13
17 legal opinion from general counsel for    12:13
18 the hospital.                             12:13
19     MR. McKENNA: Are you                 12:13
20 instructing her not to answer?            12:13
21     MR. HOOVER: I am. I'm                12:13
22 instructing her not to answer.            12:13
23     Q.  In the employee lease agreement  12:13

Page 167

1  situation, explain to me how the payment  12:13
2  works in that situation.                  12:13
3      A.  You need to give me a specific   12:14
4  agreement to refer to.                    12:14
5      Q.  Do they vary from agreement to   12:14
6  agreement?                                12:14
7      A.  I don't know. I would have to    12:14
8  review them.                              12:14
9      Q.  When Aperian employed collectors 12:14
10 for referring physicians using a          12:14
11 temporary agency, the employment wasn't   12:14
12 for any set period of time, was it?       12:14
13 Since it's a temporary agency?            12:14
14     A.  Again, I'd have to look back at   12:14
15 those specific agreements. I don't know   12:14
16 if there was a specified time or not.     12:14
17     Q.  Okay. What agreement would set   12:14
18 that out?                                 12:14
19     A.  The agreements between Aperian   12:14
20 and the staffing companies, I assume.     12:14
21     Q.  Okay. Was there even an          12:14
22 agreement between Aperian and the         12:15
23 collector when they were employed through 12:15

Page 168

1  the temporary agency?                     12:15
2      A.  Not that I'm aware of.           12:15
3      Q.  To your understanding, was there 12:15
4  just a general agreement between Aperian  12:15
5  and the staffing agency to provide        12:15
6  collectors in general, or was there an    12:15
7  agreement for each individual collector   12:15
8  that was placed?                          12:15
9      MR. HOOVER: Again, she can          12:15
10 testify to the extent that there's        12:15
11 deposition testimony, there's been        12:15
12 testimony out there. But any independent  12:15
13 investigation she has done in her role as 12:15
14 general counsel I think is privileged.    12:15
15     Q.  I mean, the staffing agency      12:15
16 contracts before the litigation ever      12:15
17 started would have come through your      12:15
18 office, wouldn't they?                    12:15
19     A.  I think earlier I testified that 12:15
20 those contracts often went through our HR 12:15
21 department.                               12:15
22     Q.  Okay. Well, have you seen in     12:16
23 any of the depositions contract between   12:16

Page 169

1  Aperian and a staffing agency that were   12:16
2  for a single collector placed as opposed   12:16
3  to just a general contract with the       12:16
4  staffing agency?                           12:16
5    A.  I'd have to review the agreement   12:16
6  specifically.                             12:16
7    Q.  Do you have a -- have you seen    12:16
8  any in the depositions that were for     12:16
9  using a temporarily agency that applied  12:16
10 to a specific collector?                  12:16
11   A.  I have seen some exhibits of      12:16
12 temporary staffing -- staffing agency    12:16
13 contracts.  I wasn't looking specifically 12:16
14 at time periods, so I would have to go    12:16
15 back and look.                            12:16
16   Q.  And when Aperian employed         12:16
17 collectors for referring physicians of   12:17
18 Summit and Compass, those collectors were 12:17
19 in locations in various spots around the  12:17
20 country; correct?                         12:17
21   A.  Repeat that question?             12:17
22   Q.  Sure.  When Aperian employed      12:17
23 collectors for referring physicians using 12:17

Page 170

1  a temporary agency, those collectors were 12:17
2  in various locations all over the         12:17
3  country?                                  12:17
4    A.  I'm really not aware of all the   12:17
5  locations they were.                      12:17
6    Q.  Okay.  Do you know if -- I'm      12:17
7  talking about collectors employed through 12:17
8  temporary agencies.  Did Aperian ever go  12:17
9  observe the collectors in the field?      12:17
10     MR. HOOVER:  You can answer         12:17
11 based on the testimony that's out there   12:17
12 to your understanding, if you recall.     12:17
13   A.  I don't recall.                   12:18
14   Q.  Before this litigation ever       12:18
15 began, were you aware of Aperian ever     12:18
16 sending anyone to go observe collectors   12:18
17 in the field that were employed by        12:18
18 temporary agencies?                       12:18
19     MR. HOOVER:  Let me for the         12:18
20 record, too, I'll continue with the same  12:18
21 objection, because I don't think it       12:18
22 matters when she did it.  If she did it   12:18
23 in her role as general counsel, then --   12:18

Page 171

1  and she was doing it for legal purposes,  12:18
2  then that's going to be privileged.       12:18
3  Whether it happened beforehand or whether 12:18
4  it happened afterwards, it's going to be  12:18
5  privileged.                               12:18
6      MR. McKENNA:  That's the problem    12:18
7  with the two hats that's written about -- 12:18
8      MR. HOOVER:  Not a problem at       12:18
9  all.  There's no -- there's no -- Don,    12:18
10 there's no exception for compliance under 12:18
11 attorney-client privilege.  There's not.  12:18
12     MR. McKENNA:  If she's              12:18
13 performing her role as compliance officer 12:18
14 to check and make sure things are         12:18
15 compliant, that is not privileged.        12:18
16     MR. HOOVER:  She is a lawyer.       12:18
17 She is doing it in her role as a lawyer.  12:18
18 If she is compliance officer and not a    12:18
19 lawyer, that may be a different story.    12:18
20 There is no exception for compliance as   12:19
21 to attorney-client privilege.  There is   12:19
22 none.  In fact, there's cases out there   12:19
23 that specifically uphold the              12:19

Page 172

1  attorney-client privilege on that very    12:19
2  basis.                                    12:19
3      MR. McKENNA:  Well, we may find     12:19
4  out.                                      12:19
5      MR. HOOVER:  Well, I guess we       12:19
6  will find out.  We'll let Coogler decide. 12:19
7    Q.  (By Mr. McKenna) In your role as  12:19
8  compliance officer, did you ever send     12:19
9  anybody out in the field to observe the   12:19
10 collectors employed by temporary          12:19
11 agencies?                                 12:19
12     MR. HOOVER:  To the extent it's     12:19
13 different from your role as a lawyer.     12:19
14     THE WITNESS:  I don't think it      12:19
15 is different than my role as a lawyer.    12:19
16     MR. McKENNA:  You're instructing    12:19
17 her not to answer?                        12:19
18     MR. HOOVER:  I just said to the     12:19
19 extent it's different from her being a    12:19
20 lawyer.  If she's performing her role as  12:19
21 general counsel at the hospital, she's    12:19
22 not -- she can't answer that.             12:19
23     MR. McKENNA:  But I didn't ask      12:19

Page 173

1  her about --                    12:19
2       MR. HOOVER: That's exactly    12:19
3  right. But she --                12:19
4       MR. McKENNA: I said in her role  12:19
5  as compliance officer.           12:19
6       MR. HOOVER: So that's -- but  12:19
7  her -- that's why she gave the answer.  12:19
8  That's exactly what she gave you. Which  12:19
9  is, is there a difference between her    12:19
10 acting as a compliance officer as opposed  12:19
11 to her role as a lawyer. She answered   12:19
12 the question.                    12:20
13    Q. (By Mr. McKenna) Are you aware   12:20
14 of Aperian having any supervision or    12:20
15 control over the collectors placed      12:20
16 through temporary agencies all over the  12:20
17 country?                         12:20
18       MR. HOOVER: Same objection.   12:20
19    Q. Are you aware?              12:20
20    A. Any answer to that would be   12:20
21 based on my role as general counsel in   12:20
22 my -- in my legal capacity.      12:20
23    Q. Investigating after the fact or  12:20

Page 174

1  looking at it during the time it was   12:20
2  happening?                      12:20
3    A. Either.                    12:20
4    Q. Did you look into it during the  12:20
5  time it was happening, when they were   12:20
6  employee collectors, whether there was  12:20
7  any supervision or control?      12:20
8       MR. HOOVER: If you recall.    12:20
9    A. Did I look into it how?       12:21
10    Q. With regard to temporary agency  12:21
11 collectors, did you look into whether   12:21
12 Aperian had any supervision or control  12:21
13 over them? I don't know how you would do  12:21
14 it, but --                       12:21
15    A. It was -- it was certainly an   12:21
16 expectation that Aperian monitored that.  12:21
17    Q. All right. Did you do anything  12:21
18 to confirm if that expectation was being  12:21
19 met?                             12:21
20       MR. HOOVER: Outside of you.    12:21
21    A. Outside of me, I'm not aware.  12:21
22    Q. Did you provide in your role as  12:21
23 compliance officer any criteria to      12:22

Page 175

1  Aperian for which customer were eligible  12:22
2  to get a collector placed with them?    12:22
3       MR. HOOVER: Again, if it's     12:22
4  different -- if -- if it's outside your  12:22
5  role as legal counsel, you can answer.   12:22
6    A. I don't -- that's not outside my  12:22
7  legal role.                      12:22
8    Q.                            12:22
9       MR. McKENNA: So you're not     12:22
10 going to let her answer whether any     12:22
11 criteria was provided by her as the    12:22
12 compliance officer at the hospital?     12:22
13       MR. HOOVER: Because it's not   12:22
14 just her as a compliance officer. If you  12:22
15 want to talk about the compliance      12:22
16 department, that's one thing. Or the    12:22
17 director of regulatory affairs, that's a  12:22
18 different thing. But her role as general  12:22
19 counsel is different.            12:22
20    Q. All right. Did the compliance   12:22
21 department provide any criteria to      12:22
22 Aperian as to which customers could and  12:23
23 could not receive -- or what criteria   12:23

Page 176

1  were necessary for a physician to receive  12:23
2  a collector paid for by Aperian?        12:23
3    A. I'm not aware of any.         12:23
4    Q. Okay. And did the compliance    12:23
5  department do anything to confirm the   12:23
6  expectation that collectors would be    12:23
7  monitored and supervised by Aperian?    12:23
8    A. I don't know.               12:23
9    Q. Were there guidelines put out by  12:23
10 the compliance department for what a    12:23
11 collector was permitted to do at a     12:23
12 physician's office at any time from 2008  12:23
13 to 2009?                         12:24
14    A. From the compliance department,  12:24
15 not -- I'm not aware.            12:24
16    Q. Did the compliance department   12:24
17 put out any guidelines for what a      12:24
18 collector was prohibited to do in a     12:24
19 physician's office at any time between   12:24
20 2008 to 2013?                    12:24
21    A. I'm not aware of any from the   12:24
22 compliance department.           12:24
23    Q. Are you aware of any from the   12:24

**Roben Nutter**                                      **45 (177 - 180)**

Page 177

1 legal department?                    12:24
2    MR. HOOVER: Object to the legal  12:24
3 department.                          12:24
4    MR. McKENNA: I didn't hear your   12:24
5 objection.                           12:24
6    MR. HOOVER: I would object to     12:24
7 the question as it applies to the legal 12:24
8 department. That would like -- that's 12:24
9 advice.                              12:24
10   MR. McKENNA: I just need that     12:24
11 on the record. You're not going to let 12:24
12 her answer that?                     12:24
13   MR. HOOVER: Huh?                   12:24
14   MR. McKENNA: You're not going     12:24
15 to let her answer that?              12:24
16   MR. HOOVER: That's legal          12:24
17 advice.                              12:24
18   MR. McKENNA: That's fine. I       12:24
19 just need it on the record.          12:24
20   MR. HOOVER: Yes, I'm not going    12:24
21 to let her answer that.              12:24
22 Q.   (By Mr. McKenna) All right.    12:24
23 Same thing for guidelines that were put 12:24

Page 178

1 out for what a collector was permitted to 12:24
2 do in a customer's office from 2008 to  12:24
3 2013. Are you aware of any guidelines  12:25
4 put out by the legal department?       12:25
5    MR. HOOVER: Same objection.       12:25
6 I'm not going to let her answer that.  12:25
7 Q.   Was there any mechanism by the  12:25
8 compliance department for ensuring      12:25
9 guidelines regarding what collectors    12:25
10 could and could not do or adhere to?   12:25
11 A.   I'm not aware of any.           12:25
12 Q.   Did Trae Fite have discussions  12:25
13 with you about bringing in an outside  12:26
14 auditor to look at the Aperian business? 12:26
15   MR. HOOVER: To the extent it's    12:26
16 her role as general counsel, I would   12:26
17 instruct her not to answer that.      12:26
18   MR. McKENNA: I'm not asking her   12:26
19 about the substance of the discussion,  12:26
20 just whether he brought it to her      12:26
21 attention.                           12:26
22   MR. HOOVER: Okay.                  12:26
23 A.   Prior to the audit?            12:26

Page 179

1 Q.   Yes, prior to the audit.        12:26
2 A.   Not that I recall.              12:26
3 Q.   So my follow-up was, did you    12:26
4 work with Trae to identify and select an 12:26
5 outside auditor? I'm assuming, since he 12:26
6 didn't bring it, you didn't.          12:26
7 A.   I did not.                      12:26
8 Q.   Okay. Do you know how          12:26
9 Colaborate was chosen?               12:26
10 A.   I do not.                      12:26
11 Q.   Did you approve of bringing in  12:26
12 the outside auditor before the outside  12:26
13 audit happened?                     12:26
14 A.   I was not involved.            12:26
15   MR. HOOVER: Yeah, I think she     12:26
16 testified she didn't know about it.   12:27
17 Q.   Okay. Were you aware that the  12:27
18 outside audit was going to happen before 12:27
19 it did happen?                      12:27
20 A.   Not that I recall.             12:27
21 Q.   Are you aware from sitting      12:27
22 through depositions that -- and looking 12:27
23 at exhibits that Ken Lott was aware and 12:27

Page 180

1 on board in bringing in the outside    12:27
2 auditor and having the audit done before 12:27
3 the June meeting with Jannie and the Cain 12:27
4 brothers?                            12:27
5 A.   Repeat that?                    12:27
6 Q.   Sure. Are you aware from        12:27
7 sitting through depositions and looking 12:27
8 at exhibits that were utilized in       12:27
9 depositions that Ken Lott was both aware 12:27
10 and on board with the Colaborate audit 12:27
11 and having it done before the June      12:27
12 meeting with Jannie and the Cain        12:27
13 Brothers?                            12:27
14 A.   I believe there's been testimony 12:27
15 to that effect.                      12:27
16 Q.   Okay. Did you participate in   12:27
17 the outside audit of Aperian by        12:28
18 Colaborate?                          12:28
19 A.   When they were on site?         12:28
20 Q.   Yes.                           12:28
21 A.   No.                            12:28
22 Q.   Were you upset with Trae Fite  12:28
23 for bringing in an outside auditor to  12:28

1 look at Aperian without informing you?  12:28
2    A.  I don't know that characterizing  12:28
3 it as "upset" with him would be  12:28
4 appropriate.  There -- I would have  12:28
5 preferred that that audit be run through  12:28
6 our compliance department.  12:28
7    Q.  Did you express that to him,  12:28
8 that you would have preferred it to be  12:28
9 run through the compliance department?  12:28
10    A.  I don't recall.  Probably.  But  12:28
11 I don't recall.  12:28
12    Q.  When was the first time you  12:28
13 learned about the audit from Colaborate?  12:28
14    A.  After it happened, but I  12:29
15 don't -- I don't remember exactly when.  12:29
16    Q.  Was it -- was there a triggering  12:29
17 event?  Receipt of the report, an e-mail  12:29
18 about it?  12:29
19    A.  I just don't remember how I  12:29
20 first became aware.  12:29
21    Q.  Okay.  Do you recall a person  12:29
22 named Kevin Hunter from Colaborate?  12:29
23    A.  Certainly at this point, I  12:29

1 understand who Kevin Hunter is.  12:29
2    Q.  Okay.  Did you ever meet him  12:29
3 when he was on site?  12:29
4    A.  No.  12:29
5    Q.  Okay.  Prior to the litigation,  12:29
6 did you have any conversations with Kevin  12:29
7 Hunter?  12:29
8    A.  No.  12:29
9    Q.  Did you have any e-mail  12:29
10 exchanges with Kevin Hunter prior to the  12:29
11 litigation?  12:29
12    A.  Not that I recall.  12:30
13    Q.  Okay.  Were you made aware of  12:30
14 the findings by the Colaborate audit?  12:30
15    A.  At some point I was.  12:30
16    Q.  Okay.  12:30
17       Now I just have to find those  12:30
18 documents.  12:30
19    A.  I was going to say, I hope those  12:30
20 aren't all for me.  12:30
21       MR. HOOVER:  I thought that was  12:30
22 a box of hot pizza, is what I thought  12:30
23 that was.  That's what it looks like.  12:30

1 That's his delivery pizza box.  12:31
2       MR. McKENNA:  That is.  12:31
3       MR. HOOVER:  Unsalted cashews  12:31
4 and lonzengers, Kleenex.  It's a  12:31
5 vaporizer.  He puts his head down and  12:31
6 covers his head with the cover.  12:31
7       MR. McKENNA:  You're not helping  12:31
8 me find the documents.  Here they are.  12:31
9       MR. HOOVER:  At least you don't  12:31
10 have Vicks VapoRub all over your chest  12:31
11 and we're not sitting here smelling you.  12:31
12       Sorry.  12:31
13       MR. McKENNA:  They're in here.  12:31
14       MR. HOOVER:  My eyes itch from  12:31
15 trying so hard not to touch them with my  12:31
16 hands.  12:31
17       MR. McKENNA:  I should have worn  12:31
18 latex gloves for you guys.  12:31
19       MR. HOOVER:  That's right.  12:31
20    Q.  (By Mr. McKenna) I'll start by  12:31
21 showing you what is Exhibit 13 to Jerry  12:32
22 McHan's deposition, which is Aperian  12:32
23 Bates number 7 and 8.  This is entitled  12:32

1 "Colaborate Preliminary Report  12:32
2 Highlights, June 8, 2012."  First, had  12:32
3 you seen this document before this  12:32
4 litigation?  12:32
5    A.  I don't recall if I saw this or  12:32
6 the full report.  12:32
7    Q.  You may or may not understand  12:32
8 from the testimony we've heard, but Kevin  12:32
9 Hunter was on site for three days and the  12:32
10 last day was June 8th, 2012, the date of  12:32
11 this preliminary report.  Do you recall  12:32
12 being in any meetings where these  12:32
13 preliminary report highlights were  12:32
14 presented by Kevin Hunter?  12:32
15    A.  I do not.  12:32
16    Q.  Okay.  The second finding,  12:33
17 bullet point that said "Reviewed all  12:33
18 existing compliance procedures and  12:33
19 previous inspection reports," the second  12:33
20 bullet point under that is:  "Reviewed  12:33
21 contracts with marketing company, need to  12:33
22 change policy on paying a percentage of  12:33
23 revenue to anyone.  MCR clearly prohibits  12:33

Page 185

1  'fee splitting'."                    12:33
2      Do you see that?                 12:33
3  A.  I see it.                        12:33
4  Q.  All right.  Did anybody at       12:33
5  Aperian bring this finding of the    12:33
6  Colaborate audit to your attention?  12:33
7  A.  As I said a minute ago, I don't  12:33
8  know if I saw this or the full report.  12:33
9  But at some -- at some point I saw all of 12:33
10 the recommendations.                 12:33
11 Q.  Okay.  Did a particular          12:33
12 individual bring those recommendations to 12:33
13 your attention?                      12:33
14 A.  I just don't recall exactly how  12:34
15 that came to me.                     12:34
16 Q.  Okay.  And I think you may have  12:34
17 told me you didn't have any          12:34
18 teleconferences with Kevin Hunter prior 12:34
19 to this litigation?                  12:34
20 A.  Not that I recall.               12:34
21 Q.  Okay.  I'm going to give you     12:34
22 what's been marked Exhibit 40 to George 12:34
23 Powell's deposition, which is the    12:34

Page 186

1  Colaborate report, Kevin Hunter bio, Jim 12:34
2  Sundberg's bio, and the terms and    12:34
3  conditions.  If I don't spell that out, 12:34
4  Jim will point it out.              12:34
5      MR. HOOVER:  Just trying to do   12:35
6  my doc job.                         12:35
7      MR. McKENNA:  That's right.     12:35
8  Q.  The report itself, before it     12:35
9  gets to the bios, is Bates numbers PL 12:35
10 21665 through 21675.                12:35
11     (Witness reviews document.)      12:35
12 A.  Actually, I think part of that   12:35
13 is the engagement letter.           12:35
14 Q.  You're right.                    12:35
15 A.  So, yeah, it would be through    12:35
16 26670.                              12:35
17 Q.  670.                            12:35
18 A.  Would be the body of the report. 12:35
19 Q.  Thank you for that               12:36
20 clarification.  All right.  Have you seen 12:36
21 the Colaborate audit dated June 13th, 12:36
22 2012, before?                       12:36
23 A.  I have seen it.                  12:36

Page 187

1  Q.  Okay.  Outside of this          12:36
2  litigation, what context did you see it 12:36
3  in?                                 12:36
4  A.  Again, I don't recall if I      12:36
5  received this report or the preliminary 12:36
6  report.  But I received it at some point. 12:36
7      MR. HOOVER:  What was that?  Was 12:36
8  that Bob?  Was that you?            12:36
9  Q.  On page 2 of the report under    12:36
10 "Compliance Program Implementation and 12:36
11 Management," did you receive this finding 12:36
12 about having a -- a separate -- Aperian 12:37
13 should have a -- adopt a board-approved 12:37
14 compliance plan and identify a compliance 12:37
15 officer and compliance committee     12:37
16 responsible for implementing and     12:37
17 maintaining an effective compliance  12:37
18 program?                            12:37
19 A.  I saw at some point all of the   12:37
20 recommendations.                    12:37
21 Q.  Okay.                           12:37
22 A.  Yes.                            12:37
23 Q.  Was there -- was there ever an   12:37

Page 188

1  effort prior to the 2014 to create a 12:37
2  separate compliance program and plan for 12:37
3  Aperian outside of the hospital's    12:37
4  compliance program and plan?        12:37
5  A.  Prior to 2014 was there an       12:37
6  effort to create a separate compliance 12:37
7  program --                         12:37
8  Q.  Yes.                            12:37
9  A.  -- for Aperian?  No.            12:37
10 Q.  Okay.  Was this recommendation   12:37
11 of having a separate compliance program 12:38
12 and plan for Aperian discussed with the 12:38
13 management of Aperian by the compliance 12:38
14 department?  I guess I better say the 12:38
15 Health Care Authority.              12:38
16 A.  As I recall, I discussed this    12:38
17 finding, or at least had correspondence 12:38
18 on this finding with Trae.          12:38
19 Q.  Okay.  And what do you remember  12:38
20 telling Trae about this finding?    12:38
21     MR. HOOVER:  Let me just for the 12:38
22 record so she doesn't waive any     12:38
23 attorney-client privilege, I'm going to 12:38

Page 189

1  let her testify as to the compliance     12:38
2  program and how it functions, but nothing 12:38
3  else as far as legal conclusions or     12:38
4  anything like that.               12:38
5       MR. McKENNA: Okay.           12:38
6    A.  So repeat your question. I'm     12:38
7  sorry.             12:38
8    Q.  What did you communicate with     12:38
9  Trae about the finding of needing a     12:38
10  separate compliance program for the lab? 12:38
11   A.  To the best that I can recall,     12:39
12  he and I discussed this particular     12:39
13  finding. And I -- I had looked into this 12:39
14  prior to, just generally, to make sure     12:39
15  that our compliance program was as     12:39
16  effective as it should be and could be.     12:39
17  As it relates to this particular finding 12:39
18  to Aperian, I actually consulted with     12:39
19  some outside folks just to make sure that 12:39
20  I felt comfortable that we were covering 12:39
21  all our bases appropriately. And again, 12:39
22  because of the way we are structured, you 12:39
23  know, we're not a large healthcare     12:39

Page 190

1  system. And the way we're structured,     12:39
2  with the expectations that we have of our 12:39
3  management team and people who run our     12:39
4  service lines, everyone is sort of     12:39
5  responsible for compliance. So we felt     12:40
6  like we have appropriate measures in     12:40
7  place through the existing program to     12:40
8  identify and have issues be raised as     12:40
9  appropriate, so ultimately decided we     12:40
10  were comfortable with the way the program 12:40
11  was structured.               12:40
12   Q.  Okay. Let me follow up on a     12:40
13  couple of things you said. When you said 12:40
14  you consulted some outside folks. If     12:40
15  they were counsel, I don't want to know     12:40
16  about the details of the conversation.     12:40
17  But who did you consult with who were     12:40
18  outside folks?               12:40
19   A.  Outside counsel.           12:40
20   Q.  Okay. Specifically who?     12:40
21   A.  I know Jim Hoover was one. I     12:40
22  think I maybe even asked the question to 12:40
23  Jim Pool as well.               12:40

Page 191

1    Q.  Okay. So this recommendation to 12:40
2  have a separate compliance program by     12:41
3  Colaborate ultimately was not adopted?     12:41
4    A.  It was not.               12:41
5    Q.  Page 5 of the report under     12:41
6  "Compliance," "Contracted Sales     12:41
7  Agreements," it says, "Colaborate     12:41
8  reviewed the contracted sales agreements 12:41
9  with both Summit and Total Diagnostic     12:41
10  Solutions, the Summit and Compass     12:41
11  contracts should be revised; a good rule 12:41
12  of thumb is not to enter into any     12:41
13  relationships that pay commissions based 12:41
14  on Medicare revenue."               12:41
15       Did I read that correctly?     12:41
16    A.  You did.               12:41
17    Q.  Okay. And were you made aware     12:41
18  of that finding by Colaborate?     12:41
19    A.  I received all the           12:41
20  recommendations --               12:41
21    Q.  Okay.               12:41
22    A.  -- from the audit.           12:41
23    Q.  And of course, as we looked at, 12:41

Page 192

1  Summit's contract with Aperian did pay     12:42
2  commissions based on Medicare revenues;     12:42
3  correct?               12:42
4    A.  There were commission contracts 12:42
5  that we've looked at, yes.           12:42
6    Q.  And the Summit contract included 12:42
7  all payors including federal; right?     12:42
8    A.  It did not exclude them.     12:42
9    Q.  Yeah. Was the Summit contract     12:42
10  changed as a result of this finding?     12:42
11       MR. HOOVER: To the extent     12:42
12  that's a legal -- asks for legal advice     12:42
13  or legal conclusion, I think that's -- I 12:42
14  think that's protected and privileged.     12:42
15       MR. McKENNA: I just asked     12:42
16  whether it was changed.           12:42
17       MR. HOOVER: Yeah. But you said 12:42
18  as a result of this finding.           12:42
19    Q.  Was the Summit contract with     12:42
20  Aperian ever changed?               12:42
21    A.  I'm not aware that that contract 12:42
22  changed.               12:42
23    Q.  Okay. The original Compass     12:42

**Roben Nutter**

**49 (193 - 196)**

Page 193

1 contract, contract number one that we   12:43
2 looked at dated September 11th, 2011, it   12:43
3 also paid commissions that included   12:43
4 Medicare revenues and other federal payor 12:43
5 revenues; correct?   12:43
6    A.  It did.   12:43
7    Q.  Okay.  Is the Colaborate report   12:43
8 the reason why the Compass and TDS   12:43
9 contracts were -- Compass and TDS -- my   12:43
10 mouth's not working.   12:43
11       Is the Colaborate report the   12:43
12 reason why the Compass and TDS contracts   12:43
13 were changed?   12:43
14       MR. HOOVER:  To the extent   12:43
15 you're asking her for her legal opinion   12:43
16 or her legal process, that's privileged.   12:43
17 I instruct her not to answer that.   12:43
18    Q.  Was it the triggering event that   12:43
19 led to changing those contracts?   12:44
20    A.  I don't think so.  Not that I   12:44
21 can recall.   12:44
22    Q.  Do you recall what was the   12:44
23 triggering event that changed the Compass 12:44

Page 194

1 and Total contracts?   12:44
2    A.  I think I'd have to get into my   12:44
3 role as legal counsel to answer that.   12:44
4    Q.  Do you have any explanation as   12:44
5 to why the Summit contract was not   12:44
6 changed in response to this audit   12:44
7 finding?   12:44
8       MR. HOOVER:  Again, and to the   12:44
9 extent you're asking her for opinion, for 12:44
10 general counsel legal opinion, then I   12:44
11 would object to that as privileged.   12:44
12    Q.  Do you have any opinion that's   12:45
13 not a legal opinion as to why it wasn't   12:45
14 changed?   12:45
15    A.  I don't.   12:45
16    Q.  It wouldn't be a legal opinion   12:45
17 if somebody just didn't do it, would it?   12:45
18    A.  I'm not aware that that's the   12:45
19 case.   12:45
20    Q.  Okay.  Was there any discussion   12:45
21 within the Aperian-EAMC group about   12:45
22 changing the Summit contract to eliminate 12:45
23 percentage-based commissions after the   12:45

Page 195

1 Colaborate audit finding?   12:45
2       MR. HOOVER:  Repeat the   12:45
3 question.  I missed it.  I'm sorry.   12:45
4       MR. McKENNA:  Would you read   12:45
5 that back?   12:45
6       (Requested portion read.)   12:45
7    Q.  Not asking for the details, just 12:45
8 --   12:45
9       MR. HOOVER:  Yeah.  I was going 12:45
10 to say, yeah, as long as she -- if there   12:46
11 was a discussion, she can say yes or no,   12:46
12 but not the substance of the discussion.   12:46
13    A.  I don't recall the time period,   12:46
14 but there were discussions.   12:46
15    Q.  Okay.  And I'm not trying to pin 12:46
16 you to like any date, just were the   12:46
17 discussions before Trae left employment   12:46
18 at EAMC?   12:46
19    A.  Yes.   12:46
20    Q.  Okay.  But ultimately, the   12:46
21 contract was not changed?   12:46
22    A.  Specifically related to Summit?  12:46
23    Q.  Yes.   12:46

Page 196

1    A.  I'm sorry, I probably didn't   12:46
2 answer that correctly.  I thought you   12:46
3 meant generally were there ever   12:46
4 discussions around commission-based   12:46
5 contracts.  I don't recall specifically   12:46
6 as it relates to Summit.   12:46
7    Q.  Okay.  I mean, during the whole   12:46
8 time period, if we look at claims,   12:46
9 although their volume may have gone down  12:46
10 over time, Summit was still generating   12:46
11 business for Aperian from 2009 through   12:47
12 2014; correct?   12:47
13    A.  I'd have to look at the specific  12:47
14 timing and -- and what was coming in at   12:47
15 that point from Summit.  I don't -- I   12:47
16 just don't know the time frame of that.   12:47
17    Q.  Have you looked at the expert   12:47
18 report of Steve Brannon?  I'm sorry --   12:47
19 yeah, of Steve Brannon.   12:47
20    A.  Yes.   12:47
21    Q.  All right.  And did you see the   12:47
22 charts attached as Exhibit H?   12:47
23    A.  I'm sure I did.   12:47

