FILED

2018 Mar-20  PM 03:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT 4
# DEPOSITION OF
# LAURA GRILL

**Page 1**

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE NORTHERN DISTRICT OF ALABAMA

3          NORTHEASTERN DIVISION

4

5

6

7    CIVIL ACTION NO.:  5:13-cv-1626-LSC

8

9    UNITED STATES OF AMERICA, ex rel. LEAMON

10   M. FITE, III,

11        Plaintiffs,

12   v.

13

14   APERIAN LABORATORY SOLUTIONS, LLC; EAST

15   ALABAMA HEALTH CARE AUTHORITY, d/b/a EAST

16   ALABAMA MEDICAL CENTER; SUMMIT

17   DIAGNOSTICS, LLC; et al.,

18        Defendants.

19

20

21   VIDEOTAPED DEPOSITION TESTIMONY OF:

22          LAURA GRILL

23        February 9, 2018

**Page 2**

1       S T I P U L A T I O N S

2       IT IS STIPULATED AND AGREED

3    by and between the parties through their

4    respective counsel that the deposition of

5    LAURA GRILL may be taken before Lane C.

6    Butler, a Court Reporter and Notary

7    Public for the State at Large, at the law

8    offices of Burr & Forman, 420 North 20th

9    Street, Suite 3400, Birmingham, Alabama,

10   on the 9th day of February, 2018,

11   commencing at approximately 10:20 a.m.

12       IT IS FURTHER STIPULATED

13   AND AGREED that the signature to and the

14   reading of the deposition by the witness

15   is waived, the deposition to have the

16   same force and effect as if full

17   compliance had been had with all laws and

18   rules of Court relating to the taking of

19   the depositions.

20       IT IS FURTHER STIPULATED

21   AND AGREED that it shall not be necessary

22   for any objections to be made by counsel

23   to any questions except as to form or

**Page 3**

1    leading questions and that counsel for

2    the parties may make objections and

3    assign grounds at the time of trial or at

4    the time said deposition is offered in

5    evidence, or prior thereto.

6       In accordance with the Federal

7    Rules of Civil Procedure, I, Lane C.

8    Butler, am hereby delivering to Robert

9    Battle, Esq., the original transcript of

10   the oral testimony taken the 9th day of

11   February, 2018,

12       Please be advised that this is

13   the same and not retained by the Court

14   Reporter, nor filed with the Court.

15

16

17

18

19

20

21

22

23

**Page 4**

1       A P P E A R A N C E S

2

3    FOR THE PLAINTIFF:

4

5    Donald P. McKenna, Jr., Esq.

6    Randi L. McCoy, Esq.

7    HARE, WYNN, NEWELL & NEWTON

8    2024 Third Avenue North

9    Suite 800

10   Birmingham, Alabama  35203

11   don@hwnn.com

12   randi@hwnn.com

13

14   Robert E. Battle, Esq.

15   BATTLE & WINN

16   2901 Second Avenue South

17   Suite 220

18   Birmingham, Alabama  35233

19   bbattle@battlewinn.com

20

21

22

23

Page 5

1 FOR THE DEFENDANTS:
2
3 James A. Hoover, Esq.
4 BURR & FORMAN
5 420 North 20th Street
6 Suite 3400
7 Birmingham, Alabama 35203
8 jhoover@burr.com
9
10 Daniel J. Martin, Esq.
11 JONES WALKER
12 1819 Fifth Avenue North
13 Suite 1100
14 Birmingham, Alabama 35203
15 danielmartin@joneswalker.com
16
17
18 ALSO PRESENT:
19
20 Roben Nutter, Esq.
21 Ted Yost, videographer
22
23

Page 6

1            I N D E X
2
3 EXAMINATION BY:            PAGE NO.
4 Mr. Battle            11
5 Mr. Martin            171
6 Mr. Hoover            173
7
8
9
10          E X H I B I T S
11
12 FOR THE PLAINTIFF:
13 1 E-mails, 9/17/2008, Subject: RE:   60
14   Discussion with George Powell of
15   Summit
16 2 E-mails, 12/3/2008, Subject: RE:   70
17   Summit National Sales Director
18   meeting (TOX)
19 3 E-mails, 12/22/2008, Subject:   73
20   Oversight Committee Minutes
21   12-7-08.doc
22 4 Oversight Board Meeting, April   82
23   1st

Page 7

1 5 E-mail, 4/13/2009, Subject: RE:   87
2   Phone conversation with George
3   Powell
4 6 E-mails, 4/22/2009, Subject: RE:   90
5   Aperian Organizational structure
6 7 Oversight Board Meeting, May 6th   92
7 8 Oversight Board Meeting, June   96
8   3rd
9 9 Oversight Board Meeting, August   98
10   19th
11 10 Sales Services Contractor   101
12   Agreement
13 11 E-mails, 1/25/2010, Subject: FW:   108
14   Weekly Summary Highlights
15 12 E-mails, 8/11/2011, Subject: FW:   113
16   Summit Daily Volumes
17 13 Subcontract Agreement, September   114
18   1, 2011
19 14 Subcontract Agreement, March 1,   117
20   2012
21 15 Colaborate report, June 13, 2012  118
22 16 Colaborate Summary   121
23 17 Services Agreement   126

Page 8

1 18 E-mails, 4/29/2013, Subject: FW:   134
2   Request
3 19 E-mails, 5/21/2013, Subject: Re:   142
4   Trae was released today
5 20 E-mails, 11/18/2013, Subject:   169
6   FW: Health Care Insight - Court
7   Rules Hospital Violated Stark
8   Law in Oncologist Payment Case
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 9

1      I, Lane C. Butler, a Court
2   Reporter and Notary Public, State of
3   Alabama at Large, acting as Notary,
4   certify that on this date, pursuant to
5   the Federal Rules of Civil Procedure and
6   the foregoing stipulation of counsel,
7   there came before me at the law offices
8   of Burr & Forman, 420 North 20th Street,
9   Suite 3400, Birmingham, Alabama,
10   commencing at approximately 10:20 a.m.,
11   on the 9th day of February, 2018, LAURA
12   GRILL, witness in the above cause, for
13   oral examination, whereupon the following
14   proceedings were had:
15
16      THE VIDEOGRAPHER: This          10:28
17   begins Disc No. 1 in the deposition   10:28
18   of Laura Grill in the matter of the    10:28
19   United States, ex rel. Leamon M.      10:28
20   Fite, III, v. Aperian Laboratory     10:28
21   Solutions, LLC, et al., Case No.      10:28
22   5:13-CV-1626-LSC in the United       10:28
23   States District Court for the        10:28

Page 10

1   Northern District of Alabama,        10:28
2   Northeastern Division. On the        10:28
3   record at 10:28 a.m. on Friday,      10:28
4   February 9th, 2018. This deposition   10:28
5   is taking place in Birmingham,       10:28
6   Alabama. My name is Ted Yost,       10:29
7   representing Freedom Court           10:29
8   Reporting.                  10:29
9      Would counsel identify         10:29
10   yourself and state whom you        10:29
11   represent.                10:29
12      MR. HOOVER: Jim Hoover. I     10:29
13   represent Aperian Laboratory Solutions   10:29
14   and East Alabama Health Care Authority.  10:29
15      MR. MARTIN: Dan Martin on     10:29
16   behalf of Summit Diagnostics.       10:29
17      MR. BATTLE: Bob Battle here on  10:29
18   behalf of the relator, Trae Fite.      10:29
19      MR. McKENNA: Don McKenna on    10:29
20   behalf of relator Fite and the United   10:29
21   States.                  10:29
22      MS. McCOY: Randi McCoy on     10:29
23   behalf of the relator and the United    10:29

Page 11

1   States.
2      THE VIDEOGRAPHER: Would the
3   reporter please swear in the witness.
4      LAURA GRILL,
5      being first duly deposed,
6   was examined and testified as follows:
7
8      THE COURT REPORTER: Usual
9   stipulations?             10:29
10      MR. HOOVER: That's fine.      10:29
11      MR. BATTLE: That's fine.      10:29
12                    10:29
13   EXAMINATION BY MR. BATTLE:        10:29
14      Q. Could you please state your full 10:29
15   name for the record.          10:29
16      A. Laura D. Grill.          10:29
17      Q. All right. Ms. Grill, my name  10:29
18   is Bob Battle. I'm a lawyer, and I'm   10:29
19   representing the relator, Trae Fite, as  10:29
20   well as the United States in this case.  10:29
21   Have you ever given a deposition before? 10:29
22      A. I have.             10:29
23      Q. Okay. How many times?       10:29

Page 12

1      A. Once, if I recall.         10:30
2      Q. Okay. So you may be familiar   10:30
3   with -- with the rules. First of all, I  10:30
4   just want to let you know I'm going to   10:30
5   try to be efficient today. I found out   10:30
6   yesterday that I was going to be taking  10:30
7   this deposition because my law partner  10:30
8   has the flu. He had been working on --  10:30
9   on preparing for this. So if it is     10:30
10   slower than it should be, I apologize for 10:30
11   that, but we decided not to expose     10:30
12   everyone to --              10:30
13      A. I appreciate that.         10:30
14      Q. -- to the flu. So, can you tell  10:30
15   me what that case was about that you gave 10:30
16   the deposition in?            10:30
17      A. The one I recall was a divorce.  10:30
18      Q. Okay. Well, I'll be -- you    10:30
19   know, I know you've been through one   10:30
20   before, but I'll obviously be asking    10:30
21   questions today. And for the court     10:30
22   reporter's sake, if you could wait until  10:30
23   I finish my question to give your answer, 10:30

1  that will allow her to be able to        10:30
2  transcribe everything without us talking  10:31
3  over each other.  Also, if you can give   10:31
4  verbal answers as opposed to nodding,     10:31
5  that also helps the court reporter.       10:31
6      If at any time you need to take       10:31
7  a break, just let me know that.  The one  10:31
8  thing that I would ask is that if I have  10:31
9  posed a question to you, if you'll go     10:31
10 ahead and answer that question before we  10:31
11 take a break, I'd appreciate that.  Is    10:31
12 that okay with you?                       10:31
13    A.  Yes.                              10:31
14    Q.  If you don't understand my        10:31
15 question, I'll be happy to rephrase it.   10:31
16 But -- but if -- if you answer the        10:31
17 question without asking me to do so, I'm  10:31
18 going to assume that you understood my    10:31
19 question.  Is that okay?                  10:31
20    A.  Yes.                              10:31
21    Q.  All right.  What is your home     10:31
22 address?                                  10:31
23    A.  1726 Altamont Court, Auburn,      10:31

1  Alabama.                                  10:31
2     Q.  Okay.  How long have you lived    10:31
3  there?                                    10:31
4     A.  That location, about six and a    10:31
5  half years.                              10:31
6     Q.  And what's your date of birth?    10:31
7     A.  6/11/62.                         10:31
8     Q.  In the deposition that you gave   10:31
9  in the divorce matter that you recall,    10:32
10 how long ago was that?                    10:32
11    A.  Probably 28 years, 29 years.      10:32
12    Q.  Okay.  What did you do to         10:32
13 prepare for your deposition today?        10:32
14    A.  I worked with my counsel and      10:32
15 refreshed myself on the --               10:32
16    Q.  How long did you meet with your   10:32
17 counsel?                                  10:32
18    A.  It's really hard to say.  Hours,  10:32
19 a couple of hours, a couple of days.      10:32
20    Q.  So multiple days?                 10:32
21    A.  Maybe two.                        10:32
22    Q.  Did you review any documents?     10:32
23    A.  I did.                            10:32

1     Q.  What documents do you recall      10:32
2  reviewing?                                10:32
3     A.  I reviewed other transcripts.     10:32
4     Q.  Do you recall what transcripts?   10:32
5     A.  Mr. Fite's and -- I'm trying to   10:32
6  recall -- Mr. Price.                     10:33
7     Q.  Is that Sam Price?                10:33
8     A.  Yes.                              10:33
9     Q.  Any others?                       10:33
10    A.  No.                               10:33
11    Q.  Other than those deposition       10:33
12 transcripts, do you recall reviewing any 10:33
13 other documents?                          10:33
14    A.  Are you asking specific?  I       10:33
15 don't -- can you clarify what you're     10:33
16 asking or --                             10:33
17    Q.  Sure.  First of all, I'm asking   10:33
18 whether you reviewed any other documents 10:33
19 besides those two transcripts.  It's just 10:33
20 yes or no.                               10:33
21    A.  Yes.                              10:33
22    Q.  And then the next question is     10:33
23 what other documents, other than those   10:33

1  two transcripts, did you review?          10:33
2     A.  I reviewed some e-mails,          10:33
3  timeline of the case that -- or not the   10:33
4  case, but the points of the toxicology   10:33
5  lab, Aperian.                            10:34
6     Q.  Any others that you recall?       10:34
7     A.  Not that I recall.               10:34
8     Q.  Do you recall specifically what  10:34
9  e-mails you reviewed?                     10:34
10    A.  Not specifically, no.            10:34
11    Q.  Or what the subject matter was    10:34
12 of those e-mails?                         10:34
13    A.  Not specifically.                10:34
14    Q.  Do you remember anything          10:34
15 generally about them?                     10:34
16    A.  That they mostly related to       10:34
17 Aperian.                                 10:34
18    Q.  Anything else you remember about  10:34
19 them other than that they related to      10:34
20 Aperian?                                 10:34
21    A.  Not specifically.                10:34
22    Q.  Were you interviewed by the DOJ   10:34
23 in this case?                            10:34

Page 17

1   A.  Not that I recall.        10:34
2   Q.  Are you currently married?   10:34
3   A.  I am currently married.  Yes, I   10:34
4 am.                            10:35
5   Q.  Okay.  And what is your      10:35
6 husband's name - or, I'm sorry, your   10:35
7 spouse's name?                 10:35
8   A.  I don't have a husband.  Thank   10:35
9 you.                           10:35
10  Q.  I'm sorry.                 10:35
11  A.  Patricia Stewart.          10:35
12  Q.  Okay.  And how long have you   10:35
13 been married to Ms. Stewart?    10:35
14  A.  Four years.               10:35
15  Q.  Do you have relatives that are   10:35
16 over the age of nineteen that reside in   10:35
17 Alabama?                       10:35
18  A.  I have a daughter.         10:35
19  Q.  And what is her name?        10:35
20  A.  Katherine.                10:35
21  Q.  Where does she reside?      10:35
22  A.  In Hoover.                10:35
23  Q.  Okay.  Any others?          10:35

Page 18

1   A.  Any other?                10:35
2   Q.  Any other relatives in the state   10:35
3 of Alabama?                     10:35
4   A.  I have two brothers and a sister   10:35
5 that live in Alabama.           10:35
6   Q.  Okay.  And the purpose of -- of   10:35
7 my questions along that is in case there   10:35
8 are relatives in a jury pool one day if   10:35
9 this case goes to trial, we just need to   10:35
10 make sure that --              10:35
11  A.  Sure.                     10:35
12  Q.  -- people in the -- on the jury   10:35
13 panel don't know them well --    10:36
14  A.  Sure.                     10:36
15  Q.  -- et cetera.  And so that's why   10:36
16 I'm asking.  Could you provide their   10:36
17 names and where they live, please,   10:36
18 your -- your brothers and --     10:36
19  A.  My oldest brother is Don Duke,   10:36
20 D-O -- D-U-K-E.  Excuse me.  My sister is   10:36
21 Martha Martin.  My other brother is Wayne   10:36
22 Duke.  My daughter is Katherine Colbert.   10:36
23  Q.  And where do Don, Martha, and   10:36

Page 19

1 Wayne live?                    10:36
2   A.  Specific addresses?  I couldn't   10:36
3 give you --                     10:36
4   Q.  No, no.  Just cities.      10:36
5   A.  Don lives in McCalla, Wayne   10:36
6 lives in Hoover, Martha lives in Hoover,   10:36
7 and my daughter lives in Hoover.   10:36
8   Q.  And -- and I know you were      10:36
9 married a long time ago as well and got   10:36
10 divorced a long time ago.  What was --   10:36
11 who were you married to then?    10:37
12  A.  John Grill.               10:37
13  Q.  And is he living in Alabama?   10:37
14  A.  I couldn't say.           10:37
15  Q.  All right.  And -- don't be   10:37
16 offended by this question.  This is one   10:37
17 that -- that we need to ask also.  But   10:37
18 have you ever been convicted or pled   10:37
19 guilty to a felony?             10:37
20  A.  No.                       10:37
21  Q.  Could you give me your -- your   10:37
22 educational history starting with high   10:37
23 school going forward?           10:37

Page 20

1   A.  I can.  I attended Midfield High   10:37
2 School.  I graduated in 1980.  I then   10:37
3 attended the University of Alabama      10:37
4 Birmingham, where I received a bachelor's   10:37
5 of science in nursing and graduated in   10:37
6 1984.  I then attended the University of   10:37
7 Alabama, graduated with a master's in   10:37
8 business administration in 1990.      10:37
9   Q.  Who is your current employer?   10:37
10  A.  East Alabama Medical Center.   10:37
11  Q.  How long have you been employed   10:37
12 by East Alabama Medical Center?    10:37
13  A.  A little over 25 years.     10:38
14  Q.  When you first came to EA- --   10:38
15 can I call it EAMC?  Is that --   10:38
16  A.  Yes.                      10:38
17  Q.  Okay.  When you first started   10:38
18 working at EAMC, what -- what was your   10:38
19 job title and what were your      10:38
20 responsibilities?              10:38
21  A.  My job title was the director of   10:38
22 cardiology, so I was responsible for the   10:38
23 cardiology program and the operations of   10:38

Page 21

1 those departments. 10:38
2 Q. How long were you in that 10:38
3 position? 10:38
4 A. Approximately two and a half, 10:38
5 three years. 10:38
6 Q. And just to -- to sort of speed 10:38
7 it up, if you could walk me through the 10:38
8 different jobs you have had at EA- -- 10:38
9 EAMC up through today and just give me 10:38
10 time frames and -- and the general job 10:38
11 responsibilities for each position you've 10:38
12 had. 10:39
13 A. Sure. And the -- the times and 10:39
14 the dates will not be exact because -- 10:39
15 Q. Sure. 10:39
16 A. -- it's 25 years. After about 10:39
17 three and a half years, I moved into a 10:39
18 role called the vice president of patient 10:39
19 care services. And that was 10:39
20 responsibility for nursing, clinical type 10:39
21 nursing-related services, in an 10:39
22 administrative role. Did that until 10:39
23 probably around, gosh, I don't know, ten, 10:39

Page 22

1 twelve years. Was then promoted to a 10:39
2 position of chief operating officer. So 10:39
3 I had operational responsibility for 10:39
4 departments that were overall within -- 10:39
5 within the hospital overall. Then a few 10:39
6 years after that, there was a title 10:39
7 change, really not a responsibility 10:40
8 change. But the -- my current title is 10:40
9 executive vice president, administrator 10:40
10 of our Opelika campus. 10:40
11 Q. What year did you become the 10:40
12 COO? 10:40
13 A. I couldn't say off the top of my 10:40
14 head. That may have been 2012 perhaps. 10:40
15 I would -- I would have to look, but -- 10:40
16 it may have been earlier, but I'm not -- 10:40
17 I'm not sure. 10:40
18 Q. And how long ago did the title 10:40
19 change? 10:40
20 A. To which title? 10:40
21 Q. You said you were the COO and 10:40
22 then that -- 10:40
23 A. And then the title -- 10:40

Page 23

1 Q. -- title changed to EVP of admin 10:40
2 for the Opelika campus. 10:40
3 A. Maybe four years ago. And 10:40
4 again, these are -- 10:41
5 Q. Right. They're approximate 10:41
6 dates. I -- it's not a memory test. I'm 10:41
7 just trying to get a -- 10:41
8 A. Sure. 10:41
9 Q. -- general idea. And I 10:41
10 appreciate that. 10:41
11 And so, is your current title 10:41
12 EVP of administration of the Opelika 10:41
13 campus? 10:41
14 A. Correct. Yes. 10:41
15 Q. Have your job responsibilities 10:41
16 changed since you became COO? And then I 10:41
17 know the title changed during that time 10:41
18 to this other title. 10:41
19 A. Over a period of that time, 10:41
20 there -- the responsibility has grown 10:41
21 somewhat. We are in a transition plan 10:41
22 to -- our CEO is retiring, and I'm 10:41
23 preparing to take his place in October of 10:41

Page 24

1 '18. 10:41
2 Q. And is Mr. Andrus the current 10:41
3 CEO? Is that correct? 10:42
4 A. Yes, that's correct. 10:42
5 Q. And you said the 10:42
6 responsibilities have -- have grown. 10:42
7 Give me a little more detail about how 10:42
8 that has grown. 10:42
9 A. Okay. For example, when I was 10:42
10 first in the chief operating officer 10:42
11 role, my duties tended to be more 10:42
12 centrally around the hospital campus, 10:42
13 what was within the hospital walls per 10:42
14 se. And then after that -- so not -- not 10:42
15 everyone reported to me. I guess that 10:42
16 would be a clearer way of saying that. 10:42
17 We all in some form or fashion reported 10:42
18 to the CEO. And then over time, those 10:43
19 positions transitioned to report to me. 10:43
20 Q. Okay. And so, what -- what, in 10:43
21 general, new positions report to you now 10:43
22 that didn't report to you when it -- it 10:43
23 was just the -- the centrally located 10:43

Page 25

1 position?                    10:43
2    A.  That has evolved over -- over    10:43
3 time as well.  It's different today than    10:43
4 it was prior to January.  So it --    10:43
5 there's a change every -- every little    10:43
6 bit as part of this transition plan.  So    10:43
7 for example, the human resources vice    10:43
8 president reports to me now.  That used    10:43
9 to report directly to the CEO.  That's    10:43
10 one example.  The vice president of    10:43
11 operations reports to me now, didn't    10:44
12 report to me then.  Our Lanier campus now    10:44
13 reports to me; it did not before.  It    10:44
14 reported up to the CEO.                10:44
15    Q.  During your time at EAMC, did    10:44
16 you have any compliance responsibility or    10:44
17 have you had any compliance    10:44
18 responsibility?              10:44
19    A.  You mean reporting to me or -- I    10:44
20 don't understand your question.    10:45
21    Q.  Right.  It -- it --        10:45
22    A.  I -- I directly myself did not    10:45
23 have responsibility for compliance.    10:45

