FILED

2018 Mar-20  PM 04:46
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES ex rel** | : | |
| | : | |
| **LEAMON M. FITE III**, | : | |
| | : | |
| | : | |
| *Relator-Plaintiff*, | : | |
| | : | **CIVIL ACTION NO.** |
| **v.** | : | **5:13-cv-1626-LSC** |
| | : | |
| **APERIAN LABORATORY SOLUTIONS** : | | |
| **LLC; EAST ALABAMA HEALTH** | : | |
| **CARE AUTHORITY d/b/a EAST** | : | |
| **ALABAMA MEDICAL CENTER;** | : | |
| **AND SUMMIT DIAGNOSTICS, LLC,** | : | |
| | : | |
| *Defendants*. | : | |

## MOTION FOR SUMMARY JUDGMENT OF
## RELATOR LEAMON M. FITE III

## Table of Contents

I.    Summary Judgment Standard ............................................................................1

II.    Statement of Undisputed Material Facts ........................................................1

A.    Aperian and EAMC entered into commission-based marketing arrangements with Compass, TDS, and Summit. .....................................................................1

    1. Summit referred samples to Aperian for commissions based on volume and value of referrals. ...........................................................................................4

    2. Compass and TDS referred samples to Aperian for commissions based on volume and value of referrals. .............................................................................6

    3. These commission-based commission relationships were designed to increase volume for Aperian, and did so effectively. ....................................................11

    4. Aperian recognized the law that prohibited their conduct. ...........................13

B.    HHS-OIG Guidance and the Colaborate Report Show Commission-Based Marketing Arrangements are Illegal. .....................................................................14

C.    Aperian and EAMC provided point-of-care testing cups for free to physicians and medical practices to induce the referral of tests. .............................................15

D.    HHS-OIG guidance and the Colaborate report confirm free point-of-care testing cups were illegal inducements. ..................................................................19

E.    These schemes were material to the payment of claims by Federal payors. .20

III.    Argument ...................................................................................................21

A.    The False Claims Act provides a civil remedy for violations of the Anti-Kickback Statute and the Stark Law. ....................................................................22

B.    HHS-OIG Prohibits Commission-Based Marketing Arrangements that Do Not Satisfy a Safe Harbor. .....................................................................................23

C.    HHS-OIG Determined that Point-of-Care Testing Cups are Inducements. ....27

D.    EAMC and Aperian knowingly violated the False Claims Act, Anti-Kickback Statute, and Stark law. .........................................................................29

IV.    Conclusion ................................................................................................30

## I.    Summary Judgment Standard

When movants show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," summary judgment is appropriate under Rule 56(a). A material fact "might affect the outcome of the case." *Urquilla–Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1049 (11th Cir. 2015); *United States ex rel. Salters v. Am. Family Care, Inc.*, 262 F. Supp. 3d 1266, 1272 (N.D. Ala. 2017) (Coogler, J.). Genuine disputes, when examining the record as a whole, "could lead a rational trier of fact to find for the nonmoving party." *Urquilla–Diaz*, 780 F.3d at 1049. This Court, then, must decide whether any genuine issues of material fact must go to trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Based on the undisputed facts and law below, summary judgment in Fite's favor is proper.

## II.    Statement of Undisputed Material Facts

These undisputed material facts show summary judgment in Fite's favor is proper against EAMC and Aperian on the following counts of the Second Amended Complaint: I, II, IV, and VII.

### A. *Aperian and EAMC entered into commission-based marketing arrangements with Compass, TDS, and Summit.*

1.    Defendant Aperian Laboratory Solutions, LLC (Aperian) is wholly-owned subsidiary of Defendant East Alabama Health Care Authority d/b/a East Alabama Medical Center (EAMC). Exh. A (Fite Dep.) 817: 5-7; Exh. B (Price Dep.) 20:10 to 22:9.

2.    Aperian provides laboratory services for drug testing done by healthcare providers. Exh. A 122:19 to 126:14.

3.    Ken Lott (EAMC vice president in charge of Aperian), Fite (Aperian Operations Director), Allen Valaer (Aperian Clinical Director), Dr. Jerry McHan (Aperian Medical Director), and Michele Hunter (Aperian Client Relations Manager) operated as a team to "build the business" at Aperian. Exh. C (M. Hunter Dep.) 35:15 to 36:3.

4.    Valaer spent 100% of his time at Aperian, while Fite spent 25% of his time at Aperian and 75% of his time at EAMC Lab Outreach. Exh. C 42:4 to 43:4.

5.    In addition to his role at Aperian, Fite also was the manager of Lab Outreach. Exh. A 67:9-10.

6.    Dr. Jerry McHan was the medical director of Aperian. Exh. D (McHan Dep.) 26:11-15.

7.    Lott, the vice president in charge, was the ultimate decisionmaker regarding the business of Aperian. Exh. C 45:8-17.

8.    Aperian has compliance policies which state "[p]ayments or other items of value . . . intended to induce or reward favorable decisions or actions are not to be offered, made, solicited, received, or tolerated in connection with" the business of EAMC. Exh. E (Nutter Dep.) 338:2-11 & Exh. 36.

9.     Aperian did not adequately educate key personnel regarding how to comply with laws preventing waste and abuse of Federal healthcare programs. Exh. C 45:18-22; Exh. F (Lott Dep.) 336:21 to 337:6 & Exh. 41.