1    Q.   Okay.                      12:47
2    A.   I don't -- I don't -- as I sit   12:47
3  here, I don't recall exactly what that   12:47
4  was.                                12:47
5    Q.   Yeah, we can pull it out, but   12:47
6  they show there were ebbs and flows,   12:47
7  consistent business from Summit that   12:47
8  entire time period.                 12:47
9    A.   I don't know if it was -- that's   12:47
10 true for the entire time period.  I    12:47
11 recall there being a decline over time.   12:47
12   Q.   True.                       12:48
13   A.   I just don't recall the time   12:48
14 periods around that.                12:48
15   Q.   And I recall a decline as well.   12:48
16 But do you recall any cessation of   12:48
17 business prior to 2014 with Summit?   12:48
18   A.   Again, there was a cessation of   12:48
19 business at some point, but I don't   12:48
20 remember the timing of that.        12:48
21   Q.   Okay.                       12:48
22   A.   In fact, I seem to think that it   12:48
23 was definitely before 2014, but again, I   12:48

1  don't -- I don't know.              12:48
2    Q.   Like the relationship completely   12:48
3  ended before 2014?                  12:48
4    A.   I thought so, but I could be   12:48
5  wrong about that.                   12:48
6    Q.   Okay.                       12:48
7    A.   I just -- I don't remember.   12:48
8    Q.   Do you recall an e-mail from --   12:48
9  in Allen Valaer's deposition that's dated   12:48
10 December 2014 where Allen Valaer and   12:48
11 George Powell discuss ending the practice   12:48
12 of providing free Noble cups and then   12:49
13 George Powell forwards that to his   12:49
14 counsel at the Health Law Partners?   12:49
15   A.   I don't recall that e-mail   12:49
16 specifically.  I do remember there being   12:49
17 correspondence about that relationship,   12:49
18 essentially.                        12:49
19   Q.   Okay.                       12:49
20   A.   Not being in place anymore.   12:49
21   Q.   In any event, the claims data   12:49
22 will show how long their --          12:49
23   A.   I assume that would speak for   12:49

1  itself.                             12:49
2    Q.   -- business transactions   12:49
3  continued.                          12:49
4    Okay.  The next sentence says   12:49
5  under "Contracted Sales Agreements," "The   12:49
6  Total Diagnostic Agreement needs to be   12:49
7  rewritten to remove the requirement of   12:49
8  providing Noble cups as this could be   12:49
9  viewed as an inducement with the OIG."   12:49
10   Did I read that correctly?   12:49
11   A.   You did.                    12:49
12   Q.   Then it says, "With the pressure   12:50
13 the industry is under this should be   12:50
14 addressed as soon as possible and Total   12:50
15 Diagnostic should be instructed to return   12:50
16 any undistributed cups as soon as   12:50
17 possible."                          12:50
18   Did I read that correctly?   12:50
19   A.   You did.                    12:50
20   Q.   Okay.  And we've looked at the   12:50
21 Total Diagnostic contracts.  There wasn't   12:50
22 a requirement to provide cups in that   12:50
23 contract; correct?                  12:50

1    A.   I would have to look back at it.   12:50
2  I don't think so.                   12:50
3    Q.   Okay.  The contract that -- that   12:50
4  had cups mentioned in it was the Summit   12:50
5  contract; correct?                  12:50
6    A.   That's my best recollection.   12:50
7    Q.   Okay.  Do you know if prior to   12:50
8  the e-mail I discussed with -- between   12:50
9  Allen Valaer and George Powell, whether   12:50
10 any effort was made to stop the provision   12:50
11 of free Noble cups to clients of Summit   12:50
12 by Aperian or East Alabama Health Care   12:50
13 Authority?                          12:51
14   A.   You're going to have to repeat   12:51
15 that question.                      12:51
16   Q.   Sure.                       12:51
17   MR. McKENNA:  You're going to   12:51
18 have to read that back.             12:51
19   (Requested portion read.)   12:51
20   MR. HOOVER:  To the extent that   12:51
21 she did any investigation, I would object   12:51
22 that that would be attorney-client   12:51
23 privilege.                          12:51

Page 201

1   If it's something that you've   12:51
2   learned or -- testimony, you can answer   12:51
3   to the testimony. If it's something you   12:51
4   learned in your investigation as general   12:51
5   counsel, that would be privileged.   12:51
6   A. Yeah, I'm not aware of anything   12:51
7   else out of my role as general counsel.   12:51
8   Q. And did the compliance office,   12:51
9   or the compliance department make any   12:51
10  effort to stop the provision of free   12:51
11  Noble cups to clients of Summit at any   12:51
12  time before George Powell and Allen   12:51
13  Valaer agreed to stop providing them in   12:51
14  an e-mail in 2014?   12:51
15  A. I don't know.   12:51
16  Q. I'll give you what was marked   12:52
17  Exhibit 14 to McHan, and then we'll break   12:52
18  for lunch. Exhibit 14 to Jerry McHan's   12:52
19  deposition is an agenda dated June 14th,   12:52
20  2012, with various attachments. There is   12:53
21  a meeting between East Alabama Medical   12:53
22  Center, Total Diagnostics, and the Cain   12:53
23  Brothers and Co., LLC scheduled for June   12:53

Page 202

1   14th, 2012. Did you participate in any   12:53
2   of those meetings?   12:53
3   A. I don't recall.   12:53
4   Q. Did you have any interaction   12:53
5   with the Cain Brothers in the attempted   12:53
6   deal that was being contemplated between   12:53
7   Jannie Chapman's companies and Aperian?   12:53
8   A. Not that I recall.   12:53
9   Q. If we look at page PL 21802,   12:53
10  there is a document entitled "Excerpts   12:54
11  from Aperian Compliance Review." Do you   12:54
12  know who put this document together?   12:54
13  A. I do not.   12:54
14  Q. Okay. The first page lists the   12:54
15  "Compliance Program Implementation and   12:54
16  Management" and the recommendations about   12:54
17  having a compliance plan, compliance   12:54
18  officer, and a compliance committee for   12:54
19  the lab? Is that right?   12:54
20  A. Without reading every word, I   12:54
21  think that's the same recommendation that   12:54
22  we saw --   12:54
23  Q. Okay.   12:54

Page 203

1   A. -- previously.   12:54
2   Q. And then the second page, under   12:54
3   "Compliance," "Contracted Sales   12:54
4   Agreements," the recommendation against   12:54
5   providing commissions based upon Medicare   12:55
6   revenue is again repeated?   12:55
7   A. That looks to be the same   12:55
8   language.   12:55
9   Q. Okay.   12:55
10  A. Yes.   12:55
11  Q. And there's also a   12:55
12  recommendation that employee -- employee   12:55
13  lease agreements and physician provided   12:55
14  collectors have compliance forms that are   12:55
15  signed annually?   12:55
16  A. It does say that.   12:55
17  Q. Okay. Do you know if prior to   12:55
18  the Colaborate audit Aperian was   12:55
19  requiring compliance forms to be signed   12:55
20  annually by collectors that it paid for?   12:55
21  A. I don't recall.   12:55
22  Q. Do you know if at any time prior   12:55
23  to 2014 Aperian required collectors that   12:56

Page 204

1   it paid for to sign annual compliance   12:56
2   forms?   12:56
3   A. I don't recall.   12:56
4   Q. After the Colaborate -- after   12:56
5   you received the Colaborate report, did   12:56
6   you discuss -- just generally, did you   12:56
7   discuss the findings with Trae Fite? Not   12:56
8   the details.   12:56
9   A. I recall discussing at least one   12:56
10  finding. I don't recall beyond that.   12:56
11  MR. McKENNA: All right. How   12:56
12  about we break for lunch?   12:56
13  MR. HOOVER: Okay.   12:56
14  THE VIDEOGRAPHER: We are going   12:56
15  off the record at 12:58.   12:56
16  (Break taken.)   13:54
17  THE VIDEOGRAPHER: This begins   13:54
18  Disc No. 4. We're back on the record at   13:55
19  1:57.   13:55
20  Q. (By Mr. McKenna) All right.   13:55
21  Just a couple of follow-ups from this   13:55
22  morning. Who was it that offered you the   13:55
23  job as general counsel for the Health   13:55

**Roben Nutter**                                           **52 (205 - 208)**

Page 205

1  Care Authority?                    13:56
2    A.  I assume it was Terry Andrus,    13:56
3  although I don't have a recollection of  13:56
4  that.                               13:56
5    Q.  Okay.  Again, these are not    13:56
6  detailed questions, just whether you had  13:56
7  the conversation.  Did you have any   13:56
8  discussions with Terry Andrus about the  13:56
9  Colaborate audit?                   13:56
10   A.  I don't recall.               13:56
11   Q.  How about Ken Lott?           13:56
12     MR. HOOVER:  Did you -- did she  13:56
13  have a phone -- did she have a       13:56
14  conversation with Terry Andrus about Ken  13:56
15  Lott, or did she --                13:56
16     MR. McKENNA:  No.  Sorry.       13:56
17     MR. HOOVER:  Sorry.            13:56
18   Q.  Did you have any conversations  13:56
19  with Ken Lott about the Colaborate audit?  13:56
20   A.  I don't recall.              13:56
21   Q.  Other than Trae Fite, tell me  13:56
22  the people you remember having       13:56
23  discussions with about the Colaborate  13:56

Page 206

1  audit.                             13:56
2    A.  Specifically, I don't -- I don't  13:57
3  recall.                            13:57
4    Q.  Okay.  Do you recall a group   13:57
5  meeting about the Colaborate audit where  13:57
6  you were present?                   13:57
7    A.  I don't.                     13:57
8    Q.  Group conference call?        13:57
9    A.  I don't.                     13:57
10   Q.  Okay.  Did you receive any     13:57
11  advice from any outside consultants about  13:57
12  the legality of providing free Noble  13:57
13  rapid screen cups?                  13:57
14   A.  I'm sorry.  Repeat it?        13:57
15   Q.  Sure.  Did you receive any     13:57
16  advice from outside consultants about the  13:57
17  legality of providing free Noble rapid  13:57
18  screen cups?                       13:57
19   A.  Only outside counsel.         13:57
20   Q.  And just this specific question.  13:57
21  When did you receive advice from outside  13:58
22  counsel about the legality of providing  13:58
23  free Noble rapid screen cups?       13:58

Page 207

1    A.  I don't recall a time period.  13:58
2    Q.  From whom?  Which outside      13:58
3  counsel?                           13:58
4    A.  I don't recall that with       13:58
5  certainty.                         13:58
6    Q.  Which ones are you thinking?   13:58
7    A.  I can narrow it to two.        13:58
8    Q.  Which would those be?         13:58
9    A.  Either Jim Hoover or Jim Pool.  13:58
10   Q.  The Jim Hoover we're talking    13:58
11  about is the one sitting next to you   13:58
12  today?                             13:58
13   A.  It is.                       13:58
14   Q.  Did you receive any advice from  13:58
15  any outside consultants about the    13:58
16  legality of providing free Noble cup --  13:58
17  free Noble rapid screen cups that was  13:58
18  different than the advice provided in the  13:58
19  Colaborate report?                  13:58
20   A.  Can I refer back to the report?  13:59
21   Q.  Sure.                        13:59
22   A.  I think my answer to that would  14:00
23  be yes.                            14:00

Page 208

1    Q.  Okay.  Was the advice contrary  14:00
2  to the advice provided in the Colaborate  14:00
3  report?                            14:00
4      MR. HOOVER:  I think that's too  14:00
5  close to attorney-client privilege.  14:00
6      MR. McKENNA:  Are you           14:00
7  instructing her not to answer?       14:00
8      MR. HOOVER:  I am.             14:00
9    Q.  Was the advice received from   14:00
10  outside consultants about the legality of  14:00
11  providing free Noble cups provided to you  14:00
12  after the contract between Summit and  14:00
13  Aperian was -- and Aperian was already in  14:00
14  place?                             14:00
15   A.  Well, it wasn't outside        14:00
16  consultants, it was outside counsel.  But  14:00
17  I don't remember the time period.    14:00
18   Q.  If you didn't know the Summit   14:01
19  contract was even entered into at the  14:01
20  time it was entered into, is it fair to  14:01
21  say that any advice you got about free  14:01
22  Noble cups, Noble rapid screen cups would  14:01
23  be after the Summit contract?       14:01

**Roben Nutter**                                    53 (209 - 212)

Page 209

1  A. That's probably fair.       14:01
2  Q. Do you recall a marketing entity 14:01
3  called Magnolia Analytical out of    14:01
4  Mississippi?              14:01
5  A. Do I recall the name?       14:01
6  Q. Yes.            14:01
7  A. I recall the name Magnolia.   14:01
8  Q. Do you recall a marketing rep   14:01
9  named Ashley Hudson that worked for   14:01
10 Magnolia Analytical?          14:01
11 A. I recall there being a rep by   14:01
12 that name.            14:01
13 Q. Okay. You never met her?    14:01
14 A. No.            14:01
15 Q. And do you know if Jannie    14:01
16 Chapman had an ownership interest in   14:01
17 Magnolia Analytical?         14:01
18 A. I do not.           14:01
19 Q. Do you know if David --     14:01
20 Dr. David Lee, did you ever hear of him? 14:02
21 A. I don't recall.         14:02
22 Q. Do you know if he had an     14:02
23 ownership interest in Magnolia     14:02

Page 210

1  Analytical?             14:02
2  A. I do not.           14:02
3  Q. Do you know if Magnolia     14:02
4  Analytical was paid commissions by   14:02
5  Aperian for laboratory test specimens  14:02
6  that Magnolia arranged to be referred to 14:02
7  Aperian?            14:02
8  A. I do not. I do not.       14:02
9  Q. Okay. Do you know if Dr. Lee's 14:02
10 practice, Southern Neurologic & Spine,  14:02
11 referred specimens to Aperian for   14:02
12 testing?             14:02
13 A. I do not.           14:02
14 Q. Do you know whether Magnolia  14:02
15 Analytical was paid commissions on test 14:02
16 specimens referred by Southern    14:02
17 Neurologic& Spine?          14:02
18 A. I do not.           14:02
19 Q. Did you ever hear Dr. Lee was  14:02
20 Ashley Hudson's girlfriend?      14:02
21 MR. HOOVER: Girlfriend?     14:03
22 MR. McKENNA: Girlfriend.    14:03
23 MR. HOOVER: No.       14:03

Page 211

1  MR. McKENNA: What did I say?  14:03
2  MR. HOOVER: You said      14:03
3  girlfriend.          14:03
4  MR. McKENNA: Okay. I thought  14:03
5  you said I said boyfriend.      14:03
6  MR. HOOVER: That's what I was  14:03
7  expecting. Sorry.         14:03
8  A. I don't recall knowing that or  14:03
9  hearing that.          14:03
10 Q. (By Mr. McKenna) Yeah. And I  14:03
11 did say it wrong. Did you ever hear -- 14:03
12 see, I did take another DayQuil at lunch 14:03
13 because I was starting to sneeze.    14:03
14 Did you ever hear that Dr. Lee   14:03
15 and Ashley Hudson were boyfriend and   14:03
16 girlfriend?           14:03
17 A. I don't recall knowing that or  14:03
18 hearing that.          14:03
19 Q. Okay. What information did Trae 14:03
20 Fite take from Aperian?        14:03
21 MR. HOOVER: To the extent that  14:03
22 you know.           14:03
23 A. I don't think I know.      14:03

Page 212

1  Q. Okay.           14:03
2  A. The information he took.     14:03
3  Q. Did you read the counterclaims  14:03
4  filed by Aperian and East Alabama Health 14:03
5  Care Authority in response to the second 14:03
6  amended complaint before they were filed? 14:04
7  A. I did.           14:04
8  Q. Okay. The complaint does not  14:04
9  specify the information that Trae Fite  14:04
10 took from Aperian. Can you tell me what 14:04
11 information he took from Aperian?    14:04
12 MR. HOOVER: If you know.     14:04
13 A. I don't know the extent of the  14:04
14 information that he took.       14:04
15 Q. Okay. Did you investigate    14:04
16 what -- what information Trae took?   14:04
17 A. Yes.            14:04
18 Q. Okay. What did the        14:04
19 investigation consist of?       14:04
20 MR. HOOVER: That's going to be  14:04
21 attorney-client privilege.       14:04
22 MR. McKENNA: This goes to the  14:04
23 factual basis for the counterclaim.   14:04

Page 213

1    MR. HOOVER: Not from general    14:04
2  legal counsel it doesn't.    14:04
3    MR. McKENNA: She's the person    14:04
4  that did the investigation.    14:04
5    MR. HOOVER: Yeah. In her role    14:04
6  as a lawyer for the -- for the hospital.    14:04
7    MR. McKENNA: Okay.    14:04
8    Q.  (By Mr. McKenna) Did the    14:04
9  investigation reveal which documents Trae    14:04
10  took?    14:05
11    A.  It revealed some documents that    14:05
12  he took.    14:05
13    Q.  Okay.  Which documents do you    14:05
14  recall that he took?    14:05
15    A.  I don't recall specifically    14:05
16  which documents.    14:05
17    Q.  The counterclaim alleges that    14:05
18  Trae Fite took thousands of documents --    14:05
19  this is a quote -- thousands of documents    14:05
20  loaded with the medical center's    14:05
21  confidential information, proprietary    14:05
22  information, and trade secrets.    14:05
23    What information did Trae --    14:05

Page 214

1  that Trae copied is a trade -- trade    14:05
2  secret?    14:05
3    A.  I don't know specific documents    14:05
4  to refer you to, but I would refer back    14:05
5  to his testimony in which he had a rule    14:05
6  on his e-mail to forward everything from    14:05
7  the hospital to his personal e-mail    14:06
8  address.    14:06
9    Q.  For a period of time while his    14:06
10  father was ill, and that was his    14:06
11  testimony?    14:06
12    A.  I think his testimony was that    14:06
13  he began doing that when his father    14:06
14  passed away.    14:06
15    Q.  Okay.  Are you aware of any of    14:06
16  the information that was forwarded    14:06
17  through his e-mail being a trade secret    14:06
18  of --    14:06
19    A.  If everything that came through    14:06
20  his e-mail was forwarded to his home    14:06
21  e-mail, I would assume that there were    14:06
22  trade secrets there.    14:06
23    Q.  What trade secrets?    14:06

Page 215

1    A.  I don't know specifically as we    14:06
2  sit here today.    14:06
3    Q.  Do you know who would know that    14:06
4  information? Trae's testimony was that    14:06
5  he didn't copy any trade secrets.    14:06
6    A.  I think that would be determined    14:06
7  through our legal analysis as to what    14:06
8  were trade secrets and what weren't.    14:06
9    Q.  So, are we going to find out    14:06
10  about it for the first time at trial?    14:07
11  It's not going to be provided to us    14:07
12  because it's protected by privilege?    14:07
13    A.  I'm not sure what the strategy    14:07
14  will be around that.    14:07
15    Q.  So, can you tell me sitting here    14:07
16  today one document that Trae Fite copied    14:07
17  that was a trade secret of East Alabama    14:07
18  Health Care Authority or Aperian?    14:07
19    A.  Not specifically.    14:07
20    Q.  Can you tell me generally?    14:07
21    A.  I think my answer would be the    14:07
22  same.  If he forwarded every single    14:07
23  document that he received through his    14:07

Page 216

1  hospital e-mail to his home e-mail, then    14:07
2  likely, that's going to contain    14:07
3  information that had trade secrets.    14:07
4    Q.  And do you have --    14:07
5    A.  In addition to protected health    14:07
6  information.    14:07
7    Q.  What is the factual basis for    14:07
8  your statement that he forwarded every    14:07
9  e-mail from the hospital e-mail to his    14:07
10  home e-mail?    14:07
11    A.  His testimony that he began    14:07
12  forwarding everything when his father    14:07
13  passed away and what we've learned    14:08
14  through our internal investigation.    14:08
15    Q.  Did the internal investigation    14:08
16  reveal that every e-mail from the time    14:08
17  his father passed away to the time he    14:08
18  left was forwarded to his personal    14:08
19  e-mail?    14:08
20    A.  I don't recall the specifics    14:08
21  around what that showed.    14:08
22    Q.  Do you have any information that    14:08
23  Trae shared the information that he    14:08

Page 217

1  copied with anybody other than his        14:08
2  attorneys or the United States government  14:08
3  employees charged with investigating       14:08
4  fraud on the government?                   14:08
5   A.  I don't have any information          14:08
6  about that one way or the other.           14:08
7   Q.  Do you have any information that      14:08
8  Trae shared any of the EAMC-Aperian        14:08
9  information with competitors of Aperian    14:08
10 or EAMC?                                   14:08
11  A.  I don't know if he did or not.        14:08
12  Q.  Do you have any information that      14:08
13 Trae Fite attempted to hack the computer   14:08
14 systems of Aperian or EAMC after his       14:08
15 employment was terminated?                 14:09
16  A.  "Hack" is a broad term.  Can you      14:09
17 be more specific?                          14:09
18  Q.  Yeah.  Tried to access the            14:09
19 computer systems of Aperian or EAMC        14:09
20 without authorization after his            14:09
21 employment was ended.                      14:09
22  A.  Not that I'm aware of.                14:09
23  Q.  Do you have any information that      14:09

Page 218

1  Trae shared confidential patient           14:09
2  information with anyone other than his     14:09
3  attorneys or the government employees      14:09
4  charged with investigating the fraud on    14:09
5  the government?                            14:09
6   A.  I'm not aware one way or the          14:09
7  other what he did with the information.    14:09
8   Q.  You understand there are              14:09
9  protective orders in this case that        14:09
10 prevent public disclosure of trade         14:09
11 secrets and patient information?           14:09
12  A.  As it relates to this case?           14:09
13  Q.  Yes.                                  14:09
14  A.  Yes.                                  14:09
15  Q.  Did Trae Fite cause any harm to       14:09
16 the computer systems of EAMC or Aperian?   14:09
17  A.  I am not aware.                       14:10
18  Q.  How has EAMC or Aperian been          14:10
19 damaged by Trae's copying of work-related  14:10
20 documents and forwarding of work-related   14:10
21 e-mails?                                   14:10
22  A.  I don't think we know the answer      14:10
23 to that fully right now.                   14:10

Page 219

1   Q.  But can you articulate any way        14:10
2  in which EAMC or Aperian has been damaged  14:10
3  by his forwarding of e-mails and copying   14:10
4  of work-related documents?                 14:10
5   A.  I don't know that I have enough       14:10
6  information to answer that at this point.  14:10
7   Q.  Okay.  Do you understand that         14:10
8  Aperian and EA- -- or Aperian/EA have      14:10
9  paid the United States government to       14:10
10 settle some of the allegations made by     14:10
11 Mr. Fite in this lawsuit?                  14:10
12  A.  Yes.                                  14:11
13  Q.  Do you understand that                14:11
14 Compass/TDS and Chapman have paid the      14:11
15 United States to settle all of Mr. Fite's  14:11
16 allegations in the lawsuit?                14:11
17  A.  I don't know the terms of their       14:11
18 settlement.                                14:11
19  Q.  You understand they have              14:11
20 settled?                                   14:11
21  A.  I do.                                 14:11
22  Q.  Have you read the settlement          14:11
23 agreement?                                 14:11

Page 220

1   A.  I have not.                           14:11
2   Q.  You understand that Dr. Aggarwal      14:11
3  has paid the United States to settle all   14:11
4  of Mr. Fite's allegations in the lawsuit?  14:11
5   A.  I do.  Well, I mean, I don't          14:11
6  know the same, same as Compass, but I      14:11
7  understand there was a settlement.         14:11
8   Q.  Okay.  I'll give you mark as          14:11
9  Exhibit 5.                                 14:12
10 (Plaintiff's Exhibit 5 was marked for      14:12
11 identification and is attached.)           14:12
12     (Witness reviews document.)            14:12
13  Q.  Okay.  Can you identify Exhibit       14:12
14 5 for us, please.                          14:12
15  A.  It appears to be a series of          14:12
16 e-mails.                                   14:12
17  Q.  Okay.  Are you on this e-mail         14:12
18 chain with Trae Fite and Jannie Chapman?   14:12
19  A.  I'm on the last e-mail in the         14:12
20 chain.                                     14:12
21  Q.  Okay.  And if you're on the           14:12
22 e-mail in the chain, do you understand     14:12
23 that you would have been provided with     14:12

Page 221

1 the prior e-mails that are in that chain? 14:13
2    A.  I don't know that that's the 14:13
3 case, but I know I received the one -- or 14:13
4 am on the chain of the one -- the last 14:13
5 one. 14:13
6    Q.  Okay.  And this e-mail chain is 14:13
7 discussing a conference call between 14:13
8 Trae, Jannie, and you sometime the next 14:13
9 day between 10:00 and 2:00.  And he also 14:13
10 asked to get Blake on the call to discuss 14:13
11 the TDS and Magnolia contracts and get 14:13
12 those squared away.  Do you see that? 14:13
13    A.  I see that. 14:13
14    Q.  Okay.  And he also mentions 14:13
15 discussing a response to the letter y'all 14:13
16 received from Ameritox? 14:13
17    A.  It does mention that. 14:13
18    Q.  Okay.  Do you recall having a 14:13
19 conference call with Trae, Jannie, and 14:13
20 Blake Bourland about these topics? 14:14
21    A.  I recall vaguely having a 14:14
22 conference call or two.  I don't know if 14:14
23 it was in response to this e-mail or when 14:14

Page 222

1 it occurred. 14:14
2    Q.  Okay.  So you did have several 14:14
3 conference calls with Trae, Jannie, 14:14
4 Blake, and you? 14:14
5    A.  A couple maybe.  I don't 14:14
6 remember specifically. 14:14
7    Q.  Okay.  And -- okay.  If we look 14:14
8 at the e-mail on the second page that's 14:14
9 July 5th, 2012, at 2:09 p.m.?  You see 14:14
10 that? 14:14
11    A.  I do. 14:14
12    Q.  Trae says: "Jannie, You asked 14:14
13 that I send a summary of the proposed 14:15
14 contract language for a new TDS contract 14:15
15 and Magnolia contract.  If all this looks 14:15
16 good to you, please forward to Blake. 14:15
17 Here's the highlights." 14:15
18        And then he goes through Total 14:15
19 Diagnostics, it would be commission, a 14:15
20 "$40,000 flat fee each month to cover 14:15
21 staffing costs and marketing efforts." 14:15
22 Says, "If 25% of the reimbursement 14:15
23 exceeds $40,000, then an additional fee 14:15

Page 223

1 will be paid equaling the difference in 14:15
2 the amounts to cover the costs associated 14:15
3 with increased volume and marketing 14:15
4 efforts." 14:15
5        Did I read that correctly? 14:15
6    A.  Yes. 14:15
7    Q.  Did you understand that is what 14:15
8 was being proposed by Aperian to TDS in 14:15
9 July of 2012? 14:15
10    A.  I don't -- I don't recall. 14:15
11    Q.  And did this offering of $40,000 14:15
12 a month flat fee with an additional fee 14:15
13 of 25 percent reimbursement exceeds 14:16
14 $40,000 raise any concerns for you? 14:16
15        MR. HOOVER:  To the extent it 14:16
16 asks for her mental impression or her 14:16
17 mental judgment, I'm going to object as 14:16
18 attorney-client privilege.  She can 14:16
19 testify to this e-mail.  I don't think 14:16
20 she can testify as to what her thought 14:16
21 process was. 14:16
22    Q.  Did the e-mail raise any 14:16
23 concerns for you? 14:16

Page 224

1        MR. HOOVER:  It's the same 14:16
2 thing.  I mean, what I'm saying is she -- 14:16
3 she can testify -- this e-mail is not -- 14:16
4 is not protected by attorney-client 14:16
5 privilege, obviously, because it's going 14:16
6 to outside.  But her thought process and 14:16
7 what was a concern and not a concern is 14:16
8 protected. 14:16
9    Q.  All right.  Did you communicate 14:16
10 to Jannie Chapman or Blake Bourland that 14:16
11 you could not offer an additional fee 14:16
12 would be paid equaling the difference in 14:16
13 the amounts to -- did you explain to -- 14:16
14 let me back up. 14:17
15        Did you have any discussions 14:17
16 with Blake or Jannie about the commission 14:17
17 structure that is set forth in bullet 14:17
18 point, or item number 1 of Trae's e-mail 14:17
19 to Jannie? 14:17
20    A.  I don't recall the specific 14:17
21 discussions I had with either one of 14:17
22 them. 14:17
23    Q.  So we're just going to get your 14:17

Page 225

1  mental impressions or "I don't recall,"    14:17
2  are all the answers --    14:17
3    A.  I mean, this is six years ago.    14:17
4  I don't recall the specifics of my    14:17
5  conversations with them.    14:17
6    Q.  All right.  Well, offering a    14:17
7  bonus on top of a flat fee if 25 percent  14:17
8  of reimbursement exceeds $40,000 is a    14:17
9  pretty specific term.  Do you recall    14:17
10  having discussions with Blake or Jannie    14:17
11  about that term and whether a bonus on    14:17
12  top of a flat fee would be offered?    14:17
13    A.  I don't recall that.    14:18
14    Q.  Do you recall any conversations    14:18
15  with Blake or Jannie telling them that    14:18
16  Aperian could not offer that?    14:18
17    A.  I don't recall.    14:18
18    Q.  Hand you what's been marked as    14:18
19  Nutter Exhibit 6.  It's a marketing    14:18
20  services agreement with a box up in the    14:19
21  top, "Burr & Forman LLP, Draft of August  14:19
22  2, 2012, For Discussion Purposes Only."    14:19
23  Do you recall this document?    14:19