Page 26

1    Q.  Okay.  But people who are    10:45
2 responsible for compliance reported to    10:45
3 you during --              10:45
4    A.  No.  Not reported directly to    10:45
5 me.                  10:45
6    Q.  Okay.            10:45
7    A.  No.              10:45
8    Q.  What role have you had in -- in    10:45
9 compliance at EAMC at any point in time    10:45
10 from the time you started up to today?    10:45
11    A.  Well, the compliance department    10:45
12 didn't report to me, but I've been part    10:45
13 of compliance committees of our board.    10:45
14 We have a compliance department.  Does    10:45
15 that answer your question?  I'm -- I'm    10:45
16 not -- as a senior leader, we all have    10:45
17 responsibility to be knowledgeable about    10:45
18 compliance and to.            10:45
19    Q.  All right.  I want to follow up    10:45
20 just a little bit on -- on that because I    10:46
21 know that's a -- that's a broad question.    10:46
22    A.  Uh-huh.            10:46
23    Q.  But you mentioned you've been on    10:46

Page 27

1 compliance committees of the board.  Can    10:46
2 you give me a little more specificity    10:46
3 about when that was and what board that    10:46
4 was?                  10:46
5    A.  Well, what I'm referring to is    10:46
6 our -- obviously, our healthcare    10:46
7 authority board, we have a compliance    10:46
8 committee that reports to the board, just    10:46
9 as we have other committees that report    10:46
10 to the board.  And that is a dedicated    10:46
11 time to discuss whatever may be    10:46
12 happening, whatever we may be monitoring    10:47
13 from a legal and compliance standpoint    10:47
14 for the organization.            10:47
15    Q.  And that would report to the    10:47
16 board of EAMC, that committee?        10:47
17    A.  The -- the board of directors of    10:47
18 the Health Care Authority.        10:47
19    Q.  Okay.              10:47
20    A.  The Health Care Authority board,    10:47
21 which does business as EAMC.        10:47
22    Q.  And is that a committee you said    10:47
23 that you have served on?        10:47

Page 28

1    A.  I don't serve.  I attend.    10:47
2    Q.  You attend?          10:47
3    A.  I attend the compliance    10:47
4 committee meetings.  It's -- it's a --    10:47
5 it's a board committee.  We -- we just    10:48
6 attend those meetings.          10:48
7    Q.  As far as that compliance    10:48
8 committee, do you know when that    10:48
9 committee was first formed, how many    10:48
10 years ago?              10:48
11    A.  I -- I couldn't answer that.    10:48
12 I -- I don't know.          10:48
13    Q.  Do you know whether that    10:48
14 committee maintains minutes?        10:48
15    A.  I -- that's -- that's not in my    10:48
16 purview.  I don't know.  I would --    10:48
17    Q.  Okay.  But you -- how often    10:48
18 would you attend the meetings of the    10:48
19 compliance committee?        10:48
20    A.  I couldn't say for certain.    10:48
21 Maybe twice a year if I was available.    10:49
22    Q.  Who is generally on the -- the    10:49
23 committee, the compliance committee?    10:49

1   A.  The compliance committee is made   10:49
2  up of different members of the board that   10:49
3  may serve on that committee, like --   10:49
4  that's -- periodically a rotating   10:49
5  membership, as board members may change   10:49
6  or committee membership may change.   10:49
7   Q.  How long has -- has EAMC had --   10:49
8  had a compliance department?   10:50
9   A.  I couldn't say specifically.  As   10:50
10 long as -- as long as I recall in my   10:50
11 history there, there's been a compliance   10:50
12 department, compliance officer.   10:50
13  Q.  Have you ever had responsibility   10:50
14 as part of your -- your job   10:50
15 responsibilities to review contracts?   10:50
16  A.  No.   10:50
17  Q.  Do you have any responsibility   10:50
18 to oversee any folks doing sales?   10:51
19  A.  No, I do not.   10:51
20  Q.  Did you have any jobs prior to   10:51
21 the time you started at EAMC?   10:51
22  A.  I did.   10:51
23  Q.  Okay.  Tell me about your   10:51

1  employment history prior to that time.   10:51
2   A.  Okay.  I'm going to work   10:51
3  backwards.  So --   10:51
4   Q.  Okay.   10:51
5   A.  -- before I came to E- --- EAMC,   10:51
6  I was at Brookwood Medical Center for   10:51
7  maybe two to three years in the capacity   10:51
8  of the director of cardiology.  Prior to   10:51
9  that, I worked at UAB in the intensive   10:51
10 care unit.  I worked at Carraway   10:51
11 Methodist in the intensive care units and   10:52
12 cardiology units as a nurse.   10:52
13  Q.  Okay.  And then before that, I   10:52
14 guess it was --   10:52
15  A.  Before that, I was a nursing   10:52
16 assistant.   10:52
17  Q.  -- school?   10:52
18  A.  In school.  Correct.   10:52
19  Q.  Okay.   10:52
20  A.  Yes.   10:52
21  Q.  During your time at EMC--- --   10:52
22 EAMC, do you recall who was the head of   10:52
23 the compliance department during any   10:52

1  given time and -- and generally what   10:52
2  years they were the head of the   10:52
3  compliance department?   10:52
4   A.  I couldn't tell you years or   10:52
5  times.  You know, I've been there a   10:52
6  while.  Janice Baker at -- at one point   10:53
7  was our compliance officer, head of   10:53
8  compliance department.  Different people   10:53
9  in that role.  I can't recall specific   10:53
10 names.  Roben Nutter, the compliance   10:53
11 department reported up to her as our   10:53
12 compliance officer and general counsel,   10:53
13 but at which time point I'm not sure.   10:53
14  Q.  Okay.  So other than those two,   10:53
15 you don't recall any names of who ran the   10:53
16 compliance department?   10:53
17  A.  I think Ria Story at one point   10:53
18 was in the compliance department.  There   10:53
19 have been others, but without looking at   10:53
20 a list, I couldn't tell you.   10:53
21  Q.  Okay.  Do you maintain documents   10:53
22 related to your work at -- at EAMC?   10:54
23  A.  Some, I do.  Yeah.   10:54

1   Q.  And did you search for records   10:54
2  related to this case?   10:54
3   A.  I didn't personally search for   10:54
4  any records for this case.   10:54
5   Q.  And I assume you have a lot of   10:54
6  e-mails and documents related to your   10:54
7  work at -- at EAMC that are on a   10:55
8  computer.  Is that right?   10:55
9   A.  I do.   10:55
10  Q.  Do you also maintain hard copies   10:55
11 of -- of documents and files in your   10:55
12 office?   10:55
13  A.  I typically -- I have some,   10:55
14 but -- but I rely on other departments or   10:55
15 an assistant to help me with those.   10:55
16  Q.  But you haven't actually   10:55
17 searched for any documents related to   10:55
18 this case?   10:55
19  A.  No.   10:55
20  Q.  Have you ever had any training   10:55
21 on the anti-kickback statute?   10:55
22  A.  As just part of our broad   10:55
23 compliance training or seminars I may   10:55

Page 33

1 have attended in my role in the hospital. 10:55
2   Q. Okay. And how far back does 10:55
3 that go? 10:55
4   A. Be hard to venture to guess, but 10:55
5 usually yearly we have -- yearly or twice 10:56
6 yearly we, you know, talk about it. 10:56
7 Obviously, we get education when we 10:56
8 attend meetings through the hospital 10:56
9 association or those -- those sorts of 10:56
10 venues. 10:56
11   Q. And have you been having those 10:56
12 types of training sessions going back 10:56
13 ever since you can remember when you 10:56
14 started working at EAMC? 10:56
15   A. As far as I can recall, yes. 10:56
16   Q. What is your understanding of 10:56
17 the anti-kickback statute? 10:56
18   A. It's very general. I'm not a 10:56
19 lawyer. I -- I defer those questions, 10:56
20 comments to our in-house counsel or 10:56
21 outside counsel. That's not in my -- not 10:56
22 in my everyday work. 10:56
23   Q. Okay. And I -- I'm just asking 10:56

Page 34

1 for your general -- 10:57
2   A. Sure. 10:57
3   Q. -- your general understanding. 10:57
4 I know you're not a lawyer. 10:57
5   A. Right. 10:57
6   Q. Do you have a general 10:57
7 understanding of what the anti-kickback 10:57
8 statute is designed to prevent? 10:57
9   A. It's designed to prevent, the 10:57
10 best of my understanding, for kickback 10:57
11 for referrals or things that are 10:57
12 inappropriate. Again, not my everyday 10:57
13 language. 10:57
14   Q. Have you had any training about 10:57
15 the False Claims Act? 10:57
16   A. Again, within that same sort of 10:57
17 general compliance training. 10:57
18   Q. And I know you -- you mentioned 10:57
19 hospital association meetings, you would 10:58
20 sometimes get that type of training. 10:58
21 What did EAMC provide internally as far 10:58
22 as training on -- on that? 10:58
23   A. We provided internal things we 10:58

Page 35

1 called Otis lessons. They're modules 10:58
2 where those are pushed out to people 10:58
3 throughout the organization to refresh 10:58
4 them on compliance-related matters. 10:58
5 Occasionally, we would bring in outside 10:58
6 speakers for our management team to 10:58
7 review topics to educate them. 10:58
8   Q. And how often would that occur? 10:58
9   A. I couldn't say with certainty. 10:58
10 The modules, I think, were yearly 10:59
11 acknowledgment. But external speakers, 10:59
12 I -- I couldn't say with certainty. 10:59
13   Q. And -- and so, were documents 10:59
14 maintained about what training was given 10:59
15 to employees of EAMC? 10:59
16   A. Do you mean the -- the modules I 10:59
17 mentioned or -- 10:59
18   Q. The modules or any training 10:59
19 materials. 10:59
20   A. Not for me personally. Not with 10:59
21 me personally. But I would imagine we 10:59
22 had that as part of their educational 10:59
23 file. 10:59

Page 36

1   Q. And so, what is your 10:59
2 understanding of what the False Claims 11:00
3 Act is -- is designed to prevent? 11:00
4   A. Generally, it's designed to 11:00
5 prevent submitting false claims for 11:00
6 payment for things you may or may not 11:00
7 have done or done appropriately. That's 11:00
8 my general understanding. 11:00
9   Q. And did you -- did -- did EAMC 11:00
10 provide training to employees on the 11:00
11 Stark law? 11:00
12   A. I can't say specifically I 11:00
13 would -- as part of the entire compliance 11:00
14 overarching training, that would be part 11:00
15 of that. 11:00
16   Q. Okay. What do you know about 11:00
17 the Stark law and -- and the purpose of 11:00
18 the Stark law? 11:00
19     MR. HOOVER: Object to the form. 11:00
20 You may answer. 11:00
21   A. I -- I couldn't really say 11:00
22 specifically. Again, that's -- these are 11:01
23 things I would refer to my counsel. 11:01

Page 37

1   Q.   Tell me, what is Aperian?        11:01
2   A.   Aperian is a department of the    11:01
3   hospital that is a forensic toxicology   11:01
4   lab, clinical lab.                       11:01
5   Q.   And how long has it been a         11:01
6   department of EAMC?                     11:02
7   A.   I couldn't say specifically.       11:02
8   Maybe twelve years.                     11:02
9   Q.   Was that when it was started?      11:02
10  A.   When it was started, it was        11:02
11  started as a forensic toxicology lab.   11:02
12  And then sometime -- again, I can't     11:02
13  remember the specific years -- it       11:02
14  received a name of Aperian, sort of a   11:02
15  brand name, much like we do other       11:02
16  entities within our organization.       11:02
17  Q.   And has it always been a           11:02
18  department of EAMC?                     11:03
19  A.   Well, I believe it was a           11:03
20  separate LLC at one time and then became 11:03
21  a department of the hospital. I -- I'm  11:03
22  not sure. It was -- I know there was    11:03
23  some transition, but always been in some 11:03

Page 38

1   form a department of the hospital.      11:03
2   Q.   Did Aperian have its own           11:03
3   compliance department?                  11:03
4   A.   No.                                11:03
5   Q.   Was that the responsibility of     11:03
6   EAMC?                                   11:03
7   A.   Yes.                               11:03
8   Q.   So EAMC would provide any          11:03
9   compliance training --                  11:03
10  A.   As -- yes. As it would --          11:03
11  Q.   -- for employees of Aperian? Is    11:03
12  that correct?                           11:03
13  A.   For any employees of the           11:03
14  organization, yes.                      11:03
15  Q.   Which would include?               11:03
16  A.   And Aperian being part of the      11:03
17  organization.                           11:03
18  Q.   Okay. So, did employees of         11:03
19  Aperian receive any additional compliance 11:04
20  training other than what the employees  11:04
21  throughout the organization received, or 11:04
22  was it just sort of the same across the  11:04
23  board?                                  11:04

Page 39

1   A.   No. All employees received the     11:04
2   same training as part of the            11:04
3   organization.                           11:04
4   Q.   What role did you have related     11:04
5   to Aperian?                             11:04
6   A.   I had no direct role related to    11:04
7   Aperian.                                11:04
8   Q.   What -- that begs the question.    11:04
9   What -- what indirect role, then, did you 11:04
10  have with Aperian?                      11:05
11  A.   Well, it was -- it was an          11:05
12  overall department of the hospital. It   11:05
13  did not report directly to me. But I was 11:05
14  aware that we had the Aperian lab as a -- 11:05
15  as part of our services.                11:05
16  Q.   Did you keep up with what was      11:05
17  going on at the Aperian lab?            11:05
18  A.   What do you mean, "keep up         11:05
19  with"?                                  11:05
20  Q.   Did you -- were -- were you        11:05
21  provided with updates of how the lab was 11:05
22  performing, for example?                11:05
23  A.   I -- I would be part of a forum    11:05

Page 40

1   that would review the progress of       11:05
2   different departments of the hospital on 11:05
3   a periodic basis. Aperian was one of    11:05
4   those. We would receive reports or      11:06
5   updates.                                11:06
6   Q.   And you said you were a part of    11:06
7   a forum? Is that what you called it?    11:06
8   A.   Oh, it was just -- I called it a   11:06
9   forum.                                  11:06
10  Q.   Okay.                              11:06
11  A.   Yes. I think.                      11:06
12  Q.   Who else was part of the -- the    11:06
13  group that would get those updates?     11:06
14  A.   Well, there would be different     11:06
15  people that were invited to the different 11:06
16  meetings. We called them progress to    11:06
17  goals, where we would review whatever   11:06
18  might be happening in a particular      11:06
19  department. We would -- there would be  11:06
20  several people that were invited, too.  11:06
21  I -- I think I was invited to all sorts 11:06
22  of meetings. Didn't necessarily get the 11:06
23  chance to attend all of them, but.      11:07

Page 41

```
 1    Q.  As it relates to the -- the      11:07
 2  meetings for the department that was    11:07
 3  Aperian, who would typically get invited 11:07
 4  to -- to those meetings?  I know you said 11:07
 5  it was different people for different     11:07
 6  departments.  But as far as Aperian, who  11:07
 7  were the ones that -- that would be       11:07
 8  invited?                    11:07
 9    A.  I'd have to refresh my memory.   11:07
10  Typically, it would be the department     11:07
11  director's responsibility to invite.  And 11:07
12  it would be a few members of the senior   11:07
13  leader team, different departments that   11:07
14  may want to hear the progress of what was 11:07
15  going on with that particular entity.  It 11:07
16  was really more a forum for that       11:08
17  department to provide any updates to what 11:08
18  may be happening in the department, to    11:08
19  have a forum with different members of    11:08
20  the leadership team to review how their   11:08
21  department was doing.             11:08
22    Q.  And you said you did attend some  11:08
23  of those forums about Aperian or those    11:08
```

Page 42

```
 1  meetings?                   11:08
 2    A.  I -- I did attend some of them.  11:08
 3  I couldn't say how many or -- or when,    11:08
 4  but I was invited.              11:08
 5    Q.  Did you ever take notes at any    11:08
 6  of those meetings?             11:08
 7    A.  Not that I recall.  I wouldn't   11:08
 8  have reason to.                11:08
 9    Q.  And why wouldn't you have reason 11:08
10  to?                    11:09
11    A.  It was primarily for them to     11:09
12  report out on how they were doing, and I  11:09
13  would sit and listen.  It was.        11:09
14    Q.  And you mentioned that these     11:09
15  meetings were to talk about progress to   11:09
16  goals.  What -- what were the goals of    11:09
17  Aperian?                   11:09
18        MR. HOOVER:  Object to the form. 11:09
19    A.  I -- I couldn't say the specific 11:09
20  goals for Aperian per se.  But the     11:09
21  meetings covered a variety of things that 11:09
22  were happening in that department.     11:10
23    Q.  Is there an Aperian board?      11:10
```

Page 43

```
 1    A.  Not in the terms of a board of   11:10
 2  directors.  It's just -- there's -- it's  11:10
 3  a meeting.                  11:10
 4    Q.  Okay.  So -- so I just want to   11:10
 5  understand.  So there -- there's no board 11:10
 6  of directors for Aperian, I assume,    11:10
 7  currently because it's a department of    11:10
 8  EAMC.  Is that right?             11:10
 9    A.  No.  Nor would have there been   11:11
10  prior to, a board --            11:11
11    Q.  Okay.                 11:11
12    A.  -- a separate board of        11:11
13  directors.                  11:11
14    Q.  And there wouldn't have been a   11:11
15  board of directors even when it was a    11:11
16  separate LLC?                11:11
17    A.  No.                  11:11
18    Q.  They were still under the       11:11
19  umbrella of EAMC and --          11:11
20    A.  Yes.                 11:11
21    Q.  Would board members of EAMC be   11:11
22  assigned to Aperian?             11:11
23    A.  No.                 11:11
```

Page 44

```
 1    Q.  Do you know how often there      11:11
 2  would be these forums or meetings to     11:11
 3  discuss what was going on at Aperian?    11:11
 4  Were -- were they regularly scheduled, or 11:11
 5  was it just ad hoc or -- I don't want to  11:11
 6  tie you down.  I mean, just explain that  11:12
 7  to me, if you could, to the extent you    11:12
 8  know.                    11:12
 9    A.  To the extent that I recall, we  11:12
10  tried to have those scheduled, but I -- I 11:12
11  cannot recall the frequency.  It may have 11:12
12  been quarterly.                11:12
13    Q.  Did you have any role in setting  11:12
14  up Aperian as a -- as a lab?         11:12
15    A.  No.  I had no direct role in    11:12
16  that.                    11:12
17    Q.  Did you have any role, indirect  11:12
18  as well?                   11:13
19    A.  No, I did not.            11:13
20    Q.  Did you have any role in helping 11:13
21  recruit business for the Aperian lab once 11:13
22  it was set up?                11:13
23    A.  I did not.              11:13
```

Page 45

1    Q.  And never have?          11:13
2    A.  Never have.              11:13
3    Q.  Who was responsible for the          11:13
4  Aperian lab once it got up and running?  11:13
5    A.  Well, those would have been the  11:13
6  department directors.  So it was Trae  11:13
7  Fite as the operational director, Allen  11:13
8  Valaer as the clinical director.       11:13
9    Q.  All right.  I -- I know Mr. Fite  11:13
10  is no longer there.  Who -- who runs it  11:14
11  now?                           11:14
12    A.  Mr. Valaer is the clinical  11:14
13  director.                      11:14
14    Q.  Okay.  Anyone else other than  11:14
15  Mr. Fite and Mr. Valaer from the time  11:14
16  that Aperian started up until now?  11:14
17    A.  For a period of time, there was  11:14
18  a medical director, Jerry McHan.  I think  11:14
19  he was the.                    11:14
20    Q.  And so -- so -- actually, strike  11:14
21  that.                          11:14
22        When the Aperian lab got       11:15
23  started, who was the -- the compliance  11:15

Page 46

1  officer at EAMC?  Who was the compliance  11:15
2  officer or -- or head of the compliance  11:15
3  department at EAMC?            11:15
4    A.  I would have to check when it  11:15
5  started.  I'm not certain.  But I think  11:15
6  at that time, if I -- if I recall  11:15
7  correctly, the compliance officer the  11:15
8  compliance department worked under was  11:15
9  Roben Nutter as the compliance officer.  11:15
10    Q.  And who was the compliance  11:15
11  officer before Roben Nutter?   11:15
12    A.  I believe that would have been  11:15
13  Janice Baker.                  11:15
14    Q.  Do you know if there was any  11:15
15  kind of compliance manual that was  11:16
16  provided to Aperian employees?  11:16
17    A.  Specifically for Aperian  11:16
18  employees?                     11:16
19    Q.  Or for -- I mean, that was  11:16
20  provided to -- I mean, it wouldn't be --  11:16
21  it may be specific to Aperian.  I  11:16
22  don't -- I don't know, but.    11:16
23    A.  Not that I'm aware of.      11:16

Page 47

1    Q.  And was there a compliance  11:16
2  manual that was generally provided to all  11:16
3  employees under the EAMC umbrella?  11:16
4    A.  I'm not aware of a manual, but  11:16
5  there was compliance training available  11:16
6  to all.                        11:16
7    Q.  And when you say "available,"  11:16
8  was it required?               11:16
9    A.  There were modules that were  11:16
10  required, I believe, by all employees of  11:16
11  the organization.  There were standards  11:16
12  of conduct and -- that were available to  11:17
13  all employees upon hire.  There was -- I  11:17
14  believe it alludes to it in the employee  11:17
15  handbook, so that was available to all  11:17
16  employees as well.             11:17
17    Q.  And would that be something that  11:17
18  Roben Nutter would know more specifics  11:17
19  about?                         11:17
20    A.  I'm not sure who would know the  11:17
21  most specifics about that.  I mean, the  11:17
22  compliance department.  We have a  11:17
23  compliance department ultimately that  11:17