10.    EAMC policies prohibit "[r]eceiving or making payments for any patient referrals" and "[o]ffering or giving gifts, money, services, or other items to influence purchasing decisions to any third party." Exh. E 338:12-16 & Exh. 36.

11.    Dr. McHan nevertheless offered cash and things of value to physicians to whom he pitched Aperian services. Exh. D 136:7 to 137:4 & Exh. 11.

12.    On May 9, 2008, McHan wrote to Aperian leadership he had a receptive meeting with employees and physicians at Gwinnett Pain, including stating "[s]ince I had such a receptive audience and since I knew that they were only testing a portion of their new patients, I decided to go for the gold." Exh. D 136:8-10.

13.    McHan offered Gwinnett Pain inducements to increase their testing volumes: a color printer if they referred 20 samples per month for testing; a $20,000 grant if they referred 100 samples per month for a year; and the cost of a new employee if they referred 150 samples per month for testing. Exh. D 136:11-23.

14.    Aperian provided Gwinnett Pain with cartridges for their color printer because they met the first incentive level. Exh. D 138:13-18.

15.     Though Lott received that email from McHan detailing the offers of things of value to induce more referrals, Lott did not believe it posed a compliance concern sufficient to report it to EAMC compliance. Exh. F 356:16-18.

16.     McHan also created incentives for Alabama-based clinics to increase their testing volume. Exh. D 140-43.

17.     To Dr. Yearwood in Daphne, McHan wrote Aperian "would like to give your practice an incentive to increase the volume of testing." Exh. D 140:20-22.

18.     As he did with Gwinnett Pain, McHan made offers of printers, cash, and leased employees to induce Yearwood to increase his volume of testing. Exh. D 140:20 to 142:17.

19.     McHan characterized offering inducements in exchange for increased volume of samples referred as "nothing unusual." Exh. D 142:17.

### 1. Summit referred samples to Aperian for commissions based on volume and value of referrals.

20.     Dr. McHan took the lead on communication with Summit. Exh. D 40:14 to 41:17.

21.     George Powell, the president of Summit, negotiated the contract directly with Dr. McHan. Exh. G (Powell Dep.) 84:15-17.

22.     "Dr. McHan brought us the pitch, so to speak, to work with Summit." Exh. C 58:1-2.

4

23.    Aperian "didn't have a sales force," so the Summit agreement provided "a contracted sales force that would work for us." Exh. C 60:7-9.

24.    Summit pitched to Aperian "[t]hat they could expand our reach, so to speak, to a national level, as far as bringing on clients." Exh. C 60:1-2.

25.    Summit's own contract referred to the services it provides as "referral services." Exh. G 53:22-24 & Exh. 2 ¶¶ 2, 6.1, 6.2.

26.    McHan wrote to Hunter and others that "the charge for Summit's gaining a client will range from fifteen to thirty percent of our reimbursement based on volume. I.e., the higher the volume, the higher the percentage." Exh. C 187:7-11 & Exhs. 14-15.

27.    The contract required Aperian to pay Summit "a base amount of 15% for all specimens received" from Summit clients. Exh. G 79:18-24 & Exh. 2.

28.    The contract also established a value-for-volume relationship, because Summit received a 20% commission if it referred up to 1000 samples per month; a 22% commission if it referred up to 1200 specimens per month; and a 28% commission if it referred more than 1201 specimens per month for testing by Aperian. Exh. G 80:9 to 81:4.

29.    Summit knew the value of its commissions changed based on the volume of specimens referred to Aperian for testing. Exh. G 88:1-3.

30.    Summit was paid commissions on claims reimbursed by both private insurers and Federal payors. Exh. G 52:12 to 53:2.

31.    Powell said the contracted referral agreement between Summit and Aperian was intended to have referring physicians "sign up with Aperian, and then they would refer the services to them." Exh. G 54:22 to 55:3.

32.    Summit began referring samples to Aperian for testing beginning in March 2009. Exh. H (Gill Dep.) 66:4 & Exh. 2.

33.    Summit was paid commissions on samples it to Aperian for testing until September 2015. Exh. H 66:4-5 & Exh. 2.

34.    Outside compliance auditor Kevin Hunter of Colaborate (now retained as an expert witness by Aperian) said in June 2012 that the Summit contract was not compliant with Federal law. Exh. I (K. Hunter Dep.) 242:1 to 243:22 & Exh. 5.

35.    This audit report was presented to management of EAMC and Aperian on or about June 13, 2012. Exh. I 207:17 to 208:2.

36.    Despite that knowledge, based on Hunter's own review, Aperian never attempted to change the terms of the Summit agreement. Exh. I 242:6-20.

### 2.  Compass and TDS referred samples to Aperian for commissions based on volume and value of referrals.

37.    Compass now operates a toxicology laboratory. Exh. J (Chapman Dep.) 26:13.

38.     Before the Compass laboratory was up and running, Compass marketing agents "were selling [physicians] a confirmation test that was performed by Aperian." Exh. J 74:11-13.

39.     TDS is a medical testing device sales company that also markets toxicology laboratory services. Exh. J 25-26.

40.     Defendant Chapman has an ownership interest in both companies. Exh. J 36:11-12; 42:6-11.

41.     Dr. Shelinder Aggarwal, a former defendant in this case, owned 50% of Compass. Exh. J 43:11-17.

42.     Fite informed executives at EAMC and Aperian that Aggarwal was a member of Compass, and dealing with that company could result in a violation of the Stark Law. Exh. A 196-98.