Page 226

1  (Plaintiff's Exhibit 6 was marked for    14:19
2  identification and is attached.)    14:19
3    MR. HOOVER:  You know, I'm going    14:19
4  to instruct her not to testify to this    14:19
5  because this, to me, should not have been  14:19
6  produced and I think it's subject to the  14:19
7  clawback provision.  I mean it clearly    14:19
8  says Burr Forman, draft, August 2nd,    14:19
9  2012, "For Discussion Purposes Only."    14:19
10    MR. McKENNA:  Well, we're going    14:19
11  to get to the documents, there's lots of  14:19
12  e-mails where these drafts were forwarded  14:19
13  to --    14:19
14    MR. HOOVER:  Okay.    14:19
15    MR. McKENNA:  -- to Blake and    14:19
16  Jannie, and then Blake marks them up and  14:19
17  like strikes through "Burr Forman" and    14:19
18  sends them back "Evans Petree."    14:19
19    MR. HOOVER:  Okay.  I mean, if    14:19
20  these are attached to these e-mails, I    14:19
21  mean, I think you have to also be careful  14:19
22  about taking it out of -- out of the    14:20
23  order of the e-mail so you know what the  14:20

Page 227

1  context of --    14:20
2    MR. McKENNA:  Sure.    14:20
3    MR. HOOVER:  -- of the contract  14:20
4  is.    14:20
5    MR. McKENNA:  Sure.    14:20
6    MR. HOOVER:  Without having her  14:20
7  testify to it cold.    14:20
8    Q.  (By Mr. McKenna) Well, my first  14:20
9  question before we got to the objection  14:20
10  was going to be, do you recall were these  14:20
11  drafts exchanged with Jannie and Blake    14:20
12  Bourland, drafts of contracts?    14:20
13    A.  I don't recall exchanging these  14:20
14  drafts with them myself.  But it's    14:20
15  possible that I was on e-mails in which  14:20
16  they were exchanged.    14:20
17    Q.  Okay.  All right.  Let's go back  14:20
18  to Exhibit A, "Marketing Services," which  14:21
19  was page Aperian 8885.  Do you see    14:21
20  Exhibit A, that there's a list of    14:21
21  marketing services there?    14:21
22    A.  I do.    14:21
23    Q.  Okay.  As we go through the    14:21

Page 228

1  documents, we'll see that this list of    14:21
2  marketing services did not make it into  14:21
3  the final contract.  Did they -- did this  14:21
4  list of marketing services not make it    14:21
5  into the final contract because it was    14:21
6  objected to by Jannie Chapman and her    14:21
7  side of the negotiations?    14:22
8    A.  I don't remember why it didn't  14:22
9  make it into the final draft.    14:22
10    Q.  Okay.  The payments down at the  14:22
11  bottom begin October 2012 at $50,000, and  14:22
12  then they go up until they reach $75,000  14:22
13  a month in September of 2013.  What's    14:22
14  your recollection of why there was    14:22
15  increasing payments in the early    14:22
16  discussions?    14:22
17    A.  I don't have a recollection    14:22
18  about that.    14:22
19    Q.  Do you see on the first page,    14:22
20  number 4, "Compensation," there was a    14:22
21  requirement for the contractor, being    14:22
22  Total Diagnostics Solutions, to devote at  14:22
23  least 240 hours per month to the services  14:22

**Roben Nutter**                                          **58 (229 - 232)**

Page 229

1  identified in Exhibit A? That hours     14:23
2  requirement did not make it into the     14:23
3  final contract. Do you know why not?     14:23
4     A. I don't recall.          14:23
5     Q. Do you know why it was placed in     14:23
6  this draft?          14:23
7        MR. HOOVER: Object to the     14:23
8  extent you're asking her for her mental     14:23
9  conclusions or mental opinions on the     14:23
10 contract language.          14:23
11    Q. I'm asking you based on your     14:23
12 discussions with third parties, because     14:23
13 we'll see that there was plenty of them     14:23
14 back and forth.          14:23
15    A. I don't recall.          14:23
16    Q. Surely, somebody communicated to     14:23
17 Jannie and Blake the reason why a     14:23
18 240-hour month -- -per-month requirement  14:23
19 was being proposed; correct?          14:23
20    A. I don't know that is     14:23
21 correct. And I was not the primary     14:23
22 person negotiating these, so I don't -- I  14:23
23 don't recall having a discussion about     14:23

Page 230

1  that one way or another.          14:23
2     Q. Who was the primary person     14:23
3  negotiating these?          14:23
4     A. Trae Fite. Trae Fite initially,     14:23
5  and then eventually -- well, at least on     14:24
6  a few occasions, Jim Hoover and Blake     14:24
7  talked individually.          14:24
8     Q. Individually?          14:24
9     A. Well, worked together.          14:24
10    Q. Okay. Did you ever meet Blake     14:24
11 Bourland?          14:24
12    A. No.          14:24
13    Q. Did you ever look up Blake     14:24
14 Bourland's profile on his firm website?  14:24
15    A. I don't recall if I did or not.  14:24
16    Q. Do you understand that Blake     14:24
17 Bourland is a transactional lawyer?     14:24
18    A. I don't know that I understood.     14:24
19    Q. Okay.          14:24
20    A. That.          14:24
21    Q. Do you understand that Blake     14:24
22 Bourland lists no healthcare law     14:24
23 experience on his firm profile?     14:24

Page 231

1     A. No.          14:24
2     Q. Okay. Exhibit 7. This is an     14:24
3  August 15th e-mail from Trae Fite to Ken  14:25
4  Lott, Allen Valaer, and cc'd to you     14:25
5  entitled "Jannie contract payment     14:25
6  amounts." And if you'll look at Exhibit  14:25
7  6, it's similar to what we saw at the     14:25
8  bottom of the draft of the compensation.  14:25
9  (Plaintiff's Exhibit 7 was marked for     14:25
10 identification and is attached.)     14:26
11    (Witness reviews document.)     14:26
12    A. Mine is cut off, but.          14:26
13    Q. Yeah, mine is cut off, too. But  14:26
14 for the months that we can see?          14:26
15       MR. HOOVER: Was this attached  14:26
16 to another e-mail, or is this a     14:26
17 stand-alone e-mail? Do you recall?     14:26
18       MR. McKENNA: I don't recall.     14:26
19    A. At least from what I can see, it  14:26
20 looks similar.          14:26
21    Q. Okay. And Trae says: "Here are  14:26
22 my thoughts on this. To get to the 4200  14:26
23 per month number as an average for the     14:26

Page 232

1  next fiscal year, we need to ask Jannie  14:26
2  to add 200 specimens per month beginning  14:26
3  in October. That puts her at an average  14:26
4  monthly volume of 3600 samples for     14:26
5  Total/Magnolia combined. Her average     14:26
6  reimbursement is $65-$75, so I chose the  14:26
7  lower for calculating commission."     14:26
8        So, is it fair to say that the     14:26
9  increased payments go along with          14:26
10 increased expected volume?          14:26
11       MR. HOOVER: Object to the form.  14:26
12    A. I don't know that I can say     14:27
13 that.          14:27
14    Q. You don't see that?          14:27
15    A. I didn't do any of these     14:27
16 calculations, so I don't know what.     14:27
17    Q. Well, isn't that what Trae's     14:27
18 setting forth in the e-mail, that the     14:27
19 increased payments --          14:27
20    A. I think the e-mail speaks for     14:27
21 itself, so. You're reading it correctly.  14:27
22    Q. Okay. All right. Down at the     14:27
23 bottom, the second -- after the -- the     14:27

Page 233

1 dollar numbers per month, it says, "In 14:27
2 terms of payment, right now we are paying 14:27
3 $35,000 per month for the total specimens 14:27
4 and $10,000 a month for Magnolia." Did I 14:27
5 read that correctly? 14:27
6 A. You did. 14:27
7 Q. Okay. And I'm trying to piece 14:27
8 together, the contract we looked at 14:27
9 earlier that spelled out $35,000 a month 14:27
10 is dated March 1st, 2012. Was that 14:27
11 contract already in effect in August of 14:28
12 2012, or were the parties still working 14:28
13 to negotiate it, negotiated it, and then 14:28
14 backdated it to March? 14:28
15 A. Which contract are you referring 14:28
16 to? 14:28
17 Q. The second contract, the one 14:28
18 that was dated March -- 14:28
19 A. The TDS contract? 14:28
20 Q. Yeah, the TDS contract. 14:28
21 A. And I'm sorry, you're going to 14:28
22 have to repeat your question. 14:28
23 Q. Sure. 14:28

Page 234

1 A. Again. 14:28
2 Q. What I'm trying to figure out is 14:28
3 we've got the first contract was 14:28
4 percentage commission, second contract 14:28
5 was flat fee $35,000, third contract 14:28
6 percentage commission, supposed to 14:28
7 exclude federal payors. The second 14:28
8 contract is entered into in March of 14:28
9 2012. Am I right about that? 14:29
10 A. That's -- 14:29
11 Q. That's the date on it. 14:29
12 A. The date on the contract, yes. 14:29
13 Q. And the e-mail we're looking at 14:29
14 that is exhibit what, 7? 14:29
15 MR. HOOVER: Yes. 14:29
16 Q. Yeah, Exhibit 7. It's dated in 14:29
17 August 2012; right? 14:29
18 A. Correct. 14:29
19 Q. And it's also discussing a flat 14:29
20 fee concept with escalating; correct? 14:29
21 A. That's what it appears. 14:29
22 Q. Okay. So what I'm trying to 14:29
23 just get, a timeline understanding, was 14:29

Page 235

1 the March 2012 contract entered into in 14:29
2 March of 2012 or was it still being 14:29
3 negotiated in August of 2012 and then 14:29
4 backdated to March? 14:29
5 A. I would not think it was 14:29
6 backdated, but I don't -- I don't know. 14:29
7 Q. Okay. Do you know if there was 14:29
8 ever a point where the parties were 14:30
9 operating on a flat fee agreement but 14:30
10 there was no signed contract to that 14:30
11 effect yet? 14:30
12 A. I'm not aware of that. 14:30
13 Q. Give you what we've marked 14:30
14 Exhibit 8. 14:30
15 (Plaintiff's Exhibit 8 was marked for 14:31
16 identification and is attached.) 14:31
17 (Witness reviews document.) 14:31
18 Q. All right. Exhibit 8 is an 14:31
19 August 23rd, 2012, e-mail from, at the 14:31
20 top it's from Jannie to Trae. But before 14:31
21 that, it is from Trae to Jannie. And he 14:31
22 says: "Good afternoon Jannie. I 14:31
23 apologize for not getting in touch 14:31

Page 236

1 sooner, but I had a family emergency last 14:31
2 week I had to deal with. Our legal 14:31
3 counsel, Roben, and I have been working 14:31
4 with our attorney to finalize a contract 14:31
5 going into the new fiscal year in 14:31
6 October." 14:31
7 Did I read that correctly? 14:31
8 A. You did. 14:31
9 Q. Is that a true statement? 14:31
10 A. I don't recall the e-mail 14:31
11 specifically. 14:31
12 Q. Well, was it a true statement 14:31
13 that you and Trae were working with your 14:31
14 attorney to finalize a contract going 14:31
15 into the new fiscal year in October? 14:32
16 A. I don't recall this e-mail 14:32
17 specifically or the timing. There were 14:32
18 periods where we were working with 14:32
19 outside counsel on these contracts. 14:32
20 Q. Okay. Next he says, "After our 14:32
21 compliance audit and a review of our 14:32
22 current contract, we tried to make the 14:32
23 new one as comprehensive and compliant as 14:32

Page 237

1  possible."      14:32
2     Is the "compliance audit" he's   14:32
3  referring to there the Colaborate audit? 14:32
4     A.  I don't know.      14:32
5     Q.  Are you aware of any other    14:32
6  compliance audit that dealt with the    14:32
7  Compass or TDS contracts in this time    14:32
8  frame?      14:32
9     A.  I'm not aware of any others.    14:32
10    Q.  Okay.  Then, is it accurate that 14:32
11 you would have received the Colaborate    14:32
12 report sometime before this August 2012 14:32
13 e-mail?      14:32
14    A.  I don't recall when I received    14:32
15 the report.      14:32
16    Q.  Doesn't it make sense based on    14:32
17 this e-mail that you would have received 14:32
18 it prior to this e-mail?      14:33
19    A.  I just, I don't recall when I    14:33
20 received it, so I'm not going to      14:33
21 speculate on that.      14:33
22    Q.  Okay.  What review was done of    14:33
23 the current contract?      14:33

Page 238

1     A.  I don't think I could talk about 14:33
2  that.      14:33
3     Q.  Okay.  Is it referring to the    14:33
4  Colaborate review of the current      14:33
5  contract?      14:33
6       MR. HOOVER:  I object.      14:33
7     A.  I don't know what he's referring 14:33
8  to.      14:33
9       MR. HOOVER:  Yeah, I was going    14:33
10 to say object to the fact that you're    14:33
11 trying to get her to speculate as to what 14:33
12 Trae was referring to or Jannie was      14:33
13 referring to.      14:33
14    Q.  Okay.  Did you have outside    14:33
15 counsel review the future contract?  I'm 14:33
16 not asking what the results were, just    14:33
17 whether you had them review it.      14:33
18    A.  I'm not sure what current      14:33
19 contract he's talking about, but I did    14:33
20 have outside counsel involved.      14:33
21    Q.  Well, do you know what contract    14:33
22 would have been the current contract in    14:33
23 August of 2012?      14:33

Page 239

1     A.  I'm not going to assume I know    14:34
2  what he's talking about here.  I had      14:34
3  outside counsel involved in -- in the    14:34
4  contracts.      14:34
5     Q.  Okay.  In which contracts.      14:34
6     A.  Well, that's a good question.    14:34
7     Q.  You don't know?      14:34
8     A.  I don't recall specifically the    14:34
9  time periods and -- you know, I'm      14:34
10 assuming that this was working into the    14:34
11 December contract.      14:34
12    Q.  Okay.      14:34
13    A.  And if that's the one we're      14:34
14 talking about, I had outside counsel      14:34
15 involved.      14:34
16    Q.  Okay.  Trae ends by saying,      14:34
17 "would it be okay if Roben and I go ahead 14:34
18 and involve Blake to begin reviewing the 14:34
19 contract language?"      14:34
20      Did you do that, involve Blake    14:34
21 Bourland in the contract language review? 14:34
22    A.  I think there's e-mails that      14:34
23 show that Blake and I had some      14:34

Page 240

1  correspondence.      14:35
2     Q.  Exhibit 9.  This is five days    14:35
3  after Trae contacts Jannie about "Can we 14:36
4  get Blake involved" and provide a copy of 14:36
5  the contract.      14:36
6     (Plaintiff's Exhibit 9 was marked for    14:36
7  identification and is attached.)      14:36
8       (Witness reviews document.)      14:36
9     Q.  Is that correct?      14:36
10    A.  The last e-mail in the chain.    14:36
11    Q.  Yes.      14:36
12    A.  Yes.      14:36
13    Q.  All right.  All right.  Trae in    14:36
14 this last e-mail on the first page      14:36
15 e-mails you, Blake Bourland, Jannie.  And 14:36
16 he says:  I think you will find that we    14:36
17 have allowed for Compass" -- "for that in 14:37
18 the compensation plan outlined in Exhibit 14:37
19 A.  Please review and we can discuss      14:37
20 further during our conference call at      14:37
21 1PM."      14:37
22      Do you recall what Bourland's      14:37
23 reaction to the terms of the Aperian      14:37

Page 241

1 proposed contract were on the conference 14:37
2 call?                          14:37
3   A.  I don't.              14:37
4   Q.  On the third page, 868 here,     14:37
5 Blake Bourland writes you, copies -- and 14:37
6 also Trae Fite.  Says: "Roben: Where    14:37
7 are you on the Compass/Aperian Contract? 14:37
8 Jannie says that it is way past time to  14:37
9 get this completed and in fact that     14:37
10 it" -- "the fact that it hasn't been done 14:37
11 yet has cost Compass $5,000 for two     14:37
12 months ($10,000) for which Compass will 14:37
13 want to get reimbursed per the terms of  14:37
14 the new agreement."              14:38
15     Did I read that correct?         14:38
16   A.  You did.            14:38
17   Q.  How had the delay in the -- in   14:38
18 the contract negotiations cost Compass   14:38
19 $5,000 a month?                  14:38
20   A.  I don't know.          14:38
21   Q.  Was there a -- were they       14:38
22 expecting an increase in the compensation 14:38
23 in the new contract that hadn't been    14:38

Page 242

1 finalized?                      14:38
2     MR. HOOVER:  Object to the form. 14:38
3   A.  I don't recall.            14:38
4   Q.  Show you Exhibit 10.  This is an 14:38
5 e-mail chain going back to July, would   14:39
6 include you, Trae, Blake Bourland, and   14:39
7 Jannie Chapman, about the contract      14:39
8 language for Total and Magnolia?        14:39
9 (Plaintiff's Exhibit 10 was marked for   14:40
10 identification and is attached.)        14:40
11     (Witness reviews document.)      14:40
12   Q.  Ready?              14:40
13   A.  Uh-huh.              14:40
14   Q.  What was the answer to that     14:40
15 question?  Did you answer it?       14:40
16   A.  What was your question?       14:40
17   Q.  Is this an e-mail chain going    14:40
18 back to July 2012 through August 28th,   14:40
19 2012?                        14:40
20   A.  I didn't realize that was a    14:40
21 question.  I thought that was a        14:40
22 statement.  It does appear that this     14:40
23 e-mail chain goes back to July 5th, 2012. 14:40

Page 243

1   .Q.  Okay.  In this -- on the very   14:40
2 first page, 336 here, Trae says: "Blake, 14:40
3 I understand a lot of work has been put  14:41
4 into these agreements.  However, based on 14:41
5 the recent letter from Ameritox about    14:41
6 Ashley Hudson's involvement with the     14:41
7 Magnolia business and their allegations  14:41
8 that she was violating her non-compete   14:41
9 agreement prompted our CEO to require us 14:41
10 to attempt to create an agreement that   14:41
11 falls within a Safe Harbor and protects  14:41
12 Aperian and the Healthcare Authority from 14:41
13 excessive compliance risks.  He has      14:41
14 gotten several calls personally from the 14:41
15 attorney representing Ameritox, and      14:41
16 coupled with some skepticism about the   14:41
17 current business model, while he tasked  14:41
18 us with adding some protections on our   14:41
19 side."                        14:41
20     Did I read that correctly?       14:41
21   A.  You did.            14:41
22   Q.  What skepticism did the CEO     14:41
23 express about the current business model 14:41

Page 244

1 between Aperian and Total Diagnostics?   14:41
2   A.  Given that this is coming from   14:41
3 Trae, I couldn't speak to that.        14:42
4   Q.  Was that skepticism expressed to 14:42
5 you?                          14:42
6   A.  Not that I recall.          14:42
7   Q.  Okay.  Do you know which safe    14:42
8 harbor is being referred to that Aperian 14:42
9 is trying to fit within?            14:42
10   A.  I don't.              14:42
11   Q.  Okay.  If you turn to the second 14:42
12 page, 337 here.  Well, let me put it in  14:42
13 context.  If we look at 38, Trae e-mails 14:42
14 Blake Bourland, says, "Blake, Attached   14:42
15 please find a draft version of the      14:42
16 contract attached."              14:42
17     Do you see that?            14:42
18   A.  I -- I do.              14:42
19   Q.  Okay.  Blake's response that is  14:42
20 on page 337, he says, "I have taken a    14:43
21 quick look at your proposed agreement and 14:43
22 I don't think we're on the same page."   14:43
23 Is that the 8/2/2012 Burr draft?        14:43

Page 245

1      MR. HOOVER:  Object to the form.  14:43
2   A.  I don't know.                14:43
3   Q.  He says, "Unless something is    14:43
4  changed, I don't think a marketing     14:43
5  agreement is the proper type of        14:43
6  agreement."                     14:43
7      Did you have discussions with    14:43
8  Blake Bourland about why a marketing    14:43
9  agreement is not -- he didn't think a    14:43
10  marketing agreement was the proper type  14:43
11  agreement?                    14:43
12   A.  I do remember some discussions    14:43
13  around that.                    14:43
14   Q.  Okay.  What was his reason for    14:43
15  saying it should not be a marketing type  14:43
16  agreement?                    14:43
17   A.  I don't recall the specifics of   14:43
18  what he said.  I just remember there    14:43
19  being discussions and some confusion     14:43
20  around that issue.                14:43
21   Q.  Did he express the opinion that   14:43
22  this wasn't really a marketing agreement  14:43
23  but an agreement to refer -- refer     14:44

Page 246

1  laboratory specimens?             14:44
2   A.  I don't recall that.           14:44
3   Q.  I'll give you Exhibit 11.  This    14:44
4  is an August 29th e-mail from Blake      14:45
5  Bourland to Trae, you, with a cc to     14:45
6  Jannie?  Is that correct?            14:45
7  (Plaintiff's Exhibit 11 was marked for   14:45
8  identification and is attached.)        14:45
9   A.  I see that, yes.              14:45
10   Q.  Blake says, "Trae/Roben," and    14:45
11  then about halfway down he says, "That   14:45
12  being said, in my view, the agreement    14:45
13  that had been drafted by Burr" -- "Burr &  14:45
14  Forman is not simply 'adding some       14:45
15  protections on your side' - it completely  14:45
16  changes the relationship from two       14:45
17  laboratories working together for the    14:45
18  mutual benefit of each one to the" -- "of  14:45
19  each other to one company providing     14:45
20  marketing services to a laboratory for   14:45
21  the sole purpose of growing the business  14:45
22  of that laboratory, without any benefit  14:45
23  to my client other than the monthly     14:45

Page 247

1  payment - as you well know, that has    14:45
2  never been a business model that has    14:45
3  interested my client."             14:45
4      Did I read that correctly?       14:46
5   A.  You did.                 14:46
6   Q.  Is it clear from Blake's        14:46
7  statement that Aperian had not been     14:46
8  paying Compass for marketing services    14:46
9  previously?                    14:46
10      MR. HOOVER:  Object to the form.  14:46
11   A.  I don't know that that's clear    14:46
12  in this.                     14:46
13   Q.  He says, "that has never been a   14:46
14  business model that has interested my    14:46
15  client."  Did I read that correctly?    14:46
16   A.  Yes.                   14:46
17   Q.  And that business model was     14:46
18  where one company is providing marketing  14:46
19  services to a laboratory; correct?      14:46
20   A.  I don't know what Blake meant by  14:46
21  his e-mail, so.                 14:46
22   Q.  Okay.  Compass didn't want a    14:46
23  contract for marketing services at this  14:46

Page 248

1  time, did it?                  14:46
2   A.  I think you can read what the     14:46
3  e-mail says.                   14:46
4   Q.  Okay.  And that would be a no?   14:46
5   A.  It's we can read what the e-mail  14:46
6  says.                       14:46
7   Q.  Do you know what is redacted     14:46
8  above?                      14:46
9   A.  I don't.                 14:46
10   Q.  Do you know if a privilege log   14:46
11  covering that material, including the to,  14:46
12  from, date, and subject matter, has been  14:46
13  produced so we can determine whether to   14:46
14  challenge the redaction?            14:46
15   A.  I don't know.              14:46
16   Q.  Give you Exhibit 12.  The last   14:46
17  three exhibits were all in the time frame  14:47
18  of August 28th, 29th, and now we're on   14:47
19  the 30th.  This is an e-mail from you to  14:47
20  Blake Bourland; correct?            14:47
21  (Plaintiff's Exhibit 12 was marked for   14:47
22  identification and is attached.)        14:47
23   A.  That's correct.             14:47

**Roben Nutter**                                                    **63 (249 - 252)**

Page 249

1    Q.  And Blake is Jannie's outside    14:47
2  counsel; right?                        14:47
3    A.  That was my understanding.       14:47
4    Q.  Okay.  You say: "Enjoyed         14:47
5  talking with you today.  This is the   14:47
6  recent article that I mentioned on our 14:47
7  call.  It may be helpful to give you a 14:47
8  brief synopsis of the Anti-Kickback    14:47
9  statute.  I look forward to talking with 14:47
10 you next week."                        14:47
11       Did I read that correctly?       14:47
12   A.  You did.                         14:48
13   Q.  And if -- we can see there is an 14:48
14 attachment to this e-mail; correct?    14:48
15   A.  It appears that way.             14:48
16   Q.  All right.  And the subject of   14:48
17 the e-mail is "Anti-kickback article"; 14:48
18 correct?                               14:48
19   A.  That's what it says.             14:48
20   Q.  Okay.  And you mentioned that    14:48
21 article to him in a call; right?       14:48
22   A.  Apparently, I did.  That's what  14:48
23 the e-mail says.                       14:48

Page 250

1    Q.  Okay.  Did you discuss with      14:48
2  Blake the anti-kickback concerns of    14:48
3  Aperian's relationship with TDS during 14:48
4  your call with him?                    14:48
5    A.  I don't recall the specifics of  14:48
6  the call.                              14:48
7    Q.  But you did discuss              14:48
8  anti-kickback article with him during  14:48
9  that call?                             14:48
10   A.  I think we can read what the     14:48
11 e-mail says.                           14:48
12   Q.  Okay.                            14:48
13   A.  That's -- I don't have that      14:48
14 recollection outside of that.          14:48
15   Q.  Was the article specifically     14:48
16 about the anti-kickback statute in     14:48
17 laboratories?                          14:48
18   A.  I don't recall what the article  14:48
19 was about, other than what it says here. 14:48
20   Q.  Do you recall who it was by?     14:48
21   A.  No.                              14:48
22   Q.  Why did you send him an article  14:48
23 on the anti-kickback statute while you 14:49

Page 251

1  were in the midst of contract          14:49
2  negotiations with Compass?             14:49
3    A.  Well, obviously, I thought it    14:49
4  would be helpful to him.  That's what I 14:49
5  wrote here.                            14:49
6    Q.  Okay.  From where did you obtain 14:49
7  the article?                           14:49
8    A.  I don't know.                    14:49
9    Q.  Did you explain to Blake that    14:49
10 the anti-kickback statute applied to the 14:49
11 relationship between Aperian and Total 14:49
12 Diagnostics?                           14:49
13   A.  I don't recall our discussion.   14:49
14      MR. McKENNA:  We can go off the   14:49
15 record.                                14:49
16      THE VIDEOGRAPHER:  We are going   14:49
17 off the record at 2:51.                14:49
18      (Break taken.)                    14:59
19      THE VIDEOGRAPHER:  This begins    14:59
20 Disc No. 5.  We're back on the record at 15:01
21 3:03.                                  15:01
22   Q.  (By Mr. McKenna) I'm going to    15:01
23 give you Exhibit 13, which is the article 15:01

Page 252

1  attached to the e-mail to Blake Bourland. 15:01
2  And it's entitled -- well, first, let's 15:01
3  start down at the bottom.  It's American 15:01
4  -- AHLA Connections.  Is that one of the 15:01
5  publications you get                   15:01
6  (Plaintiff's Exhibit 13 was marked for 15:01
7  identification and is attached.)       15:01
8    A.  Yes.                             15:01
9    Q.  Okay.  And that's from the       15:01
10 August 2012 subscription?              15:01
11   A.  That's what it says.             15:02
12   Q.  All right.  And in August of     15:02
13 2012 is when you sent the article to   15:02
14 Blake; correct?                        15:02
15   A.  Correct.                         15:02
16   Q.  And the underlying and           15:02
17 bracketing throughout the article, is  15:02
18 that yours?                            15:02
19   A.  I don't recall that being mine.  15:02
20   Q.  Do you know who made the         15:02
21 underlining and bracketing if it wasn't 15:02
22 you?                                   15:02
23   A.  I don't.                         15:02

Page 253

1   Q.   I'm assuming, if you sent this   15:02
2  article to Blake Bourland, that you would 15:02
3  have read it before you sent it to him?   15:02
4   A.   I don't recall one way or the   15:02
5  other.                      15:02
6   Q.   Okay.  Are you really going to   15:02
7  testify that you would have sent him an 15:02
8  article on the anti-kickback statute   15:02
9  without having read it yourself?   15:02
10   A.   I'm going to testify that I   15:02
11  don't recall.                 15:02
12   Q.   All right.  This article is   15:02
13  entitled, "Does Intent Matter?  Applying 15:03
14  the Federal Anti-Kickback Law to   15:03
15  Marketing Arrangements."  Correct?   15:03
16   A.   That's what the title says.   15:03
17   Q.   All right.  And it goes through 15:03
18  -- it's got a section on case law, it's 15:03
19  got a section on advisory opinions that 15:03
20  deal with marketing arrangements.   15:03
21  Correct?                    15:03
22      (Witness reviews document.)   15:03
23   A.   I see a section on case law.   15:03

Page 254

1  What other?                  15:03
2   Q.   Do you see where it's been   15:03
3  underlined, "In Advisory Opinion 98-1"? 15:03
4  On page 20 of the article?      15:03
5   A.   I do see that.           15:03
6   Q.   Did you provide this article to 15:03
7  anybody else besides Blake Bourland?   15:03
8   A.   I don't know if I did or not.   15:03
9   Q.   Is this an article that you came 15:03
10  upon by yourself in reading AHLA   15:04
11  Connections, or did somebody provide it 15:04
12  to you?                     15:04
13   A.   I don't know.  I don't recall.   15:04
14   Q.   Did Blake Bourland provide you   15:04
15  any comments or feedback after he   15:04
16  received this article from you?   15:04
17   A.   I assume you've got the e-mails 15:04
18  if he did, but I don't recall.   15:04
19   Q.   Well, the prior e-mail mentioned 15:04
20  telephone conversation you had with him. 15:04
21  Did you have any telephone conversations 15:04
22  with him about this anti-kickback statute 15:04
23  article that relates to marketing   15:04

Page 255

1  arrangements?                 15:04
2   A.   I don't recall.           15:04
3   Q.   Giving you what I've marked as   15:04
4  Exhibit 14, another.  Is this an e-mail 15:06
5  chain that goes back from August 12th,   15:06
6  2011, to August 30th, 2011, regarding   15:07
7  contract revisions between -- in the   15:07
8  Compass/Aperian contract?      15:07
9  (Plaintiff's Exhibit 14 was marked for   15:07
10  identification and is attached.)   15:07
11   A.   That's what it appears to be.   15:07
12   Q.   All right.  So this particular   15:07
13  document is in 2011; correct?  So this is 15:07
14  a different prior year than what we've   15:07
15  been looking at; right?         15:07
16   A.   Correct.                 15:07
17   Q.   All right.  And is this related   15:07
18  to the first contract that was entered   15:07
19  into in September of 2011?      15:07
20   A.   I don't know for sure, but that   15:07
21  fits within the time frame.      15:07
22   Q.   Okay.  Let's start toward the   15:08
23  back and work our way up.  Let's start on 15:08