Page 48

1  reports up to, through our general  11:17
2  counsel, Roben.                11:17
3    Q.  Okay.  And she -- she is also  11:17
4  the -- the compliance officer for EAMC?  11:17
5  Is that right?                 11:17
6    A.  I know she's our general  11:17
7  counsel, yeah.                 11:17
8    Q.  Okay.  What is her title?  11:17
9    A.  General counsel.          11:17
10    Q.  And that's it?            11:17
11    A.  And compliance officer.  I --  11:17
12  she's my general counsel.      11:18
13    Q.  Okay.                    11:18
14    A.  We have a compliance department  11:18
15  that reports up through her.   11:18
16    Q.  Do you know one way or the other  11:18
17  whether there was any training on  11:18
18  healthcare fraud and abuse that was  11:18
19  provided to employees of Aperian?  11:18
20    A.  I can't say with certainty  11:18
21  what's in the -- what's provided with --  11:18
22  with all in the compliance training, but  11:18
23  I -- I couldn't say with certainty.  11:18

Page 49

1      MR. BATTLE: Let's take a quick   11:18
2   break.                        11:19
3      THE VIDEOGRAPHER: Going off the 11:19
4   record at 11:19 a.m.              11:19
5       (Break taken.)          11:19
6      THE VIDEOGRAPHER: This begins   11:19
7   Disc No. 2 in the deposition of Laura    11:32
8   Grill. We're going back on the record at 11:32
9   11:32 a.m.                    11:32
10     Q. (By Mr. Battle) Ms. Grill,    11:32
11  before the break you had mentioned Ria   11:32
12  Story's name. And remind me what her    11:32
13  role was.                     11:32
14     A. She worked in regulatory      11:32
15  affairs, as I recall, and compliance. I 11:32
16  don't recall specifically her title.   11:32
17     Q. And is she still there?       11:32
18     A. She is not.              11:32
19     Q. When did she leave?          11:32
20     A. I can't say with certainty.    11:32
21     Q. Was it more than a year ago?   11:32
22     A. I would believe so.          11:33
23     Q. Why did she leave?          11:33

Page 50

1      A. I don't know.             11:33
2      Q. And she was part of the      11:33
3   compliance department?            11:33
4      A. Compliance and regulatory     11:33
5   affairs.                      11:33
6      Q. Do you know where she is now?  11:33
7      A. I'm not sure. I think she is a 11:33
8   consultant doing Six Sigma training    11:33
9   perhaps.                      11:33
10     Q. And what -- what does that mean? 11:33
11     A. That is lean methodologies.    11:33
12     Q. And what is that?          11:33
13     A. How to put efficiencies into   11:33
14  your everyday work flow and design.    11:34
15     Q. Do you know if she still lives 11:34
16  in Alabama?                   11:34
17     A. I have no idea.           11:34
18     Q. What is your understanding of  11:34
19  the -- the claims submission process that 11:34
20  Aperian uses for federal payors?       11:34
21     A. I don't. That's really out of 11:34
22  my wheelhouse. As far as the way the    11:34
23  claims are managed or submitted, That   11:34

Page 51

1   would be part of the revenue cycle    11:34
2   billing function.               11:34
3      Q. Do you know who signs the -- the 11:34
4   CMS 1500 form that's submitted to      11:35
5   Medicare for EAMC?               11:35
6      A. I don't know with certainty.   11:35
7   Sam Price, our CFO.              11:35
8      Q. And who would sign the CMS     11:35
9   1500 --                      11:35
10     A. Pardon me.               11:35
11     Q. -- submitted to Medicare for   11:35
12  Aperian?                      11:35
13     A. I can't say with certainty.    11:35
14     Q. Would the people that -- that  11:35
15  sign those forms be under your umbrella 11:35
16  at all of supervision?            11:35
17     A. They would not.           11:35
18     Q. Whose would they be under?     11:35
19     A. I'm not certain. Perhaps the   11:36
20  CFO. That would be Mr. Price.         11:36
21     Q. And who does the CFO report to? 11:36
22     A. The CEO.                11:36
23     Q. Are you familiar with a business 11:36

Page 52

1   named Summit Diagnostics?          11:36
2      A. In the context of -- of this   11:36
3   setting with Aperian. That's -- I know 11:36
4   of the name.                  11:36
5      Q. When did you first become aware 11:36
6   of Summit Diagnostics?            11:36
7      A. I would say as part of attending 11:36
8   the progress to goals meetings for     11:37
9   Aperian.                      11:37
10     Q. And I am saying that -- it's   11:37
11  progress to goals? Is that right?      11:37
12     A. Correct.                11:37
13     Q. Okay. And those were the      11:37
14  committee meetings that you were talking 11:37
15  about earlier in the deposition?       11:37
16     A. Yes, that.               11:37
17     Q. Do you recall about when you   11:37
18  first became aware of Summit Diagnostics, 11:37
19  what year?                    11:37
20     A. I couldn't say with certainty   11:37
21  what -- what year that was.          11:37
22     Q. I know you mentioned that you  11:37
23  first became aware of them in the      11:37

Page 53

1 progress to goals meetings. What -- what 11:37
2 was your understanding of what Summit    11:37
3 Diagnostics did at that time?           11:38
4    A.  You know, I really -- because     11:38
5 that department didn't report to me, I   11:38
6 would just sit and hear the information. 11:38
7 I was not certain exactly what they did. 11:38
8    Q.  At what point did you come --     11:38
9 come to understand what they -- they did? 11:38
10    A.  I don't know that there was a    11:38
11 point I ever said I came to understand   11:38
12 what they did.  I just would hear the    11:38
13 name --                                  11:38
14    Q.  Okay.                            11:38
15    A.  -- Summit as it related with     11:38
16 Aperian in the meetings.                 11:39
17    Q.  Do you have an understanding      11:39
18 that they referred lab business to       11:39
19 Aperian, sitting here today?             11:39
20        MR. HOOVER: Object to the form. 11:39
21    A.  I don't.  I don't.  I'm not sure 11:39
22 what -- that -- that department was not  11:39
23 under my responsibility, so I couldn't   11:39

Page 54

1 say with any certainty.                  11:39
2    Q.  So, is your testimony sitting     11:39
3 here today that you have no idea what     11:39
4 services were provided by Summit for      11:39
5 Aperian?                                  11:39
6    A.  Specifically the services?  No,   11:39
7 I do not.                                 11:39
8    Q.  Generally, did you have an        11:39
9 understanding that they would refer       11:39
10 business to Aperian?                      11:39
11        MR. HOOVER:  Object to the form. 11:39
12    A.  I -- I really was very            11:39
13 tangentially involved with that.  I      11:40
14 don't -- I can't say with any certainty  11:40
15 what the relationship was or what -- what 11:40
16 Summit did specifically.  I don't -- I   11:40
17 cannot.                                  11:40
18    Q.  Did you understand that there     11:40
19 was an agreement between Summit           11:40
20 Diagnostics and Aperian?                 11:40
21    A.  I was not a party to any          11:40
22 agreement between the two.               11:40
23    Q.  I didn't ask whether you were a  11:40

Page 55

1 party to any agreement.  I said --       11:40
2    A.  Okay.                            11:40
3    Q.  -- did you have an understanding 11:40
4 that there was an agreement between       11:40
5 Aperian and Summit?                       11:40
6    A.  In -- in reviewing this           11:40
7 information in preparation, yes.          11:40
8    Q.  So the first time that you        11:40
9 became aware of an agreement that existed 11:40
10 between Aperian and Summit was in         11:40
11 reviewing the information for this        11:40
12 deposition?                              11:40
13    A.  That's correct.                  11:40
14    Q.  You had no knowledge that there  11:40
15 was an agreement between Summit and       11:40
16 Aperian before that time?                11:40
17    A.  As I stated earlier, I was not   11:40
18 part of the Aperian operations.  No.     11:41
19        MR. BATTLE: So, could you read  11:41
20 back my question?                        11:41
21        (Requested portion read.)        11:41
22    Q.  Before the time that you -- let  11:41
23 me just -- I think it may have been the  11:41

Page 56

1 question before.                         11:41
2        I just want to make sure I       11:41
3 understand your testimony, that -- that   11:41
4 it's your testimony that you had no       11:41
5 knowledge that there was an agreement     11:41
6 between Aperian and Summit prior to the   11:41
7 time you prepared for this deposition?    11:41
8    A.  Not specifically an agreement,    11:41
9 no.  I was not aware of specifics of an   11:41
10 agreement.                               11:41
11    Q.  Were you aware that there was a  11:41
12 business relationship prior to the time   11:41
13 you prepared for the deposition between   11:41
14 Summit and Aperian?                      11:42
15    A.  I was aware there was some        11:42
16 relationship.  I did not know the details 11:42
17 of what that was.                        11:42
18    Q.  Did you have any general          11:42
19 understanding of what Summit was doing    11:42
20 for Aperian prior to the time you -- you  11:42
21 prepared for this deposition?            11:42
22    A.  Not specifically, no.            11:42
23    Q.  What about generally?            11:42

Page 57

```
1    A.  Marketing.  I don't know.  I        11:42
2  mean.                   11:42
3    Q.  Marketing for what?              11:42
4    A.  Aperian.                 11:42
5    Q.  Okay.  So you had an          11:42
6  understanding that Summit was going to   11:42
7  provide marketing for Aperian.  When did  11:42
8  you first become aware of that?          11:42
9    A.  I don't know.  I can't say with  11:42
10 any certainty when I first became aware  11:42
11 of it because I -- as I said, I was not  11:42
12 directly involved with the Aperian       11:42
13 business.                 11:42
14   Q.  Did you have any -- any         11:42
15 knowledge about how Summit would be paid  11:43
16 by Aperian for providing marketing for   11:43
17 Aperian?                  11:43
18   A.  I had no knowledge of that.     11:43
19   Q.  When did you first become aware  11:43
20 of how Summit would be compensated for   11:43
21 its services for Aperian in marketing?   11:43
22   A.  I was not made aware of how     11:43
23 Summit was paid.  As I said, I was not   11:43
```

Page 58

```
1  involved with that.              11:43
2    Q.  Okay.  So it's your testimony   11:43
3  that you -- sitting here today, you don't  11:43
4  have any idea how Summit was going to be  11:43
5  compensated for the services it provided  11:43
6  to Aperian?                11:43
7    A.  No.               11:43
8    Q.  Is that correct?              11:43
9    A.  That's correct.             11:43
10   Q.  Do you have any knowledge about  11:43
11 when Summit started performing services  11:44
12 for Aperian?               11:44
13   A.  I do not.              11:44
14   Q.  Do you know whether Summit is   11:44
15 still providing services for Aperian?    11:44
16   A.  I don't believe so, but I'm not  11:44
17 certain.                11:44
18   Q.  Have you ever reviewed any      11:44
19 contracts between Summit and Aperian?    11:44
20   A.  No.  That was not my          11:44
21 responsibility.             11:44
22   Q.  I wasn't asking whether it was  11:44
23 your responsibility.  I was just asking  11:44
```

Page 59

```
1  whether you have or haven't.         11:44
2    A.  No, I have not.            11:44
3    Q.  Let me show you what I'm going  11:44
4  to mark as Exhibit 1.              11:45
5      MR. BATTLE:  Okay.  Yeah.  I    11:45
6  didn't make enough copies, apparently.   11:45
7      MR. McKENNA:  Do you need one    11:45
8  for yourself?                  11:45
9      MR. BATTLE:  Yeah, I've got one  11:45
10 for myself.                11:45
11     MR. McKENNA:  Okay.           11:45
12     MR. BATTLE:  But I don't have    11:45
13 one for --                 11:45
14     MR. McKENNA:  It's okay.  We    11:45
15 haven't been -- we haven't been doing   11:45
16 that.                  11:45
17     MR. HOOVER:  Yeah.            11:45
18     MR. BATTLE:  Maybe y'all can     11:45
19 share.                   11:45
20   Q.  (By Mr. Battle)  Ms. Grill, I've  11:45
21 handed you what I've marked as          11:45
22 Plaintiff's Exhibit No. 1.  Is this an   11:45
23 e-mail at the top from Ken Lott to you?  11:46
```

Page 60

```
1  (Plaintiff's Exhibit 1 was marked for    11:46
2  identification and is attached.)         11:46
3    A.  It is.                 11:46
4    Q.  And what's the date on the      11:46
5  e-mail?                    11:46
6    A.  September 17th, 2008.         11:46
7    Q.  And what is the subject line?   11:46
8    A.  "RE:  Discussion with George    11:46
9  Powell of Summit."              11:46
10   Q.  Was this the first e-mail that  11:46
11 you received related to Summit?          11:46
12   A.  I couldn't say if it was -- what  11:46
13 number e-mail it was.  I get hundreds of  11:46
14 e-mails a day.  I couldn't say if it     11:46
15 was -- what -- what it was.          11:46
16   Q.  Did you read this e-mail at the  11:46
17 time you received it?              11:47
18   A.  I -- I can't recall.          11:47
19   Q.  Do you know who George Powell    11:47
20 is?                      11:47
21   A.  Based on this, he's George      11:47
22 Powell of Summit.               11:47
23   Q.  Looking down to the bottom of   11:47
```

Page 61

1 that e-mail, it looks like it's an e-mail 11:47
2 from mchanj@bellsouth.net. Do you know 11:47
3 who that is? 11:47
4 A. I would assume that's Jerry 11:47
5 McHan. 11:48
6 Q. Okay. And who is Jerry McHan? 11:48
7 A. Jerry McHan was the medical 11:48
8 director, Ph.D., director of Aperian for 11:48
9 a period of time. 11:48
10 Q. And was he the medical director 11:48
11 at this time? 11:48
12 A. Pardon me? 11:48
13 Q. Was he the medical director at 11:48
14 this time, the -- the date of the e-mail? 11:48
15 A. I'm -- I'm not certain. 11:48
16 Probably. Maybe so. I don't know. 11:48
17 MR. HOOVER: Don't guess if you 11:48
18 don't know or don't recall. 11:48
19 A. I don't recall. 11:48
20 Q. And it looks like Ken Lott was 11:48
21 the one who forwarded the e-mail to you. 11:48
22 Who is Ken Lott? 11:48
23 A. Ken Lott is a vice president 11:48

Page 62

1 with East Alabama Medical Center. 11:48
2 Aperian reported to him. 11:48
3 Q. And Aperian reported to him at 11:48
4 this time? 11:49
5 A. Yes. 11:49
6 Q. I want you to turn to page 2 of 11:49
7 Exhibit 1. 11:49
8 (Witness reviews document.) 11:49
9 Q. I know you testified earlier 11:49
10 that Summit provided marketing services 11:49
11 for Aperian. In the second paragraph, 11:49
12 the last sentence there, it says: "The 11:49
13 charge for Summit's gaining a client will 11:50
14 range from 15% to 30% of our 11:50
15 reimbursement based on volume. i.e., the 11:50
16 higher the volume, the higher the 11:50
17 percentage." 11:50
18 Do you see that? 11:50
19 A. I see what you just read, yes. 11:50
20 Q. Was this the -- the first time 11:50
21 you had received any kind of information 11:50
22 about how Summit would be paid for its 11:50
23 services for marketing for Aperian? 11:50

Page 63

1 A. I can't recall. Even -- I see 11:50
2 it's to me, but even reading this e-mail, 11:50
3 it's been -- you know, it's been so long 11:50
4 ago. 11:50
5 Q. Is this an e-mail that you went 11:50
6 back and reviewed in preparation for your 11:50
7 deposition? 11:50
8 A. It is not. 11:50
9 Q. Why were you receiving this 11:50
10 e-mail? 11:50
11 A. Well, obviously, because Ken 11:50
12 Lott sent it to me. You know, I get 11:51
13 e-mails from all over the organization. 11:51
14 Q. Do you know why Ken Lott would 11:51
15 be sending you this information? 11:51
16 MR. HOOVER: Object to the form. 11:51
17 A. No. 11:51
18 Q. At the time, did you raise any 11:51
19 concerns about the compensation 11:51
20 arrangement proposal for Summit to be 11:51
21 paid for its marketing services for 11:51
22 Aperian? 11:51
23 A. Not that I recall. 11:51

Page 64

1 Q. Did you have any concerns with 11:51
2 that type of compensation arrangement? 11:52
3 A. Not that I recall, no. I -- I 11:52
4 was not part of this, why I was copied on 11:52
5 the e-mail. 11:52
6 Q. Okay. Sitting here today, does 11:52
7 this type of compensation -- compensation 11:52
8 arrangement trouble you in any way? 11:52
9 MR. HOOVER: Object to the form. 11:52
10 A. I -- I can't say with certainty 11:52
11 because I was not involved with this. 11:52
12 Q. Okay. Do you think it's 11:52
13 appropriate for a marketing company to be 11:52
14 paid on a percentage basis of volume of 11:52
15 sales? 11:52
16 MR. HOOVER: Object to the form. 11:52
17 A. You know, those were questions I 11:52
18 would get advice on. That's not a 11:53
19 determination I would make independently. 11:53
20 Q. As far as your understanding, 11:53
21 though, do you have any -- I mean, do you 11:53
22 have any concerns about a marketing 11:53
23 company being paid on a percentage of 11:53

Page 65

1  sales when they are providing services to  11:53
2  market for a lab company to get more  11:53
3  business?                              11:53
4      MR. HOOVER: Object to the form.  11:53
5    A.  You know, again, I would defer  11:53
6  that to my in-house counsel.  I wouldn't  11:53
7  make that determination.               11:53
8    Q.  Okay.  And I'm just asking for  11:53
9  your -- your understanding.            11:53
10    A.  Yeah.  I -- I would not have an  11:53
11  understanding, so I would defer that to  11:53
12  my counsel to guide me on that.         11:53
13    Q.  Looking back at the front page  11:54
14  of this e-mail, at the top it looks like  11:54
15  Ken Lott sent it to you but also cc'd  11:54
16  this to others, including Sam Price.  Who  11:54
17  is Sam Price?                          11:54
18    A.  As I mentioned before, Sam is  11:54
19  our chief financial officer.           11:54
20    Q.  Okay.  It looks like he also  11:54
21  sent it to Allen Valaer?               11:54
22    A.  Correct.                        11:54
23    Q.  And who is Allen Valaer again?  11:54

Page 66

1    A.  Allen Valaer was the clinical  11:54
2  director of the Aperian lab.           11:54
3    Q.  And then also Trae Fite?        11:54
4    A.  Yes.  Trae Fite was the director  11:54
5  of operations for Aperian.             11:54
6    Q.  Was there ever any discussion  11:54
7  that you were a part of regarding this  11:55
8  e-mail?                                11:55
9    A.  I don't recall any discussions  11:55
10  specifically related to this e-mail.   11:55
11    Q.  Do you recall whether Mr. Price  11:55
12  expressed any concerns about whether this  11:55
13  proposed compensation arrangement may be  11:55
14  a violation of the law?                11:55
15    A.  If Mr. Price expressed concerns?  11:55
16    Q.  Yes.                           11:55
17    A.  Not that I'm aware of.          11:55
18    Q.  What about Mr. Valaer?         11:55
19    A.  Not that I'm aware of.          11:55
20    Q.  And you don't have any          11:55
21  understanding one way or the other, is  11:55
22  that your testimony, of whether that type  11:55
23  of compensation arrangement may violate  11:55

Page 67

1  the anti-kickback statute?             11:56
2      MR. HOOVER: Object to the form.  11:56
3    A.  Could you repeat that?          11:56
4    Q.  Do you have any understanding  11:56
5  one way or the other as to whether that  11:56
6  type of compensation arrangement for a  11:56
7  marketing company to be paid a percentage  11:56
8  of sales for referring lab business is  11:56
9  violative of the anti-kickback statute?  11:56
10      MR. HOOVER: Object to the form.  11:56
11    A.  Again, I would refer that to my  11:56
12  counsel.                              11:56
13    Q.  Did you refer this e-mail to  11:56
14  your counsel at the time?              11:56
15    A.  I can't recall.                11:56
16    Q.  When these committees, the     11:56
17  progress to goals committee for Aperian  11:57
18  would get together, was that group     11:57
19  advised of what was going on with the  11:57
20  negotiations as it related to entering  11:57
21  into a business relationship with Summit?  11:57
22    A.  Not that I recall specifically.  11:57
23    Q.  Do you have an understanding   11:57

Page 68

1  from any of those meetings or -- or     11:57
2  otherwise about why Aperian would want to  11:57
3  enter into a business relationship with  11:57
4  Summit?                                11:57
5    A.  Not specifically.              11:57
6    Q.  What about generally?           11:58
7    A.  Generally, if it was a good     11:58
8  opportunity, that would be discussed.  11:58
9    Q.  Okay.                          11:58
10    A.  If it added to the services and  11:58
11  business of Aperian.                   11:58
12    Q.  And Aperian was in the lab     11:58
13  business?                             11:58
14    A.  In the laboratory testing     11:58
15  business, correct.                    11:58
16    Q.  And so the marketing would be to  11:58
17  increase the volume of laboratory      11:58
18  testing.  Is that accurate?            11:58
19      MR. HOOVER: Object to the form.  11:58
20    A.  Could you repeat that?          11:58
21    Q.  And so the marketing would be to  11:59
22  increase the volume of laboratory      11:59
23  testing.  Is that accurate?            11:59

Page 69

1     MR. HOOVER: Object to the form. 11:59
2     A.  The objective was not only to    11:59
3  just -- was not to just increase the    11:59
4  volume.  The objective was to get the    11:59
5  appropriate specimens that required    11:59
6  forensic toxicology services to our lab. 11:59
7     Q.  And the department was    11:59
8  interested in making more money; right?  11:59
9  Aperian -- Aperian wanted to make more    11:59
10 money, didn't it?             11:59
11     MR. HOOVER: Object to the form. 11:59
12     A.  I think any service that you    11:59
13 provide wants to cover their expenses and 11:59
14 provide a good product.             11:59
15     Q.  Right.  And so, I mean, you want 11:59
16 your departments to be more profitable.    12:00
17 Is that accurate?             12:00
18     A.  Sure.  You want your departments 12:00
19 to be profitable the right way.             12:00
20     Q.  Right.  Let me show you what    12:00
21 I've marked as Exhibit No. 2.  And this    12:00
22 looks like an e-mail at the top from you    12:00
23 sent on December 3rd, 2008.  Is that    12:00