43.     "I felt like that Aggarwal overprescribing medicines was a big red flag. The fact that we knew he was an investor was a big red flag. I think the fact that we knew Jannie was partners with him was a big red flag. We had—we had gotten an e-mail from Peachtree billing a year or so prior about how Jannie's previous partner lab was billing unethically, in Peachtree's opinion." Exh. A 228:5-14.

44.     Chapman confirmed Aggarwal was known as an overprescriber and overutilizer: "He was the one killing our kids. He was the one prescribing the most, so he's the one we wanted testing." Exh. J 41:6-8.

45.    Aggarwal, Chapman, Compass, and TDS have entered into settlement agreements with Fite and the Government to resolve the claims pleaded against them. Exh. J 474:19-22; Dkt. 98, 99, 110, 122.

46.    This referral relationship began when Chapman cold-called Aperian and spoke with Michele Hunter. Exh. J 80:12 to 81:4; Exh. C 116:11-18.

47.    Three written contracts were signed between Aperian and Compass/TDS. Exh. J Exhs. 22, 33, 45.

48.    First, Aperian contracted to pay Compass a 25% commission for referral of specimens to Aperian from September 1, 2011 through March 1, 2012. Exh. J 223:11 to 224:3 & Exh. 22.

49.    That contract included all payors, including Government payors. Exh. B 122:2-18.

50.    Under the second contract, which was ostensibly from March 1, 2012 to December 1, 2012, the parties changed their contract from a percentage-based commission contract to a flat fee of $35,000 a month. Exh. J 94:11-14.

51.    The parties agreed that, if $35,000 a month was not enough to equate with the former percentage arrangement, the monthly amount would be increased. Exh. J 287:19 to 288:2 & Exh. 29.

52.    The change to a flat fee was made, in part, because Aperian was concerned that a percentage-based commission contract violated the Stark Law and AKS. Exh. A 420:16 to 421:3.

53.    Fite testified "when we were trying to change the Compass contract from a percentage reimbursement into a flat fee. . . . It was—my concern was is that there could be some compliance issues dealing with the Stark law, the anti-kickback statute, and—and referrals based on that percentage of reimbursement." Exh. A 188:20 to 189:7.

54.    Fite discussed those concerns with Roben Nutter, the compliance officer, and they brought a recommendation to change the contract to Lott. Exh. A 189:9-12.

55.    Chapman discussed those compliance concerns with Fite, Nutter, counsel for EAMC, and her own counsel via conference call. Exh. J 404:2-19.

56.    The lawyer for Compass acknowledged those concerns and wrote "I think a 'per click' compensation system would work for both parties if not for the anti-kickback laws that you think are applicable here." Exh. J at Exh. 44.

57.    Despite Fite and Nutter's concerns that these contracts violated the AKS, Lott insisted Aperian continue to receive referrals from Chapman and her entities, Compass and TDS: "We need to make this happen. . . . We're going to lose

Jannie's business. We need to—we need to push this thing forward." Exh. A 189:20 to 190:3.

58.     The parties, therefore, agreed to a second contract that ostensibly set a flat fee, but was designed to approximate the percentage commission structure that was in place during the first contract. Exh. J at Exh. 28.

59.     During the pendency of the flat fee contract, Chapman was updated that the flat fee payment was approximately the same amount as a 29% commission would have been. Exh. J 324:11 to 325:13 & Exh. 34.

60.     Payments during the time period where the second contract was ostensibly in effect were not, in fact a flat fee because the amount varied month-to-month. Exh. J 316:8-19.

61.     Aperian offered a contract where Compass would be paid a flat $40,000, but would receive a 25% commission on all samples above that amount. Exh. J 307:5-22, 380:17 to 381:3, & Exh. 31.

62.     The second contract, which purported to be effective on March 1, was not actually finalized and signed until months later, in November. Exh. J 318:19 to 319:10 & Exhs. 32, 33.

63.     Compass referred samples to Aperian when there was no written contract in place between the parties. Exh. J 421:11 to 422:1 & Exh. 50.

64.    The third contract was designed to exclude Federal payor referrals and commission payments. Exh. J at Exh. 45.

65.    Compass took no steps to actually exclude Federal payor samples, and took no steps to ensure that they were not paid on Federal payor samples. Exh. J 397:3 to 398:4.

66.    Chapman said "[t]here were probably some" Federal payor samples "that got sent" during the third contract period. Exh. J 396:18-19.

67.    Chapman testified that doctors wanted to have only one provider of lab testing, and not to segregate out Federal payor samples from private payor samples. Exh. J 389:16 to 390:15.

68.    During the pendency of the third contract, Compass was paid commissions from samples reimbursed by Federal payors. Exh. H 68:15-21 & Exh. 2; Exh. K (Lloyd Dep.) 85:3-9.

### 3. These commission-based commission relationships were designed to increase volume for Aperian, and did so effectively.

69.    The purpose of contracting with Compass and TDS was to increase the volume and get better reimbursement. Exh. C 176:23 to 177:4.

70.    Lott wanted to partner with marketing companies that could "drive volume" to Aperian. Exh. L (Valaer Dep.) at Exh. 14.

71.    Chapman initially pitched the volume of samples she could refer to entice Aperian. Exh. J 208:14-17.

11

72.     Chapman said, "We sent more volume than they'd ever been able to handle. They were doing 200 samples. We maximized everything they were doing. I mean, they were doing ten samples a day, if you take twenty day—twenty working days. We were probably doing more than that in a day." Exh. J 284:2-9.