Page 256

1  page 525.  Back on August 16th, 2011, at 15:08
2  7:21 p.m. Trae writes to Blake Bourland, 15:08
3  copies you and Ken Lott.         15:08
4      Says: "Blake, I am attaching   15:08
5  the contract document with the requested 15:08
6  changes.  I will also copy my legal   15:08
7  counsel, Roben Nutter, so she can review 15:08
8  the document and comment on some specific 15:08
9  sections of the agreement which I have   15:08
10  notated.  She will also get you a   15:08
11  Business Associates agreement to review   15:08
12  in addition to this agreement.  Please   15:08
13  let me know if you have any questions."   15:08
14      Did I read that correctly?   15:08
15   A.   You did.                 15:08
16   Q.   And so Trae copied both you and 15:08
17  Ken Lott and specifically asked for your 15:08
18  input; correct?               15:08
19   A.   I don't know that he's asking me 15:08
20  in this e-mail for my input.  He's   15:09
21  telling Blake what he's done.   15:09
22   Q.   Okay.  But he has copied you and 15:09
23  says, "so she can review the document and 15:09

**Roben Nutter**                                           **65 (257 - 260)**

Page 257

1  comment on some specific sections of the  15:09
2  agreement which I have notated."  15:09
3  Correct?  15:09
4      A.  That's what it says.  15:09
5      Q.  Okay.  15:09
6      A.  Yes.  15:09
7      Q.  And so, does this refresh your  15:09
8  recollection that you were involved in  15:09
9  reviewing the first contract entered into  15:09
10  between Compass and TDS?  15:09
11      A.  It doesn't.  15:09
12      Q.  I mean, I'm sorry, Aperian and  15:09
13  Compass.  15:09
14      A.  It doesn't.  15:09
15      Q.  Okay.  All right.  And then down  15:09
16  below the e-mail I just read, looks like  15:09
17  Blake sends to Trae the proposed  15:09
18  agreement.  Is your recollection that the  15:09
19  initial proposal came from Compass to  15:09
20  Aperian?  15:09
21      A.  I don't have a recollection  15:09
22  about that.  15:09
23      Q.  Okay.  Let's look at page 523 at  15:10

Page 258

1  the bottom.  This is from Trae to Blake  15:10
2  Bourland and copies you; correct?  August  15:10
3  29th, 2011?  15:10
4      A.  12:44 p.m.?  15:10
5      Q.  Yes.  We're together.  15:10
6      A.  Yes.  15:10
7      Q.  Right.  It says, "Blake, Our  15:10
8  legal team has had a chance to review the  15:10
9  contract and there are just a couple more  15:10
10  things we'd like to change."  Number 1,  15:10
11  "After talking with Jannie, to make her  15:10
12  whole for the work she is performing,  15:10
13  let's set the commission to 25% of  15:10
14  collected revenue."  15:10
15      Did I read that correctly?  15:10
16      A.  You did.  15:10
17      Q.  Okay.  And so, is it true, then,  15:10
18  that the legal team was aware that  15:10
19  Aperian was going to pay a 25 percent  15:10
20  commission on collected revenue from --  15:10
21  for lab samples Compass arranged to be  15:10
22  referred to Aperian?  15:10
23      MR. HOOVER:  Object to the form.  15:11

Page 259

1      A.  I don't recall.  15:11
2      Q.  Okay.  Is that what it says  15:11
3  here, the legal team has reviewed it?  15:11
4      A.  That's what it says.  15:11
5      Q.  Okay.  And 25 percent commission  15:11
6  on collected revenue was what was entered  15:11
7  into in the first contract; correct?  15:11
8  That we looked at earlier?  15:11
9      A.  I'd have to look back to make  15:11
10  sure, but that sounds correct.  15:11
11      Q.  Okay.  Is it fair that you  15:11
12  approved that arrangement despite  15:11
13  advisory opinions and case law that  15:11
14  advised against percentage brokerage  15:11
15  commissions?  15:11
16      MR. HOOVER:  Object to the form.  15:11
17  Calls for her to testify in her role as  15:11
18  general counsel, and it's attorney-client  15:11
19  privilege.  15:11
20      Q.  Okay.  Did you -- did you  15:11
21  approve this agreement that provides for  15:11
22  a percentage commission arrangement to  15:11
23  Compass?  15:11

Page 260

1      A.  I don't -- I don't recall being  15:11
2  involved in this agreement, so.  15:11
3      Q.  Well, you -- you see your name  15:12
4  on this e-mail chain; correct?  15:12
5      A.  I do.  15:12
6      Q.  Can you think of anybody else  15:12
7  besides you that would have been "our  15:12
8  legal team" reviewed this?  15:12
9      A.  Well, his terminology of "legal  15:12
10  team" implies that there's more than one  15:12
11  there, so.  15:12
12      Q.  Okay.  Well, you're copied,  15:12
13  you're specifically copied on the e-mail  15:12
14  referencing the legal team; correct?  15:12
15      A.  I am copied on it,  15:12
16      Q.  So, is it fair to say you would  15:12
17  have been part of that team?  15:12
18      A.  I don't recall.  I don't recall.  15:12
19  That's all I can say.  15:12
20      Q.  All right.  And then on the  15:12
21  first page, on August 30th, 2011, at 3:50  15:12
22  p.m., these additional people, Jannie  15:12
23  Chapman and Sam Price and Ken Lott, are  15:12

**Roben Nutter**                                                    **66 (261 - 264)**

Page 261

1  brought into the e-mail chain; correct?   15:12
2      A.  Correct.              15:12
3      Q.  And that's when they're talking   15:12
4  about we can do fax and e-mail signatures 15:12
5  on the contract.             15:13
6      A.  Correct.              15:13
7      Q.  Exhibit 15, this is a       15:13
8  subcontract agreement between Compass and 15:13
9  Aperian that is not signed, with blank   15:13
10  dates, to be entered into in 2011.  And   15:13
11  then it has comments in the margins.  Do   15:14
12  you see that?               15:14
13  (Plaintiff's Exhibit 15 was marked for   15:14
14  identification and is attached.)       15:14
15      A.  I do see it.          15:14
16      Q.  All right.  Is this the      15:14
17  agreement that -- or the marked-up       15:14
18  agreement that Trae referenced in that   15:14
19  e-mail that he had put his comments on it 15:14
20  for you to review?           15:14
21      A.  I'm sorry.  What is your      15:14
22  question?                 15:14
23      Q.  Yeah.  In the prior exhibit we   15:14

Page 262

1  looked at, Trae referenced that he had   15:14
2  made some comments and he put them in the 15:14
3  margin for counsel to review.  Is this   15:14
4  the version that has his comments in it? 15:14
5      A.  I don't know.          15:14
6      Q.  If you look down at comment 8A   15:14
7  on the second page where the comment is,  15:14
8  "Let's make this a flat 20% of        15:14
9  reimbursement received for specimens     15:14
10  acquired through contractor's services." 15:14
11      Do you see that?          15:14
12      A.  Comment A8?  Is that --      15:14
13      Q.  A8, yes.              15:14
14      A.  Okay.  That is the content --   15:14
15  the comment.                15:14
16      Q.  Okay.  What was written in the   15:14
17  draft before that comment was, "For      15:15
18  specimens in which reimbursements are    15:15
19  greater or" -- "are equal to or greater   15:15
20  than $200.00, the full reimbursement cost 15:15
21  of laboratory services minus $40.00 per   15:15
22  specimen; and, For specimens in which the 15:15
23  reimbursement is less than $200.00,      15:15

Page 263

1  eighty percent of the reimbursable cost   15:15
2  of laboratory services."           15:15
3      Did I read that correctly?        15:15
4      A.  You did read it correctly.      15:15
5      Q.  Who suggested to go -- going to   15:15
6  a flat rate percentage for all specimens? 15:15
7      A.  I don't know.          15:15
8      Q.  And this comment suggests 20    15:15
9  percent, but what was ultimately entered  15:15
10  into was 25 percent.  Do you know who   15:15
11  suggested or requested the increase to 25 15:15
12  percent?                  15:15
13      A.  I don't.              15:15
14      Q.  Give you what I'm marking       15:15
15  Exhibit 16.  And I'm going to need you to 15:17
16  refer to Exhibit 14 as well to try to   15:17
17  connect the dots.  If you look at page   15:17
18  522 of Exhibit 14, where there is an     15:17
19  e-mail from the bottom of begins at the   15:17
20  bottom of 521 and goes to the top of 522 15:17
21  from Blake to Trae, copies you and      15:17
22  Jannie.  It says, "Trae, Attached is a   15:17
23  pdf redline and a clean word version of   15:17

Page 264

1  my revisions based on your comments."     15:17
2      Is Exhibit 16 a PDF redline that   15:17
3  was provided by Blake Bourland?         15:17
4  (Plaintiff's Exhibit 16 was marked for   15:17
5  identification and is attached.)       15:18
6      A.  I don't know.          15:18
7      Q.  In this marked-up version on     15:18
8  page 479, the -- the amount per specimen  15:18
9  -- I'm sorry, the fee went from an amount 15:18
10  per specimen to a straight 25 percent     15:18
11  commission, as was suggested in the       15:18
12  e-mail, Exhibit 14; correct?         15:18
13      A.  Where in the e-mail?       15:18
14      Q.  On the e-mail, page 523,      15:18
15  beginning at the bottom.  This is an   15:18
16  e-mail from Trae to Blake copied to you.  15:18
17  Point number 1, "After talking to Jannie, 15:18
18  to make her whole for the work she is   15:18
19  performing, let's set the commission to   15:18
20  25% of collected revenue."           15:18
21      A.  I don't know if these two go   15:19
22  together.  But yes, that's what that     15:19
23  e-mail says.                15:19

Page 265

1   Q.  Okay.  The e-mail says, "let's   15:19
2   set it at 25 percent," and this redline   15:19
3   change in Blake's draft has it to 25   15:19
4   percent, because it's -- sort of the   15:19
5   inverse is Aperian will be receiving 75   15:19
6   percent of the reimbursement, which means   15:19
7   Compass will -- will get 25 percent?   15:19
8   A.  The language in the -- in this   15:19
9   contract related to the subcontractor   15:19
10  says it's receiving 75 percent of the   15:19
11  reimbursable cost.   15:19
12  Q.  Okay.  From looking at Exhibit   15:19
13  14, does it appear that the 25 percent   15:19
14  commission was Aperian's suggestion?   15:19
15  A.  I don't know that I can say   15:19
16  that.  That is what this e-mail says.   15:19
17  And that is what the changes are, what   15:19
18  we've talked about in the draft contract.   15:19
19  Q.  Okay.   15:19
20  A.  I don't know what Trae did or   15:20
21  didn't do.   15:20
22  Q.  All right.  Hand you Exhibit 17   15:20
23  and ask you if that is the clean version   15:20

Page 266

1   that Blake Bourland references attaching   15:20
2   in his e-mail.   15:20
3   (Plaintiff's Exhibit 17 was marked for   15:20
4   identification and is attached.)   15:20
5   A.  I don't know if it is or not.   15:20
6   Q.  If I told you the documents in   15:20
7   the document management system show the   15:20
8   parent-child relationship, would that   15:20
9   help you, that the --   15:20
10  A.  I'd have to trust you on that.   15:20
11  Q.  Okay.  If you compare, to the   15:20
12  extent you need to, the redline to the   15:20
13  clean, do they appear to comport with   15:20
14  each other?   15:21
15  A.  I mean, I can go through and   15:21
16  compare all the redlines to this document   15:21
17  if you want me to.   15:21
18  Q.  To the ex-- --   15:21
19  A.  The first couple I've looked at   15:21
20  look to be the case.   15:21
21  Q.  Anything you see that would make   15:21
22  you think it's not the clean version of   15:21
23  the redline?   15:21

Page 267

1   (Witness reviews document.)   15:22
2   A.  It appears to be tracking this   15:22
3   way, without having looked at every one   15:22
4   of them.   15:22
5   MR. McKENNA:  All right.  Let's   15:22
6   take a break for a second.  Let me go off   15:22
7   the record and talk with my co-counsel.   15:22
8   THE VIDEOGRAPHER:  We are going   15:22
9   off the record at 3:24.   15:22
10  (Break taken.)   15:29
11  THE VIDEOGRAPHER:  We are back   15:29
12  on the record at 3:31.   15:30
13  Q.  (By Mr. McKenna)  All right.  I'm   15:30
14  doing my best to connect cover e-mails   15:30
15  with the documents.  Let me give you   15:30
16  Exhibit 18, and I'll mark this, and then   15:30
17  I'll give everybody else copies.   15:30
18  (Plaintiff's Exhibit 18 and 19 were   15:31
19  marked for identification and are   15:31
20  attached.)   15:31
21  MR. HOOVER:  Explain to me what   15:31
22  you're doing.  I'm sorry.  You're losing   15:31
23  me.   15:31

Page 268

1   Q.  So Exhibit 18 is the e-mail --   15:31
2   MR. HOOVER:  Okay.   15:31
3   Q.  -- that I believe transmits   15:31
4   Exhibit 19.   15:31
5   MR. HOOVER:  Okay.   15:31
6   Q.  So the -- let me walk along with   15:31
7   you here, see if we can make this -- I've   15:31
8   lost my pen.  All right.  Exhibit 18 is   15:31
9   the e-mail dated 9/24/12, and Exhibit 19   15:31
10  is the Burr & Forman draft of September   15:31
11  17th, 2012, for discussion purposes only.   15:31
12  Do you see that?   15:31
13  A.  I do.   15:31
14  Q.  Okay.  And then on the e-mail,   15:31
15  the attachment is   15:31
16  DOCS-#2021471-v3-Services-Agreement_-_   15:31
17  Aperian.doc."  Do you see that?   15:32
18  A.  I do.   15:32
19  Q.  Then down in the bottom of   15:32
20  Exhibit 19 in the left-hand corner, we   15:32
21  have 2021471-v3.   15:32
22  A.  Correct.   15:32
23  Q.  So, does 19 appear to be the   15:32

Page 269

1   attachment to 18?            15:32
2      A.  It appears that way.       15:32
3      Q.  So if we look at Exhibit 19,    15:32
4   which is a contract draft under      15:32
5   "Compensation," there is blanks for a    15:32
6   flat fee; correct?           15:32
7      A.  There are blanks in there.     15:32
8      Q.  Yeah.              15:32
9      A.  Yes.              15:32
10     Q.  And there are blanks for a     15:32
11  certain number of hours per month to   15:32
12  provide a -- the contractor services;   15:32
13  correct?                15:32
14     A.  Correct.              15:32
15     Q.  All right.  And then if we go   15:32
16  back to page 994, Exhibit A, "Contractor 15:33
17  Services," the -- there is the list of   15:33
18  marketing services there again; correct? 15:33
19     A.  It's not termed "Marketing   15:33
20  Services."  It's termed "Contractor   15:33
21  Services," but --           15:33
22     Q.  Okay.              15:33
23     A.  -- there is a list there.     15:33

Page 270

1      Q.  All right.  Did that list of   15:33
2   contractor services end up in the final  15:33
3   contract entered into in December that we 15:33
4   saw earlier?              15:33
5      A.  I don't believe so, but I would  15:33
6   have to go back and look.  I'm just not  15:33
7   sure.                   15:33
8      Q.  Do you know why that list did   15:33
9   not end up in there?          15:33
10     A.  I don't.              15:34
11     Q.  Did Compass or TDS        15:34
12  representatives object to having a list  15:34
13  of services that they were required to  15:34
14  perform?                15:34
15     A.  I don't recall.           15:34
16     Q.  Did the hours requirement end up 15:34
17  in the final contract?          15:34
18     A.  I don't believe so.        15:34
19     Q.  Did the Compass or TDS      15:34
20  representatives object to having an hours 15:34
21  requirement?             15:34
22     A.  I don't recall.           15:34
23     Q.  What is your understanding of  15:34

Page 271

1   why an hours requirement was proposed in 15:34
2   the contract?             15:34
3      A.  I think that calls for a legal   15:34
4   opinion.                15:34
5      Q.  Well, was it something you    15:34
6   formulated or something that was     15:34
7   communicated to you by outside counsel? 15:34
8      A.  Was what something I formulated 15:34
9   or -- you're going to have to --     15:34
10     Q.  Yeah.              15:34
11     A.  -- ask your question        15:34
12  differently.              15:34
13     Q.  Was the hours requirement     15:34
14  something you or somebody internally on 15:34
15  the Aperian team came up with or     15:34
16  something that was suggested by outside 15:34
17  counsel?                15:35
18     A.  As it relates to the draft of   15:35
19  this contract, the e-mail says that Jim  15:35
20  has written this draft.         15:35
21     Q.  Okay.              15:35
22     A.  So.                 15:35
23     Q.  And in this draft Aperian is   15:35

Page 272

1   seeking a flat fee; correct?      15:35
2      A.  There are blanks for a flat fee  15:35
3   there.                  15:35
4      Q.  There's a statement under     15:35
5   "Compensation" about halfway down, the  15:35
6   word "The" begins the sentence.  It's in 15:35
7   the far right-hand margin.  It says, "The 15:35
8   compensation paid by Aperian to the    15:35
9   Contractor is not directly or indirectly 15:35
10  based on the volume or value of any    15:35
11  referrals or other business generated by 15:35
12  the contractor for Aperian."       15:35
13         Do you see that?         15:36
14     A.  I do.               15:36
15     Q.  And based on the e-mail we just 15:36
16  looked at from Trae offering the 25    15:36
17  percent compensation, the e-mail is    15:36
18  calculating out how much additional   15:36
19  volume Jannie was going to be bringing.  15:36
20  That's not a true statement, is it?    15:36
21        MR. HOOVER:  Object to the form. 15:36
22        (Witness reviews document.)    15:36
23     A.  You're going to have to --    15:36

**Roben Nutter**                                    **69 (273 - 276)**

Page 273

1   Q.  Sure.                    15:36
2   A.  -- ask your question          15:36
3   differently.                   15:36
4   Q.  Based on the background we've   15:36
5   seen that the amount of compensation   15:36
6   being paid is tied to Aperian's      15:36
7   projections of volume they expect Jannie  15:36
8   to bring, it is not true that the     15:36
9   compensation paid by Aperian to the   15:36
10  contractor is not directly or indirectly  15:36
11  based on volume or value of any      15:36
12  referrals.                    15:36
13  A.  I wouldn't agree with that.    15:36
14  Q.  Why not?                15:36
15  A.  I think that calls for a legal   15:36
16  opinion.                    15:36
17  Q.  So you're not going to agree    15:37
18  with the statement, but you can't explain  15:37
19  to me why?                  15:37
20  MR. HOOVER:  Yeah.  She doesn't  15:37
21  have to.  She's legal counsel.  That   15:37
22  draws for her legal conclusion and legal  15:37
23  opinion.                    15:37

Page 274

1   MR. McKENNA:  You're instructing  15:37
2   her not to answer?              15:37
3   MR. HOOVER:  I am.          15:37
4   Q.  I'm marking Exhibit 20.  That   15:37
5   just got us through a big part of the   15:37
6   stack.                     15:37
7   (Plaintiff's Exhibit 20 was marked for  15:38
8   identification and is attached.)       15:38
9   (Witness reviews document.)      15:38
10  Q.  All right.  Can you identify    15:38
11  what Exhibit 20 is?            15:38
12  A.  It appears to be PowerPoint    15:38
13  slides for a presentation entitled --   15:38
14  entitled "East Alabama Medical Center:  15:38
15  Compliance Update."             15:38
16  Q.  Are these one of those annual   15:38
17  compliance updates that are put on for  15:38
18  all employees of Aperian?         15:38
19  A.  No.  My best recollection is   15:38
20  this was a live presentation put on by  15:38
21  these three attorneys listed at Maynard  15:38
22  Cooper.                    15:38
23  Q.  Okay.  And where was the      15:38

Page 275

1   presentation made?             15:38
2   A.  It was at EAMC.  I don't     15:38
3   remember specifically where.        15:38
4   Q.  And who -- who was the audience?  15:38
5   A.  The management team for sure.   15:39
6   And there may have been others that were  15:39
7   invited as well.              15:39
8   Q.  All right.  "Management team,"   15:39
9   who would that consist of?         15:39
10  A.  Manage -- managers, directors,  15:39
11  senior leadership, any supervisors or   15:39
12  other people that are in leadership    15:39
13  positions that might not have that title  15:39
14  of manager or director.          15:39
15  Q.  Okay.  And would that include   15:39
16  for both the Health Care Authority and   15:39
17  the business units of the Health Care   15:39
18  Authority?                   15:39
19  A.  It would.                15:39
20  Q.  So that should include Trae    15:39
21  Fite?                     15:39
22  A.  Yeah.                  15:39
23  Q.  Allen Valaer?             15:39

Page 276

1   A.  Yes.  I can't say that they were  15:39
2   all present, but they would have all been  15:39
3   invited.                    15:39
4   Q.  Okay.  Ken Lott?           15:39
5   A.  Yes.                   15:39
6   Q.  Sam Price?              15:39
7   A.  Yes.                   15:39
8   Q.  Did you attend this?         15:39
9   A.  Yes.                   15:39
10  Q.  Okay.  And this presentation was  15:39
11  made on September 25th, 2012; correct?  15:40
12  A.  Correct.                15:40
13  Q.  This came right in the middle of  15:40
14  the contract negotiations with Compass;  15:40
15  correct?                    15:40
16  (Witness reviews document.)      15:40
17  A.  I don't know if I would say    15:40
18  right in the middle of, but it did fall   15:40
19  within the time period.           15:40
20  Q.  Okay.                  15:40
21  A.  Or I think some negotiations    15:40
22  were occurring.               15:40
23  Q.  And at that time, September    15:40

**Roben Nutter**                                                      **70 (277 - 280)**

Page 277

1  25th, 2012, these three attorneys from  15:40
2  Maynard Cooper came in and explained the  15:40
3  information that's on the topics in this  15:40
4  slide show; correct?                      15:40
5      A.  This was their presentation, so.  15:40
6      Q.  So they would have gone through   15:40
7  all these slides?                         15:40
8      A.  As far as I can recall, I guess.  15:40
9      Q.  Okay.  Let's look at page 975.    15:40
10 Okay.  This slide is entitled,            15:41
11 "Regulatory" -- "Regulatory Compliance:   15:41
12 Anti-kickback statute"; correct?          15:41
13     A.  Correct.                          15:41
14     Q.  And the slide goes over what is   15:41
15 prohibited by the anti-kickback statute;  15:41
16 correct?                                  15:41
17     A.  Correct.                          15:41
18     Q.  So again, during the time of      15:41
19 contract negotiations with Compass, where 15:41
20 anti-kickback concerns have been          15:41
21 expressed, articles sent from you to      15:41
22 Blake Bourland on anti-kickback statute,  15:41
23 outside counsel from Maynard Cooper comes 15:41

Page 278

1  in and reinforces to the management of    15:41
2  East Alabama Health Care Authority        15:41
3  employees what is prohibited by the       15:41
4  anti-kickback statute.  Is that right?    15:41
5          MR. HOOVER:  Object to the form.  15:41
6      A.  It's one of the topics they       15:41
7  covered.                                  15:41
8      Q.  All right.                        15:41
9      A.  Based on these slides.            15:41
10     Q.  And so no one involved in those   15:41
11 negotiations can claim that lack of       15:41
12 knowledge of what is prohibited by the    15:41
13 anti-kickback statute, can they?          15:41
14         MR. HOOVER:  Object to the form.  15:41
15     A.  I can't speak to what they claim  15:41
16 as their level of knowledge.              15:42
17     Q.  Well, if they would have either   15:42
18 come to or been provided with this        15:42
19 presentation, they would have an          15:42
20 understanding of what's prohibited by the 15:42
21 anti-kickback statute; correct?           15:42
22         MR. HOOVER:  Object to the form.  15:42
23     A.  I can't -- I can't speak to what  15:42

Page 279

1  their understanding was.                  15:42
2      Q.  Okay.  I think your prior         15:42
3  testimony was this type of training that  15:42
4  covered the anti-kickback statute, the    15:42
5  Stark law, and the False Claims Act was   15:42
6  provided annually to all employees of the 15:42
7  Health Care Authority.                    15:42
8      A.  I didn't say it was this type of  15:42
9  education (indicating).  I said there is  15:42
10 annual training that occurs.              15:42
11     Q.  On those topics?                  15:42
12     A.  That includes those topics.       15:42
13     Q.  Okay.  On page 979, the           15:42
14 attorneys also explained the Stark law    15:42
15 and what is prohibited by it?             15:42
16     A.  That is the slide.                15:42
17     Q.  Okay.                             15:43
18     A.  Regarding the Stark law, yes.     15:43
19     Q.  And then on page 973, they also   15:43
20 explained the False Claims Act and what   15:43
21 it prohibits?                             15:43
22     A.  Obviously, all these are at a     15:43
23 very general level, but yes, this is a    15:43

Page 280

1  slide about the False Claims Act.         15:43
2      Q.  After -- since it was produced    15:43
3  to us, I'm assuming that they left a copy 15:43
4  of this slide show with you, the          15:43
5  attorneys?  And I say "you," I mean the   15:43
6  Health Care Authority.  They left it with 15:43
7  somebody there, because the Health Care   15:43
8  Authority was able to produce it to us in 15:43
9  this litigation?                          15:43
10     A.  I would assume so, if we          15:43
11 produced it.                              15:43
12     Q.  Okay.  Is this the kind of        15:43
13 thing, would it be circulated to          15:43
14 management after the presentation by      15:43
15 e-mail for those that couldn't attend     15:43
16 could -- could look at it?                15:44
17     A.  I don't recall this               15:44
18 specifically, but that would be something 15:44
19 that would be common practice.            15:44
20     Q.  Okay.  And I promise I didn't do  15:44
21 this on purpose.  I just can't remember   15:44
22 the order of the documents because I've   15:44
23 seen so many, like you have.  Is Exhibit  15:44

Page 281

1  21 an e-mail forwarding the presentation  15:44
2  we just looked at to all managers,  15:44
3  directors, and EAMC administrators?  15:44
4  (Plaintiff's Exhibit 21 was marked for  15:44
5  identification and is attached.)  15:44
6      A.  It is.  15:44
7      Q.  Okay.  And you've explained to  15:44
8  me already who the managers, directors,  15:44
9  and administrators would be; correct?  15:44
10     A.  I believe so.  15:44
11     Q.  Okay.  Would that include Ken  15:44
12  Lott, Sam Price, and Terry Andrus?  15:44
13     A.  Yes.  15:45
14         MR. HOOVER:  Well, hold on.  15:45
15  Make sure her testimony is clear.  She  15:45
16  said they would be included.  Don't know  15:45
17  if they necessarily attended, I think is  15:45
18  what her testimony was.  15:45
19         MR. McKENNA:  Right.  But this  15:45
20  is an e-mail, and it's going to all  15:45
21  managers, directors, and EAMC  15:45
22  administrators.  15:45
23     Q.  And so my question is, would  15:45

Page 282

1  they be in those categories to receive  15:45
2  this e-mail?  15:45
3      A.  This -- this e-mail was sent to  15:45
4  those categories of people.  15:45
5      Q.  Okay.  And for example, like at  15:45
6  our law firm we have a lawyers e-mail, we  15:45
7  have a partners e-mail, they're sort of  15:45
8  separate.  Would -- would -- would Terry  15:45
9  Andress be listed on the administrators?  15:45
10  Would he be part of that group as it's  15:45
11  formed in the e-mail system?  15:45
12     A.  He is a part of the EAMC  15:45
13  administrators group.  15:45
14     Q.  And would Sam Price be in the  15:45
15  administrators group?  15:45
16     A.  He would.  15:45
17     Q.  Would Ken Lott be in the  15:45
18  administrators group?  15:45
19     A.  He would.  15:45
20     Q.  I forgot.  In going over your  15:45
21  employment history with you, at some  15:45
22  point you were promoted and given the  15:46
23  title of vice president.  15:46

Page 283

1      A.  Correct.  15:46
2      Q.  When was that?  15:46
3      A.  2014-ish.  That's -- I'm  15:46
4  guessing.  15:46
5      Q.  Okay.  So in the time of the --  15:46
6      A.  Maybe '15.  I can't -- I can't  15:46
7  remember exactly.  15:46
8      Q.  So at the time of the Summit and  15:46
9  Compass TDS contract negotiations, that  15:46
10  all occurred before 2014, you would not  15:46
11  have been a vice president at that time?  15:46
12     A.  I believe my title at that time  15:46
13  was assistant vice president --  15:46
14     Q.  Okay.  15:46
15     A.  -- and general counsel.  15:46
16     Q.  Ken Lott was a vice president at  15:46
17  that time, but -- but you weren't?  15:46
18     A.  I believe so.  I don't know what  15:46
19  his title was specifically then.  15:46
20     Q.  Exhibit 22.  15:46
21  (Plaintiff's Exhibit 22 was marked for  15:47
22  identification and is attached.)  15:47
23         (Witness reviews document.)  15:47

Page 284

1      Q.  All right.  Starting on the  15:47
2  second page, is this an e-mail chain  15:47
3  between Trae Fite, Blake Bourland, with  15:47
4  you and Jannie Chapman copied?  15:47
5      A.  And a Gene Thornton.  15:47
6      Q.  Okay.  Gene is copied on the  15:48
7  first page but not the second?  15:48
8      A.  Correct.  15:48
9      Q.  Beginning on the second page,  15:48
10  which is September 24th, 2012, Trae says:  15:48
11  "Blake, Roben has not had an opportunity  15:48
12  to review this draft yet, but in the  15:48
13  essence of time I am sending it to you  15:48
14  for your review.  Jim has written this as  15:48
15  Total Diagnostic Solutions, but there  15:48
16  will be no problem changing it to  15:48
17  Compass.  Also, we will determine with  15:48
18  Jannie an appropriate monthly payment to  15:48
19  enter into that section.  Please review  15:48
20  and let me know your thoughts.  I am a  15:48
21  lot more comfortable with this version,  15:48
22  and it seems to be fairly balanced."  15:48
23         And if we look at the document  15:48