Page 70

1  correct?             12:00
2  (Plaintiff's Exhibit 2 was marked for    12:00
3  identification and is attached.)             12:00
4     A.  It's correct.  Can I have just a  12:00
5  second to read this, please?             12:00
6     Q.  Sure.             12:00
7     (Witness reviews document.)             12:00
8     A.  Okay.             12:00
9     Q.  And so it looks like the subject  12:00
10 line of that e-mail is "Summit National    12:03
11 Sales Director meeting."  Is that right? 12:03
12     A.  It is.             12:03
13     Q.  And is that -- were you the one  12:03
14 that wrote, "Great job!  You've all done  12:03
15 an outstanding job and this sounds like a 12:03
16 great opportunity," there at the top?    12:03
17     A.  I did.             12:04
18     Q.  Okay.  So you -- do you recall    12:04
19 reading the e-mail below that, where you  12:04
20 responded and said, "You've done an    12:04
21 outstanding job"?             12:04
22     A.  Not until I reviewed this, no.    12:04
23     Q.  Okay.  What does it relate to?    12:04

Page 71

1     A.  It relates to the report from    12:04
2  Mr. Fite about their discussions with    12:04
3  Summit and potential opportunities for    12:04
4  bringing on clients and -- and other    12:04
5  forms of testing.             12:04
6     Q.  Okay.  And that's the same    12:04
7  Summit we talked about earlier from    12:04
8  your earlier e-mail that you didn't    12:04
9  remember?             12:04
10     A.  It is.             12:04
11     Q.  This Exhibit 1?             12:04
12     A.  Obviously.             12:04
13     Q.  Who are you send -- who did you  12:04
14 send this e-mail to?             12:04
15     A.  As it says here, I sent it to    12:04
16 Allen Valaer, Trae Fite, Ken Lott, Sam    12:04
17 Price, with a copy to Michele Hunter and  12:04
18 Jerry McHan.             12:04
19     Q.  Okay.  Are those the same people 12:04
20 that were involved in the e-mail from    12:05
21 September of 2008 involving Summit that's 12:05
22 Exhibit 1?             12:05
23     (Witness reviews document.)             12:05

Page 72

1     A.  In various areas, yes, the same  12:05
2  people.             12:05
3     Q.  I guess with the addition of you 12:05
4  added Michele Hunter and Jerry McHan?    12:05
5     A.  Well, she's on the Exhibit 1    12:05
6  e-mail --             12:05
7     Q.  Okay.             12:05
8     A.  -- as well.             12:05
9     Q.  And so, are you sort of keeping  12:05
10 tabs on what's going on with the    12:05
11 development of the Summit business    12:05
12 relationship at this point?             12:05
13     A.  No, I would not say I'm keeping  12:05
14 tabs on it.  They informed me of what    12:05
15 they were working on, and I sent back an  12:05
16 e-mail that said sounds like encouraging  12:05
17 work.             12:06
18     Q.  But you were aware of what was    12:06
19 going on at this point in time as far as  12:06
20 the development of that relationship with 12:06
21 Summit?             12:06
22     A.  Obviously, through this e-mail,    12:06
23 I think they had had discussions, yes.    12:06

Page 73

1   Q.   Why were you -- if this          12:06
2   department didn't report to you, why were you  12:06
3   you involved in this process with Summit?  12:06
4   A.   Just as a FYI, "This is what my   12:06
5   department is working on." You know,    12:06
6   there are lots of departments within the  12:06
7   hospital. And not all of them report to  12:06
8   me, but they all periodically inform me  12:07
9   of what may be happening in their area.   12:07
10   Q.   Let me show you what I'm going     12:07
11   to -- I have marked as Exhibit 3.      12:08
12   It's an e-mail dated December 22nd, 2008, 12:08
13   that's sent to a number of people,     12:08
14   including you. Is that right?          12:08
15   (Plaintiff's Exhibit 3 was marked for   12:08
16   identification and is attached.)       12:08
17   A.   That's correct.         12:08
18   Q.   Subject, "Board Oversite Meeting  12:09
19   Minutes"?                 12:09
20   A.   Uh-huh.              12:09
21   Q.   What is -- it -- what -- was      12:09
22   there a board that was meeting in      12:09
23   December of 2008 that this relates to?  12:09

Page 74

1   A.   No. As I said earlier, that's     12:09
2   not a board -- board of directors. That  12:09
3   is the committee -- the progress to goals  12:09
4   group that comes together to look at    12:09
5   what's going on in a particular        12:09
6   department. Sometimes that word was used  12:09
7   interchangeably. It could be a board.   12:09
8   We would meet in the boardroom.          12:09
9   Sometimes we would go to the departments. 12:09
10   But they were really progress to goals  12:09
11   meetings about how a department, again,  12:10
12   was performing and give that department  12:10
13   an audience with other members of the   12:10
14   organization.              12:10
15   Q.   Okay. So -- so this related to   12:10
16   a progress to goals committee meeting for  12:10
17   Aperian? Is that your -- what you're    12:10
18   saying?                 12:10
19   A.   Well, it doesn't have "Aperian"  12:10
20   on the subject line. I would need a    12:10
21   minute to read the --         12:10
22   Q.   Okay. Yeah. Feel free to take   12:10
23   whatever time you need.        12:10

Page 75

1   A.   Well, this says it on the second  12:10
2   page, "Aperian."            12:10
3   (Witness reviews document.)    12:10
4   Q.   And were these the -- the       12:10
5   members in the -- the "To" line, the    12:10
6   members of the progress and goals      12:11
7   committee for Aperian?         12:11
8   A.   They were the invitees to the    12:11
9   standing meeting, not necessarily who   12:11
10   was -- who was there. The second page   12:11
11   talks about who was in attendance.      12:11
12   Q.   Okay. Were -- were there        12:11
13   permanent members of this committee?    12:11
14   A.   I wouldn't call them permanent   12:11
15   members. People were routinely invited. 12:11
16   If you could come, you could -- you would 12:11
17   show up. And if there was someone in    12:11
18   particular that they felt like needed to  12:11
19   be included, they would include them on  12:11
20   the invitee list as well.      12:11
21   Q.   And were you routinely invited   12:11
22   to this committee's meetings?  12:11
23   A.   I would say I was routinely      12:11

Page 76

1   invited. I didn't necessarily attend all 12:11
2   of them.                  12:11
3   Q.   Okay. It appears that you        12:11
4   attended this, one based on the second   12:12
5   page where it lists your name as in     12:12
6   attendance. Is that right?     12:12
7   A.   It says "In Attendance." It --   12:12
8   I could have been there, but I don't see  12:12
9   where anybody was missing. So I guess I  12:12
10   was in attendance.            12:12
11   Q.   So, did the -- this committee    12:12
12   that met for the progress and goals for  12:12
13   Aperian keep minutes of its meetings?   12:12
14   A.   I'm not aware of specific        12:12
15   minutes. They would send out agenda     12:12
16   items for us to review in an -- in an   12:12
17   e-mail.                 12:12
18   Q.   Okay. But this says "Meeting    12:12
19   Minutes," does it not?         12:12
20   A.   It does. I don't -- I don't     12:12
21   recall getting routine minutes of -- of  12:12
22   meetings.                 12:12
23   Q.   Okay.                12:12

Page 77

1   A.  But agenda items, I do.        12:12
2   Q.  But this doesn't say "Agenda    12:12
3   Items," does it?                   12:12
4   A.  No, it does not.               12:12
5   Q.  Okay.  So, does it appear to you  12:12
6   that there were meeting minutes for this  12:13
7   particular meeting?                12:13
8   A.  That's what this appears to be,  12:13
9   yes.                               12:13
10  Q.  Who kept the minutes?          12:13
11  A.  I couldn't -- I couldn't say.  12:13
12  That would be Mr. Fite or --       12:13
13  Q.  Do you know who Daniel Bayse or  12:13
14  "Baze" is?  It says, "by Daniel J." --  12:13
15  A.  I have no idea.                12:13
16  Q.  Where would minutes be kept for  12:13
17  the progress and goals committee for  12:13
18  Aperian, if any such minutes exist?  12:13
19  A.  As I said, I'm not aware that  12:13
20  any minutes existed, but those would be  12:13
21  kept with Mr. Fite and Mr. Valaer as the  12:13
22  directors of that department.      12:13
23  Q.  Okay.  Well, we just established  12:13

Page 78

1   that there were meeting minutes for this  12:13
2   particular committee meeting.      12:13
3   A.  For this particular meeting,   12:14
4   yes.                               12:14
5   Q.  And so there may be others,    12:14
6   there may not, but we know that at least  12:14
7   for one of these meetings there were  12:14
8   minutes kept, and I'm just wondering  12:14
9   where -- where they would be kept.  12:14
10  A.  I couldn't answer that.        12:14
11  Q.  If you'll go through the "In   12:14
12  Attendance" list and just tell me who  12:14
13  these people are.  I know some of them  12:14
14  you've already testified to -- to what  12:14
15  they do.  But just to refresh my   12:14
16  recollection about those as well, I'd  12:14
17  appreciate that.                   12:14
18  A.  So, would you like their name  12:14
19  and their title?                   12:14
20  Q.  Yes.                           12:14
21  A.  Okay.  Terry Andrus is the chief  12:14
22  executive officer.  Myself, looking at  12:14
23  2008, I would have been somewhere between  12:14

Page 79

1   a vice president of patient care and  12:14
2   chief operations.  I'm not sure for  12:14
3   certain, again, when that direct changed.  12:14
4   Sam Price, CFO; Ken Lott, vice president;  12:15
5   Allen Valaer, clinical director of  12:15
6   Aperian; Trae Fite, director of   12:15
7   operations, Aperian; Jerry McHan, medical  12:15
8   director; Sarah Gray, IT; Laura Bell,  12:15
9   quality; Carey Owen, facilities and  12:15
10  construction; and Michele Hunter,  12:15
11  Aperian.  I'm not exactly sure of her  12:15
12  title.                             12:15
13  Q.  Do you have any notes related to  12:15
14  this particular meeting?           12:15
15  A.  I do not.                      12:15
16  Q.  If you'll look down the middle  12:15
17  of the second page, it has topics listed  12:15
18  there.  The third one says, "Summit  12:15
19  Moving Forward."                   12:15
20  A.  Uh-huh.                        12:15
21  Q.  Do you know what that relates  12:15
22  to?                                12:15
23  A.  I can't say with certainty, but  12:15

Page 80

1   working with Summit moving forward would  12:16
2   be my --                           12:16
3   Q.  And that would be moving forward  12:16
4   with establishing the business    12:16
5   relationship for Summit to do marketing  12:16
6   for Aperian?                       12:16
7      MR. HOOVER:  Object to the form.  12:16
8   A.  I can't speak with certainty   12:16
9   what it was, but a relationship with  12:16
10  Summit moving forward, based on what it  12:16
11  says here.                         12:16
12  Q.  Okay.  And over there in the   12:16
13  discussion, it says, "it was communicated  12:16
14  that decisions would be made during the  12:16
15  board meetings."                   12:16
16  Do you know what board meetings   12:16
17  that's referring to?  Is that the commit-  12:16
18  -- these committee meetings?       12:16
19  A.  These were the progress to goal  12:16
20  meetings that I referred to earlier.  12:16
21  Q.  Okay.  And so that committee   12:16
22  would make decisions about the Summit  12:16
23  relationship?                      12:16

Page 81

1 A. That committee would make 12:16
2 decisions related to resources that were 12:16
3 needed for Aperian, as it says here. Any 12:16
4 decision, instrumentation, or FTEs would 12:16
5 be made. 12:16
6 Q. Okay. What other types of 12:16
7 decisions did these -- the -- the 12:17
8 committee for Aperian make? 12:17
9 A. I mean, I can't say 12:17
10 specifically. If a question came up that 12:17
11 the department directors needed direction 12:17
12 on, those would be discussed. That was 12:17
13 the forum to discuss those issues. 12:17
14 Q. Would the committee make 12:17
15 decisions on whether to approve entering 12:17
16 into a contract? 12:17
17 A. No. The committee at large 12:17
18 would not. 12:17
19 Q. Would they have a discussion 12:17
20 about that? 12:17
21 A. If it was brought up by the 12:17
22 department directors, they would. 12:17
23 Q. Do you recall whether, during 12:18

Page 82

1 the course of any of those committee 12:18
2 meetings, there was a discussion about 12:18
3 the compensation arrangement for Summit 12:18
4 Diagnostics and the business relationship 12:18
5 with Aperian? 12:18
6 A. Not that I can recall with 12:18
7 certainty. 12:18
8 Q. I'll show you what I've marked 12:18
9 as Plaintiff's Exhibit No. 4. What is 12:19
10 this document? 12:19
11 (Plaintiff's Exhibit 4 was marked for 12:19
12 identification and is attached.) 12:19
13 A. This is a list of agenda items 12:19
14 and persons that are invited to the 12:19
15 Aperian progress to goals meeting. 12:19
16 Q. Okay. And obviously, at the top 12:19
17 it says, "Oversight Board Meeting." 12:19
18 A. Uh-huh. 12:19
19 Q. Is that right? 12:19
20 A. It does. 12:19
21 Q. But it's your testimony that 12:19
22 this wasn't a board meeting, it was a 12:20
23 committee meeting? 12:20

Page 83

1 A. And when I say that, it's not a 12:20
2 board per se, with officers with 12:20
3 responsibilities. It is a department 12:20
4 meeting where we review the progress to 12:20
5 goals of that department. 12:20
6 Q. During the time that Aperian was 12:20
7 a subsidiary, separate LLC from EAMC, did 12:20
8 it have officers? 12:20
9 A. No, it did not. 12:20
10 Q. Did it have board members? 12:20
11 A. Did not. 12:20
12 Q. Okay. So EAMC was -- 12:20
13 A. Was the entity that was 12:20
14 responsible, yes. 12:20
15 Q. Okay. 12:20
16 A. Had department directors. 12:20
17 Q. Okay. And -- and this, is this 12:20
18 an agenda for -- for the meeting? 12:20
19 A. This -- that's what it appears 12:20
20 to be, yes. 12:20
21 Q. I know you had referred to those 12:20
22 earlier. Do you know if there were any 12:20
23 minutes related that -- that were 12:21

Page 84

1 produced related to this meeting? 12:21
2 A. Not that I'm specifically aware 12:21
3 of, no. 12:21
4 Q. Okay. Did you attend this 12:21
5 meeting? 12:21
6 A. I can't answer for certain. I 12:21
7 was invited, as I said earlier. 12:21
8 Q. Okay. And you are listed as an 12:21
9 attendee of this meeting. Is that right? 12:21
10 A. I am listed as an attendee, but 12:21
11 that's a list of invitees. That's not a 12:21
12 present or absent roll. 12:21
13 Q. Do you know who drafted this 12:21
14 oversight board meeting agenda? 12:21
15 A. I do not. I would. 12:21
16 Q. And so, are these essentially 12:21
17 the same people who attended the 12:21
18 committee meeting that we discussed 12:21
19 earlier where we looked at the minutes? 12:21
20 MR. HOOVER: Object. Object to 12:21
21 the form. 12:21
22 A. I would have to compare the two, 12:21
23 but. 12:21

Page 85

1    Q.   Okay.                    12:21
2    A.   Similar.                 12:21
3    Q.   You can compare the two if you    12:21
4  want.                           12:22
5       (Witness reviews document.)    12:22
6    A.   They look the same, minus Mr.    12:22
7  Carey Owen.                     12:22
8    Q.   Looking down through the agenda    12:22
9  items, would -- would these items that    12:22
10 were on the agenda be discussed regularly 12:22
11 at -- at each committee meeting, or    12:22
12 did -- did some -- some of the topics    12:22
13 change?                         12:22
14   A.   I can't remember. I don't think    12:22
15 there were any standing items. It was    12:22
16 just whatever the department needed to    12:22
17 discuss.                        12:22
18   Q.   Were there -- I'm -- I'm looking    12:22
19 down at, for example, number III,    12:23
20 "Dashboard Data (Highlights)." I'm    12:23
21 sorry. Strike that. Let's -- let's go    12:23
22 to number I, "Old Business/Action Items." 12:23
23 It says, "client Progress chart:  Current 12:23

Page 86

1  clients (Michele)."             12:23
2       Would there be documents such as    12:23
3  charts or financial information or things    12:23
4  that would be distributed during this,    12:23
5  these meetings, to -- to look at while    12:23
6  you were talking about agenda items?    12:23
7    A.   I can't say with certainty, but    12:23
8  I imagine she would have referred to, if    12:23
9  she was going to review current clients,    12:23
10 who those clients were.         12:23
11   Q.   Do you ever recall documents    12:23
12 being distributed during these meetings    12:23
13 related to the agenda items?    12:23
14   A.   Distributed or displayed with    12:24
15 a -- on a projector, a PowerPoint sort of 12:24
16 thing.                          12:24
17   Q.   Did you maintain any of the    12:24
18 documents?                      12:24
19   A.   I did not.                12:24
20   Q.   And this is dated April 1st.    12:24
21 Somebody has handwritten in 2009. Do you 12:24
22 know whose handwriting that is?    12:24
23   A.   I do not.                 12:24

Page 87

1    Q.   Under new "Business/Topics of    12:24
2  Discussion," it says, "Summit Update,    12:24
3  Review Client (Spreadsheet)." Do you    12:24
4  recall anything about the Summit update?  12:24
5    A.   I do not.                 12:24
6    Q.   Do you know whether at that time    12:24
7  that an agreement had been reached    12:24
8  between Summit and Aperian for Summit to  12:24
9  do work for Aperian?            12:25
10   A.   I don't.                  12:25
11   Q.   I'll show you what I've marked    12:25
12 as Plaintiff's Exhibit No. 5. Is this an 12:25
13 e-mail to you from Sam Price at the top?  12:25
14 (Plaintiff's Exhibit 5 was marked for    12:25
15 identification and is attached.)    12:25
16   A.   From Sam Price to Ken Lott and    12:25
17 myself.                         12:25
18   Q.   And that's dated April 13th,    12:25
19 2009?                           12:25
20   A.   That's correct.           12:25
21   Q.   So a couple of weeks after the    12:25
22 board or the -- the committee meeting?    12:26
23   A.   If that was -- yes, April 1st.   12:26

Page 88

1    Q.   And the subject line is "Phone    12:26
2  conversation with George Powell." And    12:26
3  that's the Summit CEO? Is that right?    12:26
4    A.   I -- I'm not certain who George    12:26
5  Powell is. May I have a minute to read    12:26
6  this?                           12:26
7    Q.   Sure.                    12:26
8       (Witness reviews document.)    12:26
9    A.   Okay. I'm finished.        12:26
10   Q.   All right. Down at the bottom,    12:27
11 the first full paragraph there, it looks   12:27
12 like an e-mail from Jerry McHan where he   12:27
13 says, "I've spent the last hour talking    12:28
14 with George Powell of Summit    12:28
15 Diagnostics." Does that refresh your    12:28
16 recollection on who George Powell is?    12:28
17   A.   Just George Powell of Summit    12:28
18 Diagnostics.                    12:28
19   Q.   Okay. And you received this    12:28
20 e-mail, didn't you?             12:28
21   A.   Not the initial one from Jerry    12:28
22 McHan, no. It was later forwarded from    12:28
23 Ken Lott to Sam and I.          12:28

Page 89

1  Q.  Second sentence there in the      12:28
2  e-mail from McHan that was forwarded to  12:28
3  you, it says, "George said he had a 2    12:28
4  hour conference call with his sales      12:28
5  people this am and has asked that there  12:28
6  be a broader effort in bringing business 12:28
7  to Aperian."                             12:28
8      Do you know what that relates       12:28
9  to?                                      12:28
10  A.  Not specifically, no, I don't.      12:28
11  Q.  Then down at the bottom, the        12:28
12  last -- or the first sentence of the last 12:28
13  paragraph, "While we all would have liked 12:29
14  to have seen samples flowing in from     12:29
15  Summit accounts, I still feel confident  12:29
16  that the business is coming."            12:29
17      Is that referring to having more    12:29
18  lab business referred to Aperian by      12:29
19  Summit?                                  12:29
20      MR. HOOVER:  Object to the form.    12:29
21  A.  I can't answer with any             12:29
22  certainty what that's related to.        12:29
23  Q.  Do you know why you're still        12:29

Page 90

1  receiving e-mails about what's going on  12:29
2  with Summit at this point?               12:29
3  A.  As it states, "keeping you in        12:29
4  the loop."  Ken has a tendency to forward 12:29
5  a lot of e-mails.  So it was just, again, 12:29
6  FYI.  I get a lot of FYI e-mails from all 12:29
7  over the organization.                   12:29
8  Q.  But clearly, the gist of it is       12:29
9  that Aperian's hoping for more referrals 12:29
10  from Summit.  Is that accurate?         12:29
11      MR. HOOVER:  Object to the form.    12:29
12  A.  I can't --                          12:29
13      MR. HOOVER:  You can answer.        12:30
14  Q.  Did you have any conversations      12:30
15  about this e-mail with Ken or Sam?      12:30
16  A.  Not that I recall.  Again, "Just    12:30
17  keeping you in the loop."               12:30
18  Q.  I'll show you Exhibit No. 6,        12:30
19  which appears to be, at the top, an     12:30
20  e-mail from Ken Lott to Allen Valaer on 12:31
21  April 22nd, 2009, where he cc's you.  Is 12:31
22  that right?                             12:31
23  (Plaintiff's Exhibit 6 was marked for   12:31

Page 91

1  identification and is attached.)         12:31
2  A.  That's what it says.  But if         12:31
3  you'll give me just a minute to read     12:31
4  the -- read down.                        12:31
5      (Witness reviews document.)          12:32
6  A.  Okay.                                12:32
7  Q.  Looks like -- down in the            12:32
8  middle, it looks like Allen is telling   12:32
9  Ken Lott, he says, "I am a bit anxious,  12:32
10  as I know you are, since we've gotten off 12:32
11  to a slower start but I still believe    12:32
12  wholeheartedly that Summit will come thru 12:32
13  for us on this."                         12:32
14      And then Ken is the one that        12:32
15  loops you in and says, "Just keep me     12:33
16  abreast, at least by the end of each     12:33
17  week, as to where we are with Summit."   12:33
18  A.  That's what it says, yes.           12:33
19  Q.  Do you know why Ken Lott was        12:33
20  keeping you in the -- the loop and adding 12:33
21  you back in on what was going on with    12:33
22  Summit?                                  12:33
23  A.  Again, that was -- Ken was          12:33