73.     Chapman regularly got volume reports. Exh. C at Exh. 39.

74.     Aperian requested Chapman send more volume. Exh. J 428:16-21.

75.     The referrals from Chapman's companies exploded the volume of samples Aperian tested: "volume has become approximately three times what we had envisioned from this transition." Exh. C 177:12-13 & Exh. 10.

76.     The pain clinic samples referred to Aperian had the highest profit margin for Aperian, which is why Aperian paid more commissions on those samples. Exh. C 177:17 to 178:16.

77.     Similarly, the Summit contract was designed to increase volume for Aperian. Exh. G 57:7-8; Exh. L 152 & Exh. 12.

78.     Summit contractually required Aperian to send weekly volume updates for tracking purposes, but sometimes even sent those updates daily. Exh. G 78:13-19, 103:6-19.

79.     Former FBI agent and compliance officer Steve Brannan stated "the volume of the tests that were coming in and how that showed that what they were

doing was effective in increasing the volume, an effective way to grow the business and it was working." Exh. M (Brannan Dep.) 213:6-11.

### 4. Aperian recognized the law that prohibited their conduct.

80.     The Summit contract acknowledges Federal laws in paragraph 7.9, so the parties' conduct shows knowledge of the law. Exh. G 63:12-19 & Exh. 2.

81.     Powell was familiar with the AKS and Stark Law, and held training regarding compliance with Federal law. Exh. G 10-19, 32-37, 236-71.

82.     McHan testified that he was familiar with the basics of the Stark Law and AKS. Exh. D 16:10-16.

83.     McHan acknowledged that the EAMC standards of conduct applied to his work at Aperian, and that they addressed the False Claims Act, Stark Law, and AKS. Exh. D 165-68 & Exhs. 13-16.

84.     Lott testified that he and other management-level employees of EAMC and Aperian were required to perform compliance training that adequately informed them of the requirements of the AKS and the Stark Law. Exh. F 145:11 to 153:20.

85.     Price, the CFO, testified EAMC executives "have fairly regular, and I don't know what the timing is, maybe annually or every year or two, we'll have compliance updates for our medical—I mean, our staff that we go to that covers some hot topics of the day and that type of thing. So it's like a couple of hours or something that we all get together and, and have that education." Exh. B 18:13-20.

86.    Nutter, the compliance officer, testified that EAMC employees receive annual training regarding compliance with Medicare fraud and abuse laws, and Aperian employees would have had additional training opportunities available to them. Exh. E 24:22 to 25:9, 76:8-15.

87.    The claims for payment were submitted by Aperian on CMS Forms 1500 and contained express certifications signed by Aperian that Aperian complied with the AKS. Exh. F 344:12-17 & Exh. 43.

### B. HHS-OIG Guidance and the Colaborate Report Show Commission-Based Marketing Arrangements are Illegal.

88.    Fite contacted and hired an auditor, Colaborate, to conduct an audit regarding the business of Aperian. Exh. I 195:13-18; Exh. F 305-06.

89.    Kevin Hunter was the primary contact at Colaborate and completed his audit on or about June 13, 2012. Exh. I at Exh. 5.

90.    Kevin Hunter was aware of many HHS-OIG opinions that disfavored and disallowed commission-based marketing arrangements, including guidance viewing those arrangements as kickbacks. Exh. I 121-23, 131-32, 160.

91.    Hunter understood and agreed that every safe harbor characteristic must be met for a safe harbor to apply to commission-based marketing arrangements. Exh. I 277:1-6.

92.    The Colaborate audit report stated the commission-based referral contracts were not in compliance with the fraud and abuse laws:

> Colaborate reviewed the contracted sales agreement with both Summit Diagnostics and Total Diagnostic Solutions, the Summit Diagnostics and Compass contracts should be revised; a good rule of thumb is not to enter into any relationships that pay commission-based on Medicare revenue. . . . Lastly when reviewing this agreement Aperian should ask for some stronger performance requirements and require that all sales people sign a compliance agreement form that clearly outlines legal and regulatory agreement.

Exh. I at Exh. 5.

93.    Relator presented that report to his superiors at a board meeting. Exh. F 308:17 to 309:2.

94.    Despite all of that, Lott testified he had never reviewed any HHS special fraud alerts, OIG opinions, or other compliance documents that would have been relevant to the business areas over which he was vice president. Exh. F 368-72.

95.    The changes Colaborate recommended were not fully implemented during Fite's time at Aperian. Exh. I 190-94; Exh. A 296:18 to 297:16

### C. Aperian and EAMC provided point-of-care testing cups for free to physicians and medical practices to induce the referral of tests.

96.    Fite was not involved in negotiating the Summit contract with Summit president George Powell. Exh. G 50:11-15.

97.    Under that contract, Summit agreed "to arrange for its customers to refer laboratory tests to Aperian." Exh. G 52:9-10.

98.    Aperian agreed in its contract with Summit to provide free Noble Split Specimen Cups® to physicians. Exh. G 67:16 to 77:2 & Exh. 2.

15

99.    McHan and Valaer explored other point-of-care testing cup companies, but decided to stick with Noble: "we actually looked around to see if someone else had a cup that could have served it, and we can't find anything better or pricier, better price. So we didn't."  Exh. D 155:4-8.

100.   These "Noble cups," as they are commonly known, both collect samples and serve as rapid drug screen cups. Exh. G at 67:16 to 77:2.