Page 285

1  number at the top, 2021471-v3, does that  15:48
2  comport with the September 17th, 2012,  15:48
3  draft we saw earlier?  15:48
4    A.  Those aren't my document  15:49
5  numbers, but it appears that way.  15:49
6    Q.  Okay.  Then Blake responds to  15:49
7  this e-mail on the front page, September  15:49
8  27th, 2012, that you're copied on.  And  15:49
9  he says, "We are revising it, but while  15:49
10  the marketing language has been toned  15:49
11  down, there is still substantial language  15:49
12  referencing" -- "referencing a  15:49
13  'marketing' aspect that we are not  15:49
14  comfortable with, including requirements  15:49
15  for specific hours that Compass is  15:49
16  required to perform, specific services  15:49
17  that Compass is currently performing, and  15:49
18  language that Compass is the 'contractor'  15:49
19  for Aperian, which is not the case."  It  15:49
20  goes on to say, "Additionally, I thought  15:49
21  we were going to talk about a 'per click'  15:49
22  based on our conversation and that your  15:49
23  counsel was going to look into it a bit  15:49

Page 286

1  more since he had a better understanding  15:49
2  of the relationship - we didn't get any  15:50
3  follow-up on that either, just a blank  15:50
4  for a flat fee."  15:50
5    Did I read that correctly?  15:50
6    A.  You did.  15:50
7    Q.  So Compass rejected the  15:50
8  marketing language proposed by Aperian?  15:50
9    (Witness reviews document.)  15:50
10    A.  I can -- I can read this e-mail,  15:50
11  as you just did, but it sounds like.  15:50
12    Q.  Okay.  And Compass --  15:50
13    A.  -- there was a question about  15:50
14  that.  15:50
15    Q.  -- was also rejecting the  15:50
16  requirement of a certain number of hours  15:50
17  to be performed?  15:50
18    (Witness reviews document.)  15:50
19    A.  Well, I know I just saw them.  15:50
20    (Witness reviews document.)  15:50
21    A.  Tell me your question again.  15:50
22    Q.  Sure.  Compass is rejecting the  15:51
23  requirement that they perform a certain  15:51

Page 287

1  number of hours of duties?  15:51
2    A.  I'm probably getting tired, but  15:51
3  I'm missing it in this e-mail.  Oh, wait,  15:51
4  there it is, "including requirements for  15:51
5  specific hours."  Yes, he's making a  15:51
6  comment about that.  15:51
7    Q.  Okay.  And then he talks about  15:51
8  the "based on our conversation, I thought  15:51
9  we were going to talk about a 'per click'  15:51
10  basis."  In the context of these  15:51
11  negotiations, what's your understanding  15:51
12  of a per-click compensation?  15:51
13    A.  I don't think I can comment on  15:51
14  that.  15:51
15    Q.  Well, you -- you were involved  15:51
16  in these negotiations directly with Blake  15:51
17  Bourland; right?  15:51
18    A.  I was involved in e-mails with  15:51
19  him.  15:51
20    Q.  Yeah.  15:51
21    A.  And I think we can comment on  15:51
22  this e-mail, but I don't think I can talk  15:51
23  beyond, what my thoughts about the  15:51

Page 288

1  per-click arrangement was.  15:51
2    Q.  Well, what is your understanding  15:51
3  of what Blake meant by a per-click  15:51
4  arrangement?  15:52
5    MR. HOOVER:  Object to the form.  15:52
6    A.  I don't recall beyond what it  15:52
7  says here.  15:52
8    Q.  Is your understanding of per  15:52
9  click is a payment for each -- per each  15:52
10  specimen sent in, whether that be a  15:52
11  specific dollar amount of percentage?  15:52
12    A.  I think that can be one of per  15:52
13  click.  15:52
14    Q.  Yeah.  15:52
15    A.  What the per click terminology  15:52
16  can be.  15:52
17    Q.  And isn't per click was what --  15:52
18  isn't per click the type of compensation  15:52
19  that was used in the first contract  15:52
20  between Compass and Aperian dated  15:52
21  September 2011?  15:52
22    MR. HOOVER:  Object to the form.  15:52
23    A.  It was a percentage-based  15:52

**Roben Nutter**                                    **73 (289 - 292)**

Page 289

1  contract.                          15:52
2     Q.  For each specimen sent in;        15:52
3  correct?
4        MR. HOOVER:  Object to the form.  15:53
5     Q.  Each specimen reimbursed.        15:53
6     A.  I don't know that I can agree     15:53
7  with that.                         15:53
8     Q.  It was a percentage compensation  15:53
9  for each specimen sent in by Compass that  15:53
10 was reimbursed by some insurance?      15:53
11    A.  We could go back and read the    15:53
12 terminology from the contract, if you    15:53
13 want me to do that.                 15:53
14    Q.  Yeah, if that's what it takes to  15:53
15 get an answer.                      15:53
16       MR. HOOVER:  Well, I object to    15:53
17 that.  I mean, you're trying to get her   15:53
18 to testify to what her understanding of   15:53
19 a, quote, per-click arrangement is, and   15:53
20 she's telling you her understanding is    15:53
21 different, it's not the commission-based  15:53
22 contract.                          15:53
23       MR. McKENNA:  Actually, she       15:53

Page 290

1  testified that one understanding of per   15:53
2  click could be a percentage-based        15:53
3  contract.                          15:53
4        MR. HOOVER:  That's not the only  15:53
5  one.  Well, then, it's asked and        15:54
6  answered.                          15:54
7     Q.  Well, my next question is, was   15:54
8  the first contract with Compass a        15:54
9  per-click compensation plan?          15:54
10    A.  The first Compass contract;       15:54
11 right?                             15:54
12    Q.  Yes.  September 2011.           15:54
13    A.  The first Compass contract,       15:54
14 September of 2011, has the sum --        15:54
15 subcontractor being compensated for      15:54
16 services provider -- provided by         15:54
17 receiving 75 percent of the reimbursable  15:54
18 cost.                              15:54
19    Q.  Okay.                        15:54
20    A.  Of such services.              15:54
21    Q.  Is --                        15:54
22    A.  And then there's language that    15:54
23 talks about deducting that fee.         15:54

Page 291

1     Q.  Okay.  Does that comport with    15:54
2  one of the understandings you have about  15:54
3  per-click remuneration?              15:54
4        (Witness reviews document.)       15:55
5     A.  Not mine, with this contract.    15:55
6     Q.  It does not comport with your    15:55
7  understanding of per-click remuneration   15:55
8  with regard to the first Compass         15:55
9  contract?                          15:55
10    A.  No.  That's compensation based   15:55
11 on a percentage.                    15:55
12    Q.  Okay.                        15:55
13    A.  Of services.                  15:55
14    Q.  How is that different than per   15:55
15 click, in your mind?                15:55
16    A.  I think I'm getting into some    15:55
17 legal opinions with that.            15:55
18       MR. McKENNA:  Are you objecting?  15:55
19       MR. HOOVER:  Well, she can        15:55
20 testify generally, I mean, what her       15:55
21 general understanding is.            15:55
22       MR. McKENNA:  Right.             15:55
23       MR. HOOVER:  But I -- I mean, to  15:55

Page 292

1  me a per click is -- well, there -- there 15:55
2  is no legal definition of per click.     15:55
3        MR. McKENNA:  Right.  But Blake   15:55
4  Bourland in these conversations is       15:55
5  talking about per click.            15:56
6        MR. HOOVER:  That's right.        15:56
7        MR. McKENNA:  So I'm trying to    15:56
8  get an understanding of what Roben       15:56
9  understands that to be and is that what   15:56
10 you had in these other contracts.        15:56
11       MR. HOOVER:  And I think she has  15:56
12 testified that she can't -- she can't     15:56
13 testify what Blake understands and what   15:56
14 he means by per click is.            15:56
15    Q.  (By Mr. McKenna)  All right.  Was 15:56
16 the Summit contract, to your            15:56
17 understanding of the term "per click,"    15:56
18 was it a per-click contract?          15:56
19 Compensation is on the second to last    15:56
20 page, I think.                      15:56
21    A.  Again, this is 15 percent for    15:56
22 all specimens received from Summit        15:56
23 accounts up to the following volumes, and 15:56

**Roben Nutter**                                                          **74 (293 - 296)**

Page 293

1  then we've covered the breakout of those 15:56
2  volumes. I can't -- I don't recall        15:57
3  seeing or being involved in this contract 15:57
4  at all, so I don't know what the intent    15:57
5  was here.                        15:57
6      Q. So, are you changing your        15:57
7  testimony that a percentage compensation 15:57
8  is one way which something could be       15:57
9  defined as per click?              15:57
10     A. I'm saying that there's          15:57
11 different interpretations of per click.  15:57
12     Q. Okay. Do you stand by one of    15:57
13 those interpretations can be a percentage 15:57
14 compensation?                    15:57
15     A. I don't think I agreed with       15:57
16 that.                         15:57
17     Q. So then, are you changing -- if  15:57
18 the record reflects you did say that, are 15:57
19 you changing your testimony?           15:57
20     A. My understanding, you questioned 15:57
21 me about the September 2011 contract, and 15:57
22 I think my testimony was I didn't         15:57
23 consider that to be a per-click         15:57

Page 294

1  arrangement.                     15:57
2      Q. Okay. And can you answer my     15:57
3  question of why you don't consider that   15:57
4  to be a per-click -- per click?        15:58
5      A. Because I think of it in terms    15:58
6  of a percentage-based.             15:58
7      Q. You think of --               15:58
8      A. I haven't used the terminology    15:58
9  "per click" anywhere. I don't know what 15:58
10 Blake meant by per click.            15:58
11     Q. You think of the Compass        15:58
12 contract in terms of percentage-based?   15:58
13     A. Correct.                    15:58
14     Q. Do you have any understanding of 15:58
15 what the terminology Blake is using, "per 15:58
16 click," in his e-mail means?         15:58
17     A. In terms of how he used it in    15:58
18 his e-mail, I don't. It appears to me a  15:58
19 conversation that he and Trae had, so I  15:58
20 don't -- I don't recall anything about   15:58
21 that.                         15:58
22     Q. Show you Exhibit 23. If we look 15:58
23 at 23, the second page has the e-mail   15:59

Page 295

1  that we just looked at that was Exhibit   15:59
2  22. And then this is Trae's response to  15:59
3  Blake; correct?                  15:59
4  (Plaintiff's Exhibit 23 was marked for   15:59
5  identification and is attached.)       15:59
6      A. Appears so, yes.             15:59
7      Q. And you're copied on that as     16:00
8  well?                         16:00
9      A. I am.                      16:00
10     Q. Trae says: "Blake, we will       16:00
11 await your revised contract.           16:00
12 Unfortunately, we will not be able to do 16:00
13 a 'per-click' agreement. In our opinion, 16:00
14 this type of payment based on 'per click' 16:00
15 volumes skirts dangerously close to      16:00
16 several advisory opinions from the OIG   16:00
17 relating to anti-kickback provisions.    16:00
18 From the literature we have reviewed, the 16:00
19 best method for this type of arrangement 16:00
20 is a flat payment" -- he said "in," but  16:00
21 "is a flat payment, negotiated in advance 16:00
22 and based on fair-market value, and for a 16:00
23 period of at least a year."            16:00

Page 296

1      Did I read that correct?          16:00
2      A. You did.                    16:00
3      Q. Do you agree with Trae's        16:00
4  statement that you were carbon-copied on 16:00
5  that I just read?                 16:00
6      MR. HOOVER: Object to the         16:00
7  extent you asked her to form a legal     16:00
8  opinion and disclose her legal opinion.  16:00
9      Q. Did you respond to anybody on    16:00
10 this e-mail chain and say, "What Trae    16:00
11 said is incorrect," or "I need to clarify 16:01
12 what he said"?                   16:01
13     A. I don't recall if I responded or 16:01
14 not.                         16:01
15     Q. What literature was reviewed --  16:01
16 as Trae says, From the literature we have 16:01
17 reviewed, the best method for this type  16:01
18 of arrangement" -- what literature do you 16:01
19 recall being reviewed?              16:01
20     A. I don't recall.              16:01
21     Q. Was it the anti-kickback article 16:01
22 that you sent to Blake?              16:01
23     A. I don't recall.              16:01

Page 297

1    Q.  Do you recall which advisory    16:01
2  opinions were reviewed from OIG?    16:01
3    A.  I don't.    16:01
4    Q.  He goes down, and the last    16:01
5  paragraph says, "I am attaching an    16:01
6  advisory opinion, that while not    16:01
7  identical to our arrangement, does    16:01
8  provide some very good insight as to what 16:01
9  is expected with these type arrangements 16:01
10 where specimens are being referred to a   16:02
11 laboratory for testing."    16:02
12        How was that advisory opinion    16:02
13 obtained?    16:02
14   A.  I don't know.  I don't know what 16:02
15 advisory opinion it was.    16:02
16   Q.  I think -- I think I've got it   16:02
17 here.  Exhibit 24 is Advisory Opinion    16:02
18 11-17, dated issued November 16th, 2011, 16:02
19 posted November 23rd, 2011.  And if you  16:02
20 look at the e-mail, the attachment is    16:02
21 entitled "advopn11-17.pdf."  Do you    16:02
22 recognize that as the advisory opinion    16:03
23 that was attached to the e-mail to Blake  16:03

Page 298

1  Bourland?    16:03
2  (Plaintiff's Exhibit 24 was marked for   16:03
3  identification and is attached.)    16:03
4    A.  I can't recall one way or    16:03
5  another.    16:03
6    Q.  Do you know how this advisory    16:03
7  opinion was obtained?    16:03
8    A.  I don't.    16:03
9    Q.  Did you obtain it and provide it 16:03
10 to Trae?    16:03
11   A.  I don't recall.    16:03
12   Q.  If you go to pages 4 and 5 of    16:03
13 this opinion, there are sections of it    16:03
14 that are shaded, or highlighting.    16:03
15 Printing on a black-and-white printer,    16:03
16 they come out gray.    16:03
17   A.  I don't -- I really can't see    16:03
18 any highlighting there.    16:03
19   Q.  You see the sections "B.    16:03
20 Analysis"?  Look above it where it's sort 16:03
21 of cross-hashed and below it.    16:03
22   A.  Maybe.  That's very, very faint. 16:04
23 I don't.    16:04

Page 299

1    Q.  Do you know who highlighted    16:04
2  those sections?    16:04
3    A.  I don't.    16:04
4    Q.  Do you believe Trae highlighted  16:04
5  those sections?    16:04
6    A.  I have no idea.    16:04
7    Q.  If we go back to Exhibit 23 -- I 16:04
8  thought that was right -- Trae at the    16:04
9  bottom says, "I have highlighted the    16:04
10 parts (pages 4-5) that I think are most   16:04
11 important in constructing an appropriate  16:04
12 contract and protecting both parties from 16:04
13 unnecessary risk."    16:04
14        Did Trae review with you which   16:04
15 portions he had highlighted before he    16:04
16 sent this to Blake Bourland?    16:04
17   A.  I don't recall.    16:04
18   Q.  Did you discuss the highlighted  16:04
19 sections with Trae before he sent them?   16:05
20   A.  I don't recall.    16:05
21   Q.  Do you recall reviewing the    16:05
22 highlighted sections of Advisory Opinion  16:05
23 11-17 and discussing them with Trae in    16:05

Page 300

1  the context of these contract    16:05
2  negotiations?    16:05
3    A.  I don't recall, no.    16:05
4    Q.  Exhibit 25.    16:05
5  (Plaintiff's Exhibit 25 was marked for    16:06
6  identification and is attached.)    16:06
7        MR. HOOVER:  I think the top    16:06
8  part needs to be clawed back.  I think    16:06
9  that's just between Trae and Roben, and   16:06
10 that's attorney-client privilege.  I    16:06
11 think the stuff below that, obviously,    16:06
12 with Blake Bourland Roben Nutter and Trae 16:06
13 Fite is not, but I think the top part    16:06
14 should be.    16:06
15        MR. McKENNA:  I'll start at the  16:06
16 bottom part.    16:06
17   Q.  All right.  Is the bottom    16:06
18 section in this e-mail -- actually, if    16:06
19 you look back to page 2, kind of read it  16:07
20 from the back to the front, is the bottom 16:07
21 section of page 1 and the top of page 2   16:07
22 Blake's response to Trae's e-mail that    16:07
23 was Exhibit 24?    16:07

Page 301

1    A.  Exhibit 23?                    16:07
2    Q.  Oh, I'm sorry, 23.  Sorry.  Is  16:07
3  that a yes?                          16:07
4    A.  It appears that way.           16:07
5    Q.  Okay.  All right.  Over on this  16:07
6  second page, Blake says in the second  16:07
7  paragraph," I think a 'per-click'     16:07
8  compensation system would work for both  16:08
9  parties."  Are you with me?          16:08
10   A.  No, I'm not.                    16:08
11   Q.  Look in -- I'm on Bates page 850  16:08
12  down at the bottom, 251850.          16:08
13   A.  Okay.                          16:08
14   Q.  Are we together?  Second        16:08
15  paragraph, about halfway down, third  16:08
16  line, end of the line, starts with, "I  16:08
17  think."                             16:08
18   A.  Yes.                           16:08
19   Q.  Okay.                          16:08
20     "I think a 'per-click'           16:08
21  compensation system would work for both  16:08
22  parties if not for the anti-kickback laws  16:08
23  that you think are applicable here.   16:08

Page 302

1  Therefore, if we can't change your mind  16:08
2  on that, we need to figure out another  16:08
3  way to do it.  Sort of something that  16:08
4  hasn't been discussed as a solution, we  16:08
5  believe that if Aperian is unwilling to  16:08
6  enter into a 'per-click' relationship in  16:08
7  a contract that includes government     16:08
8  payors, that leaves the parties with two  16:08
9  options."                            16:08
10     Did I read that correctly?       16:08
11   A.  You did.                       16:08
12   Q.  Okay.  And the first option is,  16:08
13  "Enter into two contracts:  a services  16:08
14  agreement where Aperian provides        16:08
15  laboratory services for our clients that  16:08
16  only covers specimens to be paid by    16:09
17  non-governmental payors and is done on a  16:09
18  'per-click' basis; and a separate       16:09
19  services contract covering any specimens  16:09
20  to be paid by governmental payors that is  16:09
21  not based on a 'per-click' basis - I am  16:09
22  open to discussing with your counsel    16:09
23  whether that solves any potential       16:09

Page 303

1  issues."                             16:09
2     That's Option 1; correct?        16:09
3    A.  Correct.                       16:09
4    Q.  Option 2 is:  "Enter into a     16:09
5  services contract where Aperian provides  16:09
6  laboratory services for our clients that  16:09
7  only covers specimens to be paid by     16:09
8  non-governmental payors and is done on a  16:09
9  'per-click' basis.  In this format,     16:09
10  Compass will ensure that no specimens are  16:09
11  sent to Aperian for testing that will be  16:09
12  reimbursable by government payors.  We   16:09
13  would put in the contract that if a     16:09
14  government payor sample found its way to  16:09
15  Aperian by accident, Compass would get no  16:09
16  compensation for it at all.  Compass    16:09
17  would rather not deal with that         16:10
18  separation, but frankly I don't see a   16:10
19  another way to do it to meet Compass'   16:10
20  objectives and accurately detail the    16:10
21  relationship."                       16:10
22     Did I read that correct?         16:10
23   A.  You did.                       16:10

Page 304

1    Q.  All right.  Isn't Option 2 what  16:10
2  was ultimately attempted with contract   16:10
3  number 3 that we looked at earlier?    16:10
4    A.  Government payors were carved    16:10
5  out of that --                       16:10
6    Q.  Okay.                          16:10
7    A.  -- last contract.              16:10
8     MR. McKENNA:  And, Jim, my         16:10
9  understanding is you're claiming the top  16:10
10  of that, where --                    16:10
11     MR. HOOVER:  Yeah.  From Trae      16:10
12  to --                               16:10
13     MR. McKENNA:  Trae to Roben --    16:10
14     MR. HOOVER:  Yeah.                16:10
15     MR. McKENNA:  -- about his        16:10
16  concerns?                            16:10
17     MR. HOOVER:  Yeah.  September      16:10
18  28th, 2012, at 4:23:34 p.m.           16:10
19     MR. McKENNA:  Is that -- is your  16:10
20  reason for clawback that he's asking for  16:10
21  legal advice there?                  16:10
22     MR. HOOVER:  Uh-huh.              16:10
23     THE WITNESS:  Yes.               16:10

1        MR. HOOVER: Correct. I'm   16:10
2   sorry.                    16:10
3        MR. McKENNA: That's a       16:11
4   duplicate. Those go fast.        16:11
5   (Discussion held off the record.)   16:11
6   Q.  (By Mr. McKenna) All right. I'm  16:12
7   going to give you what I've marked as   16:12
8   Exhibits 26 and 27 because I believe they  16:12
9   go together. Twenty-six is the e-mail,   16:12
10  and 27 is the services agreement that      16:12
11  says "Evans Petree PC Revisions, Draft,"  16:12
12  October 2nd, 2012, "For Discussion    16:12
13  Purposes Only."              16:12
14       All right. On the second page   16:12
15  of Exhibit 26, Blake says: "Roben,      16:12
16  Please find attached the redline and     16:13
17  clean version from our comments.         16:13
18  Honestly, the redline isn't going to help  16:13
19  you that much so I think it would be most  16:13
20  efficient and less confusing to simply go  16:13
21  through the clean document and just refer  16:13
22  to the redline as you need. It reflects  16:13
23  my comments contained in my email last   16:13

1   week. Jannie hasn't reviewed it, but   16:13
2   based on my conversations with her, it    16:13
3   reflects her intent of the parties'      16:13
4   relationship moving forward. Please     16:13
5   forward on to Jim as appropriate."       16:13
6        Did I read that correctly?      16:13
7   (Plaintiff's Exhibit 26 and 27 were     16:13
8   marked for identification and are        16:13
9   attached.)                    16:13
10  A.  You did.                16:13
11  Q.  And do you believe Exhibit 27 to  16:13
12  be the clean copy? Based on the date of  16:13
13  Blake's e-mail and the date of the Evans  16:13
14  Petree revision.              16:14
15  A.  I don't know that I can say for  16:14
16  sure that it is, but.            16:14
17  Q.  Does it appear to be?        16:14
18  A.  I think the dates look like     16:14
19  they're lining up that way.       16:14
20  Q.  Okay. Okay. And he's providing  16:14
21  this directly to you; right?      16:14
22  A.  The -- the e-mail is to Trae    16:14
23  with me copied, but he says -- he      16:14

1   addresses me in the e-mail.       16:14
2   Q.  Okay.               16:14
3   A.  In the body of the e-mail.     16:14
4   Q.  And if we look at this draft by  16:14
5   Evans Petree from Blake -- correct?    16:14
6   Blake Bourland. Under "Contractor Duties  16:14
7   and Services," there are no marketing    16:14
8   requirements and no hours requirement, is  16:15
9   there?                    16:15
10       (Witness reviews document.)    16:15
11  A.  Nothing labeled "marketing."    16:15
12  Q.  Okay. And there are no        16:15
13  requirements that Compass perform any     16:15
14  certain number of hours for their work?   16:15
15  A.  There's not.             16:15
16  Q.  Then if we look under item 3,   16:15
17  the proposal is to exclude federal       16:15
18  reimbursement; correct?          16:15
19  A.  There is a section --         16:15
20  Q.  Okay.               16:15
21  A.  -- related to "No Federal       16:15
22  Government Reimbursement."         16:15
23  Q.  Are you aware of the HHS OIG    16:15

1   advisory opinion on carveouts and how    16:15
2   they don't assuage the HHS OIG concerns?  16:15
3   A.  Repeat your question?        16:16
4   Q.  Yeah. So, are you aware -- are  16:16
5   you aware of the HHS OIG opinions on     16:16
6   federal reimbursement carveouts? Just    16:16
7   leave it at that.             16:16
8   A.  I'd probably ask you to refer me  16:16
9   to the specific guidance.        16:16
10  Q.  To the actual --           16:16
11  A.  As I sit here today, I can't    16:16
12  think of the actual opinions, but.       16:16
13  Q.  You can't think of any opinions  16:16
14  from HHS OIG on federal reimbursement    16:16
15  carveouts?                 16:16
16  A.  I'm just not remembering what   16:16
17  the opinions are or any details about    16:16
18  what they are, so.            16:16
19  Q.  Okay.               16:16
20  A.  If you've got the opinions, I'll  16:16
21  look at them.                16:16
22  Q.  We may get to them. But sitting  16:16
23  here today, do you know if you had       16:16

**Roben Nutter**                                                    **78 (309 - 312)**

Page 309

1  knowledge of those opinions at the time  16:16
2  y'all were negotiating this contract?  16:16
3     A.  I don't recall.            16:16
4     Q.  Okay.                     16:16
5     A.  If I did or not.          16:16
6     Q.  And under 5, "Compensation,"  16:16
7  we're back to with -- with the carveout,  16:17
8  we're back at 25 percent compensation,  16:17
9  correct?                        16:17
10    A.  Subcontractor -- "Contractor" --  16:17
11 "Contractor shall pay the Subcontractor  16:17
12 seventy-five percent of the reimbursable  16:17
13 costs collected by Subcontractor."  16:17
14    Q.  Okay.  So that means Compass  16:17
15 gets 25 percent; correct?        16:17
16    A.  Assuming that we've got the  16:17
17 subcontractor and contractor language  16:17
18 correct.                        16:17
19    Q.  Do you know if Aperian accepted  16:17
20 this version of the contract?    16:17
21    A.  Do I know if Aperian accepted  16:17
22 this version of the contract?  I don't  16:17
23 really know.                    16:18

Page 310

1     Q.  Exhibit 28, does this appear to  16:18
2  be the redlined version of Exhibit 27?  16:18
3  (Plaintiff's Exhibit 28 was marked for  16:18
4  identification and is attached.)  16:18
5     (Witness reviews document.)  16:18
6     A.  This seems to indicate that  16:18
7  maybe Burr Forman, it was Burr Forman's  16:18
8  original draft (indicating), but I'm not  16:18
9  sure.                           16:18
10    Q.  Right.  That Evans Petree marked  16:18
11 up on October 2nd, just like the exhibit,  16:18
12 what, 26 is dated?              16:19
13    A.  Twenty-seven?             16:19
14    Q.  Twenty-seven, sorry.       16:19
15    A.  I don't know which of these came  16:19
16 first or second.                16:19
17    Q.  If you refer back to the e-mail  16:19
18 we looked at where Blake says he's  16:19
19 attaching both the clean and redline  16:19
20 versions, does that help you?    16:19
21    A.  Are you saying this is the clean  16:19
22 and this is the marked-up version  16:19
23 (indicating)?                   16:19

Page 311

1     Q.  Yes.  And I'm asking you if  16:19
2  that's what it appears to be.    16:19
3     A.  That's what it appears to be.  I  16:19
4  don't know for sure.            16:19
5     Q.  I don't know who else I would  16:19
6  ask, since they were sent to you.  16:19
7     A.  I don't recall, but.        16:19
8     Q.  Okay.  I'm not having any more  16:19
9  fun putting these documents together than  16:21
10 you are.  If it helps.          16:21
11    Give you Exhibit 29, which is an  16:21
12 e-mail dated 10/25/2012.  Exhibit --  16:21
13 let's do these one at a time.  This is  16:21
14 29.  Then Exhibit 30 should be the  16:21
15 redline version attached to that e-mail.  16:21
16 And Exhibit 31 should be the clean  16:22
17 version attached to the e-mail.  Make  16:22
18 sure I didn't mark on that one.  16:22
19    All right.  Looking at Exhibit  16:22
20 29, on the second page, which is Bates  16:23
21 exhibit -- Bates 1151.  And this is an  16:23
22 e-mail dated October 22nd, 2012, from Jim  16:23
23 Hoover to Blake Bourland on which you and  16:23

Page 312

1  Trae are copied; correct?        16:23
2  (Plaintiff's Exhibit 29, 30, and 31 were  16:23
3  marked for identification and are  16:23
4  attached.)                      16:23
5     A.  Correct.                  16:23
6     Q.  It says: "Blake, I have  16:23
7  attached a clean copy and a comparison  16:23
8  version of the changes we made to your  16:23
9  draft agreement.  I do not think there  16:23
10 were any significant changes.  I believe  16:23
11 Trae may have emailed Jannie and told her  16:23
12 wanted to explore paying Compass  16:23
13 according to a fixed monthly lump sum.  16:23
14 We discussed your fee proposal and are  16:23
15 agreeable with your proposal."  16:23
16    Did I read that correctly?  16:23
17    A.  You did.  There is a "However,"  16:23
18 but.                            16:23
19    Q.  Right.                    16:23
20    A.  There's more to the e-mail.  16:23
21    Q.  Am I understanding correctly  16:23
22 that Aperian agreed ultimately not to  16:24
23 utilize a flat fee in this third contract  16:24

Page 313

1  that they had been insistent upon --    16:24
2  insisting upon for compliance reasons?    16:24
3  Correct?                      16:24
4     A.  I recall what's here in the    16:24
5  e-mail.                        16:24
6     Q.  Okay.  But you did -- well, we    16:24
7  saw the prior e-mails where "we want to    16:24
8  go with the flat fee to be as compliance    16:24
9  as possible"; correct?            16:24
10    A.  We have seen that --        16:24
11    Q.  Okay.                  16:24
12    A.  -- previously.            16:24
13    Q.  But in the end, Aperian agreed    16:24
14 to not go with a flat fee?        16:24
15    A.  Again, I think I can speak to    16:24
16 what the e-mail says here.        16:24
17    Q.  Well, we're also looking at the    16:24
18 final contract where he agreed not to go    16:24
19 with a flat fee; correct?          16:24
20    A.  We know what the final contract    16:24
21 says, yes.                    16:24
22    Q.  On Exhibit 30 is Blake's      16:24
23 revision.  Item 3, "No Federal Government 16:25

Page 314

1  Reimbursement," "Contractor shall not    16:25
2  provide to Subcontractor any specimens    16:25
3  from any Client which are to be        16:25
4  reimbursed by a federal government      16:25
5  program, including but not limited to,    16:25
6  Medicare and Medicaid."            16:25
7     What is the reason that term was  16:25
8  included?                      16:25
9     MR. HOOVER:  Object.  I mean,    16:25
10 calls for her mental -- mental        16:25
11 impressions.                    16:25
12    MR. McKENNA:  Are you        16:25
13 instructing her not to answer?        16:25
14    MR. HOOVER:  I am.            16:25
15    Q.  Would you agree that the claims    16:26
16 data and commission payments to Compass    16:26
17 after the date of this contract confirm    16:26
18 that Provision 3 was not followed in    16:26
19 reality?                      16:26
20    A.  I'd have to look at the data.    16:26
21    Q.  Have you looked at the data?    16:26
22    A.  I have looked at a lot of data    16:26
23 in this case.                    16:26