Page 92

1  keeping me in the loop, He was keeping   12:33
2  Sam in the loop and, again, anybody that 12:33
3  he felt needed to be in- -- informed.    12:33
4  Q.  Okay.                                12:33
5  A.  I have no idea why.                  12:33
6  Q.  And the people he was keeping in     12:33
7  the loop were Jerry McHan, Sam, and you? 12:33
8  A.  That's correct.                      12:33
9  Q.  Did you have conversations with     12:33
10  Ken about this that you recall about what 12:33
11  was going on with Summit --             12:33
12  A.  Not that I can recall.              12:33
13  Q.  -- around this time?                12:33
14  A.  Not that I can recall.              12:33
15  Q.  So it's possible you could have,    12:33
16  you just don't recall?                  12:33
17  A.  I don't recall.                     12:33
18  Q.  Let me show you Plaintiff's         12:33
19  Exhibit No. 7.  So this is about two    12:34
20  weeks after the e-mail that Ken Lott sent 12:34
21  you keeping in the loop.  Looks like it's 12:34
22  dated May the 6th, 2009?  Is that right? 12:34
23  (Plaintiff's Exhibit 7 was marked for   12:34

1  identification and is attached.)    12:34
2     A.  That looks correct.       12:34
3     Q.  This is another document      12:34
4  entitled "Oversight Board Meeting"?     12:34
5     A.  Uh-huh.               12:34
6     Q.  But that's the -- the meeting    12:34
7  that you say was a committee meeting of  12:34
8  the progress to goals committee --      12:34
9     A.  It's a --              12:34
10    Q.  -- for Aperian.  Is that right?  12:34
11    A.  It's the meeting for the Aperian  12:34
12 staff and everybody else on the list to   12:34
13 go over their progress to goals.       12:35
14    Q.  It looks like this is about a     12:35
15 month after the earlier Aperian oversight 12:35
16 board meeting agenda.  Is that right?   12:35
17    A.  It does.              12:35
18    Q.  So, do you think the committee   12:35
19 was meeting closer to on a monthly basis 12:35
20 at this point, as opposed to a quarterly  12:35
21 basis?                  12:35
22    A.  Well, it -- it obviously met     12:35
23 April and May.  I can't say that there    12:35

1  was a regularly scheduled monthly or    12:35
2  bimonthly or quarterly.           12:35
3     Q.  Okay.  And it lists you as an    12:35
4  attendee of this meeting.  Is that right? 12:35
5     A.  It lists me as an invitee.  It    12:35
6  doesn't necessarily mean I was present at 12:35
7  the meeting.                12:35
8     Q.  Okay.  But it says "Attendees,"  12:35
9  and it lists your name; is that right?    12:35
10    A.  It says "Attendees," and it     12:35
11 lists my name.               12:35
12    Q.  Okay.                12:35
13    A.  But that doesn't assume --      12:35
14 assure I was in attendance.  It wasn't a  12:35
15 roll call.                  12:35
16    Q.  Okay.  And are those the same   12:35
17 people that are listed there that were    12:36
18 listed as attendees at the April 2009    12:36
19 meeting?                  12:36
20    (Witness reviews document.)       12:36
21    A.  These are the same people that   12:36
22 are listed, again, listed as attendees,   12:36
23 not necessarily a roll call of who was --  12:36

1  was or was not at the meeting.       12:36
2     Q.  Okay.  And you don't have a     12:36
3  recollection one way or the other whether 12:36
4  you attended either one of those       12:36
5  meetings.  Is that right?          12:36
6     A.  I do not.              12:36
7     Q.  I'm sorry.  I spoke over you.    12:36
8     A.  Yeah.  I -- I do not.         12:36
9     Q.  Sometimes I speak a little too   12:36
10 slowly, so I apologize.           12:36
11       And there under "Old         12:36
12 Business/Action Items," the second one is 12:36
13 "Summit Update (Review Client        12:36
14 Spreadsheet)."  Do you recall anything   12:36
15 about the Summit update or the client    12:36
16 spreadsheet?               12:36
17    A.  I do not.              12:36
18    Q.  Looking down under "Dashboard   12:36
19 Data," it says, "Contribution Margin     12:37
20 (YTD: 666,000, Budgeted: 1,152,000)."   12:37
21 What -- what do those numbers mean?    12:37
22    A.  That would be the contribution   12:37
23 margin for Aperian, for the department,  12:37

1  year to date versus the budgeted amount. 12:37
2  And it looks like March -- I don't know   12:37
3  what that means, "March," if that was in  12:37
4  May.                    12:37
5     Q.  And is that budgeted number for  12:37
6  the -- for the year or is that for budget  12:37
7  year to date as well?            12:37
8     A.  I couldn't -- I couldn't be      12:37
9  certain.                  12:37
10    Q.  And does -- I know I asked this  12:37
11 for -- for each of these.  But you don't  12:38
12 have any written notes related to this   12:38
13 particular meeting, do you?         12:38
14    A.  I do not.  Not that I'm aware    12:38
15 of.                     12:38
16    Q.  Let me show you what I've marked 12:38
17 as Plaintiff's Exhibit No. 8.  This looks  12:38
18 like another agenda for the -- it says    12:38
19 "Oversight Board Meeting," but I know    12:38
20 you've testified it's the project to      12:38
21 goals committee for Aperian.  Is that     12:38
22 right?                   12:38
23 (Plaintiff's Exhibit 8 was marked for    12:38

1 identification and is attached.)     12:38
2    A.  Progress.  Progress, not     12:38
3 project.                  12:38
4    Q.  Progress.  I'm sorry.     12:38
5    A.  Progress, yes.          12:38
6    Q.  And it lists you as an attendee  12:38
7 of this meeting; right?          12:39
8    A.  Again, it lists me as an     12:39
9 attendee, but it's an invitation of who  12:39
10 sits on that committee, not necessarily  12:39
11 who was or was not in attendance.     12:39
12    Q.  Okay.  And that one's dated June  12:39
13 3rd, 2009, so --               12:39
14    A.  That's correct.          12:39
15    Q.  -- approximately a month after  12:39
16 the other one?               12:39
17    A.  Yes.               12:39
18    Q.  So this is the third month in a  12:39
19 row that that committee is meeting?     12:39
20    A.  Yes.               12:39
21    Q.  Do you have a recollection of  12:39
22 that meeting?               12:39
23    A.  I do not.               12:39

1    Q.  And are the -- the people that  12:39
2 are listed as "Attendees," are there --  12:39
3 are those all the same ones that are  12:39
4 listed on the two earlier ones or are  12:39
5 there differences?          12:39
6    A.  It appears so.          12:39
7    (Witness reviews document.)     12:39
8    A.  It's invitees.          12:39
9    Q.  I'll show you Plaintiff's     12:40
10 Exhibit No. 9, which appears to be     12:40
11 another agenda for this oversight board  12:40
12 meeting which was the committee meeting  12:40
13 scheduled August 19th, 2009.          12:40
14 (Plaintiff's Exhibit 9 was marked for  12:40
15 identification and is attached.)     12:40
16    A.  That's correct.          12:40
17    Q.  And again it lists you there as  12:40
18 an attendee, which I know you've told us  12:40
19 that means invitee.  Do you recall that  12:40
20 meeting?               12:40
21    A.  I do not.  Not with any     12:40
22 certainty.               12:40
23    Q.  How often did you attend these  12:40

1 committee meetings for Aperian?     12:41
2    A.  As I was available.  You know,  12:41
3 the -- these were scheduled, and if I --  12:41
4 if I was available, I would attend.  If  12:41
5 not, I wouldn't.               12:41
6    Q.  Do you have any way to track  12:41
7 whether you attended meetings or not?  12:41
8    A.  No.               12:41
9    Q.  And you -- did you take any  12:41
10 notes related to this meeting?     12:41
11    A.  I did not.          12:41
12    Q.  How would you receive these  12:41
13 agendas?  Would it be by e-mail?     12:41
14    A.  I can't recall specifically if  12:41
15 they were e-mailed out or if they were  12:41
16 handed out at the meeting.     12:41
17    Q.  How would you get notice that  12:41
18 there was going to be a meeting?     12:41
19    A.  Perhaps by this being sent out  12:41
20 or an e-mail that the meeting was held on  12:42
21 a certain date.  I can't really recall  12:42
22 from 2009 --               12:42
23    Q.  Okay.               12:42

1    A.  -- when that -- how that was  12:42
2 scheduled.               12:42
3    Q.  And do you know whether any  12:42
4 documents would be distributed ahead of  12:42
5 time for these meetings or not?     12:42
6    A.  I can't recall.          12:42
7    Q.  And was this a committee that  12:42
8 would meet on a regular basis, obviously  12:42
9 going back to April 1st, 2009, but going  12:42
10 forward, would they meet on a regular  12:42
11 basis?               12:42
12    A.  Well, it appears they met three  12:42
13 months in a row and then they skipped a  12:42
14 month and -- and met again.  So as I said  12:42
15 earlier, those meetings could be monthly,  12:42
16 they could be quarterly, they could --  12:42
17 that -- that schedule could vary.     12:42
18    Q.  Okay.  Do you know whether they  12:42
19 continued, this committee continued to  12:43
20 meet in 2010 and 2011 and 2012?     12:43
21    A.  I can't say with any certainty,  12:43
22 no.                  12:43
23    Q.  So on that agenda under number  12:43

1  1, "Old Business/Action Items," under    12:43
2  "Marketing/Client Progress," it says    12:43
3  "Summit Update." Do you know anything    12:43
4  about the Summit update that happened    12:43
5  that day?                    12:43
6      A.  I do not. I can't recall.        12:43
7      Q.  I'll show you what I've marked    12:43
8  as Exhibit No. 10. Have you ever seen    12:44
9  this document before?            12:44
10  (Plaintiff's Exhibit 10 was marked for    12:44
11  identification and is attached.)        12:44
12      (Witness reviews document.)        12:44
13      A.  Not that I recall.            12:44
14      Q.  So it's possible; you just can't    12:44
15  recall one way or the other. Is that    12:44
16  correct?                    12:44
17      A.  I don't recall seeing this        12:44
18  document.                    12:44
19      Q.  Do you recall ever discussing    12:44
20  the terms of an agreement between Aperian 12:44
21  Laboratory Solutions, a service of East    12:45
22  Alabama Medical Center, and Summit        12:45
23  Diagnostics?                12:45

1      A.  I do not.                12:45
2      Q.  Does this refresh your        12:45
3  recollection as to whether Summit        12:45
4  Diagnostics had an agreement with        12:45
5  Aperian?                    12:45
6      A.  It appears to be an agreement    12:45
7  between East Alabama Medical Center and    12:45
8  Summit Diagnostics is -- is all I can    12:45
9  speak to.                    12:45
10      Q.  And you don't recall any        12:45
11  discussion about the terms of this     12:45
12  agreement before it was entered into?    12:45
13      A.  I do not.                12:45
14      Q.  And you'll see paragraph number    12:45
15  2 says "compensation." It says,        12:46
16  "Client," which is East Alabama Medical    12:46
17  Center, "will pay Contractor," which is    12:46
18  Summit, "a fee for services rendered    12:46
19  under the Agreement as set forth in        12:46
20  attached Exhibit A." That's that last    12:46
21  page, "Compensation." It shows that    12:46
22  there will be a base amount of 15 ·       12:46
23  percent. And then if volumes went up,    12:46

1  there would be a 20 percent commission    12:46
2  for a certain number of specimens sent    12:46
3  per month. You see that?            12:46
4      A.  I do.                    12:46
5      Q.  And if it was 800 to 1,000, it    12:46
6  would go up to a 20 percent commission?    12:46
7  You see where that is?            12:46
8      A.  I do.                    12:46
9      Q.  If it was between 1,001 and        12:46
10  1,200, the commission would be 22        12:47
11  percent?                    12:47
12      A.  I see that.                12:47
13      Q.  And then over 1,200, it would be  12:47
14  28 percent?                    12:47
15      A.  I see that.                12:47
16      Q.  And so, is that consistent with    12:47
17  the e-mail that you got back in September 12:47
18  of '08 where they talked about the        12:47
19  commission compensation proposal that    12:47
20  Summit had to be paid a commission        12:47
21  between 15 and 30 percent --            12:47
22      A.  Is that an e-mail --            12:47
23      Q.  -- for its services?            12:47

1      A.  -- that you've already given me?    12:47
2      Q.  Yes. It's Exhibit 1. It's that    12:47
3  second page.                12:47
4      MR. HOOVER: Object to the form.    12:47
5      A.  Can you repeat the question?        12:47
6  I'm not sure what you're asking me.    12:47
7      Q.  Yeah. Is -- is the structure    12:47
8  about paying a percentage of commissions  12:47
9  as a percentage of referrals in this    12:47
10  agreement consistent with what Summit had 12:47
11  proposed back almost a year before that?  12:48
12      A.  I can't -- I can't speak        12:48
13  specifically to that. I see there's a    12:48
14  referral where it says a range, but I --  12:48
15  I was not aware or a party to the        12:48
16  contract.                    12:48
17      Q.  So on Exhibit 1, second page --    12:48
18      A.  Right.                    12:48
19      Q.  -- second paragraph, that last    12:48
20  sentence, it says, "The charge for        12:48
21  Summit's gaining a client will range from 12:48
22  15% to 30% of our reimbursement based on  12:48
23  volume. i.e., the higher the volume the   12:48

Page 105

1  higher the percentage."        12:48
2     A.  Correct. I just said I saw that 12:48
3  range --                       12:48
4     Q.  Okay.                   12:48
5     A.  -- on there.            12:48
6     Q.  And -- and that concept is what 12:48
7  was finally included in the agreement 12:49
8  between East Alabama Medical Center and 12:49
9  Summit; correct?               12:49
10       MR. HOOVER: Object to the form. 12:49
11    A.  I -- I can't answer that. I was 12:49
12 not party to the contract.     12:49
13    Q.  Well, you can read --   12:49
14    A.  I can refer to it in the e-mail. 12:49
15 Yes, I can read. Of course, I can read. 12:49
16    Q.  I mean, you can read the 12:49
17 contract is what I'm saying.   12:49
18    A.  Right. I can read --    12:49
19    Q.  Exhibit A to the contract. 12:49
20    A.  -- the contract.        12:49
21    Q.  And obviously, the higher the 12:49
22 volume of specimens that were being 12:49
23 referred to East Alabama and Aperian by 12:49

Page 106

1  Summit, the higher the percentage; right? 12:49
2        MR. HOOVER: Object to the form. 12:49
3     A.  Again, I was not party to this 12:49
4  contract. And yes, I can read, but I was 12:49
5  not a part of drafting or approving this 12:49
6  contract.                      12:49
7     Q.  Right. I didn't say that you 12:49
8  were. I'm saying that that same concept 12:49
9  --                             12:49
10    A.  Right. There -- there is a 12:49
11 range of -- of specimens, or collections, 12:49
12 specimens with percentages associated 12:50
13 with them, yes.                12:50
14    Q.  Right. And the higher the 12:50
15 volume of specimens that are referred, 12:50
16 the higher the commission percentage gets 12:50
17 paid?                          12:50
18    A.  There is a higher -- there is a 12:50
19 higher percentage, yes.        12:50
20    Q.  Okay. That's -- that's all I 12:50
21 was asking.                    12:50
22       At any time between the time 12:50
23 that you received the e-mail in September 12:50

Page 107

1  of 2008 where Summit was going to -- 12:50
2  where Summit proposed that it get paid 12:50
3  this higher commission for higher volume 12:50
4  of referrals, and the time this contract 12:50
5  came about in August of 2009, almost a 12:50
6  year later, was there any discussion 12:50
7  about whether this commission structure 12:50
8  might violate the law?         12:50
9     A.  Not that I was a party to, no. 12:50
10    Q.  Okay.                    12:50
11       MR. BATTLE: We can take a break 12:50
12 to switch out tapes.           12:51
13       THE VIDEOGRAPHER: We're going 12:51
14 off the record at 12:51 p.m.   12:51
15       (Break taken.)           12:51
16       THE VIDEOGRAPHER: This     13:44
17 begins Disc No. 3 in the deposition 13:44
18 of Laura Grill. We're going back on 13:44
19 the record at 1:44 p.m.        13:44
20    Q.  (By Mr. Battle) Ms. Grill, 13:44
21 you had mentioned Ria Story earlier. 13:44
22 Is Ms. Story a lawyer?         13:45
23    A.  No, she's not.          13:45

Page 108

1     Q.  As it relates to the last 13:45
2  exhibit that I gave to you, the Summit 13:45
3  Diagnostics contract with Aperian and 13:45
4  EAMC, do you know who was involved in the 13:45
5  negotiation of that contract?  13:45
6     A.  I do not.               13:45
7     Q.  And who signed that contract on 13:45
8  behalf of EAMC and Aperian?    13:45
9     A.  That was Ken Lott.       13:45
10    Q.  And did you ever have any 13:45
11 conversations between that e-mail of 13:46
12 September 2008, which was Exhibit No. 1, 13:46
13 about Summit and the date the contract 13:46
14 was entered into with Ken Lott about 13:46
15 the -- the terms of this contract? 13:46
16    A.  Not that I recall.       13:46
17    Q.  Let me show you what I've marked 13:46
18 as Plaintiff's Exhibit No. 11. This 13:46
19 looks like an e-mail from Ken Lott to you 13:46
20 and some other people as well, dated 13:47
21 January 25th, 2010. Is that right? 13:47
22 (Plaintiff's Exhibit 11 was marked for 13:47
23 identification and is attached.) 13:47

Page 109

1    A.  That's correct.          13:47
2    Q.  And then -- and I know you told  13:47
3  me who Sam Price and Terry Andrus is.  13:47
4  Who is Dennis Thrasher?          13:47
5    A.  Dennis Thrasher is our      13:47
6  controller.          13:47
7    Q.  Okay.  And what about Lorri    13:47
8  Lloyd?          13:47
9    A.  Lorri Lloyd is one of our     13:47
10  accountants.          13:47
11    Q.  Okay.  Subject line says,     13:47
12  "Weekly Summary Highlights."  What --  13:47
13  what -- what is this, this report that's  13:47
14  being sent to you on January 25th, 2010?  13:47
15    A.  May I have just a minute to read  13:47
16  it?          13:47
17    Q.  Sure.          13:47
18    (Witness reviews document.)       13:47
19    A.  Okay.          13:47
20    Q.  So, what was the purpose of this  13:47
21  report that was forwarded to you?    13:48
22    MR. HOOVER:  Object to the form.  13:48
23    A.  I'm not sure of the specific     13:48

Page 110

1  purpose.  It appears that it's a --      13:48
2  Michele giving a volume report to Ken,   13:48
3  that Ken then forwarded to a host of     13:48
4  other individuals.          13:49
5    Q.  Did you get these on a regular   13:49
6  basis, these types of updates?       13:49
7    A.  I can't recall.          13:49
8    Q.  And do you know why Ken Lott    13:49
9  would be forwarding this to you among the  13:49
10  others?          13:49
11    A.  I can't say as to why Ken would  13:49
12  be sending the e-mails, but Ken tended to  13:49
13  send -- forward a lot of e-mails, as I    13:49
14  said, to keep people --          13:49
15    Q.  Were you --          13:49
16    A.  -- in the loop.          13:49
17    Q.  -- interested at the time in the  13:49
18  volume of business that Summit was      13:49
19  referring to Aperian and EAMC?       13:49
20    A.  I don't recall having a specific  13:49
21  interest, no.          13:49
22    Q.  Prior to this contract with     13:49
23  Summit, do you know what Aperian's    13:50

Page 111

1  sources of business for toxicology    13:50
2  confirmation testing were?          13:50
3    A.  Pain clinic samples, drug     13:50
4  testing samples was my understanding.   13:50
5    Q.  Did the volume of business go up  13:50
6  after Summit got involved sending     13:50
7  referrals to Aperian?          13:50
8    A.  I don't know specifically how   13:50
9  the volumes went up, but I do know that  13:50
10  it -- it appeared the volumes did go up  13:50
11  if they were appropriate volumes,     13:50
12  appropriate specimens.          13:50
13    Q.  And are there documents that    13:50
14  would show that, that Aperian would have?  13:50
15    A.  I'm not aware of documents they  13:50
16  would have.          13:50
17    Q.  Do you know who Jannie Chapman  13:50
18  is?          13:50
19    A.  I've heard her name.          13:50
20    Q.  Other than hearing her name, do  13:51
21  you know anything about her?         13:51
22    A.  Not directly, but through review  13:51
23  of this case.  I was never involved with  13:51

Page 112

1  Jannie.          13:51
2    Q.  Okay.  What about Compass     13:51
3  Laboratories?  Have you heard of them?  13:51
4    A.  Again, just in preparation for  13:51
5  this.          13:51
6    Q.  Did you have any involvement    13:51
7  with -- or strike that.          13:51
8      Did you ever have any         13:51
9  conversations with Jannie related to her  13:51
10  business doing business with Aperian?   13:51
11    A.  Not that I recall.          13:51
12    Q.  Have you ever heard of a company  13:51
13  called Total Diagnostics Solutions?    13:52
14    A.  In reviewing this information.  13:52
15    Q.  Other than in reviewing this    13:52
16  information, have you ever heard of Total  13:52
17  Diagnostics Solutions, LLC?          13:52
18    A.  Not that I recall.          13:52
19    Q.  Let me show you what I've marked  13:52
20  as Plaintiff's Exhibit 12.  This appears  13:53
21  to be an e-mail from Ken Lott to you on  13:53
22  August 11th, 2011, forwarding Summit    13:53
23  daily volumes.  Is that accurate?    13:53

Page 113

1  (Plaintiff's Exhibit 12 was marked for   13:53
2  identification and is attached.)        13:53
3     A.  That's what it appears to be,    13:53
4  yes.                                     13:53
5     Q.  Okay.  Did he often send you     13:53
6  Summit daily volumes?                    13:53
7     A.  I wouldn't say Summit daily       13:53
8  volumes, that I can recall, but Ken would 13:53
9  forward e-mails often concerning many    13:53
10 departments, not just Aperian.           13:53
11    Q.  Okay.  Down at the bottom of the  13:53
12 front page, it looks like there's an     13:54
13 e-mail from Trae Fite to Ken Lott about a 13:54
14 company called Total Diagnostic          13:54
15 Solutions.  Sounds like the company is   13:54
16 very similar to Summit.  Does that       13:54
17 refresh your recollection about Total    13:54
18 Diagnostic?                              13:54
19    A.  It -- it really does not.  But    13:54
20 if you'll allow me a minute, I'll just   13:54
21 read --                                  13:54
22    Q.  Sure.                             13:54
23    A.  -- the e-mail.                    13:54