101.   This function is important because the cup itself may be used for collection purposes, but when combined with the unique strip technology of a Noble cup—which is in the broad category known as "point-of-care testing cups"—a physician may obtain a rapid result for testing because of the strip technology of the Noble cup. Exh. G 67:16 to 77:2; Exh. G Exhs. 3-6, 27.

102.   Doctors who received the Noble cups were able to drug screen patients in their offices and "the physicians were using those to get the rapid results point of care results." Exh. C 67:20-22, 223:6-21.

103.   Those test results could be billed. Exh. G 223:23-25.

104.   Noble cups were provided by Aperian as a prerequisite to obtain referral business from physicians and practice groups. Exh. D at 51:17-21.

105.   "[T]he agreement that we had with Summit was this: That their clients—in order to get a client, that client had to have these Noble cups, was the

name we used. And the only way to get that client was to provide those cups. That was it." Exh. D 55:2-6.

106.   "We had to provide Noble cups to Summit clients." Exh. C 67:3-4.

107.   Noble cups have a monetary value. Exh. G 215:16-18.

108.   Noble cups sold for between $7.22 (for a 10-panel cup) and $9.20 (for a 12-panel cup). Exh. C 207:7-12 & Exhs. 22, 32, 34.

109.   Aperian bought Noble cups in cases of 25 cups per case and provided cups, shipping, and supplies to referring physicians. Exh. C 208:8 to 209:1; Exh. G at Exh. 37.

110.   Chapman's company, TDS, "sold point of care cups. We sold them. We charged for them." Exh. J 70:9-11.

111.   Michele Hunter and Chapman both view free Noble cups as inducements. Exh. C 155:7 to 156:16; Exh. J 98:18 to 99:22.

112.   Physicians who billed for point-of-care test results referred tests to Aperian, who then billed Federal payors for the referred samples. Exh. C 68:17 to 69:16.

113.   Aperian was informed that Nashville Pain physicians were "using Aperian cups and billing for screenings." Exh. C 219:1-19 & Exh. 25.

114.   Aperian knew Aggarwal billed for testing he performed using rapid screen cups in 2011. Exh. J 175:10-20 & Exh. 13.

17

115.   Until Summit required Aperian and EAMC to provide free point-of-care rapid screen cups to referring physicians, Aperian and EAMC did not provide those cups for free. Exh. C 77:12-16.

116.   Aperian expected a test to be referred for each cup sent to each physician who received a cup. Exh. C 73:4-13.

117.   Aperian tracked those numbers closely, and Hunter reported those at monthly Aperian Board meetings. Exh. C 73:17 to 74:6; Exh. C Exhs. 19, 30.

118.   Summit was informed of the rate of return on these expenditures by Aperian. Exh. G Exh. 31.

119.   Aperian informed Summit that a return rate of less than 80% was unacceptable. Exh. G 224:19-21.

120.   Aperian informed Summit that a referral source who did not result in financial gain to Aperian would be cut off: "We can't continue to ship cups at this rate of return." Exh. G 222:17 to 224:23 & Exh. 31.

121.   Physicians switched their lab testing to Aperian based on Noble cups being provided. Exh. G 230:1-24 & Exh. 33.

122.   Aperian provided cups to Summit-affiliated doctors in December 2014. Exh. L 110:8 to 111:14; Exh. G at Exh. 39.

123.   Aperian continued to provide free cups to Summit-affiliated doctors in June 2014. Exh. N (Green Dep.) at Exhs. 8, 9.

124.    One Aperian client, Dr. Raquib in Winfield, Alabama, referred so many samples that the CEO of EAMC, Terry Andrus, is recalled saying: "Well, he must be testing the whole town of Winfield if he's sending that kind of volume." Exh. F 180:16-22.

### D. HHS-OIG guidance and the Colaborate report confirm free point-of-care testing cups were illegal inducements.

125.    Powell stated that Summit would not have made free cups available itself. Powell testified "I have a compliance background. I have seen laboratories go down. And I was part of the Quest training when they first brought their Stark/anti-kickback. And I spent two weeks in Teterboro, New Jersey. And that's enough to make you realize what you have to do." Exh. G 201:12-17.

126.    Powell would have been concerned that providing CLIA-waived point-of-care testing cups to physicians was an inducement. Exh. G 202:1-3.

127.    No one at Aperian informed Powell that Colaborate determined that providing Noble cups to physicians for free could be viewed as an inducement, but he would have wanted to know that determination. Exh. G 255:20 to 256:16.

128.    No one at Aperian informed Dr. McHan that Colaborate determined providing Noble cups to physicians for free could be viewed as an inducement. Exh. D 155:15-20.

129. Chapman testified it was known in the point-of-care testing cup industry since 2005 that marketing companies and labs could not provide free cups to physicians because those were inducements. Exh. J 98:18 to 99:10.

130. "From our point of view, we're in—we—we provided a point of care cup to the physicians because they were billing for it. We cannot give anything that has a monetary value to a physician that they are billing for, is my understanding of that." Exh. J 99:16-22.

### E. These schemes were material to the payment of claims by Federal payors.

131. Lott testified that Aperian should not have been paid for tests billed to Federal payors if they did not obtain that business legally. Exh. F 396:14-20.

132. Lott testified that overutilization of Federal healthcare resources was a bad thing, and that it was important for Aperian to determine that it was not contributing to overutilization. Exh. F 182:17 to 184:7.