Page 315

1     Q.  All right.  Well, do you know if 16:26
2  you've looked at data that confirms that    16:26
3  Provision 3 was not followed in -- in    16:26
4  actuality?                    16:26
5     A.  I recall that there may have    16:26
6  been some, but I don't recall the time    16:26
7  periods in which that occurred.        16:26
8     Q.  Would it have been some after    16:26
9  the date of this contract was entered    16:26
10 into?                        16:26
11    A.  That I can't remember.        16:26
12    Q.  Show you Exhibit 32, which is an 16:26
13 e-mail from Blake Bourland to Jim Hoover, 16:28
14 carbon-copied to you, Trae, and Jannie.    16:28
15 And Blake says:  "Attached is a clean and 16:28
16 redlined version of the revised and what    16:28
17 I believe would be final document.  I    16:28
18 talked with Jannie and she indicated she    16:28
19 thought it would be easier to set an      16:28
20 effective date of December 1, meaning    16:28
21 that Aperian would make a flat payment in 16:28
22 December for 'November services' and the    16:28
23 first payment under the new agreement    16:29

Page 316

1  would be in January."            16:29
2     Did I read that correctly        16:29
3  (Plaintiff's Exhibit 32 was marked for    16:29
4  identification and is attached.)        16:29
5     A.  You did.                16:29
6     Q.  And if you would -- okay.  Does  16:29
7  that comport with your recollection of    16:29
8  how the agreements operated, that the    16:29
9  flat fee ended in November and the new    16:29
10 contract began in December?        16:29
11    A.  I recall from looking at the    16:29
12 document that the effective date was    16:29
13 December 1, 2012.  I don't have a        16:29
14 recollection outside of that.        16:29
15    Q.  I'll give you what's been marked  16:30
16 as Exhibit 33.  Sort of a composite    16:30
17 exhibit, but it was produced as one      16:30
18 document.  It's Aperian Bates 60 through  16:30
19 79.  And the first three pages are a    16:30
20 letter from Evans Petree dated October 9, 16:30
21 2013.  The next thirteen pages appear to  16:30
22 be the last contract.  And then there are 16:30
23 some letters from Burr Forman.        16:30

**Roben Nutter**                                                    **80 (317 - 320)**

Page 317

1    Are Bates numbers 63 through 75    16:31
2   the final December 1st, 2012, contract    16:31
3   between Compass and Aperian?    16:31
4   (Plaintiff's Exhibit 33 was marked for    16:31
5   identification and is attached.)    16:31
6    A.  I'm not positive without    16:31
7   comparing it to the versions that we've    16:31
8   produced, but it appears to be dated    16:31
9   effective December 1st, 2012.    16:31
10    Q.  Okay.  And it has the Aperian    16:31
11   Bates number on it, so it would be    16:31
12   something you produced.    16:31
13    A.  Okay.  It appears to be the    16:31
14   final contract.    16:31
15    Q.  On Bates pages 76 through 77,    16:31
16   there's a letter dated October 17th    16:31
17   through -- 2013, from Jim Hoover to Katy    16:31
18   Laster at Evans Petree terminating the    16:32
19   agreement between Aperian and Compass.    16:32
20   Do you see that?    16:32
21    A.  I do.    16:32
22    Q.  Why was the agreement terminated    16:32
23   between Aperian and Compass?    16:32

Page 318

1    (Witness reviews document.)    16:32
2    A.  I think that calls for my legal    16:32
3   opinion.    16:32
4    Q.  Well, from a business    16:32
5   perspective, what was the reason that    16:32
6   they -- that the contract was terminated?    16:32
7    A.  I don't think there was a    16:32
8   business perspective.  I think it was a    16:32
9   legal action.    16:32
10    Q.  Was a lawsuit brought by    16:32
11   somebody concerning the Compass/Aperian    16:32
12   entities?    16:32
13    A.  No, not that I recall.    16:33
14    Q.  All right.  Was the contract    16:33
15   terminated for compliance concerns?    16:33
16    MR. HOOVER:  To the extent    16:33
17   you're asking her to give her legal    16:33
18   conclusion and legal opinion, I object to    16:33
19   the attorney-client privilege.    16:33
20    (Witness reviews document.)    16:33
21    Q.  What's your answer?    16:33
22    A.  What's the question again?    16:33
23    MR. HOOVER:  Was it terminated    16:33

Page 319

1   because of compliance concerns.  To which    16:33
2   I objected.    16:33
3    A.  Well, clearly, this letter on    16:33
4   the front of this exhibit is a cease and    16:33
5   desist letter.  Which I would consider    16:33
6   purely legal.  And so to the extent    16:33
7   that --    16:34
8    Q.  So the --    16:34
9    A.  You asking me why it was    16:34
10   terminated, I think is clearly a legal    16:34
11   issue.    16:34
12    Q.  The cease and desist letter    16:34
13   which -- which we have here deals with,    16:34
14   in broad terms, Aperian contacting    16:34
15   clients that Compass considered to be    16:34
16   their clients?  Is that correct?    16:34
17    A.  In a broad -- broad sense.  It's    16:34
18   talking about violation of a    16:34
19   nonsolicitation provision.    16:34
20    Q.  Okay.  And in response to that,    16:34
21   Aperian's reaction was just to terminate    16:34
22   the contract?    16:34
23    A.  I didn't draft the response, so.    16:34

Page 320

1   But that is what it says.    16:34
2    Q.  Wait.  Well, you wouldn't let    16:34
3   outside counsel terminate a contract of    16:34
4   Health Care Authority or its business    16:35
5   entity without your approval and input;    16:35
6   correct?    16:35
7    A.  I'm sure I was involved.    16:35
8    Q.  Yeah.  And was it because of    16:35
9   this nonsolicitation thing?    16:35
10    A.  Honestly, I don't recall    16:35
11   specifically all the thoughts and    16:35
12   decisions around the response.    16:35
13    MR. McKENNA:  Okay.  Let's take    16:35
14   a break.    16:35
15    THE VIDEOGRAPHER:  We are going    16:35
16   off the record at 4:37.    16:35
17    (Break taken.)    16:51
18    THE VIDEOGRAPHER:  This begins    16:51
19   Disc No. 6.  We're back on the record at    16:53
20   4:54.    16:53
21    Q.  (By Mr. McKenna) Earlier today,    16:53
22   I was asking you about conversations    16:53
23   between you and Blake Bourland, and you    16:53

Page 321

1  just said you couldn't recall any of the  16:53
2  specifics of the conversations. Did you  16:53
3  keep any notes of those conversations  16:53
4  while you were negotiating these  16:53
5  contracts with Blake?  16:53
6    A.  Not that I recall.  16:53
7    Q.  I'm giving you Exhibit 34. This  16:53
8  is HHS OIG Advisory Opinion 13-03.  16:53
9  (Plaintiff's Exhibit 34 was marked for  16:54
10  identification and is attached.)  16:54
11    (Witness reviews document.)  16:54
12    Q.  Would this be the type of  16:54
13  opinion that would come out on the HHS  16:54
14  OIG Listserv?  16:54
15    A.  It's an advisory opinion, and  16:54
16  those do come out on the Listservs.  16:54
17    Q.  Okay. If we look at the "Legal  16:54
18  Analysis," under "Law," it's talking  16:54
19  about the anti-kickback statute; correct?  16:54
20    A.  It is.  16:54
21    Q.  All right. And the second  16:54
22  paragraph under that, it -- it sets forth  16:54
23  the -- the one-purpose test under Greber?  16:54

Page 322

1  Is that right? It's actually -- and it  16:54
2  also quotes the United States v. Borrasi  16:55
3  out of the 11th Circuit [sic].  16:55
4    A.  I haven't -- I haven't read this  16:55
5  whole opinion, but I see that it's  16:55
6  talking about one purpose of  16:55
7  remuneration.  16:55
8    Q.  Okay. And you understand that  16:55
9  Greber was the opinion in 1985 that laid  16:55
10  out that one-purpose test under the  16:55
11  anti-kickback statute?  16:55
12    A.  I don't.  16:55
13    Q.  Okay.  16:55
14    A.  I don't think I've read that  16:55
15  case.  16:55
16    Q.  Under Section B, "Analysis," the  16:55
17  second paragraph says: "The OIG has a  16:55
18  long-standing concern about arrangements  16:55
19  under which parties 'carve out'  16:55
20  Federal" -- I'm sorry, "'carve out'  16:55
21  referrals of Federal health care program  16:55
22  beneficiaries or business generated by  16:55
23  Federal health care programs from  16:55

Page 323

1  otherwise questionable financial  16:55
2  arrangements. Such arrangements  16:55
3  implicate, and may violate, the  16:56
4  anti-kickback statute by disguising  16:56
5  remuneration for Federal health care  16:56
6  program business through payment of  16:56
7  amounts purportedly related to  16:56
8  non-Federal health care program  16:56
9  business."  16:56
10    Did I read that correctly?  16:56
11    A.  You did.  16:56
12    Q.  And were you aware of this  16:56
13  long-standing concern of HHS OIG about  16:56
14  carveouts at the time the third contract  16:56
15  was entered into with between Compass and  16:56
16  Aperian?  16:56
17    A.  This opinion is after that date.  16:56
18    Q.  Right. But the opinion refers  16:56
19  to "a long-standing concern"; correct?  16:56
20    A.  I don't know. I would like you  16:56
21  to show me opinions related to that. But  16:56
22  this opinion is dated after --  16:56
23    Q.  Sure.  16:56

Page 324

1    A.  -- those arrangements.  16:56
2    Q.  I can show you plenty. I don't  16:56
3  have them all here with me today, but  16:56
4  there are plenty of opinions that state  16:56
5  the OIG --  16:56
6    A.  I don't know that they're  16:56
7  completely on point to what we're talking  16:56
8  about here today, so.  16:56
9    Q.  But my question was, were you  16:56
10  aware of the OIG's long-standing concern  16:57
11  about arrangements which carve out  16:57
12  federal referrals of federal healthcare  16:57
13  program beneficiaries?  16:57
14    A.  Not as it relates to the facts  16:57
15  in this case.  16:57
16    Q.  Were you aware of it in general?  16:57
17    A.  That there were opinions related  16:57
18  to carveouts?  16:57
19    Q.  Yes.  16:57
20    A.  I think generally I was aware  16:57
21  that there are opinions related to  16:57
22  carveouts, but not as it applies to the  16:57
23  facts in this case.  16:57

**Roben Nutter**                                              **82 (325 - 328)**

Page 325

1  Q.  Okay.  Were you aware at the     16:57
2  time of the third Aperian Compass     16:57
3  contract that there were opinions related 16:57
4  to carveouts?                          16:57
5  A.  I don't recall the timing in     16:57
6  which I was aware of those.            16:57
7  Q.  All right.  Give you Exhibit 35.  16:57
8  Can you identify what Exhibit 35 is,    16:57
9  please.                                16:57
10 (Plaintiff's Exhibit 35 was marked for 16:58
11 identification and is attached.)       16:58
12   (Witness reviews document.)          16:58
13  Q.  What is a corporate compliance   16:58
14 report log?                            16:58
15  A.  It's a log in which compliance   16:58
16 concerns or questions are raised.      16:58
17  Q.  Okay.  What gets -- what types    16:58
18 of compliance concerns get put -- put on 16:58
19 the report log?                        16:58
20  A.  Primarily things that are raised 16:59
21 to our compliance department.          16:59
22  Q.  Okay.  Do you understand, based  16:59
23 on the standards of conduct and the -- 16:59

Page 326

1  the way compliance concerns can be raised 16:59
2  in there, they can be raised by an    16:59
3  employee to the compliance officer or the 16:59
4  manager to whom they report?  Correct? 16:59
5  A.  Or to the compliance department  16:59
6  or to some other --                    16:59
7  Q.  Right.                            16:59
8  A.  -- person that they would like   16:59
9  to report that to.                     16:59
10  Q.  Right.  So if -- if an employee  16:59
11 reports a compliance concern, they choose 16:59
12 the avenue of reporting it to their    16:59
13 manager, would you expect that compliance 16:59
14 concern to end up on this corporate    16:59
15 compliance report log?                 16:59
16  A.  If the manager reports it to     16:59
17 compliance.                            16:59
18  Q.  Okay.  Would you expect the      16:59
19 manager to report it to compliance?    16:59
20  A.  I would.                         16:59
21  Q.  Okay.                            16:59
22  A.  If it's a concern to the         16:59
23 manager.                              16:59

Page 327

1  Q.  Well, is the manager then a      16:59
2  filter?  Or -- or is the manager      17:00
3  obligated to pass all compliance concerns 17:00
4  reported to the manager by the employee? 17:00
5  A.  Well, I think sometimes concerns 17:00
6  are raised that are easily answered and 17:00
7  the manager is knowledgeable enough to 17:00
8  field those questions and answer those 17:00
9  questions appropriately.  If it is a   17:00
10 question that rises to the level of going 17:00
11 to the compliance department, I would   17:00
12 expect it to go there.                 17:00
13  Q.  Okay.  On this particular        17:00
14 compliance log, Trae Fite back in      17:00
15 December of 2008 is reporting a concern 17:00
16 of Dr. Patel placing an order for 600  17:00
17 vials to use in his -- in his personal 17:00
18 practice; correct?                     17:00
19  A.  It appears to be a concern.      17:00
20  Q.  Okay.                            17:00
21  A.  By Trae about vials which went   17:00
22 to this physician's office, yes.       17:00
23  Q.  In your experience, did Trae     17:00

Page 328

1  typically report things that he thought 17:01
2  were compliance concerns?              17:01
3    MR. HOOVER:  Object to the form.   17:01
4  A.  He reported this one.             17:01
5  Q.  Okay.  Over your time working    17:01
6  when -- when Trae worked there, did he 17:01
7  report compliance concerns on more than 17:01
8  this -- this one basis?                17:01
9  A.  I don't know if there are others 17:01
10 that he reported through the compliance 17:01
11 department or not.                     17:01
12  Q.  Okay.  Well, if he reported      17:01
13 compliance concerns to Ken Lott, would 17:01
14 you expect those reports to end up on a 17:01
15 corporate compliance report log?       17:01
16  A.  If that was communicated back to 17:01
17 the compliance department.             17:01
18  Q.  Would you expect Ken to have     17:01
19 communicated it back to the compliance 17:01
20 department?                            17:01
21  A.  If -- if it was a compliance     17:01
22 issue and question, yes.               17:01
23  Q.  Okay.  And if Trae raised a -- a 17:01

Page 329

1  concern with the anti-kickback statute to 17:02
2  Ken Lott, would you expect that to be    17:02
3  passed on and reported on the corporate   17:02
4  compliance report log?                    17:02
5     A.  I think more than likely that      17:02
6  would be considered a legal issue and     17:02
7  would be brought to me.                   17:02
8     Q.  So reports of concerns with the    17:02
9  kickback or Stark law, you wouldn't       17:02
10 expect that to end up on the corporate    17:02
11 compliance report log?                    17:02
12    A.  It could if it was reported        17:02
13 through the compliance department, but I  17:02
14 think it would land with me.              17:02
15    Q.  Okay.                              17:02
16    A.  As a legal issue.                  17:02
17    Q.  Well, where do reports of          17:02
18 compliance that are reported through      17:02
19 management that are deemed legal issues,  17:02
20 where do they get recorded?               17:02
21    A.  If they go through the             17:02
22 compliance department, they would be      17:02
23 reported on this log.  I have people that 17:02

Page 330

1  communicate and talk with me every day    17:02
2  all, day long, so I don't keep a separate 17:02
3  legal log.                                17:02
4     Q.  Okay.  So --                       17:02
5     A.  Of issues.                         17:02
6     Q.  -- unless it goes through the      17:03
7  compliance committee, even though it may  17:03
8  fall under the category of compliance,    17:03
9  it's not going to be on the compliance    17:03
10 report log?                               17:03
11    A.  I think if it falls in the         17:03
12 category of compliance and goes through   17:03
13 the compliance department, it would be on 17:03
14 the log.                                  17:03
15    Q.  In your understanding, do          17:03
16 anti-kickback statutes, Stark law, and    17:03
17 False Claims Act reports fall into        17:03
18 compliance?                               17:03
19    MR. HOOVER:  Object, asked and         17:03
20 answered.                                 17:03
21    A.  I think my -- my testimony just    17:03
22 was those would probably be bumped to me  17:03
23 as legal issues.                          17:03

Page 331

1     Q.  And --                            17:03
2     A.  Not to say they couldn't ever be  17:03
3  on this log.  They could be.  But I think 17:03
4  most of the time those would be bumped to 17:03
5  me.                                       17:03
6     Q.  What's the dividing line between   17:03
7  compliance and legal at East Alabama      17:03
8  Health Care Authority?                    17:03
9     A.  I don't know that I understand     17:03
10 your question.                            17:03
11    Q.  I mean, don't all compliance       17:03
12 issues concern complying with some aspect 17:03
13 of a regulation or law?                   17:04
14    A.  Which makes them, a lot of them    17:04
15 legal issues.                             17:04
16    Q.  Right.  But you're                 17:04
17 differentiating between -- you're         17:04
18 differentiating for me something that     17:04
19 comes through --                          17:04
20    MR. HOOVER:  No.                       17:04
21    Q.  -- that you consider a             17:04
22 compliance issue versus a legal issue.    17:04
23    MR. HOOVER:  That's not her            17:04

Page 332

1  testimony.  Because your questions have   17:04
2  been different than that.                 17:04
3     Q.  The -- the reports that Trae       17:04
4  Fite made to Ken Lott in April of 2013,   17:04
5  did those appear on any corporate         17:04
6  compliance report log?                    17:04
7     A.  Not that I'm aware of.             17:04
8     Q.  Do you know why they're not        17:04
9  recorded on the corporate compliance      17:04
10 report log?                               17:04
11    A.  Because Trae didn't report them    17:04
12 to the compliance department.             17:04
13    Q.  Okay.  But you're also the head    17:04
14 of the compliance department, aren't you? 17:04
15    A.  I'm the compliance officer.        17:04
16    Q.  Yes.  So if Trae reported it to    17:04
17 you or you received those concerns that   17:04
18 he reported to Ken Lott, is he not in a   17:04
19 sense reporting them to compliance?       17:05
20    A.  Well, as I just testified, when    17:05
21 issues come to me that are legal issues,  17:05
22 I'm going to be dealing with those        17:05
23 issues, not necessarily reporting those   17:05

Page 333

1  back to the compliance department.    17:05
2     Q.  But doesn't it help the    17:05
3  compliance department to know what --    17:05
4  what issues are being raised so they    17:05
5  don't have those same issues come up in    17:05
6  other parts of the hospital?    17:05
7     MR. HOOVER:  Object to the form.  17:05
8     A.  I don't think I said that the    17:05
9  compliance department wouldn't be aware.  17:05
10  I said those weren't reported to the    17:05
11  compliance department and they weren't    17:05
12  made -- made -- they weren't -- they    17:05
13  didn't make it to the corporate    17:05
14  compliance report log because they    17:05
15  weren't reported that way.    17:05
16     Q.  Do you know if East Alabama    17:05
17  Health Care Authority provided these    17:05
18  corporate compliance report logs to DOJ  17:05
19  when they investigated the case?    17:05
20     A.  I don't know what was produced    17:05
21  to them.    17:05
22     Q.  Exhibit 36 was produced as a    17:05
23  single document with Bates Aperian 123    17:06

Page 334

1  through 156.  If we start with the first    17:06
2  page, what is -- what is the first page,  17:06
3  Aperian 123?    17:06
4  (Plaintiff's Exhibit 36 was marked for    17:06
5  identification and is attached.)    17:06
6     A.  This is a cover page for our    17:06
7  president regarding the corporate    17:06
8  compliance policy and standards of    17:06
9  conduct.    17:06
10     Q.  Okay.  And then the next two    17:06
11  pages, 124 and 125, are those the    17:07
12  corporate compliance policy?    17:07
13     A.  For what time period?    17:07
14     Q.  That would be a good question.    17:07
15  The time period I'm most interested in is 17:07
16  2008 through 2013.  Do you know what time 17:07
17  period these are for?    17:07
18     A.  I don't.  If this is what we    17:07
19  produced in response to -- to that    17:07
20  request, then I guess I can assume that's 17:07
21  what time period it is.    17:07
22     Q.  Okay.  All right.  The corporate  17:07
23  compliance policy, item 1 says "It is the 17:07

Page 335

1  policy of East Alabama Medical Center and 17:07
2  affiliated entities to comply with all    17:07
3  applicable federal, state and local laws  17:07
4  and regulations, both civil and criminal, 17:07
5  as well as those pertaining to tax-exempt 17:07
6  status in the Medical Center."  This    17:07
7  would include Aperian; correct?    17:08
8     A.  It would.    17:08
9     Q.  Okay.  And item 2 says, "In    17:08
10  addition to complying with the law, it is 17:08
11  also the policy of the Medical Center to  17:08
12  comply with this Policy and the Standards 17:08
13  of Conduct which are adopted from time to 17:08
14  time."    17:08
15     Correct?    17:08
16     A.  Correct.    17:08
17     Q.  And standards of conduct are a    17:08
18  separate document?    17:08
19     A.  They're -- they're housed    17:08
20  together as one document.    17:08
21     Q.  Okay.    17:08
22     A.  There are two separate parts to  17:08
23  the document.    17:08

Page 336

1     Q.  So the compliance policy is one  17:08
2  part and the standards of conduct is    17:08
3  another?    17:08
4     A.  They're presented just as you    17:08
5  see it here, with the compliance policy   17:08
6  first and the standards of conduct    17:08
7  following.    17:08
8     Q.  Okay.  All right.  Paragraph 4   17:08
9  of the corporate compliance policy has    17:08
10  the reporting requirement for employees   17:08
11  who are aware of violations of something  17:08
12  they believe violates the law?  Correct? 17:08
13     A.  Correct.    17:08
14     Q.  And it says they should report   17:08
15  the matter to "his or her immediate    17:09
16  supervisor, director, vice president,    17:09
17  President, or the Compliance Officer."    17:09
18  Correct?    17:09
19     A.  It does say that.    17:09
20     Q.  And it's that's an "or."  They   17:09
21  can choose which one to report that to;   17:09
22  right?    17:09
23     A.  And they also know that they can 17:09

**Roben Nutter**                                                    **85 (337 - 340)**

Page 337

1  do that through the hotline.         17:09
2    Q.  Okay.                          17:09
3    A.  And also on -- online.  You can  17:09
4  do an online a report as well.       17:09
5    Q.  Okay.                          17:09
6    A.  That goes to the compliance    17:09
7  department.                          17:09
8    Q.  All right.  And then beginning  17:09
9  on page 126 through -- let's see if I can  17:09
10  find it again -- 139, is that the "East  17:09
11  Alabama Medical Center Standards of  17:09
12  Conduct"?                           17:09
13    A.  For the time period that you're  17:09
14  interested in.  I'm assuming that --  17:09
15    Q.  Okay.                         17:09
16    A.  -- that they're -- that they  17:09
17  were in place during that time.      17:09
18    Q.  And these standards of conduct  17:09
19  also applied to Aperian?             17:10
20    A.  Yes.                          17:10
21    Q.  Okay.  On page 127, item 5,   17:10
22  "Improper Payments, Bribes and      17:10
23  Kickbacks," are you with me?         17:10

Page 338

1    A.  I am.                          17:10
2    Q.  Says, "Payments or other items  17:10
3  of value in the nature of 'kickbacks' or  17:10
4  'bribes' intended to induce or reward  17:10
5  favorable decisions or actions are not to  17:10
6  be offered, made solicited, received or  17:10
7  tolerated in connection with any of the  17:10
8  Medical Center's business."  And then on  17:10
9  the next page, 128, it has examples of  17:10
10  kickbacks; correct?                  17:10
11    A.  It does.                       17:10
12    Q.  Okay.  And the very first thing  17:10
13  that is prohibited is "Receiving or   17:10
14  making payment for any patient       17:10
15  referrals"; correct?                 17:10
16    A.  It does say that.              17:10
17    Q.  And then the third thing that is  17:10
18  prohibited is "Making false claims for  17:10
19  Medicare or Medicaid reimbursement";  17:10
20  correct?                            17:10
21    A.  It does say that.              17:10
22    Q.  All right.  Item 6 in the      17:10
23  standards of conduct is              17:10

Page 339

1  "Medicare-Medicaid Anti-Fraud and Abuse"; 17:11
2  correct?                            17:11
3    A.  Yes.                           17:11
4    Q.  It says in the first paragraph:  17:11
5  "Employees, medical staff and agents must  17:11
6  adhere to the federal and state fraud and  17:11
7  abuse laws related to government health  17:11
8  care programs.  These persons and    17:11
9  entities should be familiar with the  17:11
10  fraud and abuse laws, the role of such  17:11
11  laws in preventing and detecting fraud,  17:11
12  waste and abuse, protections applicable  17:11
13  to whistleblowers and the Medical    17:11
14  Center's policy regarding detecting and  17:11
15  preventing fraud, waste and abuse."   17:11
16      Did I read that correctly?       17:11
17    A.  You did.                       17:11
18    Q.  And so employees of both EAMC   17:11
19  and Aperian would be required to read and  17:11
20  be familiar with the fraud and abuse  17:11
21  laws; correct?                       17:11
22    A.  I don't know that we've said   17:11
23  there's a requirement to read them.  And  17:11

Page 340

1  certainly, after they read them, if they  17:12
2  did, they wouldn't fully understand them. 17:12
3    Q.  Okay.                          17:12
4    A.  But.                           17:12
5    Q.  Well, they are required to read  17:12
6  and sign they've read the standards of  17:12
7  conducts; correct?                   17:12
8    A.  Yes.                           17:12
9    Q.  And you actually set forth the   17:12
10  anti-kickback statute requirements, Stark 17:12
11  law, and False Claims Act --         17:12
12    A.  In this document.              17:12
13    Q.  -- in the standards of conduct?  17:12
14    A.  Yes, correct.                  17:12
15    Q.  So if they do what they've     17:12
16  signed they've done, they have read those 17:12
17  -- those laws set forth by the employer.  17:12
18    A.  This is not the full law.      17:12
19    Q.  Right.  The portions provided by  17:12
20  the employer.                       17:12
21    A.  Yes.                          17:12
22    Q.  Okay.  The second paragraph on  17:12
23  page 129 says, "In an effort to      17:12

Page 341

1 comply" -- well, let me put it in        17:12
2 context.                                  17:12
3       "It is the Medical Center's         17:12
4 policy to comply with all applicable      17:12
5 fraud and abuse laws. In the effort to    17:12
6 comply, the Medical Center will utilize   17:12
7 monitoring and auditing systems           17:13
8 reasonably designed to detect             17:13
9 misconduct."                              17:13
10      Did I read that correct?            17:13
11   A.  You did.                           17:13
12   Q.  What monitoring and auditing       17:13
13 systems did the medical center have in   17:13
14 place between 2008 and 2012 to monitor   17:13
15 and audit to make sure kickbacks were not 17:13
16 being made for referrals?                17:13
17   A.  Well, I think I discussed much     17:13
18 earlier today about the auditing systems 17:13
19 that the compliance department has. They  17:13
20 have an auditing schedule. We employ      17:13
21 outside resources to -- to audit and      17:13
22 monitor.                                  17:13
23   Q.  Were any of those resources        17:13

Page 342

1 designed to monitor for kickbacks being   17:13
2 paid in exchange for referrals?           17:13
3   A.  I would have to look back over      17:13
4 those years and look at what audits       17:13
5 actually occurred over those years to be  17:13
6 able to answer that question.             17:13
7   Q.  All right. Both the federal        17:13
8 anti-kickback law, the Physicians         17:14
9 Self-Referral, Stark law, Alabama False   17:14
10 Claims Act, Alabama anti-kickback law are 17:14
11 set forth in part by EAMC in the          17:14
12 standards of conduct?                     17:14
13   A.  Yes, they are.                      17:14
14   Q.  And those are all provided to       17:14
15 employees at EAMC and Aperian?            17:14
16   A.  Yes.                                17:14
17   Q.  And they're all supposed to be      17:14
18 familiar with those laws and              17:14
19 prohibitions, according to the document?  17:14
20   A.  Yes.                                17:14
21   Q.  And the False Claims Act,           17:14
22 anti-kickback statute, and Stark law, all 17:14
23 allege to have been violated in this      17:14

Page 343

1 case, are spelled out for employees of    17:14
2 EAMC in this document that they are       17:14
3 provided and required to sign that they   17:15
4 have read; correct?                       17:15
5       MR. HOOVER:  Object to the form.    17:15
6   A.  I don't know that "spelling out"    17:15
7 those laws would be an accurate           17:15
8 representation. They are broadly covered  17:15
9 in this document.                         17:15
10   Q.  Okay.                              17:15
11   A.  And as we have talked about, any   17:15
12 question that an employee would have     17:15
13 regarding a particular practice or       17:15
14 surrounding any of these laws would be   17:15
15 expected to be raised.                   17:15
16   Q.  Okay. Section 14 on page 138,     17:15
17 "Reporting Violations." "All personnel,  17:15
18 medical staff and agents should report   17:15
19 known or suspected violations of these   17:15
20 policies to their supervisors the        17:15
21 appropriate Medical Center executive, or 17:15
22 the Compliance Officer." Correct?        17:15
23   A.  Yes, that's what it says.          17:15

Page 344

1   Q.  And for Trae, that would have      17:15
2 been either Ken Lott or you; correct?     17:15
3   A.  That depends on what time period   17:15
4 you're talking about, but. I was not     17:15
5 compliance officer during that entire    17:16
6 time period that you have mentioned.     17:16
7   Q.  Okay.                              17:16
8   A.  And I don't know that he           17:16
9 reported to Ken during the time the      17:16
10 entire time period either.               17:16
11   Q.  All right. I think he testified   17:16
12 his direct report was always Ken, but.   17:16
13 You were compliance officer beginning in 17:16
14 2010; correct?                           17:16
15   A.  October 2010.                      17:16
16   Q.  Okay. So his -- his choices       17:16
17 under this would have been Ken, who was  17:16
18 both his supervisor and a medical center 17:16
19 executive; correct?                      17:16
20   A.  Assuming that's correct, Ken was  17:16
21 his supervisor the entire time. And yes, 17:16
22 he's a -- Ken was a vice president during 17:16
23 that entire -- entire time period, as far 17:16