Page 114

1     (Witness reviews document.)           13:54
2     A.  Okay.                             13:54
3     Q.  Are you aware that Aperian and    13:54
4  EAMC entered into an agreement with Total 13:56
5  Diagnostic later on to perform services  13:56
6  similar to those that Summit was         13:56
7  performing?                              13:56
8     A.  Not that I recall.                13:56
9     Q.  Ken Lott says in his e-mail,      13:56
10 "Here's something positive brewing, Let's 13:56
11 pray."  Did y'all talk about the subject 13:56
12 matter of this e-mail after he sent that 13:56
13 e-mail to you?                           13:56
14    A.  Not that I remember.              13:56
15    Q.  Let me show you what I've marked  13:56
16 as Exhibit 13.  For some reason, I only  13:56
17 have -- no.  There it is.  Sorry.        13:57
18    This is a contract dated              13:57
19 September 1, 2011, between Compass and   13:57
20 Aperian.  Have you ever seen this        13:57
21 document before?                         13:57
22 (Plaintiff's Exhibit 13 was marked for   13:57
23 identification and is attached.)         13:57

Page 115

1     A.  I have not.                       13:57
2     Q.  Did you review it in preparation  13:57
3  for your deposition?                     13:57
4     A.  I reviewed that there was a       13:57
5  contract at that time, but not the       13:57
6  contract itself.                         13:57
7     Q.  Did you have any input related    13:57
8  to the terms of this contract?           13:57
9     A.  I did not.                        13:57
10    Q.  Did you have any knowledge about  13:57
11 the terms being discussed that are       13:57
12 contained in this contract prior to the  13:57
13 date it was entered into?                13:57
14    A.  Not that I recall.                13:57
15    Q.  Are you aware of anybody          13:57
16 expressing any concerns about the terms  13:58
17 of this contract, and in particular, the 13:58
18 compensation aspect of this contract?    13:58
19    A.  Not that I recall.                13:58
20    Q.  And who signed this contract on   13:58
21 behalf of Aperian?                       13:58
22    A.  On behalf of the Health Care      13:58
23 Authority is Sam Price.                  13:58

Page 116

1     Q.  Okay.  And then on page 7, under  13:58
2  "Subcontractor," for Aperian, was that   13:58
3  also Sam Price who signed this?          13:58
4     A.  I don't have a page 7.  I         13:58
5  have -- page 6 of 6 is my last page.     13:59
6     Q.  Maybe I have -- no.  I've got --  13:59
7       MR. HOOVER:  I've got the whole     13:59
8  thing.  Here.                            13:59
9     A.  Unless I -- it just goes through  13:59
10 6 of 6 unless they're out of order.      13:59
11      MR. BATTLE:  There -- it looks      13:59
12 like there's --                          13:59
13      MR. HOOVER:  Six of 6 would be      13:59
14 the business associate agreement, so look 13:59
15 for that.                                13:59
16      THE WITNESS:  I apologize.          13:59
17    A.  Okay.  Page 7, you said?          13:59
18    Q.  Right.  And who's signing on      13:59
19 behalf of Aperian there?                 13:59
20    A.  Sam Price.                        13:59
21    Q.  Okay.  Let me show you Exhibit    13:59
22 14, which is a contract dated March 1st, 14:00
23 2012, between Total Diagnostic Solutions 14:00

Page 117

1  and Aperian Laboratory Solutions, LLC.    14:00
2  Have you ever seen this document, this    14:00
3  contract?                           14:01
4  (Plaintiff's Exhibit 14 was marked for    14:01
5  identification and is attached.)        14:01
6     A.  No.                        14:01
7     Q.  Were you involved at all in any    14:01
8  discussion of the terms that are        14:01
9  contained in this contract?            14:01
10    A.  I was not.                    14:01
11    Q.  Do you know why this contract    14:01
12  was -- was entered into?              14:01
13    A.  I do not.                    14:01
14    Q.  Did you ever get any reports of    14:01
15  any referrals of business being made by    14:01
16  either Compass Laboratories or Total    14:01
17  Diagnostic Solutions to Aperian?        14:01
18    A.  If they were presented in the    14:01
19  form of the progress to goals, which I    14:01
20  mentioned earlier, with the agendas. But 14:01
21  I -- I'm not certain.                14:01
22    Q.  Do you know how Total Diagnostic  14:01
23  Solutions was to be paid under this    14:01

Page 118

1  agreement?                        14:02
2     A.  I do not.                    14:02
3     Q.  And same question for the        14:02
4  earlier agreement with Compass          14:02
5  Laboratories?                       14:02
6     A.  I do not.                    14:02
7     Q.  And who signed this agreement on 14:02
8  behalf of Aperian?                   14:02
9     A.  On page 7, that would be Ken    14:02
10  Lott.                            14:02
11    Q.  Okay.  And then, who signed the  14:02
12  HIPAA business associate -- association  14:02
13  agreement for the Health Care Authority? 14:02
14    A.  Roben Nutter.                  14:02
15    Q.  Do you know when Ms. Nutter    14:02
16  started working for EAMC?              14:02
17    A.  Original start date, I don't. I  14:02
18  don't know.                        14:02
19    Q.  I'll mark this as Exhibit 15.    14:02
20  Have you ever seen this Colaborate report 14:03
21  dated June 13th, 2012?              14:03
22  (Plaintiff's Exhibit 15 was marked for  14:03
23  identification and is attached.)        14:03

Page 119

1     A.  Not that I recall.            14:03
2     Q.  Are you familiar with this        14:03
3  Colaborate report?                   14:03
4     A.  I've heard through preparation    14:03
5  of this report, yes.                  14:03
6     Q.  What is your understanding of    14:03
7  what this report is about?            14:03
8     A.  As it says on the first page,    14:03
9  "Laboratory Compliance and Billing        14:03
10  Advisory Services."                   14:03
11    Q.  And do you know what            14:03
12  recommendations were made?            14:03
13    A.  I do not.                    14:03
14    Q.  Did you ever have any            14:03
15  discussions with anyone at EAMC or      14:04
16  Aperian about the recommendations in this 14:04
17  report?                           14:04
18    A.  Not that I can recall.          14:04
19    Q.  Were you at any meetings where  14:04
20  this report was discussed?            14:04
21    A.  Not that I can recall.          14:04
22    Q.  Do you know whether Aperian or  14:04
23  EAMC changed any of their business    14:04

Page 120

1  practices after this report was        14:04
2  published?                        14:04
3     A.  Not that I can address.  I      14:04
4  don't -- I'm not aware.              14:04
5     Q.  Do you know who received a copy  14:04
6  of this report at EAMC and Aperian?    14:05
7     A.  I couldn't say.                14:05
8       MR. HOOVER:  Can I just get      14:05
9  something on the record?  I think what  14:05
10  you're -- what you've attached as Exhibit 14:05
11  15 is more than just the report.  I think 14:05
12  you -- and I just want to make sure the  14:05
13  record's clear.  If I misunderstood -- if 14:05
14  I misspeak, let me know -- is -- is the  14:05
15  report.  But then there's also, it looks  14:06
16  like -- I know the -- it may have been  14:06
17  the engagement letter attached to it,    14:06
18  behind it, I mean.  And that's fine --  14:06
19       MR. BATTLE:  Yeah.              14:06
20       MR. HOOVER:  -- that it's        14:06
21  attached to it.  I think let's just see  14:06
22  what it is, because there's -- the first  14:06
23  couple of pages is dated June 13th, 2012. 14:06

Page 121

1 And then -- let's see. So maybe page 7, 14:06
2 according to my count, is a letter dated 14:06
3 May 14th, 2012? 14:06
4     MR. BATTLE: Okay. I see that. 14:06
5     MR. HOOVER: And then there's a 14:06
6 biography attached to it. So I just -- I 14:06
7 mean, with that. Just making sure the 14:06
8 record's clear as to what all is in this 14:06
9 document. 14:06
10     MR. BATTLE: Sure. 14:06
11     MR. HOOVER: Okay. 14:06
12     Q. (By Mr. Battle) Let me show you 14:06
13 what I've marked as Exhibit No. 16. It 14:07
14 says "Colaborate Summary." Have you ever 14:07
15 seen that document before? 14:07
16 (Plaintiff's Exhibit 16 was marked for 14:07
17 identification and is attached.) 14:07
18     A. Not that I recall. 14:07
19     Q. Are you familiar with the 14:07
20 statements in that summary? 14:07
21     A. In reading them now? 14:07
22     Q. Before now. 14:07
23     A. Again, not that I recall. 14:07

Page 122

1     Q. The first one says, "Review 14:07
2 contracts with marketing companies (TDS 14:08
3 and Summit)." Those are those 14:08
4 agreements -- 14:08
5     A. Contracts you referred to. 14:08
6     Q. -- we talked to -- talked about 14:08
7 earlier. It says, "Currently based on % 14:08
8 of revenue." It says, "Change to flat 14:08
9 fee." Do you know why? 14:08
10     A. Based off the recommendations of 14:08
11 the review. I'm -- that's my assumption. 14:08
12     MR. HOOVER: Don't. Don't 14:08
13 assume. 14:08
14     Q. Do you know why that 14:08
15 recommendation would be made? 14:08
16     A. I don't. 14:08
17     Q. Do you know whether the 14:08
18 contracts with TDS and Summit were 14:08
19 changed to a flat-fee basis? 14:08
20     A. Based on these that you were -- 14:08
21     Q. Any -- I mean, the relationship 14:09
22 after this Colaborate report came out, do 14:09
23 you know whether any of the contracts 14:09

Page 123

1 were changed such that the compensation 14:09
2 paid to TDS or Summit was based on a flat 14:09
3 fee as opposed to a percentage of volume 14:09
4 of sales? 14:09
5     A. Well, based on what you just 14:09
6 showed me, they did change. Does that -- 14:09
7 I'm not sure what you're asking me. 14:09
8     Q. Okay. When did the Summit 14:09
9 contract change to a flat fee? 14:09
10     A. I -- I don't know specifically. 14:09
11 If it's dated on here, if that's the 14:09
12 change, then I'm -- I'm assuming that's 14:09
13 when the contract changed. 14:09
14     Q. Okay. I thought you didn't know 14:09
15 anything about what was in those 14:09
16 contracts. 14:09
17     A. I said I was not a part to the 14:09
18 contracts, but I said that was -- I'm 14:09
19 assuming when they would have changed. 14:09
20     Q. Are you familiar with the 14:09
21 compensation structure in those 14:09
22 contracts? 14:09
23     A. Based on what I just looked at, 14:09

Page 124

1 yes. 14:10
2     Q. Okay. And what is the 14:10
3 compensation structure in the Summit 14:10
4 contract? 14:10
5     A. In the Summit contract? 14:10
6     Q. Right. Summit is the first one 14:10
7 listed -- or not the first, but one of 14:10
8 the two listed here. 14:10
9     A. Yeah. They're both listed. I 14:10
10 thought that's what you were referring 14:10
11 to. I'm sorry. I misunderstood what you 14:10
12 were asking me. 14:10
13     Q. Do you understand that Summit is 14:10
14 a company that's separate and apart from 14:10
15 TDS? 14:10
16     A. I do now, yes. 14:10
17     Q. Okay. And Summit's the one 14:10
18 where you were getting the e-mails with 14:10
19 updates along the way that we looked 14:10
20 at -- 14:10
21     A. Yes. 14:10
22     Q. -- earlier. And they were the 14:10
23 ones where they got paid a percentage of 14:10

1   the volume --                    14:10
2       A.   A percentage, yes.           14:10
3       Q.   -- of sales.  And it's your   14:10
4   testimony that that contract changed to a 14:10
5   flat fee contract?                14:10
6       A.   On the Summit one?          14:10
7       Q.   Right.                  14:10
8       A.   I can't say specifically on    14:10
9   Summit without looking back on here.  But 14:10
10  yes, the last one was on -- that we     14:10
11  reviewed prior to I think lunch was a    14:10
12  percentage.                       14:11
13      Q.   Okay.  And the TDS contract was 14:11
14  changed to a flat fee?  Is that --      14:11
15          MR. HOOVER:  TDS being Exhibit 14:11
16  No. 14?                          14:11
17          MR. BATTLE:  Right.          14:11
18          MR. HOOVER:  Yeah.           14:11
19          MR. BATTLE:  I think that's    14:11
20  right.                            14:11
21      A.   I would have to compare the -- 14:11
22  the two.                          14:11
23      Q.   Okay.  You -- you don't have to 14:11

1   go through.  I really want to know if you 14:11
2   have independent knowledge about any    14:11
3   change -- excuse me -- any changes that  14:11
4   were made and -- and why they may have   14:11
5   been made.                        14:11
6       A.   No, I don't have independent   14:11
7   knowledge of why.  I was answering your  14:11
8   question based off what this says.      14:11
9       Q.   And were you part of any     14:11
10  meetings where there were discussions   14:12
11  about changing the -- the way          14:12
12  compensation was paid to Summit or      14:12
13  Compass or TDS?                    14:12
14      A.   Not that I recall.          14:12
15          MR. BATTLE:  That was Exhibit  14:12
16  16?                              14:12
17          MR. HOOVER:  Seventeen.       14:12
18          MR. BATTLE:  Seventeen.       14:12
19      Q.   And this is an agreement dated  14:12
20  December 1st, 2012, between Compass and  14:12
21  Aperian.  Are you familiar with this    14:13
22  agreement?                        14:13
23  (Plaintiff's Exhibit 17 was marked for   14:13

1   identification and is attached.)        14:13
2       A.   I am not.                 14:13
3       Q.   Did you have any discussions   14:13
4   regarding the negotiation of this       14:13
5   agreement?                        14:13
6       A.   I did not.                14:13
7       Q.   Or any discussion with anyone  14:13
8   about the terms of this agreement?      14:13
9       A.   I was not.                14:13
10      Q.   And who signed this agreement on 14:13
11  behalf of Aperian?                  14:13
12      A.   Sam Price.                14:13
13      Q.   How often did you interact with 14:13
14  Trae Fite?                        14:14
15      A.   Couldn't quantify a number.  But 14:14
16  frequently.                       14:14
17      Q.   And what would be the -- the   14:14
18  general reasons to communicate with Trae? 14:15
19      A.   It would depend on Trae's role  14:15
20  in the organization at -- at the time.   14:15
21  He -- we had several conversations       14:15
22  throughout his career with our facility.  14:15
23      Q.   And did he report to you?      14:15

1       A.   Not directly, no.          14:15
2       Q.   Who would he report to?       14:15
3       A.   Again, it would depend on what  14:15
4   role he was in at that period with the   14:15
5   organization.  That would change.       14:15
6       Q.   And what -- what roles did he   14:15
7   have at the organization while you were  14:15
8   there?                            14:15
9       A.   He was a medical technologist,  14:15
10  if I recall, at the time Trae scheduled a 14:16
11  meeting with me and wanted to grow with   14:16
12  the organization.  Was a bright young    14:16
13  man, and I offered him a job in a        14:16
14  department called process management,     14:16
15  which is really an analytics department  14:16
16  of the organization.               14:16
17      Q.   Okay.  So he was a med tech and  14:16
18  he was also in process management?       14:16
19      A.   Yeah.  He moved into a new      14:16
20  department as an analyst in process       14:16
21  management.                        14:16
22      Q.   Okay.  Any other?            14:16
23      A.   I believe from there, Trae moved 14:16

Page 129

1  on to become the manager of Lab Outreach, 14:16
2  and then assumed also Aperian as the   14:16
3  director of operations.       14:17
4    Q. And so, are those all the -- the  14:17
5  different roles that Trae played?    14:17
6    A. That I can recall.     14:17
7    Q. Yeah. And so, which of those   14:17
8  roles would you be -- have regular   14:17
9  communication with him in?     14:17
10    A. None of those roles he would   14:17
11  have reported directly to me. I think I  14:17
12  served more in a mentor capacity for   14:17
13  Trae. He would come to me, and he asked  14:17
14  to advance in the organization and I gave  14:17
15  him opportunities to do that. But he did  14:17
16  not report directly to me.     14:17
17    Q. And do you know why Trae is no   14:18
18  longer employed at Aperian and EAMC?   14:18
19    A. Trae resigned.     14:18
20    Q. And do you know why?    14:18
21    A. I -- I don't know why Trae    14:18
22  resigned.          14:18
23    Q. Did Trae tell you why he    14:18

Page 130

1  resigned?          14:19
2    A. Not to my knowledge. I don't   14:19
3  recall him telling me why he resigned.  14:19
4    Q. Did you have any conversations   14:19
5  about Trae's decision to resign?    14:19
6    A. I had a conversation regarding   14:19
7  Trae's relationship with a subordinate.  14:19
8    Q. And who was that conversation   14:19
9  with?           14:19
10    A. That conversation was with   14:19
11  myself and Roben Nutter.     14:19
12    Q. And when did you have that    14:19
13  conversation?       14:20
14    A. I can't recall the specific    14:20
15  date.           14:20
16    Q. Do you recall talking about    14:20
17  anything other than that topic?     14:20
18    MR. HOOVER: If it's involving a  14:20
19  conversation with Roben, it's     14:20
20  attorney-client privilege, and I would   14:20
21  instruct her not to answer that.    14:20
22    Q. Other than your conversation   14:20
23  with Roben Nutter --     14:20

Page 131

1    MR. BATTLE: And -- and, I mean,  14:20
2  she's already said one thing that they   14:20
3  talked about, so, you know, I don't -- we  14:20
4  can talk about it.      14:20
5    MR. HOOVER: Well, she's not   14:20
6  going to go in depth. She said she had a  14:20
7  conversation with Roben, but she's not   14:20
8  going to go into detail about that    14:20
9  conversation.       14:20
10    MR. BATTLE: Right. She talked  14:20
11  about one topic that they talked about.   14:20
12  But we -- we'll talk about it after. I   14:20
13  don't want to get into a fight on the   14:20
14  record.        14:20
15    MR. HOOVER: Okay.     14:20
16    Q. (By Mr. Battle) Did you have   14:20
17  conversations with anyone other than   14:21
18  Roben about Trae's decision to resign?   14:21
19    A. Not that I recall.     14:21
20    Q. Was there more than one     14:21
21  conversation with Roben Nutter about   14:21
22  Trae's decision to resign?     14:21
23    A. Not that I recall.     14:21

Page 132

1    Q. Did you ever talk to Ken Lott   14:21
2  about it?        14:21
3    A. About what?      14:21
4    Q. Trae's decision to resign.    14:21
5    A. Not that I recall.     14:21
6    Q. Did Ken Lott ever communicate   14:21
7  any reason that Trae wanted to resign?   14:21
8    A. Not that I recall.     14:21
9    Q. Or was considering resigning?   14:21
10    A. No.        14:21
11    Q. Did you have any conversations   14:21
12  with Ken Lott about Trae wanting to no   14:22
13  longer work with Aperian?     14:22
14    A. I was aware of an e-mail. I    14:22
15  don't know of a specific conversation.   14:22
16    Q. Okay. What was the -- the    14:22
17  reason that you understood Trae didn't   14:22
18  want to work with Aperian anymore?    14:22
19    A. I'm not sure. I would have    14:22
20  to review the e-mail. I'd have to look   14:22
21  at that.        14:22
22    Q. Okay. Did you review an e-mail  14:22
23  about that in preparation for this    14:22

Page 133

1  deposition?                        14:22
2    A.  I may have.  I can't say with    14:22
3  certainty.  I looked at a lot of e-mails.  14:22
4    Q.  Okay.  Do you recall          14:22
5  specifically any e-mails that stood out    14:22
6  during your review of e-mails in       14:22
7  preparation for this deposition?       14:22
8    A.  That stood out?  Not that I     14:22
9  recall.                            14:22
10   Q.  I mean, do you remember anything  14:22
11  in particular about any of those e-mails  14:23
12  that you reviewed in preparation for this  14:23
13  deposition?                       14:23
14   A.  Do I remember anything in      14:23
15  particular?                       14:23
16   Q.  Yes.                        14:23
17   A.  No.  It was a lot of          14:23
18  information.                      14:23
19   Q.  Were you aware that Trae Lott    14:23
20  was concerned about compliance issues at  14:23
21  Aperian?                         14:23
22   A.  You said Trae Lott.           14:23
23   Q.  I mean -- I'm sorry.  Trae Fite.  14:23

Page 134

1    A.  I'm sorry.  Could you repeat    14:23
2  that?                            14:23
3    Q.  Were you aware that Trae Fite    14:23
4  was concerned about compliance issues at  14:23
5  Aperian?                         14:23
6    A.  Not that I recall, but Trae     14:23
7  could have come to me at any time.  My    14:23
8  door was open for any purpose.        14:23
9    Q.  I'll show you what is Exhibit    14:24
10  18.  This looks like an e-mail from Ken   14:24
11  Lott dated April 29th, 2013, to Terry    14:24
12  Andrus, cc'ing you and a couple of      14:24
13  others.  Is that right?              14:24
14  (Plaintiff's Exhibit 18 was marked for   14:24
15  identification and is attached.)        14:24
16   A.  That's correct.               14:24
17   Q.  Did you review this e-mail at    14:24
18  the time you -- at the time it was sent?  14:24
19   A.  I'm sure I must have at the time  14:24
20  it was sent.  May I have a minute to read  14:24
21  it?                             14:25
22     MR. HOOVER:  Yeah.  On the top   14:25
23  part, I think that was supposed to be    14:25

Page 135

1  withheld on attorney-client privilege.    14:25
2  So I would want it -- if we need to get   14:25
3  into that on the record, we can do that.  14:25
4  But I think that is also protected.  The  14:25
5  one below that from Trae to Ken obviously  14:25
6  is not, but I think the one above that    14:25
7  is.                             14:25
8     MR. BATTLE:  Okay.  Are you      14:25
9  saying the substance of the e-mail --     14:25
10     MR. HOOVER:  Hold on.  Yeah.    14:25
11  I'm just -- let me look at it.          14:25
12     I think that was produced in      14:26
13  error.  I think that's attorney-client    14:26
14  privilege, the top part.             14:26
15     MR. BATTLE:  Are you saying that  14:26
16  because it was sent to people including    14:26
17  Roben Nutter, it was --              14:26
18     MR. HOOVER:  Yeah.  I think      14:26
19  Roben is on there, and I think it reads    14:26
20  to me that Ken may be seeking legal      14:26
21  advice from -- from Roben.            14:26
22     MR. BATTLE:  Why don't I go      14:26
23  ahead and ask about other parts of this   14:27