133. Lott testified Federal payors "should not have been billed for" any sample that had aged so long that its reliability was effected. Exh. F 342:3-7.

134. Samples, particularly those referred by Compass, aged for more than a month, where they were kept in a closet near a storage room and tested on days when Aperian's lab needed more volume. Exh. C 124-27.

135.   Hunter smelled those aged samples from her work area, and some sample cups spontaneously burst at Aperian's lab, spilling urine. Exh. C 127:20-21; Exh. J 433-34.

136.   Lott testified that compliance with Federal law, including the Stark Law and AKS, was important. Exh. F 345-46.

137.   Lott concedes Federal payors should not pay claims Aperian submitted if they violated the Stark Law or AKS. Exh. F 345:19 to 346:3.

## III.   Argument

Fite seeks summary judgment against Defendants EAMC and Aperian because the undisputed material facts above can be applied to clear law. There are numerous significant statutes, agency guidance, and cases that could apply to this case. But, at bottom, this much is clear: EAMC and Aperian induced doctors and physician practice groups to use their services, they intended to induce that result, and they were successful in inducing referrals of testing. The first scheme they used to induce the referral of laboratory testing was through the use of commission-based marketing agreements, which are illegal unless they satisfy every element of a known safe harbor. The second scheme they used to induce the referral of lab testing was by offering and providing Noble cups as inducements to providers who referred samples for testing—which was a contractual requirement between Aperian and

Summit. After a brief discussion of the pertinent statutory provisions at issue, we address each of those three schemes in turn below.

### A. *The False Claims Act provides a civil remedy for violations of the Anti-Kickback Statute and the Stark Law.*

The False Claims Act prohibits the actions of EAMC, Aperian, and Summit in this case and confers liability for damages, penalties, and other relief, including exclusion from participation in Federal healthcare programs, against violators. 31 U.S.C. § 3729(a). The AKS prohibits offering or paying kickbacks in any form, regardless of whether the particular kickback gave rise to overutilization or poor quality of care. 42 U.S.C. § 1320a-7b(b). The AKS provides civil remedies and criminal penalties for violations. *Id*. As of March 23, 2010, "a claim that includes items or services resulting from" any violation of the AKS "constitutes a false or fraudulent claim" as a matter of law. 42 U.S.C. § 1320a–7b(g)

The Stark Law bars physicians from referring Federal healthcare beneficiaries who need "designated health services" to an entity with which he has a "financial relationship" unless an exception applies. 42 U.S.C. § 1395nn. Entities who submit those prohibited claims violate the law. 42 U.S.C. § 1395(a)(1)(B). Violators are subject to civil remedies. 42 U.S.C. § 1395nn(g); 42 CFR § 1003.100 (b)(viii).

**B. HHS-OIG Prohibits Commission-Based Marketing Arrangements that Do Not Satisfy a Safe Harbor.**

Courts addressing False Claims Act cases regularly consider HHS guidance. *Jones-McNamara v. Holzer Health Sys.*, No. 15-3070, 2015 WL 6685302, at *6 (6th Cir. Nov. 2, 2015) ("While not binding, the [HHS-OIG] has offered further guidance on the meaning of 'remuneration' and 'induce.'"); *see also United States v. Quest Diagnostics Inc.*, 734 F.3d 154, 160 (2d Cir. 2013*); Klaczak v. Consol. Med. Transp.*, 458 F. Supp. 2d 622, 630-31 (N.D. Ill. 2006); *United States ex rel. Osheroff v. Humana, Inc.*, No. 10-24486-CV, 2012 WL 4479072, at *2 (S.D. Fla. Sept. 28, 2012) *aff'd*, 776 F.3d 805 (11th Cir. 2015). Indeed, this Court determined at the motion to dismiss stage that the pleaded commission-based marketing arrangements were violations of the AKS. Dkt. 79 at 14 ("This agreement falls within the AKS's prohibitions—receiving a cash remuneration in return for referring testing payable under a federal health care program—and Defendants offer no law interpreting the AKS as excluding these types of arrangements.").

Beginning in 1998, HHS-OIG has made healthcare companies aware that "suspect characteristics" of a commission-based marketing agreement included, but were not limited to the following characteristics:

- compensation based on percentage of sales;
- direct billing of a Federal health care program by the Seller for the item or service sold by the sales agent;

- direct contact between the sales agent and physicians in a position to order items or services that are then paid for by a Federal health care program;
- direct contact between the sales agent and Federal health care program beneficiaries;
- use of sales agents who are health care professionals or persons in a similar position to exert undue influence on purchasers or patients; or
- marketing of items or services that are separately reimbursable by a Federal health care program (e.g., items or services not bundled with other items or services covered by a DRG payment), whether on the basis of charges or costs.

HHS-OIG Advisory Request 98-10 (Aug. 31, 1998). The list above was "illustrative, not exhaustive, and the absence of any of these factors certainly does not mean that a sales arrangement is permissible under the anti-kickback statute." Id. It stated that these suspect characteristics were cumulative, and "the more factors that are present, the greater the scrutiny we ordinarily will give an arrangement." *Id*.

Advisory Request 98-10 was circulated by email during negotiations of the second Compass contract. The relevant decisionmakers for Aperian and for Compass were well aware that the first characteristic was met, because they openly agreed to compensate Compass based on a percentage of the tests Aperian performed. Aperian directly billed the Federal payors for the testing referred by Compass and TDS. Compass and TDS "sales agents" made direct contact with the physicians that ordered laboratory testing from Aperian. Exh. J 61:3-11.