**Roben Nutter**                                                    **87 (345 - 348)**

Page 345

1  as I can recall.                    17:16
2      Q.  Or the compliance officer, which  17:16
3  was you beginning in 2010; correct?    17:16
4      A.  In October of 2010.            17:16
5      Q.  Okay.                          17:16
6      A.  And he additionally was trained  17:16
7  that those could be reported anonymously  17:16
8  through the hotline or online.  He was  17:16
9  also trained that those could be taken to  17:16
10 the compliance department.  There is    17:16
11 multiple ways that compliance issues can  17:17
12 be raised.                             17:17
13     Q.  Okay.  As -- as this policy    17:17
14 reads on reporting violations, who should  17:17
15 somebody who is a vice president, like   17:17
16 Ken Lott, report violations to?         17:17
17     A.  I think I've just testified to  17:17
18 that.  If it's a compliance-related     17:17
19 issue, he would report that to the      17:17
20 compliance department.  If it's what he  17:17
21 perceives to be a legal issue, he would  17:17
22 report that to me.                      17:17
23     Q.  Okay.                          17:17

Page 346

1      A.  He may report that to me       17:17
2  regardless, in which case I would report  17:17
3  back compliance -- purely compliance    17:17
4  issues if I was bumping that back down to  17:17
5  the compliance department to handle, or I  17:17
6  would handle the -- the legal issues.   17:17
7      Q.  All right.  On page 139, the   17:17
8  last paragraph under the signature block  17:17
9  says:  "I have received a copy of the   17:17
10 Corporate Compliance Policy and Standards  17:17
11 of Conduct and certify I have read and   17:17
12 understand the provisions contained     17:17
13 therein.  I agree to comply with them.  I  17:18
14 acknowledge I have a duty to report any  17:18
15 suspected violations of the law or       17:18
16 standards of conduct to my immediate     17:18
17 supervisor, the Compliance Officer, or   17:18
18 President of the Medical Center."        17:18
19         Did I read that correctly?     17:18
20     A.  You did.                        17:18
21     Q.  And each employee is required to  17:18
22 sign and certify that statement; correct?  17:18
23     A.  Correct.                        17:18

Page 347

1      Q.  All right.  Then there are     17:18
2  several different policies set forth    17:18
3  after that.  I just want to talk about a  17:18
4  couple of them.  On page 147, under     17:18
5  "Employee Compliance Education," you see  17:18
6  where this policy is approved by you?   17:18
7      A.  Yes.                            17:18
8      Q.  All right.  The policy is that  17:18
9  "It is the policy of EAMC to provide     17:18
10 employees involved in the claim         17:19
11 development and submission process or in  17:19
12 any business activities that may be     17:19
13 subject to the fraud and abuse laws with  17:19
14 such training as may be reasonably      17:19
15 necessary and appropriate to ensure     17:19
16 material compliance with applicable laws  17:19
17 relating to the submission of claims or  17:19
18 EAMC business relationships."           17:19
19         Did I read that correctly?     17:19
20     A.  You did.                        17:19
21     Q.  Did that include Aperian?      17:19
22     A.  Yes.                            17:19
23     Q.  All right.  On page 2 of that  17:19

Page 348

1  policy, section B, "Payments for       17:19
2  Referrals and Related Fraud and Abuse   17:19
3  Issues."                               17:19
4         It says:  "EAMC will provide the  17:19
5  following education to employees involved  17:19
6  in negotiating business relationships   17:19
7  with physicians, providers, and vendors  17:19
8  on behalf of EAMC.  Such training will  17:19
9  include, at a minimum, not less than 2  17:19
10 hours annually of training on" --       17:19
11 "annually of training related to one or  17:20
12 more of the following subjects:  EAMC's  17:20
13 compliance program; an overview of the  17:20
14 fraud abuse laws as they relate to,     17:20
15 prohibitions against payments for       17:20
16 referrals kickbacks and rebates, and    17:20
17 other legal inducements; an overview of  17:20
18 the Stark I and II laws and regulations,  17:20
19 and changes made to those laws by       17:20
20 subsequent amendments thereto and       17:20
21 consequences to both individuals and EAMC  17:20
22 of failing to comply with applicable laws  17:20
23 and regulations."                       17:20

**Roben Nutter**                                      **88 (349 - 352)**

Page 349

1     Did I read that correct?        17:20
2     A.  You did.                    17:20
3     Q.  Would that apply to the     17:20
4  following people: Ken Lott, Sam Price,  17:20
5  Allen Valaer, Trae Fite, Jerry McHan, and  17:20
6  Michele Hunter?                    17:20
7     A.  Clarify what you mean by "would  17:20
8  that apply" to them.               17:20
9     Q.  Would this education on payments  17:20
10 for referrals and related fraud and abuse  17:20
11 issues.                           17:20
12    A.  If they were involved in    17:20
13 negotiating business relationships with  17:21
14 physicians, providers, and vendors on  17:21
15 behalf of EAMC, it would.          17:21
16    Q.  Okay. All right. Then section  17:21
17 C says, "EAMC shall document the training  17:21
18 provided to each employee." Where is  17:21
19 that documented?                   17:21
20    A.  Within the compliance       17:21
21 department.                       17:21
22    Q.  Is that those giant         17:21
23 spreadsheets, or is there any individual  17:21

Page 350

1  forms for people?                  17:21
2     A.  "Individual forms" meaning?  17:21
3     Q.  Like a form signed by Trae Fite,  17:21
4  "I completed two hours of fraud and abuse  17:21
5  law training."                    17:21
6     A.  Not sure that -- that we would  17:21
7  have that. We would have documentation  17:21
8  of the training provided and which  17:21
9  employees attended the training.   17:21
10    Q.  What form would that         17:21
11 documentation take?               17:22
12    A.  I'm not sure.               17:22
13    Q.  All right. The last policy I  17:22
14 want to talk about in here begins on page  17:22
15 152, the "Fraud and Abuse Compliance"  17:22
16 policy.                           17:22
17    All right. Under "Procedure,"    17:22
18 the last sentence says there, "In  17:22
19 addition, this program is attended" --  17:22
20 "intended to apply to business    17:22
21 arrangements with physicians, vendors,  17:22
22 hospitals and other persons which may be  17:22
23 impacted by federal or state laws  17:22

Page 351

1  relating to fraud and abuse."      17:23
2     Did I read that correctly?      17:23
3     A.  You did.                    17:23
4     Q.  And -- all right. And this   17:23
5  applies to Aperian as well?       17:23
6     A.  It does.                    17:23
7     Q.  And Aperian was a business unit,  17:23
8  as we've talked about; correct?    17:23
9     A.  It applies to East Alabama   17:23
10 Health Care Authority, its affiliates and  17:23
11 subsidiaries. So depending on the time  17:23
12 frame, it was either a department of EAMC  17:23
13 or a subsidiary.                   17:23
14    Q.  All right. A1, "Compliance   17:23
15 Policies and Procedures" says, "All  17:23
16 corporate departments or business units  17:23
17 must have written policies and procedures  17:23
18 that address issues of compliance risk in  17:23
19 their particular department or business  17:23
20 unit."                            17:23
21    Did I read that correctly?      17:23
22    A.  You did.                    17:23
23    Q.  And have you heard the testimony  17:23

Page 352

1  from multiple people that worked at  17:23
2  Aperian that there were no such policies  17:24
3  and procedures separate and apart for the  17:24
4  Aperian business unit that addressed  17:24
5  compliance risk?                   17:24
6     A.  What -- what are you -- tell me  17:24
7  what testimony you're talking about  17:24
8  specifically.                     17:24
9     Q.  I'm talking about I've asked  17:24
10 Allen Valaer, Jerry McHan, Trae Fite  17:24
11 whether they were aware of any separate  17:24
12 compliance policies and procedures for  17:24
13 Aperian. Michele Hunter. And all of  17:24
14 them said no.                      17:24
15    A.  Okay.                       17:24
16    Q.  Okay.                       17:24
17    A.  What's the question?         17:24
18    Q.  Well, are you aware of any    17:24
19 testimony to the contrary, that there  17:24
20 were separate compliance risk policies  17:24
21 and procedures for Aperian separate and  17:24
22 apart from the hospital's?         17:24
23    A.  I'm not aware of testimony in  17:24

Page 353

1  this case, no.                        17:24
2     Q. Okay. According to this policy,  17:24
3  is Aperian supposed to have written    17:24
4  policies and procedures that address the  17:25
5  issues of compliance risk in their      17:25
6  particular department?                  17:25
7     A. That's what that says.           17:25
8     Q. Okay. Do you know if they had    17:25
9  them at any time from 2008 to 2013?     17:25
10    A. I think I talked about this      17:25
11 morning that the policies and procedures  17:25
12 are housed in a central electronic      17:25
13 location. I didn't talk specifically    17:25
14 about that. But I did mention that the   17:25
15 department's policies are within that    17:25
16 system, so. I haven't reviewed that     17:25
17 myself, so I don't know if there was or  17:25
18 wasn't.                                 17:25
19    Q. Well, we looked at               17:25
20 200-and-something thousand pages of     17:25
21 documents in this case. Do you know if  17:25
22 the department's policies and procedures  17:25
23 have been produced?                     17:25

Page 354

1     A. I don't.                         17:25
2     Q. Do you know if they even exist   17:25
3  for that time period?                   17:25
4     A. If the department had any        17:25
5  policy -- policies and procedures       17:25
6  specific to their department?           17:25
7     Q. Yes.                             17:25
8     A. For that time period? I would    17:25
9  assume they had some policies and       17:25
10 procedures specific to their department,  17:25
11 but I have not looked at those myself,   17:26
12 either.                                 17:26
13    Q. So you don't know one way or the  17:26
14 other?                                  17:26
15    A. I don't.                         17:26
16    Q. Section B on page 153, item 2    17:26
17 says, "All employees are required to    17:26
18 report their good faith belief of any    17:26
19 violation of the compliance program or  17:26
20 applicable laws." Did I read that       17:26
21 correctly?                              17:26
22    A. You did.                         17:26
23    Q. All right. "Responsible          17:26

Page 355

1  Officer," section C. I'm not reading the  17:26
2  whole thing. Is that you?               17:27
3     (Witness reviews document.)         17:27
4     A. That is referring to the         17:27
5  compliance officer.                     17:27
6     Q. Okay. And then items (a)         17:27
7  through (g) are the responsibilities of  17:27
8  the compliance officer and support from  17:27
9  various departments?                    17:27
10    A. Yes.                             17:27
11    Q. All right. If we go over to the  17:27
12 next page, 154, item 3. The last        17:27
13 sentence says, "The Compliance Officer   17:27
14 shall also report to the Board of        17:27
15 Directors, from time to time, on reports  17:27
16 received, and inquiries conducted,      17:27
17 recommendations for action or action    17:27
18 taken in all related matters." Did I     17:28
19 read that correctly?                     17:28
20    A. You did.                         17:28
21    Q. Did you provide the Colaborate   17:28
22 audit to the board of directors of East  17:28
23 Alabama Health Care Authority?          17:28

Page 356

1     A. I don't recall if the actual     17:28
2  report was provided to them or not.     17:28
3     Q. And did you make the board of    17:28
4  directors aware of the Colaborate audit?  17:28
5     A. I believe so, but I would have   17:28
6  to go back and look at the reports to say  17:28
7  for sure.                               17:28
8     Q. Do you know when you made them   17:28
9  aware in relation to when the audit     17:28
10 happened?                               17:28
11    A. I don't.                         17:28
12    Q. Section D sets forth the         17:28
13 Corporate Compliance Committee members   17:28
14 and their -- their -- it sets forth by   17:28
15 their position; correct?                17:28
16    (Witness reviews document.)         17:28
17    A. Yes.                             17:28
18    Q. Okay. And these compliance       17:28
19 committee members, I think as we        17:29
20 discussed this morning, all have other   17:29
21 jobs in the hospital, compliance is not  17:29
22 their full-time position. Correct?      17:29
23    A. That's true.                     17:29

**Roben Nutter**                                               **90 (357 - 360)**

Page 357

1   Q.   Other than you, were there any   17:29
2   people at EAMC from 2008 to 2012 whose   17:29
3   full-time job was compliance?   17:29
4   A.   Repeat that for me, please?   17:29
5   Q.   Sure.  From 2008 to 2012, was   17:29
6   there anyone at EAMC whose full-time job   17:29
7   was compliance other than you?   17:29
8   A.   My full-time job was not   17:29
9   compliance.   17:29
10   Q.   Okay.   17:29
11   A.   But.  And we had a compliance   17:29
12   department who had employees whose   17:29
13   full-time job was compliance.   17:29
14   Q.   And did you tell me the names of   17:29
15   those people this morning?   17:29
16   A.   Well, it would depend for what   17:29
17   time period you're asking.  And I don't   17:29
18   think I can recall them all.   17:29
19   Q.   Giving you Exhibit 37.  I'm   17:29
20   primarily interested in point number 6 on   17:30
21   the attachment.   17:30
22   (Plaintiff's Exhibit 37 was marked for   17:30
23   identification and is attached.)   17:30

Page 358

1   (Witness reviews document.)   17:30
2   Q.   This is an e-mail dated   17:30
3   September 12th through September 16th   17:30
4   with attachment "Aperian Growth Talking   17:30
5   Points."  Do you see that?   17:31
6   A.   I see it.   17:31
7   Q.   And then what's attached is the   17:31
8   talking points?   17:31
9   A.   I see that.   17:31
10   Q.   Okay.  Item 6 is "On Site   17:31
11   Sample" -- "On Site Clinic Sample   17:31
12   Collectors."  About halfway down, it   17:31
13   says:  "We have very strict documented   17:31
14   tasks that are" -- "that they are allowed   17:31
15   to take part in which has been approved   17:31
16   by Roben.  Karen will be 'valuing' each   17:31
17   client from a volume perspective and   17:31
18   working alongside Lorri to determine the   17:31
19   financial justification of each collector   17:31
20   prior to hiring."   17:31
21   Did I read that correctly?   17:31
22   A.   You did.   17:31
23   Q.   Did you approve documented tasks   17:31

Page 359

1   for collectors?   17:31
2   A.   Did I approve documented tests   17:31
3   for collectors?   17:31
4   Q.   Yeah.  It says, "we have very   17:31
5   strict documented tasks that are" --   17:31
6   A.   "Tasks."  I'm sorry.  I thought   17:31
7   you said "tests."   17:31
8   Q.   Sorry.  It's the cold.   17:31
9   A.   No, no.  That's my fault.   17:31
10   I -- I was involved in reviewing   17:32
11   collector tasks.   17:32
12   Q.   Okay.   17:32
13   A.   As I recall.   17:32
14   Q.   And would that have been in the   17:32
15   time period of fall of 2013?   17:32
16   A.   I don't recall the specific time   17:32
17   period.   17:32
18   Q.   All right.  Who asked you to   17:32
19   review a list of collector tasks?   17:32
20   A.   I don't recall.   17:32
21   Q.   Aperian/EAMC had been employing   17:32
22   collectors at physicians' offices since   17:32
23   2008-2009; correct?   17:32

Page 360

1   A.   I don't know the time period   17:32
2   that that --   17:32
3   Q.   Okay.   17:32
4   A.   -- began.   17:32
5   Q.   Are there -- in the safe   17:32
6   harbors, have they always required that   17:32
7   the collectors only perform collection   17:32
8   duties?   17:32
9   MR. HOOVER:  Object to the form.   17:32
10   And I also object for legal opinion.   17:32
11   A.   I need you to repeat the   17:32
12   question.   17:32
13   Q.   Sure.   17:32
14   A.   Please.   17:32
15   Q.   The safe harbor that applies to   17:32
16   collectors, the personal services safe   17:33
17   harbor that applies to collectors,   17:33
18   doesn't it require that they only perform   17:33
19   collection-related duties?   17:33
20   MR. HOOVER:  Same objection.   17:33
21   A.   Are you talking about the   17:33
22   personal services safe harbor?   17:33
23   Q.   Yes.   17:33

Page 361

1    MR. HOOVER: Same objection.    17:33
2  You're asking her to make a legal    17:33
3  conclusion and legal opinion.    17:33
4    MR. McKENNA: Okay. Are you    17:33
5  instructing her not to answer?    17:33
6    MR. HOOVER: (Nods head.)    17:33
7    Q. All right. And do you know if    17:33
8  there was an approved list of tasks that    17:33
9  collectors were allowed to perform and    17:33
10  not perform prior to you approving the    17:33
11  list discussed here?    17:33
12    A. I don't recall.    17:33
13    Q. Exhibit 38. This is an e-mail    17:33
14  exchange in December of 2013 with Ken    17:34
15  Lott and Allen Valaer, and the reason you    17:34
16  get pulled into this is because Ken    17:34
17  Lott's e-mail to Allen says, "Don't cc    17:34
18  Roben but bcc her." Do you see that?    17:34
19  (Plaintiff's Exhibit 38 was marked for    17:34
20  identification and is attached.)    17:34
21    A. I see that.    17:34
22    Q. All right. Who is SEAMC    17:34
23  referred to in the e-mail at the bottom    17:34

Page 362

1  of the page? "Connie at SEAMC"?    17:34
2    A. I don't know who Connie is.    17:35
3    Q. Okay. Do you know what entity    17:35
4  SEAMC is?    17:35
5    (Witness reviews document.)    17:35
6    A. I could guess, but I don't -- I    17:35
7  don't know for sure.    17:35
8    Q. What's your best educated guess?    17:35
9    A. I would guess Southeast Alabama    17:35
10  Medical Center.    17:35
11    Q. Okay. Is that affiliated with    17:35
12  EAMC?    17:35
13    A. No.    17:35
14    Q. Okay. I didn't know, so.    17:35
15    All right. So this is an e-mail    17:35
16  at the bottom from Allen to Ken that he    17:35
17  intends to send to Connie at Southeast    17:35
18  Alabama Medical Center?    17:35
19    MR. HOOVER: Object to the form.    17:35
20    Q. All right. And in the proposed    17:35
21  e-mail, item 3, he says: "Regarding our    17:35
22  current employee lease agreement. I have    17:35
23  located the original template for this    17:35

Page 363

1  document but I am unable to locate the    17:36
2  one signed by both parties. This    17:36
3  agreement has been in effect since 2006    17:36
4  and, although the intent within is    17:36
5  correct, this document needs to be    17:36
6  replaced with one that ensures protection    17:36
7  of both parties by amending the text and    17:36
8  format. We currently pay the equivalent    17:36
9  of $18,000/year with an additional 25%    17:36
10  provision for benefits. Thru the years I    17:36
11  believe we have lost any accountability    17:36
12  of who is being utilized and what duties    17:36
13  are actually being performed. I have    17:36
14  attached three documents for your review;    17:36
15  a copy of the old contract template,    17:36
16  another copy of the employee lease    17:36
17  agreement, and a copy of the Collector    17:36
18  duties allowed under this employee lease.    17:36
19  Please review the latter two and if you    17:36
20  have any questions, please let me know.    17:36
21  We need to get this new contract replaced    17:36
22  as soon as we can. We also need to    17:36
23  identify the individuals who will be    17:36

Page 364

1  handling the duties allowed."    17:37
2    Did I read point 3 correctly?    17:37
3    A. You did.    17:37
4    Q. All right. Were you aware that    17:37
5  Aperian and EAMC had lost accountability    17:37
6  of who was being utilized as a collector    17:37
7  and what duties were actually being    17:37
8  performed?    17:37
9    (Witness reviews document.)    17:37
10    A. No. And I don't know that    17:37
11  that's what that says exactly.    17:37
12    Q. Do you understand that close    17:37
13  monitoring of the duties performed by    17:37
14  collectors was required by the safe    17:37
15  harbor?    17:37
16    MR. HOOVER: Object. It's    17:37
17  that's an inaccurate statement of law.    17:37
18    MR. McKENNA: Are you    17:37
19  instructing her not to answer?    17:37
20    MR. HOOVER: I'm objecting    17:37
21  that's an inaccurate statement of the    17:37
22  law. Object to your mischaracterization    17:37
23  of the law.    17:37

**Roben Nutter**                                    **92 (365 - 368)**

Page 365

1    Q.  Did EAMC provide close          17:37
2  monitoring of the duties performed by    17:37
3  collectors at any time prior to 2013?    17:37
4      MR. HOOVER:  I'm going to object  17:37
5  to the extent that you're asking her for  17:37
6  any legal conclusions or legal inspection 17:38
7  or investigation she's done.             17:38
8    Q.  I'm asking, during your          17:38
9  observations during your time 2008 to two 17:38
10  thousand -- before 2013.  Not an        17:38
11  investigation that goes back and looks at 17:38
12  that period, but during that actual time, 17:38
13  in the day-to-day business of Aperian and 17:38
14  EAMC, did they provide monitoring of the 17:38
15  activities performed by collectors?      17:38
16    A.  I can't speak to exactly what    17:38
17  was happening in every department.  It's 17:38
18  certainly the expectation that they did  17:38
19  that.                     17:38
20    Q.  Was there a mechanism for them   17:38
21  to document that they did that?          17:38
22    A.  I think that would be specific   17:38
23  to the departments.                      17:38

Page 366

1    Q.  And do you know if there was a   17:38
2  mechanism for them to document that at    17:38
3  Aperian?                     17:38
4    A.  I don't.                 17:38
5    Q.  Show you Exhibit 39.           17:38
6  (Plaintiff's Exhibit 39 was marked for    17:39
7  identification and is attached.)         17:39
8      (Witness reviews document.)        17:39
9    Q.  In April of 2009, did you        17:39
10  provide -- provide Trae Fite with a copy 17:39
11  of the safe harbor related to personal   17:39
12  service agreements?                     17:39
13      MR. HOOVER:  Give me a second to  17:39
14  look at this.  Yeah, I'm going to -- I'm 17:39
15  going to ask that this be clawed back.  I 17:40
16  don't think this was supposed to have     17:40
17  been produced.  It was between Trae and   17:40
18  Roben, especially in the last e-mail      17:40
19  giving legal advice to Trae.             17:40
20      MR. McKENNA:  Which e-mail are    17:40
21  you talking about giving legal advice?  I 17:40
22  see a conversation between Trae and       17:40
23  Michele.                   17:40

Page 367

1      MR. HOOVER:  On the second page.  17:40
2  From Roben to Trae.  This is the safe     17:40
3  harbor related to personal services       17:40
4  agreements.                17:40
5      MR. McKENNA:  This is             17:40
6  transmitting the text of the safe harbor. 17:40
7  Where is the legal advice?               17:40
8      MR. HOOVER:  That's part of the   17:40
9  legal advice, Don.  You give someone what 17:40
10  the law is.  That's legal advice.  That's 17:40
11  like the ultimate legal advice, is it     17:40
12  not?                    17:40
13      MR. McKENNA:  No.  Legal advice   17:40
14  is how the law applies to a particular    17:40
15  fact situation.                17:40
16      MR. HOOVER:  I'm still going to   17:40
17  make -- claw that back.  I think that --  17:40
18  that is absolutely legal advice.          17:40
19      MR. McKENNA:  Well, we can mark   17:40
20  the record on that one, because that one  17:40
21  I don't agree with.                17:40
22      MR. HOOVER:  Okay.              17:41
23      MR. McKENNA:  So, are you going   17:41

Page 368

1  to allow me to ask her questions on this  17:41
2  document?                 17:41
3      MR. HOOVER:  I think I would as   17:41
4  to the first page, but not the last part  17:41
5  of the -- that particular e-mail.  But, I 17:41
6  mean, you can ask about the e-mails       17:41
7  between Trae, Michele, Allen, and Jerry.  17:41
8      MR. McKENNA:  Okay.             17:41
9    Q.  (By Mr. McKenna) Look at the     17:41
10  first page on Exhibit 39.  Do you see     17:41
11  that Trae sends to Michele, Allen, and    17:42
12  Jerry McHan a forward of your e-mail, but 17:42
13  then he summarizes the safe harbor in     17:42
14  the -- in the top?               17:42
15      (Witness reviews document.)        17:42
16    A.  I see that.               17:42
17    Q.  Okay.  And do you see that       17:42
18  Michele asks the question in response,    17:42
19  "This would apply to temp agency          17:42
20  collectors as well?"               17:42
21    A.  I see that.               17:42
22    Q.  Okay.  And Trae's response is,   17:42
23  "no...that is a lot riskier because we    17:42

**Roben Nutter**                                                    **93 (369 - 372)**

Page 369

1  don't have an agreement with the clinic." 17:42
2  Do you see that?                    17:42
3     A.  I see that.                   17:42
4     Q.  Okay.  In 2009, were you aware   17:42
5  that collectors were being provided      17:42
6  through temp agencies?               17:42
7     A.  I don't recall.               17:42
8     Q.  Did you have any discussions    17:42
9  with Trae, not the substance, just about  17:43
10 whether the safe harbor applied to      17:43
11 temporary agency collectors?           17:43
12    A.  Don't re- -- I don't recall if I  17:43
13 had a discussion with him or not.        17:43
14    Q.  Okay.  Do you agree with Trae's   17:43
15 response to Michele, that the -- it would  17:43
16 be a lot riskier because there's no      17:43
17 agreement with the clinic for temporary   17:43
18 agency collectors?                   17:43
19       MR. HOOVER:  Object to the form.  17:43
20 You're asking her to give a legal        17:43
21 opinion.  I'm instructing her not to      17:43
22 answer, yes.  Yes, I am.              17:43
23       MR. McKENNA:  Just got to have   17:43

Page 370

1  it.                                17:43
2     Q.  Give you Exhibit 40.  Exhibit 40  17:43
3  came out of your custodial file.  And it  17:44
4  is a Stark law Listserv e-mail dated      17:44
5  11/20/2008.  Is this something you would  17:44
6  have received?                      17:44
7  (Plaintiff's Exhibit 40 was marked for   17:44
8  identification and is attached.)        17:44
9     A.  I don't recall.               17:44
10    Q.  Okay.  The middle of the page,    17:44
11 somebody at a Listserv asks:  "I am well  17:44
12 aware of the prohibition on pay a        17:44
13 percentage based on the volume of        17:44
14 physician referrals.  My question has to  17:45
15 do with paying a non-physician,         17:45
16 non-health care professional, a         17:45
17 commission based upon recruiting new     17:45
18 clients for a lab, referring clients to a  17:45
19 home health company, etc.  Does anyone   17:45
20 have experience with this and how this   17:45
21 would be viewed, assuming the commission  17:45
22 is fmv?"                            17:45
23       And then in response, somebody   17:45

Page 371

1  asks, "How does this fly under AKS?"  You  17:45
2  see that?                          17:45
3     A.  I see that.                   17:45
4     Q.  Okay.  See at the bottom of this  17:45
5  page, 173274, it says, "You are currently  17:45
6  subscribed to starklaw," and then it has  17:45
7  an e-mail address, you know, a code      17:45
8  there?                             17:45
9     A.  I see that.                   17:45
10    Q.  Can you think of anybody else at   17:45
11 Aperian that would have been subscribed   17:45
12 to this Stark law Listserv, or at EAMC   17:45
13 who would have been subscribed to this in  17:45
14 2008?                              17:45
15    A.  There certainly wasn't a        17:45
16 prohibition for anybody who wanted to    17:45
17 subscribe to it.  I don't know.          17:46
18    Q.  I'll give you Exhibit 41.  Which  17:46
19 is a response the same day to the same    17:46
20 Listserv question.  It says:  "Well, be   17:46
21 careful on this.  There is a difference   17:46
22 between general public" -- "generalized   17:46
23 public relations and 'recommending or    17:46

Page 372

1  arranging' for referrals that can't be   17:46
2  paid for under the federal statute, even  17:46
3  to people who cannot make referrals.     17:46
4  There are a number of cases and Advisory  17:46
5  Opinions on marketing that you should dig  17:46
6  into."  And it lists a case.  It        17:46
7  concludes with, "They all go a little    17:46
8  different depending on the facts, so you  17:47
9  have to do your own research here."      17:47
10    Q.  Do you know if you received this  17:47
11 response in the Stark law Listserv.      17:47
12 (Plaintiff's Exhibit 41 was marked for   17:47
13 identification and is attached.)        17:47
14    A.  I don't.                      17:47
15    Q.  With regard to the             17:47
16 Aperian-Summit arrangement, did you do   17:47
17 any research, review any cases or        17:47
18 advisory opinions before that contract   17:47
19 was entered into?                    17:47
20       MR. HOOVER:  You can say if you   17:47
21 -- if you recall --                   17:47
22    A.  Not that I recall.             17:47
23    Q.  I forgot, there was one more.    17:47

Page 373

1   Exhibit 42 is another response in that   17:47
2   Listserv with an Aperian Bates number.   17:47
3   You'll see at the bottom of -- actually,   17:47
4   if you'll look at the second page, you   17:47
5   get to the original question that we   17:48
6   looked at on Exhibit 41. Down on the   17:48
7   bottom of the first page, somebody asks,   17:48
8   "How does that fly under AKS?" Then we   17:48
9   have another response again that says, "I   17:48
10  don't think it will fly under the AKS,   17:48
11  unless the person is an employee. Under   17:48
12  that Safe harbor, there is no prohibition   17:48
13  against any remuneration based on the   17:48
14  volume or value of referrals, even though   17:48
15  the marketer is not making a 'referral'   17:48
16  under the legal definition of that term." 17:48
17       Did I read that correctly?   17:48
18  (Plaintiff's Exhibit 42 was marked for   17:48
19  identification and is attached.)   17:48
20    A.  You did read it correctly.   17:48
21    Q.  Are you aware of the HHS OIG   17:48
22  guidance that says if -- when the safe   17:48
23  harbors came out, HHS OIG was -- was   17:48

Page 374

1   asked to consider an exception for   17:48
2   marketers, specifically marketing   17:48
3   companies, and that the HHS OIG response 17:48
4   in 1987 was to reject that request for an 17:49
5   exception and state that if a company   17:49
6   wanted to pay marketers on a commission   17:49
7   basis, they should be made employees   17:49
8   because employees are subject to more   17:49
9   control because the corporation is liable 17:49
10  for their actions, or words to that   17:49
11  effect. Were you aware of that?   17:49
12    A.  Am I aware of that particular   17:49
13  opinion?   17:49
14    Q.  Yes.   17:49
15    A.  I don't recall if I've seen that   17:49
16  opinion or not.   17:49
17    Q.  Have you read it in any cases?   17:49
18  It's actually quoted by several cases on   17:49
19  commission, brokerage agreements.   17:49
20       MR. HOOVER:  To the extent that   17:49
21  you recall.   17:49
22    A.  I don't recall. I don't know.   17:49
23    Q.  And if -- if the document   17:50