Page 136

1  e-mail.                          14:27
2     MR. HOOVER:  Okay.             14:27
3     MR. BATTLE:  And then we can     14:27
4  have a --                         14:27
5     MR. HOOVER:  Okay.             14:27
6     MR. BATTLE:  -- discussion about  14:27
7  that.                            14:27
8     MR. HOOVER:  And maybe mark      14:27
9  the -- maybe mark the transcript?  Maybe  14:27
10  mark the record or whatever where we are,  14:27
11  I mean, just -- because if we have it    14:27
12  out, I mean, we can always come back to   14:27
13  it.  If it's not, it will be --         14:27
14     MR. BATTLE:  Right.  I -- I'm     14:27
15  not sure it's really seeking legal       14:27
16  advice.                          14:27
17     MR. HOOVER:  Okay.             14:27
18     MR. McKENNA:  She's also        14:27
19  compliance officer.                 14:27
20     MR. HOOVER:  Yeah.  But it --    14:27
21  she's also a lawyer, and she's on here as  14:27
22  general counsel.                   14:27
23     MR. McKENNA:  There's no        14:27

Page 137

1  question asked in the e-mail.        14:27
2      MR. HOOVER:  So --        14:27
3      MR. McKENNA:  It's just        14:27
4  forwarding facts.        14:27
5      MR. HOOVER:  So you're telling   14:27
6  me, Don, if your client comes to you and  14:27
7  tells you a fact pattern in -- in a   14:27
8  conference with you, that that's not   14:28
9  seeking legal advice?  You have to   14:28
10 actually ask something?        14:28
11     MR. McKENNA:  All they're doing  14:28
12 is reporting what they've -- what they've 14:28
13 done.        14:28
14     MR. HOOVER:  That's right.  And  14:28
15 he's -- he's telling -- he's telling   14:28
16 Roben, Roben's on this e-mail, about   14:28
17 this -- about Trae wanting to resign.   14:28
18     MR. McKENNA:  Whoever reviewed  14:28
19 it didn't think it was privileged.   14:28
20     MR. HOOVER:  Well, we've got a   14:28
21 clawback provision.  You haven't ever   14:28
22 produced something accidentally that's   14:28
23 not privileged --        14:28

Page 138

1      MR. McKENNA:  No.        14:28
2      MR. HOOVER:  -- or that's   14:28
3  privileged?  Well.        14:28
4      MR. BATTLE:  And you're just   14:28
5  saying that top part is what you're --  14:28
6      MR. HOOVER:  Yeah.  I mean,   14:28
7  between Trae and Ken is obviously not.  14:28
8      MR. BATTLE:  Okay.  Well, we'll  14:28
9  talk about that --        14:28
10     MR. HOOVER:  Okay.        14:28
11     MR. BATTLE:  -- top part at a   14:28
12 break.        14:28
13     Q.  (By Mr. Battle) Did you get a  14:29
14 chance to review?        14:29
15     A.  I did.        14:29
16     Q.  Okay.  It looks like there's an 14:29
17 e-mail that Mr. Fite sent to Ken Lott on 14:29
18 April 23rd that's being forwarded to you 14:29
19 on April 29th; is that right?   14:29
20     A.  That's correct.        14:29
21     Q.  And Mr. Fite is asking to end   14:29
22 his involvement with Aperian because he's 14:30
23 concerned about various compliance issues 14:30

Page 139

1  and things that he considered may be   14:30
2  unlawful.  Is that your understanding?  14:30
3      A.  Based on what this says,   14:30
4  correct.        14:30
5      Q.  Okay.  Had you heard about any  14:30
6  of the issues that are raised in the   14:30
7  e-mail from Mr. Fite to Mr. Lott prior to 14:30
8  receipt of this e-mail on April 29th,   14:30
9  2013?        14:30
10     A.  Not that I recall.        14:30
11     Q.  Had you had any discussions with 14:30
12 or communications with anyone at Aperian 14:30
13 or EAMC about the issues raised in Mr.   14:30
14 Fite's e-mail prior to the time that you  14:30
15 received the e-mail on April 29th, 2013? 14:30
16     A.  Not that I recall.        14:30
17     Q.  The -- the first sentence of the 14:30
18 e-mail from Mr. Fite to Mr. Lott says,   14:30
19 "Pursuant to our conversation on   14:31
20 Thursday, April 4th," he says that he was 14:31
21 getting offered additional job duties and 14:31
22 an increase in personal responsibilities. 14:31
23 Is that right?        14:31

Page 140

1      A.  I can't speak to that   14:31
2  personally, but that's what it does say  14:31
3  here.        14:31
4      Q.  So you didn't have any part in  14:31
5  the discussion about that?        14:31
6      A.  About his expanding -- I --   14:31
7  I'm -- I'm not aware of his job duties   14:31
8  expanding beyond what he was already   14:31
9  currently responsible for.        14:31
10     Q.  Okay.  I know you had mentioned  14:31
11 that he had -- you had mentored him and  14:31
12 --        14:31
13     A.  Early in his career.        14:31
14     Q.  -- he had asked for -- asked you 14:31
15 to increase his role with the company at 14:31
16 times and you tried to help him with   14:31
17 that.  So I'm just asking whether that   14:31
18 was the case in this instance.        14:31
19     A.  I don't read it -- that was much 14:31
20 after the conversations he had with me   14:31
21 regarding growing with the organization. 14:31
22     Q.  He mentions in the second   14:31
23 paragraph "The compliance audits" --   14:32

Page 141

1  "audit that I commissioned from        14:32
2  Colaborate, and the results I shared with 14:32
3  you, Roben, and the Aperian board further 14:32
4  enhanced these concerns."              14:32
5      Do you know, is the Aperian        14:32
6  board -- you -- you've mentioned there's 14:32
7  not an Aperian board, that it's that   14:32
8  committee about progress to goals. Is  14:32
9  that right?                            14:32
10    A.  Correct. It was -- as I stated  14:32
11  earlier.                              14:32
12    Q.  Were you part of any committee  14:32
13  meetings where any concerns were -- were 14:32
14  raised about compliance prior to the time 14:32
15  this e-mail was received by you?       14:32
16    A.  I do -- I do not recall whether 14:32
17  I was at the meeting or -- or not.     14:32
18  That's been a while back.              14:32
19    Q.  After Mr. Lott forwarded this   14:33
20  e-mail from Trae expressing these      14:33
21  concerns to -- to you, did you have any 14:33
22  communications with Ken Lott about this? 14:33
23    A.  Not that I recall.              14:33

Page 142

1    Q.  Did you have any conversations   14:33
2  about Mr. Fite's concerns with Mr. Fite 14:33
3  after this e-mail was sent to you?     14:33
4    A.  Again, not -- not that I recall  14:33
5  regarding his concerns.                14:33
6    Q.  Let me show you what I've marked 14:33
7  as Exhibit 19. This looks like an e-mail 14:34
8  at the bottom, Ken Lott to Mr. Andrus, 14:35
9  cc'ing you, about Mr. Fite being released 14:35
10  today. And it's dated May 21st, 2013.  14:35
11  Did you receive that e-mail?           14:35
12  (Plaintiff's Exhibit 19 was marked for 14:35
13  identification and is attached.)       14:35
14    A.  I did if I was copied on it,     14:35
15  yes.                                  14:35
16    Q.  And then you respond at the top 14:35
17  on May 21st, 2013, just to Mr. Andrus; is 14:35
18  that right?                           14:35
19    A.  Correct.                        14:35
20    Q.  And the e-mail from Mr. Lott to 14:35
21  Mr. Andrus says: "Big Boss, Susan and I 14:35
22  released Trae today..Prior to the      14:35
23  release, Susan, Roben, Laura and I met to 14:35

Page 143

1  talk thru the matter."                 14:35
2      Do you remember a meeting to       14:35
3  talk through the matter with Susan and 14:35
4  Roben and Ken?                         14:35
5    A.  I don't recall the meeting.      14:36
6    Q.  And then in the next sentence,   14:36
7  it says, "Yesterday Roben and Laura met 14:36
8  with him as a follow-up to the email he 14:36
9  sent out asking to meet with Roben."   14:36
10      Do you remember a meeting with    14:36
11  Mr. Fite the day before this e-mail?   14:36
12    A.  Other than the one I mentioned   14:36
13  earlier? Is that -- I'm sorry. I'm --  14:36
14  I'm confused.                         14:36
15  (Witness reviews document.)            14:36
16    A.  So it says Roben, or we met with 14:36
17  him --                                14:36
18    Q.  Okay. Is that the -- that's the 14:36
19  meeting -- is that a meeting that you and 14:36
20  Roben had with Trae Fite that you were 14:36
21  referring to earlier?                  14:36
22    A.  That's what I was referring to  14:36
23  earlier, yes.                          14:36

Page 144

1      MR. BATTLE: And are you            14:36
2  asserting that that meeting, Jim, was   14:37
3  privileged, the meeting with Trae Fite 14:37
4  and Roben and Laura?                   14:37
5      MR. HOOVER: Was Trae in the        14:37
6  meeting?                              14:37
7      MR. BATTLE: Yes.                   14:37
8      MR. HOOVER: Let me talk to         14:37
9  Roben, if I can. You want to take a    14:37
10  break?                               14:37
11      MR. McKENNA: I need to take one   14:37
12  anyway.                              14:37
13      MR. HOOVER: Okay.                 14:37
14      MR. BATTLE: Yeah, we'll take a    14:37
15  break.                               14:37
16      THE VIDEOGRAPHER: We're going     14:37
17  off the record at 2:37 p.m.            14:37
18      (Break taken.)                    14:37
19      THE VIDEOGRAPHER: This begins     14:37
20  Disc No. 4 in the deposition of Laura  15:10
21  Grill. We're going back on the record at 15:10
22  3:10 p.m.                             15:10
23      MR. BATTLE: All right. Did --     15:10

Page 145

1  did y'all have further discussion about  15:10
2  that e-mail?                          15:10
3      MR. HOOVER:  Yeah.  Well, I      15:10
4  think the e-mail, the top part is -- is  15:10
5  still attorney-client privilege.  We had  15:10
6  more discussion about this meeting --    15:10
7      MR. BATTLE:  Okay.              15:10
8      MR. HOOVER:  -- that you         15:10
9  referred to in that e-mail.            15:10
10     MR. BATTLE:  Well, and we --     15:10
11 yeah.  And we put off discussion about  15:11
12 this e-mail at the top.  And I'll go back  15:11
13 to where I was questioning about the    15:11
14 second e-mail --                      15:11
15     MR. HOOVER:  Okay.  Yeah.       15:11
16     MR. BATTLE:  -- for now.  But,   15:11
17 yeah, as far as the top part of that     15:11
18 e-mail, you're still asserting a        15:11
19 privilege to asking any questions about  15:11
20 that, and you're asserting that that's    15:11
21 attorney-client privilege, and you're    15:11
22 going to instruct the witness not to     15:11
23 answer regarding anything in that portion  15:11

Page 146

1  of the e-mail?  Is that --             15:11
2      MR. HOOVER:  Correct.           15:11
3      MR. BATTLE:  Okay.  We'll --     15:11
4  we'll address that --                  15:11
5      MR. HOOVER:  Okay.              15:11
6      MR. BATTLE:  -- shortly.         15:11
7      Q.  (By Mr. Battle)  All right.  So I  15:11
8  believe -- and it's been a little while   15:11
9  since we were having our -- our         15:11
10 conversation, Ms. Grill.  But I believe  15:11
11 that we were talking about the meeting  15:11
12 that is referenced in Exhibit 19 in the  15:11
13 e-mail from Ken Lott to you and Susan   15:11
14 Johnston where he says, about the third  15:11
15 line down, "Yesterday Roben and Laura met  15:11
16 with him as a follow-up to the email he  15:11
17 sent out."                            15:11
18     MR. HOOVER:  Read -- read the    15:11
19 whole sentence.                       15:12
20     Q.  "Asking to meet with Roben."  15:12
21     MR. HOOVER:  I just want to make  15:12
22 sure it's clear on the record.          15:12
23     Q.  And you, I believe, answered and  15:12

Page 147

1  said that was the meeting where you had  15:12
2  the conversation with -- about Trae about  15:12
3  having a relationship with a subordinate.  15:12
4  Is that --                            15:12
5      A.  Correct.                    15:12
6      Q.  -- accurate, or are there two  15:12
7  different meetings?                    15:12
8      A.  That's -- that's the meeting   15:12
9  about the relationship.               15:12
10     Q.  Okay.  And you mentioned Roben  15:12
11 was there, and that's when your attorney  15:12
12 instructed you not to answer.  But we now  15:12
13 know it was a meeting with Trae also.  Is  15:12
14 that right?                           15:12
15     A.  Correct.                    15:12
16     Q.  And during that meeting, was --  15:12
17 was this a meeting that is referenced    15:12
18 here as happening the day before Ken Lott  15:12
19 sends this e-mail?  Is that the same     15:12
20 meeting?  I just want to make sure I     15:12
21 understand.                          15:13
22     A.  I'm sorry.  Could you --      15:13
23     Q.  When did the meeting between you  15:13

Page 148

1  and Roben Nutter and Trae take place?   15:13
2  Where you discussed his relationship with  15:13
3  a subordinate.                       15:13
4      A.  I don't know that that's      15:13
5  reflected in this specific -- so maybe -- I  15:13
6  maybe it was the day prior if it says    15:13
7  "yesterday," but, you know, I would want  15:13
8  to verify that.  Is that what you're     15:13
9  asking me?                           15:13
10     Q.  Okay.  How would you verify    15:13
11 that?                               15:13
12     A.  I don't know.                15:13
13     Q.  Okay.                       15:13
14     A.  But I'm -- I'm just going off of  15:13
15 that says "yesterday."  But that's when  15:13
16 we met.                             15:13
17     Q.  Okay.  Let -- let -- let's --   15:13
18     A.  Keep going.                  15:13
19     Q.  -- back up.  So we know in     15:13
20 Exhibit 18 that you get an e-mail on     15:13
21 April 29th --                         15:13
22     A.  Correct.                    15:13
23     Q.  -- that's forwarding the e-mail  15:13

Page 149

1  that Mr. Fite sent to Ken Lott where he   15:13
2  expresses a lot of concerns about        15:13
3  unlawful activity by Aperian and wanting 15:13
4  to leave.                                15:14
5     A.  Correct.                          15:14
6     Q.  Did you have any meetings with    15:14
7  Mr. Fite between April 23rd -- or, I'm    15:14
8  sorry, April 29th and May 21st?          15:14
9     A.  Yes.                              15:14
10    Q.  How many meetings did you have     15:14
11  with Mr. Fite during that time?         15:14
12    A.  One that I can recall.            15:14
13    Q.  Okay.  Who was at that meeting?    15:14
14    A.  Trae, myself, and Roben.          15:14
15    Q.  And so that meeting happened      15:14
16  after Mr. Fite had expressed all these  15:14
17  concerns about unlawful activity;        15:14
18  correct?                                15:14
19    A.  The meeting with regard --        15:14
20  regarding the relationship, yes.        15:14
21    Q.  Okay.  Was there a meeting        15:14
22  regarding anything else that you had with 15:14
23  Mr. Fite?                               15:14

Page 150

1     A.  No.                               15:14
2     Q.  Do you recall what date that      15:14
3  meeting occurred?                        15:14
4     A.  I don't recall specifically.      15:14
5  I'm going off of this e-mail that        15:14
6  says "yesterday."  And it's dated the    15:15
7  21st.  And I recall one meeting with     15:15
8  Trae, so.                                15:15
9     Q.  Okay.  So you had --              15:15
10    A.  I don't know for sure that that    15:15
11  would be --                             15:15
12    Q.  So that -- that meeting with      15:15
13  Trae and Roben, how -- where was it?    15:15
14    A.  That was in Roben's office.       15:15
15    Q.  And how long did it last?         15:15
16    A.  Less than an hour.  Probably      15:15
17  half an hour.                           15:15
18    Q.  And why were you in that          15:15
19  meeting?                                15:15
20    A.  Because I wanted to speak with    15:15
21  Trae.  If you even look up at the top of 15:15
22  that where I say "this was hard," I -- I 15:15
23  cared about that young man.  I helped him 15:15

Page 151

1  get his start, and I hated to see what he 15:15
2  was doing with throwing his career       15:15
3  risk with his relationship with a        15:16
4  subordinate.  And that was my concern in 15:16
5  talking with him.                        15:16
6     Q.  Okay.  So the meeting lasted      15:16
7  less than an hour but --                 15:16
8     A.  Yeah.  I can't recall how long    15:16
9  the meeting was.  Probably less than an  15:16
10  hour.                                    15:16
11    Q.  Could have been more than half    15:16
12  an hour?                                15:16
13    A.  I can't guess how long.  I -- I   15:16
14  don't know.                             15:16
15    Q.  Okay.  So it could have been two  15:16
16  minutes?                                15:16
17    A.  I doubt that.  That's not a       15:16
18  two-minute conversation that one would   15:16
19  have.                                   15:16
20    Q.  Okay.  What -- what would be a    15:16
21  reasonable estimate of the time that -- 15:16
22  of that meeting?                        15:16
23    A.  Between half an hour and an       15:16

Page 152

1  hour.                                    15:16
2     Q.  Okay.  And during that meeting,   15:16
3  it's your testimony that the only topic  15:16
4  that was discussed was Trae's            15:16
5  relationship with a subordinate?         15:17
6     A.  Yes.                              15:17
7     Q.  And it's your testimony that      15:17
8  there was no discussion at all about any 15:17
9  of the issues that he raised in his      15:17
10  e-mail to Ken Lott on April 23rd that you 15:17
11  received on April 29th?                 15:17
12    A.  That is my recollection, yes.     15:17
13    Q.  Okay.  So if Trae said            15:17
14  otherwise, then you would disagree with 15:17
15  him, or it's just you don't recall?     15:17
16    A.  I would disagree with him.        15:17
17    Q.  So Ken Lott's e-mail in the next 15:17
18  sentence says, "Trae left the meeting    15:18
19  knowing the mess he has caused."         15:18
20       Do you know what he is talking      15:18
21  about there?                            15:18
22    A.  I can't know what Ken meant.      15:18
23    (Witness reviews document.)           15:18

Page 153

1   A.   You know, I think it -- you        15:18
2   know, as it says, had a very frank        15:18
3   discussion expressing my disappointment   15:18
4   with him.                                  15:18
5   Q.   Okay.  Is that --                     15:18
6   A.   Of my disappointment with him        15:18
7   about his relationship with Imo Holstick. 15:18
8   Q.   What do you recall Ms. Nutter        15:18
9   talking about in that meeting?            15:18
10   A.   I don't recall specifically        15:18
11   anything Ms. Nutter said at that meeting. 15:18
12   I -- I talked.                            15:18
13   Q.   Okay.  So Ms. Nutter didn't        15:18
14   speak during that meeting?                15:18
15   A.   Not that I remember, no.           15:18
16   Q.   And what did you tell Trae?        15:19
17   A.   I can't recall specifically what   15:19
18   I said to Trae, but I asked him to       15:19
19   acknowledge and address he was in a      15:19
20   relationship and that that was          15:19
21   inappropriate in a workplace, that he    15:19
22   couldn't supervise a subordinate, that   15:19
23   his personal choices were his personal  15:19

Page 154

1   choices, but he couldn't be in a work     15:19
2   relationship where he supervised someone, 15:19
3   that that was not appropriate.  And we    15:19
4   would have some decisions to make.  One   15:19
5   would have to move one place or the       15:19
6   other, but they couldn't work together if 15:19
7   they were in a personal relationship.     15:19
8   That's just a standard of conduct in our  15:19
9   organization.  Just you can't supervise   15:19
10   an employee you're having a relationship 15:19
11   with.  And that's what I was trying to   15:19
12   appeal to Trae about.  Again, I cared    15:19
13   about that young man.  I gave him his    15:19
14   start.                                    15:19
15   Q.   And tell me everything that you    15:19
16   recall that -- that Trae said in that    15:20
17   meeting.                                  15:20
18   A.   I don't recall Trae saying much    15:20
19   of anything.                              15:20
20   Q.   Do you recall anything he said?   15:20
21   A.   Not specifically, I don't.         15:20
22   Q.   The e-mail continues to say down   15:20
23   below that, "Susan and I met with him at 15:20

Page 155

1   2."                                        15:20
2        That would be -- Ken -- Ken is       15:20
3   writing this e-mail, so I assume that     15:20
4   Susan and Ken met with him at 2:00.  Were 15:20
5   you part of that meeting?                  15:20
6   A.   No, I was not.                       15:20
7   Q.   Did Ken tell you anything about    15:20
8   that meeting?                             15:20
9   A.   Not that -- not that I remember     15:20
10   specifically.                            15:20
11   Q.   And who is Susan Johnston?         15:20
12   A.   She's the vice president of        15:20
13   human resources.                         15:20
14   Q.   Okay.  Did Susan tell you          15:20
15   anything about that meeting?             15:21
16   A.   Not that I recall.                  15:21
17   Q.   Did you and Mr. Lott ever have     15:21
18   any discussion about the issues raised by 15:21
19   Trae Fite in the April 23rd e-mail about 15:21
20   his concern about unlawful activity at   15:21
21   Aperian and et cetera, that -- just      15:21
22   anything, any of the topics he raised    15:21
23   that were concerns in that e-mail?       15:21

Page 156

1   A.   Not that I recall that he -- Ken    15:21
2   and I had a discussion about.  I was      15:21
3   obviously copied on the -- forwarded the  15:21
4   e-mail.                                    15:21
5   Q.   Did --                               15:21
6   A.   Not copied.                          15:21
7   Q.   Did the issues he raised in that   15:21
8   e-mail concern you at all?                 15:21
9   A.   Well, the issues he raised are      15:21
10   concerning, but I -- Trae never brought  15:21
11   those issues to my attention.  Trae never 15:21
12   brought those issues to -- and that's -- 15:21
13   that's what I'm a little confused about.  15:21
14   There were ample opportunity.  Trae and I 15:21
15   had a very good relationship.  He could  15:21
16   have brought anything to me that he was  15:21
17   concerned about.                          15:21
18   Q.   Right.  But you acknowledge you    15:21
19   were aware of those issues when you --   15:21
20   A.   No.  I didn't --                     15:21
21   Q.   -- received this e-mail; right?    15:21
22   A.   No.  I didn't -- that -- that's    15:22
23   not what I said.  I said I -- Ken and I  15:22