As Advisory Request 98-10 stated, "[o]f course, in all cases the statute is not violated unless the parties have the requisite intent to induce referrals." *Id*. at 4. Here,

the evidence is clear the intent of this contract and conduct was to induce referrals. This conduct did, in fact, induce referrals which dramatically increased the claims billed to Federal payors.

More than twenty years ago a Federal district court determined this specific type of commission-based marketing scheme was a criminal violation of the AKS. *Modern Med. Labs., Inc. v. Smith-Kline Beecham Clinical Labs., Inc*., No. 92 C 5302, 1994 WL 449281, at *3 (N.D. Ill. Aug. 17, 1994)) (section 1320a-7b(2) "reaches activity whereby one entity receives remuneration for essentially taking the physician's 'order' for laboratory tests and arranging for another entity to perform the work"). HHS-OIG has stated that "'[p]er patient,' 'per click,' 'per order,' and similar payment arrangements with parties in a position, directly or indirectly, to refer or recommend an item or service payable by a federal health care program are disfavored under the anti-kickback statute." OIG Advisory Opinion No. 03-8 (Apr. 10, 2003) *at* http://oig.hhs.gov/fraud/docs/advisoryopinions/2003/ao0308.pdf. Further, "[w]here remuneration is paid purposefully to induce or reward referrals of items or services payable by a Federal health care program, the anti-kickback statute is violated. By its terms, the statute ascribes criminal liability ***to parties on both sides of an impermissible 'kickback' transaction.***" OIG Advisory Op. No. 10-23 (Nov. 4, 2010) *at* http://oig.hhs.gov/fraud/docs/advisoryopinions/2010/AdvOpn10-23.pdf (emphasis added). "The statute has been interpreted to cover any arrangement where

one purpose of the remuneration was to obtain money for the referral of services or to induce further referrals." *Id.* (citing *United States v. Kats*, 871 F.2d 105 (9th Cir. 1989); *United States v. Greber*, 760 F.2d 68 (3d Cir. 1985), *cert. denied*, 474 U.S. 988 (1985)).

HHS considered, and rejected, options that would have reconsidered these sales agent arrangements. *Med. Development Network, Inc. v. Prof'l Respiratory Care/Home Medical Equip. Servs., Inc.*, 673 So. 2d 565, 567 (Fla. 4th DCA. 1996). Further, Aperian and EAMC did not satisfy the safe harbor provisions that could have saved these agreements. Safe harbor provisions require 100% compliance, not substantial compliance. *Nursing Home Consultants, Inc. v. Quantum Health Servs., Inc.*, 926 F. Supp. 835, 844 & n.21 (E.D. Ark. 1996), *aff'd*, 112 F.3d 513 (8th Cir. 1997). As such, the commission-based marketing agreements are not protected.

Many courts have determined that commission-based marketing agreements violate the statutes at issue in this case. *MedPricer.com, Inc. v. Becton, Dixon & Co.*, 240 F. Supp. 3d 263, 270 (D. Conn. 2017), *adhered to on reconsideration*, No. 3:13-CV-1545 (MPS), 2017 WL 1234102 (D. Conn. Apr. 3, 2017); *Nursing Home Consultants, Inc. v. Quantum Health Servs., Inc.*, 926 F. Supp. 835, 844 (E.D. Ark. 1996), *aff'd*, 112 F.3d 513 (8th Cir. 1997); *Zimmer, Inc. v. Nu Tech Med., Inc.*, 54 F. Supp. 2d 850, 861-62 (N.D. Ind. 1999); *United States ex rel. Bane v. Breathe Easy Pulmonary Servs., Inc.*, No. 806-CV-40-T-24MAP, 2007 WL 4885468, at *8 (M.D.

26

Fla. Nov. 30, 2007), *report and recommendation adopted in part*, No. 806-CV-40-T-24 MAP, 2008 WL 343158 (M.D. Fla. Feb. 5, 2008); *Med. Dev. Network, Inc. v. Prof'l Respiratory Care/Home Med. Equip. Servs., Inc.*, 673 So. 2d 565, 567 (Fla. 4th DCA 1996).

### C. HHS-OIG Determined that Point-of-Care Testing Cups are Inducements.

This Court has written "[t]he AKS prohibits the offering or receipt of any remuneration in return for providing a referral for the furnishing of a service for which payment may be made under a federal health care program. 42 U.S.C. § 1320a-7b(b). Section 1320a-7a, which allows for civil penalties for AKS violations, provides a definition of 'remuneration' as including 'transfers of items or services for free or for other than fair market value.' 42 U.S.C. § 1320a-7a(i)(6). In other words, the AKS imposes civil penalties for the offer, payment, or receipt of free services or items to induce someone to provide a referral . . . ." Dkt. 79 at 15.