Page 375

1   production records showed this e-mail was 17:50
2   in your custodial file, is it fair to say 17:50
3   you had this information in your   17:50
4   possession at the time both the Summit   17:50
5   and Compass contracts were entered into?  17:50
6     A.  No.   17:50
7     Q.  Why not?   17:50
8     A.  Because I don't know if I ever   17:50
9   read it, even if it did come to my   17:50
10  e-mail.   17:50
11    Q.  Well, if you got an e-mail from   17:50
12  the Stark law Listserv in 2008 that   17:50
13  talked about the anti-kickback statute in 17:50
14  the marketing context and you still --   17:50
15  and it was still available in 2017 and   17:50
16  '18 to be produced, wouldn't that have   17:50
17  been something you saved?   17:50
18    A.  No. Not necessarily.   17:50
19    Q.  You still have all your e-mails   17:50
20  back to 2008?   17:50
21    A.  I don't.   17:51
22    Q.  Okay. Well, do you know how   17:51
23  this got produced as part of your   17:51

Page 376

1   custodial file?   17:51
2     A.  As far as I'm aware, there was a 17:51
3   pull done from the e-mail archives. But  17:51
4   that doesn't mean that those e-mails   17:51
5   would be available to me.   17:51
6     Q.  Okay.   17:51
7     A.  And I don't know that this was   17:51
8   me. I don't know that this came to my   17:51
9   e-mail to begin with.   17:51
10    Q.  But this would have been   17:51
11  something that was in the archives of the 17:51
12  East Alabama Health Care Authority e-mail 17:51
13  system; correct?   17:51
14    A.  If we produced it, it must have  17:51
15  been.   17:51
16    Q.  Okay.   17:51
17       MR. McKENNA:  Jim, so we don't   17:51
18  waste a lot of time, I think when Bob did 17:51
19  Laura Grill's deposition, we kind of   17:52
20  agreed that we wouldn't -- the top part   17:52
21  of this we wouldn't talk about other than 17:52
22  this was forwarded.   17:52
23       MR. HOOVER:  Got you. Yeah.   17:52

**Roben Nutter**                                    **95 (377 - 380)**

Page 377

1    MR. BATTLE:  Actually, I thought  17:52
2  we did talk about it after all.        17:52
3    MR. McKENNA:  You ended up        17:52
4  getting into it after all.              17:52
5    MR. BATTLE:  Right.  Because Jim  17:52
6  decided not to object.                  17:52
7    Q.  (By Mr. McKenna) All right.    17:52
8  Exhibit 43 is --                        17:52
9    MR. HOOVER:  I think that was a  17:52
10  different e-mail.                      17:52
11    MR. McKENNA:  No.  I think it is  17:52
12  this one.  Because I remember         17:52
13  specifically it being this one.       17:52
14    MR. BATTLE:  No.  It had text.    17:52
15    MR. HOOVER:  It had another one  17:52
16  on the top of it.                      17:52
17    MR. BATTLE:  And the text ended  17:52
18  up not really being --                 17:52
19    MR. HOOVER:  Right.              17:52
20    MR. BATTLE:  -- privileged after  17:52
21  all as we looked at it more closely.  17:52
22    MR. McKENNA:  All right.          17:52
23  (Plaintiff's Exhibit 43 was marked for  17:52

Page 378

1  identification and is attached.)        17:52
2    Q.  (By Mr. McKenna) All right.    17:52
3  This e-mail from Trae Fite to Ken Lott,  17:52
4  did it eventually get forwarded to you?  17:53
5    A.  According to this e-mail chain  17:53
6  it did.                                 17:53
7    Q.  Okay.  And it looks like it was  17:53
8  forwarded to you the day after Trae sent  17:53
9  it to Ken on April -- he sent it to Ken  17:53
10  on April 23rd, 2013; correct?         17:53
11    A.  That's what this e-mail says,  17:53
12  yes.                                   17:53
13    Q.  Okay.  And actually, it looks  17:53
14  like you got it less than an hour later,  17:53
15  at 3:08.  He sent it at 2:22; correct?  17:53
16    A.  Looks like it was sent to me  17:53
17  then.  I don't know when I actually --  17:53
18    Q.  Okay.                         17:53
19    A.  -- received it or saw it.     17:53
20    Q.  All right.  One of the things,  17:53
21  if we go through what Trae said to Ken,  17:53
22  he said, first:  "I have taken the time  17:53
23  to educate myself on Federal          17:53

Page 379

1  Anti-Kickback statutes, Stark Law, and  17:53
2  other compliance issues.  The more I've  17:53
3  learned about compliance risks that    17:54
4  seemed to be increasing with Aperian, the  17:54
5  less my comfort level has become in    17:54
6  several strategic objectives related to  17:54
7  the business."                         17:54
8    Did I read that correctly?         17:54
9    A.  You did.                       17:54
10    Q.  Okay.  The second paragraph, he  17:54
11  says:  "The compliance audit that I   17:54
12  commissioned from Colaborate, and the  17:54
13  results I shared with you, Roben, and the  17:54
14  Aperian board further enhanced these   17:54
15  concerns.  However, despite caution    17:54
16  expressed from the audit, Roben, and   17:54
17  myself, leadership's appetite for more  17:54
18  risk only seemed to grow."             17:54
19    Did I read that correctly?         17:54
20    A.  You did.                       17:54
21    Q.  All right.  Is it fair to say  17:54
22  that Trae expressed his compliance     17:54
23  concerns to you and others during the  17:54

Page 380

1  contract negotiations with Compass?    17:54
2    MR. HOOVER:  I think that what    17:54
3  the conversation between Trae and Roben,  17:54
4  that would be attorney-client privilege.  17:55
5    MR. McKENNA:  I'm just asking on  17:55
6  a general level, not what specific     17:55
7  concerns that he expressed as compliance.  17:55
8    MR. HOOVER:  Are you saying that  17:55
9  he asked --                            17:55
10    MR. McKENNA:  No.  Did he         17:55
11  express his compliance concerns.       17:55
12    A.  Which compliance concerns?    17:55
13    Q.  Related to the contract       17:55
14  negotiations with Compass.             17:55
15    MR. HOOVER:  A particular         17:55
16  contract or any one?                   17:55
17    MR. McKENNA:  Any of them.        17:55
18    A.  I think that issues were raised  17:55
19  through those contract negotiations.   17:55
20  Issues and questions.                  17:56
21    Q.  Okay.  And did Trae express   17:56
22  concerns about issues during the contract  17:56
23  -- compliance concerns during the      17:56

Page 381

1  contract negotiation?                17:56
2    A.  Generally, I think there were --  17:56
3  there were questions.                17:56
4      MR. HOOVER:  Don't get into the  17:56
5  substance.                           17:56
6      THE WITNESS:  Okay.              17:56
7    Q.  Trae says, "despite caution I  17:56
8  expressed from that audit, Roben, and  17:56
9  myself, leadership's appetite for more  17:56
10  risk seemed to grow."               17:56
11      Did you express caution to the  17:56
12  leadership about the relationships   17:56
13  Aperian had with Compass?           17:56
14      MR. HOOVER:  Object.  That would  17:56
15  be attorney-client privilege.       17:56
16      MR. McKENNA:  Are you           17:56
17  instructing her not to answer.      17:56
18      MR. HOOVER:  I am instructing   17:56
19  her not to answer.                  17:57
20    Q.  The next paragraph, Trae says,  17:57
21  "Recently, Roben and I both expressed  17:57
22  concern to you about the relationship  17:57
23  between Aperian and Compass Lab/TDS, and  17:57

Page 382

1  in particular Jannie's disregard for  17:57
2  adequate compliance safeguards."     17:57
3      Did I read that correctly?       17:57
4    A.  You did.                       17:57
5    Q.  Is it a true statement?        17:57
6      MR. HOOVER:  Object to the       17:57
7  extent you're asking her to reveal what  17:57
8  her conversations were as general    17:57
9  counsel.                             17:57
10      MR. McKENNA:  Are you           17:57
11  instructing her not to answer if    17:57
12  that's --                           17:57
13      MR. HOOVER:  I am instructing   17:57
14  her not to answer that.  I am sorry if I  17:57
15  don't make that clear.              17:57
16    Q.  All right.  Further on down, he  17:57
17  says, "A few glowing signs include   17:58
18  Dr. Aggarwal" -- "Aggarwal's suspension  17:58
19  by the Board of Medical Examiners, the  17:58
20  action taken on Winfield (Raquib) due to  17:58
21  over-utilization, and Jannie's use of a  17:58
22  sales rep in spite of a clear non-compete  17:58
23  agreement with Ameritox."           17:58

Page 383

1      What happened with Winfield --   17:58
2  at Winfield with Dr. Raquib?         17:58
3    A.  I don't recall.                17:58
4    Q.  Do you recall the testimony by  17:58
5  Trae and Michele Hunter that Terry Andrus  17:58
6  said, "The only way Winfield could have  17:58
7  that many tests sent to us in a month is  17:58
8  if they tested the entire town"?     17:58
9    A.  I recall that testimony.       17:58
10    Q.  Okay.  All right.  He next says,  17:58
11  "Even Terry Andrus has commented on  17:59
12  multiple occasions about the risks   17:59
13  associated with pursuing these      17:59
14  relationships, yet they continue."   17:59
15      Do you recall Terry Andrus      17:59
16  commenting on the risks of relationships  17:59
17  with Aggarwal and Winfield?         17:59
18    A.  I don't.                      17:59
19      MR. HOOVER:  Okay.  Go ahead.   17:59
20    Q.  Do you recall any comments made  17:59
21  by Terry Andrus about pursuing       17:59
22  partnerships with Compass?          17:59
23      MR. HOOVER:  I would instruct   17:59

Page 384

1  her not to answer to the extent the   17:59
2  comments were made to her seeking legal  17:59
3  advice.                              17:59
4      MR. McKENNA:  Well, if they were  17:59
5  made in a group setting and you just  17:59
6  happened to hear them, they weren't for  17:59
7  legal advice, what comments --      17:59
8      MR. HOOVER:  Well, not           18:00
9  necessarily.  I mean, the employees are  18:00
10  the employees.  But now, I mean, if he  18:00
11  said it screaming down the hall, that  18:00
12  might be a different story.  But if -- if  18:00
13  there's a group of people sitting in a  18:00
14  conference room like this and it's all  18:00
15  employees, then the employee --  the  18:00
16  attorney-client privilege would protect  18:00
17  those conversations.                18:00
18      MR. McKENNA:  Well, if he made   18:00
19  the comment to Trae and people at Aperian  18:00
20  and Roben wasn't even there but heard  18:00
21  about it from somebody, that wouldn't be  18:00
22  attorney-client privilege.          18:00
23      MR. HOOVER:  That's -- that's --  18:00

Page 385

1  that's -- but I want to make sure -- but  18:00
2  that's a different question --            18:00
3      MR. McKENNA: Right.                   18:00
4      MR. HOOVER: -- Don. So let's          18:00
5  make sure that the question --            18:00
6      Q. (By Mr. McKenna) So let me ask     18:00
7  you this way. Are you aware of any        18:00
8  comments made by Terry Andrus about       18:00
9  partnerships with Compass or other        18:00
10 marketing entities?                       18:00
11     A. Conversations --                   18:00
12     MR. HOOVER: Outside your              18:00
13 role --                                   18:00
14     A. -- that I wasn't present?          18:00
15     Q. Just the question is whether       18:01
16 you're aware, and then we can get into    18:01
17 what the context is and whether I can ask 18:01
18 you about it or not.                      18:01
19     A. I'm not aware of any               18:01
20 conversations outside of my presence.     18:01
21     Q. When Terry Andrus made those       18:01
22 comments in your presence, was he seeking 18:01
23 your legal advice --                      18:01

Page 386

1      A. I didn't say he made comments in   18:01
2  my presence.                              18:01
3      Q. Okay. Are you aware of any         18:01
4  comments that Terry Andrus made about the 18:01
5  partnerships with Compass or others?      18:01
6      A. I'm going to answer it the same    18:01
7  way I just answered it. Outside of my     18:01
8  presence, I'm not aware of any comments   18:01
9  that he made.                             18:01
10     Q. Then you also said you're not      18:01
11 aware of any comments he made in your     18:01
12 presence.                                 18:01
13     A. No. I said -- I didn't say he      18:01
14 made any comments in my presence.         18:02
15     Q. I hate this tap dance. All         18:02
16 right. Further on down, it says,          18:02
17 "Another example is when Roben and I      18:02
18 attempted to amend the TDS" -- "TDS       18:02
19 contract to remove the risk of Medicare   18:02
20 'per-click' remuneration, we both got     18:02
21 the message to back-off before Jannie     18:02
22 took her business away."                   18:02
23     Did I read that correctly?           18:02

Page 387

1      A. You did.                           18:02
2      Q. What actions did you and Trae      18:02
3  take to try to remove the risk of         18:02
4  Medicare per-click remuneration?          18:02
5      MR. HOOVER: Object. That would        18:02
6  be attorney-client privilege. Instruct    18:02
7  you not to answer.                        18:02
8      Q. What actions did you take in       18:02
9  response to receiving this e-mail?        18:02
10     MR. HOOVER: Same objection.           18:03
11     MR. McKENNA: Are you                  18:03
12 instructing her not to answer?            18:03
13     MR. HOOVER: Not to answer.           18:03
14     Q. Did you launch an investigation    18:03
15 into the allegations Trae made in this    18:03
16 e-mail?                                   18:03
17     MR. HOOVER: Same objection.           18:03
18     A. And I would add that any           18:03
19 response that I had to this e-mail was    18:03
20 made in anticipation of litigation.       18:03
21     Q. Okay. So any response you had      18:03
22 after receiving this on April 23rd, it's  18:03
23 your testimony, would have been in        18:03

Page 388

1  response to -- it was in anticipation of  18:03
2  litigation?                               18:03
3      A. Yes.                               18:03
4      Q. So after receiving this, you       18:03
5  were anticipating litigation?            18:03
6      A. I thought it was a possibility.    18:03
7      Q. Okay. Did you record the          18:03
8  expressed concerns here in the compliance 18:03
9  log?                                      18:03
10     A. I did not.                         18:03
11     Q. Did you create a file on the       18:03
12 allegations?                              18:03
13     A. I created a file on this matter.   18:03
14     Q. Okay. Did you interview people     18:03
15 to corroborate or refute the allegations? 18:04
16     MR. HOOVER: I mean, it would be       18:04
17 made in anticipation. I don't know if     18:04
18 she can -- if she can testify to that. I  18:04
19 mean, the fact that she did a -- she did  18:04
20 an investigation. I mean, she said it     18:04
21 would be made in anticipation of          18:04
22 litigation.                               18:04
23     MR. McKENNA: Just generally did       18:04

**Roben Nutter**                                              98 (389 - 392)

Page 389

1  she interview people? I'm not going to   18:04
2  get into the substance of it.            18:04
3       MR. BATTLE: You can give the        18:04
4  names of the people that are interviewed. 18:04
5  You just can't get into the substance on  18:04
6  a work product objection.                18:04
7       MR. McKENNA: It's kind of like      18:04
8  asking me --                             18:04
9       MR. HOOVER: Well, but you can       18:04
10 get the underlying -- you can -- you can  18:04
11 get the facts. I don't think you can      18:04
12 get -- I mean, I don't think you can get  18:04
13 --                                       18:04
14      MR. McKENNA: You can ask me who     18:04
15 all I took witness statements from, but   18:04
16 you can't get my witness statement. So    18:04
17 work product is my witness statements.    18:04
18      MR. HOOVER: I don't know. I've      18:04
19 seen some objections from lawyers saying  18:05
20 if the lawyers -- if it's to the lawyers, 18:05
21 they say that's attorney-client privilege 18:05
22 or that's attorney work product. If it's  18:05
23 from the client that's doing it, then --  18:05

Page 390

1  and the client's talking to witnesses,    18:05
2  then you disclose that. When it's coming  18:05
3  from the lawyer, then that's different.   18:05
4  And most lawyers take the position that's 18:05
5  attorney-client privilege, unless there   18:05
6  is a witness list or an exhibit list that 18:05
7  you got to disclose pursuant to the court 18:05
8  order.                                   18:05
9       THE COURT REPORTER: Three          18:05
10 minutes.                                 18:05
11      MR. McKENNA: On the tape. All      18:05
12 right.                                   18:05
13   Q. Okay. Did you ask for a meeting    18:05
14 with Trae to discuss the allegations     18:05
15 further?                                 18:05
16   A. I don't recall asking for a        18:05
17 meeting with Trae.                       18:05
18      MR. HOOVER: That's basically       18:05
19 the same objection.                      18:05
20   Q. Okay. Let me give you Exhibit      18:05
21 44, which is the separation agreement for 18:06
22 Trae. Did you draft the separation       18:06
23 agreement?                               18:06

Page 391

1  (Plaintiff's Exhibit 44 was marked for   18:06
2  identification and is attached.)         18:06
3    A. I did not.                          18:06
4    Q. Okay. Did you meet with Trae       18:06
5  about the separation agreement?          18:06
6    A. I don't recall meeting with Trae   18:06
7  specifically about the separation        18:06
8  agreement.                               18:06
9    Q. I've got e-mails back and forth    18:06
10 where you're sending him the separation   18:06
11 agreement and answering some questions    18:06
12 about it. Do you recall that?            18:06
13   A. My recollection is that it would   18:06
14 have come from the HR director or vice    18:06
15 president first. I may be wrong on that,  18:06
16 but that's typically how it happens.      18:06
17   Q. All right. I hate doing           18:06
18 everything the hard way. Here's Exhibit   18:07
19 45. Is this an e-mail to you -- between   18:07
20 you and Trae about the separation         18:07
21 agreement where he tells you he has an    18:07
22 appointment with an attorney that day?    18:07
23 (Plaintiff's Exhibit 45 was marked for    18:07

Page 392

1  identification and is attached.)         18:07
2       MR. HOOVER: You know, I don't      18:07
3  know what the -- I don't know what the    18:07
4  question -- I thought your question was,  18:07
5  "Did you have any meetings with Trae,"    18:07
6  and opposed to e-mails. So, I mean,       18:07
7  you're --                                18:07
8       MR. McKENNA: Yeah. And then I      18:07
9  asked a follow-up, "Okay, so no           18:07
10 meetings?"                               18:07
11      MR. HOOVER: And she said she       18:07
12 doesn't recall. So, I mean, the          18:07
13 commentary, little offhand commentary     18:07
14 about doing it the hard way, she's        18:07
15 telling you whether she recalls it or     18:07
16 not. You can show her the e-mail, which   18:07
17 is what you're doing, or you can cut out  18:07
18 the commentary.                          18:07
19   Q. All right. Did you have           18:07
20 communication with Trae about the         18:07
21 severance agreement?                     18:07
22   A. I did.                             18:07
23   Q. Okay. And with full knowledge     18:07

**Roben Nutter**                                                    **99 (393 - 396)**

Page 393

1  of the compliance complaints that Trae  18:07
2  had made in April 23rd e-mail, they would  18:07
3  acknowledge that you anticipated  18:07
4  litigation after that e-mail, East  18:07
5  Alabama Medical Center was going to ask  18:07
6  Trae Fite to sign a severance agreement  18:07
7  to give up his legal rights to bring a  18:07
8  lawsuit and acknowledge that he was aware  18:08
9  of no compliance issues at East Alabama  18:08
10  Medical Center; correct?  18:08
11  A.  I think the separation agreement  18:08
12  speaks for itself.  18:08
13  Q.  Okay.  So they were -- East  18:08
14  Alabama Medical Center was asking Trae to  18:08
15  sign a severance agreement that they knew  18:08
16  from the e-mail that Ken Lott and you and  18:08
17  others received would have required him  18:08
18  to state -- to sign a falsehood.  18:08
19  MR. HOOVER:  Object to the form.  18:08
20  Q.  Because he outlined those  18:08
21  compliance concerns in an e-mail dated  18:08
22  April 23rd, 2013; correct?  18:08
23  A.  I don't agree with your  18:08

Page 394

1  characterization of it, no.  18:08
2  Q.  All right.  You do agree that he  18:08
3  outlined his compliance concerns on April  18:08
4  23rd, 2013; correct?  18:08
5  MR. HOOVER:  Object to the form.  18:08
6  A.  I don't know that I would agree  18:08
7  with that either.  18:08
8  Q.  You don't believe -- you don't  18:08
9  believe the e-mail of April 23rd sets  18:08
10  forth his compliance concerns?  18:08
11  A.  I think we see what the e-mail  18:09
12  says.  18:09
13  Q.  All right.  Are you aware that  18:09
14  the Court in this case imposed a deadline  18:09
15  for any party that wishes to raise an  18:09
16  advice of counsel defense to do so by  18:09
17  December 15th, 2017?  18:09
18  A.  Vaguely.  18:09
19  Q.  Okay.  Are you aware that  18:09
20  Aperian and EAMC have not raised that  18:09
21  defense?  18:09
22  A.  Yes.  18:09
23  Q.  Okay.  Is it because EAMC and  18:09

Page 395

1  Aperian did not follow the four corners  18:09
2  of the advice it received from counsel  18:09
3  regarding the relationships with Compass?  18:09
4  MR. HOOVER:  I'm objecting to  18:09
5  that as attorney-client privilege and  18:09
6  instruct her not to answer that.  18:09
7  Q.  Okay.  Did EAMC and Aperian not  18:10
8  raise the advice of counsel defense  18:10
9  because it did not follow the four  18:10
10  corners of the advice it received related  18:10
11  to the contract with Summit?  18:10
12  MR. HOOVER:  Object.  Asking for  18:10
13  attorney-client privilege, impression --  18:10
14  mental impressions of a -- of an  18:10
15  attorney, and I'm instructing you not to  18:10
16  answer.  18:10
17  Q.  In your time at East Alabama  18:10
18  Health Care Authority, did you have  18:10
19  trouble getting Ken Lott to listen to and  18:10
20  follow compliance advice?  18:10
21  MR. HOOVER:  Object to the form.  18:10
22  Object to the -- what she may have not  18:10
23  done as a lawyer and what -- what his  18:10

Page 396

1  response was to her.  18:10
2  MR. McKENNA:  Are you  18:10
3  instructing her not to answer?  18:10
4  MR. HOOVER:  And I'm instructing  18:10
5  her not to answer that question.  18:10
6  Q.  All right.  You are vice  18:10
7  president now and you were not at the  18:10
8  time frame of the allegations.  Is it  18:10
9  fair to say that Ken Lott simply used his  18:10
10  position to overrule you on compliance  18:10
11  concerns raised about the Aperian  18:10
12  relationships with marketing companies?  18:11
13  MR. HOOVER:  Object to trying --  18:11
14  A.  I don't agree with that  18:11
15  statement.  18:11
16  Q.  Then the last exhibit is 46.  If  18:11
17  we look at the bottom of 46, this was the  18:11
18  original -- bottom is the original  18:11
19  transmission of the Colaborate report  18:11
20  from Kevin Hunter to Trae; correct?  18:11
21  (Plaintiff's Exhibit 46 was marked for  18:11
22  identification and is attached.)  18:12
23  A.  Correct.  18:12

**Roben Nutter**                                    **100 (397 - 400)**

Page 397

1    Q.  And then here --          18:12
2    A.  I don't know if it's the          18:12
3   original, actually, but it appears that   18:12
4   way.                          18:12
5    Q.  Okay.  And then here on April   18:12
6   30th, the week after Trae raised his   18:12
7   compliance concerns, the Colaborate   18:12
8   report is being provided to Sam Price,   18:12
9   Ken Lott, yourself, and Laura Grill;   18:12
10  correct?                       18:12
11   A.  I'm sorry.  Say that again?   18:12
12   Q.  On -- according to the e-mail,   18:12
13  on April 30th, 2013, a week after Trae's   18:12
14  April 23rd e-mail to Ken Lott with   18:12
15  compliance concerns, the Colaborate   18:12
16  report, which was issued almost a year   18:12
17  prior, is now being provided to Ken Lott,   18:12
18  Roben -- you, Sam Price, and Laura Grill?   18:12
19   A.  It was forwarded to me that day.   18:12
20   Q.  Okay.  Why was it being provided   18:12
21  at that time, almost a year after it was   18:12
22  issued?                        18:13
23       MR. HOOVER:  Object.          18:13

Page 398

1    A.  I don't recall.             18:13
2       MR. McKENNA:  I'm out of       18:13
3   questions.  I could ask until tomorrow,   18:13
4   but I won't.                     18:13
5       MR. HOOVER:  I don't believe it.   18:13
6   The fact that you're out of questions, I   18:13
7   don't believe that for a moment.  May be   18:13
8   out of time and out of energy.         18:13
9       MR. McKENNA:  I am out of time.   18:13
10      MR. HOOVER:  And out of voice.   18:13
11  All that I might believe.            18:13
12      MR. COULTER:  Can you tell us   18:13
13  how long we went, please?           18:13
14      THE COURT REPORTER:  Can you   18:13
15  tell us how long we were on the record?   18:13
16      THE VIDEOGRAPHER:  7:04.  We are   18:13
17  at 1:20 right now on the tape.         18:13
18      MR. HOOVER:  Yeah.  You want to   18:13
19  get a new tape in there?             18:13
20      THE VIDEOGRAPHER:  Yes.          18:13
21      MR. HOOVER:  You have some       18:13
22  questions.  Okay.                  18:13
23      MR. WOLFE:  Yeah, I just have a   18:13

Page 399

1   couple.  I hate to get a whole tape for   18:13
2   that, but I --                   18:13
3       THE VIDEOGRAPHER:  Do you know   18:13
4   how much --                     18:13
5       MS. WOLFE:  I mean, I might have   18:13
6   four minutes.                    18:13
7       THE VIDEOGRAPHER:  Yeah, we'll   18:13
8   --                             18:13
9       MS. WOLFE:  Just keep going?    18:13
10      THE VIDEOGRAPHER:  Yeah, keep   18:13
11  going.                         18:13
12      MS. WOLFE:  Okay.  Great.       18:13
13                               18:13
14  EXAMINATION BY MS. WOLFE:            18:13
15   Q.  All right.  Just a couple of   18:13
16  quick questions, hopefully.          18:13
17  Earlier today, there were some        18:13
18  questions about the Colaborate audit.   18:14
19  One of those questions, you were asked   18:14
20  whether the Total Diagnostics contract   18:14
21  was the one that included the language   18:14
22  about the requirement to provide Noble   18:14
23  collection cups.  And you said, "No, I   18:14

Page 400

1   agree with you, that was in the Summit   18:14
2   contract."  Is that correct?  Do you   18:14
3   remember that conversation?           18:14
4    A.  Vaguely.                   18:14
5    Q.  Okay.  If you have the Summit   18:14
6   contract in front of you, we marked this   18:14
7   earlier.  I think it was Exhibit 2 to   18:14
8   somebody else's deposition.          18:14
9       MR. COULTER:  Powell's          18:14
10  deposition.                      18:14
11   Q.  All right.  So on the second to   18:14
12  last page, where it has Exhibit A and it   18:14
13  lists out the duties of the contract?   18:14
14   A.  Yes.                       18:14
15   Q.  So I just wanted to clarify   18:14
16  about the -- what was described as the   18:14
17  requirement to provide Noble cups.  You   18:14
18  see that item (i)?                 18:14
19   A.  I do.                      18:14
20   Q.  Okay.  And just I'm going to   18:14
21  read it.  It says the client "Must make   18:15
22  Noble cups or other client requested   18:15
23  collection cups available."  And I just   18:15

Page 401

1  wanted to point out that there is an "or"  18:15
2  in that paragraph.  The requirement is    18:15
3  not to make Noble cups available, it      18:15
4  could be other client-requested           18:15
5  collection cups.  Is that correct?        18:15
6      A.  That's what it says.              18:15
7      Q.  Okay.  Do you have any evidence,  18:15
8  and I'm talking about any evidence         18:15
9  whatsoever in any form, that Summit or     18:15
10 anyone associated with Summit caused or    18:15
11 encouraged collectors to do work other     18:15
12 than urine collection at a physician       18:15
13 office?                                    18:15
14     MR. BATTLE:  Object to the form.       18:15
15     MR. McKENNA:  Object to the            18:15
16 form.                                      18:15
17     Bob, wake me up.                       18:15
18     Q.  Do you understand the question?    18:15
19     A.  I do.  And that answer is I am     18:15
20 not aware.                                 18:15
21     Q.  Okay.  And are you aware of any    18:15
22 evidence whatsoever in whatever form that  18:15
23 Summit or anyone associated with Summit    18:15

Page 402

1  engaged in any of the conduct alleged to   18:15
2  be unlawful in the second amended          18:15
3  complaint of the plaintiff?                18:16
4      MR. McKENNA:  Object to the            18:16
5  form.                                      18:16
6      A.  I am not aware of that.            18:16
7      MS. WOLFE:  That's all I have.         18:16
8      MR. McKENNA:  Are you guys             18:16
9  saving your questions?                     18:16
10     MR. HOOVER:  I don't think I           18:16
11 did.  Let me go -- let me go talk to her   18:16
12 real quick.                                18:16
13     THE VIDEOGRAPHER:  We are going        18:16
14 off the record at 6:17.                    18:16
15     (Break taken.)                         18:19
16                                            18:19
17 END OF DEPOSITION
18     (6:19 p.m.)
19
20
21
22
23

1        C E R T I F I C A T E
2  STATE OF ALABAMA      )
3  COUNTY OF JEFFERSON  )
4      I hereby certify that the above
5  and foregoing proceeding was taken down
6  by me by stenographic means, and that the
7  content herein was produced in transcript
8  form by computer aid under my
9  supervision, and that the foregoing
10 represents, to the best of my ability, a
11 true and correct transcript of the
12 proceedings occurring on said date at
13 said time.
14     I further certify that I am
15 neither of counsel nor of kin to the
16 parties to the action; nor am I in
17 anywise interested in the result of said
18 case.
19     /s/ Lane C. Butler
20     LANE C. BUTLER, RPR, CRR, CCR
21     CCR# 418 -- Expires 9/30/18
22     Commissioner, State of Alabama
23     My Commission Expires:  2/11/21