Page 157

1 didn't have any other converse -- I don't 15:22
2 believe that's what I said. She can tell 15:22
3 me. 15:22
4     I don't -- Ken and I didn't have 15:22
5 any specific conversations about this 15:22
6 e-mail. I thought that's what you asked 15:22
7 me. 15:22
8     Q. And then I asked you whether you 15:22
9 had any concerns about the issues that 15:22
10 were raised in this e-mail from Trae to 15:22
11 Ken Lott -- 15:22
12     A. Well -- 15:22
13     Q. -- at that time. 15:22
14     A. -- just that -- that Trae 15:22
15 expressed some concern. That -- 15:22
16     Q. Did you follow up on any of the 15:22
17 issues that were raised in this e-mail 15:22
18 with anyone at Aperian or EAMC after you 15:22
19 got notice of them -- 15:22
20     A. Not that I recall. 15:22
21     Q. -- April 29th? · 15:22
22     A. No. As I said, I didn't -- you 15:22
23 know, my opinion was not sought. I did 15:22

Page 158

1 not reach out to Trae. I don't recall 15:22
2 any specific conversations about this 15:22
3 particular e-mail or his concerns. 15:22
4     Q. Well, obviously, Mr. Lott 15:22
5 thought it was an important enough e-mail 15:22
6 to forward to you; correct? 15:23
7     MR. HOOVER: Object to the form. 15:23
8     A. Well, he forwarded it to several 15:23
9 people. 15:23
10     Q. Yeah. He forwarded it to the 15:23
11 CEO, Mr. Andrus. 15:23
12     A. Uh-huh. 15:23
13     Q. He forwarded it to the head of 15:23
14 HR, and he forwarded it to the compliance 15:23
15 officer, Ms. Nutter. Right? 15:23
16     A. That's correct. 15:23
17     Q. Okay. And it wasn't forwarded 15:23
18 to some huge group of people. It was the 15:23
19 people at the top; right? 15:23
20     A. Not all the people at the top, 15:23
21 no. But yes, several. 15:23
22     Q. Who else do you think should 15:23
23 have known about this e-mail? 15:23

Page 159

1     A. I don't know that anyone should 15:23
2 have known about it. You said "the 15:23
3 people at the top." 15:23
4     Q. But did you have conversations 15:23
5 with any of the other people on this 15:23
6 e-mail chain about the concerns raised by 15:23
7 Mr. Fite? 15:23
8     A. Not that I recall. 15:23
9     Q. So it didn't bother you at all, 15:23
10 these issues raised by Trae Fite? 15:23
11     A. I'm not saying it did or it 15:23
12 didn't bother me. 15:24
13     Q. Well, did it? 15:24
14     A. Well, obviously, Mr. Fite had 15:24
15 some concerns, and he sent those to Ken 15:24
16 Lott. But he didn't send those to me. 15:24
17 Ken forwarded those to me. 15:24
18     Q. Do you know of any measures that 15:24
19 were taken to address any of these 15:24
20 concerns by EAMC or Aperian? 15:24
21     A. Again, not that I'm directly 15:24
22 aware of. 15:24
23     Q. What about indirectly? 15:24

Page 160

1     A. Not that I'm aware of. 15:24
2     Q. Who is Carol Sue? 15:24
3     A. That would be Carole Sue Nelson. 15:25
4 Was one of our outside counsel. 15:25
5     Q. And then, who is Chris? 15:25
6     A. I'm not certain, but I believe 15:25
7 that would have been Chris Clark. 15:25
8     Q. And what was Chris Clark's role 15:25
9 in this? 15:25
10     A. The clinical laboratory reported 15:25
11 to Chris Clark. Kathey Story was over 15:25
12 the clinical laboratory, and she reported 15:25
13 to Chris Clark. 15:25
14     MR. BATTLE: So, Jim, I'm -- I'm 15:25
15 not sure. I -- I was going to ask some 15:26
16 questions about that top part that you're 15:26
17 asserting the privilege on. If you would 15:26
18 prefer, we can fight about it another day 15:26
19 with the Court if we need to and come 15:26
20 back and ask questions about it, because 15:26
21 I understand you're not going to change 15:26
22 your position on that today. Is that 15:26
23 right? 15:26

Page 161

1    MR. HOOVER: Yeah. Correct. I    15:26
2 mean, you can -- I -- I guess if you want 15:27
3 to ask her a question -- I mean, I don't 15:27
4 know if -- if the question is going to    15:27
5 be -- I mean, I guess it depends on what 15:27
6 you ask her about the top part of that    15:27
7 e-mail, whether or not it's going to be    15:27
8 subject to the attorney-client privilege 15:27
9 would be -- I mean, I don't -- if -- if    15:27
10 that makes any sense. Because you've    15:27
11 talked to her about an e-mail that's    15:27
12 dated after the fact -- I mean, May 21st 15:27
13 as opposed to this one, which is April    15:27
14 29th.                          15:27
15    MR. BATTLE: Right. And you've    15:27
16 objected to talking about the substance    15:27
17 of the e-mail, so I've only used right    15:27
18 now the -- the date and the fact that she 15:27
19 got this bottom part of the e-mail.    15:27
20    Q. (By Mr. Battle) Do you know --    15:27
21    MR. BATTLE: You want me to ask    15:27
22 --                          15:27
23    MR. HOOVER: Yeah. Ask her, and 15:27

Page 162

1 if I have an objection, I'll raise the    15:28
2 objection. It might be a good way to do    15:28
3 it.                          15:28
4    Q. Ms. Grill, the -- the top part    15:28
5 of the e-mail from Ken Lott to you and    15:28
6 the CEO, Mr. Andrus, and the head of HR, 15:28
7 Ms. Johnston, and Roben Nutter, the    15:28
8 compliance officer, says, "I have another 15:28
9 email coming to you with an attachment    15:28
10 that has four different options in order 15:28
11 that SJ and I see this."          15:28
12    Who is SJ?                15:28
13    A. My assumption would be,    15:28
14 referring to Susan Johnston.        15:28
15    Q. Okay. "Sam, Roben, Laura Nell, 15:28
16 and Susan have been involved."        15:28
17    Who is -- I know who Sam is and    15:28
18 Roben. Who is Laura Nell?          15:28
19    A. That would be me. That's my    15:28
20 middle name.                  15:28
21    Q. Okay. Okay. "I have spent more 15:28
22 time today talking with SJ since she has 15:28
23 been in contact with Carole Sue."    15:29

Page 163

1    Do you know what the four    15:29
2 different options are that are referenced 15:29
3 in the e-mail to you?          15:29
4    A. I do not.            15:29
5    Q. Did you receive an e-mail with    15:29
6 four different options? He says, "I have 15:29
7 another email coming to you with an    15:29
8 attachment that has four different    15:29
9 options."                  15:29
10    A. If I did, I can't recall it. I    15:29
11 may have. I -- but I can't recall an    15:29
12 e-mail with four different options on it. 15:29
13    Q. And you don't know what the four 15:29
14 different options are?          15:29
15    A. I --                15:29
16    Q. Or any of the options?    15:29
17    A. I do not.            15:29
18    Q. And did you have a discussion    15:29
19 with anybody about options that are    15:29
20 referenced in this e-mail?        15:29
21    A. Not that I recall. But I don't 15:29
22 have an e-mail with --          15:29
23    Q. Then it says --        15:29

Page 164

1    A. -- in front of me with options. 15:29
2    Q. -- "after the Admin Meeting    15:29
3 tomorrow I thought we might convene and    15:29
4 ask Chris to stay in with us."        15:29
5    Who is Chris?              15:29
6    A. Chris Clark that I referred    15:29
7 to --                      15:29
8    Q. Okay.                15:29
9    A. -- a few minutes ago.        15:29
10    Q. Did you convene after the admin 15:30
11 meeting to discuss this e-mail about --    15:30
12 with the issues that Trae Fite raised to 15:30
13 Ken Lott?                  15:30
14    A. I'm not sure if we -- if we did 15:30
15 or not. Again, he says, "I thought we    15:30
16 might convene." I'm not sure if we did    15:30
17 convene --                  15:30
18    Q. Right.                15:30
19    A. -- or not.            15:30
20    Q. And I'm just asking for your    15:30
21 recollection as to whether you did or    15:30
22 not.                      15:30
23    A. Not that I recall.        15:30

Page 165

1   Q. Was there any discussion -- did   15:30
2  you go -- first of all, did you go to an   15:30
3  admin meeting the next day?   15:30
4   A. We have administrative meetings   15:30
5  once a week, so I'm assuming that's what   15:30
6  he's referring to, when we all come   15:30
7  together.   15:30
8   Q. Are there agendas kept for the   15:30
9  admin meetings?   15:30
10   A. There are.   15:30
11   Q. Are there minutes kept of the   15:30
12  admin meetings?   15:30
13   A. Sometimes there are, yes.   15:30
14   Q. And who keeps those?   15:31
15   A. The administrative secretary.   15:31
16   Q. And who is the administrative   15:31
17  secretary?   15:31
18   A. Ginger McConnell.   15:31
19   Q. Okay. And would she have been   15:31
20  the one at the time?   15:31
21   A. During the meeting.   15:31
22   Q. I'm sorry. I'm sorry. Back in   15:31
23  April of 2013, would she have been the   15:31

Page 166

1  person?   15:31
2   A. If -- if she was -- if she was   15:31
3  there that day, she would have been the   15:31
4  person, yes.   15:31
5   Q. Okay. But, yeah, she worked   15:31
6  there, and that was her job   15:31
7  responsibility at that time?   15:31
8   A. Right.   15:31
9   Q. And it says, next sentence,   15:31
10  "Chris is aware of this also since we may   15:31
11  have to fall back on Kathey and possibly   15:31
12  have Sylvia work for us for several   15:31
13  months, if she would."   15:31
14       Do you know what Mr. Lott is   15:31
15  talking about there?   15:31
16   A. I believe that was the time that   15:31
17  then Lab Outreach came back under the   15:31
18  clinical laboratory. So Mr. Fite was   15:31
19  reporting to the clinical laboratory,   15:31
20  which then reported to Mr. Clark.   15:32
21   Q. Okay. So that was what would   15:32
22  happen if Mr. Fite no longer was working   15:32
23  for Aperian?   15:32

Page 167

1   A. No. Mr. Fite in the Lab   15:32
2  Outreach would come back under the   15:32
3  clinical lab.   15:32
4   Q. Okay.   15:32
5   A. Under the direction of the   15:32
6  clinical lab director.   15:32
7   Q. You're unaware of whether   15:32
8  anybody at Aperian or EM- -- EAMC ever   15:32
9  addressed any of the issues that Trae   15:32
10  Fite raised in the April 23rd e-mail?   15:32
11       MR. HOOVER: Object. Asked and   15:32
12  answered.   15:32
13   A. Not that I'm aware of or was a   15:32
14  part of.   15:32
15   Q. During that time period of 2013   15:32
16  leading up to the April e-mail that   15:33
17  Mr. Fite sent and then looks like about a   15:33
18  month later is when you and Roben had a   15:33
19  meeting with Mr. Fite to talk about the   15:33
20  relationship with a subordinate, how   15:33
21  often did you interact with Mr. Fite?   15:34
22   A. Occasionally, I would see him at   15:34
23  our leadership meetings. I would pass   15:34

Page 168

1  him in the halls. I would see him if I   15:34
2  attended a progress to goals meeting. My   15:34
3  office was on the main corridor of the   15:34
4  hospital with the door remained open.   15:34
5  You know, I would see Trae when he was in   15:34
6  the hospital.   15:34
7   Q. Did you ever talk to Mr. Fite   15:34
8  about the relationship with the   15:34
9  subordinate prior to the meeting --   15:34
10   A. No.   15:34
11   Q. -- you and Roben had with him?   15:34
12   A. I did not.   15:34
13   Q. When did you first become aware   15:34
14  of it?   15:34
15   A. I couldn't say when I was first   15:34
16  made aware of it. There were rumors and   15:34
17  rumblings and -- but I couldn't tell you   15:34
18  when that was.   15:34
19   Q. Do you know whether it was   15:34
20  before or after the April 23rd e-mail?   15:34
21   A. I can't recall.   15:34
22   Q. Let me show you Exhibit No. 20.   15:34
23  And who is Pat Stewart?   15:35

Page 169

1  (Plaintiff's Exhibit 20 was marked for    15:35
2  identification and is attached.)    15:35
3    A.  I believe we covered that    15:35
4  earlier.  She is my current spouse.    15:35
5    Q.  Oh, okay.  I'm sorry.  Like I    15:35
6  said, I'm filling in on this, so I do    15:35
7  not -- need to have more knowledge.    15:35
8        Okay.  And so she sent you an    15:35
9  e-mail on November 18th, 2013, attaching    15:35
10  a -- it looks like an article about a    15:35
11  ruling on Stark law and a violation of    15:35
12  Stark law.    15:35
13    A.  Uh-huh.    15:35
14    Q.  Is that right?  Do you know why    15:35
15  she sent this to you?    15:35
16    A.  I can't recall.  She also worked    15:35
17  in healthcare and would occasionally send    15:35
18  me articles of interest that she saw or    15:35
19  things she would pick up on other jobs.    15:35
20    Q.  Had the two of you talked about    15:35
21  Stark law issues before she sent this    15:36
22  e-mail?    15:36
23    A.  Not that I recall.    15:36

Page 170

1    Q.  So this just sort of came out of    15:36
2  the blue?    15:36
3    A.  We often shared interesting    15:36
4  healthcare-related topics.    15:36
5    Q.  And did you sort of keep up to    15:36
6  date on things like the Stark law and the    15:36
7  False Claims Act and the anti-kickback    15:36
8  statute?    15:36
9    A.  I wouldn't say I kept up to    15:36
10  date.  I made myself as available and    15:36
11  knowledgeable as I could with -- you    15:36
12  know, relying on the experts that I have.    15:36
13    Q.  And who are the experts that you    15:36
14  would rely on?    15:36
15    A.  Our outside counsel, my inside    15:36
16  counsel.    15:36
17    Q.  What about anybody who were    15:36
18  compliance officers?    15:36
19    A.  Well, certainly, if that's what    15:37
20  I needed to do.  I typically would work    15:37
21  through the compliance department or    15:37
22  through our -- through our attorneys.    15:37
23  I'm not a lawyer.  I don't -- I don't --    15:37

Page 171

1  I'm going to defer to those experts.    15:37
2    Q.  And did you receive regular    15:37
3  e-mail updates from anybody else about    15:37
4  Stark law or False Claims Act or    15:37
5  anti-kickback statute other than Pat?    15:37
6    A.  I -- I get e-mail alerts from    15:37
7  all sorts of leaders about, regularly,    15:37
8  any -- any related topic.  You know, get    15:37
9  about 200-plus e-mails a day.    15:37
10    MR. BATTLE:  Let's just take a    15:37
11  quick break.    15:37
12    THE VIDEOGRAPHER:  Going off the    15:37
13  record at 3:37 p.m.    15:37
14    (Break taken.)    15:37
15    THE VIDEOGRAPHER:  We're back on    15:37
16  the record at 3:46 p.m.    15:46
17            15:46
18  EXAMINATION BY MR. MARTIN:    15:46
19    Q.  Good afternoon.  My name is Dan    15:46
20  Martin, and I'm counsel for Summit    15:46
21  Diagnostics.  And I only request a couple    15:46
22  of minutes of your time for just a few    15:46
23  questions.    15:46

Page 172

1    A.  Okay.    15:46
2    Q.  You've testified about a lot of    15:46
3  different things, and I just want to    15:46
4  confirm what I -- what I think is true.    15:46
5        Are you aware of any evidence or    15:47
6  other information -- and -- and I want to    15:47
7  construe "evidence" as broadly as    15:47
8  possible; any kind of personal    15:47
9  observation, e-mails, anything like    15:47
10  that -- any evidence that suggests that    15:47
11  George Powell or anybody at Summit did    15:47
12  anything illegal?    15:47
13    MR. BATTLE:  Object to form.    15:47
14    A.  Not that I'm aware of.    15:47
15    Q.  Okay.  You're -- you're    15:47
16  generally familiar with the allegations    15:47
17  being made by Trae Fite in this lawsuit;    15:47
18  correct?    15:47
19    A.  Correct.    15:47
20    Q.  Are you aware of any evidence or    15:47
21  information of any sort that George    15:47
22  Powell or Summit engaged in any of the    15:47
23  conduct alleged to be unlawful in this    15:47

Page 173

1 lawsuit? 15:47
2    MR. BATTLE: Object to form. 15:47
3   A. Not to my knowledge. 15:47
4    MR. MARTIN: Pass the witness. 15:47
5                   15:47
6 EXAMINATION BY MR. HOOVER: 15:47
7   Q. Ms. Grill, my name is Jim 15:47
8 Hoover. You know me, but I feel 15:47
9 compelled to introduce myself. It's the 15:47
10 first time I get to really say anything 15:47
11 today. 15:48
12    Let's go back a little bit. You 15:48
13 were shown an exhibit. I think -- I 15:48
14 believe it was Plaintiff's 18. And at 15:48
15 the -- the bottom part of that, the 15:48
16 e-mail from Trae Fite to Ken Lott. And 15:48
17 that's dated April 23rd, 2013. 15:48
18   A. Uh-huh. 15:48
19   Q. Do you recall seeing that -- 15:48
20   A. I do. 15:48
21   Q. -- in your deposition today? 15:48
22   A. I do. 15:48
23   Q. You were asked some questions 15:48

Page 174

1 about, you know, what, if anything, you 15:48
2 did to follow up on -- on that e-mail 15:48
3 from Trae. Do you recall seeing any 15:48
4 other e-mails from Trae where he had 15:48
5 expressed concerns about Aperian or if he 15:48
6 had some compliance concerns about what 15:48
7 Aperian was doing? 15:48
8   A. Not that I'm aware of. 15:48
9   Q. Okay. You said you had -- 15:48
10 you -- you considered yourself a mentor 15:48
11 of Trae? 15:48
12   A. I did. 15:48
13   Q. And why is that? 15:48
14   A. Because Trae came to me about 15:48
15 how to grow in the organization, and I -- 15:48
16 I gave him his first several 15:49
17 opportunities and exposure. 15:49
18   Q. And I believe Mr. Battle asked 15:49
19 you some questions about had you had any 15:49
20 interactions with Trae. Do you recall 15:49
21 his questions? 15:49
22   A. I do. 15:49
23   Q. Did he ever have an occasion to 15:49

Page 175

1 come to you and ask you for advice or 15:49
2 make any other compliance concern about 15:49
3 any operations within the hospital? 15:49
4    MR. BATTLE: Object to form. 15:49
5   A. Trae would stop in, say hello. 15:49
6 As I said, my door was open. But never 15:49
7 specifically about compliance concerns. 15:49
8   Q. Did you ever ask him how things 15:49
9 were going or if he had any concerns 15:49
10 about what he was doing? 15:49
11    MR. BATTLE: Object to form. 15:49
12   A. Not in that manner. But we 15:49
13 would be around each other and have 15:49
14 conversation. And if he was concerned, I 15:49
15 would have certainly thought he would 15:49
16 have brought it up. 15:49
17   Q. And you -- you may not be 15:49
18 knowledgeable about this, but I think you 15:50
19 said you learned at some point in time 15:50
20 that he was having a relationship. I 15:50
21 believe her name was Imo Holstick? 15:50
22   A. Yes. 15:50
23   Q. Do you know what her position 15:50

Page 176

1 was? 15:50
2   A. I believe she was either a 15:50
3 coordinator or a manager for Lab 15:50
4 Outreach -- 15:50
5   Q. Okay. And -- 15:50
6   A. -- which reported to Trae. 15:50
7   Q. I was going to ask you that. So 15:50
8 in that role she would have reported 15:50
9 directly to Trae? 15:50
10   A. That's correct. 15:50
11   Q. And do you know -- I believe you 15:50
12 were asked this question -- when -- when 15:50
13 you started -- when you found out about 15:50
14 the relationship? 15:50
15   A. Uh-huh. I -- I don't recall 15:50
16 specifically when I found out about the 15:50
17 relationship. 15:50
18   Q. Do you have a recollection or a 15:50
19 judgment if it would have happened before 15:50
20 April 23rd, 2013? 15:50
21    MR. BATTLE: Object to form. 15:50
22   A. I do not. 15:50
23   Q. Okay. Do you recall -- what -- 15:50

Page 177

1 did Trae resign or was he terminated?    15:50
2 What do you recall about that?        15:50
3    A.  I recall he resigned.            15:50
4        MR. HOOVER:  That's all I have.  15:51
5        MR. BATTLE:  I don't have        15:52
6 anything else.  Thank you for your time.  15:52
7        THE WITNESS:  Thank you.        15:52
8        THE VIDEOGRAPHER:  We're going   15:52
9 off the record at 3:52.  This concludes  15:52
10 the deposition.                15:52
11                    15:52
12        END OF DEPOSITION
13        (3:50 p.m.)
14
15
16
17
18
19
20
21
22
23

1        C E R T I F I C A T E
2 STATE OF ALABAMA    )
3 COUNTY OF JEFFERSON )
4        I hereby certify that the above
5 and foregoing proceeding was taken down
6 by me by stenographic means, and that the
7 content herein was produced in transcript
8 form by computer aid under my
9 supervision, and that the foregoing
10 represents, to the best of my ability, a
11 true and correct transcript of the
12 proceedings occurring on said date at
13 said time.
14        I further certify that I am
15 neither of counsel nor of kin to the
16 parties to the action; nor am I in
17 anywise interested in the result of said
18 case.
19        /s/ Lane C. Butler
20        LANE C. BUTLER, RPR, CRR, CCR
21        CCR# 418 -- Expires 9/30/18
22        Commissioner, State of Alabama
23        My Commission Expires: 2/11/21