A HHS-OIG Special Fraud Alert squarely addressed this practice. "How does the Anti-Kickback Statute Relate to Arrangements for the Provision of Clinical Lab Services?" Doc. 39-3 at 11; 59 Fed. Reg. 65372, 65722 (Dec. 19, 1994). According HHS-OIG, "[w]henever a laboratory offers or gives to a source of referrals anything of value not paid for at fair market value, the inference may be made that the thing of value is offered to induce the referral of business. The same is true whenever a referral source solicits or receives anything of value from the laboratory." *Id.*

HHS-OIG does not want doctors' decisions tainted by inducements because "[t]he quality, timeliness and cost of these services are of obvious concern to Medicare and Medicaid patients and the programs that finance their health care services. Since the physician, and not the patient, generally selects the clinical laboratory, it is essential that the physician's decision regarding where to refer specimens is based only on the bests interests of the patient." *Id.*

This practice also has been addressed by a Special Fraud Alert, "Arrangements for the Provision of Clinical Lab Services," 59 Fed. Reg. 65372, 65377 (Dec. 19, 1994) and the court proceeding *In re: Petition for Declaratory Statement of Dominion Diagnostics, LLC* (2008). The Florida Healthcare Agency stated in *Dominion Diagnostics* that HHS "has explained that when a laboratory gives an item or service for free to a referral source, an inference may arise that the item is offered to induce the referral business." *In Re: Petition for Declaratory Statement of Dominion Diagnostics, LLC.,* FRAES No. 200800828 (Fla. Agency for Health Care Admin., July 8, 2008) The agency noted, however, that HHS "has explained that when a laboratory gives an item or service for free to a referral source, an inference may arise that the item is offered to induce the referral of business."

This professional guidance is supported by caselaw from the Middle District of Florida, which held that lab operators providing free point-of-care testing cups to doctors may constitute violations of the Stark Law and AKS, even though the lab

argued the cups were used solely to collect, transport and store the specimens. *Ameritox,* 20 F. Supp. 3d at 1354-56, *vacated and remanded on other grounds*, 803 F.3d 518 (11th Cir. 2015). Six weeks after *Ameritox* was decided in the Middle District of Florida, HHS-OIG issued another Special Fraud Alert reiterating that violations of the AKS and False Claims Act occur when remuneration is paid from laboratories to referring physicians. HHS-OIG, *Special Fraud Alert: Laboratory Payments to Referring Physicians*, 79 Fed. Reg. 40115 (July 11, 2014). HHS-OIG specifically addressed providing free point of care testing cups, like the Noble cup at issue here, and how providing free cups violates the AKS. *Id.* at n.5. ("The same principles described in this Special Fraud Alert apply to arrangements that are similar or analogous to Specimen Processing Arrangements, including arrangements under which clinical laboratories . . . provide free or below-market point of care testing cups to health care providers who use the cups to perform billable in-office testing").

### D. EAMC and Aperian knowingly violated the False Claims Act, Anti-Kickback Statute, and Stark law.

Under the False Claims Act, the mental state of the Defendants' knowledge can be proven by evidence that defendants "act[ed] in deliberate ignorance of the truth or falsity of the information," or "act[ed] in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(ii) & (iii). That evidence is present here. Among other things Lott was deliberately ignorant of several

29

significant instances that could have raised—and indeed did raise—legitimate compliance concerns within Aperian and EAMC compliance.

Compliance with the AKS is a condition of payment by the Medicare program. *McNutt*, 423 F.3d at 1259. A claim for payment that is tainted by a violation of the AKS "constitutes a false or fraudulent claim for purposes of" the False Claims Act. *United States ex rel. Lisitza v. Johnson & Johnson*, 765 F. Supp. 2d 112, 127 & n.25 (D. Mass 2011); *see also United States v. Rogan,* 517 F.3d 449, 452 (7th Cir. 2008); *McNutt,* 423 F.3d at 1259; *United States ex rel. Schmidt v. Zimmer, Inc.,* 386 F.3d 235, 243 (3d Cir. 2004); *United States ex rel. Fry v. The Health Alliance,* 2008 WL 5282139, at *12 (S.D. Ohio Dec. 18, 2008); *United States ex rel. Bidani v. Lewis,* 264 F. Supp. 2d 612, 616 (N.D. Ill. 2003). The requisite intent is the intent to induce referrals—not a specific intent to violate the statute. *Zimmer, Inc.*, 54 F. Supp. 2d at 862–63.

## IV.   Conclusion

Summary judgment should be granted in Fite's favor on the following on the following counts of the Second Amended Complaint: I, II, IV, and VII.

Respectfully submitted,

*/s/ Adam P. Plant*
Robert E. Battle (ASB-7807-T67R)
Adam P. Plant (ASB-6324-A64P)
**BATTLE & WINN, LLP**
2901 Second Avenue South, Suite 220
Birmingham, Alabama 35233
Tel: (205) 397-8160
Fax: (205) 397-8179

*/s/Don McKenna*
Scott A. Powell (ASB-7523-L60S)
Don McKenna (ASB-6494-C66D)
**HARE, WYNN, NEWELL & NEWTON, LLP**
The Massey Bldg., Suite 800
2025 Third Avenue North
Birmingham, AL 35203
Tel: (205) 328-5330
Fax: (205) 324-2165

**Attorneys for Relator Leamon M. Fite III**

## <u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on March 20, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Joyce White Vance, US Attorney usaaln.ecfusa@usdoj.gov
Erin Massey Everitt erin.everitt@usdoj.gov
Lane H. Woodke lane.woodke@usdoj.gov
Don Long Don.Long2@usdoj.gov
James A. Hoover jhoover@burr.com
S. Greg Burge gburge@burr.com
Kelli C. Flemming kflemming@burr.com
Benjamin B. Coulter bcoulter@burr.com
Daniel J. Martin danielmartin@joneswalker.com
Timothy P. Burkhard tburkhard@thehlp.com
Adrienne D. Dresevic adresevic@thehlp.com
Sara M. Turner smturner@bakerdonelson.com


/s/Adam P. Plant          
***Attorney for Relator***